## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Joint Administration Requested) |
|  | **Objection Deadline: To be determined** |
|  | **Hearing Date: To be determined[2]** |

## MOTION OF MOHAMMAD HONARKAR AND 4G WIRELESS, INC. FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)

Mohammad Honarkar and 4G Wireless, Inc. ("**4G**" and together with Mr. Honarkar, the "**Movants**"), by and through their undersigned counsel, hereby move (this "**Motion**") for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, in the above-captioned cases (collectively, the "**Chapter 11 Cases**") directing the appointment of a chapter 11 trustee for each of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") pursuant to 11 U.S.C. § 1104(a). In support of this Motion, the Movants respectfully state as follows:

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2] Substantially contemporaneously with the filing of this Motion, the Movants have filed, or will file, the *Motion to Shorten the Notice Period for the Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a).*

## INTRODUCTION

1.      A chapter 11 trustee should and must be appointed in these Chapter 11 Cases due to the appalling fraud, self-dealing, and gross mismanagement of the Debtors perpetrated by the Continuum Parties[3] – which are comprised of the Debtors' direct and indirect majority members, managers, and consultants responsible for asset management (Continuum Analytics, Inc. ("**Continuum**")), and their affiliates. Put simply, the Movants lack faith in the Debtors' former leadership, in their current leadership that was selected and appointed by the Continuum Parties, and in the direction of these Chapter 11 Cases under such leadership. A truly independent fiduciary is needed to administer the Debtors' estates.

2.      Most motions for the appointment of a chapter 11 trustee begin with these same alarming allegations. However, in this case, these are not allegations; they are factual and legal findings by a JAMS-appointed arbitrator who is a now-retired former Associate Justice of the California Court of Appeal (Hon. David Thompson).[4] The facts have been established and support the only logical outcome under the circumstances: the appointment of an independent chapter 11 trustee.

3.      The MOM Debtors[5] were created in June 2021 as part of a joint business venture between the Movants and the Continuum Parties. Mr. Honarkar intended for this joint venture to

---

[3] As used herein, the term "Continuum Parties" shall refer, collectively, to Mahender Makhijani, Deba Shyam, Jason Miller, Andrew Stupin, Bhajneet Singh Malik, Continuum Analytics, Inc., MOM CA Investor Group LLC, MOM AS Investor Group LLC, MOM BS Investor Group LLC, MOM CA Manager LLC, and MOM AS Manager LLC.

[4] In the *Declaration of Mark Shinderman in Support of Petitions and First Day Motions* filed on March 11, 2025 at Docket No. 11 (the "**Shinderman Declaration**"), Mark Shinderman, the Debtors' recently-appointed chief restructuring officer ("**CRO**"), provides only a cursory and superficial discussion of the arbitration. The stated reason for this is a mistaken belief as to the confidentiality of the arbitration. (Shinderman Decl. ¶ 53.) As discussed herein, the arbitrator made multiple specific findings that showcase the fraud and other misconduct committed by the Continuum Parties against both the Movants and the Debtors.

[5] As used herein, the term "MOM Debtors" shall refer, collectively, to Debtors MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC.

resolve the financial issues that he faced as a result of the COVID-19 pandemic and the dissolution

of his marriage. As part of their contribution to the joint venture, the Movants transferred to the

newly-formed MOM Debtors their membership interests in various limited liability companies,

including nearly all of SPE Debtors,[6] which own valuable real estate. Mr. Honarkar had amassed

this real estate as part of a larger portfolio formed through decades of hard work following his

immigration to the United States.

4.       However, per the findings and conclusions issued in the arbitration commenced by

the Movants against certain of the Continuum Parties and others,[7] the Continuum Parties never

intended to do business honestly with the Movants.  Indeed, as the arbitrator found after extensive

discovery, a three week evidentiary hearing, and pre- and post-hearing briefing, the Continuum

Parties fraudulently induced Mr. Honarkar and 4G into the joint venture, never provided the

required initial capital contribution that was critical to the terms of the deal between the parties,

and then repeatedly breached their contractual and fiduciary obligations in their management of

the joint venture. The Continuum Parties' mismanagement includes, but is not limited to:

- encumbering the assets of the Debtors through unauthorized loans, including a $20 million loan that was secured by properties held by certain of the SPE Debtors at a time when those SPE Debtors were owned entirely by the Movants—all without informing the Movants of the loan;

---

[6] As used herein, the term "SPE Debtors" shall refer, collectively, to Debtors Aryabhata Group LLC, 694 NCH Apartments, LLC, 777 at Laguna, LLC, 891 Laguna Canyon Road, LLC, Cliff Drive Properties DE, LLC, Duplex at Sleepy Hollow, LLC, Heisler Laguna, LLC, Hotel Laguna, LLC, Laguna Art District Complex, LLC, Laguna Festival Center, LLC, Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Tesoro Redlands DE, LLC, 4110 West 3rd Street DE, LLC, 314 S. Harvard DE, LLC, Laguna HI, LLC, Laguna HW, LLC, The Masters Building, LLC, and 837 Park Avenue, LLC. The only SPE Debtor not contributed by the Movants at the formation of the joint venture is Aryabhata Group LLC ("**Aryabhata**"), which was formed during the joint venture.

[7] A true and correct copy of the *Partial Interim Award* issued in the Arbitration (as defined herein) on February 21, 2025 (the "**Arbitration Award**") is attached as Exhibit 1 to the Declaration of Mohammad Honarkar (the "**Honarkar Declaration**") filed contemporaneously with this Motion.

- selling interests in real property owned by the SPE Debtors and funneling the proceeds of those sales to the Continuum Parties, rather than the joint venture;

- allowing deeds of trust to remain recorded against the Debtors' assets despite the loans secured by those deeds of trust never funding;

- leveraging the Debtors and causing them to enter into "contribution agreements" that empowered the Continuum Parties, in their sole discretion, to determine whether the millions of dollars purportedly provided to the joint venture constituted a capital contribution or a loan—a practice that the arbitrator called, "Heads I win; tails you lose";

- failing to maintain adequate books and records for the Debtors; and

- allowing the Debtors to default on their mortgage obligations, resulting in trustee's sales being scheduled for multiple properties.[8]

5.    Once Mr. Honarkar uncovered the Continuum Parties' fraud and mismanagement, he promptly acted to protect his rights and interests by seeking access to the Debtors' books and records in state court and commencing the arbitration. The Continuum Parties responded by retaliating against Mr. Honarkar – including threatening physical harm and taking action against his family – and by providing false testimony and evidence in the arbitration in an attempt to hide their schemes. However, the arbitrator saw through the Continuum Parties and issued an award in the Movants' favor on nearly all of the claims asserted in the arbitration. The arbitrator also denied all of the Continuum Parties' asserted claims against Mr. Honarkar.

6.    Within the week after the arbitrator issued the award, the Continuum Parties unilaterally appointed a new CRO for the Debtors and caused the MOM Debtors to file for

---

[8] In his declaration, the CRO claims that Mr. Honarkar appears to be at least partly to blame for the Debtors' bankruptcy filings due to his "admitted diversion of rents from [the SPE Debtors]." (Shinderman Decl. ¶ 61.) However, as discussed herein, the arbitrator found that the Continuum Parties failed to prove their conversion claims against Mr. Honarkar (or any other of their asserted claims), and it was, in fact, the Continuum Parties' misconduct and gross mismanagement of the Debtors that necessitated these Chapter 11 Cases. In discussions between the CRO and the Movants after the filing of the Shinderman Declaration, the CRO acknowledged that this (false) statement about Mr. Honarkar's supposed diversion of rents was not intended to be, and should not have been, included in his declaration.

bankruptcy. After the MOM Debtors' filings, the Continuum Parties then unilaterally appointed a new independent manager. The SPE Debtors' bankruptcy filings, which were clearly orchestrated by the Continuum Parties, followed shortly thereafter.

7.      The Continuum Parties did not consult the Movants or obtain their approval in appointing the CRO or the independent manager, and the Movants had no prior knowledge of these appointments. The Movants also question whether the applicable operating agreements even gave the Continuum Parties the right to appoint the independent manager. Regardless, both the CRO and independent manager are hopelessly conflicted given that they were selected and appointed by the untrustworthy Continuum Parties.

8.      The Continuum Parties' deception and self-dealing knows no bounds. Their actions caused the Movants to lose any faith in the Continuum Parties that the Movants once had, and in any agents or officers handpicked by the Continuum Parties to manage and operate the Debtors.

9.      Accordingly, ample cause exists for the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a)(1). A chapter 11 trustee is also in the best interests of the Debtors' estates, creditors, and equity holders and, therefore, warranted pursuant to 11 U.S.C. § 1104(a)(2). In short, the only appropriate path forward in these Chapter 11 Cases is the appointment of a truly independent estate fiduciary untainted by any of the Continuum Parties' prepetition fraud, mismanagement, and other misconduct: a chapter 11 trustee.

## JURISDICTION AND VENUE

10.      The United States Bankruptcy Court for the District of Delaware (this "**Court**") has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

11.     In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Procedure for the District of Delaware, the Movants hereby consent to entry of a final order if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

12.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory basis for this Motion is 11 U.S.C. § 1104(a).

