<u>Exhibit 2</u>

Pre-Trial Brief

1   AARON M. MAY (SBN 207751)
    Aaron.May@halpernmay.com
2   JOSEPH J. YBARRA (SBN 218130)
    Joseph.Ybarra@halpernmay.com
3   HALPERN MAY YBARRA GELBERG LLP
4   550 South Hope Street, Suite 2330
    Los Angeles, California 90071-2604
5   Telephone: (213) 402-1900

6   Attorneys for Claimant and Cross-Respondent
7   MOHAMMAD HONARKAR and Claimant 4G
    WIRELESS, INC., individually and on behalf of
8   MOM AS INVESTCO LLC, MOM BS
    INVESTCO LLC, and MOM CA INVESTCO
9   LLC

10

11              **JUDICIAL ARBITRATION AND MEDIATION SERVICES**

12

| | |
|---|---|
| 13  MOHAMMAD HONARKAR and 4G WIRELESS, INC., individually and on behalf of MOM AS INVESTCO LLC, MOM BS INVESTCO LLC, and MOM CA INVESTCO LLC, | **JAMS Reference No. 5220003126** |
| 14 | |
| 15 | **Consolidated with JAMS Reference No. 5200001122** |
| 16          Claimants, | **CLAIMANTS' PRE-HEARING BRIEF** |
| 17      v. | |
| 18  MAHENDER MAKHIJANI; CONTINUUM ANALYTICS, INC.; MOM AS INVESTOR GROUP LLC; MOM BS INVESTOR GROUP LLC; MOM CA INVESTOR GROUP LLC; MOM CA MANAGER LLC; MOM BS MANAGER LLC; MOM AS MANAGER LLC; NANO BANC; and DOES 1-100, inclusive, | Arbitration Hearing: June 24-July 12, 2024 |
| 19 | Arbitrator: Hon. David A. Thompson (Ret.) |
| 20 | |
| 21 | |
| 22          Respondents, | |
| 23      and | |
| 24  MOM AS INVESTCO LLC, a Delaware limited liability company; MOM BS INVESTCO LLC, a Delaware limited liability company; MOM CA INVESTCO LLC, a Delaware limited liability company; and DOES 1-10, inclusive, | |
| 25 | |
| 26 | |
| 27 | |
| 28          Nominal Respondents. | |



# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 8

II.  FACTUAL BACKGROUND ........................................................ 10

   A.   Mr. Honarkar Amasses A Large Real Estate Portfolio In Southern California. .......................................................... 10

   B.   Mr. Honarkar Seeks Capital For His Businesses. .................... 11

   C.   Respondents Fraudulently Induce Mr. Honarkar Into Forming A Joint Venture. .................................................... 12

   D.   The Joint Venture Companies And Agreements. ...................... 14

   E.   Mr. Honarkar Discovers That Respondents Never Made Their Initial Capital Contribution. ..................................... 16

   F.   Mr. Honarkar Discovers Respondents' Wrongdoing, And Respondents Launch A Retaliation Campaign Against Him.............. 18

     (1)  Respondents forcibly take control of Mr. Honarkar's properties.......................................................... 19

     (2)  Respondents mismanage the businesses. ...................... 21

     (3)  Respondents' personal attacks on Mr. Honarkar and his family. ................................................... 22

     (4)  Respondents abuse their control in an effort to deprive Mr. Honarkar of the ability to litigate............................. 23

III. HONARKAR PARTIES' AFFIRMATIVE CLAIMS ................................... 24

   A.   Claims Against Respondents Makhijani, Continuum, And MOM Parties........................................................... 25

     (1)  Fraudulent Inducement ...................................... 25

     (2)  Breach of Contract ......................................... 28

       1.  Breach of Obligation to Provide a Capital Contribution ........ 28

       2.  Additional Contractual Breaches ........................... 28

     (3)  Derivative Claims for Conversion and Violation of Cal. Penal Code § 496 .......................................... 34

     (4)  Derivative Claim for Unjust Enrichment.................... 36

     (5)  Forcible Entry and Detainer................................ 36

     (6)  Respondents Waived Their Affirmative Defenses ............ 38

Halpern May Ybarra Gelberg

B.    Honarkar Parties' Claims Against Respondent Nano Banc.................................. 39

   (1)    Conspiracy and Aiding and Abetting Fraud ............................................. 39

   (2)    Derivative Claim for Breach of Loan Agreement...................................... 43

   (3)    Derivative Claims for Conversion and Violation of Penal
       Code Section 496 ...................................................................................... 43

IV.    REMEDIES.......................................................................................................... 43

A.    Accounting........................................................................................................ 44

B.    Recission Of The Joint Venture Agreements With Restitution And
    Consequential Damages.................................................................................... 49

C.    Alternative Damages Calculations.................................................................... 51

V.    THE CROSS-CLAIMS AGAINST MR. HONARKAR ARE
    FRIVOLOUS ....................................................................................................... 52

VI.    CONCLUSION.................................................................................................... 59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# TABLE OF AUTHORITIES

*Cases*

*Aalgaard v. Merchants Nat'l Bank, Inc.*,
224 Cal. App. 3d 674 (1990) ........................................................ 57

*Apple Inc. v. Super. Ct.*,
18 Cal. App. 5th 222 (2017). ........................................................ 52

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ........................................................ 57, 58

*AREI II Cases*,
216 Cal. App. 4th 1004 (2013) ........................................................ 39

*Bedi v. McMullan*,
160 Cal. App. 3d 272 (1984) ........................................................ 37

*Chapman v. Skype Inc.*,
220 Cal. App. 4th 217 (2013) ........................................................ 49

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
68 Cal. App. 4th 445 (1998) ........................................................ 54

*Comunale v. Traders & Gen. Ins. Co.*,
50 Cal. 2d 654 (1958) ........................................................ 28

*Daluiso v. Boone*,
71 Cal. 2d 484 (1969) ........................................................ 36, 38

*Duke v. Super. Ct.*,
18 Cal. App. 5th 490 (2017) ........................................................ 34

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) ........................................................ 25

*Enter. Leasing Corp. v. Shugart Corp.*,
231 Cal. App. 3d 737 (1991) ........................................................ 34

*Four Seas Inv. Corp. v. Int'l Hotel Tenants' Ass'n*,
81 Cal. App. 3d 604 (1978) ........................................................ 37

*Frangipani v. Boecker*,
64 Cal. App. 4th 860 (1998) ........................................................ 54

*Glass v. Najafi*,
78 Cal. App. 4th 45 (2000) ........................................................ 37

*Halvorsen v. Aramark Unif. Servs., Inc.*,
65 Cal. App. 4th 1383 (1998) ........................................................ 57

*IIG Wireless, Inc. v. Yi*,
22 Cal. App. 5th 630 (2018) ........................................................ 39, 40

4

Halpern
May
Ybarra
Gelberg

*Kasparian v. Cnty. of Los Angeles*,
    38 Cal. App. 4th 242 (1995) ........................................................................... 57

*Leaf v. Phil Rauch, Inc.*,
    47 Cal. App. 3d 371 (1975) ............................................................................ 51

*Lee v. Hanley*,
    61 Cal. 4th 1225 (2015) .................................................................................. 34

*Magneson v. Comm'r*,
    753 F.2d 1490 (9th Cir. 1985) ....................................................................... 30

*Mahon v. Berg*,
    267 Cal. App. 2d 588 (1968) .......................................................................... 51

*Margolis v. Commissioner*,
    337 F.2d 1001 (9th Cir. 1964) ....................................................................... 30

*Marzec v. Cal. Pub. Emps. Ret. Sys.*,
    236 Cal. App. 4th 889 (2015) ......................................................................... 50

*McBride v. Smith*,
    18 Cal. App. 5th 1160 (2018) ......................................................................... 56

*McCoy v. West*,
    70 Cal. App. 3d 295 (1977) ............................................................................ 50

*Millar v. James*,
    254 Cal. App. 2d 530 (1967) .......................................................................... 51

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*,
    150 Cal. App. 4th 384 (2007) ......................................................................... 34

*People v. Thompson*,
    43 Cal. App. 4th 1265 (1996) ......................................................................... 37

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) ....................................................................... 36

*Plummer v. Day/Eisenberg, LLP*,
    184 Cal. App. 4th 38 (2010) ........................................................................... 34

*Poggi v. Scott*,
    167 Cal. 372 (1914) ........................................................................................ 34

*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
    29 Cal. App. 5th 230 (2018) ........................................................................... 36

*Quelimane Co. v. Stewart Title Guar. Co.*,
    19 Cal. 4th 26 (1998) ...................................................................................... 56

*Regals Realty Co. v. Commissioner*,
    127 F.2d 931 (2d Cir. 1942) ........................................................................... 30

**CLAIMANTS' PRE-HEARING BRIEF**

*Rickley v. Goodfriend,*
    212 Cal. App. 4th 1136 (2013) ........................................................................ 40

*Rosenthal v. Great W. Fin. Sec. Corp.,*
    14 Cal. 4th 394 (1996) ........................................................................ 25

*Rutherford Holdings, LLC v. Plaza Del Rey,*
    223 Cal. App. 4th 221 (2014) ........................................................................ 28

*San Francisco Bay Area Rapid Transit Dist. v. Spencer,*
    No. C 04-04632 SI, 2006 WL 3751428 (N.D. Cal. Dec. 19, 2006) ................ 36

*Sass v. Cohen,*
    10 Cal. 5th 861 (2020) ........................................................................ 44

*Sharabianlou v. Karp,*
    181 Cal. App. 4th 1133 (2010) ........................................................................ 50

*Siry Inv., L.P. v. Farkhondehpour,*
    13 Cal. 5th 333 (2022) ........................................................................ 35

*Spinks v. Equity Residential Briarwood Apartments,*
    171 Cal. App. 4th 1004 (2009) ........................................................... 37, 38

*Switzer v. Wood,*
    35 Cal. App. 5th 116 (2019) ........................................................................ 35

*Taylor v. Forte Hotels Int'l,*
    235 Cal. App. 3d 1119 (1991) ........................................................................ 34

*Teselle v. McLoughlin,*
    173 Cal. App. 4th 156 (2009) ........................................................................ 44

*Voris v. Lampert,*
    7 Cal. 5th 1141 (2019) ........................................................................ 34

*Wong v. Stoler,*
    237 Cal. App. 4th 1375 (2015) ........................................................................ 50

***Statutes***

26 U.S.C. § 1031 ........................................................................................................ 30

6 Del. C. § 18-1004 ........................................................................................... 51, 52

Civ. Code § 1572 ........................................................................................................ 25

Civ. Code § 1689 ................................................................................................... 28, 49

Civ. Code § 1692 ................................................................................................... 49, 50

Civ. Code § 1954 ........................................................................................................ 37

Civ. Proc. Code § 1159 ....................................................................................... 36, 37, 38

**CLAIMANTS' PRE-HEARING BRIEF**

Civ. Proc. Code § 1160 ........................................................................................ 37, 38

Civ. Proc. Code § 1859 ............................................................................................ 54

I.R.C. § 1031 .......................................................................................................... 30

Penal Code § 418 .................................................................................................... 22

Penal Code § 496 ................................................................................ 35, 43, 52, 58

*Other Authorities*

CACI No. 303 ................................................................................................... 28, 53

CACI No. 325 .......................................................................................................... 28

*Rules*

JAMS Rule 9............................................................................................................ 39

*Treatises*

5 Witkin Summary of Cal. Law (9th ed. 1988) Torts, § 624, pp. 717-18................... 34

Intentional Interference with Prospective Economic Relations: Particular Defenses,
    Rutter Cal. Prac. Guide, Civ. Proc. Trial Claims and Def., Ch. 3(II)-C, ¶
    3:250 ............................................................................................................... 57

Trespass to Land: Elements of Claim, Rutter Cal. Prac. Guide, Civ. Proc. Trial
    Claims and Def., Ch. 11(III)-B ........................................................................ 56

1   Claimant 4G Wireless, Inc. ("4G") and claimant and cross-respondent Mohammad

2   Honarkar ("Honarkar") (together, the "Honarkar Parties"), individually and derivatively on behalf

3   of MOM AS INVESTCO LLC, MOM BS INVESTCO LLC, and MOM CA INVESTCO LLC

4   (together, the "MOM Investco LLCs") hereby submit their Pre-Hearing Brief with respect to their

5   claims against Respondents Mahender Makhijani and Continuum Analytics, Inc. ("Continuum" and

6   together with Mr. Makhijani, the "Makhijani/Continuum Parties"); MOM AS Investor Group LLC;

7   MOM BS Investor Group LLC; MOM CA Investor Group LLC; (together, the "MOM Members");

8   MOM CA Manager LLC; MOM BS Manager, LLC; and MOM AS Manager LLC (together, the

9   "MOM Managers," and collectively with the MOM Members, "MOM Parties"); and Nano Banc.

10  This Pre-Hearing Brief also addresses the cross-claims brought by the MOM Investco LLCs and

11  MOM Members against Mr. Honarkar.

12  **I.      INTRODUCTION**

13          Notwithstanding the contentious manner in which this case has been litigated, this is, at

14  bottom, a fairly simple fraud case in which the central facts are undisputed.

15          In early 2021, Mr. Honarkar was in a tough financial situation.  Despite having built a real

16  estate portfolio worth hundreds of millions of dollars, Mr. Honarkar needed cash to satisfy a

17  payment he was required to make in his divorce proceedings and to refinance a large loan secured

18  by several, but not nearly all, of his properties.  Mr. Honarkar sought financing from Respondent

19  Nano Banc, a regional bank located in Orange County with which he had previously worked, that

20  then referred him to Mahender Makhijani and his company, Continuum Analytics, Inc., an entity

21  that looked to acquire distressed real estate assets.

22          Seeing an opportunity, Mr. Makhijani proposed that Continuum and Mr. Honarkar form a

23  joint venture, whereby Mr. Honarkar would contribute the membership interests in the limited

24  liability companies holding title to his real estate portfolio, and, in turn, Continuum would both

25  provide Mr. Honarkar with $35 million in cash and use its banking relationships to refinance Mr.

26  Honarkar's debt.  Then, going forward, Mr. Honarkar and Continuum—or its designees—would be

27  the joint owners of the new joint venture holding title to what had been Mr. Honarkar's properties.

28          As the contemporaneous documents produced in this case make crystal clear, Mr.

1 Makhijani's promise to contribute cash to the joint venture was false on the day it was made. Rather

2 than fulfill that promise, on June 7, 2021—*the day before* the joint venture agreements were

3 executed—Respondents secretly caused the newly formed joint venture entities (the "MOM

4 Investco LLCs") to borrow $20 million from Nano Banc, secured by properties that, at the time,

5 were wholly owned by Mr. Honarkar and had not yet been contributed to the MOM Investco LLCs.

6 Even worse, to conceal their actions, Respondents directed Nano Banc to put the $20 million in

7 loan proceeds into a Continuum bank account, so that Continuum—rather than Nano Banc—could

8 then wire that money to escrow, making it appear that the money was part of Continuum's $30

9 million capital contribution.

10 There is not a single contemporaneous document disclosing the $20 million Nano Banc loan

11 to Mr. Honarkar. Nor would it make any sense for Mr. Honarkar to relinquish control of his real

12 estate portfolio in exchange for a loan secured by Mr. Honarkar's own properties—something that

13 would be akin to selling a 50% interest in your house to a third party for $1 million, only to find out

14 the third party borrowed that $1 million from a bank and that loan is *secured by your house*.

15 And unfortunately, as Mr. Honarkar discovered in 2023, the $20 million Nano Banc loan is

16 only the "tip of the iceberg," as Respondents have proceeded to use Mr. Honarkar's properties as

17 their personal piggy bank for nearly 3 years now, loading those properties up with hundreds of

18 millions of dollars in debt while using the loan proceeds for their own purposes. As just one

19 example (the evidence will show many), in early July 2021—less than 1 month after the joint

20 venture was formed—Respondents caused one of the entities formerly owned entirely by Mr.

21 Honarkar (Tesoro Redlands LLC ("Tesoro")) to borrow $1 million from Nano Banc, secured by

22 real property owned by Tesoro, and then used that $1 million in loan proceeds to repay one of

23 Respondents' investors who wanted a refund. None of the $1 million went to the joint venture, but

24 the joint venture remains on the hook to pay that money back, or lose one of its properties.

