## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |

## MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (the "Motion"), pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 2002-1, 4001-2, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"),[2] and a final order (the "Final Order", together with the Interim Order, the "DIP Orders"); (ii) scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rules 4001(b) and (d), and (iv) granting related relief. In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Mark Shinderman in Support*

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2] Undefined capitalized terms have the meanings ascribed to them in the Declarations (defined below).

*of Debtor's First Day Motions* (as may be amended, the "<u>First Day Declaration</u>") and the

*Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders*

*(i) Authorizing the Debtors to Obtain Postpetition Financing; and (ii) Granting Related Relief*,

contemporaneously filed with this Motion (the "<u>DIP Declaration</u>", together with the First Day

Declaration, the "<u>Declarations</u>").  A copy of the DIP Declaration is attached hereto as **<u>Exhibit C</u>**.

The Declarations are both incorporated herein by reference.

## <u>RELIEF REQUESTED</u>

1.      By this Motion, the Debtors seek, among other things:

(i)      authorization for the Debtors to obtain secured debtor in possession financing of no less than $3,500,000 up to $5,000,000 at 10% non-default interest (the "<u>DIP Loan</u>") pursuant to the terms and conditions set forth in the DIP Orders and that certain Debtor-in-Possession Loan Term Sheet, (the "<u>DIP Term Sheet</u>"), by and between the Debtors (the "<u>Borrowers</u>") and Specialty DIP LLC, a Delaware limited liability company (the "<u>DIP Lender</u>"), a copy of which is attached hereto as **<u>Exhibit B</u>**, and the agreements, instruments, certificates, and other documents executed in connection therewith (collectively, the "<u>DIP Documents</u>");

(ii)     granting the DIP Liens (as defined below), which liens shall be first priority as to unencumbered property and second-priority to encumbered property and shall not attach to causes of action, to the DIP Lender on all of the DIP Collateral (as defined below) to secure the DIP Loan and all obligations owing and outstanding thereunder and under the DIP Documents and the DIP Orders, as applicable (collectively, the "<u>DIP Obligations</u>"), subject only to Permitted Liens and the Carve Out (in each case, as defined below);

(iii)    authorization to pay the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Term Sheet;

(iv)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the Debtors and the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Documents;

(v)     scheduling the Final Hearing for an order approving this Motion on a final basis; and

(vi)    granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over the above-captioned chapter 11 cases (the "Chapter 11 Cases"), the Debtors, property of the Debtors' estates, and these matters under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue of these cases is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

## BACKGROUND

### A.      The Debtors' Chapter 11 Cases

5.      On February 28, 2025 (the "Investco Petition Date"), Debtor MOM CA Investco LLC ("MOM CA"), Debtor MOM AS Investco LLC ("MOM AS"), and Debtor MOM BS Investco LLC ("MOM BS," collectively with MOM CA and MOM AS, the "MOM Investcos") each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  On March 10, 2025 (the "SPE Petition Date", together with the Investco Petition Date, respectively, the "Petition Date"), nineteen subsidiary special purpose entities (each an "SPE") owned by the MOM Investcos

(collectively, the "SPE Debtors")[3] each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no trustee, examiner or statutory committee of creditors has been appointed in these cases.

6.      The Debtors constitute a real estate operation comprised of a portfolio of commercial properties owned by the Debtors.  The properties that make up the portfolio include hotels, an apartment complex, office buildings, other commercial real estate, and individual homes used as luxury vacation rentals.  The Debtors can be separated into two classes: (1) the MOM Investcos, which are holding companies and the sole member, respectively, of, (2) the SPE Debtors, which are separate entities that each own and operate distinct assets.  The SPE Debtors' assets generate and collect all of the Debtors' revenues.  Historically, the SPE Debtors "upstream" the revenues to the MOM Investcos, as needed, to cover the expenses of other SPE Debtors.

7.      Additional factual background regarding the Debtors is set forth in the First Day Delcaration.

**B.      The Debtors' Prepetition Capital Structure**

8.      As of the Petition Date, the Debtors have approximately $194 million in senior secured institutional indebtedness (excluding accrued interest and certain costs).  That indebtedness is secured by first priority deeds of trust against properties owned by the SPE Debtors.  The total debt on all properties appears to exceed $300 million.

---

[3]    The "SPE Debtors" are: Retreat at Laguna Villas, LLC; Sunset Cove Villas, LLC; Duplex at Sleepy Hollow, LLC; Cliff Drive Properties DE, LLC; 694 NCH Apartments, LLC; Heisler Laguna, LLC; Laguna Festival Center, LLC; 891 Laguna Canyon Road, LLC; 777 AT Laguna, LLC; Laguna Art District Complex, LLC; Tesoro Redlands DE, LLC; Aryabhata Group LLC; Hotel Laguna, LLC; 4110 West 3rd Street DE, LLC; 314 S. Harvard DE, LLC; Laguna, HI, LLC; Laguna HW, LLC; The Masters Building, LLC, and 837 Park Avenue, LLC.

9.      Historically, the Debtors funded their operations with a combination of cash flow from business operations and funded indebtedness. The MOM Investcos do not have operations; however, certain SPE Debtors operate and generate cash flow. Unfortunately, as of the Petition Date, the MOM Investcos are not receiving substantial cash flow, and many of the SPE Debtors do not generate sufficient cash flow to cover their expenses.

Property Level Secured Obligations

10.     Based on an initial review of preliminary title reports for the properties, the SPE Debtors and their owned real properties are subject to deeds of trust for mortgages and other secured debt.  These obligations are generally owed by the respective SPE Debtor that owns the real property at issue. Below are the real property assets owned by the SPE Debtors, outstanding loan amount, and any notice of default:

| SPE | Real Property Address[4] | Lender | Outstanding Loan Amount | Notice of Default Filed |
|---|---|---|---|---|
| Retreat at Laguna Villas, LLC*[5] | 749 Gaviota (729 Ocean Front) | Enterprise Bank & Trust[6] | $6,177,300.00 | February 12, 2025 |
| Sunset Cove Villas, LLC* | 683 Sleepy Hollow Ln, Laguna Beach | Enterprise Bank & Trust | $10,322,300.00 | February 7, 2025 |
| Duplex at Sleepy Hollow, LLC* | 689 Sleepy Hollow Ln, Laguna Beach | Enterprise Bank & Trust | $1,725,800.00 | February 12, 2025 |
| Cliff Drive Properties DE, LLC* | 150-154 Cliff Dr, Laguna Beach | Enterprise Bank & Trust | $5,583,600.00 | February 7, 2025 |
| 694 NCH Apartments, LLC* | 694 N Coast Hwy, Laguna Beach | Enterprise Bank & Trust | $3,848,000.00 | February 12, 2025 |

---

[4]    All properties listed are collectively referred to as the "Real Properties."

