**Exhibit C**

**DIP Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF MARK SHINDERMAN IN SUPPORT OF MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; AND (II) GRANTING RELATED RELIEF**

I, Mark Shinderman, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am generally familiar with the Debtors' business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2. I am authorized to submit this declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information I have received from the Debtors' advisors, and conversations with the

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 at Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

prior managers of the enterprise and property managers. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3. Additional evidence of, among other things, my personal qualifications, experience and capacity, my role and involvement with the Debtors and these Chapter 11 Cases, my decisions made, and actions and efforts taken, in furtherance of my duties as CRO, and relevant facts and other information and findings regarding the Debtors' history, present circumstances and intended course of action during these Chapter 11 Cases is set forth in detail in my *Declaration of Mark Shinderman in Support of Debtors' First Day Motions* filed contemporaneously herewith (as may be amended, the "First Day Declaration"). My First Day Declaration is incorporated herein by reference. Capitalized terms in this Declaration take the meaning given to them in the First Day Declaration, unless otherwise defined herein.

4. I submit this declaration in support of the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; And (II) Granting Related Relief* (the "DIP Loan Motion").

**INTRODUCTION**

5. To enable the Debtors to continue operating effectively, the Debtors have immediate cash needs. At present, the Debtors possess almost no cash needed to operate their properties and businesses.

6. In light of this dire financial situation, I advised both ownership groups of the need for immediate debtor in possession financing and asked they provide that financing. As explained herein and in the DIP Loan Motion, Specialty DIP LLC ("Specialty DIP") has offered to provide short-term DIP loan of up to $5,000,000, with an immediate funding of $3,500,000 (the "DIP

Loan"). This DIP Loan will address the Debtors' immediate cash needs, while allowing sufficient time to procure a longer-term DIP loan to will enable the Debtors to reorganize.

7.  I have been advised that Specialty DIP is an entity created by Mahender Makhijani ("Makhijani") and that the DIP loan will be funded by individuals or entities that have personally guaranteed some of the institutional loans secured by first priority deeds of trust against certain of the Debtors' properties. Makhijani is likely an insider.

8.  Nevertheless, given the current dire financial condition of the Debtors and that FTI has not completed its review of financial records in order to create operating budgets and projections for each of the Debtors and their properties, the proposed DIP loan (even though it is being provided by an entity created by Makhijani) is in the best interest of the Debtors and these bankruptcy cases.

9.  In negotiating the DIP Loan with Specialty DIP, I demanded the following items:

- Specialty DIP would not be entitled to any i) origination fees or points, or ii) exit fees or points, and iii) repayment fees or costs.
- Specialty DIP would not be entitled a security interest against any litigation-related claims or assets, including any judgment arising out of the "Arbitration Award."

Specialty DIP agreed to these items.

10. While the Debtors are currently proceeding forward with the proposed DIP Loan offered by Specialty DIP, they continue to explore alternative DIP financing options. As such, it is possible that on or before the hearing on the DIP Loan Motion, the Debtors will request approval of an alternative DIP loan by a different lender. I have received other offers and, if they are not substituted in for the proposal that is the subject of the DIP Loan Motion, they still may become take-out DIP loans that replace the initial DIP Loan and provide the estates with more runway. Those proposals currently require certain information that we have not yet compiled and/or

3

commitments to an endgame that we have not yet concluded is or is not in the best interests of the estates and their constituents.

11. The DIP Loan, as offered by Specialty DIP, is narrowly tailored to the Debtors' short-term needs and the objectives of the CRO and the Debtors' advisors and professionals. Given the circumstances, the CRO, in consultation with the Debtors' advisors have established a flexible plan of action over three phases:

12. *Phase 1:* For the next 30-60 days, the highest priority is gathering sufficiently reliable and verified information from the Debtors' prior managers and third-parties to make informed decisions about the next steps in this reorganization. Of equal importance is the need to ensure that the estates have the funds and flexibility to address the Debtors' short term financial needs. At this time, it is difficult to specifically identify what those needs are on a line-item basis, but given that most of the Debtors' assets are high-profile hotel and hospitality properties, the Debtors must have the ability to keep employees and vendors current and to fulfill their obligations to guests and customers, especially as the Debtors' most profitable, summer months are rapidly approaching. Given the breadth and complexity of the Debtors' organization and assets and the need to act quickly, the Debtors need to compensate their experienced professionals for the significant time and effort needed to accomplish the short and long-term goals of this reorganization. Absent the DIP Loan there are no funds to cover expenses and pay professionals.

