**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 89** |

**OBJECTION OF MOHAMMAD HONARKAR AND 4G WIRELESS, INC. TO MOTION
OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION FINANCING; AND
(II) GRANTING RELATED RELIEF**

Mohammad Honarkar and 4G Wireless, Inc. (collectively, the "**Honarkar Parties**"), by and through their undersigned counsel, hereby file this objection (this "**Objection**") to the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89] (the "**DIP Motion**"). In support of this Objection, the Honarkar Parties respectfully state as follows:

**BACKGROUND**

**A.    The Chapter 11 Cases**

1.    On February 28, 2025, MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC (collectively, the "**MOM Debtors**") each filed a voluntary petition for

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court of the District of Delaware (the "**Court**").

2. On March 10, 2025, nineteen of the MOM Debtors' subsidiaries (collectively, the "**SPE Debtors**" and together with the MOM Debtors, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.

3. The Debtors' bankruptcy cases (the "**Chapter 11 Cases**") are being jointly administered pursuant to the Court's *Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 56].

4. On March 13, 2025, the Honarkar Parties filed the *Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* [Docket No. 29] ("**Trustee Motion**"), seeking the appointment of a chapter 11 trustee for all of the Debtors pursuant to section 1104(a) of the Bankruptcy Code based on, among other grounds, the fraud, dishonesty, gross mismanagement of the Debtors, and other misconduct committed by the Continuum Parties.[2] The Honarkar Parties have issued discovery on the Debtors related to the Trustee Motion.

5. The hearing to consider the relief requested by the Trustee Motion is currently scheduled for April 11, 2025 at 10:00 a.m. (ET). *See* Docket Nos. 76, 78.

6. On March 17, 2025, MOM CA Investor Group LLC, MOM BS Investor Group LLC ("**MOM BS Investor**"), and MOM CA Investor Group LLC (collectively, the "I**nvestor Debtors**"), all of which are among and controlled by the Continuum Parties and are the MOM Debtors' other 50% members, filed their own chapter 11 bankruptcy cases in this Court. *See MOM*

---

[2] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the DIP Motion or the Trustee Motion, as applicable.

*CA Investor Group LLC*, Case No. 25-10510 (BLS); *MOM BS Investor Group LLC*, Case No. 25-10512 (BLS); *MOM AS Investor Group LLC*, Case No. 25-10513 (BLS). No other pleadings have been filed in those cases other than the voluntary chapter 11 petitions. The Honarkar Parties will move to dismiss those chapter 11 cases as filed in bad faith.

    **B.**    **The DIP Motion**

    7.    On March 19, 2025, the Debtors filed the DIP Motion and the *Declaration of Mark Shinderman in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* (the "**DIP Declaration**"), which is attached to the DIP Motion as Exhibit C.

    8.    By the DIP Motion, the Debtors seek entry of interim and final orders that, among other things, authorize (i) the Debtors to enter into the DIP Facility and the DIP Documents and obtain the DIP Loan pursuant to the DIP Term Sheet, and (ii) in connection with the foregoing, grant to the DIP Lender superpriority administrative expense claims against the Debtors' estates, first-priority DIP Liens on the Debtors' unencumbered assets, and second-priority DIP Liens on the Debtors' assets encumbered by valid, perfected, and non-avoidable liens.

    9.    The proposed DIP Lender is Specialty DIP LLC, which, according to the DIP Motion and the DIP Declaration, is an entity created by Mahender Makhijani (and others), who is one of the Continuum Parties and an insider of the Debtors. The DIP Term Sheet was signed on behalf of Specialty DIP LLC by Bhajneet Singh Malik as its "Manager." Mr. Malik is also one of the Continuum Parties, the sole member of MOM BS Investor (which holds 50% of the membership interests in Debtor MOM BS Investco LLC), and one of Continuum's largest investors, all as set forth in the Trustee Motion. *See* Trustee Motion ¶ 19. As noted above, MOM BS Investor is now in chapter 11.

10. As set forth in the Arbitration Award, and as discussed in the Trustee Motion, the Arbitrator specifically found that Mr. Makhijani, Continuum, and the Investor Debtors fraudulently induced (i) the Honarkar Parties' entry into the joint venture, (ii) violated California's forcible entry and detainer statutes, (iii) converted more than $35 million of the MOM Debtors' assets in at least six separate instances, and (iv) unjustly enriched himself from the MOM Debtors' assets. *See* Trustee Motion ¶ 91.

