## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*, [1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |

## AMENDED DECLARATION OF MARK SHINDERMAN IN SUPPORT OF PETITIONS AND FIRST DAY MOTIONS

I, Mark Shinderman, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am generally familiar with the Debtors' business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2.      I am a Senior Managing Director at FTI Consulting ("FTI"), a global consulting and financial advisory firm with an office located at 350 S. Grand Avenue, Suite 3000, Los Angeles, CA 90071. FTI provides a broad range of corporate advisory services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services. Prior to joining FTI, I was a partner at Milbank LLP. I have restructured

---

[1]     The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229].  The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

companies inside and outside of bankruptcy, directed bankruptcy-related litigation, and led the purchase of assets out of bankruptcy for more than 36 years. My engagements have involved companies in a diverse group of industries such as apparel, biopharma, consumer products and services, ecommerce, energy, finance, healthcare, hospitality, media and entertainment, real estate, retail, technology, and transportation. My experience includes representations in the following matters, among other things: *In re Sorrento Therapeutics, Inc., et al.*; *In re Knotel Inc., et al.*; *In re Vitamin OldCo Holdings, Inc., (f/k/a GNC Holdings, Inc.), et al*; *In re Diamond Sports Group, LLC, et al.*; *In re SunPower Corp.*; *In re Ocean Rig Udw Inc., et al.*; *In re John Q. Hammonds Fall 2006, LLC, et al.; In re Verity Health Sys. of CA, Inc., et al.; In re VSI Liquidating Inc. (f/k/a Vertellus Specialties, Inc.), et al.*; *In re Cengage Learning, Inc. et al.*; *In re Dex Media, Inc., et al.*; *In re Blockbuster Inc., et al.; In re William Lyon Home, et al.; In re American Capital Equipment, LLC; In re MSR Resort Golf, LLC, et al.; In re Relativity Media, LLC, et al.; In re Real Mex Restaurants, Inc., et al.*; *In re Gatehouse Media, Inc., a Delaware Corp., et al.*; *In re Everyware Global, Inc., et al.*; and *In re Select Specialized Staffing, Inc.* I have been materially involved in and led many distressed real estate matters, including the bankruptcy cases of: Ashton Woods; William Lyon Homes; John Q. Hammonds hotels; MSR Resort Golf; Banyan Cay; Dallas Office Building; Seattle Office Plaza; Cal Coastal; Knotel; and Lake Las Vegas. I have also led or played material roles in out of court restructurings on several hotel projects and mixed use projects.

3.      I am authorized to submit this declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information I have received from the Debtors' advisors, and conversations with the

prior managers of the enterprise and property managers.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

4.  As set forth in more detail herein, the purpose of the above-captioned chapter 11 cases (the "Chapter 11 Cases") is to preserve and maximize the value of substantial assets, including many significant real properties throughout Southern California. Principals of the Debtors have an ownership and management dispute that has not yet been fully resolved. Accordingly, the goal of the Chapter 11 Cases is to have independent advisors and managers take control of the Debtors to preserve and maximize the value of the enterprise, regardless of where such value may ultimately flow.

5.  In an effort to come up to speed, I have, among other things: (i) carefully analyzed the Arbitration Award (as defined herein); (ii) met or spoken with the ultimate principals and/or their advisors; (iii) visited most of the properties; (iv) reviewed Debtors' books and records, including financial records, and (v) spoken on several occasions with the property management company and hotel manager, who represented to me that they are not affiliates of the ultimate principals.

6.  To ensure independent decision-making throughout these Chapter 11 Cases, the Debtors have also appointed the Independent Manager (as defined herein) to whom I report and who has the ultimate decision-making authority on behalf of the Debtors.

7.  These Chapter 11 Cases are emergency filings and much of the information remains to be developed. I intend to verify key information that has been represented by the Debtors and their pre-petition management by reviewing books and records more closely, looking at underlying documents, and seeking the input of each of the parties in interest. To help me do so, I am working with my colleagues at FTI, who have begun to review budgets, rent rolls, and other documents

provided to them. To the extent necessary or appropriate, I intend to supplement this declaration as information develops.

8.      This Declaration is divided into four sections. Section I provides an introduction, a brief overview of the Debtors' business operations, and a discussion of the Debtors' capital structure. Section II contains a discussion of the events giving rise to these cases.  Section III provides the path and strategy that Debtors intend to utilize in these cases. Finally, Section IV provides the factual and evidentiary basis for the emergency and other relief that the Debtors have requested from the Court pursuant to the First Day Motions.

## SECTION I

## Background

### A.  Founding and Purpose

9.      The Debtors constitute a real estate venture comprised of a portfolio of commercial and residential properties owned by the Debtors.  The properties that make up the portfolio include hotels, an apartment complex, office buildings, other commercial real estate, and individual homes used as luxury vacation rentals.

10.     Debtor MOM CA Investco LLC ("MOM CA"), Debtor MOM AS Investco LLC ("MOM AS"), and Debtor MOM BS Investco LLC ("MOM BS," collectively with MOM CA and MOM AS, the "MOM Investcos") were founded in June of 2021 for the purpose of managing a robust real estate investment portfolio.  Each of the MOM Investcos owns a number of subsidiary special purpose entities (each an "SPE"), each for a separate investment property.  Collectively, the MOM Investcos have ownership interests in roughly sixty (60) SPEs for properties across California.  Each of the MOM Investcos holds one-hundred percent (100%) of the ownership

interests for each of their respective SPEs. Not all of the SPEs have or will file bankruptcy and there is a dispute as to whether certain SPEs belong to the enterprise.

11.     Prior to the formation of the MOM Investcos, Continuum Analytics ("Continuum"), of which Mahender Makhijani ("Makhijani") is an employee, and 4G Wireless, Inc. ("4G Wireless"), through Mohammad Honarkar ("Honarkar"), documented their preliminary understanding regarding the material terms of the joint venture in a term sheet, dated May 24, 2021 (the "Term Sheet").

12.     On or about June 8, 2021, the MOM Investcos were founded pursuant to their respective operating agreements (collectively, the "Operating Agreements"). Pursuant to the Operating Agreements, Honarkar and 4G Wireless contributed the portfolio of SPEs to the MOM Investcos. The Operating Agreements provide that the MOM Managers (as defined below) would contribute $30 million to the MOM Investcos for certain projects related to the SPEs.

**B.  Structure and Assets**

13.     MOM CA has two members: MOM CA Investor Group LLC ("CA Investor") and Honarkar. The managing manager of CA Investor is MOM CA Manager LLC ("CA Manager"). The SPEs owned and controlled by MOM CA, as of the Petition Date,[2] are set forth, including their real property interests, if any, on **Schedule 1**.

