**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 89** |

**SUPPLEMENTAL DECLARATION OF MARK SHINDERMAN IN SUPPORT OF
MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING; AND (II) GRANTING RELATED RELIEF**

I, Mark Shinderman, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am generally familiar with the Debtors' business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2. I am authorized to submit this supplemental declaration (the "Supplemental DIP Declaration") on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information I have received from the

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 at Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

Debtors' advisors, and conversations with the prior managers of the enterprise and property managers. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3. Additional evidence of, among other things, my personal qualifications, experience and capacity, my role and involvement with the Debtors and these Chapter 11 Cases, my decisions made, and actions and efforts taken, in furtherance of my duties as CRO, and relevant facts and other information and findings regarding the Debtors' history, present circumstances and intended course of action during these Chapter 11 Cases is set forth in detail in my *Declaration of Mark Shinderman in Support of Debtors' First Day Motions* (as may be amended, the "First Day Declaration") [Docket No. 11] and the *Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; And (II) Granting Related Relief* [Docket No. 89-4] (the "Initial DIP Declaration"). My First Day Declaration is incorporated herein by reference. Capitalized terms in this Declaration take the meaning given to them in the First Day Declaration, unless otherwise defined herein.

4. I submit this Supplemental Declaration in further support of the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; And (II) Granting Related Relief* [Docket No. 89] (the "DIP Motion") and to address the concerns articulated by the Court at the initial hearing on March 24, 2025 (the "Initial DIP Hearing").

I. **EVENTS LEADING UP TO THE FILING OF THE DIP MOTION**

5. Upon my engagement as CRO, it became immediately clear that the Debtors were in dire need of financing. After meeting with the Debtors' property managers (who are not affiliated with the so-called Continuum group ("Continuum")), assessing the business operations,

2

and cash flows, and consulting with the Debtors' advisors, I decided that the best option for the Debtors was to bring in a short-term, smaller loan to stabilize the Debtors' operations and bridge to an end game resolution of these Chapter 11 Cases.  I came to this conclusion because, in my experience, no potential DIP lender would be willing to make a subordinated loan to these Debtors significant enough to finance the entire case given the lack of information available, which I explain in greater detail below.  While I readily acknowledge that the Debtors need a more robust loan, no binding or actionable commitment could be acquired under these circumstances—namely, lack of reliable books and records, lack of current appraisals, and lack of a virtual data room (the "VDR") containing all of the information that interested parties would require.

6.      Understanding that an investment was unlikely to come from a non-insider, I asked both ownership groups whether they would make a short-term subordinated loan to the Debtors with the understanding that the loan would serve as a mere bridge to more permanent financing. *See* Initial DIP Decl. ¶ 6.  I made it clear to each ownership group that this loan was not an instrument to take control of the Debtors' enterprise, influence decisions, or impact litigation in any way.  I further advised both ownership groups that I did not want any exit fees or other impediments to taking out the loan, which I expect would occur within six to ten weeks of approval.  Additionally, I required that there be no priming liens, no liens on causes of action, and no liens on the equity held by the Debtors in its subsidiaries.  Finally, I made it clear to both ownership groups that if the Debtors failed to obtain a loan on these terms, I would have no choice but to convert these cases to cases under Chapter 7 and cease operations.  I cannot, and will not, run these businesses with no ability to pay employees, maintain insurance, pay taxes, or give assurances of future performance at the Debtors' many properties.

7. As the Court is aware, Specialty DIP, LLC (the "Specialty DIP") provided the binding commitment to loan $3.5 million on an interim basis, and up to $5 million, to the Debtors, as described in the DIP Motion and in my Initial DIP Declaration. Specialty DIP met all of my terms above for providing a short-term solution to the Debtors' cash needs.

8. I understand and share the Court's concerns that the loan from Specialty DIP should not influence *in any way* how these Chapter 11 Cases proceed. That is why I required that the loan and the order approving the loan be stripped of any attempts to assert control and provide no impediments or costs to taking the loan out by another lender.

## II. THE NEED FOR FUNDING IS CLEAR

9. As discussed in my Initial DIP Declaration and was acknowledged by the Court at the Initial DIP Hearing, the Debtors are in dire need of funding, without which these Chapter 11 Cases will need to immediately convert to cases under Chapter 7. Funding is needed to support operations and pay the costs of administering these Chapter 11 Cases. With respect to operations, the Debtors need funding to make payroll, pay property taxes that continue to accrue postpetition, pay vendors, and provide and maintain insurance for all properties, among other things. These payments are critical to the Debtors' many secured creditors as well as other stakeholders. In addition to funding operations, approval of the DIP Motion is needed to assure the marketplace that business will proceed as normal and maintain the value of the assets. Indeed, I have received calls from our property managers and third parties concerned about whether the Debtors will be able to carry forth with its committed events and obligations, like weddings that are scheduled in the near future.

