# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOM CA Investco LLC, *et al.*,[1] | ) Case No. 25-10321 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 89** |
| | ) |
| | ) **Hearing Date: March 31, 2025** |
| | ) **at 11:00 a.m. (ET)** |
| | ) **Obj. Deadline: At or Before the Hearing** |

## OBJECTION OF BANC OF CALIFORNIA TO DEBTORS' MOTION AUTHORIZING POSTPETITION FINANCING

Banc of California files this objection ("Objection") to the Debtors' continued and revised DIP Motion.

### The DIP Motion Should Be Denied Unless The Entire DIP Loan Is Used For The Operations Of The Businesses And The Budget Is Clarified With A Commitment To Sell Property To Fund Operations

1.  Banc of California filed its previous objection to the DIP financing motion on the primary ground that there was no budget attached to the motion, and thus the DIP motion did not reflect how the proceeds of the DIP loan would be applied among the various operating properties. The only thing that was certain was that out of the $3.5 million secured DIP Loan,

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

$2.5 million would be reserved for the Debtors' professionals, and that the Debtors would also pay the DIP Lender's fees and expenses. Thus, the objection went on to note that there would be less than $1 million of DIP proceeds available to fund operating expenses, with absolutely: (1) no visibility as to how the funds would be allocated among the assets; (2) no visibility as to how long those funds will be able to keep the assets operating; (3) no assurance that there will be any further funding of the DIP Loan, and (4) "the distinct possibility that their cases may well crash and burn in the coming weeks." At the interim hearing last week, the Court authorized the Debtors to use up to $500,000 on only a super priority administrative basis.

2. Now the Debtors have filed a Budget [Docket 135]. Importantly, the Debtors are still trying to have $2.5 million of the $3.5 million secured DIP Loan reserved for professional fees, once again leaving less than $1 million of DIP Loan proceeds for operating expenses. <u>However, the Budget is severely deficient in that it does NOT clearly disclose in either the Supplemental Declaration of Mark Shinderman or their Reply brief how long the remaining $1 million of DIP Loan proceeds will last</u>. In fact, given that the Debtors received authority to use up to $500,000 of the DIP proceeds exclusively for operations at last week's interim hearing, it was quite possible that there is only $500,000 of the DIP Loan remaining today, as the Debtors state that the $500,000 interim DIP loan comes off the top of the $3.5 million commitment. The Debtors supplemental pleadings and Budget do NOT indicate how much of the $500,000 was used last week. However, in a conversation with the CRO and Independent Director late Saturday evening this weekend about our concerns raised herein, the CRO stated that last week the Debtors used $250,000 of the interim DIP Loan. Thus, this proposed DIP Loan now only has approximately $750,000 remaining for paying the operational expenses of all the properties. The CRO indicated that they would get back to us the next day, Sunday, March 30.

3. At the meeting held on Wednesday of last week among the CRO, FTI, the Debtors' professionals, and the secured lenders and their respective counsels, the current Budget was presented to the lenders for the first time. Mr. Kharasch asked the CRO if and how the $1 million DIP Loan that could be used for operating costs could last the 13 weeks as set forth in the Budget. The CRO responded that it could not last 13 weeks, and when pressed, the CRO responded that it might last 8 weeks. The CRO also indicated to Mr. Kharasch at that meeting that we should not expect the DIP Loan to increase beyond the $3.5 million, and confirmed that representation over this weekend.

4. However, a careful review of the Budget for each of the properties, which requires the reader (including this Court) to get out a calculator, indicates that during the first 2 weeks of the Budget through week ending April 4, the total "DIP need" (see the 2d to last line item of each Budget for the properties) adds up to $907,922. Thus, given that the remaining DIP Loan, if approved by this Court, that can be used for operating expenses is down to $750,000 or less, the Debtors do not have enough cash to get through this week ending Friday, April 4! When one adds up the additional "DIP need" of all the properties for the week through April 11, that adds an additional $746,492, making the total DIP need through April 11 $1,654,414.

5. Unfortunately, this Budget fails to clarify that the payment of $2.5 million of the DIP Loan to the Debtors' professionals results in the detriment of the estate. What this Budget and the Debtors' supplemental pleadings fail to disclose is that these cases will in fact crash and burn within a week, or at best, between 1-2 weeks. The fact that the reader needs a calculator to figure this out is frankly extremely distressing.

