**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 394 |
| | Hearing Date: June 10, 2025 at 10:00 a.m. (ET)<br>Objection Deadline: May 27, 2025 at 4:00 p.m. (ET) |

**OBJECTION OF MOHAMMAD HONARKAR AND 4G WIRELESS, INC. TO DEBTORS' MOTION FOR ORDER (I) ESTABLISHING PROCEDURES FOR THE (A) SALE OF REAL ESTATE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF NON-RESIDENTIAL REAL PROPERTY; AND (II) GRANTING RELATED RELIEF**

Mohammad Honarkar and 4G Wireless, Inc. (collectively, the "**Honarkar Parties**"), by and through their undersigned counsel, hereby file this objection (this "**Objection**") to the *Debtors' Motion for Order (I) Establishing Procedures for the (A) Sale of Real Estate Free and Clear of all Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts and Unexpired Leases of Non-Residential Real Property; and (II) Granting*

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

103746785.4

*Related Relief* [Docket No. 394] (the "**Sale Procedures Motion**")[2] filed by the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). In support of this Objection, the Honarkar Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1. It has become clear to the Honarkar Parties that the Debtors do not intend, and never intended, to work in good faith on the terms of a chapter 11 plan of reorganization, which the Honarkar Parties continue to believe is the most value maximizing path forward in these Chapter 11 Cases. Instead, the Debtors' sole goal is to break apart the real estate enterprise created by the Honarkar Parties, and stolen by the Continuum Parties, piecemeal through fire sales that are likely to undervalue the Properties while causing the Debtors' estates to continue to incur substantial costs. Ironically, breaking apart the enterprise is exactly what the Debtors wrongly accused the Honarkar Parties of trying to do in the Debtors' opposition to the Honarkar Parties' request for stay relief. Now, and despite the alternatives that the Honarkar Parties have worked diligently to provide to the Debtors, the Debtors apparently have decided that the only way to "maximize value" is a death-by-a-thousand-cuts approach that will have the direct effect of undermining the Honarkar Parties' well-established rights to rescission and to retake ownership of the entire enterprise, once again having the real property assets of the Honarkar Parties forcibly removed from their control. It took the Honarkar Parties decades to amass the real estate portfolio that is at the heart of the Debtors' business, it took the Continuum Parties less than four years to run this

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Procedures Motion.

business into the ground, and it took the Debtors a matter of mere months to forestall any opportunity for the Honarkar Parties to right the Continuum Parties' wrongs.

2. As this Court is aware, the Honarkar Parties provided the Debtors with a draft plan term sheet that contemplated, among other things, the Honarkar Parties serving collectively as the plan sponsor and Genesis Credit LLC ("**Genesis**") serving as the exit financing lender (the "**Plan Term Sheet**"). The Plan Term Sheet included $200 million in contingent exit financing and contemplated the Debtors immediately selling three (3) properties to fund the Chapter 11 Cases. As this Court is also aware, the Honarkar Parties have already passed along not one but two substantial written offers for the purchase of one of these properties from independent potential third-party purchasers. The Honarkar Parties also continue to work to connect the Debtors with truly independent sources for further postpetition financing. Unfortunately, none of these efforts by the Honarkar Parties were able to dissuade the Debtors from their undying desire to run a "fulsome" sale process to "maximize value."

**THE DEBTORS CANNOT SELL WHAT THEY DO NOT OWN.**

3. The Honarkar Parties believe that any need that there may have been for any expedited sales of the Properties to fund these Chapter 11 Cases has passed, and that any sales can and should proceed on a more traditional sale timeline and through a more standard bankruptcy sale process, if at all. These Chapter 11 Cases simply are not run-of-the-mill real estate cases where quick sales may be appropriate, and significant tax exposure concerns continue to hang over any potential sales that the parties will need time to address. Given the background and current circumstances of the Chapter 11 Cases, including the recently-commenced Adversary Proceeding (as defined below), the Sale Procedures Motion should be denied because the Debtors cannot sell what they do not own.

3

4. The Sale Procedures Motion should be denied because the Debtors cannot sell any of the Properties, let alone free and clear of the Honarkar Parties' interests in each Property. As set forth in the Honarkar Parties' Complaint, as a result of the Continuum Parties fraud committed against the Honarkar Parties, the Debtors are holding all of the Properties in constructive trust for the benefit of the Honarkar Parties. Thus, the Honarkar Parties are the true owners of each Property, and the Properties never became property of the bankruptcy estate. Accordingly, the Debtors cannot sell the Properties, whether pursuant to section 363 of the Bankruptcy Code or otherwise.