## BACKGROUND

**A.      The Debtors' Ownership Structure and Relationship with the Movants.**

15.     As discussed in more detail further below, and as discussed in the Arbitration Award and in the Movants' pre-hearing brief in the Arbitration,[9] each of the MOM Debtors was formed on June 8, 2021 as part of a joint venture between the Movants and Continuum. (*See* Ex. 1 (Arb. Award) at 5-11; Ex. 2 (Pre-Trial Br.) at 11-14.)[10]

16.     The MOM Debtors hold all of the membership interests in the SPE Debtors, which, in turn, hold title to various real properties located in California. As discussed further herein, the membership interests in all of the SPE Debtors, other than Aryabhata (which did not exist at the time the joint venture was formed), were previously held by and transferred by the Movants to the MOM Debtors upon the formation of the joint venture.

---

[9] A true and correct copy of the *Claimants' Pre-Hearing Brief* submitted by the Movants in the Arbitration on June 20, 2024 (the "**Pre-Trial Brief**") is attached as Exhibit 2 to the Honarkar Declaration.

[10] Citations to "Ex." refer to the exhibits to the Honarkar Declaration.

17.     Movant 4G, a California corporation wholly owned and controlled by Mr. Honarkar, holds 50% of the membership interests in each of the MOM Debtors.[11] (Honarkar Decl. ¶ 2.) From the MOM Debtors' formation until March 29, 2023, Mr. Honarkar was also the administrative manager of the MOM Debtors. (Ex. 1 (Arb. Award) at 10, 14; Ex. 2 (Pre-Trial Br.) at 15, 19.)

18.     The remaining membership interests in Debtors MOM CA Investco LLC ("**Debtor MOM CA**"), MOM AS Investco LLC ("**Debtor MOM AS**"), and MOM BS Investco LLC ("**Debtor MOM BS**") are held, respectively, by MOM CA Investor Group LLC ("**MOM CA Member**"), MOM AS Investor Group LLC ("**MOM AS Member**"), and MOM BS Investor Group LLC ("**MOM BS Member**" and together with MOM CA Member and MOM AS Member, the "**MOM Members**").

19.     MOM CA Member's sole member is Deba Shyam, MOM AS Member's sole member is Andrew Stupin, and MOM BS Member' sole member is Bhajneet Singh Malik. Mr. Shyam is the owner and principal of Continuum, and Messrs. Stupin and Malik are two of Continuum's largest investors. (Ex. 1 (Arb. Award) at 7 (discussing the "interwoven and overlapping" relationships between Continuum, Nano Banc, and their employees and investors, including Mr. Shyam).)

20.     The manager of Debtor MOM CA and of MOM CA Member is MOM CA Manager LLC ("**MOM CA Manager**"), the manager of Debtor MOM AS and of MOM AS Member is MOM AS Manager LLC ("**MOM AS Manager**"), and the manager of Debtor MOM BS and of

---

[11] The MOM Debtors' petitions erroneously state that Mr. Honarkar owns 19.9% of the membership interests in each of the MOM Debtors. In truth, Mr. Honarkar owns 50% of the relevant membership interests through his sole ownership of 4G.

MOM BS Member is MOM BS Manager LLC ("**MOM BS Manager**" and together with MOM CA Manager and MOM AS Manager, the "**MOM Managers**").

21.     The manager of MOM CA Manager is Mr. Shyam, and the manager of MOM AS Manager and of MOM BS Manager is Jason Miller.

22.     On or about June 7, 2021, the MOM Managers entered into a written Consulting Agreement with Continuum, wherein Continuum was engaged to provide, inter alia, asset management services for the entities and properties that were part of the joint venture.  The consulting agreement was for a period of 5 years.

23.     A chart summarizing the Debtors' organizational structure is attached as Exhibit 3 to the Honarkar Declaration, and schedules purporting to identify each of the MOM Debtors' subsidiaries as of February 28, 2025 are attached to the Shinderman Declaration.[12]

**B.      The Formation of the Joint Venture.**

**1.      Mr. Honarkar's Business and Financial Distress**

24.     Not long after immigrating to the United States from Iran when he was just 20 years old, Mr. Honarkar started a small business selling wireless cell phones. Mr. Honarkar eventually sold that business and went into the real estate business with his family. Over time, Mr. Honarkar

---

[12] As discussed in this Motion, the Continuum Parties have denied the Movants access to the Debtors' books and records for years. As a result, the Movants do not currently have a full, up-to-date list of all of the MOM Debtors' subsidiaries. Although the Shinderman Declaration purports to identify each of the MOM Debtors' respective subsidiaries, the Arbitration Award provides that certain of these entities were never intended to be part of or transferred to the Joint Venture. (Ex. 1 (Arb. Award) at 43.) By way of example, and not of limitation, Schedule 1 to the Shinderman Declaration lists 4G as a subsidiary of Debtor MOM CA. However, 4G is, in truth, wholly and directly owned by Mr. Honarkar. 4G holds certain of the membership interests in Debtor MOM CA, not the other way around. (*See* Ex. 1 (Art. Award) at 43 (finding that it would be "absurd" to interpret the operating agreements to mean that 4G is both a member of the MOM Debtors and an asset of the MOM Debtors).) The Movants do not adopt or incorporate herein any of the schedules to the Shinderman Declaration, and the Movants expressly reserve and preserve all of their rights with respect to which companies are properly considered to be the MOM Debtors' subsidiaries or other affiliates.

amassed a real estate portfolio that included large hotels, individual homes used as luxury rentals, and commercial real estate. (*See* Ex. 1 (Arb. Award) at 5-6; Ex. 2 (Pre-Trial Br.) at 10.)

25.     Mr. Honarkar originally operated his wireless cell phone business through 4G and, after selling that business, has since used 4G as the operating and holding company for his companies created to hold title to various real estate assets. (*See* Ex. 1 (Arb. Award) at 5; Ex. 2 (Pre-Trial Br.) at 10.)

26.     During the COVID-19 pandemic, Mr. Honarkar's real estate business suffered, as did many other businesses in the hospitality and commercial industries. At the same time, Mr. Honarkar was involved in a contentious divorce, which ultimately resulted in a stipulated judgment for Mr. Honarkar to pay his ex-wife $17.5 million by June 12, 2021.  (*See* Ex. 1 (Arb. Award) at 5-6; Ex. 2 (Pre-Trial Br.) at 11.)

27.     Meanwhile, Mr. Honarkar defaulted on a loan issued by LoanCore Capital to Mr. Honarkar (the "**LoanCore Loan**") in the original principal amount of $195 million. The LoanCoreLoan was secured by, among other things, deeds of trust encumbering most, but not all, of Mr. Honarkar's real estate assets, as well as a personal guaranty. A receiver was appointed over those properties, and soon thereafter the LoanCore Loan was purchased by another entity which immediately took action to foreclose on the properties. The foreclosure sales were scheduled to begin on June 15, 2021. (*See* Ex. 1 (Arb. Award) at 6.)

**2.     Mr. Honarkar's Search for New Financing**.

28.     Under immense time pressure due to the pending foreclosures and the payment owed to his ex-wife, Mr. Honarkar sought funding from multiple sources during the first half of 2021. However, given the timing and amounts at issue, combined with the uncertainties created

by the pandemic, it was challenging for Mr. Honarkar to obtain financing. (*See* Ex. 1 (Arb. Award) at 6; Ex. 2 (Pre-Trial Br.) at 11.)

29.     Mr. Honarkar was referred by the then-chief credit officer (and later interim CEO) of Nano Banc ("**Nano**"), with which Mr. Honarkar had an existing relationship, to Mahender Makhijani at Continuum. Continuum is an entity owned by Deba Shyam that acquires and manages distressed real estate assets and that has long-standing and deep ties with Nano. (*See* Ex. 1 (Arb. Award) at 7; Ex. 2 (Pre-Trial Br.) at 11-12.)

30.     Nano and Continuum ultimately became Mr. Honarkar's sole option for potentially resolving his financial difficulties. Mr. Makhijani proposed that Continuum and Mr. Honarkar form a joint venture (the "**Joint Venture**") whereby Mr. Honarkar would contribute the membership interests in the limited liability companies holding title to his real estate portfolio and, in turn, Continuum would provide Mr. Honarkar with an initial cash contribution of $35 million (later reduced to $30 million) and help to refinance Mr. Honarkar's debt. Moving forward, Mr. Honarkar and Continuum (or its designees) would then be the joint owners of the Joint Venture holding title to what had been Mr. Honarkar's properties. (*See* Ex. 1 (Arb. Award) at 7; Ex. 2 (Pre-Trial Br.) at 12.)

31.     As Mr. Honarkar was negotiating the terms of the Joint Venture with Mr. Makhijani and Continuum, Nano provided to Mr. Honarkar on May 19, 2021 a letter of intent for a $150 million loan to pay off the LoanCore Loan. This loan would made by Nano and other participating banks and would be secured by deeds of trust on various of Mr. Honarkar's properties. With Nano's letter of intent in hand, Mr. Honarkar entered into a term sheet with Mr. Makhijani for the joint venture on May 24, 2021. (*See* Ex. 1 (Arb. Award) at 7-8; Ex. 2 (Pre-Trial Br.) at 12.)