25 Unable to justify their rampant self-dealing, Respondents have since done everything in

26 their power to keep this case from reaching trial, freezing Mr. Honarkar out from any financial

27 reporting or revenue earned by the joint venture since Mr. Honarkar first raised his concerns in

28 February 2023. As just one example (among many that will be detailed at trial), after Mr. Honarkar



9

**CLAIMANTS' PRE-HEARING BRIEF**

1   made an official books and records inspection demand in March 2023, Respondents terminated him

2   as Administrative Manager of the entities, and Mr. Makhijani told Mr. Honarkar that, if the demand

3   was not withdrawn, Mr. Makhijani would personally see to it that Mr. Honarkar's adult children

4   and their families (who reside in homes owned by entities that had been owned by Mr. Honarkar)

5   were thrown out onto the street.  Respondents later followed through on that threat, serving eviction

6   notices on Mr. Honarkar and his kids—one of whom was seven months pregnant at the time the

7   eviction notice was served.

8       In short, Respondents indisputably defrauded Mr. Honarkar into forming the joint venture

9   and when their fraud was exposed, have attempted to bully Mr. Honarkar into standing down and

10  accepting his lot.  It hasn't worked, and trial will demonstrate that Mr. Honarkar is entitled to the

11  rescission of the joint venture agreements and restitution and consequential damages in the amount

12  of $122,200,265, in addition to other damages sought here, including but not limited to punitive

13  damages, treble damages and attorney's fees.

14  **II.      FACTUAL BACKGROUND**

15  **A.      Mr. Honarkar Amasses A Large Real Estate Portfolio In Southern**

16  **California.**

17      Claimant Mohammad "Mo" Honarkar moved to the United States from Iran when he was

18  20 years old.  Not long thereafter, Mr. Honarkar started a small business selling wireless cell

19  phones.  Through hard work and diligence, Mr. Honarkar built that company into a success,

20  eventually selling it and going into real estate development with his family.

21      As with his wireless business, Mr. Honarkar became a success in real estate, amassing a

22  portfolio of properties worth several hundred million dollars.  The properties ranged from large

23  hotels, like a Marriott in Palm Desert, California, to individual homes used as luxury vacation

24  rentals, to commercial real estate.  Among Mr. Honarkar's development projects is the historic

25  Hotel Laguna—a beloved landmark and one of only a handful of businesses in California permitted

26  to serve alcoholic drinks directly on the beach.

27      Claimant 4G Wireless, Inc. ("4G") is a California corporation wholly-owned and

28  controlled by Mr. Honarkar, through which he originally began his wireless cell phone business.



10

**CLAIMANTS' PRE-HEARING BRIEF**

1  After selling those stores and going into real estate, Mr. Honarkar and his family used 4G as the

2  operating and holding company for the single purpose entities (limited liability companies) created

3  to hold title to the various real estate assets.  As detailed below, 4G is a member of the three joint

4  venture entities at issue in this case.

5              **B.**    **Mr. Honarkar Seeks Capital For His Businesses.**

6              The COVID-19 pandemic devastated the hospitality and commercial real estate markets,

7  including Mr. Honarkar's portfolio.  At the same time, Mr. Honarkar was going through a

8  contentious divorce.  The two factors combined to place significant financial pressures on Mr.

9  Honarkar in Spring 2021, as Mr. Honarkar needed to refinance existing debt on his real estate

10 portfolio and pay a financial obligation to his ex-wife, both of which were due in June 2021.

11             To meet these needs, Mr. Honarkar sought financing from various sources, including

12 Respondent Nano Banc, a state-chartered bank based in Irvine, California, with which Mr.

13 Honarkar had previously done business.  Nano Banc, through its then-Chief Credit Officer (and

14 later interim Chief Executive Officer) Anthony Gressak, referred Mr. Honarkar to Mahender

15 Makhijani, a representative of Respondent Continuum Analytics, Inc. ("Continuum")—an entity

16 that pools funds from various investors to acquire and manage distressed real estate assets.  Mr.

17 Honarkar understood that Mr. Makhijani had a banking background, and believed that that

18 experience would be valuable as Mr. Honarkar considered financing options.

19             As it turns out, Mr. Makhijani and Continuum have a long-standing, deep relationship with

20 Nano Banc.  Continuum's owner, Deba Shyam, and several of Continuum's largest investors

21 helped found the bank, and provided the bank with millions of dollars in initial capital.  Several of

22 these Continuum investors/Nano Banc founders—including Gerald Marcil, Andrew Stupin, Deba

23 Shyam, and Bhajneet Sing Malik—are investors in the joint venture at issue here, and were also

24 on the other end of many of the improper transactions at issue.  (Ex.[1] 1000 at 189:19-190:9, 200:20-

25 201:1.)  These same individuals have borrowed over $100 million from Nano Banc since its

26 _____

27 [1] All exhibits cited in this brief are contained in the Compendium of Exhibits filed concurrently

28 herewith, and the exhibit numbers cited herein are the same exhibit numbers to be used at the
   arbitration hearing.

Halpern
May
Ybarra
Gelberg

formation.  (*Id.*)  In addition, Mr. Makhijani is one of Nano Banc's largest referral sources, facilitating loans with Continuum's clients, his ventures, and others.

Mr. Honarkar did not know it at the time, but when Nano Banc introduced him to Continuum, the bank was already under scrutiny from its regulators for making improper loans to insiders and shareholders.  Nano Banc's top executives, including Mr. Gressak, who spearheaded the loan at issue in this case, were eventually forced to resign and entered into consent decrees with bank regulators that prohibited them from participating in Nano Banc's operations.  Nano Banc itself has entered into multiple consent decrees with regulators, requiring the bank to revamp its lending practices and take steps to remedy prior deficiencies, including those relating to transactions involving insiders and shareholders like the transaction at issue here.

**C.**  **Respondents Fraudulently Induce Mr. Honarkar Into Forming A Joint Venture.**

Shortly after Mr. Gressak introduced Mr. Honarkar to Mr. Makhijani, Messrs. Honarkar and Makhijani, through their respective corporate entities, worked towards forming a potential new joint venture.  Mr. Makhijani promised Mr. Honarkar that, under the joint venture, he would continue to operate his family business on a day-to-day basis in the same manner he had been doing, now just with an additional party who would assist with financing.

The specific terms of the joint venture remained undecided until May 24, 2021—when Messrs. Honarkar and Makhijani entered into a temporary binding Term Sheet.  (Ex. 148.) Pursuant to the Term Sheet, Continuum was to contribute $35 million in capital (defined as "cash equity")[2] to an entity to be formed by Messrs. Honarkar and Makhijani *and* secure refinancing for Mr. Honarkar's existing debt obligations to LoanCore on certain properties (then-estimated to be $145 million), which were coming due in mid-June 2021.  Mr. Honarkar, in turn, was to contribute to the newly formed entity his ownership interests in certain limited liability companies that, in

---

[2] Continuum initially drafted the Term Sheet to provide that its capital contribution could be made in the form of "debt with equity warrants and/or equity."  (Ex. 84.)  Mr. Honarkar deleted the option for Continuum to make the contribution with debt (Ex. 91), and the executed Term Sheet specifying that Continuum's contribution be made by "cash equity."

Halpern
May
Ybarra
Gelberg

1   turn, held title to parts of his real estate portfolio. According to the Term Sheet, the membership

2   interests in those limited liability companies were to be owned by the newly formed entity, which

3   was not named in the Term Sheet. Mr. Honarkar had no idea that at the time he signed this Term

4   Sheet, Mr. Makhijani's fraudulent scheme was already underway.

5          As Mr. Makhijani was informed, Mr. Honarkar planned to use half of Continuum's capital

6   contribution ($17.5 million) to meet his financial obligations to his former spouse—a payment that

7   Mr. Honarkar needed to make by June 12, 2021 or forfeit his right to a house jointly owned by the

8   couple. Nonetheless, Continuum's entire $35 million was to be credited as capital contributions

9   by Continuum to the further development of Hotel Laguna and another real estate project owned

10  by Mr. Honarkar in Los Angeles's Koreatown. As to the remainder of the real estate assets to be

11  controlled, indirectly, by the joint venture, the Term Sheet provided that Mr. Honarkar would

12  retain the right to sell and/or refinance the projects, subject only to Continuum's limited consent

13  rights. Mr. Honarkar would also be entitled to all proceeds from a sale of those other assets.

14  Continuum was only entitled to receive a financial return from Hotel Laguna and the Koreatown

15  projects, absent a further capital contribution by Continuum to another project.

16         Mr. Makhijani informed Mr. Honarkar that his lawyers would draft the formal Operating

17  Agreements for the limited liability company or companies that would become the new joint

18  business venture. Knowing that the situation was urgent and time was of the essence, and with his

19  scheme already well underway, Mr. Makhijani then waited 10 days after the Term Sheet was

20  signed (until after business hours on June 4, 2021) to provide Mr. Honarkar with three (3) draft

21  operating agreements for three limited liability companies, which were to comprise the new

22  venture.

23         The Operating Agreements were signed only four days later (with two of those days being

24  weekend days), on June 8, 2021, both because Mr. Honarkar had immediate financial obligations

25  to meet and because Mr. Makhijani refused to negotiate the terms set forth in the drafts that he

26  belatedly presented. As the evidence at trial will show, Mr. Makhijani and his agents used the

27  flurry of activity taking place under extreme time pressure to require that Mr. Honarkar review

28  and approve portions of the contracts piecemeal, without access to the complete papers.

**CLAIMANTS' PRE-HEARING BRIEF**

Halpern
May
Ybarra
Gelberg

On the same day that the joint venture Operating Agreements were signed—June 8, 2021—the parties closed escrow on the refinancing of the $145 million in existing debt on certain of Mr. Honarkar's properties. However, Mr. Makhijani claimed that he could not secure sufficient financing to pay off the entirety of the existing $145 million debt on Mr. Honarkar's properties (as the Term Sheet had required), and instead Mr. Makhijani proposed, and Mr. Honarkar consented, that Continuum's capital contribution be reduced to $30 million and be used to "close the gap" in the refinance, which was believed to be about $30 million. Because the capital contribution was now being reduced and used to refinance the existing debt on his properties, Mr. Honarkar was unable to use that cash to pay his obligation to his former spouse, as the parties had planned and agreed upon. As a result, Mr. Honarkar was forced to relinquish his right to the residence formerly owned by the couple.

The Escrow Closing Statement for the refinance transaction (pictured below) made it *appear* that Continuum made its required $30 million capital deposit to escrow through two separate wire transfers ($20 million and $10 million, respectively). (Ex. 308.) The Closing Statement also shows that Continuum received a refund of approximately $4 million *from* the escrow account at closing, and that Mr. Makhijani's and Continuum's counsel, Marc Cohen, personally received $125,000 from the escrow. (*Id.*)

| Description | Debit | Credit |
|---|---|---|
| **TOTAL CONSIDERATION:** | | |
| Deposit - Continuum Analytics FBO Borrower | | 20,000,000.00 |
| Deposit - Continuum Analytics FBO Borrower | | 10,000,000.00 |
| **ADDITIONAL CHARGES:** | | |
| Lender Legal Fee to Cohen Law Group, APC | 125,000.00 | |

## D. The Joint Venture Companies And Agreements.

On June 8, 2021, Messrs. Honarkar and Makhijani executed the Operating Agreements for the three separate limited liability companies that would become the owners of the membership interests formerly held by Mr. Honarkar—MOM CA Investco LLC ("MOM CA"); MOM AS Investco LLC ("MOM AS"); and MOM BS Investco LLC ("MOM BS") (together, the "MOM Investco LLCs"). Mr. Makhijani's company Continuum Analytics provided its initials for the name of the largest of the entities—MOM *CA*—and two of Mr. Makhijani's investors who are also

founding shareholders of Respondent Nano Banc—Andrew Stupin and Bhajneet Sing Malik—used their initial for the names of other two entities—MOM *AS* and MOM *BS*, respectively.

The material terms of the three Operating Agreements are substantially similar.  They are as follows:

(a) Makhijani/Continuum, through a newly formed entity (MOM CA Member), was required to make a $30 million "Contribution" to MOM CA, which was to be used for the Hotel Laguna project.  (Ex. 315 § 6.1.)  The Operating Agreement defines "Contribution" as "money or property" that a "Member contributes to the Company as capital" (*id*. § 1.19) and expressly states that loans by a Member to the Company "shall not be considered Contributions for purposes of this Agreement."  (*Id*. § 6.5.)

(b) Mr. Honarkar contributed to MOM CA the entirety of the membership interests in various limited liability companies owned and controlled by Mr. Honarkar, which were defined as either "Subsidiaries" or "Projects."  (*Id*. § 6.1(a).)  The Operating Agreement states expressly that, as of the time of execution, the only "Project" was Hotel Laguna (*id*. § 1.45); each of the other entities was a "Subsidiary."  A "Subsidiary" would become a "Project" only upon the MOM CA Member (Makhijani/Continuum) making a specified capital contribution to the "Subsidiary."  Absent such a Contribution, the MOM CA Member would hold no capital interest in the "Subsidiary" and would not be entitled to participate in any revenues generated by the entity.

(c) MOM CA would be managed by a "Managing Manager" and "Administrative Manager."  The initial Managing Manager was MOM CA Manager—an entity controlled by Makhijani/Continuum.  The initial Administrative Manager was Mr. Honarkar.  Although most of the powers were placed in the hands of the Managing Manager, the Operating Agreement specifically states that, as to the "Subsidiaries/Other Owned LLCs" (as distinct from the "Projects"), the Managing Manager is not entitled to sell the assets of those entities or ownership interests in the entities absent the prior written consent of Mr. Honarkar.  (*Id*. § 9.3(b).)

(d) The Operating Agreement provides that the Managing Manager is required to keep full and accurate books and records of the Company, including as to all income, expenses, and transactions of the Company.  (*Id*. § 12.1.)  Additionally, the Managing Manager is to provide monthly and annual financial reports on the Company, including its balance sheet, profit and loss statement, and tax returns.  (*Id*. § 12.2.)[3]

---

[3] On July 14, 2022, the Mr. Honarkar, 4G, and Respondents executed a Letter Agreement that amended each of the Operating Agreements to clarify that 4G was a Member of each of the MOM LLCs, not Mr. Honarkar personally.  (Ex. 583.)  The Letter Agreement states that the parties originally intended for 4G to be the member, and the amendment conforms the Agreements to the parties' original intent.  (*Id*. § 3.)

**CLAIMANTS' PRE-HEARING BRIEF**

Also on June 8, 2021, the parties executed an Asset Contribution Agreement ("ACA"), which effectuated the transfer of the membership interests in the various LLCs holding title to his properties from Mr. Honarkar/4G to the three newly established joint venture companies. (Ex. 304.) According to the ACA's express language, as of the effective date (June 8, 2021), "the direct and indirect ownership of each LLC … is being restructured … so that the sole owner of all of the membership interests in each LLC is MH [Mr. Honarkar] and [] immediately after such restructure, MH hereby contributes [] the membership interests in each LLC" to the MOM Investco LLCs. (*Id*. § 2(a)(i).) The ACA further specified that certain entities—defined as "Held-back LLCs"—were not subject to the restructuring and contribution by Mr. Honarkar. (*Id.*)

**E.      Mr. Honarkar Discovers That Respondents Never Made Their Initial Capital Contribution.**

In early 2023, Mr. Makhijani's learned from a potential lender that there was a deed of trust securing a $20 million loan from Nano Banc on one of the joint venture properties. Surprised by this, Mr. Honarkar decided to investigate the title records of various real properties owned, indirectly, by the MOM Investco LLCs. The facts learned by Mr. Honarkar demonstrate substantial wrongdoing by Mr. Makhijani, Continuum, the limited liability companies controlled by Mr. Makhijani, and Nano Banc.

First of all, Makhijani/Continuum failed to make their initial $30 million capital contribution and, as Mr. Honarkar now knows, conspired with third parties including Nano Banc to make it appear that they had done so. They then concealed their actions from Mr. Honarkar:

- On *May 20, 2021*—several days *before the Term Sheet was even signed*, let alone the Operating Agreements and ACA—Nano Banc sent to Deba Shyam of Continuum—and not to Mr. Honarkar—a written proposal for a $20 million loan to be made by Nano Banc to the MOM Investco LLCs. (Ex. 130.) The proposal expressly provides that the loan proceeds were to be used to refinance Mr. Honarkar's debt and be secured by LLC interests and Deeds of Trust against 4 properties then wholly owned by Mr. Honarkar.