[5]    SPE Debtors listed in the table with an "*" are collectively referred to as the "Operating Properties," which are subject to the relief sought in the Cash Collateral Motion (as defined herein).

[6]    Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, and Banc of California are collectively referred to as the "Real Property Lenders").

| SPE | Real Property Address[4] | Lender | Outstanding Loan Amount | Notice of Default Filed |
|---|---|---|---|---|
| Laguna Festival Center, LLC* | 805-859 Laguna Canyon Rd, Laguna Beach | Enterprise Bank & Trust | $27,600,000.00 | February 13, 2025 |
| 891 Laguna Canyon Road, LLC* | 891 Laguna Canyon Rd, Laguna Beach | | | |
| 777 at Laguna, LLC* | 777 Laguna Canyon Rd, Laguna Beach | | | |
| Laguna Art District Complex, LLC* | 775-793 Laguna Canyon Rd, Laguna Beach | | | |
| Heisler Laguna, LLC* | 305-397 North Coast Highway, Laguna Beach | Enterprise Bank & Trust | $16,971,000.00 | February 7, 2025 |
| The Masters Building, LLC* | 2711 Pacific Coast Hwy (2713 w Coast Hwy), Corona Del Mar | PMF CA REIT, LLC | $6,540,000.00 | N/A |
| Laguna HI, LLC* | 696 S Coast Hwy, Laguna Beach | Wilshire Quinn Income Fund, LLC | $12,550,000.00 | N/A |
| Laguna HW, LLC* | 688-690 S Coast Hwy, Laguna Beach | | | |
| 314 S. Harvard DE, LLC | 314 Harvard Blvd, Los Angeles | Lone Oak Fund, LLC | $6,500,000.00 | December 5, 2024 |
| 4110 West 3rd Street DE, LLC | 4110 West 3rd Street, Los Angeles | | | |
| 837 Park Ave, LLC | 837 Park Ave, Laguna Beach | | | N/A |
| Tesoro Redlands DE, LLC* | 106 W Pennsylvania Ave, Redlands | Preferred Bank | $39,000,000.00 | November 20, 2024 |
| Hotel Laguna, LLC* | 421 S Coast Hwy, Laguna Beach | Banc of California | $27,000,000.00 | February 25, 2025 |
| Aryabhata Group, LLC | 4251,4225,4253 Martingale Way, 1701 Corinthian Way, 4200,4220,4250 Scott Drive, 1660 Dove Street, Newport Beach | Preferred Bank | $28,500,000.00 | November 20, 2024 |

11.     The loan held by Enterprise against Debtors Laguna Festival Center, LLC, 891 Laguna Canyon Road, LLC, 777 at Laguna, LLC, and Laguna Art District Complex, LLC is cross-collateralized by such Debtors' Real Properties.

12.     The loan held by Wilshire Quinn Income Fund, LLC against Debtors Laguna HI, LLC and Laguna HW, LLC are cross-collateralized by such Debtors' Real Properties.

13.     The loan held by Loan Oak Fund, LLC against Debtors 314 S. Harvard DE, LLC, 4110 West 3rd Street DE, LLC, and 837 Park Ave, LLC are cross-collateralized by such Debtors' Real Properties.

Cantor Loans

14.     Certain SPE Debtors allegedly have loans with the Cantor Group IV, LLC and Cantor Group V, LLC (together, the "Cantor Lenders").  Based on a review of the promissory notes for the Cantor Loans, the Cantor Lenders allegedly made eleven loans with a principal balance totaling over $92.5 million (the "Cantor Loans").[7]

Coastline Loan

15.     Based upon information provided by prepetition management, certain of the SPE Debtors issued a promissory note in favor of Coastline Santa Monica Investments, LLC ("Coastline"), dated August 26, 2021, in the principal sum of $17,255,316.00 (the "Coastline Loan"). Based upon information provided by prepetition management, the current outstanding balance of the Coastline Loan is $29,485,896.48. All information provided by prepetition management is being verified.[8]

---

[7]     The Debtors take no position on the validity, enforceability and secured status of the Cantor Loans and reserve all rights to challenge the Cantor Loans.

[8]     The Debtors take no position on the validity, enforceability and secured status of the Coastline Loan and reserve all rights to challenge the Coastline Loan.

### C.    The Events Leading to the Chapter 11 Cases

16.    Certain of the Debtors have been parties to contentious Arbitration proceedings regarding disputes over who owns and controls the Debtors' enterprise.  These proceedings are more fully described in the First Day Declaration.

17.    Currently, the Debtors lack cash flow overall. Additionally, the Debtors' prior managers both represented to the CRO and FTI that many tenants have not been paying rent.  As a result of the failure to pay mortgage payments, many of the SPE Debtors have received notices of default and foreclosure, which have been stayed by the filing of these Chapter 11 Cases.

### D.    The Debtors' Immediate Need for Debtor-in-Possession Financing

<u>CRO Actions to Investigate Finances and Evaluate the Estates' Needs</u>

18.    The CRO, in consultation with the Debtors' advisors, continues to thoroughly investigate the Debtors' assets and affairs. While that investigation is ongoing, the need for immediate financing is very apparent.

19.    Since their engagement about two weeks ago, the CRO and FTI have been hard at work meeting with different constituents, evaluating information they have, identifying additional information that is needed, and taking steps to obtain additional information. The FTI team recently spent a week in person with the managers as well as others identifying what specific information is needed and determining what tasks should have priority.

20.    Among other things, the CRO and FTI are in the process of reviewing the Debtors' preliminary cash collateral budgets and continue to work with various parties to verify and, if needed, update the information contained in those budgets. The CRO and FTI are in the process of obtaining access to information, and books and records, including such information that is not in the Debtors' possession. While the parties have been helpful, this process necessarily takes time.