13. *Phase 2:* Using the information obtained during Phase 1, the Debtors can then create reliable budgets and forecasts to create a plan of action during the intermediate term of the following 2-6 months. Having stabilized operations during Phase 1, the Debtors can focus on maximizing value during their most profitable months, with the goal of potentially operating the estate out of revenues, and, if needed, strategic sales of estate assets. During this phase, I, with the

assistance of the Debtors' advisors and the independent manager, will assess the various exit options and replace the short-term DIP Loan with a more traditional DIP loan following a marketing period.

14. *Phase 3*: Having obtained reliable information through the first-hand operation of the Debtors' businesses, the Debtors can then form a concrete plan to exit bankruptcy by way of a sale of assets and/or plan of reorganization.

15. The estates undoubtedly need the DIP Loan, which is a short-term, stopgap loan, to even begin Phase 1. These Chapter 11 Cases have been appropriately described as a freefall bankruptcy. Without the DIP Loan and retention of the Debtors' experienced professionals, these Chapter 11 Cases will rapidly fall into a Chapter 7 liquidation, eliminating millions of dollars of value that could otherwise be used to satisfy creditors. To be clear, the Debtors' independent manager and I will use the DIP Loan proceeds with complete transparency to the Court, the U.S. Trustee, the Honarkar Parties, secured creditors and all stakeholders.

## DIP LOAN MOTION

16. I have reviewed the DIP Loan Motion and all facts set forth in therein are true and correct based upon my personal knowledge; information provided to me by certain of the Debtors' former employees and professionals; my review of relevant documents; or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors. Accordingly, for the reasons stated herein and in the DIP Loan Motion, I believe that the relief requested therein is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.

17. The Debtors have narrowly tailored the pending DIP Loan Motion to meet the goals of: (i) continuing their operations in chapter 11 to preserve value for the Debtors' estates and their

creditors; (ii) providing an adequate runway for the Debtors to obtain replacement DIP financing and effectuate a successful reorganization; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

18. In Part I of this Declaration, I set forth the immediate need for the short-term DIP loan (from any source) that is subject of the DIP Loan Motion. In Part II, I set forth how I presently intend to proceed if the Court approves the DIP Loan Motion. In Part III, I provide additional information that I believe the parties and Court might want to know.[2]

## I. The Debtors' Immediate Need for Debtor in Possession Financing

19. I, in consultation with the Debtors' advisors and the independent manager, continue to thoroughly investigate the Debtors' assets and affairs. While that investigation is ongoing, the need for immediate financing is very apparent to me.

20. Since being engaged about two weeks ago, FTI and I, along with the independent manager, have been hard at work meeting with different constituents, evaluating information they have, identifying what else is needed, and taking steps to obtain that which is needed. My team recently spent a week in person with the managers as well as others identifying what specific information is needed and determining what tasks should have priority. In addition to visiting the properties and meeting with the managers in person, I have daily calls with all of the property managers. I also speak with the independent manager at least twice a day.

21. That the Debtors need funds to proceed in these Chapter 11 Cases cannot really be questioned. Indeed, based on my review of the historical performance of the properties so far, it appears that the Debtors' ever-present cash flow challenges seem to have existed irrespective of

---

[2] As the Court noted at the first-day hearing, I am presenting the information in sections II and III for informational purposes only. The information presented is without prejudice to any party challenging the assertions made therein.

6

whomever was managing the Debtors and their assets, leading to defaults, threatened foreclosure sales, and receiverships throughout the history of the project. Nonetheless, these Chapter 11 Cases present the Debtors and their creditors with the opportunity to work together, align their interests and coordinate their efforts and resources to stabilize the business.

22. In addition, a review of the Projections make it apparent that current cash flows generated from the Debtors' properties do not provide any material funding for the administration of the estates.

23. Based on the foregoing, I determined that a DIP loan is absolutely necessary to cover operating expenses of the Debtors' businesses and the administrative expenses necessary to allow this reorganization to proceed.

24. The estates need a DIP loan to be able to fund short term and longer-term net operating deficits. The estates need initial funding for the next 6-9 weeks while FTI and I review the Debtors' books and records, revise the projections, and begin talking to the various constituents. Significant funding beyond that initial period will be needed, but the scope of that funding is still to be determined.