11. Despite the Arbitrator's findings,[3] the Debtors – through the CRO, who was unilaterally hired by Mr. Makhijani and others without the Honarkar Parties' approval or input – have decided to, subject to this Court's approval, obtain financing from Mr. Makhijani through his affiliates subject to certain conditions.

12. This decision was made following an admittedly "limited marketing" of the DIP Loan and based, at least in part, on "projections using information provided by prior management and the property managers," which information "FTI is verifying." *See* DIP Motion ¶¶ 21, 27-28.

13. The conditions of the DIP Loan include, but are not limited to, that it will be an event of default under the DIP Loan if, among other things, any of the following occur:

- an order is entered appointing "an examiner having expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee to operate all or any material part of the DIP Borrowers' business;"

- an order is entered "granting relief from the automatic stay so as to: allow a third party or third parties to proceed against any property with a value in excess of $50,000, including the DIP Collateral, of the applicable DIP

---

[3] The DIP Motion includes only a passing reference to the Arbitration, which is characterized in the DIP Motion as a proceeding "regarding disputes over who owns and controls the Debtors' enterprise" and that is "more fully described in the First Day Declaration." DIP Motion ¶ 16. However, as set forth in the Arbitration Award and discussed in the Trustee Motion, the Arbitration is about much more than the Debtors' ownership and control. The discussion of the Arbitration and the Arbitration Award in the First Day Declaration is also cursory and superficial, at best. For a more complete and accurate description of the Arbitration, the Honarkar Parties refer to the Trustee Motion and to the true and correct copy of the Arbitration Award filed in connection with the Trustee Motion. The Honarkar Parties continue to be perplexed by the Debtors' refusal to acknowledge their victory in the Arbitration Award.

> Borrowers or to commence or continue any prepetition litigation against the DIP Borrowers involving potential liability in excess of $50,000 in the aggregate;"

- an order is entered "terminating the DIP Borrower's exclusive right to file a plan or the expiration of the DIP Borrower's exclusive right to file a plan;"

- a plan is filed by the Debtors or is confirmed in the Chapter 11 Cases that "is not satisfactory to the DIP Lender in its sole and absolute discretion, and … does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the DIP Lender in its sole and absolute discretion ...;" or

- "[t]he filing or support of any pleading by the DIP Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate) seeking, or otherwise consenting to, any relief, the granting or prosecution of which could reasonably be expected to result in the occurrence of a DIP Event of Default[.]"

DIP Term Sheet at 12-15.

14. If an event of default occurs and is continuing under the DIP Loan, then, upon just 5 business days' notice to the DIP Borrowers, the DIP Lender (an insider) may terminate its commitment to make any further advances under the DIP Loan, declare all unpaid amounts plus interest under the DIP Loan immediately due and payable, and foreclosure upon the DIP Collateral. DIP Motion ¶ 11. The amounts due under the DIP Loan would also be subject to a 13% default interest rate. DIP Term Sheet at 2.

15. The conditions of the DIP Loan also include a release by the Debtors in favor of the DIP Lender and its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for on behalf of any of them, of and from any all claims "directly or indirectly arising out of, connected with or relating to the DIP Documents and the Financing Orders," provided that this release does not apply to any claims that a court finds resulted from gross negligence of willful misconduct, and that no release granted pursuant to the

interim order granting the DIP Motion shall release the DIP Lender from any "Derivative Actions," which term is undefined. *See* Proposed Interim Order ¶ 20.

16. The DIP Loan's terms also include a $2.5 million carveout set aside to pay the fees of the Debtors' professionals – whose retention has not been sought let alone approved by the Court – which carveout is more than 70% of the $3.5 million minimum to be funded under the DIP Loan and 50% of the $5 million maximum funding. DIP Loan ¶ 30.

17. The hearing to consider interim approval of the relief sought by the DIP Motion is currently scheduled for March 24, 2025 at 1:00 p.m. (ET). For the reasons set forth herein, the Honarkar Parties believe that an adjournment of the DIP Motion to the hearing scheduled for March 31, 2025 at 11:00 a.m. (ET) is the best interest of the parties.

## OBJECTION

18. The Honarkar Parties acknowledge and understand the need for funding in these Chapter 11 Cases.[4] Accordingly, the Honarkar Parties are continuing to solicit and search for independent financing options for the Debtors and these Chapter 11 Cases and will introduce the Debtors to alternative potential DIP lenders, and potential exit lenders, such that the Honarkar Parties are hopeful that alternative postpetition financing may be available in the near term. Accordingly, the Honarkar Parties believe that a week long adjournment of the hearing on the DIP Motion is appropriate.