14.     MOM AS has two members: MOM AS Investor Group LLC ("AS Investor") and Honarkar. The managing manager of AS Investor is MOM AS Manager LLC ("AS Manager"). The SPEs owned and controlled by MOM AS, as of the Petition Date, are set forth, including their real property interests, if any, on **Schedule 2**.

---

[2] The MOM Investcos filed their chapter 11 bankruptcy petitions on February 28, 2025. The additional Debtors filed their petitions on March 10, 2025. "Petition Date" as used herein refers to either of the petition dates, as applicable.

15.     MOM BS has two members: MOM BS Investor Group LLC ("BS Investor," collectively with CA Investor and AS Investor, the "Investor Groups") and Honarkar.  The managing manager of BS Investor is MOM BS Manager LLC ("BS Manager," collectively with CA Manager and AS Manger, the "MOM Managers"). The SPEs owned and controlled by MOM BS, as of the Petition Date, are set forth, including their real property interests, if any, on **Schedule 3**.

**C. Appointment of CRO and Independent Manager, and Bankruptcy Filings**

16.     On February 26, 2025, I executed an engagement letter with the Debtors to become the CRO of the Debtors.  In that capacity, I will be in charge of the administration of the Debtors' operations during the Chapter 11 Cases. It is contemplated that I will serve as CRO of the MOM Investcos and whatever SPEs ultimately file bankruptcy petitions as well.

17.     On February 28, 2025, the MOM Managers filed voluntary chapter 11 petitions on behalf of the MOM Investcos (collectively, the "Investco Cases"). The Investco Cases were emergency filings and the decision to file the Investco Cases was not made by me. However, based on my review of the Debtors' books and records, my reading of the Arbitration Award (as defined below), and the underlying assets, it appears that the filing of the Investco Cases and, eventually, the filing of the SPEs, were necessary to preserve the value of the enterprise.

18.     In light of the Arbitration Award (as defined below), the severe financial distress faced by the MOM Investcos and their subsidiaries and the imminent foreclosure sales against many of the Debtors' properties, Debtors determined that hiring an independent manager to govern the operations of the MOM Investcos and the SPEs was appropriate in order to provide a buffer between the operation of the Debtors and the claims raised in the Arbitration (as defined below).

19.     The presence of the Independent Manager ensures that I can be entirely independent and am not reporting to either Makhijani and Honarkar, or their affiliates. Accordingly, on March 4, 2025, the MOM Investcos executed that certain Independent Manager Agreement (the "Manager Agreement") under which each of the respective MOM Managers delegated all managerial authority over its respective MOM Investco to the Independent Manager. In addition, as the managing manager of all of the MOM Investcos, the Independent Manager has sole authority and decision-making power under the Operating Agreements to manage not only all aspects of the MOM Investcos, but also the respective SPEs owned by each of the MOM Investcos.

20.     As the CRO, I have broad authority to manage, operate, sell and reorganize the Debtors, though, of course, I will report to the Independent Manager. Accordingly, I will not report to Makhijani, Honarkar, or any of their affiliates, but I certainly will solicit their input and discuss their views as is necessary and appropriate.

21.     In an effort to come up to speed, I have, among other things: carefully analyzed the Arbitration Award; met with the ultimate principals and/or their advisors; visited most of the properties; reviewed Debtors' books and records, including financial records, spoke on several occasions with the property management company, VGruppe Management ("VGruppe"), and the hotel manager, Everyday Luxury.  Everyday Luxury has represented that it is not an affiliate of Makhijani or Honarkar or their affiliates.

22.     Jason Miller ("Miller") is a current officer and manager of VGruppe.  Miller also is the Manager of MOM AS and MOM BS.  I have been advised that Miller is disassociating himself from VGruppe.

23.     Over the next several weeks, I will evaluate whether the Debtors continue with the property management relationship with VGruppe or seek an alternative property management company.

24.     As of March 5, I set up daily calls with VGruppe and Everyday Luxury.

25.     On March 4, 2025, the Independent Manager and I met with the Debtors' team of professionals and Makhijani and his team.

26.     On March 6, 2025, the Independent Manager and I toured the various real properties owned by the SPEs to evaluate the assets and met with and/or spoke to VGruppe and Everyday Luxury.

27.     On March 6, 2025, the Independent Manager and I spoke with counsel for Honarkar.

28.     I have asked my advisors to run title searches for all of the real properties owned by the SPEs, as well as UCC searches for each of the Debtors.

29.     Also, I have invited Makhijani and Honarkar and their advisors to call me anytime to discuss ideas, issues, thoughts and concerns with the clear admonishment that I do not work for or report to either of them. My goal, I have made clear, is to preserve and maximize the value of the enterprise regardless of to whom that value belongs.

30.     As of March 4, 2025, I worked with Debtors' counsel to engage FTI to support me in my role as CRO.

31.     On March 10, 2025, I authorized the remaining Debtors to file the Chapter 11 Cases, and they filed them that day.

32.     To be clear, these are truly emergency filings, given various notices of defaults (set forth below), and in some instances, notices of trustee sales, and the need for capital, which will

hopefully be provided by debtor-in-possession financing. As such, my advisors and I have not yet had the opportunity to review all of the budgets or the data underlying the budgets, or verify all of the material information that will need to be reviewed. However, in this very short period of time, we have covered a lot of ground, gathered and reviewed a significant amount of information, and developed and implemented a plan for moving forward quickly and efficiently

### D. The Debtors' Bank Accounts and Cash Management System

33.     Based on my efforts to investigate the Debtors' business, it is my understanding that the MOM Investcos maintain bank accounts at Nano Banc ("Nano") and Enterprise Bank & Trust ("Enterprise"). The MOM Investcos historically used the bank accounts at Nano to conduct their business in the ordinary course, including receiving upstream funds from performing SPEs and transfer to non-performing SPEs. Originally, certain SPEs maintained accounts at Enterprise. For ease and use for funding, the MOM Investcos maintained accounts with Enterprise. The MOM Investcos understand that Enterprise is on the United States Trustee's list of approved depository institutions, but that Nano is not. Debtors are in the process of setting up debtor-in-possession accounts at approved depository institutions.

34.     It is has been represented that many of the SPEs have bank accounts in the name of the SPE. Certain operating SPEs receive rents from tenants or online booking revenue. Money generated by the operating SPEs is "upstreamed" to the MOM Investcos to pay certain operating costs, such as payroll, which is then "downstreamed" to the SPEs.

35.     The signatory on the SPE bank accounts is VGruppe, the property management company, and, to the extent the SPE is a hotel, Everyday Luxury, the hotel management company. Both VGruppe and Everyday Luxury have been advised that they may continue operations in the

ordinary course, but they may only take input and instructions from me, not Makhijani or Honarkar, or any of their proxies.

36.      The Debtors will be seeking to open approved DIP accounts and are seeking "first day" cash management relief in the interim.