10. Additionally, part of the funding would be used to fund the administration of these Chapter 11 Cases. None of the Debtor-SPEs generate significant net operating cash, and even if

they did, there is a question as to whether or not the Debtors could use net operating cash from one SPE to support another. Moreover, these Chapter 11 Cases were filed as free-fall cases whereby the Debtors' professionals did not have the requisite time or money to perform any of the work or planning that would normally occur prepetition. Indeed, my advisors did not have the opportunity to draft most of the first- and second-day motions until after the commencement of these cases.

11. Without approval of financing, I would have no choice but to seek to convert the Chapter 11 Cases to ones under Chapter 7. Assets would need to be liquidated because there would not be any funds to pay payroll, insurance, post-petition property taxes, and the like. My concern, of course, is that conversion to Chapter 7 would likely decrease the value available for all constituents and harm the community at large.

### III. EVENTS THAT HAVE TRANSPIRED SINCE THE FILING OF MY INITIAL DIP DECLARATION

#### A. Books and Records and Development of a Reliable Budget

12. As noted in my Initial DIP Declaration, the Debtors' books and records were being maintained by Continuum and those books and records were in the process of being transitioned to FTI. Initial DIP Decl. ¶ 40.[2] I can now report that I, through FTI, have complete control over the books and records with access to QuickBooks and backup information. What I have learned is that it appears that many of the books and records were not current, there were no budgets, and the Debtors' entire enterprise had not filed tax returns for several years. It is also important to note that none of SPE-Debtors maintained their own books and records. Prior to the Petition Date, all cash and invoices were upstreamed from the SPEs to the MOM Investcos and then back down to the SPEs for operations. FTI has also been analyzing the Debtors' books and records (and related

---

[2] I can also confirm that Jason Miller has been removed from all roles with Vgruppe, which is one of the Debtors' property managers. *See* Initial DIP Decl. ¶ 43.

5

backup information) to verify the contents therein and to update the draft budgets received based on the facts it has been able to ascertain since the outset of these cases and its review of records and discussion with the various property managers.

13. Indeed, the delay in presenting updated cash collateral budgets was not designed to create any pressure on any party, but rather, reflected deficiencies in the information that I initially received regarding the Debtors' operations and my inability to rely on the same. By way of one example, the budgets first presented to me simply took expenses for the last year and divided it evenly over the 12-month period, which does not appropriately account for payment obligations as those vary from time to time and, in these Debtors' cases, are seasonal. To be clear, Continuum has been cooperative in the process, answering questions raised by FTI and myself; but the budget needed to be built from scratch and went through an iterative process.

14. Upon receiving access to the Debtors' books and records, I estimated that it would take two to three weeks to fully analyze the contents therein and review the backup information to support projections. Given the dire circumstances of these cases, I committed to getting it done even faster. My colleagues increased the size of the FTI team and worked late into the night every night and over the weekend. I am now happy to report that we have cash flow projections on a property-by-property basis as well as an analysis of the necessary DIP sizing to run these Chapter 11 Cases (together, the "Budget"). To be sure, the analysis will undergo refinement over the next week or two and may change as additional information is uncovered, but the budgets as they now stand are directionally and functionally accurate. The Budget was filed on March 27, 2025, at Docket No. 135.

**B. Meeting with Secured Creditors**

15. As was previewed at the Initial DIP Hearing, the Debtors scheduled a call with the secured prepetition lenders and their counsel on March 26, 2025, to provide those parties with additional information regarding these Chapter 11 Cases, walk through the Budget, and answer questions. The delay in hosting that meeting was due to the analysis that needed to be completed prior to any substantive conversation among the parties. Fortunately, the Debtors' professionals were able to present the Budget as well as FTI's report on certain other issues (the "FTI Report") to these parties at the meeting. A true and correct copy of the FTI Report is attached hereto as **Exhibit A**.[3]

16. I believe the call was productive and we are addressing the concerns raised by those parties in real time. By way of one example, some of the Debtors are delinquent in insurance policy payments or have force-placed policies. The prepetition lenders expressed this concern, which I wholeheartedly understand and agree must be addressed. Accordingly, the Debtors have filed an emergency motion seeking authority to pay certain prepetition amounts owed on account of insurance policies as well as enter into new insurance policies to protect and preserve the Debtors' properties. Of course, payments related to this forthcoming motion are dependent on obtaining financing.

17. I also committed to having my team meet with each of the prepetition lenders for one-on-one discussions and permitted their counsel to reach out directly to me and members of the FTI team with any questions or concerns they have so that we could expedite addressing any issues.

---

[3] To be clear, the budgets presented in the FTI Report are identical to the Budget that was filed separately on the docket.

18.     I have asked these parties to consider entry into a further interim cash collateral order that extends the Debtors' use of cash collateral through, at least, the second day hearing set for April 15, 2025.  That will give the Debtors the additional time they need to come to an agreement on a longer-term plan for the use of cash collateral as well as gain approval of the DIP Motion, which will fund the Debtors' operations go-forward.