4898-2961-1309.2 68700.001

6. The CRO and the Debtors' professionals took on this representation fully knowing that there was no free and clear cash, a very hostile environment between the insiders, and most significantly, no dip lender giving them the usual carve out that not only funds professional fees for some period of time, but also funds the operations of the debtors for some extended period of time. Frankly, the undersigned counsel, which has filed countless chapter 11 debtor cases through the decades, almost certainly would not have filed these cases given those stated risks. In the CRO's first day declaration, the CRO includes a summary of the appraisals of all the properties, which shows about $166 million of equity. [Docket 11, pp. 10-12] That is undeniably a lot of equity, and it is clear the CRO and the professionals of the Debtors believe that at the end of the day, they will get paid, which is why they took on the risks. But now the CRO and his professionals are pleading poverty, and want to be paid in full as the case goes on to the detriment of the assets and creditors.

7. Banc of California has tried to be as cooperative as possible with the CRO. The bank ended up approving both the 1st and 2d interim cash collateral orders. But the bank cannot support this DIP Loan that needlessly put the estates' operations in certain failure. If the CRO is willing to have the entire DIP Loan used for operations, and shows the lenders a more accurate Budget of how long it will last, Bank of California may well support that kind of DIP Loan. Moreover, the Debtors should make a showing as to how these cases can proceed without a further DIP Loan, and selling some of the properties immediately to free up the substantial equity the CRO alleges is in the properties in order to fund this case, including the operations and the professional fees.

8. Today, on Sunday, the CRO and Independent Director got back to us about our concerns about the Budget deficiency, and informed us that they will be going back to this Court tomorrow at the hearing to reduce the $2.5 million of the DIP Loan reserved for attorneys' fees down to $1.70 million, which they think, along with some other revisions, may extend the DIP Loan through April 25-27, and that in the meantime they will continue negotiations with other dip lenders to get past that time period. Banc of California absolutely does not consent to that, given that the assured destruction of the businesses will just occur in a couple of more weeks.

9. Banc of California does not need this kind of a partnership with the CRO or the insiders. The bank is willing to get immediate relief from stay to both start a foreclosure proceeding now, with having to come back to this Court for relief to complete the foreclosure sale later, and immediate relief from stay to put in a receiver to preserve the bank's collateral, including funding that receiver.

10. But Banc of California thinks there may well be a middle ground as follow: (1) out of the interim DIP Loan of $3.5 million, the Debtors' professionals will get a reserve of $1 million for professional fees; (2) if the DIP Lender funds the additional $1.5 million upon entry of the final order, the professionals will get an additional reserve of $500,000 (we do not understand why the CRO thinks the DIP Lender is not liable for the additional $1.5 million upon entry of the Final Order, as the term sheet seems clear about that); (3) FTI must give assurance that this will fund operations through at least the end of June; (4) the CRO must continue setting up a data room for the sale of at least the Hotel Laguna and complete it by April 15; (5) if there is no additional DIP funding by a new dip lender by April 15 that provides for an additional runway to confirm a plan, then the CRO must file an application to employ a broker for the sale of at least the Hotel

4898-2961-1309.2 68700.001

Laguna and have that broker employed by April 25, and the property must be marketed started on April 26, for a closing within 90 days.

11.  The CRO also indicates that prior to the entry of the Final Order, the parties shall deliver definitive financing documentation governing the DIP Loan (the "DIP Documents"). [Docket 149-1, p. 4]  Why those DIP Documents have not been already drafted and circulated is yet another mystery.  Banc of California needs to see those DIP Documents as far in advance of the hearing as possible.

12.  Finally, neither the Budget nor any declaration filed with respect to the DIP hearing indicate why the DIP Loan needs to be approved by March 31, as opposed to several days later, especially given that $250,000 of the interim DIP Loan still remains.  At most, this hearing should be briefly continued to deal with the concerns raised in this objection.

Dated:  March 30, 2025

/s/ James E. O'Neill
PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (admitted *pro hac vice*)
Ira D. Kharasch (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: joneill@pszjlaw.com
             ecorma@pszjlaw.com

*Counsel for Banc of California*