## BACKGROUND

### A. The Chapter 11 Cases

5. On February 28, 2025, MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC (collectively, the "**MOM Investcos**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

6. On March 10, 2025, nineteen of the MOM Investcos' subsidiaries (collectively, the "**SPEs**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Chapter 11 Cases of each of the MOM Investcos and the SPEs are being jointly administered under Case No. 25-10321-BLS. *See* Docket No. 56.

7. On March 31, 2025, Terra Laguna Beach, Inc. ("**Terra**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. Terra's Chapter 11 Case is being

jointly administered with the Chapter 11 Cases of the other Debtors under Case No. 25-10321-BLS on an interim basis.[3] *See* Docket No. 220.

8.   The Debtors are currently operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has yet been appointed in these Chapter 11 Cases.

### B.   The Partial Final Award and Adversary Proceeding

9.   On May 23, 2025, the Arbitrator issued the Partial Final Award (the "**Partial Final Award**"). The Partial Final Award incorporates the Partial Interim Award [Docket No. 27-1]. As referenced in the Partial Final Award, the Arbitrator's Ruling on Motion for Attorney Fees and Costs (the "**Attorney Fee Ruling**") was filed contemporaneously with the Partial Final Award and entitles the Honarkar Parties' to recover their attorneys' fees and costs against the Respondents in the amount of $8,303,510.25 in attorney fees plus $893,916.06 in costs, for a total of $9,197,426.31. A true and correct copy of the Partial Final Award and the Attorneys Fee Ruling are attached hereto as Exhibit A and Exhibit B, respectively.

10.   On May 12, 2025, the Arbitrator issued an order in the Arbitration making it clear that the Arbitration Award determined that Terra and various other entities are not now and never have been owned by the MOM Investcos (the "**Arbitrator Clarification**"). Accordingly, Terra is not and never was an affiliate of the MOM Investcos. A true and correct copy of the Arbitrator Clarification is attached hereto as Exhibit C.

11.   On May 27, 2025, the Honarkar Parties filed the *Complaint for Declaratory Judgment, Imposition of Constructive Trust, and Turnover of Property* [Docket No. 1] (the

---

[3] On May 12, 2025, the Arbitrator issued an order in the Arbitration making it clear that the Arbitration Award determined that Terra and various other entities are not now and never have been owned by the MOM Investcos. Accordingly, Terra is not and never was an affiliate of the MOM Investcos.

5

"**Complaint**") against the MOM Investcos and the SPEs commencing an adversary proceeding captioned as *Honarkar v. MOM CA Investco, LLC, et al.,* Adv. No. 25-50959 (the "**Adversary Proceeding**"). A true and correct copy of the Complaint is attached hereto as Exhibit D.

12. By the Complaint, the Honarkar Parties are seeking a declaratory judgment under section 541(d) of the Bankruptcy Code against the MOM Investcos (Count I), a declaratory judgment under section 541(d) of the Bankruptcy Code against the SPEs (Count II), imposition of a constructive trust upon the membership interests in the SPEs, the Properties and turnover of the proceeds of any and all sales of the Properties (Count III), and turnover by the Debtors of any legal title they possess in the membership interests and/or the Properties to the Honarkar Parties and the proceeds of any and all sales of the Properties (Count IV).

### C.    The Sale Procedures Motion

13. On May 13, 2025, the Debtors filed the Sale Procedures Motion seeking, *inter alia*, approval of certain procedures pursuant to which the Debtors may sell some or all of the Properties, which exclude only the Tesoro Property (as defined in the *Motion of Debtors for Entry of Orders (A)(I) Approving Bidding Procedures for Tesoro Property, (II) Scheduling the Bid Deadlines, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of Tesoro Property, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of Tesoro Property Free and Clear of All Interests, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 280] (the "**Tesoro Sale Motion**")).[4]

---

[4] The Honarkar Parties expressly reserve and preserve all rights to object to any proposed sale of the Tesoro Property, in addition to the other Properties.

14. Pursuant to the Debtors' proposed Sale Procedures, they would file and serve a Sale Notice just fourteen (14) days before the closing date of a proposed sale of the applicable Property, with objections due just seven (7) days thereafter.

15. According to the Debtors, these "streamlined" procedures are necessary because "the Debtors may lose potential purchasers, either through attrition caused by delay or because sales may not close in time to meet a buyer's financing contingencies." Sale Procedures Motion ¶ 19. The Debtors are also "confident" that the proposed Sale Procedures will achieve "maximum value" for the Properties because engaging in the ordinary "bankruptcy auction process … might … have the effect of discouraging certain interested buyers and adding cost and delay to the sale process." Sale Procedures Motion ¶ 31.