32.    What Mr. Honarkar did not know at the time was that Nano was incapable of extending the $150 million in new financing, despite Nano indicating otherwise, and that, before the term sheet was signed, Continuum and Nano and their agents were already conspiring to defraud Mr. Honarkar, as discussed further below. (*See* Ex. 1 (Arb. Award) at 7; Ex. 2 (Pre-Trial Br.) at 12-13.)

**3.    The Chaotic Drafting of the Joint Venture Agreements.**

33.    It is undisputed that the document negotiation and drafting process for the Joint Venture was chaotic and frantic. (*See* Ex. 1 (Arb. Award) at 8.)

34.    Continuum's counsel took the lead on the drafts, and the initial drafts of the operating agreements had blank or incomplete exhibits. Despite this, Mr. Honarkar was pressured to sign documents early and before they were finalized, and many documents were approved piecemeal. (*See* Ex. 1 (Arb. Award) at 8-9.)

35.    Moreover, an exhibit that was intended to list Mr. Honarkar's limited liability companies that were to be contributed to the Joint Venture was not provided to Mr. Honarkar's team until 11:00 p.m. on June 7, 2021 – the night before the formation of the Joint Venture and when the LoanCore Loan refinancing was set to close. That belated exhibit was improperly populated using a comprehensive list of entities owned by and affiliated with Mr. Honarkar's businesses, which list Mr. Honarkar's team had provided to Continuum for due diligence purposes, not as a list of the companies to be contributed to the Joint Venture. (*See* Ex. 1 (Arb. Award) at 9.)

36.    Despite the chaotic drafting process, and due to Mr. Honarkar's pressing need for financing and Mr. Makhijani's refusal to negotiate further, the operating agreements and other agreements for the Joint Venture were signed and the MOM Debtors were formed on June 8, 2021. Escrow closed on the LoanCore Loan refinancing that same day. (*See* Ex. 1 (Arb. Award) at 9.)

37.     Upon the formation of the Joint Venture, the Movants' membership interests in the SPE Debtors (other than the non-yet-formed Aryabhata) were transferred to the MOM Debtors.[13] Continuum took control of the Joint Venture's bank accounts while Mr. Honarkar continued the day-to-day operations as administrative manager.

38.     The MOM Debtors' operating agreements required, among other things, Mr. Makhijani/Continuum to make, through a newly formed entity, a $30 million "Contribution" to the MOM Debtors. (*See* Ex. 1 (Arb. Award) at 10-11 (discussing the material terms of the MOM Debtors' operating agreements); Ex. 2 (Pre-Trial Br.) at 15 (same).) However, as discussed below, the Continuum Parties never made – and never intended to make – this required contribution.

### 4.     The Nano Loan

39.     On May 20, 2021, the day <u>after</u> Nano provided the $150 million letter of intent to Mr. Honarkar and four days <u>before</u> the term sheet for the Joint Venture was signed, and without Mr. Honarkar's knowledge, Nano provided to Mr. Shyam (Continuum's owner) a letter of intent for a $20 million loan (the "**Nano Loan**") to also help pay off the LoanCore Loan. (*See* Ex. 1 (Arb. Award) at 7.)

40.     The letter of intent provided that the borrowers on the Nano Loan would be the MOM Debtors, which had no Operating Agreement because Mr. Honarkar and Continuum had not yet agreed on the terms of the deal, and that the Nano Loan would be secured by an assignment of membership interests in certain of the MOM Debtors' subsidiaries (including certain of the SPE Debtors) and by deeds of trust encumbering properties held by those subsidiaries. At the time, all of those entities (including nearly all of the SPE Debtors) were still wholly owned by the

---

[13] Importantly, certain of Mr. Honarkar's companies were held back from the Joint Venture and retained by Mr. Honarkar. However, due to the erroneous exhibit prepared for the operating agreements, numerous companies were falsely listed as transferred to the MOM Debtors. (*See* Ex. 1 (Arb. Award) at 43.) As stated above, the Movants reserve and preserve all rights with respect to these companies.

Movants—i.e., the MOM Debtors held no interest in those entities and had no power to encumber the assets owned by those entities. (*See* Ex. 1 (Arb. Award) at 7.)

41.     The Nano Loan closed on June 7, 2021, the day before the MOM Debtors were formed. On that date, all of the real properties and subsidiary companies were still wholly owned by the Movants. (*See* Ex. 1 (Arb. Award) at 13.)

42.     Notwithstanding the fact that the MOM Debtors were the borrowers on the Nano Loan, the $20 million loan proceeds were transferred to a Continuum bank account.  In turn, Continuum used those funds to make most of its required $30 million initial contribution to the Joint Venture—making it appear to Mr. Honarkar that the contribution was coming from Continuum. (*See* Ex. 1 (Arb. Award) at 13.)[14]

43.     Thus, two-thirds of Continuum's supposed capital contribution to the MOM Debtors was funded by a loan improperly and invalidly taken out in the names of the MOM Debtors' themselves and secured by assets of the SPE Debtors--entities that, at the time of the loan, were wholly owned by Mr. Honarkar and 4G. (*See* Ex. 1 (Arb. Award) at 17 (finding that the Nano Loan was "unauthorized" and "invalid" and that nothing in the term sheet or the MOM Debtors' operating agreements authorized the required initial contribution to be made in the form of a loan to the MOM Debtors "secured by their own assets").)  In short, Continuum made its purported initial capital contribution to the joint venture with money that belonged to the joint venture itself and had been procured using Mr. Honarkar's own assets as collateral.

44.     As the Arbitration Award states, this was all purposefully concealed from Mr. Honarkar by the Continuum Parties. Mr. Honarkar never received copies of the loan documents

---

[14] The Movants are not aware of the source of funding for the remaining $10 million of the Continuum Parties' initial contribution. However, the escrow documents show that Continuum received a refund of approximately $4 million from the escrow account at closing. Thus, the Continuum Parties contributed only, at most, $6 million of the required $30 million to the Joint Venture. (*See* Ex. 2 (Pre-Trial Br.) at 14.)

for the Nano Loan, and the Nano Loan was never identified in the written communications to Mr.

Honarkar or the escrow company as one of the loans to be used in the LoanCore Loan refinancing.

Further, because the Nano Loan proceeds were paid to Continuum rather than the MOM Debtors,

the $20 million appeared to Mr. Honarkar to be Continuum's initial capital contribution to the joint

venture, when, in truth, that $20 million constituted loan proceeds on which the joint venture was

the borrower.  Additionally, when Mr. Honarkar later requested a list of the outstanding loans on

the Debtors' assets in December 2021, the Continuum Parties sent him a list that did not include

the $20 million Nano Loan. (*See* Ex. 1 (Arb. Award) at 22.)

### C.    The Continuum Parties Gross Mismanagement of the Joint Venture.

45.    At this time, the full extent of the Continuum Parties' mismanagement and self-

dealing was unknown to the Movants, as the Continuum Parties had intentionally and consistently

denied the Movants' access to the Debtors' books and records and a full accounting of the

transactions involving the Debtors, their assets, and their subsidiaries. However, the evidence that

the Movants uncovered demonstrates that, almost as soon as the Joint Venture was formed, the

Continuum Parties began to mismanage the Debtors for their own personal gain.

### 1.    Unauthorized Transactions and Self-Dealing.

#### a.    The Tesoro Loan.

46.    On or around July 1, 2021, less than a month after the Joint Venture's formation,

the Continuum Parties caused one of the SPE Debtors, Tesoro Redlands DE LLC ("**Tesoro**

**Redlands**"), to obtain a $1 million loan from Nano (the "**Tesoro Loan**"). The Tesoro Loan was

secured by a deed of trust encumbering real property owned by Tesoro Redlands, which deed of

trust was not recorded until March 2022. (*See* Ex. 1 (Arb. Award) at 11.)  Mr. Honarkar was not

aware of or involved in the Tesoro Loan. (*See* Ex. 1 (Arb. Award) at 40 ("Nano issued the $1

million Tesoro Loan without Honarkar's knowledge.").) Indeed, the Continuum Parties actively concealed the Tesoro Loan from Mr. Honarkar, including by omitting that loan from the list of loans on the Debtors' assets provided to Mr. Honarkar by the Continuum Parties in December 2021. (*See* Ex. 1 (Arb. Award) at 22 n. 16.)

47.    On the same day as the Tesoro Loan—July 1, 2021—one of the individual investors in the MOM Members (Rick Arvielo) was repaid his $3 million investment in the MOM Members. As the Arbitrator found, $1 million of the $3 million repaid to Mr. Arvielo came from the proceeds of the Tesoro Loan. (*See* Ex. 1 (Arb. Award) at 11.).