- Around the same time, Nano Banc provided Mr. Honarkar with a written proposal for a potential $150 million loan to be made to Mr. Honarkar's entities to refinance his existing debt. (Ex. 155.) That proposal provided for the loan to be secured by Deeds of Trust on several of Mr. Honarkar's properties, *including the same 4 properties contemplated to serve as collateral for the simultaneous $20 million loan proposed to Continuum* (above). Mr. Honarkar executed that proposal with Nano Banc on May 25, 2021, and Nano Banc used the pretext of that potential loan to obtain information

16

Halpern
May
Ybarra
Gelberg

regarding Mr. Honarkar's finances and the value of his properties—information ultimately used to make the $20 million loan to the MOM Investco LLCs. Nano Banc apparently had no intention of making the $150 million loan to Mr. Honarkar, as the loan was far in excess of the bank's lending limit. (Ex. 1000 at 40:9-41:6, 55:25-56:24.)

- On June 7, 2021—*before the MOM Investco LLC Operating Agreements were even executed, and before Mr. Honarkar contributed his ownership interests in real property to the MOM Investco LLCs*—the MOM Investco LLCs finalized the $20 million loan from Nano Banc that had been in the works for weeks. (Ex. 243.) The terms of the loan included an assignment of the MOM Investco LLCs' membership interests in certain subsidiary entities then wholly owned by Mr. Honarkar, as well as Deeds of Trusts on certain properties that, as of June 7, 2021, were solely owned by Mr. Honarkar.[4]

- With Nano Banc's agreement and assistance, Makhijani/Continuum Parties caused Nano Banc to deposit the $20 million loan proceeds—which were borrowed by the MOM Investco LLCs—*into a Continuum bank account* (# 1405841). (Ex. 237.) Respondents then wired the loan proceeds from Continuum's account to the escrow, making it appear that the $20 million came *from Continuum*, as part of its capital contribution.

Respondents claim that Mr. Honarkar was aware that they would be funding their capital contribution through a $20 million loan from Nano Banc. But there are literally *no written communications whatsoever* informing Mr. Honarkar of that fact as the bank's PMK concedes. (Ex. 1000 at 93:21 to 94:7.) Respondents' claim is also inconsistent with their actions, including the plain subterfuge of causing Nano Banc to first deposit the loan proceeds to Continuum, and then Continuum wiring those loan proceeds to escrow. Indeed, Respondents can't even get their story straight on the reason this action was taken. Nano Banc claims that the money was wired to Continuum because the borrower informed them that the refinancing escrow had not yet been opened. (Ex. 240.) Continuum/MOM Respondents claim the money was transferred to

---

[4] In total, the $20 million loan from Nano Banc was secured by an Assignment of the MOM LLCs' ownership interests in three entities that, as of June 7, 2021, were owned solely by Honarkar Parties—Laguna HI, LLC, Laguna HW, LLC, and The Masters Building LLC—as well as three separate Deeds of Trust dated June 7, 2021 on real property owned by Laguna HI, LLC (the Holiday Inn Laguna Beach), Laguna HW, LLC (14 West Boutique Hotel), and The Masters Building, LLC (2711 and 2713 PCH, Newport Beach). On June 7, 2021, the Statements of Information on file with the California Secretary of State for each of these limited liability companies showed that Honarkar Parties were the owners of these companies. Nevertheless, each Deed of Trust is signed by Makhijani/Continuum Parties' agent Deba Shyam, on behalf of the Managing Manager of MOM CA, and not by any representative of Honarkar Parties.

Halpern
May
Ybarra
Gelberg

1    Continuum because the MOM Investco LLCs did not yet have bank accounts. (Ex. 1009 at 62:16-
2    63:8.)

3    Moreover, Respondents' position that Mr. Honarkar was aware of the $20 million Nano
4    Banc loan is patently inconsistent with their later efforts to conceal it from Mr. Honarkar. For
5    example, although the Deeds of Trust provided as collateral for the $20 million loan are dated June
6    7, 2021, Nano Banc did not record those deeds until *March 2022*. Respondents claim this was
7    because certain other Deeds of Trust on those properties needed to be reconveyed first, but the
8    written record demonstrates that, even assuming certain reconveyances were necessary (*arguendo*
9    only), those reconveyances were done in November 2021, and Nano Banc did not begin the process
10   of trying to record those Deeds of Trust until January 18, 2022, when Marc Cohen—apparently as
11   counsel to Nano Banc—sent an email to initiate the process. (Ex. 515.) Notably, January 18, 2022
12   is *the very same day* that the Federal Reserve issued a Cease and Desist Order to Nano Banc
13   requiring it to (*inter alia*) report unsecured loans made to insiders in prior years and remedy any
14   deficiencies in those loans, and to develop enhanced standards for "loans made to shareholders,
15   senior executives, directors, and/or any entities which they control." (Ex. 514 §§ 5-8.)

16   Similarly, the MOM Respondents continued to hide the $20 million loan from Mr.
17   Honarkar in their financial reporting on the joint venture. For example, in response to Mr.
18   Honarkar's requests for a list of all expenses paid by Respondents towards the joint venture,
19   Michael Kluchin of Continuum—on two separate occasions in 2022—sent Mr. Honarkar a list of
20   purported "expenses" that *included* the $20 million as a Continuum payment to the MOM Investco
21   LLCs, not a loan made to the MOM Investco LLCs by Nano Banc. (Ex. 716 at pp. 6-21.) Similarly,
22   when Mr. Kluchin reported to Mr. Honarkar a list of the loans that Respondents had taken out on
23   the joint venture, the list did *not* include the $20 million Nano Banc loan. (*Id*. at pp. 22-24.)

24   F.    **Mr. Honarkar Discovers Respondents' Wrongdoing, And Respondents**
25         **Launch A Retaliation Campaign Against Him.**

26   In February 2023, Mr. Honarkar was told by a potential lender about one of the Nano Banc
27   deeds of trust, which lead Mr. Honarkar to initiate a review of title to his real estate portfolio. That
28   review turned up all four Deeds of Trust on the Nano Banc loan discussed above, and other debt

Halpern
May
Ybarra
Gelberg

hidden from Mr. Honarkar.

Mr. Honarkar informed Mr. Makhijani and Respondents of his concerns regarding transactions he had not known about or approved (including the $20 million Nano Banc loan) and requested that MOM Parties and Makhijani/Continuum Parties produce all relevant documents and financial records of the MOM Investco LLCs.  Having not received the requested documents or information, on March 22, 2023, Mr. Honarkar, through his then-counsel at the law firm of Latham & Watkins LLP, sent a formal books and records demand with respect to each of the MOM Investco LLCs, seeking basic financial and transaction documents for the entities.  (Exs. 661-663.)

Rather than simply produce the books and records—as required to do by law and the express terms of the Operating Agreements—Respondents began a campaign of retaliation against Mr. Honarkar.  Mr. Makhijani called Mr. Honarkar on the phone and told him that unless the books and records demands were withdrawn, Mr. Makhijani would see to it that Mr. Honarkar's kids were thrown out onto the street.  On March 29, 2023—exactly one week after Mr. Honarkar sent his formal books and records request to Respondents—Mr. Makhijani and Continuum, utilizing their power as Managing Manager of the MOM Investco LLCs, terminated Mr. Honarkar as the Administrative Manager of the entities.  The termination letters, signed by Mr. Makhijani's and Continuum's attorney Marc Cohen, fail to set forth any basis for removing Mr. Honarkar from his position.  (Exs. 669-671.)  Unfortunately, this was just the beginning.

### *(1)    Respondents forcibly take control of Mr. Honarkar's properties.*

Two days later, on March 31, 2023, Mr. Makhijani and Continuum sent a team of armed guards to enter and physically take control of several of the properties managed by Mr. Honarkar, including Hotel Laguna, a Holiday Inn Hotel in Laguna Beach, and more than 30 vacation rental properties.  Among other things, Mr. Makhijani and Continuum terminated existing management, disabled security cameras and other security apparatuses, dismantled or disabled existing operational systems, and began noisily misrepresenting to tenants, vendors, and city officials that Mr. Honarkar was no longer the owner of the properties.

Thereafter, in early May 2023, Mr. Honarkar sought to retake control of Hotel Laguna from Respondents, resulting in a confrontation with Respondents' agents.  Banayotis Haddad,

Halpern May Ybarra Gelberg

1  Continuum employee and Manager of MOM AS Manager, LLC, was arrested by Laguna Beach

2  police for assaulting a construction worker at Hotel Laguna; he was the only person arrested.

3      Immediately thereafter, Mr. Honarkar and Respondents sought injunctive relief from the

4  Orange County Superior Court regarding control of Hotel Laguna and some of the other entities.

5  Judge Hesseltine of the Orange County Superior Court reviewed the Operating Agreements and

6  issued an Order requiring Honarkar to stay away from Hotel Laguna, which he has done since

7  then. Judge Hesseltine subsequently declined to issue any injunction deciding control of the joint

8  venture and its subsidiaries, finding that that issue should be resolved in arbitration.

9      Respondents apparently were emboldened by their takeover of the Hotel Laguna. On the

10 night of June 30/early morning of July 1, 2023, Respondents again sent a team of armed guards

11 and other agents to enter and physically take control of a property that Mr. Honarkar had been

12 operating for years, a restaurant located at the Festival of Arts (650C Laguna Canyon Road,

13 Laguna Beach, CA 92651) that Mr. Honarkar operated through Terra Laguna, Inc. Respondents

14 have operated that restaurant since July 1, 2023, earning substantial revenues. None of those

15 revenues have been shared with Mr. Honarkar.

16     Only a few weeks later, on the afternoon of July 24, 2023—*while Honarkar and*

17 *Respondents were in Court before Judge Hesseltine to argue the parties' then-pending amended*

18 *motions for injunctive relief*—Respondents sent more than a dozen men dressed in all black—who

19 were apparently ready and waiting on standby—to violently break into the 4G corporate

20 headquarters, where both 4G and Mr. Honarkar have their offices, and which Honarkar Parties

21 have been in possession of since 2021. Michael Kluchin, Continuum's Director of Operations,

22 instructed the more than one dozen agents—which included multiple locksmiths and people

23 dressed in all black purporting to be private security guards but without any private security guard

24 insignia—to force open the double doors at the front entrance to the 4G offices, and when that was

25 unsuccessful, gained entry by using a metal mallet to break a glass door located on the side of the

26 office building.

27     Once inside, Makhijani/Continuum Parties and MOM Parties proceeded to steal

28 documents, files, computer equipment, and other objects from the offices, including employees'



**CLAIMANTS' PRE-HEARING BRIEF**

1   personal effects.[5]   The stolen materials includes multiple banker's boxes of hardcopy files

2   specifically labelled "LEGAL."  Makhijani/Continuum Parties and MOM Parties also attempted

3   to access human resources files with sensitive information about 4G's employees, including their

4   home addresses and social security numbers.  Mr. Kluchin personally conducted a search of the

5   office, putting sensitive documents into his backpack.

6        After the break in, Respondents stationed approximately twenty (20) purported private

7   security guards inside the office and changed the locks on the doors to the offices.  Respondents

8   continue to forcibly occupy the property to this day and have done their best to prevent Mr.

9   Honarkar from accessing any materials that had been in those offices.  On Mr. Honarkar's motion,

10  Judge Hesseltine referred the matter to a special master to determine rightful possession of the

11  items that Respondents took from 4G offices, including privileged legal files, but counsel for

12  Makhijani/Continuum Parties and MOM Parties have not agreed to schedule the special master

13  proceedings.   Through their deliberate efforts to delay, Respondents have ensured that Mr.

14  Honarkar will not have access to his files during the hearing in this matter.  Indeed, Respondents

15  have refused to even allow Mr. Honarkar's employees to retrieve their personal effects stored in

16  the offices.

17              *(2)      Respondents mismanage the businesses.*

18       Since removing Mr. Honarkar as Administrative Manager on March 29, 2023, Respondents

19  have engaged in blatant violations of law, exposing the businesses to civil and criminal penalties.

20       For example, Respondents illegally evicted Nooshin Gholizadeh, the live-in manager of

21  the Laguna Holiday Inn, from the apartment she has lived in at the hotel since 1993.  Respondents

22  did this by changing the lock on Ms. Gholizadeh's door without notice, locking all her belongings

23  inside.  Ms. Gholizadeh has been locked out of her apartment for over a year now, and Respondents

24  have refused her any access at any time—including refusing to allow her to collect her personal

25

26  _____

27  [5] Meanwhile, Mr. Honarkar's employees gathered in fear in the central part of the offices and made multiple calls to 911 for assistance.  Several employees later reported that they were followed home after leaving the offices on the evening of July 24 and feared for their personal safety as a

28  result.



1    belongings, in violation of California's Penal Code section 418.

2          Respondents have also refused to honor pre-payments made by guests of the Holiday Inn

3    Laguna Beach and Vacation Rental Properties, instead requiring them to make new payments to

4    Respondents and telling them to seek a "charge-back" of the first payment from their credit card

5    company.  Similarly, Respondents refused to honor reservations made by guests many months in

6    advance, ruining these innocent third parties' family vacations and destroying the reputation and

7    goodwill that Mr. Honarkar's businesses have spent years building.

8          With respect to other Held-back LLCs—again, entities that were never part of the joint

9    venture and in which Respondents hold no ownership interest—Respondents have repeatedly filed

10    false Statements of Information with the California Secretary of State, changing the forms so that

11    Respondents are listed as the owners of entities, rather than Mr. Honarkar, and wrongfully altering

12    the designated agents for service of process.

13          *(3)*     ***Respondents' personal attacks on Mr. Honarkar and his family.***

14          Sadly, Respondents' campaign of retaliation has even spread to Mr. Honarkar's family.

15          After Mr. Makhijani told Mr. Honarkar that he would have Mr. Honarkar's kids thrown

16    out onto the street, Respondents attempted to follow through on that threat, serving eviction notices

17    on both of Mr. Honarkar's children, including serving an eviction notice on Mr. Honarkar's

18    daughter Hasty Honarkar while she was seven months pregnant.[6] Respondents have also

19    filed multiple lawsuits against Mr. Honarkar, his children, his employees, and his tenants, in

20    multiple different courts, all in an effort to drain Mr. Honarkar of the financial resources necessary

21    to litigate his affirmative case against Respondents, and to use the litigation privilege as a

22    shield to make defamatory statements about Mr. Honarkar and his family that can be repeated

23    widely, including false allegations that Mr. Honarkar is stealing money from the joint venture.

24

25

26    _____

27    [6] Respondents also began eviction proceedings against multiple tenants that had leased joint

28    venture properties, where Respondents perceived those tenants to side with Mr. Honarkar over Mr. Makhijani in this dispute.



**CLAIMANTS' PRE-HEARING BRIEF**

Notably, Respondents and their attorney Marc Cohen have repeated these false allegations multiple times, including during live presentations by Messrs. Makhijani and Cohen to the Laguna Beach City Council accusing Mr. Honarkar of misconduct.[7]  Respondents even went as far as hiring mobile billboards displaying pictures of Mr. Honarkar and *his children* to drive around Laguna Beach, with defamatory messages, further damaging his reputation in the community that he has spent decades building.



(Ex. 1150.)

When asked at deposition whether he was involved in the display of these billboards, Mr. Makhijani testified that he "just could not remember" (Ex. 1011 at 117:16-118:21)—as if paying for mobile billboards to accuse your business "partner" of corruption is so commonplace that it cannot be recalled only months later.

> ### (4) *Respondents abuse their control in an effort to deprive Mr. Honarkar of the ability to litigate.*

Since Mr. Honarkar was removed as Administrative Manager in March 2023, Respondents

---

[7] Respondents have also published articles in local newspapers doing the same.  *See, e.g.*, https://www.lagunabeachindy.com/the-emperor-has-no-clothes/

**CLAIMANTS' PRE-HEARING BRIEF**

1   have not provided Mr. Honarkar with any income from the operations of any of the properties,

2   despite the fact the properties have generated millions of dollars in this period and Respondents

3   have, by their own admission, paid themselves more than $4 million.  Respondents' actions are a

4   transparent effort to deprive Mr. Honarkar of the funds needed to litigate this dispute.

5          Neither have Respondents provided Mr. Honarkar with any financial reporting

6   whatsoever—unless compelled to do so in litigation.  For example, Respondents vigorously

7   opposed Mr. Honarkar's Petition to Compel Books and Records (*Mohammad Honarkar et al. v.*

8   *MOM AS Investco LLC et al.*, Los Angeles Superior Court Case No. 23STCP01361) (the

9   "Petition"), despite not having any basis in law for doing so.