21.     What is clear so far is that the estate desperately needs funds now.  Assuming postpetition property taxes will be paid in the ordinary course, and further assuming there will not be any debt service in the near term, the projections using information provided by prior management and the property managers (the "Projections") (which FTI is verifying) indicate that many of the Debtors barely have positive cash flow over time and will continue to operate at a loss.  At any given point in time, each of the Debtors could be cash flow negative.

22.     That the Debtors need funds to proceed in these Chapter 11 Cases cannot really be questioned.  Indeed, based on the CRO's review of the historical performance of the properties so far, it appears that the Debtors' ever-present cash flow challenges seem to have existed irrespective of whomever was managing the Debtors and their assets, leading to defaults, threatened foreclosure sales, and receiverships throughout the history of the project.  Nonetheless, these Chapter 11 Cases present the Debtors and their creditors with the opportunity to work together, align their interests and coordinate their efforts and resources to stabilize the business.

23.     In addition, a review of the Projections makes it apparent that cash flows from the Debtors' properties do not provide any material funding for the administration of the Debtors' estates.  The CRO requested that each of the estates' advisors provide conservative estimates of projected professional fees based on an assumed flow of work that is most likely.  Of course, if the issues are more contentious than anticipated, the Projections will prove to be too low; conversely, if the Debtors can solve issues and garner cooperation more easily than anticipated, the administrative costs in the Projections will prove to be high. Additionally, as noted at the first day hearing, FTI is handling the books and records.

24.     Based on the foregoing, the CRO determined that a DIP Loan (defined below) is absolutely necessary to cover operating expenses of the Debtors' assets and the administrative expenses necessary to make sure that these cases can move forward.

25.     The DIP Loan is narrowly tailored to the Debtors' short-term needs and the objectives of the CRO and the Debtors' advisors and professionals. Given the circumstances, the CRO, in consultation with the Debtors' advisors have established a flexible plan of action over three phases:

    a.  Phase 1: For the next 30-60 days, the highest priority is gathering sufficiently reliable and verified information from the Debtors' prior managers and third-parties to make informed decisions about the next steps in this reorganization. Of equal importance is the need to ensure that the estates have the funds and flexibility to address the Debtors' short term financial needs. At this time, it is difficult to specifically identify what those needs are on a line-item basis, but given that most of the Debtors' assets are high-profile hotel and hospitality properties, the Debtors must have the ability to keep employees and vendors current and to fulfill their obligations to guests and customers, especially as the Debtors' most profitable, summer months are rapidly approaching. Given the breadth and complexity of the Debtors' organization and assets and the need to act quickly, the Debtors need to compensate their experienced professionals for the significant time and effort needed to accomplish the short and long-term goals of this reorganization. Absent the DIP Loan there are no funds to cover expenses and pay professionals.

b.  Phase 2: Using the information obtained during Phase 1, the Debtors can then create reliable budgets and forecasts to create a plan of action during the intermediate term of the following 2-6 months. Having stabilized operations during Phase 1, the Debtors can focus on maximizing value during their most profitable months, with the goal potentially operating the estate out of revenues, and, if needed, strategic sales of estate assets.  During this phase, the CRO and his advisors will assess the various exit options and replace the short-term DIP Loan with a more traditional DIP loan following a marketing period.

c.  Phase 3: Having obtained reliable information through the first-hand operation of the Debtors' businesses, the Debtors can then form a concrete plan to exit bankruptcy by way of a sale of assets and/or plan of reorganization.

26.     The estates undoubtedly need the DIP Loan, which is a short-term, stopgap loan, to even begin Phase 1. These Chapter 11 Cases have been appropriately described as a freefall bankruptcy. Without the DIP Loan and retention of the Debtors' experienced professionals, these Chapter 11 Cases will rapidly fall into a Chapter 7 liquidation, eliminating millions of dollars of value that could otherwise be used to satisfy creditors. To be clear, the Debtors' independent manager and CRO will use the DIP Loan proceeds with complete transparency to the Court, the U.S. Trustee, the Honarkar Parties, secured creditors and all stakeholders.

The Proposed DIP Loan is Reasonable and Necessary to Maximize Value and Prevent Irreparable Harm for Creditors

27.     Having determined that the DIP Loan is necessary, the CRO immediately contacted both ownership groups at the outset of these cases to discuss the need for short-term financial support, presuming that they would have a better sense of the Projections and assets, and thus might be willing to provide support for the short-term and/or could call upon others to provide that

short term support. While the Debtors would have liked a more fulsome marketing process, the limited marketing of the DIP Loan to the Debtors' ownership groups is appropriate under the circumstances, as no third-party, traditional lender would have extended a DIP loan to the Debtors at all, much less on the favorable terms of the DIP Loan.

28.    The CRO made it clear that the DIP Loan is a short-term DIP loan, and because it could not be fully marketed, would need to be "very clean" with "no bells and whistles."  Most importantly, the CRO made it clear that the DIP Loan: a) needed to be able to refinance/pay off any short-term DIP loan without a prepayment penalty, b) would need to be subordinate to existing secured debt, and 3) could not be secured by any of the estates' causes of actions. The DIP Loan proposed in this Motion meets these criteria.

29.    As clearly set forth in the Debtors' Cash Collateral Motion, the responses of the SPE Debtors' respective secured creditors to the Cash Collateral Motion and the discussion in open court at the first day hearing, the Debtors are desperately low on cash and effectively have no unencumbered revenue at this point.

Terms of the DIP Loan

30.    The DIP Loan being offered to the Debtors is fair and reasonable and is narrowly tailored to allow this Chapter 11 Case to go forward and preserve millions of dollars for creditors and stakeholders that would otherwise be immediately wiped out. The specific terms of the DIP Loan are set forth below, but generally, the DIP Loan provides the Debtors with postpetition financing of a minimum of $3.5 Million, up to $5 Million at 10% non-default interest, which is secured by a senior lien on the Debtors unencumbered assets and a junior lien on the Debtors' encumbered assets. There is no set budget for the DIP Loan, other than that $2.5 Million of the DIP Loan proceeds will be set aside in escrow to ensure payment of the Debtors' professionals

(pursuant to the Court's orders on professional retention and compensation) who have already taken on significant financial risk in a good faith effort to serve the best interests of the Debtors' estates.[9]

31.     The DIP Loan is being provided Specialty DIP, an entity created by individuals involved with and familiar with the properties and including at least one likely insider of the Debtor (M Mahender Makhijani).  As discussed in the First Day Declaration, the Independent Manager was duly hired and delegated the power to manage the Debtors, and the CRO was retained to run the Debtors' businesses under the supervision of the Independent Manager. The would-be DIP Lender does not participate in the management or operations of the Debtors. The Debtors have taken all reasonable corporate precautions to, on one hand, maximize the value of the Debtors' businesses and assets as a going concern and, on the other hand, provide the appropriate corporate separateness between the DIP Lender and the Debtors.