    A.    <u>The Proposed DIP Loan is Reasonable and Necessary to Maximize Value and Prevent Irreparable Harm for Creditors.</u>

25. Having determined that the DIP Loan is necessary, I immediately contacted both ownership groups at the outset of these cases to discuss the need for short-term financial support, presuming that they would have a better sense of the Projections and assets, and thus might be willing to provide support for the short-term and/or could call upon others to provide that short term support. While I would have liked a more fulsome marketing process, the limited marketing of the DIP Loan to the Debtors' ownership groups is appropriate under the circumstances, as no

third-party, traditional lender would have extended a DIP loan to the Debtors at all,[3] much less on the favorable terms of the DIP Loan given the lack of reviewed and updated financial statements and uncertainty at this juncture.

26. I made it clear that the DIP loan is a short-term loan, and because it could not be fully marketed, would need to be "very clean" with "no bells and whistles." Most importantly, I made it clear that the DIP loan: a) needed to be without a prepayment penalty, b) would need to be subordinate to existing secured debt, and 3) could not be secured by any of the estates' causes of actions.

27. As set forth below, the DIP loan proposed in the DIP Loan Motion satisfies these criteria. At this time, I understand that such short-term borrowing may not be sufficient to pay all administrative costs in full, leaving the estates' advisors at risk of non-payments, something that cannot go on for long. For the avoidance of doubt, FTI and I presently estimate that the DIP loan will help the estates stabilize over the next 6-9 weeks, but additional funding will be needed. In the weeks ahead, FTI and my other advisors will be compiling the information needed to attract such longer-term financing.

28. For the immediate moment, however, as clearly set forth in the Debtors' Cash Collateral Motion, the responses of the SPE Debtors' respective secured creditors to the Cash Collateral Motion and the discussion in open court at the first day hearing, the Debtors are desperately low on cash and effectively have no unencumbered revenue at this point.[4]

29. As such, an immediate DIP loan (from whatever source) is necessary.

---

[3] As set forth in paragraph 35, I have received one additional offer for DIP financing but its terms were not acceptable at this time without more clarity as to a viable exit strategy for these cases.

[4] Indeed, the Debtors' cash needs are so dire that current ownership has made a short-term cash infusion to a non-Debtor SPE, Beach Club LLC, so that this entity could upstream these funds to address immediate-need costs to avoid any disruption to business operations while the DIP loan is being approved.

8

B.  Terms of the DIP Loan

30. The DIP loan offered by Specialty DIP is fair and reasonable and is narrowly tailored to allow these Chapter 11 Cases to go forward and preserve assets while the Debtors' advisors and I figure out the best way to preserve and maximize value for all constituents.

31. The specific terms of this initial DIP loan are as follows:

- Amount:  Up to the maximum, original principal amount of $5,000,000, which includes in the an initial funding original principal amount of $3,500,000 (the "Initial Funding Amount") and an additional funding amount of $1,500,000 (the "Final Funding Amount") of up to $5,000,000;

- Non-Default Interest:  10%;

- Default Interest:  13%;

- Maturity Date:  90 days after entry of the interim approval of the DIP Loan Motion;

- Usage:  For administrative costs and to provide the SPEs with some capital; and

- Security:  Senior lien on the Debtors' unencumbered assets, other than causes of action, and a junior lien on the Debtors' encumbered assets, excluding litigation claims.

32. Importantly, the proposed terms are aimed at a successful outcome for all creditors and not an attempt to gain an inside advantage for one party over others. Indeed, the DIP loan does not contain DIP financing terms that are commonly associated with postpetition financing. The fair terms of the DIP loan also demonstrate confidence by the would-be DIP Lenders in a good outcome if the Debtors are able to utilize the proceeds of the DIP loan and reorganize. Notably, there are no requests for:

a. Roll-ups or other attempts to improve the treatment of prepetition liens;

9

    b. Releases, waivers or exculpations;

    c. Debtors' stipulations as to the extent, validity and priority of prepetition liens and claims;

    d. Releases in favor of the DIP Lender other than solely with respect to the DIP Facility;

    e. Unrealistic and inflexible budgets and performance milestones;

    f. Origination, exit or prepayment fees and penalties;

    g. Loan Facility Fees;

    h. Attempts to assert ownership or control over derivative and estate claims and causes of action;

    i. Liens on the estates' causes of action;

    j. Waivers of Bankruptcy Code § 506(c) surcharge; or

    k. Waiver of the "equities of the case" exception in Bankruptcy Code § 552(b).

These terms reflect my insistence that the DIP loan be clean and that the terms thereof cause minimal disruption to the Debtors' current capital structure.