---

[4] The DIP Motion states that "it appears that the Debtors' ever-present cash flow challenges seem to have existed irrespective of whomever was managing the Debtors and their assets, leading to defaults, threatened foreclosure sales, and receiverships throughout the history of the project." DIP Motion ¶ 22. However, the financial issues that the properties and Mr. Honarkar faced in 2021 were due in large part to the COVID-19 pandemic, which at that time was at its peak and had a devastating impact on the hospitality and commercial industries. *See* Trustee Motion ¶ 26. The notices of default, foreclosure sales, and other financial issues facing the properties upon the filing of these Chapter 11 Cases are the direct result of the Continuum Parties' fraud and gross mismanagement of the Debtors.

19. However, to the extent the Debtors proceed with the currently proposed DIP Loan, it is inappropriate and simply unacceptable because: (i) the disclosures contained in the DIP Motion and DIP Declaration are woefully inadequate; (ii) the DIP Loan was not subjected to a robust marketing and vetting process required for an insider loan that is admittedly subject to entire fairness; (iii) if approved, the terms of the DIP Loan would confer an improper advantage on the Continuum Parties in these Chapter 11 Cases; (iv) the proposed release of the DIP Lender is impermissibly vague; and (v) the proposed outsized carveout for professional fees is inappropriate. Thus, the Honarkar Parties respectfully submit that the DIP Loan cannot be approved as proposed.

### A.  Inadequate and Insufficient Disclosures.

20. Neither the DIP Motion nor the DIP Declaration contains adequate and sufficient disclosures regarding the DIP Loan to justify its approval by the Court on even an interim basis.

21. In the DIP Declaration, the CRO states that he has "been advised that [the proposed DIP Lender] is an entity created by Mahender Makhijani … and that the DIP loan will be funded by individuals or entities that have personally guaranteed some of the institutional loans secured by first priority deeds of trust against certain of the Debtors' properties." DIP Declaration ¶ 7. According to the DIP Motion, the proposed DIP Lender is "an entity created by individuals involved with and familiar with the properties and including at least one likely insider of the Debtor (M Mahender Makhijani)." DIP Motion ¶ 31.

22. Neither the DIP Declaration nor the DIP Motion identify or disclose any of the other individuals or entities that were involved in the creation of the proposed DIP Lender or who would be funding any of the advances under the proposed DIP Loan. Although the DIP Term Sheet provides that Bhajneet Singh Malik (another insider) is the purported manager of the DIP Lender, it is <u>completely unknown</u> who all is behind or who would be involved in this proposed financing.

23. Moreover, <u>no one knows</u>, because the DIP Motion does not disclose, whether any of the individuals or entities behind the proposed DIP Loan have the financial means or wherewithal to provide the contemplated $3.5 million to $5 million in funding. Thus, at this time, it is also <u>completely unknown</u> whether the proposed DIP Loan is even feasible or if it is simply illusory. This issue is exacerbated by the fact that Mr. Makhijani and the other Continuum Parties who had sole control of the Debtors leading up to the filing of the Chapter 11 Cases and who were responsible for making payments on the Debtors' behalf failed to do so and instead allowed multiple notices of default and notices of trustee's sales to be issued against the Debtors, among other financial issues. Yet, somehow, these very same insiders are now purportedly able to fund the proposed DIP Loan. To say that this is suspicious would be a vast understatement.

24. Furthermore, neither the DIP Motion nor the DIP Term Sheet contain any proposed budget, and, therefore, <u>no one knows</u> how the Debtors propose to use any of the funding of the DIP Loan assuming they receive it; in fact, the DIP Motion specially states that there will be no budget for operating costs!

25. Accordingly, the DIP Motion and DIP Declaration do not provide nearly enough information for this Court to determine the appropriateness of the DIP Loan or the purported good faith of the proposed DIP Lender or the ultimate source(s) of the funds to be provided to the Debtors' estates under the proposed DIP Facility.