**E.  The Debtors' Capital Structure**

37.      Historically, the Debtors funded their operations with a combination of cash flow from business operations and funded indebtedness. The MOM Investcos do not have operations; however, certain SPEs operate and generate cash flow. Unfortunately, as of the Petition Date, the MOM Investcos are not receiving substantial cash flow.

<u>Property Level Secured Obligations</u>

38.      It has been represented that several of the SPEs and their owned real properties are subject to deeds of trust for mortgages and other secured debt arising from the acquisition, development, and/or ownership of real property.  These obligations are generally owed by the SPE that owns the real property at issue. Below are the real property assets owned by the SPEs, their value, outstanding loan amount, and any notice of default:

| SPE | Real Property Address[3] | Property Value[4] | Lender | Outstanding Loan Amount | Notice of Default Filed |
|---|---|---|---|---|---|
| Retreat at Laguna Villas, LLC*[5] | 749 Gaviota (729 Ocean Front) | $9,300,000.00 | Enterprise Bank & Trust[6] | $6,177,300.00 | February 12, 2025 |
| Sunset Cove Villas, LLC* | 683 Sleepy Hollow Ln, Laguna Beach | $15,500,000.00 | Enterprise Bank & Trust | $10,322,300.00 | February 7, 2025 |
| Duplex at Sleepy Hollow, LLC* | 689 Sleepy Hollow Ln, Laguna Beach | $2,525,000.00 | Enterprise Bank & Trust | $1,725,800.00 | February 12, 2025 |
| Cliff Drive Properties DE, LLC* | 150-154 Cliff Dr, Laguna Beach | $8,130,000.00 | Enterprise Bank & Trust | $5,583,600.00 | February 7, 2025 |
| 694 NCH Apartments, LLC* | 694 N Coast Hwy, Laguna Beach | $5,800,000.00 | Enterprise Bank & Trust | $3,848,000.00 | February 12, 2025 |
| Laguna Festival Center, LLC* | 805-859 Laguna Canyon Rd, Laguna Beach | $41,700,000.00 | Enterprise Bank & Trust | $27,600,000.00 | February 13, 2025 |
| 891 Laguna Canyon Road, LLC* | 891 Laguna Canyon Rd, Laguna Beach | | | | |
| 777 at Laguna, LLC* | 777 Laguna Canyon Rd, Laguna Beach | | | | |
| Laguna Art District Complex, LLC* | 775-793 Laguna Canyon Rd, Laguna Beach | | | | |
| Heisler Laguna, LLC* | 305-397 North Coast Highway, Laguna Beach | $29,200,000.00 | Enterprise Bank & Trust | $16,971,000.00 | February 7, 2025 |

---

[3] All properties listed are collectively referred to as the "Real Properties."

[4] Property values are taken from various appraisals that were prepared within the last few years and were provided to me and the Debtors' professional team. These values have likely changed; however, the Debtors' prepetition management, based on their experience in the real estate rental and hospitality industries, believe the values have likely been stable enough such that each of the Real Estate Lenders may be protected by an equity cushion. The Debtors' advisors and I have been unable to investigate the values of these Real Properties prior to the Petition Date and will undertake that investigation as our work progresses.

[5] SPEs listed in the table with an "*" are collectively referred to as the "Operating Properties," which are subject to the relief sought in the Cash Collateral Motion (as defined herein).

[6] Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, and Banc of California are collectively referred to as the "Real Property Lenders").

| SPE | Real Property Address[3] | Property Value[4] | Lender | Outstanding Loan Amount | Notice of Default Filed |
|---|---|---|---|---|---|
| The Masters Building, LLC* | 2711 Pacific Coast Hwy (2713 w Coast Hwy), Corona Del Mar | $11,900,000.00 | PMF CA REIT, LLC | $6,540,000.00 | N/A |
| Laguna HI, LLC* | 696 S Coast Hwy, Laguna Beach | $25,500,000.00 | Wilshire Quinn Income Fund, LLC | $12,550,000.00 | N/A |
| Laguna HW, LLC* | 688-690 S Coast Hwy, Laguna Beach | | | | |
| 314 S. Harvard DE, LLC | 314 Harvard Blvd, Los Angeles | $12,800,000.00 | Lone Oak Fund, LLC | $6,500,000.00 | December 5, 2024 |
| 4110 West 3rd Street DE, LLC | 4110 West 3rd Street, Los Angeles | | | | |
| 837 Park Ave, LLC | 837 Park Ave, Laguna Beach | | | | N/A |
| Tesoro Redlands DE, LLC* | 106 W Pennsylvania Ave, Redlands | $65,200,000.00 | Preferred Bank | $39,000,000.00 | November 20, 2024 |
| Hotel Laguna, LLC* | 421 S Coast Hwy, Laguna Beach | $82,000,000.00 | Banc of California | $27,000,000.00 | February 25, 2025 |
| Aryabhata Group, LLC | 4251,4225,4253 Martingale Way, 1701 Corinthian Way, 4200,4220,4250 Scott Drive, 1660 Dove Street, Newport Beach | $50,000,000.00 | Preferred Bank | $28,500,000.00 | November 20, 2024 |

39.     The loan held by Enterprise against Debtors Laguna Festival Center, LLC, 891 Laguna Canyon Road, LLC, 777 at Laguna, LLC, and Laguna Art District Complex, LLC is cross-collateralized by such Debtors' Real Properties. Based on the initial investigation undertaken by Debtors' counsel and my cursory review of certain documents, it is my understanding the valuation and loan amount encompass all of such Debtors' Real Properties.

40.     The loan held by Wilshire Quinn Income Fund, LLC against Debtors Laguna HI, LLC and Laguna HW, LLC are cross-collateralized by such Debtors' Real Properties. Based on

the initial investigation undertaken by Debtors' counsel and my cursory review of certain documents, the valuation and loan amount encompass all of such Debtors' Real Properties.

41.    The loan held by Loan Oak Fund, LLC against Debtors 314 S. Harvard DE, LLC, 4110 West 3rd Street DE, LLC, and 837 Park Ave, LLC are cross-collateralized by such Debtors' Real Properties. Based on the initial investigation undertaken by Debtors' counsel and my cursory review of certain documents, the valuation and loan amount encompass all of such Debtors' Real Properties.

42.    On February 26, 2025, a Notice of Trustee's Sale was recorded against the real property owned by Debtor Aryabhata Group, LLC ("Aryabhata"), scheduling a foreclosure for March 20, 2025.

43.    Similarly, a Notice of Trustee's Sale was recorded against the real property owned by Debtor Tesoro Redlands DE, LLC ("Tesoro"), scheduling a foreclosure for March 24, 2025.

44.    It has been represented to me by prepetition management that the SPE assets overall have significant value above the secured debts, with an approximated $382 million undistressed value based on appraisals versus $194 million in first-lien secured debt. As mentioned, my advisors and I have not yet had an opportunity to verify these values.