### C. Development of the Virtual Data Room

19.     Since gaining access to the Debtors' books and records, FTI has started to compile a VDR.  The VDR is absolutely necessary in order to attract financiers for these Chapter 11 Cases or purchasers of the Debtors' assets.  No matter whether the Debtors walk down a path of reorganization or a sale, the Debtors must provide all interested parties with extensive diligence related to the Debtors' operations and properties.  Such information includes, but is not limited to, insurance policies, title reports, rent rolls, cash flow statements, and other relevant and necessary financial data of the Debtors' operations and properties.  This information has already been requested (and required) by potential DIP lenders in order to provide binding offers to the Debtors.  Unfortunately, most of this information was not readily accessible and is in the process of being created or compiled.  While a lot remains to be done, I am hopeful that the VDR will be ready for use in 2-3 weeks.  The FTI team and all of my advisors are aware how mission critical this step is and are devoting significant resources and talent to accomplish it.

## IV.    OTHER DIP LOAN PROSPECTS

20.     Notwithstanding the fact that the Debtors had no reliable budgets until recently and no VDR available, as discussed in the Initial DIP Declaration at ¶ 10, the Debtors received interest from several parties seeking to provide the Debtors with a loan to fund these Chapter 11 Cases.  I, along with Robbin Itkin (the "Independent Manager"), fielded several calls from interested parties.

My overarching takeaway from those discussions is that no party is interested in a small, short-term subordinated loan. There is simply too much risk and not enough reward.

21. However, I learned from these discussions that prospective lenders would be interested in making a larger loan if the Debtors ran a sale and/or plan process and the Debtors had a VDR with all of the necessary information indicated above. Indeed, the Debtors have received two term sheets from potential lenders that were expressly conditioned upon such diligence and participation in an endgame for these Chapter 11 Cases. These two term sheets, which are confidential, have been shared with the prepetition secured lenders and the Honarkar Parties on a confidential basis, but have not been shared with Specialty DIP.

22. Immediately following the Initial DIP Hearing, the Independent Manager and I reached out to all four known interested DIP lenders (other than Specialty DIP). Each of the four was receptive to engaging further on potential loans. Two of these potential lenders committed to providing revised term sheets and the other two continued to evaluate providing a formal term sheet. The conversations were productive, but again, underscored my belief that no third-party was interested in submitting a short-term, subordinated, "no bells and whistles" loan.

23. While I have continued to discuss loan options with all parties who have expressed interest, no binding, actionable loan has been presented to the Debtors as of the filing of this Supplemental DIP Declaration, other than that of Specialty DIP. However, it is entirely possible that one of these potential lenders takes out Specialty DIP's loan (if approved) in short order. Negotiations continue and while it is doubtful that any will be ready to replace Specialty DIP's proposed loan by Monday's hearing, I believe that the Debtors will be able to take out and replace the Specialty DIP loan in the near future.

## V. INDEPENDENCE OF THE INDEPENDENT MANAGER AND CHIEF RESTRUCTURING OFFICER

24. As discussed in my Initial DIP Declaration at ¶¶ 36-37, when I agreed to serve as CRO, I demanded complete independence, with full authority to make decisions on behalf of the Debtors' estate. I also required that I could not be replaced or threatened with replacement for doing my job as CRO. To that end, I required an independent manager be appointed to whom I would report. The Independent Manager made similar demands for complete independence. These terms were non-negotiable and were agreed to by the Continuum.

25. Like Ms. Itkin, I take great pride in the career I had as an attorney and the good will I think I have built during that time. At all times, I believe I have acted in accordance with the highest ethical standards, which I hold incredibly dear and important, and would not compromise such ethics for this case or any other case.

## VI. NEXT STEPS

26. As detailed in my Initial DIP Declaration at ¶¶ 12-14, I envision these Chapter 11 Cases unfolding in three phrases. First, the Debtors need an initial short-term loan to stabilize the businesses and administer these Chapter 11 Cases and build the VDR. Second, the Debtors would utilize the VDR to bring in more substantial financing for these Chapter 11 Cases. Third, with longer-term financing in hand, the Debtors would proceed to an end-game—either a plan of reorganization or sale.

27. I have been clear with all parties that my goal is to get the Debtors out of Chapter 11 within four to six months. In order to accomplish this goal, I anticipate dual tracking both a plan and sale process so that the Debtors can pivot if one option or the other does not pan out, all in accordance with my fiduciary duties and in consultation with my advisors and the Independent Manager. Without a dual-process in place, I likely will not be able to get the prepetition secured

lenders on board, which is critical to the efficient administration and value-maximization of these cases

28. While I understand that one path or another may be preferred to one of the ownership groups or the other, I need to move forward in accordance with my fiduciary duties in a manner that will maximize value for these estates, whether or not it upsets one ownership or the other—all with the important proviso that I will not take any action that interferes with the underlying arbitration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: March 30, 2025

By:  */s/ Mark Shinderman*
Name:  Mark Shinderman
Title:  Chief Restructuring Officer

12140355v.4