**OBJECTION**

16. The Debtors have failed to meet their burden for the approval of their proposed Sale Procedures. Bankruptcy Rule 2002 requires at least twenty-one (21) days' notice by mail of any proposal to sell property of the estate other than in the ordinary course of business "unless the court, for cause, shortens the time or orders another method of giving notice." Fed. R. Bankr. Proc. 2002(a)(2). Here, the Debtors have not shown any cause for shortening the notice period for the approval of any sales. The Debtors rely only on their stated concern that a longer sale process "may" cause them to lose potential purchasers and their "confidence" that the proposed Sale Procedures "might" result in value maximizing sales. However, the Debtors' unsubstantiated concerns and unsupported confidence falls far short of the Debtors' burden to prove cause.

17. Contrary to the Debtors' belief, the proposed Sale Procedures are in fact likely to lead to value destruction, not maximization. Unlike a standard bidding procedures motion that this Court is all too familiar with, the Sale Procedures Motion does not seek to set any threshold or

103746785.4

parameters as to what constitutes a qualified bid for any of the Properties or any deadline or even a specific timeframe for the solicitation of bids or selection of successful bidders and back-up bidders, to require any bidders to submit a good faith deposit, or to schedule any open or public auction on a specified date. The proposed Sale Procedures also would not require the Debtors to show or establish the financial wherewithal of any potential purchaser, whether the potential purchaser is an insider, whether the potential purchaser is a Continuum Party or a party related to the Continuum Parties, the ability of the potential purchaser to close any sale, or whether the potential purchaser has the requisite corporate authority to conduct the transaction. The Debtors further would not need to show how the applicable Property was marketed, for how long the Property was marketed, how many bids or offers were received for the Property, or why the Debtors chose the particular purchaser for the Property. Instead, the Sale Procedures would allow the Debtors to simply choose any purchaser and file a bare bones notice of the proposed sale just two weeks before the proposed closing date.

18.   If the Debtors were required, as they should be, to comply with this Court's local rules, they would have to disclose all of the information set forth above. *See* Local Rule 6004-1(b). The concerns regarding any sales to insiders (or entities affiliated with the Debtors' insiders) is even greater here where the Honarkar Parties anticipate that the Continuum Parties (the same entities and individuals behind the disastrous situation at the Hotel Laguna described below) would attempt to insert themselves into any sale process, even potentially covertly. Indeed, this Court is already well-aware of the Continuum Parties' attempts to conceal their involvement in these Chapter 11 Cases given the initial disclosure issues with respect to the DIP Loan. Moreover, the Honarkar Parties suspect that the Continuum Parties will use strawmen to once again steal these Properties from their rightful owners – the Honarkar Parties.

8

103746785.4

19. At a bare minimum, the Debtors should be required to comply in full with the Local Rules of the United States Bankruptcy Court for the District of Delaware with respect to any sale contemplated in these Chapter 11 Cases.

20. Moreover, at the same time that the Debtors are seeking to push through their unnecessary and unreasonable Sale Procedures for the Properties, the Debtors are also actively allowing the Properties to precipitously drop in value. The Properties include the Hotel Laguna, a historic oceanfront hotel in Laguna Beach. While the hotel portion of the Hotel Laguna is under construction, there are multiple restaurants and a beach club operated out of the Hotel Laguna. Despite the findings in the Arbitration, the Debtors have permitted entities and individuals affiliated with the Continuum Parties to continue to manage and oversee the Hotel Laguna as well as most of the other Properties. The Honarkar Parties implored the Debtors not to use the Continuum Parties' management company, to no avail. The Debtors' his was clearly a mistake, as there is now an ongoing dispute with the California Coastal Commission that may result in an enforcement action against the Hotel Laguna based on allegations that the Hotel Laguna is obstructing public beach access in violation of the California Coastal Act of 1976. The California Coastal Commission reportedly sent a letter to the Hotel Laguna addressing these alleged violations and giving it until May 23, 2025 to provide evidence that the Hotel Laguna is in compliance with the law after which the Hotel Laguna may face a fine of up to $11,250 per day. The alleged violations have been reported by multiple local news outlets and have been the subject of numerous social media posts. Thus, the Hotel Laguna has already suffered significant reputational harm and may face monetary penalties and other financial harm, all of which has likely decreased and may continue to decrease the current sale value of the Hotel Laguna. *See, e.g.,* Moná Thomas, *A Luxury California Hotel Faces Daily Fines Over $11,000 for Privatizing*