48.    Notwithstanding the $1 million Tesoro Loan, Tesoro Redlands continued to have (and still has) considerable equity value. For that reason, in early 2022, Mr. Honarkar requested that the Tesoro Redlands property be sold. Mr. Makhijani refused to consent to Mr. Honarkar's proposed sale of Tesoro Redlands, instead deciding to refinance the Tesoro Loan. (*See* Ex. 1 (Arb. Award) at 12.) Although Mr. Honarkar ultimately consented to the new loan, with certain conditions, Mr. Makhijani and Mr. Shyam finalized the refinancing <u>before</u> Mr. Honarkar gave his consent. (*Id.*)

49.    Moreover, when the refinancing of the Tesoro Loan closed, only a portion of the $39 million in refinance proceeds were, in fact, used to pay off the existing debt on Tesoro Redlands. About $8.8 million of the proceeds was paid as a cash-out and then transferred to a Continuum bank account. Additionally, $2.8 million of the proceeds was held back by escrow and later transferred to Continuum. (*See* Ex. 1 (Arb. Award) at 12.). The Movants still do not know what Continuum did with that $11.6 million in proceeds, which belonged to Tesoro Redlands, an SPE Debtor.

**b.**     **Tenant-In-Common Interest Sales.**

50.     In addition to unauthorized loans, the Continuum Parties sold tenant-in-common interests in real property owned by the SPE Debtors without Mr. Honarkar's knowledge or consent and without authorization under the MOM Debtors' operating agreements.

51.     For example, the Continuum Parties sold a tenant-in-common interest in SPE Debtor Laguna HI, LLC for $4.1 million without Mr. Honarkar's knowledge or approval. Under the terms of the operating agreements, the Continuum Parties had no right to sell this interest, or any other assets of Laguna HI, LLC, but they did so anyway. (*See* Ex. 1 (Arb. Award) at 28; Ex. 2 (Pre-Trial Br.) at 29.)

52.     Also, in April 2022, the Continuum Parties sold a tenant-in-common interest in another SPE Debtor, Hotel Laguna, LLC, for $1 million to Jaachak LLC, an entity owned and controlled by a Continuum executive. The proceeds of this sale were ultimately transferred to the MOM Members, as they were used to fund Jaachak LLC's investment in the MOM Members. (Ex. 1 (Arb. Award) at 12; Ex. 2 (Pre-Trial Br.) at 29-30.)

**c.**     **Coastline Deeds of Trust.**

53.     In June 2021, shortly after the Joint Venture was formed, the Continuum Parties caused the Joint Venture to take out a $175 million loan from Coastline Loans LLC. (*See* Ex. 1 (Arb. Award) at 32; Ex. 2 (Pre-Trial Br.) at 32.)

54.     Coastline Loans LLC is owned and controlled by Andrew Stupin, the sole member of MOM AS Member. (*See* Ex. 1 (Arb. Award) at 34; Ex. 2 (Pre-Trial Br.) at 32.)

55.     No proceeds of this loan were ever paid to the Debtors, which, according to the Continuum Parties, is because the $175 million loan was never paid out. (*See* Ex. 1 (Arb. Award) at 34; Ex. 2 (Pre-Trial Br.) at 32.)

56.     Nevertheless, the loan was secured by deeds of trust on multiple assets owned by the Debtors.

57.     The Continuum Parties failed to obtain the reconveyance of these deeds of trust, which were securing a loan that was never disbursed, despite Mr. Honarkar's demands that they do so. (*See* Ex. 1 (Arb. Award) at 34; Ex. 2 (Pre-Trial Br.) at 32.)

### d.     Cantor Group Loans.

58.     The Continuum Parties also obtained multiple loans from Cantor Group IV LLC and Cantor Group V LLC (collectively, "**Cantor**"), entities owned and controlled by Deba Shyam, the owner and operator of Continuum and the manager of MOM CA Manager. (*See* Ex. 1 (Arb. Award) at 29; Ex. 2 (Pre-Trial Br.) at 31-32.)

59.     In connection with each of these loans, the Continuum Parties caused certain of the Debtors to enter into so-called "contribution agreements" with Cantor and the MOM Members. These contribution agreements provided that, in the sole discretion of the Continuum Parties, the Cantor loan could be converted to an equity interest in the MOM Debtors—an arrangement that the Arbitrator referred to as "heads I win; tails you lose" because it gave the Continuum Parties— which were and are owned by the same individual as Cantor, the lender—the right to equity if the MOM Debtors performed well and, if the MOM Debtors performed poorly, the right to demand repayment of the loan, which was secured by real property assets belonging to the SPE Debtors. (Ex. 1 (Arb. Award) at 29, n. 1.)

60.     Each of the contribution agreements was entered into without Mr. Honarkar's consent and in violation of the terms of the Debtors' operating agreements and, as the Arbitrator found, are therefore invalid. (*See* Ex. 1 (Arb. Award) at 29; Ex. 2 (Pre-Trial Br.) at 31-32.)

61.     Prior to the Arbitration, Cantor misrepresented, *under the penalty of perjury*, to the Orange County Superior Court that it was "not an agent of [MOM CA Member] or [Debtor MOM CA], nor vice versa," and that "Cantor does not have the power to represent [MOM CA Member] or [Debtor MOM CA] and did not have such power to respect to any of the contracts at issue." (Ex. 6 (Cantor Declaration) at 2, ¶ 1.)

62.     Of note, Mr. Honarkar remains in separate ongoing litigation against Cantor relating to a forged deed of trust in the amount of $5,500,000 that was recorded by Cantor on the eve of the Joint Venture dispute. The Orange County Superior Court, Hon. David J. Hesseltine, previously acknowledged the suspicious nature of the forged deed and connection between the Continuum Parties and Cantor in issuing a preliminary injunction against Debtor MOM CA:

> [MOM CA Member and Debtor MOM CA] respond[] by arguing the title company mistakenly recorded deed of trust no. 1, and therefore it had to be promptly reconveyed, but Cantor nonetheless was entitled to record deed of trust no. 2 in March 2023 pursuant to a Pledge Agreement and the occurrence of a triggering default in 2023. … [MOM CA Member and Debtor MOM CA], however, fail[] to provide any response or explanation relating to PDCR's argument and evidence, including the face of deed of trust no. 2, that deed of trust no. 2 was an unauthorized modification of deed of trust no. 1 as demonstrated by, inter alia, the reduced size of the document's font to remove indicia of it being recorded, the handwritten signature block above Mr. Honarkar's signature, and the use of the same Notary Acknowledgement of Mr. Honarkar's signature from deed of trust no. 1. … Indeed, the apparent modification of the document is suspicious and, again, no explanation is provided.

(Ex. 7 (Minute Order) at 3.)

63.    In total, the Continuum Parties obtained nearly $60 million in self-interested loans from Cantor supported by the undisclosed, unauthorized, and invalid contribution agreements provided by the Debtors.[15]

### e.    Secret Bank Accounts.

64.    Moreover, in yet another self-interested and unauthorized move, the Continuum Parties directed Nano to establish bank accounts for each of the subsidiary companies contributed to the Joint Venture, including the SPE Debtors. Mr. Honarkar was not aware of these new bank accounts, and, in fact, the Continuum Parties directed Nano to restrict Mr. Honarkar's access to the accounts. (Ex. 1 (Arb. Award) at 13.)

### 2.    Failure to Maintain Books and Records.

65.    The Continuum Parties failed to maintain books and records for the Debtors, all in violation of the Debtors' operating agreements.

66.    The Continuum Parties admitted in the Arbitration that they only kept records for the MOM Debtors for certain periods of time. (Ex. 1 (Arb. Award) at 30 ("The MOM Parties admitted they only kept records for the [MOM Debtors] for certain periods of time, despite evidence that transactions occurred outside of these time periods.").)

67.    The Arbitrator also found it unclear where and how records of transactions between the MOM Debtors and the MOM Members were maintained, "*if at all*." (Ex. 1 (Arb. Award) at 30 (emphasis added).)

---

[15] The Movants expressly reserve and preserve their rights to seek to equitably subordinate any and all of the claims that are or may be asserted by Cantor and/or its affiliates against any or all of the Debtors, whether such claims are based on any purported loans or any other basis. The Movants further expressly reserve and preserve their rights to seek equitable subordination with respect to any and all claims asserted by any of the Continuum Parties' other affiliates against any of the Debtors.

68.     Whatever limited records were maintained by the Continuum Parties, if any, have also not been disclosed or provided to the Movants, despite Mr. Honarkar's demands and a state court judgment finding that the Continuum Parties were required to provide the records, which is described in more detail below.

### 3.     Notices of Default and Trustee's Sales.

69.     While in control of the Joint Venture, and after ousting Mr. Honarkar (as described in more detail below) as administrative manager of the Debtors, the Continuum Parties have allowed various mortgages on the Debtors' subsidiaries' properties to go into default.