10          Thankfully, delay can only work for so long.  On November 9, 2023, Mr. Honarkar's

11   Petition was granted by Judge Chalfant of the Los Angeles Superior Court.  (Ex. 1377.)  As to

12   Respondents securing the surreptitious Nano Banc loan, Judge Chalfant found what is plainly

13   obvious from the documents—that there was "evidence that, rather than make the required $20

14   million capital contribution to the MOMs, they secretly had the MOMs borrow $20 million from

15   Nano Banc using Honarkar's own properties to secure the loan. These other Members and

16   Makhijani took those funds from the MOMs, put them in a bank account belonging to themselves,

17   and used the funds as their capital Contribution to the MOMs."  (*Id*. at 18.) The Court further

18   observed that "Respondents at least partially admit this wrongdoing," because "[t]hey state that

19   they funded their capital contribution with a loan that was 'nominally' taken out by the MOMs

20   themselves." (*Id*.)  The Court then concluded: "**What is known is that Respondents wrongly**

21   **used the MOMs to borrow money, obligating it to repay the loan, and used properties then**

22   **owned by Honarkar to do so, all without his knowledge.**" (*Id*. (emphasis added).)

23          At the hearing, Judge Chalfant rejected Respondents' challenge to his factual findings,

24   stating: "You can't do it. You cannot use the MOMs to borrow money without Mr. Honarkar

25   knowing about it. I don't care how you spin it. You can't do that." (Ex. 883 at p. 125 [24:16-19].)

26   **III.    HONARKAR PARTIES' AFFIRMATIVE CLAIMS**

27          For clarity, the Honarkar Parties' affirmative claims are grouped below by Respondent, with

28   the claims against the MOM Parties and Makhijani/Continuum Parties first, followed by those

1  against Nano Banc.

2      **A.**    <u>**Claims Against Respondents Makhijani, Continuum, And MOM Parties.**</u>

3      *(1)*    ***Fraudulent Inducement***

4      Respondents Mr. Makhijani, Continuum, and the MOM Members fraudulently induced the

5  Honarkar Parties into signing the joint venture agreements by promising a $30 million cash

6  contribution to the joint venture—a promise they did not fulfill and had no intention of fulfilling

7  when made.[8]

8      The evidence establishing fraud by Respondents is extensive and, for the most part,

9  undisputed.  Section 6.1(c) of the MOM CA Operating Agreement requires Mr. Makhijani's group

10  to "make a Contribution of $30 million to the Company for the Hotel Laguna Project."  (Ex. 315 §

11  6.1.)  "Contribution" is defined as "any money or property, or a promissory note or other binding

12  obligation to contribute money or property, or to render services as permitted by law, which a

13  Member contributes to the Company as capital in that Member's capacity as a Member pursuant to

14  this Agreement."  (*Id*. § 1.19.)  The Agreement also expressly states that "Loans by a Member to

15  the Company shall not be considered Contributions for purposes of this Agreement."  (*Id*. § 6.5.)

16      It is effectively undisputed that Respondents did not actually make the required $30 million

17  "Contribution," and instead caused the MOM Investco LLCs to borrow $20 million from Nano

18  Banc (secured by what became joint venture properties), took those loan proceeds and put them in

19  a Continuum bank account, and then wired them from Continuum to the refinancing escrow—to

20

21  _____

22  [8] "Actual fraud … consists in any of the following acts, committed by a party to the contract, or
with his connivance, with intent to deceive another party thereto, or to induce him to enter into the

23  contract: [] The suggestion, as a fact, of that which is not true, by one who does not believe it to be

24  true; … [or] [] A promise made without any intention of performing it."  Cal. Civ. Code § 1572;
*see also Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 973 (1997) ("Promissory fraud is

25  a subspecies of fraud and deceit.  A promise to do something necessarily implies the intention to
perform; hence, where a promise is made without such intention, there is an implied

26  misrepresentation of fact that may be actionable fraud.") (citation and internal quotation marks

27  omitted).  "Fraud in the inducement ... occurs when the promisor knows what he is signing but his
consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of

28  the fraud, is *voidable*."  *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415 (1996) (citation
and internal quotation marks omitted).



make it appear that Continuum had sent two wires to the escrow—one for $20 million and one for $10 million—in fulfillment of its $30 million initial capital contribution.  Indeed, in sworn declarations, Mr. Makhijani has admitted as much, stating that "MOM Members funded $20 million of the contribution amount through a loan from Nano Banc (the 'Nano Loan');" that "the Nano Loan was nominally taken out in the names of the MOM Entities [the MOM Investco LLCs];" and that Mr. Makhijani "was personally involved in securing this $20 million in funding, which was funded on June 7, 2021," the day before the joint venture agreements were signed.  (Ex. 832 ¶¶ 6-11.)  As Judge Chalfant held, "You can't do that."  (Ex. 883 at p. 125; Ex 1377 at p.18.)

The evidence is also clear that Respondents never planned to make the required "Contribution."  Indeed, the written proposal for the $20 million loan is dated May 20, 2021—*before* the May 24 Term Sheet was even signed, let alone the Operating Agreements.  (Ex. 130.) Indeed, at deposition, Mr. Makhijani admitted that he had been discussing this loan with Nano Banc up to a week before the May 20, 2021 proposal—well in advance of any contractual promise made by Respondents.  (Ex. 1009 at 121:11-23.)

Similarly, the evidence will show that Respondents hid their scheme from Mr. Honarkar, who did not know about or approve of it.  In their written discovery responses, the MOM Parties fail to cite to any written communications disclosing the loan to Mr. Honarkar.  (Ex. 950.)  Indeed, to the contrary, the written record demonstrates that Respondents actively concealed the loan from Mr. Honarkar.  For example, on June 6, 2021, Continuum's Director of Operations Michael Kluchin sent an email to Mr. Honarkar and the escrow company stating that three lenders, not four, would be involved in the refinancing—Preferred Bank, First Choice Bank, and Lone Oak Fund LLC.  (Ex. 229.)  The email and attachment makes no mention of Nano Banc, with Mr. Kluchin informing the recipients instead that borrower would be making up the $29 to $30 million shortfall.  (*Id.*)  Of course, the next day, Respondents worked with Nano Banc to deposit the $20 million in loan proceeds into a bank account belonging to Continuum, so that it could be passed off as a transfer from Continuum when it was wired to escrow.  (Ex. 237.)  And when Mr. Honarkar requested a list of all loans on joint venture assets in December 2021, Respondents sent Mr. Honarkar a list that did not include the Nano Banc loan.  (Ex. 716 at pp. 22-24.)



26

1   Respondents will apparently seek to excuse their admitted fraud in two ways.   First,

2   Respondents contend that Mr. Honarkar would have agreed to the deal even if he had known about

3   the secret Nano Banc loan, because he had no better options available.   There is of course no

4   evidence to support this contention, and plenty to refute it.   For example, Respondents' initial draft

5   of the Term Sheet provided that Continuum could make its capital contribution to the joint venture

6   through "debt with equity warrants" or "equity." (Ex. 84.)  Mr. Honarkar struck that language and

7   required that the contribution be in the form of "cash equity." (Ex. 91.)  The change makes clear

8   that Mr. Honarkar had no intention of agreeing to a deal funded by debt, let alone debt taken on by

9   the new joint venture itself, for which Mr. Honarkar is at least 50% responsible.

10   Second, Respondents argue that, even if they did not make the required initial capital

11   contribution, there is "no harm, no foul" because, at the same time, the MOM Investco LLCs entered

12   into a "Contribution Agreement" with the MOM Members, whereby the MOM Members agreed to

13   make whatever payments were required on the Nano Banc loan. (Ex. 233.)  The agreement is likely

14   inauthentic, an after-the-fact document created for litigation.   There are literally *zero written*

15   *communications* regarding the Contribution Agreement—no emails, no texts, no memoranda.[9]  And

16   none of Respondents' witnesses even mentioned the purported Contribution Agreement until July

17   11, 2023, when Mr. Makhijani (alone) attached it to his declaration in opposition to Mr. Honarkar's

18   motion for the appointment of a receiver.  This was months after the inception of this dispute and

19   after Mr. Makhijani had submitted three prior declarations in the lawsuit, each of which addressed

20   the Nano Banc loan and made no reference whatsoever to the purported Contribution Agreement.

21   Moreover, even setting aside the substantial questions regarding its authenticity, the

22   Contribution Agreement is immaterial to the fraud claim.  First, if the Contribution Agreement were

23   authentic, it would be an undisclosed and unapproved Affiliate transaction between the joint venture

24   and MOM Members, which are not permitted pursuant to section 9.15 of the Operating Agreements.

25

26

---

27   [9] Indeed, Respondents produced only a PDF of the agreement—one that purportedly was found on
somebody's computer at Continuum.  Respondents have not produced the original, executed hard

28   copy of the document or a Word version of it, which would contain evidence as to when it was
created.



Second, the undisputed facts remain that Respondents have not made the required $30 million capital contribution, which the Operating Agreements expressly required to be made "[c]oncurrently with the execution hereof [of the Operating Agreement]."  (Ex. 315 § 6.1(c).) Instead, Respondents caused the MOM Investco LLCs themselves to take out a $20 million loan and passed that off as their capital contribution.  The loan remains unpaid, the MOM Investco LLCs remain the debtors of record on it, and the assets of the joint venture are at risk if the loan is not paid timely.  The purported Contribution Agreement changes nothing.

### (2)   Breach of Contract

For the reasons above, the joint venture agreements are void for Respondents' fraud, as Respondents had no intention of complying with their promises.  But even assuming otherwise, Respondents MOM Members and MOM Managers breached those agreements in multiple ways, and thus are liable for breach of contract.[10][11]

### 1.   Breach of Obligation to Provide a Capital Contribution

As discussed in detail above, the MOM Members breached their contractual obligation to make a $30 million capital contribution at the time the Operating Agreements were executed.  The agreements are rescindable on this basis.  *See* Civ. Code § 1689(b)(2) ("A party to a contract may rescind the contract in the following cases: . . . (2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds.").

### 2.   Additional Contractual Breaches

The failure to make the initial capital contribution is only one of Respondents' breaches, as noted below:

---

[10] "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 228 (2014) (citation and internal quotation marks omitted); CACI No. 303.

[11] For all of these same reasons, Respondents MOM Members and MOM Managers also breached the implied covenant of good faith and fair dealing required by the Operating Agreements. "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & Gen. Ins.* Co., 50 Cal. 2d 654, 658 (1958) (citation omitted); *see also* CACI No. 325.



- <u>Unauthorized TIC Sale in Laguna HI, LLC</u>.  Respondents sold a tenant-in-common interest in Laguna HI, LLC for $4.1 million, without Mr. Honarkar's knowledge or approval.  As set forth in the Operating Agreements, in order for a particular real estate holding to become a "Project," Respondents were required to make a "Contribution" to that project.  (Ex. 315 § 6.1(d).)  Respondents have no rights to sell assets of Other Owned LLCs without Mr. Honarkar's approval, unless and until they make a Contribution that converts the Other Owned LLC into a Project.  (*Id*. § 9.3(b).)  Respondents did not make any Contribution to Laguna HI, LLC, and thus acquired no rights to sell any assets of Laguna HI, LLC, and yet did so anyway.

- <u>Unauthorized Transactions Involving Other Owned LLCs</u>.  Respondents also breached the Operating Agreements by taking out substantial loans on the real estate assets owned by the Subsidiaries/Other Owned LLCs, without Mr. Honarkar's knowledge or consent, and for their own purposes.  For example, on July 1, 2021, Respondents caused Tesoro Redlands DE, LLC ("Tesoro") to borrow $1 million from Nano Banc, secured by a Deed of Trust encumbering real property owned by Tesoro.  Honarkar Parties were not informed of the loan or the Deed of Trust, which was not recorded by Nano Banc until several months later, in March 2022.  The loan proceeds did not go to Tesoro or to the joint venture, but instead to Enrico Arvielo—an investor in MOM Investor Group LLC—one of the entities through which Mr. Makhijani and his affiliates hold their ownership interest in the joint venture companies—who was demanding his investment money back.  (Ex. 1011 at 199:5-207:2; Ex. 410.)

- <u>Fraudulent 1031 Exchange of TIC Interest in Hotel Laguna, LLC</u>.  In April 2022, Respondents sold a tenant-in-common interest in Hotel Laguna, LLC for $1 million to Jaachak LLC, an entity controlled by Continuum executive Jaspreet Singh Sethi.  The sale was closed without an escrow account, instead using Marc Cohen's client trust account to facilitate the transfer.  As Mr. Makhijani testified at deposition, the intent

was always for this transfer to be temporary, which is prohibited by federal tax law.[12]

Despite this, Respondents claimed the transaction was a 1031 exchange and thereby exposed the joint venture to liability by allowing its assets to be used for tax fraud to enrich themselves and their family and friends.  Moreover, the $1 million in proceeds—which belonged to Hotel Laguna, LLC—were instead provided to the MOM Members, as it was used to fund Jaachak LLC's investment in the MOM Investor Group.[13]

- Excessive Distributions to Themselves.  MOM Parties have made greater distributions to themselves than is permitted under the Operating Agreements.  Section 9.4 of the Operating Agreements states that Members and Affiliates are not entitled to any payments or compensation from the joint venture whatsoever, other than distributions and reimbursement of expenses[14].  As discussed above, MOM Parties made an initial capital contribution of, at most, $6 million, because although $30 million was transferred to the escrow account, $20 million of that was funded with loan money from Nano Banc that belonged to the MOM Investco LLCs, not to Respondents, and

---

[12] Named after the applicable code sections, 26 U.S.C. § 1031 and I.R.C. § 1031, 1031 exchanges essentially allow individuals to avoid taxes owed on sales of real property if the sale proceeds are used to buy other real property of the same kind.  "To qualify for nonrecognition treatment under section 1031(a), the taxpayer must, at the time the exchange is consummated, intend to hold the property acquired for investment."  *Magneson v. Comm'r*, 753 F.2d 1490, 1493 (9th Cir. 1985) (citing *Regals Realty Co. v. Commissioner*, 127 F.2d 931, 934 (2d Cir. 1942) and *Margolis v. Commissioner*, 337 F.2d 1001, 1003–05 (9th Cir. 1964)).  "Numerous cases have held that the taxpayers' intent at the time of the exchange to liquidate their interest in the property acquired disqualifies the exchange from nonrecognition under section 1031(a)."  *Id.*  That is precisely was Respondents and Jachaak (as well as Respondents and Cheema & Ghuman Properties, LLC in the other TIC transaction) intended, disqualifying the transaction under section 1031(a) and causing the joint venture entities to be participants in tax fraud. (Ex. 1011 at 211:8-218:23.)

[13] The same is true for the $4.1 million paid for the TIC sale in Laguna HI, LLC.  Rather than provide those funds to Laguna HI, Respondents gave them back to the purchaser—Cheema & Ghuman Properties, LLC—so that entity could invest in the MOM Investor Group.

[14] Section 12.4 of the Operating Agreements provides that all direct expenses incurred in connection with Company business shall be paid by the Company.  If expenses are paid directly by a Manager or any Affiliate of a Manager, "such Person may be reimbursed for such direct expenses *without interest*."  (Ex. 315 § 12.4 (emphasis added).)

**CLAIMANTS' PRE-HEARING BRIEF**

Continuum received a refund of approximately $4 million from the escrow account at closing. Despite this, according to Respondents' own expert report, Respondents have received distributions nearly equal to the priority rate of return for a $10 million contribution rather than a $6 million contribution, meaning Respondents are making distributions to themselves for an additional $4 million dollar investment that they did not make. The disparity is even greater when one adds the proceeds from the Tesoro loan ($1 million) and TIC sales ($5.1 million), which Respondents used for their own purposes.

- Unauthorized Insider/Self-Interested Transactions. Section 9.15 of the Operating Agreements prohibits Affiliate[15] transactions by Respondents without Mr. Honarkar's written approval:

> "No agreement between the Company, on the one hand, and the Managing Manager, the MOM Member, or an Affiliate of the Managing Manager or MOM Member, on the other hand, shall be effective unless approved in writing by the Administrative Manager, except for an agreement expressly provided for herein."