32.     Importantly, the proposed DIP Loan terms are aimed at a successful outcome for all creditors and are not an attempt to gain an inside advantage for one party over others. Indeed, the DIP Loan does not contain DIP financing terms that are commonly associated with post-petition financing. The fair terms of the DIP Loan also demonstrate lender confidence in the Debtors' ability repay the DIP Loan under a confirmed plan of reorganization or otherwise–if the Debtors are able to utilize the proceeds of the DIP Loan immediately. Notably, there are no requests for, among other DIP provisions:

      a.   Roll-ups or other attempts to improve the treatment of prepetition liens;

      b.   Releases, waivers or exculpations;

---

[9]   The DIP Loan professional escrow may be used to fund a retainer for FTI. This will be handled in FTI's retention and compensation applications at the appropriate time.

    c.   Debtors' stipulations as to the extent, validity and priority of prepetition liens and claims;

    d.   Releases in favor of the DIP Lender other than solely with respect to the DIP Facility;

    e.   Unrealistic and inflexible budgets and performance milestones;

    f.   Origination, exit or prepayment fees and penalties;

    g.   Loan Facility Fees;

    h.   Attempts to assert ownership or control over derivative and estate claims and causes of action;

    i.   Liens on the estates' causes of action;

    j.   Waivers of Bankruptcy Code § 506(c) surcharge; or

    k.   Waiver of the "equities of the case" exception in Bankruptcy Code § 552(b).

## SUMMARY OF PRINCIPAL TERMS OF DIP LOAN

33.     The Debtors submit this concise statement listing certain material terms of the term sheet attached hereto as **Exhibit B** (the "DIP Term Sheet") and the proposed Interim Order in compliance with Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2.  As discussed in detail below, the DIP Loan and financing terms are necessary and justified under the circumstances of these Chapter 11 Cases:[10]

---

[10]   The terms and conditions set forth in the Motion are qualified in their entirety by reference to the provisions of the DIP Term Sheet and the DIP Orders. The descriptions of the terms of the DIP Term Sheet and the DIP Orders in this Motion are provided for the convenience of the Court and the parties in interest. In the event of any inconsistency between the descriptions in this Motion and the actual terms of the DIP Term Sheet or DIP Orders, the terms of the DIP Term Sheet or the DIP Orders, as applicable, shall govern.

| Material Term | Summary Description |
|---|---|
| **Parties to DIP Loan:** *Bankruptcy Rule 4001(c)(1)(B)* | **Borrower:** Debtors<br><br>**DIP Lender:** Specialty DIP LLC, a Delaware limited liability company |
| **Parties with an Interest in Cash Collateral:** *Bankruptcy Rule 4001(b)(1)(B)(i)* | Enterprise Bank & Trust<br><br>Banc of California<br><br>Preferred Bank<br><br>The following creditors <u>may</u> have an interest in cash collateral:<br><br>Lone Oak Fund, LLC<br><br>Wilshire Quinn Income Fund, LLC<br><br>PMF CA REIT, LLC<br><br>Cantor Group<br><br>Coastline Santa Monica Investments, LLC |
| **Stipulations:** *Bankruptcy Rule 4001(c)(1)(B)(iii)* *Local Rule 4001-2(a)(i)(B)* | No stipulations. |
| **DIP Loan and Borrowing Limits:** *Bankruptcy Rule 4001(c)(1)(B)* *Local Rule 4001-2(a)(ii)* | Debtor in Possession secured term loan facility of up to the maximum, original principal amount of $5,000,000 (the "DIP Loan"), which includes an initial funding amount of $3,500,000 (the "Initial Funding Amount") and an additional funding amount of $1,500,000 (the "Final Funding Amount").<br><br>Subject to the terms and conditions set forth herein and in the DIP Documents, including satisfaction of each of the Conditions Precedent (defined below) to each such draw, DIP Lender will fund the following draws:<br><br>1. Upon the entry in the Bankruptcy Court of the Interim Order, in form and substance acceptable to the DIP Lender in its sole and absolute discretion, approving the DIP Loan and the DIP Documents, the DIP Lender will make the Initial Funding Amount available to the DIP Borrowers.<br><br>2. Upon the earlier to occur of (i) the Bankruptcy Court's entry of the Final Order; or (ii) filing by the applicable DIP Borrowers of a motion with the Bankruptcy Court seeking authority for the sale of real estate pursuant to which the net sale proceeds of such sale shall result in the indefeasible payment in full in cash of the DIP Obligations, the DIP Lender will make available to the DIP Borrowers the Final Funding Amount. |
| **Interest Rates:** *Bankruptcy Rule 4001(c)(1)(B)* | <u>Non-Default Interest Rate:</u> Interest shall accrue on the DIP Loan at the rate of 10% per annum, and shall be payable monthly, on the first (1st) business day of each month, in arrears..<br><br><u>Default Rate:</u> At all times while an Event of Default under the DIP Loan exists, |

| Material Term | Summary Description |
|---|---|
| *Local Rule 4001-2(a)(i)(B)* | at the election of the DIP Lender, principal, interest and other amounts under the DIP Loan shall bear interest at a rate per annum equal to 13%. |
| **Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(K)* | The reasonable and documented professional fees and out-of-pocket expenses incurred by the DIP Lender, including expenses incurred in connection with defending the validity and enforceability of the DIP Documents (as defined below), shall be promptly paid by the DIP Borrowers in cash on no less than a monthly basis (documentation in summary form to be sufficient), and any DIP Lender counsel fees not paid each month shall accrue in kind and be payable in the following month. |
| **Budget and Permitted Variances:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii), (iii)*<br><br>*Local Rule 4001-2(a)(i)(E)* | There will be no DIP budget for operating expenses from the date of the entry of the Interim Order through the date of the final hearing to approve the DIP Loan. However, the Debtors must use the DIP Loan proceeds consistent with the permitted uses (discussed below), and the DIP Lender shall, in the interim period, have the right to be consulted on the use of proceeds from the DIP Loan for operating expenses that exceed $50,000 on any one item or group of related items, although the Debtors shall have sole discretion, subject to the permitted uses, as to the use of the proceeds of the DIP Loan. Notwithstanding the foregoing, the DIP Borrowers shall provide to the DIP Lender, as soon as reasonably practicable prior to the hearing to approve the Final Order (as defined below), a budget for the proceeds to be used for operating expenses subject to a 25% variance of the DIP Loan. |