    C.     <u>Statement Under Bankruptcy Rule 4001 and Local Rule 4001-2</u>

33.     The DIP loan is necessary to avoid immediate and irreparable harm; absent access to immediate funding, the Debtors will lose access to necessary liquidity to pay the ongoing costs associated with administering their estates and running the Operating Properties, thereby dissipating value to the detriment of their estates and creditors. The DIP loan is necessary to maintain operations in the ordinary course and ensure the viability of the Debtors without significant deterioration to the detriment of all stakeholders.

34. The Debtors seek entry of an interim and final order to obtain authority to enter into the DIP loan.

**II.    DIP Financing Investigation**

35. At this stage, I am just beginning to explore alternative and longer-term DIP financing. To that end, I just received a proposal from a third party lender for a longer-term DIP loan. But that proposal contained conditions regarding the structure of a reorganization plan which I am not in position to agree to at this time. I expect that once the DIP Loan is approved, I will have sufficient time to seek longer-term DIP financing.

**III.    Additional Pertinent Information**

36. I wish to reiterate that I am not beholden to any party. Until about three weeks ago, I did not know either ownership group or know about the underlying disputes. That said, as a resident of Southern California, I did know of some of the assets involved, having frequented Laguna Beach often. When considering taking on this role, I made it very clear that I needed to be completely independent from prior ownership and have complete control of the enterprise to avoid any appearance of impropriety that could undermine my role.

37. Additionally, I insisted that a knowledgeable and experienced independent manager be appointed such that I would answer to a person who is truly independent from all prior ownership. I am in daily communication with the independent manager, often speaking several times a day, regarding the operations of the Debtors' properties and potential solutions to the issues with which we have been confronted including, without limitation, the need for financing and the appropriateness of the proposed DIP Loan.

38. I have made it clear to all parties that I am happy to speak with them and listen to them as frequently as they would like to hear about the assets, what we should do, how we got

here, and the like. But I also tried to make it clear that my present focus is primarily on where we are and how to move forward. How we got here and addressing the litigation to date is certainly important, but it is not an immediate task because litigation would take time and, in my opinion, can proceed later.

39. That said, if any party knows of funds that should be paid to the estates or returned to the estates, I asked the parties to let me know immediately and to provide me with credible information to support such assertions so that I can ask my lawyers to make immediate demand for the payment/return of such property.

40. Of course, I have read the interim arbitration award, several times, in fact, and understand the findings set forth therein. Consequently, I insisted on complete independence from the outset and the separation of the so-called Continuum group from the estate. With that in mind, books and records and information are being transitioned to FTI.

41. However, as the most recent operator of the property, Continuum has a lot of institutional knowledge beyond records such that I do communicate with the Continuum group about operations as needed.

42. One of the things I tried to do upon my appointment was to ensure that no Continuum personnel were handling funds or involved in day-to-day decision-making. The bank accounts were closed and are in the process of being transitioned.

43. One mistake I made in my first day declaration was to conclude that Vgruppe was completely independent. The day after I filed that declaration, Continuum contacted me to let me know that James Miller, of Continuum, also has a material role at Vgruppe. Upon learning that, I assessed my options with my advisors and decided that we would need to transfer Mr. Miller out of Vgruppe but hoped to continue working with the other employees of Vgruppe who are not

employed by Continuum and who have institutional knowledge and are familiar with the day-to-day operations of certain properties.

44. To be clear, while I will solicit information from Continuum and its affiliates as I believe is needed, Continuum will not control day to day operations or control the estate's funds.

45. To date, I have heard many allegations about misdeeds by one ownership group or the other. I do not intend to share mere allegations publicly and have asked all parties making such allegations to provide me with back-up for such claims. I would then discuss such allegations, as appropriate, with the other side, to make sure my understanding is complete before I took any action. I simply will not proceed publicly with mere untested and un-reviewed suppositions.

46. As I said in my first declaration, my goals are to preserve and, if possible, maximize the value of the estate, regardless of to whom the value of those assets flow.

47. As for the arbitration itself, it is not my intent to get involved or hinder any action so long as it is not averse to the estate. I have noted for all parties my understanding that the arbitration award is not yet a final judgment and that, unless and until the remedy of rescission is exercised (if that does become part of the judgment), there is no change in ownership or control of the enterprise. That said, if the judgment is entered and rescission is properly exercised, I would certainly step aside as appropriate.

48. I have advised all sides that we need liquidity and that we could obtain such capital through the DIP Loan or a sale of assets. Before selling any asset, moreover, I advised each side that I would review my plan with them in case there was an objection or some material information that I should know in advance of the sale.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

By: */s/ Mark Shinderman*
Name: Mark Shinderman
Title: Chief Restructuring Officer