**B.    The DIP Loan is an Insider Loan that Was Not Subject to a Robust Marketing or Vetting Process.**

26. What is clear from the very limited disclosures about the DIP Loan is that it is an insider loan proposed by Mr. Makhijani (and his affiliates), who just weeks before the Chapter 11 Cases were filed was found to have committed fraud and to have converted and unjustly enriched himself and his affiliates from the Debtors' assets, and that Mr. Malik (another of the Continuum

Parties) is the purported manager of the DIP Lender, and not to mention that, promptly after the Debtors filed for bankruptcy, the Investor Debtors also filed for bankruptcy in an another attempt to thwart the Arbitration Award from becoming final. Because this would be an insider transaction, the DIP Loan must be subjected to the highest level of scrutiny. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (holding that heightened scrutiny was required to evaluate a DIP loan where debtor's principal was subject to personal liability which compromised his independent judgment); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("[C]ourts apply a heightened scrutiny test in assessing the bona fides of a transaction among a debtor and an insider of the debtor."); *see also In re Philadelphia Newspapers, LLC*, 445 B.R. 450, 465 (Bankr. E.D. Pa. 2010) (stating that a proposed DIP loan to be funded by an insider of the debtor is "even less likely" to be approved); *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd and remanded sub nom. Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998) (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

27.     The need for a higher standard is even greater here given the findings against Mr. Makhijani in the Arbitration Award and given the facts that the CRO who approved the proposed DIP Loan on behalf of the Debtors was unilaterally appointed by Mr. Makhijani and the other Continuum Parties and that the independence of the CRO and the Independent Manager has already been called into question, as set forth in the Trustee Motion.

28.     Although the Debtors assert that the DIP Loan meets this high standard, this is just not the case. As the Debtors and the CRO concede, the marketing for the DIP Loan was "limited."

The Debtors and the CRO also relied, at least in part, on unvetted information provided by "prior management" – *i.e.*, the Continuum Parties – and the "property managers" – which presumably includes the Debtors' project management company VGruppe Management, which, as set forth in the Trustee Motion and addressed at the first day hearing held before the Court on March 14, 2025, is controlled by one of the Continuum Parties.

29. Thus, the Debtors are asking this Court to approve an insider DIP Loan that was not subject to a robust marketing process and that was put together using unverified information provided by the very same insiders who would be funding the DIP Loan. This is untenable.

### C. **Improper Insider Advantage and Restrictions on the Chapter 11 Cases.**

30. In an attempt to reassure the Court and the parties despite these glaring problems, the Debtors claim that the proposed terms of the DIP Loan "are not an attempt to gain an inside advantage for one party over others." DIP Motion ¶ 32. However, the DIP Loan's terms do, in fact, show that Mr. Makhijani, through the DIP Lender, is still improperly trying to exert control over these Chapter 11 Cases.

31. As this Court and the Debtors are well aware, the Honarkar Parties are currently seeking the appointment of a chapter 11 trustee for all of the Debtors. Yet, the DIP Lender and the Debtors have agreed that an event of default will occur under the DIP Loan if the Court enters an order appointing a trustee "to operate all or any material part of the DIP Borrowers' business." Thus, the Debtors would have this Court enter an interim order after the March 24 hearing approving a DIP Facility that may very well go into default after the April 11 hearing on the Trustee Motion, less than three weeks later. That default would (i) allow the DIP Lender to not make any further advances under the DIP Facility and foreclose on the DIP Collateral upon just 5 business days' notice, and (ii) cause the Debtors' estates to incur up to a $5 million superpriority claim that

is immediately due and accruing default interest at 13%. Thus, it is possible, if not likely, that Mr. Makhijani (through the DIP Lender) would use the DIP Loan as an improper shield against the Trustee Motion. While the Court should disregard any such attempted shield, neither the Debtors nor Mr. Makhijani should be allowed to try to use the DIP Loan to tip the scales in their favor with respect to the Trustee Motion.

32. Likewise, it would also be an event of default if a stay relief order is entered allowing any litigation to proceed against the DIP Borrowers' property valued in excess of $50,000 or against the DIP Borrowers involving potential liability in excess of $50,000. This could potentially apply to the Arbitration, which involves each of the MOM Debtors as nominal respondents and their property (*i.e.*, their membership interests in the SPE Debtors and other subsidiaries) and which involves potential liability much greater than $50,000. Although at this time the Honarkar Parties have not sought entry of any stay relief order, the Honarkar Parties expressly reserve their right to do so, and the Debtors and Mr. Makhijani should also not be allowed to try to use the DIP Loan as a shield against any stay relief motion.