Cantor Loans

45.    Certain SPEs have loans with Cantor Group IV, LLC and Cantor Group V, LLC (together, the "Cantor Lenders").  Based on a review of the promissory notes for the Cantor Loans, Cantor made eleven loans with a principal balance totaling over $92.5 million (the "Cantor Loans"). It has been represented to me that these loans were used to fund operations and capital expenditure requirements of the Debtors, which did not have sufficient cash flow to do so themselves.

46.    It is my understanding that some of the Cantor Loans were memorialized and secured by certain of the Real Properties; however, it appears that half of the Cantor Loans are unsecured.

47.    The Cantor Lenders are separate from the Debtors, and each has its own managing entity. Deba Shyam, the manager for CA Manager, is also the manager of Cantor Group Manager LLC, an entity that manages certain managing entities of Cantor. However, CA Manager has been superseded in its role as manager of MOM CA by the Independent Manager.

Coastline Loan

48.    Based upon my review of the promissory note, on August 26, 2021, certain of the SPE Debtors issued a promissory note in favor of Coastline Santa Monica Investments, LLC in the principal sum of $17,255,316.00 (the "Coastline Loan"). Prepetition management has represented to me by that the current outstanding balance of the Coastline Loan is $29,485,896.48.

49.    I have also reviewed a related Commercial Guaranty, which indicates that Honarkar is the guarantor of the Coastline Loan.

Intercompany Transfers

50.    Additionally, in the ordinary course of business, there are transfers of funds between the MOM Investcos and SPEs. However, these transactions are not formally documented as loans. I have asked Debtors' advisors to investigate these transfers to confirm their extent, appropriate treatment, and priority.

The Debtors' Capital Raising Efforts from Individual Investors

51.    It has been represented to me that that the Debtors engaged in prepetition fundraising efforts through investors. The investors are "housed" in separate entities, which are

members of the Investor Groups.  The members of the Investor Groups house individual investors for different SPE entities.

Equity Ownership

52.     Each of the MOM Investcos are owned by Honarkar and their respective Investor Groups, the latter of which are controlled, directly or indirectly by Makhijani. Each of the MOM Investcos have two classes: "Projects" and "Other Owned." Certain of the SPEs are Projects and certain are "Other Owned." It has been represented to me that partnership for "projects" is different from "Other Owned LLCs," which were initially owned 100% by Honarkar prior to contribution to the MOM Investcos. Each of the SPEs are wholly owned by the MOM Investcos as set forth in Schedules 1-3.

53.     It has been represented to me that:

   a.   AS Investor and Honarkar own all of the membership interests of MOM AS,

   b.   BS Investor and Honarkar own all of the membership interests of MOM BS, and

   c.    CA Investor and Honarkar own all of the membership interests of MOM CA.

The members' relative capital and participation rights in each MOM Investco are set forth in each MOM Investco's organizational documents.

**SECTION II**

**Events Leading to the Commencement of these Cases**

**A.  The Arbitration[7]**

54.     The MOM Investcos have been parties to contentious arbitration proceedings that have resulted in a partial interim award (the "Arbitration Award"). On October 13, 2023, Honarkar

---

[7] The information set forth in this subsection provides a very high level overview of the Arbitration Award for the benefit of the Court. Pages 47 through 49 of the Arbitration Award are attached hereto as Exhibit A.

and 4G Wireless (collectively the "Arbitration Plaintiffs"), individually and derivatively on behalf

of the Debtors, filed an arbitration proceeding (the "Arbitration") against Makhijani, Continuum,

the Investor Groups, the MOM Mangers, and Nano (collectively the "Arbitration Defendants").

The MOM Investcos were named as "nominal respondents" in the arbitration proceeding.

55.     It is my understanding that the basis of the Arbitration is a dispute over the

ownership and management of the SPEs. The Arbitration Plaintiffs alleged numerous causes of

action against the Arbitration Defendants regarding the facts surrounding the creation of the MOM

Investcos and certain actions taken after their formation.

56.     After an evidentiary hearing, the Arbitration Award was entered. While the

Arbitration Award appears subject to confidentiality provisions in the Operating Agreements, as

permitted by the Court, it is being filed with the Court subject to any party's objection rights to

seek to have the Arbitration Award sealed.

57.     However, it is important to note that the Arbitration Award does not have any

claims against the Debtors, except for a potential award of attorneys' fees.

58.     In fact, pursuant to the Arbitration Award, it appears that, the MOM Investcos, as

derivative claimants, may be entitled to recover compensatory damages to benefit the estates.

**B.  Potential Claims on Behalf of Debtors**

59.     In addition to the Arbitration Award, information has been provided that indicate

that there are potential claims on behalf of the Debtors. Accordingly, I have instructed the Debtors'

advisors to investigate these potential claims.

60.     For example, it has been represented to me that some of the tenants of certain real

estate SPEs either were not or are not paying rent. Accordingly, prior to the Petition Date, unlawful

detainer actions (the "Unlawful Detainer Actions") have been filed in the California Superior Court

of Orange County (the "<u>Superior Court</u>") on behalf of the SPEs. The Superior Court issued an order requiring certain defendants in the Unlawful Detainer Actions to deposit rents with the Superior Court.

61.    Debtors' advisors called the clerk of the Superior Court to confirm the amount of rent being held. As of the Petition Date, approximately $223,507.32 in rent owed to the SPEs is being held at the Superior Court.  Debtors' advisors are investigating whether rents are continuing to be diverted or whether all rents are being interplead.

62.    Generally, Debtors' advisors, the Independent Manager, and I will be required to investigate all pre-petition transfers of estate property, including transfers to Honarkar and Makhijani.

**C.  Loan Defaults**

63.    Overall, the Debtors lack cash flow. When the MOM Investcos were founded in June 2021, the Debtors constantly need capital injection even while interest rates remained low. However, throughout 2022 and 2023, interest rates continued to climb and further disrupted the cash flow of the Debtors and requiring an additional capital infusion.

64.    As set forth herein, numerous of the SPEs have had Notices of Default recorded against the Real Properties. Additionally, Notices of Trustee Sale have been recorded against Aryabhata and Tesoro.