103746785.4

*Public Beach Near Resort*, People (May 19, 2025, 3:36 PM), https://people.com/luxury-california-hotel-faces-daily-fines-for-privatizing-public-beach-near-resort-11737806; Dashel Pierson, *Hotel Laguna Faces Daily $11k Fine for Beach Privatization*, Surfer (May 19, 2025, 12:12 PM)**,** https://www.surfer.com/news/hotel-laguna-faces-fine-beach-privatization; Zach Boetto, *Laguna Beach Hotel Faces Backlash from State and Residents over Private Beach Signs*, KCAL News (May 16, 2025, 4:35 PM), https://www.cbsnews.com/losangeles/news/laguna-beach-hotel-faces-backlash-from-state-and-residents-over-private-beach-signs/; Laylan Connelly & Erika I. Ritchie, *Coastal Commission Sent Notice to Hotel Laguna for Obstructing Public Beach,* The Orange County Register (May 16, 2025, 4:29 PM), https://www.ocregister.com/2025/05/16/coastal-commission-sent-notice-to-hotel-laguna-for-obstructing-public-beach/.

21. The current condition of the Hotel Laguna and ongoing dispute with the California Coastal Commission exemplifies the fact that any sale process while the Continuum Parties continue to have their hooks in the Debtors and in the Properties would only be value destructive, not value maximizing. The Debtors could have easily have rectified this situation by replacing the management company owned and operated by the Continuum Parties. The Honarkar Parties made that request in the very early stages of these Chapter 11 Cases. However, the Debtors were determined to remain embedded with the Continuum Parties and are now facing the consequences at the Hotel Laguna and other properties.

22. Furthermore, the Debtors' proposed Sale Procedures contemplate potentially dozens of separate sales involving at least eight different brokers, each with separate objection deadlines and, if applicable, hearing dates. Thus, from now until September 15, 2025 (*i.e.*, the Debtors' anticipated outside date for closing all of the different sales), there could be dozens of separate sale objections and sale hearings, which would inject unnecessary chaos into these

103746785.4

Chapter 11 Cases. A more standard and reasonable sale process with predetermined dates and deadlines would avoid these issues. Moreover, closing one sale is far superior to closing up to twenty (20) different sales with potentially 20 different purchasers.

23.     Even more problematic, is that the Debtors are publicly listing such Properties for sale at fire sale values. The Honarkar Parties know the true value of these Properties. The process being undertaken by the Debtors is far from value maximizing. The Honarkar Parties reserve all of their rights to contest each and every sale, and the marketing process utilized with respect to each sale, to prove that the sale process was not properly undertaken and that the Debtors did not utilize brokers with the appropriate knowledge of the local real estate market and industry players to garner more interest. This is despite the fact that the Honarkar Parties remain steadfast that the Debtors cannot sell what they do not own, even at fire sale values.

24.     Lastly, on top of being value destructive, allowing the sales of the Properties to proceed now pursuant to the Debtors' proposed Sale Procedures would have the direct effect of undermining the Honarkar Parties' rights and remedies awarded in the Arbitration. As the Court and the Debtors know, the Honarkar Parties have the right to elect to rescind all of the agreements for the joint venture for which the MOM Investcos were formed and retake ownership of the SPEs and, by extension and as the sole assets held by the SPEs, of the Properties. As set forth in the Complaint, given the fraud findings in the Arbitration, the MOM Investcos are holding the SPEs and the Properties in constructive trust for the benefit of the Honarkar Parties. Any sale process, and particularly any sale process as expedited as the Debtors are currently proposing, would effectively leave the Honarkar Parties with nothing to retake upon exercising rescission, if that is the remedy that the Honarkar Parties ultimately elect. Despite repeatedly representing to this Court that they hold the Arbitrator's findings as "sacrosanct" and that they do not intend to interfere with

103746785.4

the Arbitrator's award, the Debtors apparently, and paradoxically, have no qualm with proceeding with a value-destructive sale process that they know will impair and prejudice the Honarkar Parties' rescission rights. And this is all after the Honarkar Parties have already presented the Debtors with an alternative through the proposed Plan Term Sheet.

25. It is well-established that neither debtors nor their estates have any greater interest in property upon the commencement of a bankruptcy case than they had immediately prior to the commencement of the bankruptcy case. *See, e.g., Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy. … A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either."); *In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997) (noting that a debtor's estate has "no greater rights in property than those held by the debtor prior to the bankruptcy"); *Long Term Disability Plan of Hoffman-La Roche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 244 (Bankr. D.N.J. 1989) (stating that pursuant to 11 U.S.C. § 541 "the estate can have no greater right in property than the debtor had"); *TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.)*, 158 B.R. 583, 585 (D. Del. 1993) ("To the extent that an interest is limited in the hands of the debtor, it is, therefore, equally limited in the hands of the estate. The rule is elementary that the estate succeeds to only the title and rights in the property that the debtor possessed.") (internal quotations omitted).