70.     As a result, multiple notices of default were recorded against many of the Debtors' subsidiaries in late 2024 and early 2025, and trustee's sales have been scheduled for the properties owned by SPE Debtors Aryabhata Group LLC and Tesoro Redlands on March 20, 2024 and March 24, 2024, respectively. (Ex. 4 (Notices of Default); Ex. 5 (Notices of Trustee's Sale); *see also* Shinderman Decl. ¶ 35.)[16]

### D.     Mr. Honarkar's Discovery of the Fraudulent Scheme.

71.     In early 2023, Mr. Honarkar began exploring options to exit the Joint Venture.

72.     In seeking alternative financing, in February 2023, Mr. Honarkar discovered a deed of trust on one of the SPE Debtors' properties dated June 7, 2021 and securing the $20 million Nano Loan. (Ex. 1 (Arb. Award) at 13; Ex. 2 (Pre-Trial Br.) at 18-19.)

73.     This surprising discovery led Mr. Honarkar to run title searches on the various other properties owned by the SPE Debtors and the MOM Debtors' other subsidiaries. Through this

---

[16] Exhibit 4 to the Honarkar Declaration consists of true and correct copies of all of the notices of default that the Movants have obtained with respect to the Debtors as of the date hereof. The Shinderman Declaration refers to additional notices of default of which the Movants have not yet obtained copies. Because the Continuum Parties have denied the Movants access to the Debtors' books and records, the Movants do not have complete knowledge of the Debtors' defaults on their mortgage and other contractual obligations.

investigation, Mr. Honarkar learned for the first time that the $30 million contribution required to be made by Continuum under the operating agreements was funded in large part by the Nano Loan, which was secured *by the MOM Debtors' own assets* and the assets of the MOM Debtors' subsidiaries. (Ex. 1 (Arb. Award) at 13.)

74.    Mr. Honarkar also discovered the original deed of trust relating to the Tesoro Loan and recorded instruments related to other loans from Cantor, as well as memoranda related to the tenant-in-common interest sales. (Ex. 1 (Arb. Award) at 13.)

75.    Soon after making these discoveries, Mr. Honarkar sent a letter to Mr. Makhijani and Continuum raising his concerns. But, Mr. Honarkar never received a response. So, in March 2023, Mr. Honarkar's then-counsel sent a formal books and records demand for each of the MOM Debtors, seeking basic financial and transaction documents pursuant to the terms of the operating agreements. (Ex. 1 (Arb. Award) at 13; Ex. 2 (Pre-Trial Br.) at 19.)

76.    Incredibly, the Continuum Parties responded that they would provide documentation related to the Nano Loan only if Mr. Honarkar withdrew his inspection demands. Mr. Honarkar refused this absurd proposal and filed a petition in state court to compel the provision of the MOM Debtors' books and records, which petition was ultimately granted over the Continuum Parties' opposition. (Ex. 1 (Arb. Award) at 14.)

77.    Meanwhile, in April 2023 Mr. Honarkar and 4G also commenced the Arbitration,[17] individually and derivatively on behalf of the MOM Debtors, against certain of the Continuum

---

[17] As used herein, the term "Arbitration" shall refer to the JAMS arbitration proceeding captioned as *Honarkar v. Makhijani*, No. 5220003126, as consolidated with the arbitration proceeding captioned as *MOM AS Investco LLC v. Honarkar*, No. 5200001122.

Parties[18] and Nano asserting various claims based on the Continuum Parties' fraud and misconduct, as discussed in more detail further below.

> **E.    The Continuum Parties' Retaliation Against Mr. Honarkar.**

78.    Following Mr. Honarkar's discovery of the Continuum Parties' fraud and misuse of the Debtors, and as Mr. Honarkar sought documents and information and to enforce his rights, the Continuum Parties retaliated against Mr. Honarkar is numerous ways, including:

- On March 29, 2023, almost immediately after Mr. Honarkar's demand for books and records, the Continuum Parties exercised their power as managing members of the Debtors to terminate Mr. Honarkar as the administrative manager of the MOM Debtors.

- Two days after Mr. Honarkar's termination, a group of armed individuals working on the Continuum Parties' behalf entered and took control of various properties of the MOM Debtors' subsidiaries, including the SPE Debtors. This led to an altercation between Mr. Honarkar and the Continuum Parties in May 2023 in which a Continuum employee was charged with assault.

- During the night of June 30, 2023 and the early morning of July 1, 2023, a group of armed individuals and other agents working on behalf of the Continuum Parties entered and took physical control of a restaurant located in one of the Debtors' properties, which restaurant had been operated by Mr. Honarkar for years.

- On July 24, 2023, while Mr. Honarkar and certain of the Continuum Parties were appearing in a hearing in state court, certain other of the Continuum Parties – including Jason Miller, the manager of MOM AS Manager and MOM BS Manager – together with over a dozen men dressed in black, broke into 4G's corporate headquarters, where the Movants each maintained offices, while Mr. Honarkar's team was working. The individuals shattered a glass door with a hammer and forced open the front entrance doors to gain access to the building and removed documents, banker's boxes of hardcopy files labelled "LEGAL," computer equipment, and other items from the office, including employees' personal effects.

---

[18] Deba Shyam, Jason Miller, Andrew Stupin, and Bhajneet Singh Malik are not named as respondents in the Arbitration. However, their involvement in the fraudulent scheme and misconduct is discussed in the Arbitration Award.

- On July 29, 2023, the Continuum Parties served eviction notices on Mr. Honarkar and his two daughters at their residences.

- The Continuum Parties initiated multiple eviction proceedings against tenants leasing certain of the Debtors' subsidiaries' properties on the purported basis that those tenants were not paying rent directly to the Continuum Parties.

- The Continuum Parties hired mobile billboards to drive around Laguna Beach, displaying pictures of Mr. Honarkar with disparaging messages, including a billboard that implied that Mr. Honarkar was involved in corruption.

(Ex. 1 (Arb. Award) at 14-15; Ex. 2 (Pre-Trial Br.) at 19-21, 22-23.)

**F.**     **The Arbitration and Arbitration Award.**

**1.**     **The Claims and Counterclaims**

79.     On April 25, 2023, the Movants filed their original Demand and Statement of Claim commencing the Arbitration with JAMS, before retired state court judge the Honorable David A. Thompson[19] as arbitrator ("**Arbitrator**"), seeking the recission of the MOM Debtors' operating agreements or, alternatively, the appointment of a receiver over the MOM Debtors, compensatory and punitive damages, declaratory judgment, and an injunction reinstating Mr. Honarkar as the administrative manager.

80.      In the Arbitration, the Movants asserted claims against the Continuum Parties for fraudulent inducement, breach of contract, and direct forcible entry and forcible detainer, as well as claims against Nano for conspiracy to commit and aiding and abetting fraudulent inducement.

---

[19] Before his retirement, the Arbitrator was the Assistant Presiding Judge of the Orange County Superior Court, an Associate Justice with the California Court of Appeals for 9 years, and twice served as a Justice Pro-tem on the California Supreme Court.

81.     The Movants also asserted derivative claims on the MOM Debtors' behalf against the Continuum Parties for conversion, violations of Section 496 of the California Penal Code,[20] and unjust enrichment, and derivative claims against Nano for conspiracy to commit and aiding and abetting fraudulent inducement and breach of contract.

82.     The Movants further sought an accounting of the MOM Debtors' books and records by an independent third party, and declaratory relief as to the parties' respective rights, duties, powers, and obligations under the MOM Debtors' operating agreements.

83.     The Continuum Parties commenced their own arbitration against Mr. Honarkar alleging claims for trespass, conversion, violation of Section 496, intentional interference with contractual relations and prospective economic advantage, and declaratory and injunctive relief. This arbitration was consolidated with the Arbitration, and the Continuum Parties' claims were addressed (and denied) in the Arbitration as counterclaims against Mr. Honarkar.

**2.      The Continuum Parties' False Evidence and Testimony.**

84.     The Arbitration culminated in a three-week-long evidentiary hearing held from June 24, 2024 through July 12, 2024. (Ex. 1 (Arb. Award) at 4.) During this evidentiary hearing and in their pre- and post-briefing and exhibits submitted as evidence, the Continuum Parties and their witnesses repeatedly presented false evidence and testimony.

85.     In an attempt to conceal the fact that they fraudulently induced Mr. Honarkar's entry into the Joint Venture, the Continuum Parties falsely claimed that their required initial contribution obligation was satisfied by their oral promise that the MOM Members, not the MOM

---

[20] Section 496 of the California Penal Code applies to "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained." Cal. Penal Code § 496(a).

Debtors, would pay back the Nano Loan—a verbal promise that the Continuum Parties purportedly made to Mr. Honarkar before formation of the MOM Debtors on June 8, 2021. The Continuum Parties also falsely claimed that this agreement was memorialized in a written "Contribution Agreement" purportedly signed by representatives of the Continuum Parties at the time of the Nano Loan.[21] (Ex. 1 (Arb. Award) at 17.)

86.    The Arbitrator specifically found that there is "substantial reason" to doubt the existence of the purported oral promise or that the Contribution Agreement was authentic. (Ex. 1 (Arb. Award) at 18.)