Despite this, the MOM Parties obtained multiple loans from Cantor Group IV LLC and Cantor Group V LLC—entities owned and controlled by Deba Shyam, the President of Continuum and the Managing Member of MOM CA Manager. In connection with each of these loans, Respondents caused the joint venture to enter into "contribution agreements" with Cantor and MOM Members, without Mr. Honarkar's approval, and these agreements are unauthorized Affiliate transactions under the terms of the Operating Agreements. In total, Respondents obtained $59,975,000 in self-interested loan transactions from Cantor Group entities,

---

[15] "'Affiliates' of a Person means Persons Controlled by, Controlling or under common Control with such Person, or the family members of such Person." (Ex. 315 § 1.3.) "'Person' means [people and entities]." (*Id*. §1.42.) "'Control', 'Controlled', 'Controlling' mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise." (*Id*. § 1.20.)



**CLAIMANTS' PRE-HEARING BRIEF**

supported by undisclosed contribution agreements that constitute Affiliate transactions, without Mr. Honarkar's written approval, at interest rates that were well above-market. Mr. Shyam is the signatory for both the "borrower" and "lender" on these loans, which were structured to allow conversion into equity at the lender's (*i.e.*, Respondents') option. In other words, if the joint venture subsidiary that obtained the loan did well, Respondents were able to convert their loan into equity in that subsidiary; if the subsidiary's business was doing poorly, Respondents were able to keep their money in the form of a loan, being paid back in full with interest, regardless of whether the loan benefitted the joint venture in any way.

- <u>Failure to Reconvey Coastline Deed of Trust</u>. MOM Parties and Makhijani/Continuum Parties caused the joint venture to take out a $175 million loan from Coastline Loans LLC in June 2021, secured by deeds of trust on multiple joint venture assets. Coastline Loans is owned and controlled by Andrew Stupin, one of Nano Banc's founding shareholders and one of Mr. Makhijani's repeat investors, who gave his initials to MOM *AS* Investco LLC. No proceeds from this loan have ever been paid to the joint venture, which MOM Parties and Makhijani/Continuum Parties assert is because the loan never funded (meaning the $175 million was supposedly never paid out). Based on this assertion, Mr. Honarkar demanded that the deeds of trust securing a loan never disbursed be reconveyed, but Respondents have failed to obtain reconveyance. MOM Parties have breached their obligations by allowing Coastline Loans LLC (*i.e.*, Respondents' affiliate Andrew Stupin) to retain *for years* deeds of trust on multiple joint venture assets when those deeds of trust secure a loan that supposedly never funded.

- <u>Failure to Keep Complete Books and Records, and Failure to Provide Books and Records on Reasonable Demand</u>. Section 12.1 of the Operating Agreements obligates MOM Parties to keep books and records for the MOM LLCs. MOM Parties have breached this obligation by failing to keep basic records for the MOM LLCs. Not only is this failure a breach of the Operating Agreements, it demonstrates that MOM Parties'



32

and Makhijani/Continuum Parties' intent was always to loot the joint venture's assets for their personal gain, and not to run a functioning hospitality business. Additionally, MOM Parties have refused to provide the limited records that do exist to Honarkar Parties upon reasonable request, also in breach of the Operating Agreements. MOM Parties continued their refusal to provide basic books and records to Honarkar Parties *even after* Judge Chalfant of the Los Angeles Superior Court issued his decision confirming that the agreements require MOM Parties to provide this information.

- <u>Failure to Make Monthly Reporting to Honarkar Parties</u>. Section 12.2 of the Operating Agreements obligates MOM Parties to make monthly reports to Honarkar Parties regarding the MOM Investco LLCs. As Mr. Makhijani admitted during his deposition as person most knowledgeable for MOM Parties, MOM Parties have not met this obligation.

- <u>Filing False Statements of Information for Held-Back Entities</u>. As noted above, many joint venture subsidiaries remained wholly-owned by Mr. Honarkar, unless and until MOM Parties made a contribution to that specific real estate project, converting it to a "Project" under the Operating Agreements. Despite this, once this dispute began in 2023, MOM Parties began filing false Statements of Information with California's Secretary of State asserting that MOM Parties and Makhijani/Continuum Parties were owners of Held-Back Entities owned exclusively by Mr. Honarkar, including 424 Marguerite LLC and Palm Desert Collective Resorts LLC. As part of these efforts, Respondents caused Continuum's address to be listed as the address for service of legal process on corporate entities that were exclusively owned by Honarkar Parties.

- <u>Breach of the Management Agreement</u>. Honarkar Parties are owed management fees for management services provided to Hotel Laguna, the Holiday Inn Laguna Beach, and several vacation rental properties in Laguna Beach, pursuant to a management

1    agreement that predates the joint venture. Once in control of the joint venture, MOM

2    Parties failed to pay Honarkar Parties any of the fees owed under this agreement.[16]

3    ### *(3) Derivative Claims for Conversion and Violation of Cal. Penal Code § 496*

4    "Conversion is the wrongful exercise of dominion over the property of another. The

5    elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the

6    property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3)

7    damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015) (citation and internal quotation marks

8    omitted). "It is not necessary that there be a manual taking of the property; it is only necessary to

9    show an assumption of control or ownership over the property, or that the alleged converter has

10    applied the property to his own use. [A]ny act of dominion wrongfully exerted over the personal

11    property of another inconsistent with the owner's rights thereto constitutes conversion*." Plummer

12    v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 50 (2010) (alteration in original) (citations and

13    internal quotation marks omitted).[17]

14    "'If a defendant is authorized to make a specific use of a plaintiff's property, use in excess

15    of that authorized may subject the defendant to liability for conversion, if such use seriously violates

16    another's right to control the use of the property.'" *Duke v. Super. Ct.*, 18 Cal. App. 5th 490, 506

17    (2017) (citation omitted). Furthermore, "[i]n a conversion action the plaintiff need show only that

18    he was entitled to possession at the time of conversion; the fact that plaintiff regained possession of

19    the converted property does not prevent him from suing for damages for the conversion." *Enter.*

20    *Leasing Corp. v. Shugart Corp.*, 231 Cal. App. 3d 737, 748 (1991). Conversion claims can be stated

21    for both personal property and for sums of money. *PCO, Inc. v. Christensen, Miller, Fink, Jacobs,*

22    *Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 396 (2007).

23

24    [16] Despite failing to pay Mr. Honarkar the fees he is due, Respondents are paying management

25    fees to their own agents at Vierergruppe Management, Inc.

26    [17] "The *act* must be knowingly or intentionally done, but a *wrongful intent* is not necessary." *Taylor v. Forte Hotels Int'l*, 235 Cal. App. 3d 1119, 1124 (1991) (citing *Poggi v. Scott*, 167 Cal. 372, 375

27    (1914) and 5 Witkin Summary of Cal. Law (9th ed. 1988) Torts, § 624, pp. 717-18). In other words, "conversion is a strict liability tort. It does not require bad faith, knowledge, or even negligence; it

28    requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." *Voris v. Lampert*, 7 Cal. 5th 1141, 1158 (2019).

Halpern
May
Ybarra
Gelberg

MOM Parties and Makhijani/Continuum Parties are liable for multiple acts of conversion of joint venture assets here, including the following.

- Depriving the MOM Investco LLCs of their rightful possession of $20 million in loan proceeds from Nano Banc by directing Nano Banc to put those loan proceeds in a Continuum bank account so as to appear to be a capital contribution from Continuum;

- Depriving Tesoro of $1 million in loan proceeds to which it was entitled by directing Nano Banc to pay those funds to the MOM Investor Group, which later used them to repay their own obligation to Enrico Arvielo, one of their investors; and

- Taking the proceeds from sales of tenant-in-common interests in Hotel Laguna, LLC and Laguna HI, LLC (a total of $5.1 million) and returning those proceeds to the purchaser of the TIC interest to be used as their investment in the MOM Members.

Given Respondents' deliberate concealment of information regarding the joint venture and its operations, this list is probably incomplete, and an independent accounting is required. But even based solely on what Honarkar Parties know at present, MOM Respondents are liable for conversion of at least $26.1 million in joint venture assets. Moreover, these acts of conversion also constitute violations of California Penal Code section 496, subjecting Respondents to liability for treble damages on this amount.[18]

---

[18] Penal Code section 496 applies to "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained." Penal Code § 496(a). "While section 496(a) covers a spectrum of impermissible activity relating to stolen property, the elements required to show a violation of section 496(a) are simply that (i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (2019). Claims for violations of Penal Code section 496 can be asserted against the "principal in the actual theft of the property." Penal Code § 496(a); *see also Switzer*, 35 Cal. App. 5th at 126–27 (affirming Penal Code section 496 civil liability against the person who committed the actual theft of the property); *see also Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 361 (2022) (generally endorsing *Switzer* and holding fraud performed with criminal intent suffices for first element).

Halpern
May
Ybarra
Gelberg

### (4) Derivative Claim for Unjust Enrichment

Honarkar Parties also bring a derivative claim on behalf of the MOM LLCs for unjust enrichment against MOM Parties and Makhijani/Continuum Parties.[19]    MOM Parties and Makhijani/Continuum Parties have looted the MOM LLCs, treating them as personal slush funds. The evidence at trial will show that MOM Parties and Makhijani/Continuum Parties took millions of dollars belonging to the joint venture businesses and used them for their own purposes without any benefit to the joint venture, transparently enriching themselves at the expense of the MOM LLCs while exposing the MOM LLCs to substantial unnecessary risk.  Respondents also enriched themselves through self-dealing, including multiple unauthorized Affiliate transactions and other self-interested transactions.  However, for the same reasons discussed below with regard to an accounting, Honarkar Parties are not currently aware of the full extent of Respondents' unjust enrichment, because Respondents have deliberately concealed this information and continue to do so to this day.  Accordingly, once an accounting is performed, the precise nature and amount of Respondents' unjust enrichment can be determined.

### (5) Forcible Entry and Detainer

MOM Parties' and Makhijani/Continuum Parties' violent actions to break in and seize possession of the 4G offices violated California's forcible entry and forcible detainer laws.  This is true regardless of which party ultimately establishes the right to control the joint venture, as California law is crystal clear that an unlawful detainer action in court is the one and only legal way to obtain possession of real property.

California's summary possession statutes (unlawful detainer, forcible entry, and forcible detainer, Civ. Proc. Code § 1159 et seq.) set forth the only acceptable procedural mechanism for effecting a lawful eviction and obtaining possession of real property.  *E.g.*, *Daluiso v. Boone*, 71

---

[19] "To state a claim for unjust enrichment [under California law], a plaintiff must allege: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another." *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, No. C 04-04632 SI, 2006 WL 3751428, at *1 (N.D. Cal. Dec. 19, 2006) (citation and internal quotation marks omitted); *see also Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 238 (2018); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).

Halpern
May
Ybarra
Gelberg

1  Cal. 2d 484, 495 (1969).  "Forcible entry" and "forcible detainer" are both prohibited by statute.

2  Civ. Proc. Code §§ 1159 & 1160.  No person out of possession (landlords included) may resort to

3  "self-help" remedies; it is immaterial that the landlord has legal title.  *Spinks v. Equity Residential*

4  *Briarwood Apartments*, 171 Cal. App. 4th 1004, 1037 (2009); *Glass v. Najafi*, 78 Cal. App. 4th

5  45, 48–49 (2000) (Forcible detainer and forcible entry statutes "reflect a policy, with deep roots in

6  English law, barring the use of forceful self-help to enforce a right to possession of real property

7  and requiring instead the use of judicial process to gain possession.").  Absent the tenant's express

8  permission or an applicable provision in the rental agreement specifying the circumstances under

9  which a landlord may enter the premises (other than to recover possession), landlords may lawfully

10 enter their tenants' units only for statutorily specified reasons, in the time and manner prescribed

11 by Civil Code section 1954.   Real property tenants are not "trespassers"—even if they are

12 unlawfully detaining—and tenants are entitled to peaceful possession until proper legal process,

13 by settlement or judgment, awards possession to the landlord (and even then, actual dispossession

14 of the tenants must be effected by statutorily authorized eviction procedures—a judgment alone is

15 not even enough without the appropriate writ).  *Four Seas Inv. Corp. v. Int'l Hotel Tenants' Ass'n*,

16 81 Cal. App. 3d 604, 612 (1978); *Bedi v. McMullan*, 160 Cal. App. 3d 272, 276 (1984).

17       If a landlord wants to end a tenancy involuntarily after the tenant has taken possession of

18 the rental premises, the landlord must take certain legal steps under the Code to do so, including

19 bringing an unlawful detainer action in court.  "Until these steps are taken, the tenant is entitled to

20 peaceful possession of the rented premises and has the right to exclude anyone, including the

21 landlord." *People v. Thompson*, 43 Cal. App. 4th 1265, 1270 (1996).  Landlords thus may enforce

22 their rights "only by judicial process, not by self-help." *Spinks*, 171 Cal. App. 4th at 1038 (citation

23 and internal quotation marks omitted).

24       California's forcible entry statute prohibits the specific conduct that MOM Parties and

25 Makhijani/Continuum Parties engaged in here: gaining access by breaking windows and doors and

26 by changing locks, and removing property without authorization.  "Section 1159, subdivision 1,

27 prohibits an entry by means of breaking open doors or windows. Defendant violated this section

28 when he unlocked plaintiff's apartment without her consent and entered with the storage company

Halpern
May
Ybarra
Gelberg

1   employees to remove her furniture, even though there was no physical damage to the premises or

2   actual violence." *Spinks*, 171 Cal. App. 4th at 1038 (citation and internal quotation marks omitted)

3   (also explaining that gaining access by using a locksmith to change locks is an unlawful forcible

4   entry, even without any violence or property damage).  "[T]he forcibly entering defendant's title

5   or right of possession is no defense" because the right to possession is irrelevant to the question of

6   forcible entry: no forcible entry is allowed, <u>period</u>.  *Daluiso*, 71 Cal. 2d at 486.

7         MOM Parties' and Makhijani/Continuum Parties' actions on July 24, 2023 constitute an

8   illegal forcible entry under Code of Civil Procedure section 1159, and MOM Parties' and

9   Makhijani/Continuum Parties' continued possession of 4G's offices—without the required

10  judgment and writ—constitutes an illegal forcible detainer under Code of Civil Procedure section

11  1160.  It is undisputed that Mr. Honarkar and his agents were in possession of the offices at 775

12  Laguna Canyon Rd. until the afternoon of July 24, 2023, when MOM Parties' and

13  Makhijani/Continuum Parties' agents broke into the offices by force.  It is undisputed that

14  Respondents did not follow any court process before engaging in "self-help."  As such, MOM

15  Parties' and Makhijani/Continuum Parties' actions are unlawful, and in fact are the epitome of

16  what our legal system has sought to prevent by requiring all disputes regarding possession to be

17  resolved in court rather than by brute force.[20]

18              *(6) Respondents Waived Their Affirmative Defenses*

19        Respondents MOM Parties and Makhijani/Continuum Parties have no affirmative defenses

20  to any of Honarkar Parties' claims, because Respondents did not timely file an Answer asserting

21  any affirmative defenses to Honarkar Parties' First Amended Statement of Claim.

22        Following a conference call with the parties, the Arbitrator issued Report of Interim

23  Conference and Scheduling Order No. 2 in these proceedings on September 28, 2023.  Section 6 of

24  Scheduling Order No. 2 required Honarkar Parties to file their First Amended Statement of Claim

25  on or before October 13, 2023, and required MOM Parties and Makhijani/Continuum Parties to file

26

27  [20] Honarkar Parties have also brought a claim for declaratory relief, but because the factual bases
28  for that claim are the same as for the claims discussed in this brief, they are not separately discussed
    here.



38

1 their Answers on or before November 3, 2023. Section 12(c) of Scheduling Order No. 2 states that

2 "All deadlines herein shall be strictly enforced."

3       Honarkar Parties timely filed their First Amended Statement of Claim, but MOM Parties

4 and Makhijani/Continuum Parties did not file any Answer on or before November 3, 2023. By

5 operation of JAMS' Rule 9(e), their failure to file an answer functioned as a denial of Honarkar

6 Parties' claims. *See* JAMS Rule 9(e) ("Any claim or counterclaim to which no response has been

7 served will be deemed denied."). But JAMS Rule 9 requires that any affirmative defenses or

8 counterclaims be timely filed, as does Scheduling Order No. 2, and here, Respondents MOM Parties

9 and Makhijani/Continuum Parties neither timely filed affirmative defenses nor sought leave from

10 the Arbitrator to later assert affirmative defenses. Scheduling Order No. 2 (and all other scheduling

11 orders issued by the Arbitrator) makes clear that deadlines will be strictly enforced. Thus,

12 Respondents' affirmative defenses are waived.

13      **B.**     **Honarkar Parties' Claims Against Respondent Nano Banc.**

14        *(1) Conspiracy and Aiding and Abetting Fraud*

15       Respondent Nano Banc conspired with Makhijani/Continuum Parties and MOM Parties to

16 commit fraudulent inducement, and aided and abetted that fraud.