| | |
|---|---|
| **Use of DIP Loan Proceeds and Cash Collateral:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)*<br><br>*Local Rule 4001-2(a)(i)(L)* | Subject to entry of the Interim Order, the DIP Borrowers, in their sole discretion, shall use the proceeds of the DIP Loan for the following "Permitted Uses":<br><br>a.  to fund the operating expenses of the DIP Borrowers, so long as the DIP Borrowers comply with the DIP Lender's consultation rights described above,<br><br>b.  to fund the administration of the Chapter 11 Cases;<br><br>c.  to fund the reasonable, documented, and allowed fees and expenses of the DIP Borrowers' and the DIP Lender's professionals; and<br><br>d.  to pay other amounts with the prior written consent of the DIP Lender. |
| **Maturity Date and Termination:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)*<br><br>*Local Rule 4001-2(a)(i)(M)* | Unless otherwise agreed to by the DIP Lender in writing, the maturity date of the DIP Loan (the "<u>Maturity Date</u>") shall be the earliest to occur of the following, upon which the DIP Lender's commitment to provide the DIP Loan shall terminate, and the DIP Loan shall be indefeasibly paid in full in cash:<br><br>a.  90 days after entry of the Interim Order, provided, however that such 90 day period shall be extended for an additional 90 day period provided that (i) no Event of Default has occurred and is continuing, and (ii) a motion has been filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") seeking the sale of assets of the DIP Borrowers pursuant to which the net sale proceeds of such sale shall result in the indefeasible payment in full in cash of the DIP Obligations;<br><br>b.  the consummation of a sale of all or substantially all of the assets of the DIP Borrowers;<br><br>c.  acceleration of or termination of the DIP Loan pursuant to the DIP Documents; and<br><br>d.  the substantial consummation (as defined in Section 1101 of chapter 11 of Title 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") and which for purposes hereof shall be no later than the "effective date" thereof) of a plan filed in the that certain matter before the Bankruptcy Court entitled *In re: MOM CA Investco LLC, et al.*, (Case No. 25-10321, et al. (BLS)) (the "<u>Chapter 11 Cases</u>") that is confirmed pursuant to an order entered by the Bankruptcy Court.<br><br>Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the applicable provisions of the Interim Order and the Final Order, if any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions no earlier than 5 business days after notice to the DIP Borrowers:<br><br>a) a.  terminate the commitment of the DIP Lender to make any further advances under the DIP Loan;<br><br>b) declare that the unpaid amount of the DIP Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Documents, this DIP Term Sheet and the Interim Order or the Final Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Borrowers;<br><br>c) foreclose upon the DIP Collateral; or |

| | |
|---|---|
| | d) take any other action or exercise any other right or remedy as permitted by the DIP Documents or applicable law. |
| **DIP Collateral:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(G)* | As security for the DIP Obligations, the DIP Borrowers shall grant to the DIP Lender the following in the DIP Documents:<br><br>1.  a first priority security interest in and continuing lien on all of such DIP Borrowers' right, title and interest in, to and under all the DIP Borrowers' assets that are not already encumbered by a prior lien, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.<br><br>2.  a junior security interest in and continuing lien on all of such DIP Borrowers' assets that are encumbered by one or more prior liens, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.<br><br>(all of which being hereafter collectively referred to as the "DIP Collateral"). For the avoidance of doubt, the DIP Collateral shall not include any derivative actions or other claims and causes of action of the DIP Borrowers' bankruptcy estates. |
| **DIP Credit Lien/Super Priority Administrative Claim Status:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Lender shall be granted superpriority status up to $2.5 million of the Debt Proceeds, subject to the Carve-Out and the Prepetition Senior Lenders Administrative Claims. |
| **Automatic Perfection of a Lien:**<br><br>*Bankruptcy Rule 4001(c)(1)(vii)* | Yes. |
| **Milestones:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vi)*<br><br>*Local Rule 4001-2(a)(i)(H)* | N/A. |

| | |
|---|---|
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The following shall be included as an Event of Default under the DIP Documents:<br><br>a. The failure by the DIP Borrowers to perform or comply with any material term, condition, covenant or obligation (including a payment obligation) contained in the DIP Documents or any of the Interim Order or the Final Order;<br><br>b. The cessation of the DIP Loan to be in full force and effect, the DIP Loan being declared by the Bankruptcy Court to be null and void, or the DIP Lender ceasing to have the benefit of the DIP Liens granted by the Interim Order and/or the Final Order;<br><br>c. Except as for the existing liens, the entry of any order of the Bankruptcy Court granting to any third party a claim or lien pari passu with or senior to the DIP Liens granted to the DIP Lender hereunder;<br><br>d. Until the DIP Obligations are indefeasibly repaid in full in cash (other than contingent obligations for which no claim has been made or threatened) and all commitments under the DIP Loan terminated: (i) the DIP Borrowers makes any payment of prepetition principal or interest or otherwise on account of any prepetition indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Loan, the Interim Order or the Final Order; (ii) the validity or enforceability of any provision of the DIP Documents or the DIP Obligations are contested by the DIP Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate); and (iii) the DIP Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate) deny in writing that it has any further liability or obligation under any provision of the DIP Documents;<br><br>e. The DIP Borrowers fail to make any payments, including interest payments, due under any of the DIP Documents, the Interim Order or the Final Order within three (3) business days of when due;<br><br>f. The entry of an order converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the applicable DIP Borrowers filing a motion or not timely opposing a motion seeking such relief;<br><br>g. The entry of an order dismissing the Chapter 11 Cases, or the applicable DIP Borrowers filing a motion or not timely opposing a motion seeking such relief without the consent of the DIP Lender;<br><br>h. The entry of an order in the Chapter 11 Cases seeking the appointment of an examiner having expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee to operate all or any material part of the DIP Borrowers' business;<br><br>i. The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to: allow a third party or third parties to proceed against any property with a value in excess of $50,000, including the DIP Collateral, of the applicable DIP Borrowers or to commence or continue any prepetition litigation against the DIP Borrowers involving potential liability in excess of $50,000 in the aggregate;<br><br>j. The commencement of any actions by the DIP Borrowers or any respective affiliate or subsidiaries thereof (or any party acting on its behalf or on behalf of the bankruptcy estate) that challenges the rights and remedies of any of the DIP Lender under the DIP Documents; |