33. Furthermore, the proposed DIP Loan would also limit the Debtors' ability to propose a chapter 11 plan, as it is also an event to default if the Debtors propose or support any plan that "is not satisfactory to the DIP Lender in its sole and absolute discretion" and that does not contain releases and exculpatory provisions "relating to the DIP Lender in its sole and absolute discretion." It strains credulity to think that the DIP Lender would approve of any plan in its "sole and absolute discretion" that does not include a broad release and exculpation in favor of Mr. Makhijani and the other Continuum Parties. The Honarkar Parties would strenuously object to any such proposed plan, but if the Debtors go against the Continuum Parties or simply allow their exclusivity periods to lapse such that the Honarkar Parties could propose an alternative plan (or an

order is entered allowing the Honarkar Parties to propose an alternative plan), then the DIP Loan would go into default. Thus, it is clear that the Continuum Parties intend to leave the Debtors' estates with little option when it comes to a chapter 11 plan.

34. Accordingly, the DIP Loan is really just a thinly veiled attempt by the Continuum Parties to continue to exercise control over the Debtors and these Chapter 11 Cases at the expense of all other parties in interest.

### D. **Impermissibly Vague Release of the DIP Lender and Affiliates.**

35. The proposed release of the DIP Lender requested by the DIP Motion and required under the terms of the DIP Loan is also impermissibly vague. If granted, it would apply to any of the Debtors' claims against the DIP Lender and its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for on behalf of any of them, that arise out of, are connected with, or relate to the DIP Documents.

36. However, as set forth above, no one knows who any of the DIP Lender's officers, directors, servants, agents, attorneys, assigns, heirs, parents, or subsidiaries are, other than supposedly Mr. Makhijani and Mr. Malik (neither of whom should receive any releases in these Chapter 11 Cases), because the Debtors have not disclosed this information.

37. Further, no one knows what claims the Debtors may have that "relate to" the DIP Documents and, therefore, no one can properly evaluate the scope or appropriateness of the requested release. Although the proposed Interim Order provides that no release granted thereunder shall release the DIP Lender from any "Derivative Actions," this term is undefined, so the full meaning and impact of this limitation cannot be determined either.

38. As such, the release of the DIP Lender and its principals and affiliates also cannot be approved as currently proposed.

### E. **The Outsized Professional Fee Carveout Is Inappropriate.**

39. Lastly, the proposed terms of the DIP Loan also include a grossly inflated, inappropriate, and premature professional fee carveout.

40. As of the date hereof, and aside from the pending application to approve the Independent Manager's retention, the Debtors have not sought, let alone obtained, Court approval of any of their proposed professionals.

41. Nevertheless, and despite there not being any proposed budget for the DIP Loan, the Debtors seek to set aside in an escrow account $2.5 million for their professionals' fees. This constitutes at least half and up to more than two-thirds of the funds to be advanced pursuant to the DIP Loan, if approved.

42. If the Debtors' need for funding is so great and their current cash flow so low that the Debtors have no choice but to turn to their insiders who have been found liable for, among other things, fraud, conversion, and unjust enrichment, then the majority of the funds under the DIP Loan should not be set aside for the Debtors' professionals at this time, which professionals have not actually been retained.

43. Given that these Chapter 11 Cases are still in their very early stages, and not much information is known about the full extent of the Debtors' liabilities and assets, to the extent that the Debtors obtain any postpetition financing, such financing should be used to fund the Debtors' operating expenses as much as possible.

## **RESERVATION OF RIGHTS**

44. The Honarkar Parties fully reserve and preserve all of their rights with respect to the DIP Motion (including the related proposed orders), the DIP Facility, the DIP Documents, the DIP Declaration, and any and all documents related to any of the foregoing, including the Honarkar

Parties' rights to assert further and/or additional objections to the DIP Motion, the DIP Declaration, and/or any other request of the Debtors to enter into or obtain postpetition financing. The Honarkar Parties further reserve and preserve all of their rights to propose their own postpetition financing for the Debtors or to continue to connect the Debtors with alternative sources of funding for postpetition financing.

**WHEREFORE**, the Honarkar Parties respectfully request that the Court (i) either (a) adjourn the hearing on the DIP Motion to March 31, 2025 at 11:00 a.m. (ET), or (b) if the March 24 hearing goes forward, deny approval of the DIP Motion; and (ii) grant such other and further relief that the Court deems necessary or appropriate.

Dated: March 21, 2025
Wilmington, Delaware

**POLSINELLI PC**

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen A. Smith (Del. Bar No. 7456)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sasmith@polsinelli.com

-and-

Elisa Hyder (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 267-3001
Facsimile: (215) 267-3002
ehyder@polsinelli.com

*Counsel for Mohammad Honarkar and 4G Wireless, Inc.*