65.    Moreover, as of the Petition Date, there appear to be past due property taxes on many of the Real Properties as set forth below:

| SPE | Real Property | PAID (TAX YR 2024) | TOTAL UNPAID | TOTAL UNPAID WITH FEES |
|---|---|---|---|---|
| **314 S. Harvard DE, LLC** | 314 S Harvard Blvd, Los Angeles | $0.00 | $36,687.97 | $36,687.97 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **777 at Laguna, LLC** | 777 Laguna Canyon Rd, Laguna Beach | $0.00 | $54,748.28 | $61,549.11 |
| | 22446 Laguna Canyon Rd, Laguna Beach | $0.00 | $13,843.64 | $15,908.37 |
| | | | | |
| **891 Laguna Canyon Road LLC** | 891 Laguna Canyon Rd, Laguna Beach | $0.00 | $72,699.08 | $84,326.06 |
| | | | | |
| **694 NCH Apartments LLC** | 694 N Coast Hwy, Laguna Beach | $0.00 | $54,880.74 | $133,388.52 |
| | | | | |
| **837 Park Avenue, LLC** | 615 Griffith Way, Laguna Beach | $0.00 | $6,817.04 | $16,607.07 |
| | | | | |
| **4110 West 3rd Street DE, LLC** | 308 S Harvard Blvd, Los Angeles | $0.00 | $81,153.56 | $81,153.56 |
| | | | | |
| **Cliff Drive Properties DE, LLC** | 150 Cliff Drive, Laguna Beach | $0.00 | $22,252.12 | $55,080.45 |
| | 151 Cedar Drive, Laguna Beach | $0.00 | $22,252.12 | $55,080.45 |
| | 153 Cedar Drive, Laguna Beach | $0.00 | $28,268.60 | $69,781.13 |
| | | | | |
| **Duplex at Sleepy Hollow, LLC** | 689 Sleepy Hollow Lane, Laguna Beach | $0.00 | $27,888.39 | $69,191.67 |
| | | | | |
| **Hotel Laguna, LLC** | 425 S Coast Highway, Laguna Beach | $0.00 | $187,782.56 | $187,782.56 |
| | 541 S Coast Highway, Laguna Beach | $0.00 | $47,925.48 | $47,925.48 |
| | Lot | $0.00 | $100,591.55 | $100,591.55 |
| | | | | |
| **Laguna Art District Complex, LLC** | 775 Laguna Canyon Rd, Laguna Beach | $0.00 | $12,547.58 | $13,244.15 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **Laguna Festival Center** | 835 Laguna Canyon Rd, Laguna Beach | $0.00 | $127,242.92 | $152,656.99 |
| | | | | |
| **Laguna HI** | 696 S Coast Hwy, Laguna Beach | $0.00 | $241,126.15 | $241,126.15 |
| | | | | |
| **Laguna HW** | 690 S Coast Hwy, Laguna Beach | $0.00 | $95,072.31 | $95,072.31 |
| | | | | |
| **Retreat at Laguna Villas** | 729 Ocean Front, Laguna Beach | $0.00 | $87,386.08 | $212,523.77 |
| | | | | |
| **Sunset Cove Villas** | 683 Sleepy Hollow Lane, Laguna Beach | $0.00 | $176,572.38 | $386,222.70 |
| | | | | |
| **Tesoro Redlands DE, LLC** | 106 W Pennsylvania Ave, San Bernardino, CA 92374 | $0.00 | $403,117.17 | $403,117.17 |
| | | | | |
| **The Masters Building, LLC** | 2711 E. Coast Hwy, Newport Beach, CA | $0.00 | $47,108.67 | $47,108.67 |
| | 2713 E. Coast Hwy, Newport Beach, CA | $0.00 | $64,749.23 | $64,749.23 |
| | | | | |
| **Heisler Laguna, LLC** | 397 N Coast Hwy, Laguna Beach | $0.00 | $38,151.96 | $93,793.32 |
| | 385 N Coast Hwy, Laguna Beach | $0.00 | $25,154.85 | $61,340.24 |
| | 369 N Coast Hwy, Laguna Beach | $0.00 | $18,536.19 | $45,217.25 |
| | 353 N Coast Hwy, Laguna Beach | $0.00 | $39,974.94 | $97,520.04 |
| | 345 N Coast Hwy, Laguna Beach | $0.00 | $42,651.06 | $76,545.66 |
| | 331 N Coast Hwy, Laguna Beach | $0.00 | $50,311.12 | $77,218.64 |
| | 305 N Coast Hwy, Laguna Beach | $0.00 | $105,356.81 | $189,032.45 |
| | | | | |
| **Total Due** | | **$0.00** | **$320,136.93** | **$640,667.60** |

## SECTION III

## Chapter 11 Objectives

66.     The Debtors and their advisors have developed three primary objectives from these Chapter 11 Cases.

**A.  Appointment of CRO and Independent Manager**

67.     At its core, the Arbitration is a partnership dispute regarding the ultimate ownership of the Debtors' assets. It appears that, due to this dispute, the Debtors' business has suffered. Instead of one party or the other controlling assets, until the litigation is resolved, independent management will take control of the estates to preserve and maximize value, regardless of where such value ultimately flows.

68.     Serious allegations have been made against Honarkar, Makhijani, the Investor Groups, and the MOM Managers.  These issues must be addressed. In order to address these issues, I was engaged and appointed as CRO to act as an independent officer of the Debtors. Additionally, Debtors have engaged the Independent Manager to ensure these Chapter 11 Cases are run independently for the benefit of the Debtors' estates and creditors. While substantial work has been done prior to the Petition Date, the Chapter 11 Cases are an emergency filing and the Debtors' restructuring advisors have not had the time or resources to undertake a comprehensive examination of the Debtors' historical financial information, but intend to do so during these Chapter 11 Cases. Needless to say, the estates may hold claims arising from potential avoidance actions.

69.     In addition to the factual findings set forth in the Arbitration Award, I understand that I will need to conduct an investigation. I spoke with Honarkar's counsel and have spoken with Makhijani. To be absolutely clear, I am not beholden to either party, have no prior relationship

with either party, and had never met either party before my engagement in this matter. I am focused on maximizing the value of the Debtors' assets in these Chapter 11 Cases, regardless of to whom such value ultimately flows.

### B.  Assessment of Real Properties and Sale Process

70.     As described above, the Debtors maintain a portfolio of owned real property assets, through the SPEs, as well as ownership or other interests in other real property projects.  The Debtors intend to develop a comprehensive plan to maximize the value of certain of these real estate holdings, which will likely require the services of a specialized real estate advisor and/or broker.  The Debtors' path forward with respect to the real estate assets may involve a sale process of all or some assets or a longer-term development plan.

71.     The Debtors anticipate that the availability and terms of development financing will be a substantial factor in formulating their real estate strategy. The Debtors anticipate seeking debtor-in-possession financing in connection with the Chapter 11 Cases in order to maximize the value of the Real Properties.

72.     The Debtors and their advisors are in the process of negotiating a short term debtor-in-possession financing with no strings that can be refinanced once Debtors' advisors and I have a more comprehensive analysis of the business and a sense of what is required for longer term operations.

73.     The Debtors and their advisors additionally hope to negotiate consensual use of cash collateral with the various Real Property Lenders prior to the hearing on the Cash Collateral Motion (as defined herein). For the avoidance of doubt, the Debtors will not utilize any cash collateral prior to the entry of an order from the Court.