26. It also is well-established that property stolen or precured by fraud does not become property of the bankruptcy estate. *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930 (6th Cir. 2000) (finding that property embezzled by the debtor "was never property of the debtor's estate"); *U.S. v. Motor Freight Exp. (In re MotorFreight Exp.)*, 91 B.R. 705, 712 (Bankr. E.D. Pa. 1988) ("Clearly, property stolen or improperly received by a debtor … cannot be retained by a debtor on

12

the ground that it is property of the estate."); *In re Dynamic Techs. Corp.*, 106 B.R. 994, 1005 (Bankr. D. Minn. 1989) (stating that, as a general rule, "stolen property does not become property of the estate").

27.     Furthermore, courts in the Third Circuit have held that, where property is held by a debtor in trust, whether an express or a constructive trust, that property is not and does not become property of the debtor's estate. *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 313 (3d Cir. 2013) ("Section 541(d) reiterates the general principle that where the debtor holds bare legal title without any equitable interest, ... the estate acquires bare legal title without any equitable interest in the property."); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) ("[D]ebtors do not own an equitable interest in property they hold in trust for another, and … therefore funds held in trust are not property of the estate.") (cleaned up); *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); *Mullins v. Burtch (In re Paul J. Paradise & Assocs., Inc.)*, 249 B.R. 360, 366 (D. Del. 2000) ("[W]here the debtor holds particular real property in constructive trust for another as a result of fraud, § 541(d) would exclude the constructive trust beneficiary's equitable interest in the property from the estate."); *In re Edison Bros., Inc.*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) ("[C]ourts have concluded that property which a debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy."); *In re DeLauro*, 207 B.R. 412, 416 (Bankr. D.N.J. 1997) ("The Third Circuit has recognized that Congress intended that § 541(d) would apply to exclude [from property of the estate] not only the property of express trusts but also property subject to constructive trusts.").

13

28. In sum, the Sale Procedures Motion should be denied because the Debtors do not own the Properties and therefore cannot sell such Properties, the proposed Sale Procedures are unreasonable, unnecessary, and will only further devalue the Properties to the detriment of the Honarkar Parties and all other parties in interest in these Chapter 11 Cases.

**NO WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)**

29. The Debtors have requested that any order approving any sale include waivers of the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d) in order to facilitate expeditious closings of the Properties. The Honarkar Parties oppose any waiver of the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The stay of execution as provided by the Bankruptcy Code is sacrosanct to protect creditors from injustice and afford them the opportunity to protect their rights on appeal. To the extent that any sales are approved in these Chapter 11 Cases, there should absolutely not be a waiver of the requirements of Bankruptcy Rules 6004(h) and 6006(d).

**RESERVATION OF RIGHTS**

30. The Honarkar Parties fully reserve and preserve all of their rights with respect to the Sale Procedures Motion, the proposed Sale Procedures, and any and all documents related thereto, including, without limitation, the Honarkar Parties' rights to assert further and/or additional objections to the Sale Procedures Motion and/or the proposed Sale Procedures and/or to object to any and all proposed sales of any of the Properties.

31. Finally, to the extent any assets are sold out of the Debtors' estates, whether in connection with the Sale Procedures Motion or otherwise, the Honarkar Parties fully reserve all rights to include the amounts of such sales in their calculation of damages that will come out of the Arbitration Award. Nothing in these Chapter 11 Cases can or should be deemed to mean or

imply that the Honarkar Parties have consented to the sale of any assets and/or waived any of their rights in the Arbitration, including, without limitation, with respect to the amount or calculation of damages. The accounting and ultimate damages award to be issued by the Arbitrator will dictate the amount of damages due to the Honarkar Parties and no actions taken in these Chapter 11 Cases constitute a waiver of such rights and remedies in the Arbitration.

**WHEREFORE**, the Honarkar Parties respectfully request that the Court (i) deny approval of the Sale Procedures Motion; and (ii) grant such other and further relief that the Court deems necessary or appropriate.

Dated: May 27, 2025
       Wilmington, Delaware

**POLSINELLI PC**

_/s/_

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen A. Smith (Del. Bar No. 7456)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sasmith@polsinelli.com

-and-

Elisa Hyder (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 267-3001
Facsimile: (215) 267-3002
ehyder@polsinelli.com

*Counsel to Mohammad Honarkar and 4G Wireless, Inc.*

103746785.4