87.    With respect to the oral promise, the Arbitrator concluded that the Continuum Parties' testimony about the meetings where the oral promise was supposedly made to Mr. Honarkar was contradictory and simply "not credible." (Ex. 1 (Arb. Award) at 18.) The testimony given during the evidentiary hearing was also not consistent with or supported by, and at times contradicted by, the pre-hearing discovery responses and deposition testimony provided by the Continuum Parties and their witnesses. (Ex. 1 (Arb. Award) at 19.) These credibility findings combined with the facts that there was no evidence of any written communications to Mr. Honarkar or his team or any internal written communications between Mr. Honarkar and his team about the oral promise, as well as the testimony of Mr. Honarkar and his witnesses that they were not aware of the Nano Loan until 2023, led the Arbitrator to conclude that the "weight of the evidence supports finding the oral promise was not made." (Ex. 1 (Arb. Award) at 19.)

---

[21] Even if these claims were true (which they were not), neither the oral promise nor the Contribution Agreement would have satisfied the initial contribution obligation, as the Arbitrator expressly determined in the Award. (Ex. 1 (Arb. Award) at 18 (finding that even "[i]f the oral promise was made and if the Contribution Agreement is genuine, neither satisfied the initial contribution obligation").)

88. As for the Contribution Agreement, the Arbitrator found that the Continuum Parties' testimony about the existence, creation, and execution of that agreement was not credible. There was no contemporaneous evidence or written communications about the Contribution Agreement, and the Continuum Parties did not assert that it existed until July 2023 – months after the commencement of the Arbitration. (Ex. 1 (Arb. Award) at 19.) The Continuum Parties also changed their position and testimony on how the Contribution Agreement was purportedly signed, and the text of the Contribution Agreement itself suggested that it could not have existed and been signed in the manner claimed by the Continuum Parties. (Ex. 1 (Arb. Award) at 19-20.)

89. Thus, the record shows that the Continuum Parties lied about the "oral promise" and fabricated the Contribution Agreement for litigation purposes.

### 3. The Arbitration Award.

90. On February 21, 2025, the Arbitrator issued the Arbitration Award.

91. In the Arbitration Award, the Arbitrator found in favor of the Movants on nearly all of their direct and derivative claims. Specifically, with respect to the Continuum Parties, the Arbitrator found that the Movants proved that:

- Mr. Makhijani, Continuum, and the MOM Members had fraudulently induced the Movants into signing the agreements for the Joint Venture. (Ex. 1 (Arb. Award) at 16-26, 47.)

- The MOM Members and the MOM Managers breached their obligations under the MOM Debtors' operating agreements. (Ex. 1 (Arb. Award) at 27-30, 47.)

- Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers violated both the forcible entry and forcible detainer statutes. (Ex. 1 (Arb. Award) at 31-32, 47.)

- Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers converted the MOM Debtors' assets in at least six separate instances, the full amount of such conversions would need to be revealed by a full

accounting of the MOM Debtors' books and records. (Ex. 1 (Arb. Award) at 32-34, 47.)

- Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers violated Section 496 of the California Penal Code as to the Debtors. (Ex. 1 (Arb. Award) at 34-35, 47.)

- Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers unjustly enriched themselves from the MOM Debtors' assets. (Ex. 1 (Arb. Award) at 35, 47.)

- The Movants are entitled to a full accounting from the MOM Members and the MOM Managers. (Ex. 1 (Arb. Award) at 41-42, 48.)

- The Movants are entitled to the declaratory relief that they sought on various issues, including with respect to the subsidiaries that were contributed to the Joint Venture. (Ex. 1 (Arb. Award) at 42-43, 48.)[22]

92.     The Arbitrator further found that the Continuum Parties proved <u>none</u> of their claims against Mr. Honarkar. (Ex. 1 (Arb. Award) at 44.)

93.     Accordingly, the Arbitrator determined that the Movants are entitled to elect the alternative remedies of either compensatory damages or rescission of the operating agreements and other joint venture agreements with restitution and consequential damages, as well as the declaratory relief and accounting that they had requested and attorneys' fees and costs. (Ex. 1 (Arb. Award) at 44-46.)

94.     The Arbitrator also determined that the MOM Debtors, as derivative claimants, are entitled to recover compensatory damages from Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers (and Nano). (Ex. 1 (Arb. Award) at 45.)

---

[22] In addition to the direct and directive claims against the Continuum Parties, the Arbitrator also found in Movants' favor on their direct claims against Nano for conspiracy and aiding and abetting fraudulent inducement and on their derivative claims against Nano for conversion and violation of California Penal Code Section 496. (Ex. 1 (Arb. Award) at 37-41.)

95.     The Arbitrator further found that Mr. Honarkar and 4G are entitled to punitive damages from the Continuum Parties and Nano.  (Ex. 1 (Arb. Award) at 46.)

96.     With respect to the Movants' request for the appointment of a receiver, the Arbitrator found that he did not have the authority to grant this relief. However, the Arbitrator explained that a receiver "is necessary to place the [Joint Venture] in 'safe hands' and to prevent [the Continuum Parties] from further dissipating the [Joint Venture's] assets," and that the Continuum Parties' conduct before and during the Arbitration showed that the Joint Venture's assets are "certainly in danger of being lost, removed, or materially injured" if the Continuum Parties are left in control. (Ex. 1 (Arb. Award) at 46.)

### 4.    Further Proceedings in the Arbitration.

97.     As set forth above, the Arbitration Award contains all of the Arbitrator's findings and conclusions as to the Continuum Parties' liability, leaving only the question of the amount of damages (which depends on whether Mr. Honarkar elects compensatory damages or rescission), the amount of punitive damages, and attorneys' fees to be determined.

98.     Pursuant to the Arbitration Award, all amounts of restitution, consequential damages, compensatory damages, incidental damages, punitive damages, and interest (if any) to be awarded to the Movants are to be determined in further proceedings in the Arbitration, and the Movants must also file an application for their attorneys' fees and costs. (Ex. 1 (Arb. Award) at 48.)

99.     Once the determinations are made with respect to the amounts of attorneys' fees and costs to be awarded, such determinations and the Arbitration Award shall be embodied in a further "Partial Final Award," which will be subject to confirmation in California Superior Court. Then, after the accounting has been completed and the amounts of restitution, damages, punitive

damages, and interest to be awarded have been finally determined, the Arbitrator will issue a final award. (Ex. 1 (Arb. Award) at 48-49.)

100.    The Movants intend to continue to pursue their rights and remedies for their now-proven claims against the Continuum Parties, including their equitable remedy of rescinding the Joint Venture (if the Movants elect that remedy), and the Movants are also committed to continuing to pursue the derivative claims on behalf of the MOM Debtors and, now, their bankruptcy estates.

**G.    The Chapter 11 Cases.**

101.    On February 28, 2025, one week after the Arbitrator issued the Arbitration Award, the Continuum Parties caused each of the MOM Debtors to file a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

102.    Mr. Honarkar, a 50% member of the Debtors was never advised or solicited to vote on the filing of the Chapter 11 Cases.

103.    Deba Shyam signed the petition for Debtor MOM CA, and Jason Miller signed the petitions for Debtors MOM AS and MOM BS.

104.    On March 10, 2025, each of the SPE Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

105.    The MOM Debtors and SPE Debtors have requested that their chapter 11 cases be jointly administered. *See* Docket No. 4.

106.    The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, aside from this Motion, no trustee or examiner has been requested or appointed in the Chapter 11 Cases. No committee has been appointed in the Chapter 11 Cases.

107.    According to the MOM Debtors' petitions and the written consents attached thereto, on or about February 27, 2025,[23] the day before the MOM Debtors' bankruptcy filings, the MOM Managers authorized the MOM Debtors to retain, among other professionals, Mark Shinderman of FTI Consulting, Inc. as the Debtors' CRO.

108.    In discussions between the Movants and the CRO, and in the Shinderman Declaration, the CRO has stated that he reports to Robbin Itkin of Sklar Kirsh LLP as the newly appointed independent managing member of the Debtors (the "**Independent Manager**"). The Shinderman Declaration further provides that, on March 4, 2025, the Independent Manager was appointed by the Continuum Parties[24] and vested with "all managerial authority" over the Debtors. (Shinderman Decl. ¶ 19.) However, the Movants are skeptical that the applicable operating agreements permit the Debtors to appoint the Independent Manager.

109.    The Movants were not consulted, did not consent to, and were not otherwise involved in the appointment or engagement of either the CRO or the Independent Manager.

110.    Moreover, the Continuum Parties selected the Debtors' lead restructuring counsel to run the Chapter 11 Cases. The same counsel that represented the Continuum Parties in litigation against the Movants!

111.    Based on the Shinderman Declaration, the CRO is continuing to discuss, obtain, and rely upon false or misleading information provided by the Continuum Parties. One such source of information is VGruppe Management ("**VGruppe**"), the Debtors' property management company. (Shinderman Decl. ¶ 21.) According to a Statement of Information filed with the

---

[23] The Shinderman Declaration states that the CRO executed his engagement letter with the Debtors on February 26, 2025. (Shinderman Decl. ¶ 16.)

[24] Jason Miller and Deba Shyam signed the Independent Manager Service Agreement for the MOM Debtors. *See* Docket No. 9, Ex. B.