17       "Conspiracy is not a separate tort, but a form of vicarious liability by which one defendant

18 can be held liable for the acts of another.... A conspiracy requires evidence 'that each member of

19 the conspiracy acted in concert and came to a mutual understanding to accomplish a common and

20 unlawful plan, and that one or more of them committed an overt act to further it.' Thus, conspiracy

21 provides a remedial measure for affixing liability to all who have 'agreed to a common design to

22 commit a wrong' when damage to the plaintiff results. The defendant in a conspiracy claim must

23 be capable of committing the target tort." *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 652 (2018)

24 (citations omitted). "To support a conspiracy claim, a plaintiff must allege the following elements:

25 '(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the

26 conspiracy, and (3) damages arising from the wrongful conduct.'" *AREI II Cases*, 216 Cal. App.

27 4th 1004, 1022 (2013). "Conspiracies are typically proved by circumstantial evidence. '[S]ince

28 such participation, cooperation or unity of action is difficult to prove by direct evidence, it can be

Halpern
May
Ybarra
Gelberg

1    inferred from the nature of the act done, the relation of the parties, the interests of the alleged

2    conspirators, and other circumstances.'" *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1166

3    (2013) (alteration in original) (citations omitted).

4         As to aiding and abetting, "[l]iability may ... be imposed on one who aids and abets the

5    commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach

6    of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

7    substantial assistance to the other in accomplishing a tortious result and the person's own conduct,

8    separately considered, constitutes a breach of duty to the third person." *IIG Wireless, Inc.*, 22 Cal.

9    App. 5th at 653–54 (citation and internal quotation marks omitted). "'[A]iding-abetting focuses on

10   whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful

11   conduct, not on whether the defendant agreed to join the wrongful conduct." ... [W]hile aiding and

12   abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires

13   a defendant to reach a conscious decision to participate in tortious activity for the purpose of

14   assisting another in performing a wrongful act.'" *Id.* at 654 (alterations in original) (citation

15   omitted).

16        As the evidence at trial will show, Respondent Nano Banc gave substantial assistance or

17   encouragement to, and acted in concert with and cooperated in, Makhijani/Continuum Parties' and

18   MOM Parties' fraudulent inducement.  Evidence of this includes:

19   • Prior to 2021, Nano Banc issued at least one loan to Mr. Honarkar and his businesses, and

20     in connection with that loan, obtained paperwork demonstrating Mr. Honarkar's ownership

21     of the real properties that ultimately came to secure the $20 million Nano Banc loan.

22   • Nano Banc's Chief Credit Officer (and later interim Chief Executive Officer) Anthony

23     Gressak introduced Mr. Honarkar to Mr. Makhijani in 2021 for purposes of a potential

24     joint venture between Mr. Honarkar and Mr. Makhijani and his group of investors.  Mr.

25     Makhijani's group of investors include multiple Nano Banc insiders and founding

26     shareholders, including Deba Shyam, Gerald Marcil, Andrew Stupin, and Bhajneet Sing

27     Malik.  Mr. Makhijani himself is one of Nano Banc's biggest, if not the biggest, customers.

28   • Nano Banc began working with Makhijani/Continuum Parties on the contemplated $20



40

million loan in May 2021, with paperwork addressed to Continuum President and Nano Banc shareholder Deba Shyam—*only*. As the early loan papers demonstrate, the intent was always to secure this loan with properties that Nano Banc knew belonged to Mr. Honarkar. Despite this knowledge, Nano Banc did not include Mr. Honarkar on a single piece of correspondence about this loan, and made no efforts at any time to seek authorization from Mr. Honarkar for Mr. Shyam to sign papers on behalf of LLCs and properties owned by Mr. Honarkar.

- While secretly working with Mr. Makhijani and Mr. Shyam on the $20 million loan, Nano Banc simultaneously proposed to Mr. Honarkar a $150 million loan for the refinancing. The loan was to be secured, *inter alia*, by deeds of trust on the *same properties* that were being used to secure—and ultimately did secure—the secret $20 million loan, further evidence that Nano Banc knew those properties were owned by Mr. Honarkar. The evidence will show that Nano Banc did not have sufficient capital to actually make this loan to Mr. Honarkar, but used it to extract information from Mr. Honarkar about his properties, which information Nano Banc then surreptitiously used to facilitate the $20 million loan to Respondents.

- Internal Nano Banc records document that the reason the bank made the secret $20 million loan to was to "strengthens the Banc's position of the history and relationship with sponsors of the joint-venture [*i.e.* the Makhijani/Continuum Parties]." (Ex. 215 at 4.)

- Nano Banc knew that Makhijani/Continuum Parties were hiding the Nano Banc loan from Mr. Honarkar and from the escrow company handling the refinancing, and nevertheless agreed to issue and did issue the loan to Makhijani/Continuum Parties. In correspondence from the days before the deal closed, Makhijani/Continuum Parties (through Mr. Makhijani, Mr. Kluchin, and Mr. Cohen) told Mr. Honarkar and the escrow company that the refinancing would involve three lenders (Preferred Bank, First Choice Bank, and Lone Oak Fund) and that the borrower would fund the remaining $29-$30 million. (*E.g.*, Ex. 229.) Mr. Makhijani forwarded some of this correspondence to Nano Banc's Mr. Gressak before Nano Banc issued the loan. (*E.g.*, Ex. 187.) Having already arranged for and

**CLAIMANTS' PRE-HEARING BRIEF**

approved a loan from Nano Banc specifically for use in the refinancing, Mr. Gressak knew that these representations were false. No loan documents for the Nano Banc loan were provided to escrow.  Nano Banc issued the loan anyway.

- Nano Banc agreed to make, and made, the $20 million loan without review of the final MOM LLCs' governing documents—documents which were not executed and thus did not exist on the date the loan was issued.

- Nano Banc agreed to make, and made, the $20 million loan based solely on signatures from employees of Continuum, without making any efforts to verify those individuals' authority to act on behalf of the MOM Investco LLCs.  The person who signed most of the papers, Deba Shyam, is a founding shareholder of Nano Banc.

- On June 7, 2021, Nano Banc placed the $20 million in loan proceeds belonging to the MOM LLCs into a bank account belonging to Continuum, despite knowing that Continuum was not the borrower and that the assets used to secure the loan belonged exclusively to Mr. Honarkar.  Nano Banc did not make any effort to inform Mr. Honarkar regarding this transaction or seek his authorization, despite knowing that Mr. Honarkar was the current owner of the properties and future member of the joint venture.

- Nano Banc drafted a June 7, 2021 internal memorandum claiming that the borrower informed it that the loan proceeds needed to be placed into Continuum's bank account because the refinancing escrow account was not yet open and could not receive incoming transfers.  Mr. Makhijani testified that he was not aware of any such statements to Nano Banc.  Moreover, Nano Banc knew that the refinancing escrow was open on June 7 because it was involved in wiring the $20 million from Continuum's bank account to the escrow only hours after first depositing the funds into Continuum's account, on June 7.

- Nano Banc consented to taking security interests in the properties and LLCs owned by Honarkar Parties without Honarkar Parties' consent, and thereafter concealed the Deeds of Trust from Honarkar Parties, including by refraining from publicly recording those Deeds of Trust until months later.

**CLAIMANTS' PRE-HEARING BRIEF**

- Nano Banc collected significant fees and interest from the surreptitious loan, knowingly enriching itself off of Makhijani/Continuum Parties' and MOM Parties' fraud. Nano Banc also enriched its shareholders Deba Shyam, Bhajneet Sing Malik, Andrew Stupin, and Gerald Marcil, and its largest referral source, Mr. Makhijani, by participating in this scheme.

### (2) Derivative Claim for Breach of Loan Agreement

In the alternative and to the extent the surreptitious loan agreement between the MOM LLCs and Nano Banc is valid rather than fraudulent, Nano Banc breached the terms of that loan agreement. Honarkar Parties bring this claim derivatively on behalf of the MOM Investco LLCs, who were parties to the loan agreement that required distribution of the loan proceeds to the MOM Investco LLCs. In breach of this agreement, Nano Banc provided the loan proceeds to Continuum, not the MOM Investco LLCs.

### (3) Derivative Claims for Conversion and Violation of Penal Code Section 496

Respondent Nano Banc's actions in depositing $20 million in secret loan funds into a bank account belonging to Respondents, rather than to the MOM Investco LLCs, wrongfully deprived the MOM Investco LLCs of their rightful possession of $20 million in loan proceeds and constitutes conversion pursuant to the case law cited above.

Similarly, Nano Banc's actions violate Penal Code section 496 because Nano Banc concealed and withheld, and aided in concealing and withholding, $20 million in stolen funds that belonged to the MOM Investco LLCs.

## IV.    REMEDIES

Respondents' fraudulent inducements renders the joint venture agreements void and subject to rescission. But the Honarkar Parties have also suffered significant damages as a result of Respondents' extensive and wide-ranging misconduct, entitling them to restitution and consequential damages, in addition to punitive damages, interest, and attorney's fees.

Honarkar Parties are plainly entitled to some amount of monetary damages in addition to rescission. For example, MOM Parties and Makhijani/Continuum Parties indisputably misappropriated for their own use at the very least: (1) $20 million taken from the MOM Investco

Halpern
May
Ybarra
Gelberg

1  LLCs and used to fund Continuum's capital contribution; (2) $1 million taken from Tesoro

2  Redlands LLC and used to repay MOM Parties' and Makhijani/Continuum Parties' debt to one of

3  their investors, Enrico Arvielo; and (3) $5.1 million in sale proceeds from tenant-in-common

4  transactions.  MOM Parties and Makhijani/Continuum Parties have also admitted to engaging in at

5  least $59 million in unauthorized Affiliate transactions with Cantor Group—an entity owned by

6  Deba Shyam, the President of Continuum and Managing Member of MOM CA Manager.

7      However, as discussed below, Makhijani/Continuum Parties and MOM Parties have done

8  their utmost to continue hiding the actual books and records of the joint venture businesses, and the

9  evidence of their misconduct, including in discovery in this arbitration.  Accordingly, to get an

10  accurate and complete assessment of the financial condition of the joint venture's assets and the

11  resulting damages owed to Honarkar Parties, an independent accounting is first needed.

12      **A.**    **Accounting**

13      "An action for an accounting has two elements: (1) 'that a relationship exists between the

14  plaintiff and defendant that requires an accounting' and (2) 'that some balance is due the plaintiff

15  that can only be ascertained by an accounting." *Sass v. Cohen*, 10 Cal. 5th 861, 869 (2020) (citations

16  omitted).

17      A joint venture business relationship between the parties is a relationship that requires an

18  accounting, satisfying prong one.  *See Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 180 (2009)

19  ("If defendants took over the business and assets of the partnership, they would have a sufficient

20  relationship to George, or to the executor of his estate and trustee of his revocable trust, to require

21  an accounting of the partnership business.").

22      Here, an accounting is needed because Respondents have worked to ensure that the

23  Honarkar Parties do not have complete information about the MOM Investco LLCs.  Not only did

24  MOM Parties and Makhijani/Continuum Parties vigorously oppose Mr. Honarkar's books and

25  records petition all the way to judgment without any legal basis for doing so, Respondents then

26  flouted the reasoning of Judge Chalfant's decision granting that petition.  As just one example,

27  MOM Parties took the position that they were only required to provide Honarkar Parties with

28  access to the joint venture's books and records *up through March 2023*, and not to any joint venture



1    records after that, because that was the date of the inspection demands. (Ex. 1389.)  Respondents'

2    position is not reconcilable with the reasoning underlying Judge Chalfant's decision requiring

3    production of books and records to a joint owner of the business.

4         Makhijani/Continuum Parties' and MOM Parties' deliberate withholding of information

5    extends to discovery in these arbitration proceedings, which began in earnest *after* Judge Chalfant

6    issued his decision.  For example, Honarkar Parties propounded discovery asking whether the

7    multiple encumbrances that Makhijani/Continuum Parties and MOM Parties secretly placed on

8    joint venture assets were still in effect or not.   (Honarkar's Interrogatory No. 4 to

9    Makhijani/Continuum Parties, and Honarkar's Interrogatory No. 5 to MOM Parties.)  This is basic

10   information that the parties need for damages analysis in this action, and basic information that

11   MOM Parties are required to provide to Honarkar Parties under the terms of the Operating

12   Agreements and pursuant to Judge Chalfant's ruling granting Honarkar Parties access to the joint

13   venture's books and records.   Nevertheless, MOM Parties and Makhijani/Continuum Parties

14   refused to answer the request, requiring Honarkar Parties *to file a motion to compel* on March 4,

15   2024, to obtain even this basic information.[21]

16        As another example, Honarkar Parties asked for basic financial documents from the MOM

17   Investco LLCs, such as tax returns, general ledgers, and balance sheets—documents required to

18   be provided under Judge Chalfant's decision.   To satisfy this request, MOM Parties and

19   Makhijani/Continuum Parties produced documents originally generated by Honarkar Parties and

20   then sent to MOM Parties in the regular course of business.  In other words, MOM Parties and

21   Makhijani/Continuum Parties *produced Mr. Honarkar's own documents back to him*, claiming

22   they made a complete production of MOM Investco LLC financial documents by doing so.

23        After the Arbitrator granted Honarkar Parties' March 4, 2023 motion to compel, however,

24   MOM Parties produced general ledgers and balance sheets for the MOM Investco LLCs from 2021

25

26

---

27   [21] As the Arbitrator is aware, Honarkar Parties also had to file motions to compel against numerous
     third parties who are owners of or investors in the MOM Parties, who flouted Honarkar Parties'
28   subpoenas in this arbitration.  Even after the motion to compel against them was granted in full,
     Messrs. Marcil, Stupin, and Sing Malik failed to produce a single document.

Halpern
May
Ybarra
Gelberg

1   and 2022—documents that had never been provided previously.  And after Honarkar Parties

2   subpoenaed MOM Parties' accountant, BPM LLC, tax returns for certain joint venture entities

3   were produced.  Again, Honarkar Parties are joint owners of the MOM Investco LLC joint venture,

4   and they are entitled to this information, as has already been determined in a court of law.  MOM

5   Parties did not appeal that decision, and they are bound by it, but nevertheless have withheld joint

6   venture documents as they've seen fit.

7            MOM Parties' and Makhijani/Continuum Parties' continued efforts to hide basic

8   information includes the use of repeated false statements and deliberate attempts to conceal and

9   deceive.    For example, Makhijani/Continuum Parties and MOM Parties used undisclosed

10  redactions to attempt to hide relevant bank transfers.  At the outset of this case, the parties agreed

11  to provide redaction logs identifying all redactions made to produced documents, an agreement

12  memorialized in section A.7 of the Arbitrator's February 2, 2024 Report of Interim Conference

13  and  Scheduling  Order  No.  5.      In  response  to  Honarkar  Parties'  document  requests,

14  Makhijani/Continuum Parties and MOM Parties[22] produced bank statements in this arbitration.

15  Without disclosing what they were doing, Respondents made redactions to the bank statements

16  they produced to conceal certain transactions.  Rather than using black boxes to make redactions,

17  as is standard in litigation, Respondents made redactions using white boxes that blend into the

18  background of the redacted document, making it very difficult to tell with the naked eye that

19  redactions have been made.  Further, despite the parties' agreement regarding redaction logs,

20  Respondents did not identify the bank statements as documents that had been redacted.

21

22

23

24

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [22] Makhijani/Continuum Parties and MOM Parties jointly produced documents in this case, using
28  the same Bates prefix, and refused to distinguish between themselves with regard to their document
    productions.



1    Notwithstanding these obvious efforts to conceal the redacted information, Honarkar

2   Parties eventually discovered the redactions when they realized that Respondents had previously

3   filed a Continuum bank statement that had not been redacted and thus showed indisputably

4   relevant transactions that had been redacted from the version of the same bank statement produced

5   in this case.