k.  Without the prior written consent of the DIP Lender and other than as provided for in the DIP Documents, the bringing of any motion or taking of any action, seeking entry of an order, or the entry of an order by the Bankruptcy Court, in the Chapter 11 Cases (i) granting superpriority administrative expense status to any claim pari passu with or senior to the claims of the DIP Lender, (ii) permitting the DIP Borrower to obtain financing under Section 364 of the Bankruptcy Code, (iii) permitting the DIP Borrower to grant security interests or liens under Section 364 of the Bankruptcy Code, (iv) permitting the DIP Borrower to use cash collateral under Section 364 of the Bankruptcy Code other than as contemplated herein, or (v) authorizing the DIP Borrower to take other actions adverse to any DIP Lender or their rights and remedies under the DIP Documents, or their interest in DIP Collateral under Section 364 of the Bankruptcy Code;

l.  The entry of any order terminating the DIP Borrower's exclusive right to file a plan or the expiration of the DIP Borrower's exclusive right to file a plan;

m.  The DIP Borrowers or any of their respective affiliates or subsidiaries (or any party acting on its behalf or on behalf of the bankruptcy estate), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, fail to object to after DIP Lender so requests, or otherwise participate as an adverse party in any suit or other proceeding against the DIP Lender regarding the DIP Documents or the DIP Obligations;

n.  A plan shall be filed by the DIP Borrower, or be confirmed in the Chapter 11 Cases, or any order shall be entered which dismisses the Chapter 11 Cases and which plan or order (i) (x) does not provide for termination of the unused commitments under the DIP Loan and the indefeasible payment in full in cash on the effective date of such plan or order of the DIP Obligations (other than contingent indemnity obligations for which no claim has been made or threatened); or (y) is not satisfactory to the DIP Lender in its sole and absolute discretion, and (ii) does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Lender that are satisfactory to the DIP Lender in its sole and absolute discretion, or the DIP Borrowers or any of their respective subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

o.  The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the DIP Borrower that does not provide for the indefeasible payment in full in cash the DIP Obligations;

p.  The entry of an order in the Chapter 11 Cases avoiding or permitting avoidance of any portion of the payments made on account of the DIP Obligations, the DIP Documents, or in each case any related documents or any other indebtedness provided to the DIP Borrower by the DIP Lender, or the taking of any action by the DIP Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate) to challenge or support a challenge of any such payments;

q.  The Interim Order or the Final Order and the terms thereof shall cease to create valid and perfected DIP Liens on the DIP Collateral and claims as required hereunder (other than an immaterial portion thereof);

| | |
|---|---|
| | r.   The filing or support of any pleading by the DIP Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate) seeking, or otherwise consenting to, any relief, the granting or prosecution of which could reasonably be expected to result in the occurrence of a DIP Event of Default; |
| | s.   Any non-monetary final judgment or order with respect to a post-petition event shall be rendered against the DIP Borrower which does or could reasonably be expected to have a material adverse effect, and, in each case, there shall be a period often (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; |
| | t.   The Interim Order or the Final Order being amended or modified without the consent of the DIP Lender; or |
| | u.   Failure to repay the DIP Obligations on the Maturity Date. |
| **Adequate Protection:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv); and*<br><br>*4001(c)(1)(B)(ii)* | N/A |
| **Carve Out:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Rule 4001-2(a)(i)(V)* | As used in the Interim Order and/or the Final Order, the "Carve Out" means the sum, without duplication, of the following (I) (a) all fees of the DIP Borrowers required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (c) unpaid allowed professional fees, costs and disbursements ("Professional Fees") incurred by the DIP Borrowers and any statutory committee of unsecured creditors (the "Committee") appointed in the Chapter 11 Cases, in each case not to exceed $2,500,000, in the aggregate, of Professional Fees of the DIP Borrowers' professionals, and a reasonable amount of aggregate Professional Fees of the Committee's professionals (the "Professional Fee Cap") as of the delivery of a Carve-Out Trigger Notice, and (II) after the delivery of a Carve Out Trigger Notice, allowed Professional Fees in an aggregate amount not to exceed $125,000 (the "Post-Carve Out Trigger Notice Cap").<br><br>The DIP Borrower is authorized to open a new bank account at an depository approved by the DIP Lender (an "Approved Depository"), designate an existing bank account at an Approved Depository, or designate a third party's bank account at an Approved Depository that shall function as a segregated account held in trust for and exclusively available for the payment of Professional Fees (the "Professional Fees Escrow Account") in the amount equal to, but not to exceed, the lesser of (i) the allowed Professional Fees, or (ii) the Professional Fee Cap. The DIP Borrower is authorized and directed to fund the Professional Fees Escrow Account up to the full amount of the Professional Fee Cap. Such funds shall be held in the Professional Fees Escrow Account for the benefit of the Professionals to be applied to the allowed Professional Fees of the Professionals that are approved for payment pursuant to one or more orders of the Bankruptcy Court. Any allowed Professional Fees payable to the Professionals shall be paid first out of the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Lender or any liens or claims granted as adequate protection, shall not constitute DIP Collateral; provided, that, |

| | |
|---|---|
| | notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Collateral shall include the DIP Borrowers' reversionary interest in funds held in the Professional Fee Escrow Account and such reversionary interest shall be treated as DIP Collateral and subject to the all liens securing the DIP Loan (the "DIP Liens"). |
| **Modification of Automatic Stay:** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(iv)* | N/A |
| **Section 506(c) Waiver:** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(x)* <br><br> *Local Rule 4001-2(a)(i)(V)* <br><br> *Local Rule 4001-2(a)(i)(W)* | N/A |
| **Waiver of Marshaling Doctrine and Equities of Case Exception:** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(viii)* <br><br> *Local Rule 4001-2(a)(i)(X)* | N/A |
| **Lien on Avoidance Actions:** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(xi)* <br><br> *Local Rule 4001-2(a)(i)(D)* | No. |
| **"Roll-Up":** <br><br> *Local Rule 4001-2(a)(i)(E)* | N/A |