74.     In order to preserve and then maximize value, it seems to me that the estate will need more liquidity.  I thus plan to meet with Honarkar and Makhijani separately to solicit their views on how best to proceed.  It may be possible to borrow additional capital and/or asset sales may be needed.  This week, FTI, at my direction, is exploring the cash needs for the enterprise, talking to the various property and project managers.

### C.  Plan of Reorganization

75.     The Debtors intend to pursue a confirmation process for a plan of reorganization. The plan will address any assets that have not already been sold or liquidated, address disposition of causes of action previously identified, and provide a final outcome for all creditors in these cases. And, if possible, I intend to try to help the parties to the Arbitration resolve their dispute.

## SECTION IV

## First Day Motions

76.     To enable the Debtors to continue operating effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors are requesting certain emergency and other relief from the Court pursuant to the First Day Motions.  I have reviewed each of the First Day Motions, including the exhibits thereto.  All facts set forth in the First Day Motions are true and correct based upon my personal knowledge; information provided to me by certain of the Debtors' former employees and professionals; my review of relevant documents; or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors.  Accordingly, for the reasons stated herein and in the First Day Motions, I believe that the relief requested in each of the First Day Motions is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.

77.    The Debtors have narrowly tailored these First Day Pleadings to meet the goals of: (i) continuing their operations in chapter 11 to preserve value for the Debtors' estates and their creditors; (ii) providing an adequate runway for the Debtors to effectuate a successful reorganization; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

### A. Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")

78.    The Debtors are seeking joint administration of their Chapter 11 Cases pursuant to Federal Rule of Bankruptcy Procedure 1015(b). As set forth herein, all of the Debtors are affiliates or wholly-owned and controlled by the MOM Investcos. Joint administration is appropriate in these Chapter 11 Cases to promote efficiency and judicial economy. The Debtors anticipate that numerous notices, applications, motions, or other pleadings, hearings, and orders in these Chapter 11 Cases will affect all Debtors. Accordingly, joint administration is in the best interest of the Debtors, their creditors, and other parties in interest.

### B. Motion For Entry of Interim and Final Orders (i) Approving the Appointment of an Independent Manager; (II) Authorizing the Payment of Fees; and (III) Granting Related Relief (the "Independent Manager Motion")

79.    The Debtors are seeking a Court order approving the appointment of the Independent Manager and an authorization to pay the fees of the Independent Manager. The Debtors believe that the combination of the Independent Manager and the CRO will result in the fair and impartial management of the Debtors without the influence of any party to the Arbitration.

80.    The Operating Agreements allow for the MOM Managers to "take all action on behalf of the Company as the member of each Subsidiary . . . ." Under this authority, the MOM Managers elected to delegate all managerial authority of the MOM Managers to the Independent Manager.

23

81.     The MOM Investors conducted a thorough vetting process for determining whom they should select as the independent manager for the MOM Investcos.  Ultimately, the MOM Investors selected Robbin Itkin based on her extensive expertise in bankruptcy matters and her knowledge of the market in which most of the MOM Investcos and their SPEs operate.  Ms. Itkin does not have any prior relationship with the Mom Investcos, the MOM Investcos' pre-petition owners or the MOM Investcos' management.

82.     The Debtors believe that Ms. Itkin is eminently qualified and brings to bear a suite of professional restructuring and management experience that will assist the Debtors and their subsidiaries in successfully addressing the myriad, complex issues involved in these Chapter 11 cases.  The Independent Manager, coupled with the CRO, will also provide a layer of oversight and independence to the MOM Investcos', and their SPE subsidiaries', post-petition operations and bankruptcy objectives.

83.     Accordingly, ratification of the Independent Manager Agreement is within the Debtor's business judgment and should be approved.

84.     In addition to appointing the Independent Manager, the MOM Managers also delegated all managerial authority over the MOM Investcos to Ms. Itkin.  This delegation was done to ensure that the Independent Manager has full, independent control over all of the management decisions of the MOM Investcos and the SPEs without the influence of any party to the Arbitration.  As a result of this appointment, the MOM Investcos' prior management team has been fully replaced by the Independent Manager and CRO, providing added protections and independence to the Debtors' post-petition operations.

85.     Pursuant to the Manager Agreement, the Investco Debtors will pay Ms. Itkin $35,000 per month and reimburse her for all reasonable and necessary out of pocket expenses

(collectively, the "Compensation"). Additionally, Tesoro Redlands DE, LLC ("Tesoro"), a SPE of MOM CA, funded a $50,000 retainer in conjunction with the Independent Manager's employment. At the time the retainer was funded, Tesoro was not a debtor in these Chapter 11 Cases. The Debtors believe that the Compensation is reasonable in light of the anticipated work that the Independent Manager will undertake in these Chapter 11 Cases. The Compensation will be paid monthly or as otherwise provided for under the Manager Agreement. The Manager Agreement also includes customary indemnification provisions, which require that the MOM Investcos indemnify the Independent Manager unless it is determined by a court of competent jurisdiction that her conduct constituted gross negligence, willful misconduct, or fraud.

### C. Cash Management Motion

86.     The Debtors use and maintain a cash management system (the "Cash Management System") in the ordinary course of business, to collect funds, make transfers, and disburse funds to satisfy their financial obligations. The Cash Management System allows the Debtors to manage cash efficiently and maintain effective control over their bank accounts, identified on **Schedule 1** of the Cash Management Motion (collectively, the "Bank Accounts"), while facilitating their cash monitoring, forecasting, and reporting functions. Tenants of the SPEs regularly make payment to certain of the Bank Accounts; maintaining those Bank Accounts as points of receipt and avoiding any sudden disruption in the Debtors' accounts-receivable process is a critical purpose of the Cash Management Motion.

87.     In the interim, neither Honarkar nor Makhijani, or their proxies, will have ability to access the Bank Accounts.

88.     The Debtors are in the process of establishing debtor in possession accounts at a bank (the "DIP Accounts") that is an authorized depository approved by the Office of the United States Trustee ("UST"). The Debtors request the Court grant them 45 days to complete the process

of establishing the DIP Accounts. Because most of the Bank Accounts are at Nano—which is not a depository approved by the UST—the Debtors propose to implement a prompt and regularly reoccurring sweep of any funds in excess of the FDIC-insured amount from each Bank Account into the Dip Accounts. I understand this will satisfy the requirements of the Bankruptcy Code with the least possible disruption to the Cash Management System.

89.     In the ordinary course of business, the Debtors enter into intercompany transactions with each other through the operation of their Cash Management System to manage their resources efficiently (collectively, the "Intercompany Transactions"). It has been represented to me that the Debtors maintain detailed accounting records and can ascertain, trace, and otherwise account for all Intercompany Transactions, and will continue to do so during these Chapter 11 Cases. If the Intercompany Transactions were discontinued, the Cash Management System and related controls would be disrupted to the detriment of the Debtors and all stakeholders.