California Secretary of State on October 8, 2024, a true and correct copy of which is attached as Exhibit 8 to the Honarkar Declaration, Jason Miller – the manager of MOM AS Manager and MOM BS Manager – is the chief executive officer, chief financial officer, and secretary of VGruppe Management.  VGruppe is clearly an insider and a related party to the Continuum Parties. The Honarkar Parties believe that VGruppe should immediately be removed as a property manager, and Mr. Honarkar has parties lined up to serve in this capacity when needed.

### BASIS FOR REQUESTED RELIEF

112.    The Movants seek entry of an order directing the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code on the bases that: (i) cause exists to appoint a trustee due to the proven and prolific fraud, dishonesty, and gross mismanagement of the Debtors committed by the Continuum Parties; and (ii) appointing a trustee is in the best interests of the Debtors' creditors, equity holders, and estates.

### ARGUMENT

**A.    Applicable Legal Standard.**

113.    Under section 1104(a) of the Bankruptcy Code, at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, a bankruptcy court must order the appointment of a trustee:

> (1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

114.    Subsection (1) of section 1104(a) addresses management's pre- and/or post-petition misdeeds or mismanagement, while subsection (2) "creates a flexible standard" and instructs the court to appoint a trustee when doing so addresses the interests of creditors and the estate. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Where the court finds either that cause exists or that the appointment of a trustee is in the interest of the parties, "an order for the appointment … is mandatory." *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

115.    While section 1104(a)(1) lists "fraud, dishonesty, incompetence, or gross mismanagement" as examples of what constitutes "cause" for the appointment of a trustee, this list is non-exhaustive. *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998). Thus, courts have found cause in cases involving "conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties." *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020).

116.    Given the discretion and flexibility afforded to courts under section 1104(a), findings of "cause" and findings of "best interests" are often "intertwined and dependent on the same facts." *Id.* at 765. The factors that courts consider in appointing a trustee under section 1104(a)(2) include: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits

derived by the appointment of a trustee, balanced against the cost of the appointment." *Id.*; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (collecting cases).

117.    In these Chapter 11 Cases, the appointment of a chapter 11 trustee is warranted and necessary pursuant to either section 1104(a)(1) or section 1104(a)(2).

**B.    Ample Cause Exists to Appoint a Chapter 11 Trustee.**

118.    The determination of whether "cause" exists for the appointment of a trustee must be made on a case-by-case basis, taking into account all relevant factors. *Sharon Steel,* 871 F.2d at 1225. Prepetition conduct alone may provide the basis for a court to appoint a trustee. *See* 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("[T]he Code is clear that the pre-petition conduct of the debtor's management may be the sole deciding factor [in appointing a chapter 11 trustee]."); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[P]re-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

119.    Here, the Continuum Parties' prepetition fraud and gross mismanagement of the Debtors constitutes more than sufficient cause for the appointment of a chapter 11 trustee, regardless of the recent engagement of the CRO and Independent Manager, as their appointment is fruit of the poisonous tree. *See Wong Sun v. U.S.*, 371 U.S. 471, 484 (1963) (explaining that, in criminal law, the exclusionary rule "extends as well to the indirect as the direct products" of constitutional violations, the proverbial "fruit of the poisonous tree"); *U.S. v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (any evidence obtained pursuant to an unlawful stop or seizer "must be suppressed as 'fruit of the poisonous tree'").

1.    **The Continuum Parties' Repeated Fraudulent and Dishonest Conduct.**

120.    Even before the Joint Venture was ever formed, the Continuum Parties were engaging in fraudulent and dishonest conduct.

121.    This conduct has since continued throughout the Joint Venture. Mr. Shyam – who signed the petition for Debtor MOM CA – received the letter of intent for the $20 million Nano Loan just one day after Mr. Honarkar received the letter of intent for the $150 million loan for the LoanCore Loan refinancing and weeks before the agreements for the Joint Venture were drafted and finalized. The Nano Loan closed one day before the Joint Venture was formed. None of the Continuum Parties ever disclosed the Nano Loan to the Movants. To the contrary, the Continuum Parties actively concealed the existence of the Nano Loan from Mr. Honarkar.

122.    The Continuum Parties also purposely concealed the existence of other unauthorized and improper loans and transactions involving the Debtors and their assets from Mr. Honarkar and conspired with Nano to hide and restrict Mr. Honarkar's access to new bank accounts opened with Nano for the Debtors.

123.    Once Mr. Honarkar discovered (on his own) the Continuum Parties' misconduct and acted to enforce and protect his rights and interests, the Continuum Parties retaliated against Mr. Honarkar and his businesses in multiple egregious ways, as set forth above.

124.    The Continuum Parties also continued their practices of fraud and deception during the Arbitration. The Continuum Parties and their witnesses provided testimony in the Arbitration that the Arbitrator found not to be credible. Simply put, they lied.

125.    Even more, while the Arbitration was pending, the Continuum Parties fabricated the so-called Contribution Agreement. Again, the Arbitrator saw straight through the Continuum Parties' lies and deception.

126. Based on all of the evidence before him, the Arbitrator found, among other things, that Mr. Makhijani, Continuum, the MOM Members, and the MOM Managers fraudulently induced Mr. Honarkar into entering into the Joint Venture.

127. Accordingly, neither the Continuum Parties nor any of their affiliates or agents can be trusted to continue to manage any of the Debtors or to exercise any control or authority over the Debtors' estates. A chapter 11 trustee is necessary. *See In re EuroAmerican Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(l)."); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil*, 99 B.R. at 525; *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 355 ("[T]he willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." (internal citations and quotations omitted)).

### 2. The Continuum Parties' Gross Mismanagement of the Debtors.

128. In addition to the Continuum Parties' fraud and dishonesty, they have also engaged in a consistent pattern of gross mismanagement of the Debtors, mainly through an insider of the Debtors, VGruppe, an affiliate of the Continuum Parties.

129. Before the MOM Debtors even existed, without the knowledge or consent of the Movants, the Continuum Parties encumbered the MOM Debtors' would-be assets and the assets of the MOM Debtors' would-be subsidiaries – including the SPE Debtors – with the invalid and unauthorized Nano Loan. Then, less than a month after the Debtors were formed, the Continuum Parties further improperly encumbered the Debtors' assets and the assets of their subsidiaries by the unauthorized Tesoro Loan.

130.    The Continuum Parties' self-dealing is also apparent. As the Arbitrator found, they improperly sold tenant-in-common interests in properties of the SPE Debtors, with the proceeds of at least one of these sales ultimately going to the MOM Members. The Continuum Parties also allowed deeds of trust to remain recorded with respect to $175 million in loans that were purportedly never issued. These deeds of trust are in favor of an entity owned and controlled by Andrew Stupin, the sole member of MOM AS Member. Furthermore, the Continuum Parties obtained nearly $60 million in loans from entities owned and controlled by Deba Shyam through unauthorized contribution agreements provided by the Debtors.

131.    While these improper and self-interested transactions were occurring, the Continuum Parties failed to maintain adequate books and records for the Debtors, despite their clear and express obligations to do so.

132.    Accordingly, the Arbitrator found a majority of the evidence provided by the Continuum Parties not to be credible and that the Movants had proven their derivative claims on behalf of the MOM Debtors against the Continuum Parties for conversion, unjust enrichment, and violations of California Penal Code Section 496.

133.    The Continuum Parties' well-established and continuous self-dealing, mismanagement, and abuse of the Debtors warrants nothing less than the appointment of a chapter 11 trustee. *See Vascular Access Centers*, 611 B.R. at 764; *Okla. Refining*, 838 F.2d at 1136 ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee."); *In re PRS Ins. Grp.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (finding that evidence of diversion of assets, or the absence of accurate financial records constitutes "incompetence or gross mismanagement").

3.    **The CRO and Independent Manager Do Not Negate the Cause for a Chapter 11 Trustee.**

134.    The Movants and any other parties in interest in these Chapter 11 Cases require an independent and conflict-free party to oversee the administration of the Debtors' estates. To instill confidence in the Debtors and these Chapter 11 Cases, a neutral party not affiliated with or retained by any of the Continuum Parties must step in.

135.    The Movants acknowledge that, if done properly, the appointment of an independent manager and chief restructuring officer could help alleviate concerns of mismanagement. However, the Continuum Parties remain in control of the Debtors, and they alone chose restructuring counsel to the Debtors, the CRO, and the Independent Manager. The Continuum Parties did not consult with Mr. Honarkar (a 50% member of the Debtors) or obtain his consent to retain new counsel for the bankruptcy filings or the appointment of the CRO or the Independent Manager. With good reason, the Movants lack faith in any agents or officers so unilaterally chosen by the Continuum Parties.

136.    The Movants do not question the veracity of restructuring counsel, the CRO, or the Independent Manager. They were placed in the untenable position of interviewing for a post that was much needed under the circumstances. However, at some point in time, the professionals should have realized that they were the fruit of the poisonous tree and were ultimately tainted as they were solely hand selected by the Continuum Parties, which just had a neutral Arbitrator find that they committed fraud and were not credible. The Continuum Parties should have relinquished control of the Debtors to an independent party prior to the selection of restructuring counsel and any other fiduciaries to run the Chapter 11 Cases.