**DEPOSITS AND OTHER CREDITS:**

| Date | Transaction Details | Amount |
|---|---|---|

**DEBITS AND OTHER WITHDRAWALS:**

| Date | Transaction Details | Amount |
|---|---|---|
| Jun 01, 2021 | TRANSFER TO OPERATIONS SUSPENSE ASSET | $886,143.41- |
| Jun 07, 2021 | BENE:CHICAGO TITLE COMPANY TRN:P202106070106117 | $20,000,000.00- |
| Jun 10, 2021 | BENE:LATHAN & WATKINS LP TRN:P202106100099778 | $139,687.53- |

(Ex. 986 at 228.)

**DEPOSITS AND OTHER CREDITS:**

| Date | Transaction Details | Amount |
|---|---|---|
| Jun 01, 2021 | ORIG:CONTINUUM ANALYTICS TRN:P202106010140331 | $1,000,000.00 |
| Jun 07, 2021 | Loan Advance from LN #7000353700 | $20,000,000.00 |
| Jun 10, 2021 | ORIG:CONTINUUM ANALYTICS TRN:P202106100085739 | $1,000,000.00 |
| Jun 14, 2021 | ORIG:E. W. MERRITT FARMS TRN:P202106140055695 | $250,000.00 |
| Jun 16, 2021 | ORIG:CONTINUUM ANALYTICS TRN:P202106160099310 | $800,000.00 |

**DEBITS AND OTHER WITHDRAWALS:**

| Date | Transaction Details | Amount |
|---|---|---|
| Jun 01, 2021 | TRANSFER TO OPERATIONS SUSPENSE ASSET | $886,143.41- |
| Jun 07, 2021 | Loan Fees #7000353700 | $31,921.00- |
| Jun 07, 2021 | BENE:CHICAGO TITLE COMPANY TRN:P202106070106117 | $20,000,000.00- |
| Jun 10, 2021 | BENE:LATHAN & WATKINS LP TRN:P202106100099778 | $139,687.53- |

(*Id*. at 237.)

25    When Honarkar Parties inquired about this, Respondents claimed that redaction logs were

26   not required, and that regardless, only "non-parties' private personal information" had been

27   redacted from the bank statement.  (*Id*. at 62.)  Only after Honarkar Parties raised this issue with

28   the Arbitrator did Respondents agree to produce unredacted bank statements.  The unredacted



1  statements show that, far from redacting "non-parties' private personal information," Respondents

2  redacted the June 7, 2021 transaction showing Nano Banc depositing the $20 million in

3  surreptitious loan proceeds into Continuum's Nano Banc account, before Continuum wired that

4  money to escrow.  (*Id.* at 237.)

5  As a final example, in response to multiple document requests seeking Respondents' email

6  communications about the issues in this case, Makhijani/Continuum Parties and MOM Parties

7  produced *not one single internal email* from Continuum (meaning an email where only Continuum

8  employees are involved, without a third party).  Nevertheless, Respondents' February 23, 2024

9  discovery responses stated in response to each document request, "[d]ocuments responsive to this

10  Request have already been produced as a part of Respondents' initial disclosures. Responding

11  Parties have not located any additional documents responsive to this request."  Mr. Makhijani

12  verified these responses to multiple requests under penalty of perjury.[23]

13  When Honarkar Parties followed up regarding the conspicuous lack of internal emails,

14  MOM Parties' and Makhijani/Continuum Parties' attorneys doubled down.  On March 1, 2024, as

15  the parties were meeting and conferring about what issues needed Arbitrator intervention to

16  resolve, Respondents' counsel sent an email stating "Respondents do not have the following

17  categories of documents: Internal written communications."  (Ex. 986 at 47.)  Because

18  Respondents' assertions that zero internal emails existed did not appear credible, Honarkar Parties

19  moved to compel on this issue, and the Arbitrator granted the motion.  Despite their previous

20  statements that Respondents "do not have" internal written communications, Respondents then

21  produced approximately 125 internal Continuum emails following the Arbitrator's order.

22  Honarkar Parties again followed up with Respondents, as the 125 emails appeared to consist

23  only of forwards of emails originally received from third parties from one Continuum employee to

24  another, without any substantive text.  Respondents *again* falsely claimed that no additional

25  documents existed.  In light of what happened the first time, Honarkar Parties decided to again raise

26

27  [23] Mr. Makhijani's counsel Marc Cohen also accepted service of numerous subpoenas to agents of

28  Continuum or the MOM Parties, including Michael Kluchin, Jaspreet Singh Sethi, Deba Shyam,
   Jason Miller and Banayotis Haddad.  Not a single one of them produced a single document.

Halpern
May
Ybarra
Gelberg

1   this issue with the Arbitrator, and in their filing, Respondents told the Arbitrator that "Claimants

2   state nothing to support their bare speculation that more emails must exist - and Respondents are

3   not aware of any such additional internal communications. The fact that the personnel involved

4   work together in a small office and generally communicate verbally rather than via email is the

5   simple explanation for the modest email volume." (Respondents' position, April 30, 2024 Joint

6   Letter to the Arbitrator at 16.)   These representations to the Arbitrator *also proved false*, as

7   Respondents subsequently produced several hundred additional internal Continuum emails.  Like

8   the first production, however, these emails appear to consist entirely of forwards from one employee

9   to another, with little to no actual text in the emails.  Respondents and their attorneys assert, again,

10  that no additional internal emails exist, but the obvious conclusion from their course of conduct to

11  date is that substantive internal emails are being withheld based on Respondents' false assertions

12  that they do not exist.

13      **B.    <u>Recission Of The Joint Venture Agreements With Restitution And</u>**

14          **<u>Consequential Damages</u>**

15      Honarkar Parties are entitled to recission of the joint venture agreements (the Operating

16  Agreements for the MOM LLCs, as amended, and the Asset Contribution Agreement) as a remedy

17  for Respondents' fraud.  *See, e.g.*, *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 234 (2013) ("A

18  party alleging that she was fraudulently induced to enter into a contract may either rescind the

19  contract, offer to restore any benefits received, and seek restitution or retain the benefits of the

20  contract and seek damages for fraud."); *see also* Civ. Code § 1692.  Honarkar Parties are also

21  entitled to recission of the agreements as a remedy for the failure of Respondents' consideration

22  supporting the joint venture agreements.   Civ. Code § 1689 (recission available where

23  "consideration for the obligation of the rescinding party fails, in whole or in part, through the fault

24  of the party as to whom he rescinds").

25      "Rescission extinguishes the contract, terminates further liability, and restores the parties to

26  their former positions by requiring them to return whatever consideration they have received. Thus,

27  the relief given in rescission cases—restitution and in some cases consequential damages—puts the

28  rescinding party in the *status quo ante*, returning him to his economic position before he entered



the contract." *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1145 (2010) (citations and internal quotation mark omitted).[24]  Where rescission is warranted, "[t]he aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled."  Civ. Code § 1692; *see also Wong v. Stoler*, 237 Cal. App. 4th 1375, 1387–88, 1389–90 (2015).  And although in general each party must return the consideration they have each received, where "defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiff," courts "are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff.… In such a case, as a result of the rescission by the court, *nothing is exacted from the plaintiff out of particular regard for the condition of the defendant*. If his fraudulent acts have resulted in disastrous financial consequences to himself, it is no one's fault but his own, and he must sustain the necessary inconveniences thereby entailed." *Wong*, 237 Cal. App. 4th at 1389 (citation and internal quotation marks omitted).

Thus, for example, where "the vendor of a business enterprise existing for the purpose of making a profit sells the business to a buyer under a contract of sale, and thereafter the contract of sale is rescinded on the grounds of the vendor's fraud, the vendor is not entitled to receive the reasonable rental value for the vendee's use of the business without proof that the vendee's profits equaled or exceeded the reasonable rental value. *McCoy v. West*, 70 Cal. App. 3d 295, 303 (1977). The defrauding vendor is entitled to the lesser of either the rental value or profits made by the vendee. *Id*.  The defrauding party has the burden to prove any offsets to which they claim they are entitled. *Id.*

From the limited information available thus far to Honarkar Parties, the damages owed by Respondents are staggering.  Honarkar Parties' expert witness, Michael Spindler, is a Certified Public Accountant and Fraud Examiner with more than 40 years of experience.  As Mr. Spindler

---

[24] As a technical matter, "[t]he court does not rescind contracts but only affords relief based on a party-effected rescission." *Marzec v. Cal. Pub. Emps. Ret. Sys.*, 236 Cal. App. 4th 889, 914 (2015).



1  will testify at trial, in a scenario in which the joint venture agreements are rescinded and 100%

2  ownership of the membership interests in the underlying limited liability companies is returned to

3  Mr. Honarkar, Respondents still owe the Honarkar Parties at least $122,200,265 in restitution and

4  consequential damages.  Mr. Spindler calculated this figure by subtracting the total amount of

5  offsets due to Respondents for their contributions to the joint venture ($23,648,918) from the total

6  damages caused by Respondents' wrongdoing ($145,849,183).

7        Honarkar Parties also seek punitive damages, which are recoverable where recission is

8  based on fraud, based on Respondents' fraud, malice, and oppression.  *See e.g.*, *Millar v. James*,

9  254 Cal. App. 2d 530, 533 (1967); *Mahon v. Berg*, 267 Cal. App. 2d 588, 590 (1968).  Respondents'

10  fraud is clear, as is their intent from the start to use the joint venture as a personal slush fund, as

11  discussed above.  Respondents' malice and oppression is also evidenced through their campaign of

12  retaliation against Mr. Honarkar and his family, including their attempts to evict his children and

13  their filing of numerous lawsuits against Mr. Honarkar and his family, their violent take over of

14  multiple properties through force, and their use of mobile billboards that accuse Mr. Honarkar of

15  being a criminal.

16        Honarkar Parties also seek pre-judgment and post-judgment interest.  *See, e.g.*, *Leaf v. Phil*

17  *Rauch, Inc.*, 47 Cal. App. 3d 371, 375 (1975).  In addition, Honarkar Parties are also entitled to

18  their attorney's fees incurred in this dispute, in an amount to be determined by post-hearing motion,

19  pursuant to Section 17 of the Operating Agreements and 6 Del. C. § 18-1004.

20        **C.**    **Alternative Damages Calculations**

21        Honarkar Parties' expert witness Mr. Spindler also calculated damages under two alternative

22  theories.

23        Derivative Claims.[25]  Mr. Spindler calculated the damages owed by Respondents to the joint

24  venture—to the MOM Investco LLCs themselves—as $169,845,578 based on the currently

25

26

27  [25] Honarkar Parties bring derivative claims on behalf of the MOM Investco LLCs, as the evidence
     will show that Honarkar Parties have demanded that Respondents remediate their misconduct but

28  they refused on multiple occasions, and that Respondents, who currently control the MOM
                                                                                        (Continued...)



1  available information.  Additionally, treble damages and attorney's fees are sought pursuant to the

2  Penal Code section 496 claim, and punitive damages and interest are also sought.  Attorney's fees

3  are also available pursuant to Section 17 of the Operating Agreements and 6 Del. C. § 18-1004.

4  <u>Damages to Mr. Honarkar Without Recission</u>.  Finally, Mr. Spindler calculated the damages

5  to Honarkar Parties in a scenario in which the joint venture agreements are not rescinded, and

6  instead, Mr. Honarkar retains his ownership interests in the MOM Investco LLCs according to the

7  governing agreements.  In this scenario, Mr. Spindler will testify that Respondents' wrongdoing

8  has caused a total of $204,899,272 in damages to Honarkar Parties.  In this scenario, Honarkar

9  Parties also seek punitive damages, interest, and declaratory relief, and are entitled to their

10  attorney's fees incurred in this dispute, in an amount to be determined by post-hearing motion,

11  pursuant to Section 17 of the Operating Agreements and 6 Del. C. § 18-1004.

12  **V.      THE CROSS-CLAIMS AGAINST MR. HONARKAR ARE FRIVOLOUS**

13  The MOM Investco LLCs and MOM Members assert eleven causes of action against Mr.

14  Honarkar in their separately-instituted arbitration, which has now been consolidated into this

15  arbitration.  As the evidence at trial will show, the entire suit against Mr. Honarkar is part of their

16  campaign of retaliation against Mr. Honarkar, primarily serving to allow Respondents to defend

17  themselves from Mr. Honarkar's accusations of fraud and self-dealing by leveling the exact same

18  accusations back at Mr. Honarkar.  In addition to being brought for an improper purpose, MOM

19  Parties' claims are also legally and factually frivolous, for multiple reasons.

20  <u>1) All of the claims depend on the joint venture agreements being valid and enforceable by</u>

21  <u>MOM Parties</u>.  Every single claim asserted against Mr. Honarkar turns on the joint venture

22  agreements being valid and enforceable.  As discussed above, those agreements are void and

23  rescindable for Respondents' fraud, and also rescindable for the failure of Respondents'

24  consideration.  Without valid joint venture agreements, MOM Parties have no rights over any joint

25  venture assets and all of their claims fail on that basis.

26  _____

27  Investco LLCs, have a disabling self interest in the challenged transactions, which financially

28  benefitted Respondents at the expense of the MOM Investco LLCs and Honarkar Parties.  *See,
   e.g., Apple Inc. v. Super. Ct.*, 18 Cal. App. 5th 222, 248 (2017).



1    2) MOM Parties cannot sue to enforce contracts they breached. It is black letter law that a

2  party suing to enforce a contract must affirmatively prove their own performance under that

3  contract. *See, e.g.*, CACI No. 303. Even if the joint venture agreements are not rescinded, MOM

4  Parties still cannot sue to enforce those agreements because of their own breaches of the same

5  agreements—breaches that are set out in detail in the breach of contract section above. As the

6  evidence at trial will show, MOM Parties' breaches predate the alleged breaches by Mr. Honarkar

7  (which again is consistent with MOM Parties fabricating these supposed breaches after Mr.

8  Honarkar started asking questions and demanding documents).

9    3) MOM Parties cannot use Mr. Honarkar's control of 4G to manufacture false breaches.

10  The vast majority of what MOM Parties assert is Mr. Honarkar's misconduct involves his use of

11  funds belonging to Claimant 4G, with MOM Parties asserting that Mr. Honarkar is stealing money

12  from the joint venture by transferring money from 4G to himself and his family members. As the

13  Parties have made crystal clear through written agreement, however, 4G is not an asset but a

14  member of the MOM Investco LLCs joint venture, through which Mr. Honarkar holds his

15  ownership interests in the joint venture, and to the extent the original Operating Agreements said

16  anything to the contrary, that was a mistake. The Parties' July 2022 Letter Agreement on this issue

17  states this expressly: "It was intended for 4G and not MH to be the MO Member of the Companies.

18  Accordingly, the Salient Documents shall be deemed amended so that the MO Member is 4G

19  without any further action of the parties." (Ex. 583 ¶¶ 3-4.) Mr. Honarkar "is a direct or indirect

20  equity holder and/or beneficial owner of 4G." (*Id.*)

21    In short, because 4G is a member of the joint venture, and Respondents have absolutely no

22  rights to control 4G and no claims to any 4G funds, Mr. Honarkar is entitled to do whatever he

23  wants with 4G funds—including transferring money to his children if and when he so chooses—

24  without input from Respondents, and without breaching any joint venture agreements.

25    Ignoring this Letter Agreement altogether, MOM Parties attempt to rely solely on the

26  original Operating Agreements, in which 4G was incorrectly listed as a contributed entity in one

27  location and a member in other locations, in a desperate attempt to concoct claims of misconduct.

28  But the Letter Agreement plainly corrected that mistake. And an examination of the agreements as

Halpern
May
Ybarra
Gelberg

1    a whole—which is required under California law regarding contract interpretation—and including

2    the later amendments, demonstrates that the parties clearly intended and understood that 4G was a

3    member of the joint venture, not a contributed asset.  *City of Atascadero v. Merrill Lynch, Pierce,*

4    *Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998) ("Any contract must be construed as a

5    whole, with the various individual provisions interpreted together so as to give effect to all, if

6    reasonably possible or practicable.").[26]

7         Similarly, 4G is also a party and signatory to the Asset Contribution Agreement, also dated

8    June 8, 2021.  (Ex. 304.)  4G is identified as a party in the opening paragraph of the contract (unlike

9    any of the contributed assets, which are not parties), makes representations and warranties in the

10   contract, and is identified as a party to whom notice must be provided, separate from Mr. Honarkar

11   himself.  (*Id.* §§ 3(a), 3(c), 6(a), 6(e).)  Even more tellingly, 4G is identified as a party contributing

12   assets to the joint venture, (*id.* § 2(a)(iii) ["On the date hereof, MH and 4G hereby contribute to

13   MOM CA all of their right, title and interest in …."]), and, in connection with the contribution,

14   owing indemnity to the joint venture (*id.* § 5).  None of these provisions is consistent with 4G itself

15   being a "contributed asset" to the MOM Investco LLCs.