| | |
|---|---|
| **Release, Waiver or Limitation of any Estate Claim:**<br><br>*Bankruptcy Rule 4001(c)(1)(viii)* | The Final Order shall provide for the following release, in which the DIP Borrowers will acknowledge the following:<br><br>Effective upon entry of the Final Order and as of such date, the DIP Borrowers have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the DIP Borrowers' liability to repay the DIP Lender or to seek affirmative relief or damages of any kind or nature from the DIP Lender. Upon entry of the Final Order, each DIP Borrower fully, finally and forever release and discharge the DIP Lender and its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such (collectively, the "Released DIP Parties") of and from any and all actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Final Order, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to the DIP Documents and the Final Order; provided that the foregoing shall not release any claims against a Released DIP Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence or willful misconduct of such Released DIP Party.<br><br>For the avoidance of doubt, the releases herein shall only apply to claims arising from or relating to the DIP Loan. |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The DIP Lender (and its affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. Such indemnity shall not be available to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Documents. |
| **Funding of non-Debtor Affiliates**<br><br>*Local Rule 4001-2(a)(i)(D))* | N/A |

<u>**BASIS FOR RELIEF**</u>

**A.      The Debtor Should be Authorized to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

34.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs.)*, 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim).

35.      Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

   i.      The debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

   ii.      the credit transaction is necessary to preserve the assets of the estate; and

   iii.      the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (applying test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

i.     **Credit Was Not Available on Better Terms**

36.     In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Say. & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c).  *In re Snowshoe*, 789 F.2d. at 1088.  When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *affir. sub nom., Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

37.     The CRO firmly believes that in light of the events leading to these Chapter 11 Cases and the current posture—with currently unverified Projections and insufficient data to create a data room—no other lender would provide financing to the Debtors, much less on more favorable terms.  While the CRO's efforts are ongoing, to date the CRO has not located a party willing to provide financing for the Debtors.  Without immediate funding, these cases will convert to a Chapter 7 and liquidate.  The Debtors' decision to move forward with the DIP Loan, especially under the current circumstances was made according to the Debtors' sound business judgment under the direction of the Independent Manager and CRO.

ii.     **The DIP Loan is Necessary to Preserve the Debtors' Assets**

38.     Postpetition financing is necessary to fund the Debtors' ongoing operations and the administration of these Chapter 11 Cases and, therefore, will benefit all creditors and stakeholders.  Indeed, it is critical that the Debtors obtain financing to continue operating their business while they run a comprehensive sale process and complete a sale of substantially all of their assets.  In

addition to providing critical funding, the DIP Loan will also provide the Debtors' stakeholders, including customers, employees, and vendors, with confidence in the Debtors' ability to reorganize using significant equity in the Debtors' assets..

> **iii.      The Terms of the DIP Loan Are Fair, Reasonable, and Appropriate and Represent the Debtors' Sound Business Judgment**

39.      The Debtors have concluded that the DIP Lender's proposal is the best alternative available for postpetition financing and that credit cannot be obtained from another party on more favorable terms.  The terms of the DIP Loan are also fair, reasonable, and adequate under the circumstances.  The interest rates and other terms are reasonable and were extensively negotiated. As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Loan is to enable the Debtors to maximize the value of their estates while providing them with the resources necessary to formulate a confirmable plan.  *See generally In re First S. Say. Ass'n,* 820 F.2d 700, 710–15 (5th Cir. 1987).

40.      As security for the advances and other postpetition costs payable under the DIP Financing Documents, the Debtors propose to provide the DIP Lender with a blanket lien and security interest on all of the Debtors' assets, which will be a senior secured lien on all of the Debtors' unencumbered assets and a junior lien on all of Debtors' assets that are currently encumbered by a perfected lien. The DIP Lender is not taking a lien on derivative or estate causes of action and is not asking to prime any other secured creditor. Given the goals of this reorganization, the immediate need for financing, the lack of alternatives and the lack of egregious over-reaching often seen in DIP financing transactions, the Court should approve the requested relief.

41.      Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *See Trans World Airlines, Inc. v.*

*Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (debtor "is entitled to some free reign in fulfilling its perceived mission of . . . keeping an ongoing business afloat").

42.     Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303,1311 (5th Cir. 1985); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("[B]usiness judgments should be left to the boardroom and not to this Court"); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (holding that, in general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious).  For this reason, courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

43.     *Here*, the Debtors have exercised their sound business judgment in determining the merits and necessity of the DIP Loan and have satisfied the legal prerequisites for incurring debt. Consequently, the Court should grant this Motion to allow the Debtors to borrow funds from the DIP Lender on a secured basis, under section 364(c) of the Bankruptcy Code.

### iv.  Entry into the DIP Loan also Satisfies the Entire Fairness Standard

44.      The Court should authorize the Debtors to enter into the DIP Loan even though the DIP Lender is an "insider" as defined in Section 101(31) of the Bankruptcy Code.  While some Bankruptcy Courts have subjected such arrangements to the heightened "entire fairness" standard, the Debtors do not believe that such treatment is appropriate or necessary under prevailing Third Circuit precedent.  Moreover, given the appointment of the Independent Manager and CRO, the Court should defer to the Debtors' business judgment in all respects.  Nevertheless, the Debtors' actions in negotiating and entering into the DIP Loan more than satisfy the entire fairness standard.

45.      To the extent the DIP Lender includes an insider, the entire fairness standard would apply, which consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).  Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained[.]" *Weinberger v. UP, Inc.*, 457 A.2d 701, 711 (Del. 1983). "Fair price can . . . be established by demonstrating that no better alternatives were available." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020).  The Delaware District Court affirmed the Bankruptcy Court's approval of a bankruptcy sale to an insider under the "entire fairness" standard (assuming without deciding that the heightened standard actually applied) where the Bankruptcy Court found that "the sale process was fair and that no better price was available." *Zohar III Corp., et al. v. Tilton et al.* (*In re Zohar Corp.*), 2022 WL 11110270, at *3 (D. Del. Oct. 19, 2022).