90.     The Debtors also seek authority to continue using existing business forms and check stock. The delays that would result from replacing their business form and check stock, which may include revising existing forms and cash management templates, would be disruptive and divert attention from management of the Debtors' business.

91.     Given the breadth and complexity of the Debtors assets and operations, the emergency nature of the Petitions, and the control and oversight of the CRO and Independent Manager, the Debtors respectfully request that the Court extend their deadlines to comply with the Bankruptcy Code and the Operating Guidelines to the end of the Interim Period.

92.     Continuity of the Cash Management System is critical to the Debtors' business operations, but so is flexibility.  To that end, the Debtors also request authority to implement reasonable changes to the Cash Management System that they deem necessary or appropriate in

the ordinary course and in consultation with the UST and other necessary stakeholders, including closing any Bank Account and establishing new bank accounts and that the applicable banks be authorized to honor such changes.

93.     In the ordinary course of business, the Banks debit the Bank Accounts on account of payments and transfers made from the Bank Accounts from time to time.  In connection with these payments and the general maintenance of the Bank Accounts, the Banks charge, and the Debtors pay the Banks, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees").  These Bank Fees are paid by automatic deductions from the applicable Bank Accounts.  Monthly Bank Fees can fluctuate on a month-to-month basis depending on certain factors. Although it is very difficult to ascertain the exact amount of Bank Fees owed as of the Petition Date, out of an abundance of caution, the Debtors request authority to pay outstanding Bank Fees in an amount not greater than Bank Fees historically paid by the Debtors, which if owed, will come due during the Interim Period.

**D.  Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief (the "Utilities Motion")**

94.     In connection with the normal operations of their business, the Debtors use water, electric, gas, internet, telecommunications, and waste utility services (collectively, the "Utility Services").  A non-exclusive list of Utility Companies that the Debtors pay directly (the "Utility Company List") is attached to the Utilities Motion.

95.     Uninterrupted Utility Services are essential to preserving the Debtors' ongoing business operations as a going concern and, hence, the overall success of the Debtors' sale process and these Chapter 11 Cases.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted.  The relief sought in this

Motion is thus necessary to ensure that the Debtors maintain continued services from these Utility Companies to permit the Debtors to continue operating in the normal course during these Chapter 11 Cases, preserving the value of their estates.

96.     To the best of the Debtors' knowledge, the Debtors are behind on certain Utility Companies' invoices in the aggregate amount of approximately $26,000.  In the aggregate, the Debtors' monthly expenditure for all Utility Services from the Utility Companies is approximately $50,000, calculated as a historical monthly average during the twelve-month period before the Petition Date.

97.     The Debtors intend to pay all undisputed postpetition obligations owed to the Utility Companies in the ordinary course of business and in a timely manner.  Nevertheless, as additional adequate assurance for future Utility Services, the Debtors propose to deposit an amount equal to approximately one-half of the average monthly cost of Utility Services paid directly by the Debtors (the "Adequate Assurance Deposit").  The Adequate Assurance Deposit—in the amount of $25,000—will be held in a segregated account (the "Adequate Assurance Account") for the duration of these Chapter 11 Cases.  Should the Debtors default on their payment obligation to a Utility Company, such Utility Company shall have a right to the Adequate Assurance Deposit in the amount set forth in the Utilities Motion, subject to the Debtors' rights to terminate or discontinue the applicable Utility Service

98.     The Debtors have requested the Court issue an order adopting Adequate Assurance Procedures (as defined in the Utilities Motion).

**E.  Application for Appointment of Stretto, Inc. as Claims and Noticing Agent (the "Claims Agent Application")**

99.     The Debtors seek entry of an order appointing Stretto, Inc. ("Stretto") as the claims and noticing agent (the "Claims and Noticing Agent") for the Debtors and their Chapter 11 Cases,

including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.  The Debtors' selection of Stretto to act as the Claims and Noticing Agent satisfies the Claims Agent Protocol, in that the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

100.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of entities to be noticed.  Local Rule 2002-1(f) provides that "[i]n all cases with more than 200 creditors or parties in interest listed on the creditor matrix, unless the Court orders otherwise, the debtor shall file [a] motion [to retain a claims and noticing agent] on the first day of the case or within seven (7) days thereafter."  In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

**F.    Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief (the "Cash Collateral Motion")**

101.    As of the Petition Date, as part of the Prepetition Collateral, the Debtors have Cash Collateral (including cash and cash equivalents) located at the Operating Properties.[8]  The Debtors'

---

[8] The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels,

revenue is derived primarily from funds generated by bar, restaurant, and other services and hotel properties[9] and rent/leases with tenants.

102.    The Debtors intend to develop a comprehensive plan to maximize the value of certain of their real estate holdings, including the Operating Properties.  In the interim, the Debtors cannot meet their ongoing post-petition obligations to maintain the Operating Properties unless they have the immediate ability to use the Cash Collateral, including the cash generated or received by the Debtors from and after the Petition Date.  In the absence of such use, the Debtors' bankruptcy estates and creditors will suffer immediate and irreparable harm.

103.    An integral aspect of maintaining the Debtors' business operations is their ability to use Cash Collateral to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary course property maintenance and projects.

104.    Attached to the proposed Interim Order (as defined in the Cash Collateral Motion) are: (i) a consolidated administrative budget for these Chapter 11 Cases (the "Administrative Budget"); and (ii) 13-week budgets for each Operating Property (the "Operating Budgets," and collectively, the "Budgets").  The Budgets were prepared by prior management in consultation with VGruppe and Everyday Luxury. The Budgets have not yet been reviewed or verified. The Budgets will be refined and reviewed by the CRO and FTI in the coming weeks.  Importantly, no cash collateral is being consumed prior to a hearing on the Cash Collateral Motion.

---

motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

[9] It is the CRO's understanding that hotel rooms are not presently available to rent.  The CRO is working to gain an understanding of this issue and will address it accordingly.

105.    All Debtors and their estates will be jointly and severally liable for the amounts set forth in the Administrative Budget, which ensures that the Debtors have sufficient funds to administer the Chapter 11 Cases and work toward emerging from them successfully. Each Operating Budget is intended to include only the expenses necessary to maintain, preserve, and/or operate each respective Operating Property, which are each SPE's sole means of generating revenue, thereby preserving the value of the Operating Properties and providing the resources for the Debtors to pursue their chapter 11 restructuring strategy.