137.    The Movants also have substantial concerns that the Continuum Parties are continuing to exert control over the Debtors and these Chapter 11 Cases by providing false and

self-serving information to the CRO, who they alone hired. For example, the Shinderman Declaration states that "[i]t has been represented to [the CRO] that the [Cantor loans] were used to fund operations and capital expenditure requirements of the Debtors." (Shinderman Decl. ¶ 42.) Presumably, this representation was made by the Cantor, which is owned by Deba Shyam, and/or the Continuum Parties, who were found by the Arbitrator to have caused the Debtors to enter into the Cantor loans in violation of the Debtors' operating agreements. Accordingly, similar to the VGruppe, Cantor is an insider and is a related party to the Continuum Parties.

138.    As another example, the Shinderman Declaration also provides that, in order to get "up to speed," the CRO has, among other things, spoken with VGruppe, the Debtors' property management company, and, as of March 5, 2025, has set up "daily calls" with VGruppe, which has represented to the CRO that it is not affiliated with Mahender Makhijani, Mr. Honarkar, or their affiliates. (Shinderman Decl. ¶ 21.) However, as of at least October 8, 2024, Jason Miller was the chief executive officer, chief financial officer, and secretary of VGruppe, and Jason Miller is, in fact, affiliated with Mahender Makhijani and the other Continuum Parties. Again, this demonstrates that these parties are insiders and providing false and misleading information to the CRO, which only further supports the appointment of a Chapter 11 Trustee.

139.    This fact is particularly concerning because, according to the Shinderman Declaration and the Debtors' other filings, the budgets for these Chapter 11 Cases "were prepared by prior management in consultation with VGruppe," and VGruppe is a signatory on the SPE Debtors' bank accounts and has been advised that it "may continue operations in the ordinary course." Docket No. 8 ¶ 23; Docket No. 10 ¶ 15.) Thus, the Continuum Parties are undoubtedly continuing to exercise control in these Chapter 11 Cases.

140.    The Movants acknowledge that the Chapter 11 Cases were needed in order to stay the various foreclosure actions that were being commenced. Accordingly, the Movants are not seeking to dismiss these Chapter 11 Cases at the present time. The Movants solely seek independent fiduciaries to run the Chapter 11 Cases in order to maximize value. This is especially true in light of the fact that the Movants retain the right to seek recission of the Joint Venture. If the Joint Venture is rescinded, the Movants should be the parties running the Chapter 11 Cases for the benefit of all creditors and other parties in interest.

141.    Congress provided only one way to replace a debtor's management's control of a bankruptcy case with an independent fiduciary: the appointment of a trustee pursuant to section 1104(a). A CRO is not a replacement for a chapter 11 trustee. A CRO *serves* a debtor-in-possession as an executive officer, subject to the direction of its governing body, accountable to its governing body, and subject to dismissal at the will of its governing body. A chapter 11 trustee, in contrast, *administers* a debtor-out-of-possession after a court finds cause to dispossess the debtor.

142.    The Continuum Parties should not be allowed to use their engagement of a CRO and Independent Manager to co-opt, undermine, or defend against the appointment a chapter 11 trustee pursuant to section 1104(a). Rather, the Court should take the necessary step of directing the appointment of a trustee so that these Chapter 11 Cases can proceed with a truly independent and disinterested estate fiduciary free of any taint of the Continuum Parties' proven misconduct.

**C.    Appointing a Chapter 11 Trustee Is in the Best Interests of the Debtors' Estates, Creditors, and Equity Holders.**

143.    As demonstrated above, cause exists to appoint a trustee under section 1104(a)(1). Even if the Court does not find cause (which it should so find), the facts and circumstances here overwhelmingly support that appointing a trustee is still warranted under section 1104(a)(2) as being in the best interests of the Debtors estates, their creditors, and their equity holders.

144.    The appointment of a trustee is in the best interests of the parties because any hope of a successful reorganization or liquidation in these Chapter 11 Cases rests on a truly impartial party's investigation of the Debtors, their assets, all prepetition transactions involving the Debtors, and any other claims that the Debtors may have against the Continuum Parties and/or any other third-parties. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *see also PRS Ins. Grp.*, 274 B.R. 389 (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders are a significant asset of the estate); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn 1989) (appointing a chapter 11 trustee where debtor was "not in a strong-posture to pursue possible claims" due to conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate").

145.    Moreover, as stated above, the Movants do not have confidence in the Debtors' current management, including the CRO and Independent Manager, since they were appointed by the untrustworthy Continuum Parties. The Movants' level of mistrust and skepticism is very high due to the egregiousness of the Continuum Parties' prepetition fraud, deception, retaliation, mismanagement, misconduct, and abuse. The Movants do not believe that the Debtors, under any management unilaterally selected by the Continuum Parties, can effectively achieve a value-maximizing reorganization or liquidation. Rather, the appointment of a chapter 11 trustee is the

only remedy that will relieve the current state of distrust and ensure that the Debtors are managed honestly and for the benefit of all stakeholders. *See Marvel Ent. Grp.*, 140 F.3d at 474; *In re Cardinal Indus., Inc.*, 109 B.R. at 755, 766-767 (Bankr. S.D. Ohio 1990) (appointing trustee under section 1104(a)(2) where debtors' self-dealing and breach of fiduciary duties resulted in a serious erosion of trust and confidence by creditors); *Ionosphere Clubs*, 113 B.R. at 168 (stating that "the confidence—or lack thereof—of the business community and of creditors in present management" is among the factors that court consider under section 1104(a)(2)).

146.    Furthermore, there are significant benefits to appointing a chapter 11 trustee. First, as discussed, the appointment of a trustee is the only way to create confidence in these Chapter 11 Cases. Second, the Debtors have businesses and properties that, if managed properly, should provide substantial value. See *In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (concluding that appointment of chapter 11 trustee to manage a sale process was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process"). And, third, the Debtors should also possess various claims and causes of action that, if properly pursued by a truly independent fiduciary, should result in substantial recoveries to the Debtors' estates, as well.

147.    The Movants are committed to continuing to pursue the derivative claims on behalf of the bankruptcy estates. The Movants are also prepared to take control of these Chapter 11 Cases if the Arbitration is allowed to be made final[25] and the Movants elect to rescind the Joint Venture. *See In re Paragon Sec. Co.*, 589 F.2d 1240, 1242-46 (3d Cir. 1978) (explaining that, in bankruptcy, "[w]here goods are obtained by fraud of the bankrupt, the seller may rescind the contract of sale

_____

[25] The Movants expressly reserve and preserve the right to seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code, if and to the extent it applies, to proceed with the Arbitration to a final award, to confirm such final award in state court or other court of competent jurisdiction, and/or to exercise their rights and remedies as so confirmed.

and reclaim" such goods, as "fraud renders all contracts voidable, and … neither in law nor in morals would the trustee be justified in holding goods obtained by the fraud"); *Haywood Co. v. Pittsburgh Indus. Iron Works*, 163 F. 799, 800 (W.D. Pa. 1908) (allowing seller to rescind a contract and reclaim property from the estate). These actions would only inure to the benefit of all creditor constituencies.

148.   In comparison to these benefits, the cost of appointing a chapter 11 trustee is minimal. This is particularly the case given that the CRO was appointed shortly before the filing of the Chapter 11 Cases, so no institutional knowledge should be lost if control of the Debtors is shifted to a truly independent fiduciary. Indeed, the Shinderman Declaration makes it clear that the CRO's investigation of the Debtors and their assets, liabilities, and potential claims is in its early stages, yet already tainted by the Continuum Parties' misrepresentations.

149.   In sum, the appointment of a chapter 11 trustee is necessary for there to be any prospect of success in these Chapter 11 Cases, and the benefits of such appointment greatly outweigh any costs. Therefore, a chapter 11 trustee is in the best interests of the Debtors' estates, creditors, and equity holders and should be appointed pursuant to section 1104(a)(2).

## <u>CONCLUSION</u>

150.     The Movants respectfully submit that the appointment of a chapter 11 trustee in these Chapter 11 Cases is necessary and warranted both for cause due to the Continuum Parties' prepetition fraud, mismanagement, and misconduct and for the best interests of the Debtors' estates. In light of the Arbitrator's findings and conclusions in the Arbitration, this Court should not, and cannot, allow any of the Continuum Parties or any officers or agents affiliated with or engaged by any of the Continuum Parties to remain in control of the Debtors. Instead, what these Chapter 11 Cases desperately require is true independent fiduciary: a chapter 11 trustee.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Movants respectfully request entry of an order substantially in the form attached hereto as <u>Exhibit A</u> directing the appointment of a chapter 11 trustee and granting the Movants such other and further relief that the Court deems necessary or appropriate.

Dated: March 13, 2025
      Wilmington, Delaware

**POLSINELLI PC**

_____

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen A. Smith (Del. Bar No. 7456)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sasmith@polsinelli.com

-and-

Elisa Hyder (admitted _pro hac vice_)
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 267-3001
Facsimile: (215) 267-3002
ehyder@polsinelli.com

**Counsel to Mr. Honarkar and 4G Wireless, Inc.**