16        Moreover, as a matter of basic logic, Respondents' assertion that 4G is both a member and

17   an asset makes no sense.  If 4G is an owner of the MOM Investco LLCs, then 4G is entitled to

18   profits from the joint venture.  But if 4G is also an asset, then all profits from 4G flow up into the

19   MOM Investco LLCs before being distributed to the MOM Investco LLCs' owners.  Respondents'

20   proposed interpretation creates an infinite feedback loop in which 4G's profits flow to the MOM

21   Investco LLCs, which then flow back to 4G, which then flow back to the MOM Investco LLCs,

22   which then flow back to 4G, in perpetuity.  No reasonable person would create this arrangement—

23

24   _____

25

26   [26] Under California law, where there is an inconsistency between two agreements, both of which
     are executed by all the parties, the later contract supersedes the former.  *Frangipani v. Boecker*, 64
27   Cal. App. 4th 860, 863 (1998).  Similarly, where general and specific provisions of a contract are
     inconsistent, the specific provision will control.  Civ. Proc. Code § 1859.  Here, the Letter
28   Agreement's entire purpose is to clarify 4G's status as a member of the joint venture rather than
     an asset.



1  and certainly no reasonable person would create this arrangement silently, without any express

2  language anywhere in any of the contracts addressing this obvious problem.

3      Finally, the Parties' course of dealing before this dispute began confirms that 4G is not a

4  contributed asset of the MOM Investco LLCs.  As the evidence at trial will show, before

5  approximately February 2023 when this dispute began, Continuum sent multiple pieces of

6  correspondence—including to Nano Banc and to the accounting firm Continuum retained to prepare

7  the joint venture's taxes, BPM LLC—stating that 4G was not a contributed asset and should not be

8  reflected in the MOM Investco LLCs' books and records as such. And of course, in the books and

9  records litigation in Los Angeles Superior Court, Respondents took the opposite position than the

10  one they are now asserting, claiming that because 4G was the member, only 4G could bring the

11  books and records petition.

12      <u>4) MOM Parties cannot prove that other entities for which they claim misconduct were</u>

13  <u>actually contributed to the joint venture</u>.  In addition to claiming misconduct based on Mr.

14  Honarkar's operation of 4G, MOM Parties have attempted to manufacture misconduct by asserting

15  that Mr. Honarkar's operation of other entities not contributed to the MOM Investco LLCs still

16  counts as stealing from the joint venture.  As the evidence at trial will show, there was substantial

17  confusion regarding the documents being exchanged under intense time pressure in the couple of

18  days leading to the signing of the joint venture agreements, resulting in a list of companies being

19  provided by Mr. Honarkar that went beyond the entities being contributed to the joint venture.  Mr.

20  Honarkar understood that he was being asked to provide a list of all companies in which he held

21  interests, and he did so, but that list includes entities that were not agreed to be contributed, and

22  which were not contributed, for example listing 4G and Modan LLC.

23      Mr. Honarkar did not intend that these entities were to be contributed to the MOM Investco

24  LLCs.  Moreover, as confirmed by the Parties' course of dealing from June 2021 through early

25  2023, when the instant dispute began, everyone involved understood that these additional entities

26  were not contributed and were not joint venture assets.  For example, the evidence at trial will show

27  that just as with 4G, Continuum sent multiple pieces of correspondence stating that Modan LLC

28  was not contributed to the MOM Investco LLCs and was not a joint venture asset.  MOM Parties

**CLAIMANTS' PRE-HEARING BRIEF**

Halpern
May
Ybarra
Gelberg

1  only changed positions after Mr. Honarkar started raising claims of fraud, when MOM Parties were

2  trying to come up with any possible defense to Mr. Honarkar's claims against them.  The operation

3  of entities not contributed to the MOM Investco LLCs provides no basis for MOM Parties to bring

4  claims against Mr. Honarkar.

5       5) MOM Parties' claims are otherwise legally meritless.  MOM Parties' claims suffer from

6  multiple defects in addition to those discussed above.

7       *Trespass.*  MOM Parties bring two claims for trespasses that allegedly occurred on May 2,

8  2023, one for Hotel Laguna and one for the Laguna Beach Holiday Inn.  Trespass claims protect a

9  possessory right to property, not an ownership right.  *See, e.g.*, Trespass to Land: Elements of Claim,

10  Rutter Cal. Prac. Guide, Civ. Proc. Trial Claims and Def., Ch. 11(III)-B; *McBride v. Smith*, 18 Cal.

11  App. 5th 1160, 1174 (2018) ("[I]n order to state a cause of action for trespass a plaintiff must allege

12  an unauthorized and tangible entry on the land of another, which interfered with the plaintiff's

13  exclusive possessory rights.").  The evidence at trial will show that regardless of the dispute over

14  ownership and the *right* to control the joint venture, Honarkar Parties were in the actual, continuous,

15  and exclusive possession of both Hotel Laguna and the Holiday Inn from June 2021 through March

16  31, 2023, when MOM Parties and Makhijani/Continuum Parties seized possession of the hotels by

17  force and without going through the unlawful detainer process that is legally required in order for

18  Respondents to legally take possession from Honarkar Parties.  But MOM Parties' forcible entry

19  into the hotels on March 31, 2023, and MOM Parties' forcible detainer of the hotels from March 31

20  to May 2, when the alleged trespasses occurred, were unlawful and did not transfer the right to

21  possession to MOM Parties.  Because MOM Parties' illegal actions never resulted in MOM Parties

22  acquiring a possessory right to either Hotel Laguna or the Holiday Inn, they cannot now assert a

23  claim for interference with their non-existent possessory right—both as a matter of the affirmative

24  elements of a trespass claim, and as a matter of unclean hands.

25       *Intentional Interference.*  MOM Parties' claims for intentional interference with contractual

26  relations and with prospective economic advantage suffer from multiple flaws.  First, it is black

27  letter law that in order to state an intentional interference claim, there must exist "a valid contract

28  *between plaintiff* and a third party."  *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55

56
**CLAIMANTS' PRE-HEARING BRIEF**

Halpern
May
Ybarra
Gelberg

1   (1998) (emphasis added).  MOM Parties base their claim on alleged interference by Mr. Honarkar

2   with contracts between third parties and Laguna HI, LLC, but Laguna HI, LLC (and the joint

3   venture's other subsidiaries) is not a plaintiff or claimant in this action.  MOM Parties have not

4   identified any interference with any contracts to which <u>they themselves are parties</u>, and thus MOM

5   Parties are not the entities with standing to assert this claim.

6          Indeed, if the MOM Parties' *ownership* of Laguna HI LLC were sufficient to render MOM

7   Parties parties to Laguna HI, LLC's contracts, such that they can sue for interference with those

8   contracts, then the exact same is true for Mr. Honarkar: his ownership interest in Laguna HI, LLC

9   (and in the other subsidiaries) also makes him a party to Laguna HI, LLC's contracts.  Of course, it

10  is black letter law that interference claims "*can only be asserted against a stranger to the*

11  *relationship.* '[C]onsistent with its underlying policy of protecting the expectations of contracting

12  parties against frustration *by outsiders* who have no legitimate social or economic interest in the

13  contractual relationship, the tort cause of action for interference with a contract does not lie against

14  a party to the contract.'"  *Kasparian v. Cnty. of Los Angeles*, 38 Cal. App. 4th 242, 262 (1995)

15  (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994)).  If MOM

16  Parties' ownership interests in joint venture assets makes them parties to their subsidiaries'

17  contracts, then Mr. Honarkar is also a party to those contracts under the same logic, and this fact

18  forecloses these causes of action.

19         Second, MOM Parties' claims run afoul of the manager's privilege.  A defendant "is not

20  liable for interfering with the prospective economic relationship between a third party and a party

21  with whom defendant has a confidential relationship—*e.g.*, as its agent or manager."  Intentional

22  Interference with Prospective Economic Relations: Particular Defenses, Rutter Cal. Prac. Guide,

23  Civ. Proc. Trial Claims and Def., Ch. 3(II)-C, ¶ 3:250 (citing *Aalgaard v. Merchants Nat'l Bank,*

24  *Inc.*, 224 Cal. App. 3d 674, 684 (1990), and *Halvorsen v. Aramark Unif. Servs., Inc.*, 65 Cal. App.

25  4th 1383, 1391 (1998)).  Indeed, although styled as "intentional interference" claims, MOM Parties

26  have essentially brought two breach of contract claims against Mr. Honarkar, alleging that Mr.

27  Honarkar collected joint venture rents that, under the terms of the Operating Agreements, were

28  MOM Parties' to collect.  The California Supreme Court made clear long ago that intentional

Halpern
May
Ybarra
Gelberg

1  interference claims cannot be used to impose tort liability for breaches of contract, which is exactly

2  what MOM Parties seek to do here: "One contracting party owes no general tort duty to another not

3  to interfere with performance of the contract; its duty is simply to perform the contract according

4  to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who

5  have no legitimate interest in the scope or course of the contract's performance." *Applied Equip.*

6  *Corp.*, 7 Cal. 4th at 514.

7      *Conversion and Penal Code section 496.*   MOM Parties assert claims for conversion and

8  violation of Penal Code section 496 based on Mr. Honarkar's collection of rents belonging to the

9  joint venture after this ownership dispute began in February 2023, essentially arguing that by

10  collecting and holding these rents himself, rather than providing the rents to the specific people

11  currently in control of the MOM Investco LLCs, Mr. Honarkar has stolen the rents from the joint

12  venture itself.  But the logic of this assertion is inconsistent with MOM Parties' many admissions

13  under oath in these proceedings that the specific people currently in control of MOM Parties have

14  themselves diverted millions of dollars in joint venture assets for their own purposes, without a

15  cent going to the joint venture.  This includes, at the very least, $20 million admittedly stolen from

16  the MOM Investco LLCs and used to fund Continuum's initial contribution; $1 million admittedly

17  stolen from Tesoro Redlands LLC and used to fund Respondents' debt repayment to Enrico

18  Arvielo; $4.1 million admittedly stolen from Laguna HI, LLC and used to fund one of their

19  investor's (Cheema) contributions to one of MOM Parties' investor groups; and $1 million

20  admittedly stolen from Hotel Laguna, LLC to fund a fraudulent 1031 exchange for Jaachak LLC.

21  In other words, MOM Parties have admitted that money provided to the specific people currently

22  in control of the MOM Investco LLCs will not necessarily go to the MOM Investco LLCs, and

23  instead, there is a very good likelihood that the funds will be stolen by those people and used for

24  other purposes.

25      Stated differently, in order to prevail on their conversion and Penal Code claims based on

26  the theory that Mr. Honarkar withheld money from the MOM Investco LLCs *by withholding money*

27  *from MOM Parties*, MOM Parties will need to prove that funds provided to MOM Parties actually

28  go to the MOM Investco LLCs in the regular course of business.  MOM Parties cannot do this,

Halpern
May
Ybarra
Gelberg

1   having admitted that it is at least equally as likely that funds provided to MOM Parties will not go

2   to the MOM Investco LLCs and will instead be used for MOM Parties' own independent purposes.

3   In light of this reality, all actions taken by Mr. Honarkar to protect joint venture funds by collecting

4   rents, and keeping those rents accounted for during the time it takes for the consequences of

5   Respondents' admitted fraud to be litigated to fruition, are not actions that deprived *the MOM*

6   *Investco LLCs* of any assets—they are actions that deprived Mr. Makhijani and his fellow fraudsters

7   the opportunity to steal more money from the joint venture before the agreements can be rescinded.

8   Mr. Honarkar's actions to safeguard MOM Investco LLC funds from MOM Parties are purely to

9   the benefit of the MOM Investco LLCs—though obviously they are not to Mr. Makhijani's benefit.

10  **VI.    <u>CONCLUSION</u>**

11          For the reasons above and as the evidence at trial will show, Honarkar Parties should prevail

12  on their claims against Respondents in their entirety and be awarded rescission of the joint venture

13  agreements, restitution, and consequential damages, in addition to punitive damages, interest, and

14  attorney's fees.

15

16  DATED: June 20, 2024                    HALPERN MAY YBARRA GELBERG LLP
                                             AARON M. MAY
17                                           JOSEPH J. YBARRA

18

19                                         By: _____
                                              AARON M. MAY
20

21                                         Attorneys for Claimants MOHAMMAD
                                           HONARKAR and 4G WIRELESS, INC.,
22                                         individually and on behalf of MOM AS Investco
                                           LLC, MOM BS Investco LLC, and MOM CA
23                                         Investco LLC

24

25

26

27

28



1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3
4

I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is: 550 South Hope Street, Suite 2330, Los Angeles, California 90071.

5

On **June 20, 2024**, I served the foregoing document(s) described as:

6

**CLAIMANTS' PRE-HEARING BRIEF**

7

on the interested parties in this action as follows:

| | |
|---|---|
| Scott J. Leipzig, Esq.<br>Michael R. Farrell, Esq.<br>Tim C. Hsu, Esq.<br>Suzanne E. Kenney, Esq.<br>Shauna E. Woods, Esq.<br>Stephanie S. Roberts, Esq.<br>Gabriela S. Perez, Esq.<br>Leilee Ghassemi, Esq.<br>**ALLEN MATKINS LECK GAMBLE<br>MALLORY & NATSIS LLP**<br>865 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017-2543<br>sleipzig@allenmatkins.com<br>mfarrell@allenmatkins.com<br>thsu@allenmatkins.com<br>skenney@allenmatkins.com<br>swoods@allenmatkins.com<br>stephanieroberts@allenmatkins.com<br>gperez@allenmatkins.com<br>lghassemi@allenmatkins.com<br><br>*Attorneys for MOM AS INVESTOR GROUP,<br>LLC; MOM BS INVESTOR GROUP, LLC; MOM<br>CA INVESTOR GROUP LLC; MOM AS<br>INVESTCO LLC; MOM CA INVESTCO LLC,<br>MOM BS INVESTCO LLC; MOM CA<br>MANAGER, LLC; MOM BS MANAGER, LLC;<br>and MOM AS MANAGER, LLC* | Marc Cohen, Esq.<br>**COHEN LAW GROUP, APC**<br>541 S. Spring Street, Suite 1208<br>Los Angeles, CA 90013<br>marc@clgapc.com<br><br>*Attorneys for MAHENDER MAKHIJANI<br>and CONTINUUM ANALYTICS, INC.* |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**CLAIMANTS' PRE-HEARING BRIEF**

| | |
|---|---|
| Ann Marie Mortimer, Esq.<br>Hakop Stepanyan, Esq.,<br>Hunton Andrews Kurth LLP<br>550 S. Hope Street, Suite 2000<br>Los Angeles, CA 90071<br>amortimer@HuntonAK.com<br>hstepanyan@huntonak.com<br><br>*Attorneys for Nano Banc* | Carleton Goss, Esq.<br>Hunton Andrews Kurth LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, TX 75202<br>cgoss@huntonak.com<br><br><br>*Attorneys for Nano Banc* |
| Lawrence K. DeMeo, Esq.<br>Hunton Andrews Kurth LLP<br>60 State Street, Suite 2400<br>Boston, MA 02109<br>ldemeo@huntonak.com<br><br>*Attorneys for Nano Banc* | Sam B. Maralan, Esq.<br>MARALAN LAW, P.C.<br>3080 Bristol Street, Suite 630<br>Costa Mesa, CA 92626<br>sm@maralanlaw.com<br><br>*Attorneys for MOHAMMAD HONARKAR<br>and 4G WIRELESS, INC., individually<br>and on behalf of MOM AS Investco LLC,<br>MOM BS Investco LLC, and MOM CA<br>Investco LLC* |

[X]    **BY ELECTRONIC SERVICE VIA JAMS ACCESS:** By submitting an electronic version of the document(s) through the user interface https://access.jamsadr.com.  My electronic notification address is jillian.song@halpernmay.com.

Executed on **June 20, 2024**, at Chino Hills, California.

[X]    (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
Jillian Song

Halpern
May
Ybarra
Gelberg