46.      Ordinarily, the party seeking to consummate the challenged transaction bears the burden of proving entire fairness. *See Kahn v. Lynch Comm'ns Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). But, that burden "shifts . . . entirely" to the challenging party where the challenged

transaction was approved by an independent committee of directors. *Rosenblatt*, 493 A.2d at 937. Where a controlling shareholder did not dictate the terms of the transaction and an independent negotiator had real bargaining power which was exercised on an arm's-length basis, the burden to prove unfairness falls to the challenging party. Kahn, 638 A.2d at 1117. Indeed, the business judgment rule is set aside only upon a showing that the debtor's directors were uninformed, grossly negligent, or lacking independence. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bank. D. Del. 2011); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

47.     Here, the DIP Lender was represented by separate counsel for purposes of negotiating the terms of the DIP Loan. More importantly, the CRO (under the direction of the Independent Manager), approved the DIP Loan. The process that led the Debtors to agree to the DIP Loan was at all times conducted in good faith and at arm's length, the terms of the DIP Loan are likewise fair, and entry into the DIP Loan is in the best interest of the Debtors' estates. The Independent Manager and CRO, with the assistance of the Debtors' professionals, tried to obtain a better price for the financing, yet there was no better price to be had under the circumstances. Moreover, the interest rate and fees associated with the DIP Loan—which is junior to the Debtors' prepetition loans—are consistent with terms of offered in other DIP loans that provide the DIP lender with junior liens, indicating the arm's-length nature of the negotiations. Given that the proposed financing was the only and best game in town, the Debtors utilized their best corporate precautions to cleanse the financing process through the appointment of the Independent Manager and CRO. Accordingly, the Debtors' entry into the DIP Loan satisfies the entire fairness standard to the extent such standard applies.

**B.      The DIP Loan Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

48.      Under section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of the debt incurred or priority of the lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

49.      Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned.  *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

50.      Here, the terms of the DIP Loan were negotiated in good faith and at arm's length by separate representatives of, and counsel for, the Debtors and the DIP Lender, and reflect the most advantageous terms (including availability, pricing, and fees) available to the Debtors in light of their financial condition and need to move quickly in connection with the sale of substantially all of their assets.  All of the DIP Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Term Sheet and in the Interim Order other than as set forth herein.  Moreover, the DIP Loan has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  For these reasons, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code if the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## C.      Approval of the DIP Loan on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm

51.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to incur postpetition debt and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(C)(2)

52.      Generally, courts find "immediate and irreparable harm" exists where loss of business threatens a debtor's ability to reorganize. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990).  Approval of a DIP Loan on an interim basis under Bankruptcy Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. *See In re Pan Am Corp.*, 1992 WL 154200, at *6 (S.D.N.Y. June 18, 1992).  There is no limit to the amount of funding that the court can approve on an interim basis. *Id.*  After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores*, 115 B.R. at 36.

53.      Immediate and irreparable harm would result if the relief requested is not granted on an interim basis.  The Debtors need immediate access to the DIP Loan for the necessary liquidity to implement and ensure the success of these Chapter 11 Cases and the Debtors' sale efforts. Without DIP Loan funds, employees cannot be paid and will be let go, essential services will be cut off and significant value and opportunities for all stakeholders will be lost. This is especially true for hotels and rental properties in Southern California which is preparing for its primary revenue-generating season. Consequently, the requirements of Bankruptcy Rule 4001(c)(2) are

satisfied because immediate access to the DIP Loan is necessary to avoid immediate and irreparable harm to the Debtors' estates.

**D.     Modification of the Automatic Stay is Appropriate Under the Circumstances**

54.     The proposed DIP Orders provide that the automatic stay will be lifted to the extent contemplated by the provisions of the DIP Term Sheet.  Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Term Sheet and the proposed DIP Orders.

**E.     Request for a Final Hearing**

55.     Under Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, no sooner than fourteen days after the date of this Motion and no later than twenty-one days after the date of this Motion, to hold a hearing to consider entry of the Final Order and the final approval of the relief requested in this Motion.  The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to the relief requested in this Motion and the Final Order, by first class mail on the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the Final Hearing under Bankruptcy Rule 4001(c)(2).

**F.     The Scope of the Carve Out is Appropriate.**

56.     The DIP Liens granted under the DIP Loan are subject to the Carve Out.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Case would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely

prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of fees of the Clerk of the Court or the U.S. Trustee, and the estates' professional fees.

## IMMEDIATE RELIEF IS NECESSARY

57.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

## WAIVER OF ANY APPLICABLE STAY

58.     The Debtors also request that the Court waive any applicable stay of the DIP Orders, including any stay that may be imposed by Bankruptcy Rule 4001(a)(3) and Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to preserve value for their estates.  The exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

59.     Notice of this Motion will be provided to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' thirty largest unsecured creditors on a consolidated basis; (c) the secured lenders; (d) counsel to the DIP Lender; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Office of the United States Attorney for the District of Delaware; (h) the financial institutions at which the Debtors' bank accounts are maintained; (i) all parties which, to the best of the Debtors' knowledge, information, and belief,

have asserted or may assert a lien in the Debtor's assets; (j) any other party that has asserted a lien on or security interest in the Debtors' assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no further notice is necessary.

## **<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, authorizing the Debtors' entry into the DIP Term Sheet and scheduling a Final Hearing; and (ii) grant such other and further relief to the Debtors as the Court deems just and proper.

[*Signature Page Follows*]

Dated: March 19, 2025
       Wilmington, Delaware

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Rebecca Wicks (admitted *pro hac vice*)
**BUCHALTER, A PROFESSIONAL
CORPORATION**
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone: (949) 760-1121
Email: jgarfinkle@buchalter.com
       rwicks@buchalter.com

-and-

J. Leland Murphree (admitted *pro hac vice*)
John T. Baxter (admitted *pro hac vice*)
**BUCHALTER, A PROFESSIONAL
CORPORATION**
1 Music Circle South, Suite 300
Nashville, Tennessee 37203
Telephone: (629) 224-6600
Email: lmurphree@buchalter.com
       jbaxter@buchalter.com

-and-

Khaled Tarazi (admitted *pro hac vice*)
**BUCHALTER, A PROFESSIONAL
CORPORATION**
15279 N. Scottsdale Road, Suite 400
Scottsdale, Arizona 85254-2659
Telephone: (480) 383-1800
Email: ktarazi@buchalter.com

Respectfully submitted,

*/s/ Gregory J. Flasser*
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
R. Stephen McNeill (No. 5210)
Gregory J. Flasser (No. 6154)
Ethan H. Sulik (No. 7270)
Sarah R. Gladieux (No. 7404)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
      astulman@potteranderson.com
      rmcneill@potteranderson.com
      gflasser@potteranderson.com
      esulik@potteranderson.com
      sgladieux@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*