106.    The Debtors' use of Cash Collateral is necessary to avoid immediate and irreparable harm; absent use of Cash Collateral, the Debtors will lose access to necessary liquidity to pay the ongoing costs associated with administering their estates and running the Operating Properties, thereby dissipating value to the detriment of their estates and creditors, including the Real Estate Lenders.  Access to Cash Collateral is necessary to maintain operations in the ordinary course and ensure the viability of the Debtors without significant deterioration to the detriment of all stakeholders.

107.    The Debtors seek entry of the Interim Order to obtain authority to use Cash Collateral with respect to all Operating Properties on a unified basis, during the 30-day period commencing as of the date of entry of the Interim Order (the "Interim Period") through and including the Termination Date.

108.    The Debtors have not had the opportunity to negotiate use of Cash Collateral with the Real Property Lenders prior to the filing of the Cash Collateral Motion but hope to do so before the initial hearing.  For this reason, the proposed Interim Order (as defined in the Cash Collateral Motion) is designed to preserve the status quo so that, during the Interim Period, the Debtors can work with the Real Property Lenders, on a property-by-property basis, to come to an agreement

on an acceptable form of final order for each Operating Property, including appropriate adequate protection relief.

109.    The CRO and FTI intend to work with the Real Property Lenders toward an understanding as to the extent, validity, and priority of their respective liens in the Prepetition Collateral (as defined in the Cash Collateral Motion) and their respective values and loan balances during the Interim Period and as these Chapter 11 Cases progress.

### G.  Anticipated "Second Day" Motions

110.    Subsequent to the "first day" motions, Debtors' advisors anticipate filing (i) employment applications; (ii) a motion to approve short-term debtor-in-possession financing; and, perhaps, (iii) a motion to sell certain of the Real Properties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.


By:     */s/ Mark Shinderman*
        Name:  Mark Shinderman
        Title:   Chief Restructuring Officer

**Schedule 1**

**MOM CA**

| SPE | Real Property Address (if any) | Lender | Loan Amount |
|---|---|---|---|
| The Masters Building, LLC | 2711 Pacific Coast Hwy (2713 w Coast Hwy), Corona Del Mar | PMF CA REIT, LLC | $6,540,000.00 |
| 837 Park Ave, LLC | 837 Park Ave, Laguna Beach | Lone Oak fund, LLC | $6,500,000.00 |
| Laguna HI, LLC | 696 S Coast Hwy, Laguna Beach | Wilshire Quinn Income Fund, LLC | $12,550,000.00 |
| Laguna HW, LLC | 688-690 S Coast Hwy, Laguna Beach | Wilshire Quinn Income Fund, LLC | $12,550,000.00 |
| 314 S. Harvard DE, LLC | 314 Harvard Blvd, Los Angeles | Lone Oak fund, LLC | $6,500,000.00 |
| 4110 West 3rd Street DE, LLC | 4110 West 3rd Street, Los Angeles | Lone Oak fund, LLC | $6,500,000.00 |
| Tesoro Redlands DE, LLC | 106 W Pennsylvania Ave, Redlands | Preferred Bank | $39,000,000.00 |
| Hotel Laguna, LLC | 421 S Coast Hwy, Laguna Beach | Banc of California | $27,000,000.00 |
| Cliff Village, LLC | 421 S Coast Hwy, Laguna Beach | Nano Banc | $10,000,000.00 |
| Newport Crossing, LLC/Aryabhata | 4251,4225,4253 Martingale Way, 1701 Corinthian Way, 4200,4220,4250 Scott Drive, 1660 Dove Street, Newport Beach | Preferred Bank | $28,500,000.00 |
| 113 Canyon Acres, LLC | N/A | | |
| Terra Laguna Beach, Inc. | N/A | | |
| Pershing82, LLC | N/A | | |
| MJA Restaurants, Inc. | N/A | | |
| 4G Wireless, Inc. | N/A | | |
| MS Nosh, LLC | N/A | | |
| Blue Lagoon Resort, LLC | N/A | | |
| Buena Vida RSM, LLC | N/A | | |

| SPE | Real Property Address (if any) | Lender | Loan Amount |
|---|---|---|---|
| Modan, LLC | N/A | | |
| Seven Degrees Laguna, Inc. | N/A | | |
| 331 N. Coast, LLC | N/A | | |
| 331 North Coast Hwy., LLC | N/A | | |
| BMV Apartments, LLC | N/A | | |
| 7 Star Trade-In, LLC | N/A | | |
| Brookline Aliso Viejo, LLC | N/A | | |
| Laguna Beach Company, Inc. | N/A | | |
| Marquis Marine, LLC | N/A | | |
| Poppy and Seed, LLC | N/A | | |
| 2711 E Coast Hwy, LLC | N/A | | |
| Rancho San Joaquin Golf Course, LLC | N/A | | |
| The Fullest, LLC | N/A | | |
| Pizza 90, Inc. | N/A | | |
| 14 West Coast, LLC | N/A | | |
| Cliff Drive NB Properties, LLC | 150-154 Cliff Dr, Laguna Beach | | |
| 689 S Coast Hwy, LLC | 689 S Coast Hwy, Laguna Beach | | |

**Schedule 2**

**MOM AS**

| SPE | Real Property Address (if any) | Lender | Loan Amount |
|---|---|---|---|
| Retreat at Laguna Villas, LLC | 749 Gaviota (729 Ocean Front) | Enterprise Bank & Trust | $6,177,300.00 |
| Sunset Cove Villas, LLC | 683 Sleepy Hollow Ln, Laguna Beach | Enterprise Bank & Trust | $10,322,300.00 |
| Duplex at Sleepy Hollow, LLC | 689 Sleepy Hollow Ln, Laguna Beach | Enterprise Bank & Trust | $1,725,800.00 |
| Cliff Drive Properties DE, LLC | 150-154 Cliff Dr, Laguna Beach | Enterprise Bank & Trust | $5,583,600.00 |
| 694 NCH Apartments, LLC | 694 N Coast Hwy, Laguna Beach | Enterprise Bank & Trust | $3,848,000.00 |
| Heisler Laguna, LLC | 305-397 North Coast Highway, Laguna Beach | Enterprise Bank & Trust | $16,971,000.00 |

**Schedule 3**

**MOM BS**

| SPE | Real Property Address (if any) | Lender | Loan Amount |
|---|---|---|---|
| Laguna Festival Center, LLC | 805-859 Laguna Canyon Rd, Laguna Beach | Enterprise Bank & Trust | $27,600,000.00 |
| 891 Laguna Canyon Road, LLC | 891 Laguna Canyon Rd, Laguna Beach | Enterprise Bank & Trust | $27,600,000.00 |
| 777 at Laguna, LLC | 777 Laguna Canyon Rd, Laguna Beach | Enterprise Bank & Trust | $27,600,000.00 |
| Laguna Art District Complex, LLC | 775-793 Laguna Canyon Rd, Laguna Beach | Enterprise Bank & Trust | $27,600,000.00 |

12097257v.4