**<u>Exhibit D</u>**

**Complaint**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| Mohammad Honarkar and 4G Wireless, Inc., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 25-_____ |
| MOM CA Investco LLC, MOM AS Investco LLC, MOM BS Investco LLC, Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Duplex at Sleepy Hollow, LLC, Cliff Drive Properties DE, LLC, 694 NCH Apartments, LLC, Heisler Laguna, LLC, Laguna Festival Center, LLC, 891 Laguna Canyon Road, LLC, 777 AT Laguna, LLC, Laguna Art District Complex, LLC, Tesoro Redlands DE, LLC, Aryabhata Group LLC, Hotel Laguna, LLC, 4110 West 3rd Street DE, LLC, 314 S. Harvard DE, LLC, Laguna HI, LLC, Laguna HW, LLC, The Masters Building, LLC, and 837 Park Avenue, LLC, | |
| Defendants. | |

---

[1]The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

## COMPLAINT FOR DECLARATORY JUDGMENT, IMPOSITION OF CONSTRUCTIVE TRUST, AND TURNOVER OF PROPERTY

Mohammad Honarkar ("**Honarkar**") and 4G Wireless, Inc. ("**4G**" and together with Honarkar, the "**Honarkar Parties**" or "**Plaintiffs**"), by and through their undersigned counsel, hereby bring this adversary complaint (this "**Complaint**") for declaratory judgment, imposition of a constructive trust, and turnover of property against: (i) Defendants MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC (collectively, the "**MOM JV Entities**"), and (ii) Defendants Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Duplex at Sleepy Hollow, LLC, Cliff Drive Properties DE, LLC, 694 NCH Apartments, LLC, Heisler Laguna, LLC, Laguna Festival Center, LLC, 891 Laguna Canyon Road, LLC, 777 AT Laguna, LLC, Laguna Art District Complex, LLC, Tesoro Redlands DE, LLC, Aryabhata Group LLC, Hotel Laguna, LLC, 4110 West 3rd Street DE, LLC, 314 S. Harvard DE, LLC, Laguna HI, LLC, Laguna HW, LLC, The Masters Building, LLC, and 837 Park Avenue, LLC. (collectively, the "**SPEs**" and together with the MOM JV Entities, "**Defendants**"),[2] and allege as follows:

## NATURE OF THE ACTION

1.      By this action, Plaintiffs seek entry of a judgment declaring that (i) Defendants and their estates have no equitable or beneficial ownership interest in certain membership interests and real property currently held by Defendants, (ii) Defendants hold such interests and real property in trust for the benefit of Plaintiffs, and (iii) Defendants are obligated to immediately transfer any remaining legal title they may have to Plaintiffs.

2.      On June 8, 2021, the MOM JV Entities were created through a joint venture (the "**Joint Venture**") between and among Plaintiffs, on the one hand, and limited liability companies

---

[2] Collectively, the MOM JV Entities and the SPEs comprise the debtors and debtors-in-possession in the Chapter 11 Cases (the "**Debtors**").

102857361.13

created by Continuum Analytics, Inc. ("**Continuum**"), Mahender Makhijani ("**Makhijani**"), on the other hand.[3] As part of their contribution to the Joint Venture, Plaintiffs transferred to the newly-formed MOM JV Entities their membership interests in various limited liability companies, including nearly all of SPEs, each of which holds title to valuable commercial real estate.

3.    The Joint Venture was doomed from the start and in early 2023, Plaintiffs discovered that the Continuum Parties had committed numerous acts of fraud and misconduct against Plaintiffs, both before and after the Joint Venture was formed. Accordingly, Plaintiffs commenced an arbitration with JAMS on April 25, 2023 (the "**Arbitration**"),[4] asserting, among other things, claims for fraudulent inducement, breach of contract, and declaratory relief.  Plaintiffs sought, *inter alia*, to rescind the transactions creating the Joint Venture, thus returning the membership interests in the SPE's to Plaintiffs.

4.    The Honorable David A. Thompson, a former Associate Justice with the California Court of Appeals, was designated as the arbitrator (the "**Arbitrator**"). The Arbitration included extensive written and oral discovery, pre- and post-hearing briefing, and culminated in a three-week-long evidentiary hearing held from June 24, 2024, through July 12, 2024, after which all parties confirmed there was no further evidence for consideration. The record in the Arbitration is now closed.

---

[3] As used herein, the term "**Continuum Parties**" shall refer, collectively, to Makhijani, Deba Shyam ("**Shyam**"), Jason Miller, Andrew Stupin, Bhajneet Singh Malik, Continuum, MOM CA Investor Group LLC ("**MOM CA Member**"), MOM AS Investor Group LLC ("**MOM AS Member**"), MOM BS Investor Group LLC ("**MOM BS Member**," and together with MOM CA Member and MOM AS Member, the "**MOM Members**"), MOM CA Manager LLC ("**MOM CA Manager**"), MOM AS Manager LLC ("**MOM AS Manager**"), and MOM BS Manager LLC ("**MOM BS Manager**," and together with MOM CA Manager and MOM AS Manager, the "**MOM Managers**").

[4] As used herein, the term "**Arbitration**" shall refer to the JAMS arbitration proceeding captioned as *Honarkar v. Makhijani*, No. 5220003126, as consolidated with the arbitration proceeding captioned as *MOM AS Investco LLC v. Honarkar*, No. 5200001122.

5.     The Arbitrator issued that certain *Partial Interim Award* entered in favor of Plaintiffs on February 21, 2025 in JAMS Arbitration No. 5220003126 (the "**Partial Interim Award**")[5], in which the Arbitrator found, among other things, that Makhijani, Continuum, and the MOM Members fraudulently induced Plaintiffs into signing the agreements for the Joint Venture and that the MOM Members and MOM Managers breached their obligations under the MOM JV Entities' operating agreements. The Partial Interim Award entitles Plaintiffs to elect either compensatory damages or rescission of the operating agreements and other Joint Venture agreements in addition to restitution and consequential damages, amongst other remedies. A true and correct copy of the Partial Interim Award is attached hereto as Exhibit 1.

6.     Just one week later, on February 28, 2025, the MOM JV Entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court. On March 10, 2025, the SPEs filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court, as well.

7.     On May 23, 2025, the Arbitrator issued the Partial Final Award (the "**Partial Final Award**"). The Partial Final Award incorporates the Partial Interim Award. As referenced in the Partial Final Award, the Arbitrator's Ruling on Motion for Attorney Fees and Costs (the "**Attorney Fee Ruling**") was filed contemporaneously with the Partial Final Award and entitles the Honarkar Parties' to recover their attorneys' fees and costs against the Respondents in the amount of $8,303,510.25 in attorney fees plus $893,916.06 in costs, for a total of $9,197,426.31. True and correct copies of the Partial Final Award and Attorney Fee Ruling are attached hereto as Exhibit 2 and Exhibit 3, respectively.

---

[5] Capitalized terms not defined in this Complaint have the meaning given to such terms in the Partial Interim Award, as defined herein.

8.     Under California law, Defendants do not currently have an equitable or beneficial ownership interest in the SPEs' membership interests or the real estate owned by the SPEs. Defendants hold such assets in trust for Plaintiffs' benefit.

9.     Accordingly, Defendants are entitled to the immediate turnover of the Investco Membership Interests and the Real Property (including any Sale Proceeds (as defined herein)), and Defendants must transfer any remaining legal title they may have to Plaintiffs.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory predicates for the relief sought in this complaint are 11 U.S.C. §§ 105(a) and 541(d) of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

13.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order or judgment by this Court in connection with this Complaint to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

14.     Plaintiff Mohammad Honarkar is an individual with his principal place of residence in Orange County, California.

15.     Plaintiff 4G Wireless, Inc. is a California corporation with a principal place of business located at 303 Broadway Street 104-155, Laguna Beach, CA, 92651. Honarkar wholly owns and controls 4G.

5

16.     Defendants MOM CA Investco LLC, MOM AS Investco LLC, MOM BS Investco LLC, Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Duplex at Sleepy Hollow, LLC, Cliff Drive Properties DE, LLC, 694 NCH Apartments, LLC, Heisler Laguna, LLC, Laguna Festival Center, LLC, 891 Laguna Canyon Road, LLC, 777 AT Laguna, LLC, Laguna Art District Complex, LLC, Tesoro Redlands DE, LLC, Aryabhata Group LLC, Hotel Laguna, LLC, 4110 West 3rd Street DE, LLC, 314 S. Harvard DE, LLC, Laguna HI, LLC, Laguna HW, LLC, The Masters Building, LLC, and 837 Park Avenue, LLC are Delaware limited liability companies with their principal place of business located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

## FACTS COMMON TO ALL COUNTS

### A.     Honarkar builds his business and real estate portfolio.

17.     Honarkar moved to the United States from Iran in the mid 1980's and started a small cell phone business. That small business ultimately blossomed into 4G—a tremendously successful enterprise with 160 stores across five states. Although Honarkar sold the business assets of 4G to Verizon Wireless in January 2016, he retained his 100% ownership of 4G.

18.     Honarkar used the proceeds from the Verizon sale to invest in luxury commercial real estate across Laguna Beach, Palm Desert, and surrounding areas. These properties were purchased in both his individual name, and also through 4G, which held them through various special purpose limited liability companies.

### B.     The Honarkar Parties are fraudulently induced to join the Joint Venture.

#### a.     Honarkar's financial distress.

19.     While Honarkar enjoyed early success with his real estate pursuits, the 2020 COVID-19 pandemic severely affected the Honarkar Parties' operations and, ultimately, Honarkar's cash flow from the properties owned by 4G. At the same time, Honarkar was also

6

involved in a contentious divorce, which resulted in him entering into a stipulated judgment whereby he was required to pay his former wife $17.5 million by June 12, 2021.

20.    Further compounding these pressing financial issues, Honarkar also had a $195 million loan from LoanCore Capital ("**LoanCore**") secured by the majority of Honarkar's real estate assets (the "**LoanCore Loan**") coming due, which Honarkar had also personally guaranteed. Unfortunately, Honarkar was not able to make a required balloon payment under the loan, which went into default. *See id.* at 5-6.

21.    In January 2021, at the request of Honarkar's wife, Douglas Wilson was appointed received over the properties that secured the LoanCore Loan. Shortly thereafter, DIG PFSS LBCP Holding Company LLC purchased the LoanCore Loan and took swift action to foreclose on the properties, with foreclosures scheduled to commence on June 15, 2021.

###### b.    Honarkar's search for funding leads him to Makhijani and Continuum.

22.    With foreclosures looming and a $17.5 million payment due in June 2021 to his former wife, Honarkar began searching for potential financing and investment opportunities that could provide him with urgently-needed cash at a time of both global and personal financial distress.

23.    One of the funding sources he considered was Nano Banc ("**Nano**"), one of Honarkar's previous lenders. Through this lending relationship, Honarkar was familiar with Nano's then-Chief Credit Officer, Anthony Gressak ("**Gressak**"). Gressak introduced Honarkar to Makhijani and Continuum, each of whom have deep ties to Nano.

24.    On May 19, 2021, Nano provided Honarkar with a letter of intent for a $150 million loan to pay off the LoanCore Loan. But while Nano, though Gressak, was leading Honarkar to believe that funding was imminent, the reality at the bank was much different. Indeed, Daniel F. Patrick, Nano's Person Most Knowledgeable witness in the Arbitration, tested that $150 million

was "well beyond the bank's legal lending limit for a single loan" and that Nano "never would have approved Mr. Honarkar for a $150 million loan[.]"

25.     At the same time he was negotiating a potential loan from Nano, Honarkar was also discussing the potential Joint Venture terms with Makhijani and Continuum. Notably, on May 20, 2021, just **one day** after it provided Honarkar with the letter of intent for the (illusory) $150 million loan, Nano provided Shyam with a letter of intent for a $20 million loan (the "**Nano Loan**") to be made to the MOM JV Entities and secured by (i) an assignment of membership interests in 689 South Coast Hwy LLC, Laguna HI LLC, and the Masters Building LLC and (ii) deeds of trust encumbering properties held by these limited liability companies. *At the time the letter of intent for the Nano Loan was conveyed to Shyam, the properties were wholly owned by the Honarkar Parties, the MOM JV Entities did not exist, and there was no binding agreement in place between the Honarkar Parties and the Continuum Parties to even form the MOM JV Entities.*

26.     On May 24, 2021, and with time running down until the foreclosures began and his former wife's settlement payment came due, the Honarkar Parties and Continuum entered into a term sheet to form the Joint Venture. The term sheet contemplated that the Honarkar Parties would contribute their interests in the subsidiary limited liability companies that held some, but not all, of their real estate portfolio, and Continuum would provide an initial capital contribution of $35 million of "cash equity," half of which was always intended to be used to pay off Honarkar's wife. Continuum was also obligated to secure refinancing to pay off the balance of the LoanCore Loan, which was then estimated to be approximately $140 million. Because the term sheet was binding only on Honarkar, he was locked into the Joint Venture, but Continuum was free to pursue other options.

### c.    Continuum exerts maximum pressure to obtain Mr. Honarkar's signature on the rushed joint venture agreements.

27.    With time continuing to dwindle, Honarkar's counsel offered to provide initial operating agreements for the MOM JV Entities. Continuum refused and instead directed its attorneys to take control of the documents. Incredibly, although Makhijani and Continuum were aware of Honarkar's immense time pressure, they elected not to share the draft operating agreements with Honarkar when they were ready. Instead, on May 28, 2021, they circulated the operating agreements to one of the banks they were considering using to refinance the LoanCore Loan. Honarkar and his counsel did not receive them until almost a week later on June 2, 2021— less than two weeks before the foreclosures were to commence and <u>ten days</u> before the $17.5 million payment to Honarkar's wife was due.

28.    The Arbitrator observed that "[e]veryone agrees the JV document negotiation and drafting process was chaotic and frantic," and that Continuum, through its employee Michael Klutchin, pressured Honarkar into providing signature pages before the documents were even finalized. Throughout the negotiation process, Honarkar repeatedly had to confirm whether his comments to the documents had been accepted and incorporated—or whether he had even been solicited for comment at all.

29.    Predictably, this frenzied negotiation process caused additional delay that Honarkar could not afford given his impending financial cliff. Ultimately, Continuum was not able to secure sufficient financing to refinance the LoanCore Loan and, at the suggestion of Makhijani, Continuum reduced its initial contribution to $30 million to "close the gap"—despite Continuum's prior commitment of a $35 million initial contribution under the term sheet. This change resulted in Honarkar being unable to satisfy his settlement obligation to his former wife, which caused him to forfeit his former residence.

9

30. The lead up to closing on the Joint Venture agreements was just as chaotic as the rest of negotiations, with last-minute blanks in documents and missing exhibits. Most critically, Exhibit C to the operating agreements—which was to contain the list of limited liabilities that Honarkar would contribute to the Joint Venture—was not even circulated to Honarkar and his counsel until 11:00 p.m. on the night before the Joint Venture was to be formed and the LoanCore refinancing was to occur. And even at that later hour, the list was grossly inaccurate. Instead of just listing the entities that Honarkar would contribute to the Joint Venture, Makhijani populated Exhibit C with a comprehensive list of **all** of the Honarkar Parties' entities. Strictly read, this would suggest (incorrectly) that each and every one of Honarkar's business interests would be transferred to the Joint Venture.

31. Nevertheless, the MOM JV Entities were formed on June 8, 2021. *See id.* at 9.

**C. Defendants' Post-Joint Venture Corporate Structure.**

32. Following the Joint Venture, Plaintiffs held (and continue to hold) 50% of the membership interests in each of the MOM JV Entities. *See* Ex. 4 (Spindler Report) at 2, 19. The remaining 50% membership interest in MOM CA Investco LLC is held by MOM CA Member, which is 100% owned by Shyam. The remaining 50% membership interest in MOM AS Investco LLC is held by MOM AS Member, which is 100% owned by Andrew Stupin. The remaining 50% membership interest in MOM BS Investco LLC is held by MOM BS Member, which is 100% owned by Bahjneet Singh Malik.

33. The MOM JV Entities hold all of the membership interests in the SPEs, which, in turn, hold title to various real properties (collectively, the "**Real Property**") located in California. *See* Ex. 1 (Partial Interim Award) at 3-11.

34. Upon information and belief, MOM AS Investco LLC holds the membership interests in the following SPEs: (1) Retreat at Laguna Villas, LLC; (2) Sunset Cove Villas LLC;

(3) Duplex at Sleepy Hollow, LLC; (4) Cliff Drive Properties DE, LLC; (5) 694 NCH Apartments LLC; and (6) Heisler Laguna LLC (collectively, the "**MOM AS Membership Interests**"). *See* Ex. 4 (Spindler Report) at 9.

35.     Upon information and belief, MOM BS Investco LLC holds the membership interests in the following SPEs: (1) 891 Laguna Canyon Road, LLC; (2) 777 At Laguna, LLC; (3) Laguna Art District Complex, LLC; and (4) Laguna Festival Center, LLC (collectively, the "**MOM BS Membership Interests**"). *See id.*

36.     Upon information and belief, MOM CA Investco LLC holds the membership interests in the following SPEs: (1) The Masters Building, LLC; (2) 689 S. Coast Hwy, LLC; (3) 837 Park Ave, LLC; (4) Laguna HI, LLC; (5) Laguna HW, LLC; (6) 314 S. Harvard DE, LLC; (7) 4110 W. 3rd St. DE, LLC; (8) Tesoro Redlands, LLC; (9) Cliff Village, LLC; (10) Hotel Laguna, LLC; (11) Tustin Retail Properties, LLC; (12) Aryabhata Group, LLC (collectively, the "**MOM CA Membership Interests**", and together with the MOM AS Membership Interests and the MOM BS Membership Interests, the "**Investco Membership Interests**"). *See id.*

37.     The chart below lists the Real Property and their corresponding SPEs, to the best of Plaintiffs' knowledge. Because the Continuum Parties have denied Plaintiffs access to the MOM JV Entities' books and records for years, Plaintiffs do not currently have a full, up-to-date list of all the MOM JV Entities' subsidiaries.

| MOM Debtor | SPE | Real Property Address(es) |
|---|---|---|
| MOM AS Investco LLC | Retreat at Laguna Villas, LLC | 749 Gaviota (729 Ocean Front) |
| | Sunset Cove Villas, LLC | 683 Sleepy Hollow Ln, Laguna Beach |
| | Duplex at Sleepy Hollow, LLC | 689 Sleepy Hollow Ln, Laguna Beach |
| | Cliff Drive Properties DE, LLC | 150-154 Cliff Dr, Laguna Beach |

11

|  | Aryabhata Group, LLC | 4251,4225,4253 Martingale Way; 1701 Corinthian Way; 4200,4220,4250 Scott Drive; 1660 Dove Street, Newport Beach |
|  | 694 NCH Apartments, LLC | 694 N Coast Hwy, Laguna Beach |
|  | Heisler Laguna, LLC | 305-397 North Coast Highway, Laguna Beach |
| MOM BS Investco LLC | Laguna Festival Center, LLC | 805-859 Laguna Canyon Rd, Laguna Beach |
|  | 891 Laguna Canyon Road, LLC | 891 Laguna Canyon Rd, Laguna Beach |
|  | 777 at Laguna, LLC | 777 Laguna Canyon Rd, Laguna Beach |
|  | Laguna Art District Complex, LLC | 775-793 Laguna Canyon Rd, Laguna Beach |
| MOM CA Investco LLC | The Masters Building, LLC | 2711 Pacific Coast Hwy (2713 w Coast Hwy), Corona Del Mar |
|  | Laguna HI, LLC | 696 S Coast Hwy, Laguna Beach |
|  | Laguna HW, LLC | 688-690 S Coast Hwy, Laguna Beach |
|  | 314 S. Harvard DE, LLC | 314 Harvard Blvd, Los Angeles |
|  | 4110 West 3rd Street DE, LLC | 4110 West 3rd Street, Los Angeles |
|  | 837 Park Ave, LLC | 837 Park Ave, Laguna Beach |
|  | Tesoro Redlands DE, LLC | 106 W Pennsylvania Ave, Redlands |
|  | Hotel Laguna, LLC | 421 S Coast Hwy, Laguna Beach |

**D.  Honarkar discovers the fraudulent and invalid Nano Loan and the Continuum Parties retaliate.**

38.     Not surprisingly, the relationship between the Honarkar Parties and the Continuum Parties remained strained, and by early 2023, Honarkar was evaluating his options to exit the Joint Venture. While sourcing alternative financing, Honarkar discovered for the first time a deed of trust dated as of June 7, 2021 and securing the Nano Loan and encumbering one of the MOM JV Entities' properties. With that knowledge, he ran title searches on the MOM JV Entities' other

12

properties and discovered, again for the first time, the assignments of the MOM JV Entities' membership interests in 689 South Coast Hwy LLC, Laguna HI LLC, and The Masters Building LLC, as well as other previously undisclosed deeds of trusts, loans, and other transactions encumbering and involving certain of the other SPEs and properties. Honarkar's searching also uncovered the fact that the $30 million initial contribution from the Continuum Parties (which had already been reduced from the agreed-upon $35 million in the term sheet) had been funded in large part by the Nano Loan taken out by the MOM JV Entities themselves—<u>before</u> they were even formed and <u>before</u> Honarkar contributed any properties thereto.

39.     Promptly upon discovering the Nano Loan and other issues, Honarkar sent a letter to Makhijani and Continuum raising his concerns. This letter went unanswered.

40.     After his inquiry was ignored, Honarkar, through his counsel, sent a formal books and records demand to the MOM JV Entities on March 22, 2023. On April 3, 2023, the Continuum Parties indicated that they would provide documentation relating to the Nano Loan—but only if Honarkar withdrew his inspection demands. Honarkar declined, and instead filed a petition in Los Angeles Superior Court to access those books and records.[6]

41.     Honarkar's books and records demand marked a turning point in his relationship with the Continuum Parties. On March 29, 2023, the Continuum Parties utilized their power as Managing Managers under the MOM JV Entities' operating agreements to purport to terminate Honarkar as Administrative Manager of the Joint Venture. But they did not stop there.

42.     Two days later, a group of armed individuals working at the behest of the Continuum Parties entered and took control of numerous properties owned by the MOM JV

---

[6] That request was granted over the Continuum Parties' objection on November 9, 2023.

Entities, including the Hotel Laguna, a Holiday Inn Hotel in Laguna Beach, and several other vacation rentals.

43. Then they confronted Honarkar again at the Hotel Laguna in May 2023, which resulted in the assault arrest of an agent of the Continuum Parties. But the Continuum Parties were still not done with their scorched-Earth crusade against Honarkar. During the night of June 30, 2023 and morning of July 1, 2023, the Continuum Parties dispatched their armed agents—again—to take physical control of another restaurant operated by Honarkar.

44. Later in July 2023, during a time at which Honarkar and certain of the Continuum Parties were at a scheduled court hearing, the Continuum Parties arranged for more than one dozen men in black to break through 4G's corporate headquarters' glass doors with a hammer and remove physical documents marked "LEGAL," computers, and other property from the building.

### E. The Arbitration and the Partial Awards

45. On April 25, 2023, Plaintiffs filed their original Demand and Statement of Claim commencing the Arbitration with JAMS, seeking the rescission of the MOM JV Entities' operating agreements or, alternatively, the appointment of a receiver over the MOM JV Entities, compensatory and punitive damages, declaratory judgment, and an injunction reinstating Honarkar as the administrative manager. *See id.* at 14.

46. In the Arbitration, Plaintiffs asserted claims against Makhijani, Continuum, the MOM Members, and the MOM Managers for fraudulent inducement, breach of contract, and direct forcible entry and forcible detainer, as well as claims against Nano for conspiracy to commit and aiding and abetting fraudulent inducement. *See id.* at 3. Plaintiffs sought, *inter alia*, the rescission of the agreements creating the MOM JV entities, an accounting of the MOM JV Entities' books and records by an independent third party, and declaratory relief as to the parties' respective rights, duties, powers, and obligations under the MOM JV Entities' operating agreements. *See id.* at 41.

14

47.     The Continuum Parties—including the Debtors themselves—commenced their own arbitration against Mr. Honarkar alleging claims for among other things, trespass, conversion, and intentional interference with contractual relations. This arbitration was consolidated with the Arbitration, and the Continuum Parties' claims were addressed (and denied) in the Arbitration as counterclaims against Honarkar. *See id.* at 44.

48.     The Arbitration culminated in a three-week-long evidentiary hearing held from June 24, 2024, through July 12, 2024. *See id.* at 44. The Arbitrator found that, throughout the course of the Arbitration, the Continuum Parties and their witnesses repeatedly presented false evidence and testimony. *See id.* at 17-20.

49.     On February 21, 2025, the Arbitrator issued the Partial Interim Award. *See id.* at 3.

50.     The Arbitrator found that Plaintiffs proved that Makhijani, Continuum, and the MOM Members had fraudulently induced Plaintiffs into signing the agreements for the Joint Venture, and that the MOM Members and the MOM Managers breached their obligations under the MOM JV Entities' operating agreements. *See id.* at 16-26, 27-30, 47.

51.     The Arbitrator further found that the Continuum Parties proved <u>none</u> of their claims against Mr. Honarkar. *See id.* at 44.

52.     Accordingly, the Arbitrator determined that Plaintiffs are entitled to elect the alternative remedies of either compensatory damages or rescission of the Joint Venture agreements in addition to restitution and consequential damages. The Arbitrator further determined that Plaintiffs were entitled to declaratory relief and the accounting[7] that they had requested. *See id.* at 44-46.

---

[7] The Debtors have indicated that they are negotiating a protocol for the accounting to be conducted, but to date the accounting has not yet commenced and the protocol has not been discussed in several weeks.

53.     One week after the Partial Interim Award, Defendants filed for Chapter 11 bankruptcy on behalf of Terra Laguna Beach, Inc. ("**Terra**")—one of the entities at issue on Plaintiffs' declaratory relief claim, on which Plaintiffs prevailed.  In so doing, Defendants took the position that the Award had not determined that Terra and the other entities were never transferred to the MOM JV's.   Defendants took this position notwithstanding the fact that, in the Partial Interim Award, the Arbitrator characterized Plaintiffs' declaratory relief claim as seeking, *inter alia*, an Order that various entities, including Terra, "were never intended by the parties to be Contributed Entities to the JV…."  *See* Ex. 1 (Partial Interim Award) at 43.

54.     Because of Defendants' position, Plaintiffs were compelled to seek clarification from the Arbitrator on his ruling on the declaratory relief claim.  On May 12, 2025, the Arbitrator granted Plaintiffs' request for clarification, stating expressly that "the Declaratory Relief Entities (including Terra Laguna Beach, Inc.) are not now and never have been owned by the MOM JV Entities." *See* Ex. 5 (5/12/25 Order) at 2.[8]

55.     On May 23, 2025, the Arbitrator issued the Attorney Fee Ruling, granting Plaintiffs' post-hearing Motion for Attorneys' Fees and Costs.  In so doing, the Arbitrator ordered that Plaintiffs were entitled to recover from Defendants $8,303,510.25 in attorney fees plus $893,916.06 in costs, for a total of $9,197,426.31. *See* Ex. 3 (Att'y Fee Ruling) at 12.

56.     Most importantly, on May 23, 2025, the Arbitrator issued the Partial Final Award. The Partial Final Award is identical to the March 2025 Award, except that it also includes the Arbitrator's decision on Plaintiffs' motion for attorneys' fees and costs.  As set forth expressly in the Partial Final Award, the Award is to "be considered final, for purposes of a judicial proceeding to enforce, modify or vacate…" *See* Ex. 2 (Partial Final Award) at 46.

---

[8] The Arbitrator's May 12, 2025 Order is attached hereto as Ex. 5.

102857361.13

57.     Plaintiffs intend to continue to pursue their rights and remedies for their now-proven claims against the Continuum Parties.

## COUNT I
### (Declaratory Judgment Under 11 U.S.C. § 541(d) Against the MOM JV Entities)

58.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.

59.     Section 541(d) of the Bankruptcy Code provides, in relevant part, as follows:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section *only to the extent* of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

60.     Applicable state law determines a debtor's interest in property.

61.     As alleged above, under California law, the MOM JV Entities do not hold any equitable or beneficial ownership interest in the Investco Membership Interests because such interests were procured by fraud perpetrated against the Honarkar Parties.

62.     The Investco Membership Interests are the property of the Honarkar Parties and are not property of the Debtors' estates.

## COUNT II
### (Declaratory Judgment Under 11 U.S.C. § 541(d) Against the SPEs)

63.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.

64.     Plaintiffs were fraudulently induced into transferring the Investco Membership Interests in the SPEs, which SPEs held title to the underlying Real Property, to the MOM JV Entities.

17

65. The SPEs held bare legal title to the Real Property prior to the filing of the Chapter 11 Cases, and held those interests in trust for Plaintiffs because of the fraud committed by the Continuum Parties.

66. The Real Peal Property is the property of the Honarkar Parties, and is not property of the Debtors' estates.

## COUNT III
### (Imposition of a Constructive Trust and Turnover of Any Sale Proceeds)

67. Plaintiffs incorporate all preceding allegations as if set forth fully herein.

68. Plaintiffs seek the imposition of a constructive trust upon the Investco Membership Interests and the Real Property currently held by the MOM JV Entities and the SPEs, respectively, for the benefit of Plaintiffs.

69. Federal and California State Courts will impose a constructive trust against a party that has engaged in inequitable conduct, such as fraud, or where holder of the legal title may not in good conscience retain the beneficial interest therein.

70. The principal circumstances where constructive trusts are imposed are set forth in California Civil Code Sections 2223 and 2224. Section 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Section 2224 states that "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

71. "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. The essence of the theory of constructive trust is to prevent unjust enrichment and to

prevent a person from taking advantage of his or her own wrongdoing." *Communist Party of U.S. v. 522 Valencia, Inc.*, 35 Cal.App.4th 980, 990 (Cal. Ct. App. 1995) (internal citations omitted).

72.     A party seeking imposition of a constructive trust must show (1) the existence of a *res* (property or some other interest in property), (2) the right to that *res*, and (3) the wrongful acquisition or detention of the *res* by another party who is not entitled to it. *Mattel, Inc. v. MGA Entertainment, Inc.* (citing *Communist Party of U.S.*, 35 Cal.App.4th at 990).

73.     In the Partial Interim Award, the Arbitrator found that Plaintiffs proved that Makhijani, Continuum, and the MOM Members had fraudulently induced Plaintiffs into signing the agreements for the Joint Venture, and that the MOM Members and the MOM Managers breached their obligations under the MOM JV Entities' operating agreements; accordingly, the Arbitrator determined that Plaintiffs are entitled to elect the alternative remedies of either compensatory damages or rescission of the Joint Venture agreements in addition to restitution and consequential damages, as well as the declaratory relief and accounting that they had requested, and attorneys' fees and costs. Under California Civil Code Section 2224 "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

74.     The Plaintiffs have sought relief from the bankruptcy stay in order to have the Partial Interim Award confirmed by the California Court.

75.     In the event the Debtors sell any portion of the Real Property, the Honarkar Parties are entitled to any such sale proceeds and, after payment of all allowed secured claims related to such Real Property, such sale proceeds shall be held in trust for the benefit of whomever is

ultimately deemed to be the 100% owner of the Debtors after conclusion of the accounting and election of remedies in the Arbitration (the "**Sale Proceeds**").

76.     The Honarkar Parties are thus entitled to the immediate imposition of a constructive trust on the Investco Membership Interests and the Real Property currently held by the MOM JV Entities and the SPEs, and the turnover of same (as well as the turnover of any Sale Proceeds).

<u>**COUNT IV**</u>
**(Turnover of Property Against all Defendants)**

77.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.

78.     Defendants are obligated to immediately transfer any remaining legal title they possess in the Investco Membership Interests and/or the Real Property to Plaintiffs, and to turn over any Sale Proceeds.

**WHEREFORE**, Plaintiffs respectfully request that the Court award the following relief:

a.     Entry of a declaratory judgment stating that under §541(d) of the Bankruptcy Code and applicable California state law: (i) the MOM JV Entities' estates do not have an equitable or beneficial ownership interest in the Investco Membership Interests; (ii) the SPEs' estates do not have an equitable or beneficial ownership interest in the Real Property, (iii) that the Investco Membership Interests and the Real Property are not property of the Debtors' estates, and (iv) that the Investco Membership Interests and the Real Property are property of the Honarkar Parties;

b.     Entry of an order imposing a constructive trust upon the Investco Membership Interests and the Real Property (including any Sale Proceeds) currently held by the MOM JV Entities and the SPEs, respectively, for the benefit of Plaintiffs, and the immediate turnover of same;

c.     Entry of an order requiring the MOM JV Entities and SPEs to immediately transfer any remaining legal title they possess in the Investco Membership Interests and the Real Property to Plaintiffs; and

d.     Such other and further relief as the Court deems just and proper.

Dated: May 27, 2025
Wilmington, Delaware

**POLSINELLI PC**

_/s/ Christopher A. Ward_
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen A. Smith (Del. Bar No. 7456)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sasmith@polsinelli.com

-and-

Elisa Hyder
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 267-3001
Facsimile: (215) 267-3002
ehyder@polsinelli.com

-and-

James P. Martin
7676 Forsyth Blvd., Suite 800
St. Louis, MO 63105
Telephone: (314) 889-8000
Facsimile: (314) 231-1776
jmartin@polsinelli.com

_Counsel to Mr. Honarkar and 4G Wireless, Inc._

21

**EXHIBIT 1**

**JAMS ARBITRATION**
**No. 5220003126**
**(Consolidated with JAMS Case No. 5200001122)**

| | |
|---|---|
| Mohammad Honarkar and 4G Wireless, Inc., individually and on behalf of MOM AS Investco LLC, MOM BS Investco LLC, and MOM CA Investco LLC, | **PARTIAL INTERIM AWARD** |

                    Claimants and Derivative Claimants,

v.

Mahender Makhijani; Continuum Analytics, Inc.; MOM AS Investor Group LLC; MOM BS Investor Group LLC; MOM CA Investor Group LLC; MOM AS Manager LLC; MOM BS Manager LLC; MOM CA Manager LLC; and Nano Banc,

            Respondents,

            and,

MOM AS Investco LLC, MOM BS Investco LLC, and MOM CA Investco LLC,

            Nominal Respondents.

_____

**Consolidated case:**

MOM AS Investco LLC, MOM BS Investco LLC, MOM CA Investco LLC, MOM AS Investor Group LLC, MOM BS Investor Group LLC, and MOM CA Investor Group LLC,

            Claimants,

v.

Mohammad Honarkar,

            Respondent.

1

**Counsel:**

Aaron May, Esq., Joseph Ybarra, Esq., Abigail E. Marion, Esq., and Thomas Rubinsky, Esq.
HALPERN, MAY, YBARRA, GELBERG LLP
550 South Hope Street, Suite 2330
Los Angeles, California 90071
Telephone: (213) 402-1900

and

Sam Maralan, Esq.
MARALAN LAW, P.C.
3080 Bristol Street, Suite 630
Costa Mesa, CA 92626
Telephone: (714) 641-0506

*Counsel for Claimant and Cross Respondent Mohammad Honarkar ("Honarkar"); Claimant 4G Wireless, Inc. (individually "4G," and collectively with Honarkar, the "Claimants"); and Derivative Claimants MOM AS Investco LLC ("MOM AS JV"), MOM BS Investco LLC ("MOM BS JV"), MOM CA Investco LLC ("MOM CA JV") (collectively, the "MOM JV Entities")*

Marc Cohen, Esq.
COHEN LAW GROUP, APC
541 S. Spring Street, Suite 1208
Los Angeles, CA 90013
Telephone: (213) 223-7707

*Counsel for Respondents Mahender Makhijani ("Makhijani") and Continuum Analytics Inc. ("Continuum")*

Michael Farrell, Esq., Scott Leipzig, Esq., Tim Hsu, Esq., Stephanie Roberts, Esq., Gabriela Perez, Esq., Leilee Ghassemi, Esq., Shauna Woods, Esq., and Suzanne Kenney, Esq.
ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
865 South Figueroa St., Suite 2800
Los Angeles, CA 90017
Telephone: (213) 622-5555

*Counsel for Respondents and Cross Claimants MOM AS Investor Group LLC ("MOM AS Member"), MOM BS Investor Group LLC ("MOM BS Member"), MOM CA Investor Group LLC ("MOM CA Member") (collectively, the "MOM Members") and MOM AS Manager LLC ("MOM AS Manager"), MOM BS Manager LLC ("MOM BS Manager"), MOM CA Manager LLC ("MOM CA Manager") (collectively, the "MOM Managers") and the MOM JV Entities[1]*

---

[1] At times, the Arbitrator will refer to the MOM Members and the MOM Managers as the "MOM Parties;" to the MOM Parties, Makhijani, and Continuum as the "MOM Respondents;" and to the MOM Respondents and Nano Banc as the "Respondents." Allen Matkins also initially represented Makhijani and Continuum in this arbitration.

Ann Marie Mortimer, Esq., Lawrence DeMeo, Esq., and Hakop Stepanyan, Esq.,
HUNTON ANDREWS KURTH LLP
550 South Hope St., Suite 2000
Los Angeles, CA 90071
Telephone: (213) 532-2000

*Counsel for Respondent Nano Banc ("Nano")*

**Arbitrator:**

Hon. David A. Thompson (Ret.)
JAMS
5 Park Plaza, Suite 400
Irvine, CA 92614
Telephone:    (714) 939-1300

**Place of Arbitration:  Los Angeles, California**

**Date of Award:  February 21, 2025**

THE UNDERSIGNED ARBITRATOR, having been designated by JAMS in accordance with the Operating Agreements (the "Operating Agreements") for the MOM JV Entities, dated as of June 8, 2021, and having examined the claims, defenses, evidence, and arguments of the parties, now finds, concludes, rules, orders, and issues this Partial Interim Award as follows:

## I.    INTRODUCTION AND KEY PROCEDURAL HISTORY

This is a real estate joint venture dispute centered on fraud and breach of contract claims. The joint venture ("JV") comprises a portfolio of commercial properties that were previously owned by Claimants and are now owned by the MOM JV Entities.  The MOM JV Entities are managed by the MOM Managers, and the members of the MOM JV Entities are the MOM Members and Honarkar.  Claimants filed the operative First Amended Statement of Claims in Arbitration ("FAC") on October 13, 2023.  Claimants claim they were fraudulently induced by Makhijani, Continuum, and the MOM Parties into signing the Operating Agreements (Exs. 313-315) and other JV related agreements (the "Other JV Related Agreements"),[2] and further claim Nano is liable for conspiracy to commit and aiding and abetting the commission of fraudulent inducement by the MOM Respondents.  Claimants also claim the MOM Parties breached the Operating Agreements and a Management Agreement that predated the JV (Ex. 37, the "Management Agreement").  In addition, Claimants claim the MOM Respondents violated California's forcible entry and detainer laws in connection with an incident at the 4G offices.

---

[2] The Other JV Related Agreements include: the June 8, 2021, Asset Contribution Agreement (Ex. 304, the "ACA"); the June 8, 2021, Release Agreement (Ex. 317, the "Release"); the June 07, 2021, Consulting Agreement (Ex. 232).

Finally, Claimants assert derivative claims on behalf of the MOM JV Entities (as Derivative Claimants) against Makhijani, Continuum, the MOM Parties, and Nano for conversion and violation of Penal Code section 496 ("Section 496"), for unjust enrichment against the MOM Parties, and for breach of contract against Nano based on the loan agreement between the MOM JV Entities and Nano.

Nano filed an Answer to the FAC on November 3, 2023.  The MOM Parties and the MOM JV Entities (represented by Allen Matkins) and Makhijani and Continuum (represented by the Cohen Law Group) filed Answers to the FAC on November 21, 2023.

In a separate (now consolidated) demand for arbitration filed with JAMS on September 28, 2023, and amended on June 6, 2024, the MOM JV Entities and the MOM Members alleged (counter) claims against Honarkar for conversion, intentional interference with contractual relations and prospective economic advantage, and declaratory relief in connection with the parties' rights and obligations under the Operating Agreements and other JV agreements.  They also brought claims for trespass related to incidents at two JV properties in Laguna Beach.

On November 29, 2023, the MOM Respondents, Makhijani and Continuum filed Motions Contesting Arbitrability and Jurisdiction.  Both motions were denied by the Arbitrator in the "Rulings on Motions Contesting Arbitrability" dated January 3, 2024.)

**Other Pre-Hearing Proceedings, Orders and Rulings**

Preliminary, interim, final status, and discovery conferences, motion hearings, and other pre-hearing proceedings were conducted on the following dates:  February 2, March 15, March 20, March 22, May 25, May 29, and June 12, 2024.  The Arbitrator issued Scheduling Order Nos. 1-5, and Consolidated Scheduling Order Nos. 100 and 101; and issued rulings on discovery disputes, claim amendments, hearing logistics, and motions to continue the arbitration hearing.

**The Evidentiary Hearing**

The evidentiary hearing was conducted on June 24-28 and July 1-12, 2024.  The following witnesses testified: Honarkar, Brian Buchanan, Michael Kluchin ("Kluchin"), Makhijani, Kara Cobb, Marc Cohen, Glenn Taxman, Daniel Niazi, Anthony Gressak ("Gressak"), Michael Spindler (Claimant expert), Frederick Gartside, Joseph Pohlot (Respondent expert), Deba Shyam ("Shyam"), Max Prendergast, and Wayne Platt (Respondent expert).  The documents and deposition transcripts in the Joint Admitted Exhibit List dated August 22, 2024, were admitted into evidence.  The Hearing was reported by Katherine Thomas, CSR 14378.

At the conclusion of the evidentiary hearing, the parties confirmed there was no further evidence for the Arbitrator to consider.  The parties filed simultaneous closing briefs as to their respective affirmative claims on August 23, 2024.  The parties filed opposition and reply briefs on September 20, 2024, and October 4, 2024, in that order.

Virtual oral closing argument was conducted on December 17, 2024, and the matter was deemed "closed" by application of JAMS Rule 22(i) and by the agreement of the parties.[3]  Consistent with that agreement, pursuant to JAMS Rule 24(a), and for "good cause," the Arbitrator determined the award would be rendered on or before February 28, 2025.  (Notice of Award Due Date, dated January 10, 2025.)

## II.    FACTS

These factual findings are necessary to this Partial Interim Award.  They are derived from admissions in the pleadings and the testimony, argument, and evidentiary exhibits presented at the hearing.  All relevant evidence that has a tendency in reason to prove or disprove a fact of consequence to this decision has been considered, even if not specifically mentioned herein.  To the extent that these findings differ from any party's position, that difference is the result of determinations by the Arbitrator as to witness credibility, relevance, burdens of proof, legal principles, and weighing of the evidence, both oral and written.

**Honarkar's Cell Phone Business, Real Estate Business and Financial Distress**

Shortly after Honarkar moved to the United States from Iran, in the mid-1980's, he started a small business selling wireless cell phones.  Honarkar built the cell phone business, which ultimately became 4G, into a highly successful enterprise that included 160 stores in five states.  He currently owns 100% of 4G, though he sold the cell phone business assets of 4G to Verizon Wireless in January 2016.

With the proceeds from the sale of the cell phone business, Honarkar began amassing a real estate portfolio.  Properties were purchased both in his name and through 4G and held by various limited liability companies ("LLCs").  Over time, Honarkar developed the portfolio into an operation worth several hundred million dollars.  The properties ranged from large hotels to commercial real estate to individual homes used as luxury vacation rentals, most of which were located in Laguna Beach or Palm Desert and the surrounding areas.

By March 2020, COVID-19 surged and the global pandemic was declared.  Over the following year, the pandemic had a devastating effect on the hospitality and commercial industries.  Honarkar's real estate businesses were similarly affected.

---

[3] *See* 7.12 Tr. at 3940:21 through 3941:5, and the discussion which follows.

At that time, Honarkar was also involved in a contentious divorce.  In July 2020, his former wife obtained the appointment of a receiver, Blake Alsbrook, to oversee Honarkar's properties.  (Ex. 3905.)  In addition to the effects of the pandemic, Alsbrook reported the infrastructure, staff, and systems in place were "woefully inadequate" to profitably operate the properties in the portfolio.  (Ex. 2008, ¶¶ 9(a), 9(b).)  He also reported the accounting and tax practices were inadequate and corporate formalities were generally ignored, pointing out the "brazen" movement of funds after a special report on interference had been submitted to the court.  (*Id.*, ¶¶ 9(b), 71.)  Most importantly, Alsbrook reported the "cash on hand was woefully insufficient to make the vast loan, payroll, creditor and settlement payments."  (*Id.*, ¶ 9(b).)  To resolve the dispute with his wife and to remove the receivership, Honarkar entered into a stipulated judgment to pay his former spouse $17.5 million on or before June 12, 2021.  (Ex. 2107.)  Alsbrook was discharged as receiver in late December 2020.

Around that time, a loan from LoanCore Capital to Honarkar (the "LoanCore Loan") in the original principal amount of $195 million dollars was coming due. The LoanCore Loan was secured by, among other things, deeds of trust encumbering the majority of Honarkar's real estate assets, as well as a personal guarantee.  In December 2020, Honarkar failed to make a $136 million balloon payment when due, and the LoanCore Loan went into default.

In January 2021, at the request of LoanCore, a new receiver, Douglas Wilson, was appointed over the Honarkar properties that secured the LoanCore Loan.  (Ex. 3716, at 10-11, 13-17.)  LoanCore obtained the receiver on the basis that Honarkar had been diverting rents from the properties in which LoanCore asserted it had a security interest.  (Ex. 3716, at 8-9, 15.)  The receivership was to be in place until Honarkar refinanced and paid off the LoanCore Loan.

A few months after Wilson was appointed as receiver, DIG PFSS LBCP Holding Company LLC ("DIG") purchased the LoanCore Loan.  Honarkar and his team were concerned that DIG intended to foreclose on the properties that secured the LoanCore Loan.  (Exs. 4085, at 182; 2411 at 4.)  These concerns were legitimate.  DIG immediately took action and foreclosure sales were scheduled to begin on June 15, 2021.  (*Id.*)

**Honarkar's Search for Funding and Introduction to Makhijani and Continuum**

During the first half of 2021, under considerable time pressure as a result of the DIG purchase of the LoanCore Loan, the pending foreclosures, and the payment due to his former wife, Honarkar sought funding from multiple sources, including Nano.  As expected, it was challenging for Honarkar to obtain financing, given the extraordinary time pressures, dollar amounts and risks involved, together with the uncertainties created by the pandemic.

6

Honarkar had previously borrowed money from Nano and had an existing relationship with Gressak, Nano's then-Chief Credit Officer (and later interim CEO). Gressak referred Honarkar to Makhijani at Continuum, an entity that acquires and manages distressed real estate assets for groups of investors. (Ex. 52.)

Both Makhijani and Continuum had established, long-standing, and deeply ingrained affiliations with Nano. Nano was founded by, among others, Continuum's legal owner, Shyam, along with several of Continuum's largest investors (Gerald Marcil, Andrew Stupin, and Bhajneet Singh Malik), all of whom provided millions in seed capital, remain shareholders in Nano, and have borrowed over $100 million from the bank. (Ex. 1000 at 181:18-190:6.) Gressak, though no longer with Nano, remains a significant shareholder. (7.8 Tr. at 2609:22-25.) Makhijani is one of Nano's largest referral sources and is also involved in the bank's management. (Ex. 1000 at 200:20-203:3.) The relationships between Makhijani, Continuum, Nano, and their employees and investors including Shyam are interwoven and overlapping.

Ultimately, Nano and Continuum became the sole solution for Honarkar's financial difficulties. On May 19, 2021, Nano provided to Honarkar a letter of intent ("LOI") for a $150 million loan to pay off the LoanCore Loan. (Ex. 106.) This loan was to be made by Nano and "participant banks" and be secured by deeds of trust on a number of Honarkar's properties. Though Gressak was actively signaling otherwise, Daniel F. Patrick, Nano's Person Most Knowledgeable ("PMK") witness testified (via deposition admitted into evidence) Nano was incapable of extending that amount of financing to anyone. (Compare Exs. 139 [Gressak May 21 email to Honarkar: "We are aware of foreclosure sales starting June 15th on the properties and we can close prior to that date"], 211 [Gressak June 3 email to Honarkar *et al.*, seeking update from Honarkar's counsel: "[W]e are ready to fund man!!!], and 171 [email thread with Gressak, Makhijani, Honarkar et al. on "imminent" refinance with $150 million from Nano]; with Exs. 1000 at 40:9-41:6 [Patrick PMK testimony: $150 million is "well beyond the bank's legal lending limit for a single loan"]; 7.8 Tr. at 2600:15-21 [Gressak testimony – "Q: And Nano Banc never would have approved Mr. Honarkar for a $150 million loan, correct? A: Correct"].)

During this time, Honarkar was also negotiating the JV terms with Makhijani and Continuum. Most interesting, on May 20, 2021, one day after Nano provided the $150 million LOI to Honarkar, Nano provided to Shyam an LOI for a $20 million loan (the "Nano Loan") to the MOM JV Entities, entities that had not yet been formed, and the proceeds of the $20 million Nano Loan were to be used to help pay off the LoanCore Loan. (Ex. 130.) The $20 million Nano Loan was to be secured by an assignment of membership interests in 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC, and "abundance of caution" deeds of trusts encumbering properties held by these four subsidiary LLCs, all of which were then wholly owned by Claimants. (*Id.* at 2.) At that time there were no agreements between Honarkar and any of the MOM Respondents.

7

**The Term Sheet**

On May 24, 2021, just days after Nano issued the $20 million Nano Loan LOI to Shyam, Honarkar, 4G, and Continuum entered into the Term Sheet for the JV. (Ex. 148, the "Term Sheet".) It was signed by Honarkar on behalf of 4G and by Makhijani on behalf of Continuum.

The Term Sheet contemplated an initial capital contribution of $35 million by Continuum, characterized as "cash equity," in addition to Continuum's obligation to secure refinancing to pay off the balance of the LoanCore Loan, then estimated at $140 million. (Ex. 148 at 2.) The initial contribution by Continuum was to be credited to two existing projects in Honarkar's portfolio, Hotel Laguna, and a property in Los Angeles' Koreatown, though both Honarkar and Kluchin, Director of Operations at Continuum, testified that half of the initial contribution ($17.5 million) was first intended to be used to pay off the stipulated judgment in favor of Honarkar's former wife. (*Id.*; 6.24 Tr. at 108:11-109.4; 6.28 Tr. at 1214:6-15.)

In exchange, Claimants were obligated to contribute their interests in the subsidiary LLCs that held title to some of the properties in their portfolio. (Ex. 148 at 2, Exs. A and C.) The Term sheet was binding on Honarkar but not Continuum. (Ex. 148 at 8-10.) So, Continuum could terminate at any time, but Honarkar could not pursue other refinancing options.

Aside from the Hotel Laguna and Koreatown projects, Honarkar was entitled to sell and/or refinance the other real estate assets covered by the Term Sheet, subject to Continuum's qualified consent rights. (Ex. 148 at 8 [Managers provision].) Further, assuming Continuum received a 20% preferred return on all of its capital contributions, Honarkar was entitled to the entirety of the sale proceeds of those other assets. (*Id.* at 4-6 [Distributions provision].)

**The Draft Operating Agreements**

Glenn Taxman, Honarkar's transactional counsel, offered to provide initial drafts of the Operating Agreements, but Continuum's lawyers took the lead instead. On May 28, 2021, Kluchin shared draft Operating Agreements, not with Honarkar but with First Choice Bank, one of the banks through which Continuum was seeking financing to pay off the LoanCore Loan. (Ex. 1479 [attachments include MOM Manager Operating Agreements].) Kluchin did not send Honarkar and Taxman draft Operating Agreements until June 2, 2021. (Ex. 191.)

Everyone agrees the JV document negotiation and drafting process was chaotic and frantic. Kluchin pressured Honarkar into signing early, before the documents were finalized. (*E.g.,* Ex. 288 [Kluchin to Honarkar team – "We are in a mad rush to produce documents for the bank. We need signature blocks…tonight asap with the understanding the JV is not final until both attorneys…send final versions of the full agreements"]; Exs. 347, 352.)

There was a constant flurry of emails back and forth between the parties and their respective counsel, in which it was unclear whether comments from Honarkar's side had been acknowledged and/or incorporated in existing drafts or if comments from Honarkar's side had even been solicited. All of this confused the process further and caused additional delay. (Ex. 0217 at 2-3 [Taxman to Kluchin – "Why are you sending us a different JV Agreement now?...We are sticking with the prior document you sent to us for negotiating purposes…My partner is already 80% thru the other draft….[This] makes zero sense and it actually delays the process…I am going to run a redline of what [Kluchin] originally sent against this new document…"]; Ex. 2382 at 3 [Taxman to Continuum "Guys, time to cut to the chase here if we have any chance of getting to final documents. Please include your outside counsel on an email to us so we can deal directly with them. [Kluchin] playing middleman is slowing down the process and getting a redline of Document A vs. Document B is not helping the process'"].)

Admittedly, the process included "lots of moving targets." (Ex. 217 at 3 [email from Makhijani to Taxman and Honarkar].) Many of the documents were approved piecemeal. The initial drafts of the Operating Agreements had blank or incomplete exhibits. (Compare Exs. 191 at 38-41; 276 at 14-18; 298 at 17-21, with Ex. 315 at 40-46.) Plus, Exhibit C to the draft Operating Agreements was supposed to list Honarkar's "Other Owned LLC's" to be contributed to the JV. (Ex. 315 at 43.) But Exhibit C was not finalized and sent to Honarkar and his team until after 11pm on June 7, 2021, the night before the JV formation and LoanCore refinancing closing date. (Ex. 2554.) To populate Exhibit C, Makhijani used a comprehensive list of entities owned by and affiliated with Honarkar's businesses provided by Dan Niazi, 4G's Chief Operating Officer, earlier that day, on June 7, 2021. (Ex. 1397.) According to Honarkar and Niazi, that list was provided only for the Continuum investor's due diligence purposes, not as a final inventory of contributed entities. (6.24 Tr. at 128:25-131:25; 7.5 Tr. at 2467:17-2471:13.)

**The Final Operating Agreements**

Because Continuum was unable to secure enough financing to pay off the LoanCore Loan, Makhijani proposed that Continuum reduce its initial contribution to $30 million, and use it to "close the gap," despite Continuum's $35 million initial contribution obligation in the Term Sheet. (Exs. 2411, 385; 6.24 Tr. at 139:7-141:6.) Honarkar testified these changes in the initial contribution terms prevented him from paying off his former spouse as agreed, and resulted in his loss of their former residence. (6.24 Tr. at 152:14-153:24.)

Still, the Operating Agreements were signed and the MOM JV Entities were formed on June 8, 2021. (Exs. 313 [MOM AS JV]; 314 [MOM BS JV]; 315 [MOM CA JV].) That same day, the parties also closed escrow on the LoanCore Loan refinancing. (Ex. 308.) The refinancing Escrow Closing Statement showed two separate wire transfers from Continuum to the escrow holder: one in the amount of $20 million and one in the amount of $10 million. (*Id.*)

9

The Operating Agreements are substantially similar and the pertinent provisions include:[4]

(1)     The parties to the MOM CA JV Operating Agreement are the MOM CA Manager as the Managing Manager, the MOM CA Member as the MOM Member, and Honarkar as the MO Member and the Administrative Manager.[5]  (Ex. 315 at 6; §§ 9.1, 9.2, 9.3.)  Honarkar signed for himself.  Shyam signed as the Manager of the MOM CA Manager on behalf of both the MOM CA Manager and the MOM CA Member.  (Ex. 315 at 38.)[6]

(2)     The MOM CA JV Operating Agreement obligated the MOM CA Member to make a $30 million "Contribution" to be used "for the Hotel Laguna Project, which shall be disbursed as set forth on Exhibit B…."  (Ex. 315 at § 6.1(c) ["Initial Contributions"].)  Exhibit B in turn stated, "Fund shortfalls in the refinance of debt completed on or about the date hereof."  (*Id.* at Ex. B [Disbursement of Contribution for Hotel Laguna Project].)  "Contribution" was defined as "money or property, or a promissory note or other binding obligation to contribute money or property" that a "Member contributes … as capital."  (*Id.* at § 1.19.)  But loans by the MOM CA Member "shall not be considered Contributions for purposes of this Agreement."  (*Id.* at § 6.5.)

(3)     The Operating Agreements required Honarkar to contribute certain LLCs he and 4G owned or controlled, defined as either "Subsidiaries/Other Owned LLCs" or "Projects."  (Ex. 315 at §§ 1.40, 1.48, 1.45, 6.1(a), Ex. C.)  For the MOM CA JV, the only identified "Project" was the Hotel Laguna Project.  (*Id.* at § 1.45.)  Each of the other listed entities was a "Subsidiary/Other Owned LLC."  (*Id.* at Exs. C, D.)  Makhijani and Continuum through the MOM Member had the discretion to make a capital contribution to a "Subsidiary/Other Owned LLC" property and convert it to a "Project" under the Operating Agreement.  (*Id.* at § 6.1.)

(4)     The Managing Member was not entitled to sell the assets of or ownership interests in the "Subsidiary/Other Owned LLCs" absent Honarkar's prior written consent, unless Honarkar was in default, as defined.  (Ex. 315 at §§ 9.3(b), 1.36.)

(5)     Self-dealing transactions were prohibited without the written consent of both the Managing Manager and the Administrative Manager.  (Ex. 315 at § 9.15.)

---

[4] The Arbitrator will use the MOM CA JV Operating Agreement as the reference agreement.  (Ex. 315.)  The material terms of the MOM AS JV and MOM BS JV Operating Agreements are substantially similar.

[5] On July 14, 2022, the parties executed a Letter Agreement (the "Letter Agreement") amending the Operating Agreements to clarify that 4G was the MO Member of the MOM JV Entities, not Honarkar personally.  (Ex. 583 at § 3 ["It was intended for 4G and not [Honarkar] to be the MO Member of the Companies.  Accordingly, the Salient Documents shall be deemed amended so that the MO Member is 4G without any further action by the parties"].)

[6] Similarly, Banayotis Haddad, a Continuum employee, signed the MOM AS JV Operating Agreement as the Manager of the MOM AS Manager on behalf of both the MOM AS Manager and the MOM AS Member.  (Ex. 313 at 39.)  And Jason Miller signed the MOM BS JV Operating Agreement as the Manager of the MOM BS Manager on behalf of the MOM BS Manager and the MOM BS Member.  (Ex. 314 at 38.)

(6)     The Managing Manager was required to keep "full and accurate books and records" for the MOM JV Entities, reflecting "all of the income, expenses and transactions." (Ex. 315 at § 12.1.)  The Managing Manager was also required to provide monthly and annual financial reports, including balance sheets, profit and loss statements, and tax returns.  (*Id.* at § 12.2.)

That same day, Honarkar and the MOM Managers also executed the ACA, restructuring and contributing Honarkar's and 4G's membership interests in the Other Owned LLCs to the MOM JV Entities.  (Ex. 304 at § 2.)  The ACA specified certain entities (the "Held-Back LLCs") were not subject to restructuring or contribution by Honarkar.  (*Id.* at Ex. E.)  But according to Honarkar, the Operating Agreements mistakenly list multiple properties as Other Owned LLCs.[7] (*E.g.*, Exs. 304, 315 at 43 [listing 4G itself and Modan LLC, which is owned by Niazi].[8])

Once the Operating Agreements were executed, Continuum assumed control of the MOM JV Entities' bank accounts, as well as the bank accounts of the Other Owned LLCs.  Honarkar continued the day-to-day business operations of the Other Owned LLCs.

**Continuum's Alleged Wrongdoing in Operating the JV**

Less than one month after the MOM JV Entities were formed, on or around July 1, 2021, Continuum caused Tesoro Redlands DE LLC ("Tesoro Redlands"), an Other Owned LLC,[9] to obtain a $1 million loan (the "Tesoro Loan") from Nano.  (Exs. 403, 409, 411.)  That same day, one of the MOM investors, Enrico Arvielo, was repaid his $3 million investment in one of the MOM Members.  (Ex. 405.)  The Tesoro Loan was secured by a deed of trust encumbering real property owned by Tesoro Redlands, which was not recorded until March 2022.  (*Id.*)  When Honarkar's staff received a monthly billing statement for the Tesoro Loan on September 23, 2021, an employee of Nano indicated it was "a billing error and not applicable to Tesoro."  (Ex. 2723.)  Honarkar was not involved in or aware of the Tesoro Loan.  (Ex. 488 [Tesoro Loan not included in list of JV loans sent to Honarkar in Dec. 2021]; 6.27 Tr. at 960:14-961:7.)

---

[7] Notably, in September 2022 Kluchin sent a list of the "Contributed Entities" to an outside accounting firm to prepare the MOM JV Entities' 2021 tax returns, but he did not include 4G, Modan LLC, BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing82 LLC, or Brookline Aliso Viejo LLC.  (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

[8] 6.24 Tr. at 130:10-17; 7.5 Tr. at 2469:16-2470:1; Ex. 622 [Kluchin email to Nano – "Modan LLC account has nothing to do with Continuum or 4G.  This account belongs only to Dan Niazi"].

[9] Tesoro Redlands is owned by Tesoro Redlands LLC, an Other Owned LLC/Subsidiary of the MOM JV Entities.  (Ex. 279 at 2; Ex. 315 at 43.)

In early 2022, Honarkar proposed a sale of Tesoro Redlands, intending to use the proceeds to pay off debts owed to Makhijani/Continuum and other obligations. (Exs. 527, 533.) Makhijani refused to consent to the sale and instead refinanced the Tesoro Loan with Preferred Bank. (Exs. 530, 531, 533.) Though Honarkar ultimately consented to the Preferred Bank refinancing on February 25, 2022, conditioned upon his ability to sell the property after the refinance, Makhijani and Shyam (on behalf of the MOM CA Manager and MOM CA Member) set up the refinance and signed the relevant documents on February 22, 2022, prior to Honarkar's consent. (Exs. 529, 531, 533, 535.) Honarkar testified he was not informed where the refinance proceeds went and did not receive documentation relating to the refinance until over six months later. (Ex. 602 [email from Taxman on September 27, 2022 – "Mo has zero idea as to the amount of the refinance proceeds, the terms of the refinance loan and the use of the proceeds"].)

The evidence shows that when the Tesoro Redlands refinance with Preferred Bank closed on February 24, 2022, only some of the $39 million in proceeds were used to pay off existing debt. (Ex. 530.) Approximately $8.8 million was listed as a cash-out to the borrower, and $8.8 million was transferred directly into the Continuum bank account from the Tesoro Redlands bank account on March 1, 2022. (Ex. 541.) In addition, $2.8 million was held back by escrow and four months later transferred from the Tesoro Redlands bank account to the Continuum bank account. (Ex. 2894; 7.2 Tr. at 1528:5-1531:19.) It is unclear why these funds were transferred to Continuum or for what purpose they were ultimately used.

On April 10, 2022, the MOM Respondents sold a tenant-in-common (TIC) interest in Hotel Laguna, LLC for $1 million to Jaachak LLC ("Jaachak"), an entity owned and controlled by Continuum executive Jaspreet Singh Sethi. (Exs. 546, 549, 817; 6.27 Tr. at 983:19-990:17.) The TIC sale was consummated without using an escrow. Marc Cohen's client trust account was used instead because the trust company would not wire the sale proceeds to Continuum, which was not a party to the transaction. (Ex. 555 at 3-4; Ex. 558.) Upon receipt, Cohen sent the proceeds to Continuum. (Ex. 558; 7.5 Tr. at 2273:3-2280:14.) Both Honarkar and Niazi testified they were unaware of this transaction and did not receive any proceeds from it. In fact, the proceeds of the sale went directly to the MOM Members. (7.2 Tr. at 1766:6-1767:20 [Makhijani testimony that $1 million in TIC proceeds became Jaachak's capital contribution to a MOM Member].)

According to Honarkar and his attorney, Taxman, lack of transparency was a common theme in dealing with the MOM Respondents. Even when Honarkar and his team requested information, it seemed the complete financial picture was rarely provided. Taxman testified "[e]very time we met, we asked for information; we asked for financials. It was promised; it was never given. It was – you felt like Charlie Brown trying to kick the ball and Lucy pulling it up." (Tr. 7.5 at 2334:4-19.)

Also, Kluchin directed Nano to establish bank accounts for the LLCs contributed to the MOM JV Entities and to restrict access to Honarkar and his team. On October 29, 2021, Kluchin directed Nano to "set up a new The Masters Building, LLC [account]. Signers are [Shyam] and me. No one from 4G should be on this account. This is very important. [Honarkar], Chi Lu [4G's Controller] – no one. Only [Shyam] and I….Again no one from 4G should see or be on this account." (Ex. 473; Ex. 590 [September 2022 email from Kluchin to Nano – "Note DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].)

**Honarkar's Alleged Discovery of the Nano Loan**

The Nano Loan closed and funded on June 7, 2021, one day prior to the effective date of the Operating Agreements and thus one day prior to the formation of the MOM JV Entities, and on that date all of the JV properties and subsidiary LLCs were still wholly owned by Claimants. The $20 million Nano Loan proceeds were deposited in a Continuum bank account and then transferred to escrow that same day. (Ex. 240 [Memorandum to Nano Loan Committee - "proceeds will need to be funded into a related DDA account (not owned by the Borrower) held at the Banc, Continuum Analytics…Nano Banc CCO, … Gressak, has spoken with the Borrower and has approved the funding of the account"]; Ex. 308 [June 8, 2021 escrow statement with two separate Continuum payments in the amount of $10 million and $20 million].)

In early 2023, Honarkar began exploring options to exit the JV. In seeking alternative financing, on February 9, 2023, Honarkar discovered a deed of trust on one of the MOM JV Entities' properties, dated June 7, 2021, and securing the $20 million Nano Loan. (Ex. 656.) According to Honarkar, once he received the deed of trust, he ran title searches on the other properties in the MOM JV Entities. He then discovered the $30 million initial contribution the MOM Members were obligated to make under the Operating Agreements had been funded in part by the $20 million Nano Loan obtained in the name of the MOM JV Entities themselves; and further, that the Nano Loan was secured by assignments of the MOM JV Entities membership interests in the four subsidiary LLCs,[10] and by deeds of trust encumbering properties owned by these subsidiary LLCs.[11] (Ex. 239 at 78-82, 88-127; Exs. 234, 235, 236.)

On February 20, 2023, Honarkar sent a letter to Makhijani and Continuum, raising his concerns about several recorded instruments discovered as a result of the title searches, including deeds of trust relating to the Nano Loan, the Tesoro Loan, and loans from the Cantor Group V, and memoranda related to TIC transactions. (Ex. 659.) According to Honarkar, he received no response or further information pertaining to the issues raised in this letter.

---

[10] These are 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC.

[11] In these respects, the structure of the Nano Loan was similar to the structure of the loans from the other three lenders who participated in the LoanCore refinance (First Choice, Preferred, and Lone Oak).

On March 22, 2023, Honarkar's then-counsel (Latham & Watkins LLP) sent a formal books and records demand for each of the MOM JV Entities, seeking basic financial and transactional documents pursuant to the Operating Agreements. (Exs. 661-663.) On April 3, 2023, Respondents indicated they would provide documentation related to the $20 million Nano Loan only if Honarkar provided "a letter withdrawing the inspection demands." (Ex. 5480.) Honarkar refused. And, on April 27, 2023, Honarkar filed a Petition to Compel Books and Records in Los Angeles Superior Court, which Respondents opposed. (Ex. 1377.) Ultimately, on November 9, 2023, Judge James C. Chalfant granted Honarkar's Petition. (*Id.*)

**Honarkar's Demand for Arbitration**

On April 25, 2023, Honarkar filed his original Demand and Statement of Claim in this arbitration, seeking the recission of the Operating Agreements or, in the alternative, the appointment of a receiver over the MOM JV Entities, along with compensatory and punitive damages, a declaratory judgment regarding the Other Owned LLCs, and an injunction reinstating Honarkar as Administrative Manager to protect his ownership interests.

**The MOM Respondents' Alleged Retaliation Against Honarkar**

Almost immediately following Honarkar's demand for books and records, on March 29, 2023, Makhijani, Continuum, and the MOM Parties utilized their power as Managing Managers and terminated Honarkar as the Administrative Manager of the MOM JV Entities. (Exs. 669-671, 3018.) The letters terminating Honarkar were drafted and sent by Marc Cohen, Esq., current counsel for Makhijani and Continuum in this arbitration. (*Id.*)

Two days later, a group of armed individuals working on behalf of Continuum and Makhijani entered and took control of numerous JV properties, including the Hotel Laguna, a Holiday Inn Hotel in Laguna Beach, and several other vacation rentals. (Exs. 681, 1196, 1198.)

In early May 2023, Honarkar returned to the Hotel Laguna, and there was a confrontation between Makhijani, Kluchin, and the MOM Respondents' agents. (Ex. 1165 [video of portion of incident, Makhijani stating "I'll put 32 fucking guards here"]; Ex. 1160 [video of portion of incident].) Each side blames the other, but the only person arrested that day was Banayotis Haddad, a Continuum employee and the Manager of MOM AS Manager, who was charged with assault. (Ex. 1305; 6.24 Tr. at 202:3-21; 7.2 Tr. at 1800:4-9.)

Both Honarkar and Kluchin also testified that, during the night of June 30, 2023 and the early morning of July 1, 2023, a group of armed individuals and other agents working on behalf of Continuum and Makhijani entered and took physical control of Terra (a restaurant located at the Laguna Festival of the Arts and operated by Honarkar for years).

On the afternoon of July 24, 2023, while Honarkar and the MOM Respondents were appearing before Orange County Superior Court Judge David J. Hesseltine arguing motions for injunctive relief, Kluchin, Haddad, and Jason Miller, along with more than a dozen men dressed in black broke into the 4G corporate headquarters, where both 4G and Honarkar maintained offices, while Honarkar's team was working. (Ex. 773 [police report].) A glass door located on the side of the building was shattered with a hammer to gain entry and the double doors at the front entrance were forced open. (*Id.* at 4; Ex. 1212.) Kluchin admitted he and his team broke into the offices. Video of the incident appears to show the MOM Respondents' agents removing documents, banker's boxes of hardcopy files labelled "LEGAL," computer equipment, and other objects from the office, including employees' personal effects. (Ex. 1158.)

On July 29, 2023, the MOM Respondents served eviction notices on Honarkar and both of his daughters at their residences, which were JV properties under the Operating Agreements. (Ex. 772 at 4-8.) In addition, Respondents initiated multiple eviction proceedings against tenants leasing other JV properties. According to Kluchin, these eviction notices and proceedings were instituted against those tenants for not paying rent directly to the MOM Respondents.

Also, during this time, the MOM Respondents hired mobile billboards to drive around Laguna Beach, displaying pictures of Honarkar with disparaging messages. One of the billboards included photos of police officer Jessie Schmidt (one of the officers present at the scene of the 4G offices break-in) and Shohreh Dupuis (city manager for the City of Laguna Beach), along with Honarkar's photo and the word "CORRUPTION??" in large bold capital letters. (Ex. 11506.27 Tr. [Kluchin testimony – "Our PR consultant worked on this [billboard] and suggested it, and we approved it because we believe it to be true"].) According to the MOM Respondents' testimony, they included Schmidt and Dupuis on the billboard because they felt Dupuis was "allow[ing] Mo [Honarkar] to get away with a lot [of] things that he probably shouldn't have" (Kluchin, 6.27 Tr. at 1049:6-9) and the police were "not protecting our rights to manage the property" (Makhijani, 7.2 Tr. at 1811:2-21).

Additional facts are set out in the analysis and discussion that follows.

## III.    ANALYSIS

The fraud and other non-contractual claims are governed by California law. The claims for breach of the Operating Agreements are governed by Delaware law. (*e.g.*, Ex. 315 at § 19.1.) The claim for breach of the Management Agreement is governed by California law. (Ex. 37 at § 13.4.) The parties bear the burden of proof on their respective claims and defenses by a preponderance of the evidence, except for the punitive damages claim, which requires clear and convincing evidence. (Civ. Code § 3294.) The JAMS Comprehensive Arbitration Rules apply.

## A.    Claimants' Direct Fraudulent Inducement Claim Against Makhijani, Continuum and the MOM Members (FAC at 22-23)

Claimants allege they were fraudulently induced by Makhijani, Continuum and the MOM Members (i.e., the MOM Respondents) into signing the Operating Agreements by the MOM Respondents' promise to make a $30 million initial contribution.  They assert the MOM Respondents had no intent to perform the promise when they made it, and it was not performed.

The MOM Respondents argue the promise was performed because the Operating Agreements allowed them to use the $20 million Nano Loan to fund part of the $30 million initial contribution obligation.[12]  They also insist Honarkar was informed about the Nano Loan and about commitments the MOM Members made to pay off the Nano Loan.

"Promissory fraud [aka fraudulent inducement] is a subspecies of fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.)[13]  "[P]romissory fraud requires proof of  (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee." (*Gruber v. Gruber* (2020) 48 Cal. App. 5th 529, 540.)

### 1.    Initial Contribution Promise

It is undisputed the MOM Members promised to make the $30 million initial contribution to the MOM JV Entities.  (Ex. 315, § 6.1 [MOM CA Operating Agreement]; Ex. 148 at 2 [Term Sheet].)  The required *form* of the initial contribution is the crux of this dispute.  The Arbitrator's analysis will begin with the plain, unambiguous language of the Operating Agreements.

Recall the term "Contribution" is defined generally in the Operating Agreements as "any money or property, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement."  (Ex. 315, § 1.19.)  That defined term is used in connection with both Initial Contributions and Additional Contributions (compare Ex. 315, §§ 6.1 and 6.2) and throughout the Operating Agreements.

---

[12] Continuum also deposited $10 million in escrow but $3.9 million of that was immediately refunded.  (Ex. 308.)

[13] For simplicity internal citations and quotation marks have been omitted from case quotations throughout.

The MOM CA JV Operating Agreement specifically states: "6.1 Initial Contributions. … [¶] (c) Concurrently with execution hereof, by all of the Members, the MOM [CA] Member shall make a Contribution of $30 million to the Company for the Hotel Laguna Project, which shall be disbursed as set forth on Exhibit B attached hereto."  (Ex. 315, § 6.1(c).)  Exhibit B, titled "Disbursement of Contribution for Hotel Laguna Project," states it shall be used to: "Fund shortfalls in the refinance of debt completed on or about the date hereof."  (Ex. 315 at Ex. B.)

Reading these sections together reveals the term "Contribution," defined generally in Section 1.19, is also subject to the specific requirements of Section 6.1.  (*Kirkwood Knoll Maint. Corp. v. Warren* (Del. Com. Pls. Apr. 21, 2016) C.A. No. CPU4-14-003607, 2017 WL 8999315 at *5.)  Thus, the MOM Member's $30 million *initial* Contribution had to be made June 8, 2021 (upon execution) in a form that could be disbursed to fund shortfalls in the LoanCore Loan refinance that same day.  There is no other way to give meaning to both sections as required.

And the Nano Loan transaction itself did not satisfy the initial contribution obligation.

As a threshold matter, it appears the Nano Loan transaction was unauthorized and the Nano Loan documents are therefore invalid.  This is true because on the day the Nano Loan closed and funded, June 7, 2021: (a) the putative Nano Loan borrowers – the MOM JV Entities - did not yet exist; (b) the Term Sheet was still in effect; (c) the JV properties and the membership interests in the subsidiary LLCs that owned them still belonged to Claimants; and (d) neither the MOM Managers, nor any other MOM Respondents, including Continuum, had any authority to encumber those properties or to assign those membership interests.

Even if the Nano Loan transaction was authorized and the Nano Loan documents are valid, the Nano Loan itself was not a "Contribution" by the "MOM CA Member" (MOM CA Investor Group LLC) to the "Company" (MOM CA Investco LLC) "as capital in that Member's capacity as a Member pursuant to this [Operating] Agreement."  (Ex. 315, §§ 1.19, 6.1.)  In fact, the MOM CA Member was not even a party to the Nano Loan transaction.  Besides, nothing in either the Term Sheet or the Operating Agreements authorized the MOM Members to make the initial contribution in the form of a loan from Nano to the MOM JV Entities secured by their own assets.  In short, Makhijani and Continuum used Claimants' assets to secure the Nano Loan, and used the Nano Loan proceeds to acquire an interest in and gain control of those same assets.

Perhaps recognizing the Nano Loan transaction itself did not satisfy the initial contribution obligation, the MOM Respondents argue it was satisfied because they made a binding oral promise the MOM Members (not the MOM JV Entities) would pay the Nano Loan; and that the oral promise was memorialized in a "Contribution Agreement"  (Ex. 2433.)  The substance of the promise was the MOM Members would "step in and pay" the Nano Loan upon "the earlier of the Maturity Date or any date on which [Nano] demands" payment.  (*Id*. at 1.)

If the oral promise was made and if the Contribution Agreement is genuine, neither satisfied the initial contribution obligation, because neither obligated the MOM Members to make any payment on June 8, 2021. And any payment made or to be made after that date could not be used to fund shortfalls in the refinance of the LoanCore debt on that date.[14]  What's more, even now the MOM JV Entities still owe Nano $20 million and the Nano Loan is still secured by the Nano Loan trust deeds and assignments of subsidiary LLC membership interests. So, the MOM JV entities are still at risk of losing their assets if the MOM Members fail to pay.

In any event, there is substantial reason to doubt the oral promise was made and the Contribution Agreement is genuine.

The MOM Respondents maintain the oral promise to pay the Nano Loan was made at in-person meetings with Honarkar before the JV was formed. Specifically, they note: Makhijani testified he informed Honarkar of this commitment (7.2 Tr. at 1897:3-1899:12; 7.3 Tr. 2018:24-2021:22); Kluchin testified it was explained to Honarkar during a meeting at the Corona del Mar restaurant (the "CdM Meeting") that flexibility was needed and that it would be the MOM Members' "binding obligation and promise to pay the loan" (6.28 Tr. at 1205:18 – 1507:7); Gressak testified "part of those discussions [at the CdM Meeting] was talking about how the MOM investors – with this [Nano] loan, and it would pay for the loan" (7.8 Tr. at 2548:13-16); Prendergast, a Nano employee, testified Honarkar was informed at the CdM Meeting the contribution would be made either in cash or through a loan (7.12 Tr. at 3714:14 – 3715:24.1); Prendergast testified about another meeting at the Montage (the "Montage Meeting"), where Honarkar was informed of the Nano Loan and that it would be used to refinance the LoanCore obligation (7.12 Tr. at 3716:16 – 3719:17); and finally, Kluchin and Gressak both testified there was also a meeting at Honarkar's house on June 6, 2021 where the matter was discussed. (7.3 Tr. at 2018:24-2021:22; 6.27 Tr. at 1057:12-1059:4; 7.8 at 2550:18-2552:21.)

But the testimony about these meetings and the oral promise was not credible. Regarding the CDM Meeting, the witnesses contradicted each other in parts. For example, Makhijani, Kluchin, and Gressak insisted Makhijani drew a diagram of the Nano Loan on a napkin and described it to Honarkar. But Prendergast remembered only that the diagram related to dilution of the MOM Members' capital percentages, an issue unrelated to the oral promise or the initial contribution. (7.12 Tr. at 3805:4-3808:12.) As for the Montage Meeting, no witness other than Prendergast even mentioned it. Plus, as the Arbitrator observed several times during the hearing, based on basic witness credibility considerations, Kluchin, Makhijani, and Gressak were just not credible. (CACI 107 [Witness Credibility]; 7.1 Tr. at 1572:15-19 [re Kluchin]; 7.8 Tr. at 2506:3-2507:22 [re Kluchin and Makhijani]; 7.8 Tr. at 2773:8-13 [re Gressak].)

---

[14] For these same reasons, the Arbitrator rejects the MOM Respondents' claim additional funds they "infused" into the JV after June 8, 2021, satisfied the initial contribution obligation.  Besides, there is insufficient evidence in the record establishing the form or amount of these infusions, by whom they were made, or where funds came from.

These credibility findings about the oral promise testimony are buttressed by the Respondents' pre-hearing verified discovery responses and deposition testimony. The initial interrogatory responses of Makhijani, Continuum, and Nano made only general statements that Honarkar was aware of the Nano Loan "through conversations with Responding Parties and Nano Banc." (Ex. 950 at 004-005; Exs. 937 at 007, 949 at 007.) They made no mention of any specific conversations where the Nano Loan was disclosed to Honarkar. Later, Nano's PMK deposition witness testified he was not aware of any written or oral communications with Honarkar about the Nano Loan. (Ex. 1000 at 93:21-94:11.) Still later, Makhijani made no mention of the CdM Meeting in his PMK deposition for Continuum. (Ex. 1009 at 39:25-40:10.) Then, less than a week before the hearing, Nano's second supplemental interrogatory responses mentioned the CdM Meeting and the napkin diagram for the first time. (Ex. 1527.)

These credibility findings are also supported by the fact that there is no evidence of any written communications to Honarkar or his team at any time discussing the oral promise, nor are there any internal written communications between Honarkar and his team about the oral promise. Finally, Honarkar, Niazi, and Taxman all testified they were not aware of the Nano Loan until 2023. (6.24 Tr. at 169:22-178:14, 247:23-248:4 (Honarkar); 7.5 Tr. at 2301:4-2302:1 (Taxman), 2481:24-2483:14 (Niazi); 7.8 Tr. at 2526:5-2528:12 (Niazi); Exs. 656, 664, 659-63.)

In total, the weight of the evidence supports finding the oral promise was not made.

Turning to the Contribution Agreement, Kluchin testified he drafted it in "the morning of June 7, 2021." (6.28 Tr. at 1208:14-21, 1208:14-1209:7; 7.1 Tr. at 1544:13-1547:21.) He also testified it "was printed out, so it was signed in the office," "on June 7th" and was "signed in person and then scanned" the same day. (7.1 Tr. at 1544:13-16, 1548:18-1550:25.) Makhijani testified it was signed "mid-morning time on June 7" and that it was signed either using "a pen or a stamp." (7.2 Tr. at 1699:22-1701:25; 7.1 Tr. at 1548:22-1551:9.) But their testimony about the existence, creation, and execution of the Contribution Agreement is not credible.

There is no contemporaneous evidence the Contribution Agreement existed as of June 7, 2021. There are no written communications (emails, texts, or memoranda) about it. (7.1 Tr. at 1544:13-16, 1554:15-1557:7.) The MOM Respondents admit they never shared it with Honarkar or Nano. (6.28 Tr. at 1208:14-1210:15; 7.1 Tr. at 1544:13-1554:22; 6.24 Tr. at 254:23-255:22.) And they did not assert it existed until July 2023, months after the litigation began.

At the hearing, when Claimants proffered a handwriting expert to testify the signatures on the Contribution Agreement were placed by electronic means, not by pen or stamp (7.7.24 Joint Letter), the MOM Respondents stipulated, contrary to Kluchin and Makhijani's testimony about it being printed, signed, and scanned on June 7, 2021, "the signatures on the Contribution Agreement were placed onto the document by electronic means." (7.12.24 Stipulation.)

The text of the Contribution Agreement also suggests it could not have existed and been signed in the mid-morning of June 7, as Kluchin and Makhijani testified, because Paragraph 2 refers to the final Operating Agreement's definition of Contribution in "Section 1.19." But on the morning of June 7, the draft Operating Agreements had the definition of "Contribution" in section 1.20—not section 1.19. (Ex. 1505 at 001, 023 [draft circulated at 12:58 p.m. on 6.7.21]; 7.10 Tr. at 3261:13-3263:5 [Gartside testified Exhibit 1505 was then-current draft].) Moreover, the definition of Contribution was not moved to section 1.19, until subsequent drafts exchanged later in the evening of June 7. (Exs. 282, 315 at 009, 313 at 009, 314 at 009.) The MOM Respondents' explanation for all of this is based on speculation, not evidence.

Even if the Contribution Agreement was authentic, it was invalid. Claimants argue it violated the Affiliate Transaction restrictions under the Operating Agreements. (Ex. 315 at 027.) Perhaps. The Mom Respondents contend the Affiliate Transaction restrictions do not apply because the June 7 Contribution Agreement predates the June 8 Operating Agreements. But again, on June 7: (a) the MOM JV Entities – who are putative parties to and beneficiaries of the Contribution Agreement - did not exist; (b) the Term Sheet was still in effect; and (c) the Contribution Agreement promise was not "cash equity" as required by the Term Sheet.

All told, the Contribution Agreement did not satisfy the initial contribution obligation.

To the extent the MOM Respondents downplay the materiality of the initial contribution to Honarkar and his decision to enter into the JV, their position is untenable. At the outset, it was intended to immediately pay off the $17.5 million debt to Honarkar's ex-wife and then fund the Hotel Laguna Project. When Continuum was unable to secure enough financing to pay off LoanCore, the initial contribution was also to be used to "close the gap" in the refinance. As the MOM Respondents recognized: "The cash needs of the contributed businesses were staggering at the outset of the joint venture, particularly given the financial troubles faced by Honarkar through his divorce, the subsequent foreclosure action brought by DIG, and the multiple receivers imposed over Honarkar's assets." (MOM Respondents' Opposition brief at 36.)

For these reasons, Claimants proved the first element of their fraud claim.

## 2.    Intent Not to Perform

Claimants argue the MOM Respondents never intended to make the initial contribution from their own pockets, but instead planned to saddle the MOM JV Entities with debt in order to fund the initial contribution obligation. Again, "[a] promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Engalla*, *supra*, 15 Cal. 4th at 973.) And parol evidence is admissible to establish fraud. (Code Civ. Proc. ("CCP") § 1856(g).)

The evidence surrounding the JV negotiations is particularly instructive on this issue. While negotiating the Term Sheet, the drafts proposed by Continuum defined the form of the initial contribution as "debt with equity warrants and/or equity," whereas Honarkar's team repeatedly struck any reference to debt and inserted the term "cash." (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17.) Obviously, Honarkar had no intention of allowing the MOM Respondents to saddle the JV Entities with debt to help fund the initial contribution. Eventually, the parties settled on the term "cash equity," suggesting the MOM Respondents intended to mollify Honarkar by including the word "cash" but intending to use the Nano Loan proceeds anyway.[15]

That the Nano Loan closed and the proceeds were taken by Continuum the day before the Operating Agreements were finalized and executed, also suggests the MOM Respondents fully understood their promise to provide the initial contribution was false when made. Even more telling, on May 20, 2021, four days before the Term Sheet was signed and two weeks before the Operating Agreements were signed, Shyam signed the Nano Loan LOI, with the then-theoretical MOM JV Entities as the borrowers and Claimants' assets as the collateral. (Ex. 130.) According to Kluchin, this loan idea was always Continuum's plan. (6.27 Tr. at 850:17-852.11.)

These facts prove the MOM Respondents had no intention of providing the initial capital contribution without borrowing $20 million of it from Nano using Claimants' assets.

### 3.    Intent to Deceive and Induce Reliance

Claimants argue the MOM Respondents' intent to deceive Honarkar as to the form of the contribution is evidenced by their active concealment of the Nano Loan. "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an intent to induce reliance on it." (*Engalla*, *supra*, 15 Cal. 4th at 976.)

When the Nano Loan funded on June 7, 2021, Continuum requested that the proceeds be sent directly to a Continuum bank account at Nano "until the escrow company indicates that they will be ready to receive funds." (Exs. 237, 240.) Because it was unusual to transfer the loan proceeds to any entity other than the borrower, Nano employee Brian Buchanan drafted a memorandum requesting permission from the Nano Loan Committee, which stated Gressak had "spoken with the Borrower and [] approved the funding of the account." (Ex. 240.) And when the escrow closed on June 8, 2021, the escrow closing statement showed two transfers from Continuum – one for $10 million and one for $20 million. (Ex. 308.)

---

[15] The MOM Respondents fail to explain how "cash equity" differs from "cash" or how a debt could be considered a "contribution." (See, 6.26 Tr. at 806:5-7 [Kluchin cash equity "wouldn't be a loan that has to convert to equity"].) And in the financial and real estate industries, the term "cash equity" is commonly used to describe the portion of an investment that can be easily converted into cash. *See*, https://www.investopedia.com/terms/c/cash-equity.asp.

The MOM Respondents offer two explanations for these unusual transfers. First, they argue there were concerns the escrow would be delayed if the money came from the MOM JV Entities as borrowers on the Nano Loan, because the MOM JV Entities were not parties to the LoanCore payoff in the escrow holder's files (a problem created by the MOM Respondents in the first instance). Second, they posit the Nano Loan proceeds were initially transferred to Continuum because they were being submitted as the MOM Members' contribution and, as such, should be received through the MOM Members' agent, Continuum.

But these explanations are not consistent with the reason provided to Nano at the time the Nano Loan funded – that the escrow holder was not ready to receive the funds. (Ex. 240.) Nor are they consistent with Kluchin's testimony that the funds were transferred to a Continuum bank account because the MOM JV Entities did not have their own bank accounts set up. (6.27 Tr. at 868:15-871:4.) Regardless of the actual reason for Continuum's receipt of the Nano Loan proceeds, the escrow statement offered no further explanation. It certainly did not disclose that the $20 million deposit was from the proceeds of the Nano Loan to the MOM JV Entities. And there is no evidence that Respondents conveyed any of these reasons to Honarkar or his team.

Aside from Nano, three other lenders participated in the LoanCore refinance – First Choice Bank, Lone Oak, and Preferred Bank. (Exs. 220-222.) On June 4, 2021, just days before the close of escrow, Kluchin sent copies of the loan documents for each of those three lenders to Honarkar and Taxman. (*Id.*) He did not send over copies of the loan documents for the Nano Loan, despite admitting he had them available. (6.27 Tr. at 886:5-889:12.) Kluchin also sent an email chain on June 6, 2021 to Honarkar and the escrow company, indicating there were only three lenders involved in the refinance. (Ex. 229 at 2.) Neither the body of the email nor the attachment mentions the Nano Loan. (Ex. 229.) And, when Honarkar requested a list of all outstanding loans on the MOM JV Entities' assets in December 2021, the MOM Respondents sent a list from which the Nano Loan was conspicuously absent.[16] (Ex. 716 at 3, ¶ 8; 22-24.)

Nano did not record the Nano Loan deeds of trust encumbering the MOM JV Entities' properties until March 2022. (Exs. 234, 235, 236.) The recording was initiated by Marc Cohen, acting as counsel for Nano, on January 18, 2022 (Ex. 515), the same day Nano received an Order to Cease and Desist from the Federal Deposit Insurance Corporation.[17] (Ex. 514.) Thus, the weight of the evidence suggests the MOM Respondents were hiding and intentionally omitting information about the Nano Loan in their communications with Honarkar.

---

[16] This list also did not include the $1 million Tesoro Loan from Nano to Tesoro Redlands in July 2021.

[17] The order required Nano to engage an independent third party to review extensions of credit to insiders, remediate extensions made "on preferential terms or presenting more than the normal risk of repayment or other unfavorable features," and submit new procedures to "strengthen the Bank's internal controls related to financial transactions between the Bank and senior executives, directors, and/or any entities which they control." (Ex. 514, ¶¶ 5-8.)

Still, the MOM Respondents insist Honarkar and his team were aware of the Nano Loan based on a flurry of due diligence emails from Nano during the JV negotiations, as well as oral communications with Honarkar. As to the Nano emails, context matters. During the JV negotiations, on May 19, 2021, Nano provided Honarkar with the LOI for the $150 million loan from Nano and other "participant banks." (Ex. 106.) The next day, on May 20, Nano provided Shyam with the $20 million Nano Loan LOI. (Ex. 130.) Remarkably, both LOI's list the same Honarkar and 4G properties and subsidiary LLCs as collateral. (Exs. 106 at 1-2; 130 at 2.)

It is not surprising then that Honarkar and his team were receiving emails from Nano seeking due diligence on these properties. (Exs. 115 [May 19 email from Buchanan re underwriting]; 4017 [May 20 emails from Nano employee re certificates of insurance]; 4018-4020 [May 20 response emails from Honarkar's team attaching requested documents]; 5517 [May 21 email, 4G employee requesting insurance certificates – "[w]e still have the current lender, that has not changed, the bank we are refinancing the loan portfolio with is Nano Banc (who might be syndicating the loan with other lenders). They need the current certificates no matter the lender"]; 5518; 2296.) But none of these emails referenced the Nano Loan or clarified that Nano was underwriting the Nano Loan.[18] It is reasonable to believe Honarkar and his team assumed Nano was seeking documents for underwriting the $150 million loan or another outstanding Honarkar loan previously obtained from Nano (Ex. 123.) More importantly, Honarkar's reaction to discovering one of the recorded Nano Loan trust deeds in 2023 is consistent with his claimed lack of knowledge of the Nano Loan before then. (Exs. 656, 659.)

As for oral communications, again, no credible evidence was presented that the Nano Loan was disclosed to Honarkar during the CdM Meeting, the Montage Meeting, or the June 6 meeting at Honarkar's house. Rather, the weight of the evidence proves otherwise.

Respondents point to a perceived discrepancy in Honarkar's testimony, suggesting he was aware $143 million in secured loans refinanced the LoanCore Loan. (6.25 Tr. at 351:9-14; Ex. 2637 at 2; Ex. 2582 ("144m payout of DiG [for LoanCore Loan refinance] with $143M of Loan"); Ex. 3934.) Respondents argue this proves Honarkar was aware of the Nano Loan, because $143 million was the total amount of loans including the $20 million Nano Loan. This argument is not persuasive. Again, the evidence shows Honarkar was not aware the $20 million Nano Loan had been obtained in the name of the MOM JV Entities, much less that it had been used to fund the MOM Members' initial Contribution. Plus, Honarkar's testimony is consistent with Nano and the other participating banks performing under the $150 million Nano LOI.

---

[18] Though Respondents rely heavily on Buchanan's testimony that Honarkar was fully informed of the Nano Loan, the Arbitrator points out Buchanan was in fact unaware of the $150 million Nano LOI, despite his signature being on the document. (Ex. 106; 6.26 Tr. at 566:13-567:25.) There were also other LOIs from Nano to Honarkar of which Buchanan was unaware. (6.26 Tr. at 563:11-566:12; 569:22-571:7, 575:19-577:11, 584:20-585:13; 6.28 Tr. at 1118:17-1119:5.) It is likely Buchanan and Honarkar were both focusing on different Nano loans when discussing due diligence, as it seems neither knew the Nano Loan existed.

Moreover, Honarkar had several other Nano loans, in addition to the LoanCore refinance loans, which could explain his conclusion there was a total of $143 million in loans. (Exs. 29 [Nano credit memo showing prior debts], 5501 [demonstrative]; 6.25 Tr. at 358:7-361:11.)

The MOM Respondents were aware of Honarkar's position that the initial contribution should not be provided in the form of a debt. As explained above, the Nano Loan transaction itself did not satisfy the initial contribution obligation. Yet, the MOM Respondents obtained the Nano Loan, muddied the waters, omitted basic information from their communications with Honarkar that would have informed him of the Nano Loan and, given the timing, conflated due diligence on the $20 million Nano Loan with the $150 million Nano LOI and other Nano loans.

If, as the MOM Respondents insist, they informed Honarkar of the Nano Loan and the MOM Members' promise to repay it, they provided no explanation for omitting the form of the initial contribution in their written communications with Honarkar. The evidence supports a finding the MOM Respondents intended to deceive Honarkar with respect to the Nano Loan.

### 4.    Actual and Reasonable Reliance

Claimants must prove both actual and justifiable reliance or reasonable reliance. (*Beckwith v. Dahl* (2012) 205 Cal. App. 4th 1039, 1062-67.) "Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction." (*Engalla*, *supra*, 15 Cal. 4th at 976.) "It is not necessary that a plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is enough that the representation has played a substantial part, and so has been a substantial factor in influencing his decision." (*Id.* at 976-77; *Whiteley v. Philip Morris Inc.* (2004) 117 Cal. App. 4th 635, 678 (same).) "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." (*Engalla*, *supra*, 15 Cal. 4th at 977.)

Unquestionably, the $30 million initial contribution was material to Honarkar and his decision to enter into the JV, given his immediate needs for funds. And the evidence is certain Honarkar would not have agreed the initial contribution could be in the form of debt secured by the JV properties. (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17; 6.24 Tr. at 150:24-151:7 ["That defeats the purpose. You're not putting money, you know; how could you be a partner?"].) The exclusivity provision in the Term Sheet also limited Honarkar's ability to pursue other options for financing prior to establishing the JV. (Ex. 148 at 8-9.)

24

So, the evidence shows the representations the MOM Respondents made about their initial contribution substantially influenced Honarkar's decision to enter into the JV and sign the Operating Agreements. (*Hoffman v. 162 N. Wolfe LLC* (2014) 228 Cal. App. 4th 1178, 1193-94 ["Reliance can be proved in a fraudulent omission case by establishing that had the omitted information been disclosed, the plaintiff would have been aware of it and behaved differently"].)

Honarkar must also show his "actual reliance on the representation was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." (*Beckwith*, 205 Cal. App. 4th at 1066.) Justifiable reliance accounts for the particular "circumstances" of the plaintiff. (*Whiteley*, *supra*, 117 Cal. App. 4th at 684 [weighing, *inter alia*, plaintiff's "lack of sophistication" and "the evidence that she was addicted to cigarettes" in determining whether her reliance on statements about effects of cigarette use was reasonable or justified].)

The MOM Respondents argue Honarkar could not have justifiably relied on their representations because he failed to read the final Operating Agreements before execution. However, whether a plaintiff "read the entire [contract] is not dispositive" of reliance where there is "ample evidence of fraud." (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal. App. 5th 375, 392.) Given the chaos surrounding the negotiation and due diligence processes and the frantic push to get the documents finalized, Honarkar was not provided "reasonable opportunity to know of the character or essential terms of the proposed contract[s]." (*Rosenthal v. Great W. Fin. Sec. Corp.* (1996) 14 Cal. 4th 394, 423; 6.25 Tr. at 336:14-25 ["every five minutes, there was a new version. As soon as you get one, then it kicks in another version"].) He relied on his counsel to assist him with the documents. (6.24 Tr. at 132:1-133:2; 6.25 Tr. at 337:1-19, 322:5-25.) And again, Kluchin pressured Honarkar to sign early, before the Operating Agreements were finalized. (Ex. 288 ["We are in a mad rush to produce documents for the bank. We need signature blocks…tonight asap"]; Exs. 347, 352.)

Based on the financial wherewithal and resources available to the MOM Respondents, specifically Makhijani and Continuum, it was reasonable for Honarkar to assume Continuum's investors could and would follow through on their promises to fund the initial contribution. Honarkar was introduced to Makhijani by Gressak at Nano, a bank with which Honarkar already had an existing relationship and a "friend" in Gressak he trusted. (6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.) It is also important that many of the Continuum investors were also Nano shareholders and they had access to significant capital. (Ex. 1000 at 181:18-190:12.)

And finally, given the MOM Respondents' intentional concealment of the Nano Loan, there was little Honarkar could have done to discover the initial contribution obligation was going to be made by encumbering the MOM JV Entities assets with debt. (*Whiteley*, *supra*, 117 Cal. App. 4th at 684 ["Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent"].)

25

Based on the evidence in the record, the Arbitrator finds Claimants actually and justifiably relied on the MOM Respondents' representations.

### 5. Nonperformance

As discussed (§ III.A.1. above), the MOM Respondents failed to provide the $30 million capital contribution as required. In addition, the MOM Respondents claimed the monthly payments on the Nano Loan as expenses of MOM JV Entities on at least two occasions (Exs. 574, 604; Exs. 2909, 5500 [Chi Lu, 4G's Controller, questioning payments to Nano]; 6.27 Tr. at 903:18-20, 904:1-4; 7.1 Tr. 1491:7-1492:3.) The MOM Respondents contend these payment entries were made in error and subsequently reversed. (Exs. 2909, 3625.) The Arbitrator rejects these contentions as not supported by the evidence. The MOM Respondents also insist the MOM Members alone have made all the payments on the Nano Loan. (Ex. 5530 at 2; Exs. 3410, 1042.) But the evidence supporting this position is of limited value since, as of July 2022, the MOM Respondents had recorded the Nano Loan on the JV's books and records as a long-term liability of the MOM JV Entities, and have provided no books and records since. (Ex. 507.) The fact remains - the MOM Respondents did not perform the promised capital contribution.

### 6. Resulting Damage and Alternative Remedies

"To recover for fraud, a plaintiff must prove loss proximately caused by the defendant's tortious conduct." (*Fladeboe v. Am. Isuzu Motors Inc.* (2007) 150 Cal. App. 4th 42, 65.) The MOM Respondents contend Claimants have suffered no cognizable damages, as no MOM JV Entity funds were used to pay the Nano Loan. But again, the evidence shows: (1) the MOM Respondents' misrepresentations in connection with their initial contribution played a substantial part in inducing Honarkar to enter into the JV and (2) the MOM Respondents then encumbered Claimants' properties with the $20 million Nano Loan, along with hundreds of millions of dollars of additional encumbrances over the course of the JV. (Ex. 967.) These findings alone satisfy Claimants' initial burden to prove the fact that they were damaged by the MOM Respondents' conduct. (See also Exs. 1006 and 1509 [Spindler Reports].) Claimants are not required to prove the specific amount of their damages to perfect this claim, particularly since it would be impossible to quantify them without an accounting of the MOM JV Entities' finances.

For these reasons, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed (§ III.K. below); or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet. (*Chapman v. Skype Inc.* (2013) 220 Cal. App. 4th 217, 234 ["A party alleging that she was fraudulently induced to enter into a contract may either rescind the contract, offer to restore any benefits received, and seek restitution or retain the benefits of the contract and seek damages for fraud]"); Civ. Code § 1692.)

**B. Claimants' Direct Breach of Contract Claims Against the MOM Members and the MOM Managers (FAC at 24-25)**

Claimants allege the MOM Parties breached the Operating Agreements and the Management Agreement. (Exs. 313-315, 37.) Each will be discussed in turn.

**1. Applicable Law and Elements of Contract Claims**

Again, Delaware law applies to the claims for breach of the Operating Agreements (Exs. 313-315, § 19.1.), and California law applies to the claim for breach of the Management Agreement. (Ex. 37, § 13.4.) The elements of a breach of contract claim under Delaware law are substantially similar to those under California law. (Compare *Humanigen, Inc. v. Savant Neglected Diseases, LLC* (Del. Super. Ct. 2020) 238 A.3d 194, 202 with *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal. App. 4th 221, 228.)

**2. Breach of Operating Agreements – Failure to Provide Initial Contribution**

Claimants assert the MOM Parties breached the Operating Agreements by failing to provide the initial contribution. (Ex. 315, § 6.1.) The Arbitrator agrees for the reasons discussed at length in connection with the fraudulent inducement claim above (§ III.A.1.), and therefore finds Claimants proved this breach of contract claim.[19] The Arbitrator further finds this breach was material and it resulted in a failure of consideration. (*Level 4 Yoga, LLC v. CorePower Yoga, LLC*, C.A. No. 2020-0249-JRS, 2022 WL 601862, at *27 (Del. Ch. Mar. 1, 2022) [under Delaware law, "a breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract"]; *Alchemy LTD LLC v. Fanchise League Co.*, C.A. No. 2021-0476-LWW, 2023 WL 4670954, at *5 (Del. Ch. July 20, 2023) ["Failure of consideration occurs when the bargained-for consideration is not rendered by one of the parties"].)

Hence, as a separate and sufficient basis apart from fraud, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed; or (b) rescission of the Operating Agreements and the Other JV Related Agreements. (*United Engineers & Constructors, Inc. v. Babcock & Wilcox Co.*, C.A. No. 12540, 1993 WL 50309, at *3 (Del. Ch. Feb. 11, 1993) ["The courts of this State, of course, can grant rescission for a number of reasons, e.g., … failure of consideration"].)

---

[19] The MOM Respondents' arguments to the contrary based upon the Release Agreement fail because: (i) by its own terms it does not apply to "claims for breach of any operating agreement…" (Ex. 317 at § 1(a)); and (ii) "[a] release obtained through fraud is invalid." (*Butler Am., LLC v. Aviation Assurance Co.* (2020) 55 Cal. App. 5th 136, 144.)

### 3.      Breach of Operating Agreements – Unauthorized TIC Sale in Property Owned by Laguna HI, LLC

Claimants assert the MOM Parties breached the Operating Agreements by causing Subsidiaries/Other Owned LLCs to engage in transactions, including the sale of TIC interests, without Honarkar's knowledge or consent.  (Exs. 313-315, § 9.3(b) ["Managing Member shall not be entitled to sell the ownership interests in an Other Owned LLC or the asset owned by an Other Owned LLC without the prior written consent of MH…"].)  Again, the Arbitrator agrees.

In December 2022, the MOM Managers sold for $4.1 million a TIC interest in property owned by Laguna HI, LLC, a Subsidiary/Other Owned LLC owned by the MOM JV Entities. (Exs. 315 at 43; 632, 634, 645, 647.)  Honarkar was not informed or aware of the transaction. (6.24 Tr. at 180:11-22, 254:12-19; 7.8 Tr. at 2539:20-2540:9.)

The MOM Parties do not dispute the application of Section 9.3 or claim Honarkar was aware of this TIC sale.  Instead, they argue Laguna HI, LLC became a "Project" through the First Amendment to the Operating Agreements (the "First Amendment") on June 30, 2021, such that Honarkar's consent was unnecessary to sell the TIC interest.  (Ex. 689 at 72, § 1(a).)  Not so.

The Operating Agreements required the MOM Members to provide notice, make a Contribution, and agree on a development budget, in order to convert a Subsidiary/Other Owned LLC from a "Potential Project" to a "Project."  (Ex. 315, § 6.1(d).)  Moreover, while the First Amendment allowed the MOM Members to designate Potential Projects as Projects without further action by the MOM Managers or Members, *i.e.*, without Honarkar's knowledge or consent, it did not change or remove the notice and contribution requirements of section 6.1(d). (Ex. 689 at 72, § 1(a); Ex. 591 [Sep. 2022 Taxman email, noting there have been no notices or contributions to convert assets to Projects under amended agreements].)

In this way, the Operating Agreements still obligated the MOM Members to seek Honarkar's consent to recharacterize the asset.  (Ex. 315, § 6.1(d).)  Interpreting the interplay between the Operating Agreements and the First Amendment in any other way would negate the negotiated balance of power between the parties and lead to an absurd result, allowing the MOM Members to designate all properties as Projects as soon as the First Amendment was signed.

Further, there is no evidence, other than Makhijani's uncorroborated, self-serving testimony, that the proceeds from the sale of this TIC interest in the MOM JV Entities' assets were transferred to the MOM JV Entities or distributed to the MOM Members and MO Members as required by the waterfall provisions in the Operating Agreements.  (Exs. 313-315, § 8.) Accordingly, the Arbitrator finds the MOM Parties breached the Operating Agreements by selling the TIC interest and that breach resulted in monetary damages to Claimants.

### 4. Breach of Operating Agreements – Unauthorized Insider/Self-Interested "Affiliate" Transactions With Cantor

Claimants assert the MOM Parties breached the Operating Agreements by entering into "contribution agreements" with the Cantor Group and its related entities ("Cantor"), all of which are affiliates of Shyam. Claimants contend the MOM JV Entities' assets are heavily encumbered with debt obligations, in part because of loans from Cantor, and they therefore have limited ability to obtain additional financing or liquidity.

The Operating Agreements plainly prohibit, without Honarkar's prior written approval, "Affiliate" transactions by the MOM Parties; that is, transactions between the MOM JV Entities and the MOM Managers or the MOM Members and entities controlled by or under common control of the Managing Managers or MOM Members. (Exs. 313-315, §§ 9.15, 1.3, 1.17, 1.20.) Cantor is surely an "Affiliate" of the MOM Managers or MOM Members. Cantor consists solely of Shyam; it has no employees and shares the Continuum offices. (7.12 Tr. at 3642:25-3643:8.) Shyam is the founder, CEO, and owner of Continuum and the Managing Member of MOM CA Manager (as well as part of the investor group as a MOM Member). (7.12 Tr. at 3640:17-3641:8.) Kluchin also admitted Cantor was Continuum's "affiliate" and testified he had explained that to Honarkar. (6.27 Tr. at 1086:4-19; 7.1 Tr. at 1567:24-1570:3.)

The evidence shows the MOM Parties caused the MOM JV Entities and some of the subsidiary LLCs to enter into "contribution agreements" regarding loans from Cantor Group IV LLC and Cantor Group V LLC, both Cantor affiliates. (Ex. 967 at 16-17; 6.27 Tr. at 1009:18-1010:7 [Kluchin testified all Cantor loans have an associated contribution agreement].) Shyam signed these contribution agreements as both the "borrower" and "lender." (6.27 Tr. at 1002:4-1005:18.) They permit the conversion of the loans made by Cantor into equity in the MOM JV Entities at the option of the MOM Members, if the MOM JV Entities that borrowed the money perform well. (Ex. 469, § 4 [contribution provision].) But, if the MOM JV Entities do not perform well, then the MOM Parties can maintain the transaction as a loan, and require the MOM JV Entities to repay Cantor in full, with interest.[20] However, there is no evidence the MOM Respondents ever received written consent from Honarkar, or even informed him of the existence of these loans from the Cantor affiliated entities. (6.27 Tr. at 1008:2-1009:3 [Kluchin – "Q:…[Y]ou did not seek written consent from Mr. Honarkar for the contribution agreements associated with those loans before they were entered, correct? A: Not that I recall"].)

For these reasons, the Arbitrator finds the MOM Parties breached the Operating Agreements by entering into unauthorized Affiliate transactions with Cantor; that breach resulted in monetary damages to Claimants, the amount of which will be determined after the accounting discussed below is completed; and the contribution agreements are likely invalid.

---

[20] The Arbitrator notes this is a peculiar "heads I win, tails you lose" structure.

### 5. Breach of Operating Agreements – Failure to Keep and Provide Books and Records for the MOM JV Entities

Claimants assert the MOM Managers breached the Operating Agreements by failing to keep and provide books and records as required by section 12.1 which states: "Books of Account. The Managing Manager shall, at the [MOM JV Entities'] sole cost and expense, keep separate, full and accurate books and records of the [MOM JV Entities] wherein shall be recorded and reflected all of the Contributions and all of the income, expenses and transactions of the [MOM JV Entities] and a list of the names and addresses of the Members…. The Administrative Manager [Honarkar] or a Member [including the MO Member] shall have the right at any time to inspect the [MOM JV Entities] books and records.." (Exs. 313-315, § 12.1.) Claimants contend they have been damaged as a result of these breaches, because they were forced to spend time and resources on needless litigation attempting to obtain these records.

This claim has merit. Both Honarkar and Niazi testified they repeatedly sought financial information from the MOM Respondents and never received it. (6.24 Tr. at 157:22-162:14; 7.8 Tr. at 2525:1-2526:4; Ex. 5480 [MOM Respondents willing to provide financial documents only if Honarkar submits "letter withdrawing inspection demands"].) The MOM Parties admitted they only kept records for the MOM JV Entities for certain periods of time, despite evidence that transactions occurred outside of these time periods. (Exs. 1385 at 3; 967 [loan on 11.15.23].) Certainly, it is unclear where and how records of transactions between the MOM JV Entities and MOM Members were maintained, if at all, particularly since Kluchin testified he had "no information" on why QuickBooks data was not maintained for the MOM JV Entities during certain time periods. (6.27 Tr. at 975:21-981:5.) Finally, the spreadsheet submitted by the MOM Respondents carries minimal weight on this record. (Ex. 3625 [fails to track income into the JV or funds transferred out to Continuum, Makhijani, or other investors].)

For these reasons, though the resulting damages may be nominal, the Arbitrator finds the MOM Managers breached the Operating Agreements by failing to keep and provide books and records as required. (*In re P3 Health Grp. Holdings, LLC* (Del. Ch. Oct. 31, 2022) Consol. C.A. No. 2021-0518-JTL, 2022 WL 16548567, at *9 ["A court also can vindicate a breach of contract through an award of nominal damages"].)

### 6. Breach of Management Agreement – Failure to Pay Management Fee

Claimants assert the MOM Parties breached the separate Management Agreement between Honarkar and 4G, under which Honarkar was supposed to be paid monthly management fees for management services provided to Hotel Laguna, the Holiday Inn Laguna Beach, and several Laguna Beach vacation rental properties. (Ex. 37.) Claimants insist the Management Agreement remains valid because it predates the Operating Agreements.

The Management Agreement claim was not specifically alleged in the FAC and the evidence offered to support it was nominal at best.  There is simply not enough in the record to determine the parties' rights, duties, and obligations at issue.  Consequently, the Arbitrator finds Claimants have failed to prove the MOM Parties breached the Management Agreement.

**C.      Claimants' Direct Forcible Entry and Forcible Detainer Claims Against Makhijani, Continuum, and the MOM Parties (FAC at 31-33)**

Claimants assert the MOM Respondents violated California's forcible entry and forcible detainer laws by breaking into and seizing the 4G offices.  To establish this claim, "the plaintiff shall only be required to show, in addition to the forcible entry or forcible detainer complained of, that he was peaceably in the actual possession at the time of the forcible entry or was entitled to the possession at the time of the forcible detainer."  (CCP § 1172.)  The law explicitly prohibits entry "into any real property" "[b]y breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror."  (CCP § 1159.)  Similarly, the law prohibits "[b]y force, or by menaces and threats of violence, unlawfully hold[ing] or keep[ing] the possession of any real property, whether the same was acquired peaceably or otherwise."  (CCP § 1160.)

On July 24, 2023, while Honarkar and Respondents were in court on this matter, Kluchin, Haddad, and Miller, along with a number of other individuals, broke into the 4G offices at 775 Laguna Canyon Road as 4G employees were working.  (Ex. 773.)  A glass door was shattered with a hammer and the doors at the front entrance were forced open.  (*Id.* at 4.)  Property was removed from the 4G offices.

While the MOM Respondents do not dispute these facts, they contend no forcible entry or detainer occurred, because they were joint owners of 4G.  But the evidence shows 4G was not a Contributed Entity. (Exs. 583, 1354; 7.3 Tr. at 1915:7-1919:6.)  Regardless, the MOM Respondents' actions bear all the hallmarks of improper self-help under California law.

A party's "title or right of possession is no defense;" possession is irrelevant to the determination of forcible entry.  (*Daluiso v. Boone* (1969) 71 Cal. 2d 484, 486.)  An unlawful detainer action is the only legal way to obtain possession of real property.  (*Glass v. Najafi* (2000) 78 Cal. App. 4th 45, 48-49 [forcible detainer and entry statutes "reflect a policy, with deep roots in English law, barring the use of forceful self-help to enforce a right to possession of real property and requiring instead the use of judicial process to gain possession"]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal. App. 4th 1004, 1038 [landlords may enforce rights "only by judicial process, not by self-help"]; *Jordan v. Talbot* (1961) 55 Cal. 2d 597, 608 [forcible detainer found where forcible entry was followed by "removal of plaintiff's furniture and [defendant's] admonishment to 'Get the hell out of here.'"]; CCP § 1160.)

31

Accordingly, the Arbitrator finds the MOM Respondents violated both the forcible entry and forcible detainer statutes. Claimants are thus entitled to the restitution of the 4G offices and any property removed, plus incidental damages. (*Allen v. McMillion* (1978) 82 Cal.App.3d 211, 219 ["The plaintiff's interest in peaceable even if wrongful possession is secured against forcible intrusion by conferring on him the right to restitution of the premises, the primary remedy, and incidentally awarding damages proximately caused by the forcible entry"].)

### D.   Claimants' Derivative Conversion Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 28-29)

Claimants assert the MOM Respondents are liable to the MOM JV Entities for conversion of the MOM JV Entities' assets (*e.g.*, loan and sale proceeds) in six separate instances. Specifically, Claimants claim conversion of (1) $20 million in Nano Loan proceeds, (2) $1 million in Tesoro Loan proceeds, (3) $5.1 million in proceeds from the sale of TIC interests, (4) $11.6 million in Tesoro Redlands Preferred Bank loan proceeds, (5) excessive distributions the MOM Parties made to themselves, and (6) deeds of trust on properties at issue in the potential $175 million loan from Coastline Loans, LLC ("Coastline Loan") in June 2021.

California law provides, "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." (*Lee v. Hanley* (2015) 61 Cal. 4th 1225, 1240.) It may be claimed for personal property and sums of money. (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal. App. 4th 384, 396.)

"It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use." (*Plummer v. Day/Eisenberg LLP* (2010) 184 Cal. App. 4th 38, 50.) Conversion is a strict liability tort and "requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." (*Voris v. Lampert* (2019) 7 Cal. 5th 1141, 1158.)

"If a defendant is authorized to make a specific use of a plaintiff's property, use in excess of that authorized may subject the defendant to liability for conversion, if such use seriously violates another's right to control the use of the property.'" (*Duke v. Superior Court* (2017) 18 Cal. App. 5th 490, 506.) And finally, "the plaintiff need show only that he was entitled to possession at the time of conversion; the fact that plaintiff regained possession of the converted property does not prevent him from suing for damages for conversion." (*Enter. Leasing Corp. v. Shugart Corp.* (1991) 231 Cal. App. 3d 737, 748.)

The MOM Respondents argue Claimants cannot establish liability for conversion, because they have failed to prove the dollar amounts of the damages suffered. No such proof is required. To establish liability, Claimants need only prove injury, particularly where an accounting would be required to ascertain the full scope of damages. (*Lueter v. State* (2002) 94 Cal. App. 4th 1285, 1302-03 [in distinguishing between "injury" and "damages," court found "[t]o recover in tort, the plaintiff must prove the fact of proximately caused injury with reasonable certainty," where damages are "the monetary sum…awarded as compensation for the injury"].) To the extent the MOM Respondents insist their "infusion" of funds to the MOM JV Entities negates their liability for conversion, the Arbitrator notes there was no reliable evidence presented to support this assertion, outside of the MOM Respondents' self-serving testimony. These infusions will be addressed as offsets in the accounting of the MOM JV Entities' finances.

As to the $20 million Nano Loan, the proceeds were transferred to Continuum, rather than to the MOM JV Entities, the borrowers who had the right to possess those proceeds. (Exs. 239, 308.) That those proceeds appear to have been used to help pay off the LoanCore Loan or that the MOM JV Entities may have gotten a portion of those proceeds later is irrelevant to the conversion claim. The Arbitrator finds proof of conversion of those proceeds.

As to the $1 million Tesoro Loan, the proceeds borrowed from Nano did not go to the borrower, Tesoro Redlands, or even to the MOM JV Entities; instead, they went to Enrico Arvielo, an investor in one of the MOM Members, who had demanded his investment back. (Exs. 411, 405, 409; 6.27 Tr. at 953:17-957:3.) Because Tesoro Redlands was an asset of an Other Owned LLC/Subsidiary of the MOM JV Entities, the MOM JV Entities had the right to possess those loan proceeds. The Arbitrator finds proof of conversion of those proceeds.

As to the sale of TIC interests, Claimants take issue with the $1 million TIC interest in Hotel Laguna, LLC sold to Jaachak and a $4.1 million TIC interest in property owned by Laguna HI, LLC,[21] both of which are subsidiaries of the MOM CA JV. The MOM JV Entities did not receive distributions or proceeds from these sales, as the funds from both TIC sales were immediately utilized to purchase membership interests in the MOM CA Member. (6.27 Tr. at 990:18-996:19; 7.2 Tr. at 1765:13-1767:20.) The MOM CA JV, as the seller of those TIC interests, certainly had the right to possess those TIC sale proceeds. In addition, those TIC sales potentially exposed the MOM CA JV to federal tax liability. (Ex. 709, ¶ 15 [Makhijani declaration, stating these TIC sales were "made solely for purposes of making accommodations to the various investors, so they could take advantage of 1031 exchanges and tax benefits…[i]t was always intended that these transfers would be temporary"].) Hence, the Arbitrator finds proof of conversion of those proceeds.

---

[21] The Arbitrator has found the $4.1 million TIC sale was an unauthorized transaction under the Operating Agreements and was not converted into a "Project" the MOM Respondents could sell without Honarkar's written consent, all for the reasons previously discussed in Section III.B.3. above.

As to the $11.6 million in Tesoro Redlands Preferred Bank refinance loan proceeds, at least $8.8 million went directly to a Continuum bank account from the Tesoro Redlands bank account on March 1, 2022. (Exs. 541.) An additional $2.8 million held back in escrow went into the Continuum bank account four months later. (Ex. 2894; 7.2 Tr. at 1528:5-1531:19.) Thus, the evidence shows a significant portion of the proceeds from the refinance ultimately went to Continuum, rather than to the MOM JV Entity which had the right to possess those proceeds. The Arbitrator finds proof of conversion of at least a portion of those proceeds.

As to distributions made by the MOM Parties to themselves, Claimants rely on the Operating Agreements to argue the MOM Parties are entitled to a priority return based only on their actual Contribution. (Exs. 313-315, §§ 9.4, 8 [waterfall provision dictating ratio of distributions].) According to Claimants, the MOM Respondents made priority distributions to themselves based on a $10 million Contribution, although they only contributed $6.1 million. (Ex. 308 ["Remainder of Deposit to Continuum" at $3.9 million]; Ex. 1509 [Respondents' damages schedules]; 7.9 Tr. at 3021:25-3023:7, 3034:14-3035:12; 7.11 Tr. at 3430:7-3432:19.) The Arbitrator finds proof of conversion of at least some portion of these distributions.

As to the Coastline Loan deeds of trust, the MOM Parties executed those instruments on behalf of the subsidiary LLCs and thus encumbered assets of the MOM JV Entities. (Ex. 310.) Coastline is owned and controlled by Andrew Stupin, one of Nano's founding shareholders and a repeat Makhijani investor, who also gave his initials to MOM AS JV. (6.27 Tr. at 964:12-14.) Though no proceeds from this loan were ever paid to the JV, many of the deeds of trust are still outstanding.[22] (*Id.* at 964:15-966:15.) Therefore, the Arbitrator finds proof of conversion of those assets based on the encumbrances placed on them to secure the unfunded Coastline Loan.

The amount of the MOM Respondents' conversions will be revealed by the accounting.

### E.    Claimants' Derivative Penal Code Section 496 Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 30-31)

Claimants argue the acts of conversion also violated Section 496, which provides, "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."

---

[22] The MOM Respondents argue "pending litigation" prevented the removal of the Coastline Loan deeds of trust but no evidence was presented to support this position. In fact, some but not all of the deeds of trust have been reconveyed. No explanation was offered as to why some could be reconveyed but not others.

The elements of a Section 496 claim are that "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." (*Switzer v. Wood* (2019) 35 Cal. App. 5th 116, 126.)  Claims can be asserted against the "principal in the actual theft of the property." (§ 496(a).)  The language of Section 496 also "covers fraudulent diversion of partnership funds." (*Siry Inv., L.P. v. Farkhondehpour* (2022) 13 Cal. 5th 333, 361.)  However, unlike conversion, Section 496 requires criminal intent, where the "defendants acted not innocently or inadvertently, but with careful planning and deliberation." (*Id.* at 362.)

The evidence supports a finding the MOM Respondents improperly utilized funds that should have been earmarked for the JV to benefit themselves; for example, the circumstances surrounding the Nano Loan, repayment of their investor Enrico Arvielo, and TIC sales to benefit the MOM Members.  And they did so by actively concealing their actions from Claimants.  (See § III.A. above.)  (*Grouse River Outfitters, Ltd. v. Oracle Corp.* (9th Cir. 2021) 848 F. App'x 238, 242 ["because the district court held that Grouse River had adequately pleaded its fraud claims, it follows that Grouse River adequately pleaded [the elements of Section 496 claims]"].).  Moreover, there was insufficient evidence that any of these funds were ever returned to the MOM JV Entities.  Hence, the Arbitrator finds the MOM Respondents violated Section 496.

## F.  Claimants' Derivative Unjust Enrichment Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 29-30)

Claimants assert an unjust enrichment claim, arguing the MOM Respondents have looted the MOM JV Entities, using them as personal slush funds and enriching themselves without any benefit to the JV, all while exposing the MOM JV Entities to substantial risk.  To prove this claim, Claimants must show "receipt of a benefit and unjust retention of the benefit at the expense of another." (*Lectrodryer v. Seoulbank* (2000) 77 Cal.App.4th 723, 726; *Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal. App. 5th 230, 238.)

The Arbitrator finds the MOM Respondents are liable for unjust enrichment, for the reasons discussed in connection with the conversion and Section 496 claims discussed in Sections III.D. and E. above.  But the full nature and extent to which the MOM Respondents unjustly enriched themselves cannot be determined without the accounting discussed below.

## G.  Personal Liability of Makhijani

Claimants argue Makhijani is personally liable for fraudulent inducement, forcible entry and detainer, conversion, violation of Section 496, and unjust enrichment, because an agent is always liable for his own torts; and he is an alter ego of Continuum and the MOM Parties.

The MOM Respondents concede Makhijani is their agent, and is liable for his own torts, but argue Claimants failed to prove fraudulent inducement by Makhijani (apart from the other MOM Respondents) and failed to prove he is the alter ego of Continuum or the MOM Parties.[23]

The Arbitrator finds Claimants have proven Makhijani was personally involved in the fraudulent inducement and other non-contract claims discussed above. He directed and participated in the negotiation of the Term Sheet (7.2 at 1873:14-17), the Operating Agreements and the Other JV Related Agreements. (Exs. 2307, 2382, 319.) He admitted he "was personally involved" with the Term Sheet and other JV agreement negotiations. (Ex. 758 ¶ 5.) He even admitted he was "personally involved" in obtaining the Nano Loan. (Ex. 758 ¶¶ 10-11.) Makhijani was also personally involved in the conversion claims involving: the $11.6 million in Tesoro Redlands Preferred Bank loan proceeds (Ex. 2836); the $5.1 million in proceeds from the sale of TIC interests (Ex. 722 ¶ 21); the Cantor affiliate transactions (7.2 Tr. at 1660:3-1661:16); and the excessive distributions the MOM Parties made to themselves (7.3 Tr. at 2135:3 2137:20). Finally, other MOM Respondent agents testified Makhijani controls and manages the MOM JV Entities' daily operations. (6.27 Tr. at 978:14-21.) Therefore, Makhijani is personally liable for the fraudulent inducement and other non-contract claims based on his own actions.[24]

The Arbitrator finds Claimants have not proven Makhijani is the alter ego of Continuum or the MOM Parties. Alter ego is "an extreme remedy, sparingly used." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal. App. 4th 523, 539.) It requires proof of two conditions: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (*Hasso v. Hapke* (2014) 227 Cal. App. 4th 107, 155.)

The evidence shows Shyam, not Makhijani, is the owner of Continuum. (7.2 Tr. at 1650:5-14 [in the hierarchy of Continuum, Makhijani works under and reports to Shyam]; 7.11 Tr. at 3561:7-12, 3562:18-21, 3564:9-3565:5; *Hasso*, 227 Cal. App. 4th at 155.) And there would be no inequitable result if the acts in question were treated as those of Continuum or the MOM Entities, rather than as Makhijani's acts. (*Ibid*.) That is, there is no evidence that either Continuum or the MOM Parties are "judgment proof," such that they could not pay for any damages awarded to Claimants. (*Greenspan v. LADT, LLC* (2010) 191 Cal. App. 4th 486, 528 [adding alter ego manager and sister company to a judgment to avoid prejudice, when judgment debtors' actions caused assets to disappear].) Therefore, Makhijani is not personally liable for the fraudulent inducement and other non-contract claims based on the alter ego theory.

---

[23] The MOM Respondents make no such argument relative to the other personal liability claims.

[24] The Arbitrator notes no claims for conspiracy or aiding and abetting were alleged against Makhijani (unlike Nano) in the FAC and none were argued in the closing briefs. So, the Arbitrator expresses no opinion on those theories.

**H.** **Claimants' Conspiracy and Aiding/Abetting Fraudulent Inducement Claims Against Nano (FAC at 33-37)**

Claimants argue Nano is liable for the fraudulent inducement/promissory fraud discussed above (§ III.A.), because Nano conspired with and aided and abetted the MOM Respondents.

Conspiracy is "a form of vicarious liability by which one defendant can be held liable for the acts of another," where all have "agreed to a common design to commit a wrong" that damages a plaintiff. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal. App. 5th 630, 652.) Each member of a conspiracy must have "acted in concert" and come to "a mutual understanding to accomplish a common and unlawful plan," wherein one or more of them "committed an overt act to further" the plan. *Id.* The elements of the claim are: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*AREI II Cases* (2013) 216 Cal. App. 4th 1004, 1022.) Participation, cooperation, or unity of action in a conspiracy is typically proven by circumstantial evidence, including, "the nature of the act done, the relation of the parties, [and] the interests of the alleged conspirators." (*Rickley v. Goodfriend* (2013) 212 Cal. App. 4th 1136, 1166.)

Liability for aiding and abetting an intentional tort may be imposed if the person "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." (*IIG Wireless*, 22 Cal. App. 4th at 653-654.) "[I]t necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." (*Id.* at 654.) However, a person may be liable even in the absence of any independent duty to the plaintiff. (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal. App. 4th 328, 345.)

The evidence shows Nano gave substantial assistance to, and acted in concert with, the MOM Respondents in fraudulently inducing Claimants to enter into the JV.[25] Gressak's actions in particular indicate Nano and the MOM Respondents reached a "mutual understanding to accomplish a common and unlawful plan," required for conspiracy.[26] Nano knew of the MOM Respondents' fraud, as required for aiding and abetting. (*IIG Wireless*, 13 Cal. 5th at 654.)

---

[25] A bank is not immune simply by virtue of its role as a bank – liability can be found where, for example, a bank "allow[s] a person to deposit a check, payable to someone else, into a personal account, under circumstances that should have alerted the bank to the possibility of fraud." (*Casey v. U.S. Bank Nat'l Ass'n* (2005) 127 Cal. App. 4th 1138, 1151, n.3.) The Arbitrator notes these circumstances are comparable to Nano's diversion of the Nano Loan proceeds from the MOM JV Entities directly into a Continuum bank account.

[26] The Arbitrator finds Gressak's self-serving contrary testimony carried little weight, as it was not credible or consistent with the documentary evidence. Regardless, his testimony as to Nano's obligations and responsibilities did not materially move the needle in either direction. The documents told the story.

As to Nano's knowledge of and active participation in the fraud, Nano had an existing relationship with Honarkar, having issued him multiple loans prior to the JV negotiations, and Nano was aware Honarkar and 4G were the owners of the properties used to secure the Nano Loan. (Exs. 123; 130; 215 at 3-7, 16, 18-21.)  Honarkar testified he sought out Gressak's advice because he believed he and Gressak were friends, and he trusted Gressak when Gressak introduced him to Makhijani for purposes of discussing a potential JV with Makhijani's investors. (Ex. 52; 6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.)  Again, the ties and cross-connections between Nano, Continuum, and Makhijani run deep. (Ex. 1000 at 102:12-103:14, 181:18-190:6, 200:20-201:3; 6.26 Tr. at 587:24-588:22, 797:12-799:16.)

Against that background, Nano issued the $150 million LOI to Honarkar on May 19, 2021, for a loan to refinance (with other lenders) the LoanCore debt. (Ex. 106.)  The $150 million Nano loan was to be secured by the same properties used to secure the $20 million Nano Loan. (Exs. 106, 130.)  Though Nano now claims it did not have the capacity to make a $150 million loan, Gressak actively perpetuated the pretense in the days ahead of the "closing." (Exs. 139, 211, 171; Ex. 1000 at 40:9-41:6; 6.26 Tr. at 606:20-607:16 [Buchanan – funding would have been "near impossible"].)  Gressak was aware the MOM Respondents had misrepresented only three lenders would be involved in the LoanCore refinance (First Choice, Preferred, and Lone Oak). (Exs. 187, 229.)  In fact, Nano used the $150 million LOI to gather information about Honarkar's properties, failing to differentiate between the $150 million Nano LOI and the $20 million Nano Loan in their due diligence communications. (Exs. 4017-4020, 123.)

Simultaneously, Nano was working with Continuum/Makhijani/Shyam on the $20 million Nano Loan to the MOM JV Entities.  On May 20, 2021, prior to the execution of the Term Sheet on May 24, 2021 (Ex. 148), Nano issued the Nano Loan LOI to Shyam, which contemplated securing the Nano Loan with properties Nano knew were owned by Claimants. (Exs. 130, 215.)  Nano did not include Honarkar on any correspondence about the $20 million Nano Loan nor did it seek his consent to encumber the properties it knew belonged to him and 4G.  Though Nano points to the Term Sheet as providing it authority to issue the Nano Loan to the MOM JV Entities, the Term Sheet does not mention the MOM JV Entities by name nor did they even exist before the Operating Agreements were signed on June 8, 2021.[27]

Nano knew the MOM Respondents intended to use the Nano Loan proceeds as their initial contribution to the JV because Makhijani told Gressak so before the Nano Loan LOI was even issued to Shyam. (7.8 Tr. at 2729:17-2730:6; 2549:5-2550:2.)  But Nano never revealed the MOM Respondents' intent as to the initial contribution in any written communications or documents that might have alerted Honarkar. (*Id.* at 2730:7-2731:13, 2734:6-2739:19.)

---

[27] While Nano says its actions were similar to the other banks involved in the LoanCore refinance, it is important to note the other banks are on different footing as to their connections with Continuum and Makhijani.  Also, Honarkar was aware of and consented to the other bank loans and related encumbrances on his properties. (Exs. 220-222.)

Internal records state Nano made the Nano Loan to "strengthen[] the Banc's position of the history and relationship with sponsors of the joint-venture [*i.e.*, Continuum and Makhijani]." (Ex. 215 at 4.) Gressak was "strongly advocating for this loan to get made" and "overrode opposition to it" from other bank officers, including Buchanan and the chief lending officer, who were concerned the loan was not secured and would be scrutinized by regulators. (6.26 Tr. at 573:15-577:11, 586:2-24, 588:15-589:23.)

Buchanan drafted the June 7, 2021 memo to the Nano Loan Committee to memorialize the unusual request for the loan proceeds to be transferred to an entity other than the borrower, placing the onus on Gressak. (Ex. 240; 6.26 Tr. at 593:8-597:3 [Buchanan was concerned about "direction that [Nano] had received, as well as the optics with this particular loan"]; Ex. 1000 [Nano PMK – "Q: Was the loan committee consulted about the change in disbursement? A: I don't think so"].)

But the June 7, 2021 internal memo falsely stated the loan proceeds had to be placed in Continuum's account because the MOM JV Entities had indicated the refinancing escrow was not open and could not receive transfers. (Ex. 240.) Both Makhijani and Shyam testified they never told Nano the refinancing escrow was not yet open. (7.3 Tr. at 2159:20-2164:11; 7.12 Tr. at 3685:10-3686:10.) And Nano obviously knew the refinancing escrow was open on June 7 – it wired $20 million from Continuum's bank account to the refinancing escrow less than an hour after first depositing the funds in Continuum's account. (Exs. 270, 272, 278 at 2.)

Nano closed and funded the $20 million Nano Loan on June 7, 2021, before the MOM JV Entities' Operating Agreements were finalized and executed, meaning the MOM JV Entities did not exist on the date the Nano Loan was made to them. (Ex. 4104 at 4-5.) Nano also issued the Nano Loan based only on the signatures of Continuum employees, not Honarkar. (Ex. 239.)

Nano also placed the $20 million Nano Loan proceeds into a bank account belonging to Continuum, knowing Continuum was not the borrower and the assets used to secure the loan belonged to Honarkar and 4G. (Ex. 240 ["Gressak has spoken with the Borrower and has approved the funding of the account"].) Nano routed this money to the Continuum bank account at Shyam's request, based on documents signed by Shyam, without verifying Shyam's authority to effectuate the transfer to his own corporate account on behalf of the MOM JV Entities. (Exs. 237, 270; 7.12 Tr. at 3794:20-3799:6 [Prendergast – "[Gressak] just told me that, yes, Deba Shyam, by reviewing the term sheet, he has the authority…I just took [Gressak's] word for it…."].) Shyam is not mentioned in the Term Sheet, the only JV document in existence at the time of the Nano Loan funding. (Ex. 148.) Nano also violated its own policy by failing to get a request in writing from all three of the MOM JV Entities as borrowers to reroute the funds from the approved use, since Shyam was the Manager of only the MOM CA Manager, not the MOM AS Manager or the MOM BS Manager. (Ex. 1000 at 139:10-15 [Nano PMK testimony].)

Nano then took security interests under the deeds of trust securing the Nano Loan, knowing they were Claimants' properties, and did so without Honarkar's consent. Nano only publicly recorded these deeds of trust after receiving a Cease and Desist Order from the Federal Reserve. (Exs. 234-236, 239 at 88-127, 515 at 6-47, 514 at 2; Ex. 4127 [Gressak – "these are nothing but AOC [abundance of caution] liens" and "I don't need to be on this anymore"].)

Finally, Nano collected fees and interest on the Nano Loan, despite knowing of the MOM Respondents' fraud. (Exs. 1087, 215, 389.) And after this action was filed, Nano obtained an indemnity from the MOM Respondents for Claimants' claims that, *inter alia,* the Nano Loan was obtained without "the necessary consent from Mohammad Honarkar." (Ex. 869, ¶ 19.)

Even after the JV was formed, Nano continued to assist the MOM Respondents by concealing material information from Honarkar. Nano issued the $1 million Tesoro Loan without Honarkar's knowledge. Then, in response to a 4G employee's question concerning receipt of a related monthly billing statement, Nano indicated it was "a billing error and not applicable to Tesoro." (Ex. 2723.) Nano also complied with Kluchin's instructions to conceal information from Honarkar and his team. (Ex. 473 [Kluchin - "No one from 4G should be on this account. This is very important…Only Deba and I"]; Ex. 590 [Kluchin – "DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].) Similarly, after the parties' dispute erupted in February 2023, Nano assisted the MOM Respondents by restricting Honarkar's access to all JV bank accounts, including those for 4G. (Ex. 677.)

Nano cites California's economic loss rule and argues Claimants' fraudulent inducement claim is barred. However, the California Supreme Court recently clarified, "[t]he doctrine only applies to bar tort recovery for negligently inflicted economic losses unaccompanied by physical or property damage under the limits recognized in *Sheen*." (*Rattagan v. Uber Techs., Inc.* (2024) 17 Cal. 5th 1, 38; citing *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal. 5th 905, 922.) The economic loss rule does not apply to the intentional fraudulent inducement at issue here.

In summary, the record is replete with evidence Nano acted in concert with, and was aware of, the MOM Respondents' fraudulent inducement. The Arbitrator therefore finds Nano jointly and severally liable with the MOM Respondents for conspiracy to commit and aiding and abetting the commission of the fraudulent inducement. As a consequence, the Arbitrator again finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after an accounting is completed; or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet.[28] (*Chapman*, 220 Cal. App. 4th at 234; Civ. Code § 1692.)

---

[28] This finding may also constitute a basis for the MOM JV Entities to set aside the Nano Loan documents (including the loan agreement, the deeds of trust, and the subsidiary LLC membership interest assignments), in addition to their invalidity for lack of authority as discussed in § III.A.1. above.

## I. Claimants' Derivative Conversion and Penal Code Section 496 Claims Against Nano (FAC at 28-29, 30-31)

Claimants argue Nano is separately liable to the MOM JV Entities for conversion of the $20 million Nano Loan and the $1 million Tesoro Loan proceeds, which belonged, respectively, to the MOM JV Entities and Tesoro Redlands as the borrowers (Exs. 239, 411), because Nano knowingly and actively transferred the proceeds of those loans to others. (§ III.D. above.)

Claimants also argue Nano violated Section 496 because it concealed and withheld, and aided the MOM Respondents in concealing and withholding, the Nano and Tesoro Loan proceeds; and that the evidence shows Nano did so "not innocently or inadvertently, but with careful planning and deliberation." (*Siry*, 13 Cal. 5th at 362.) The Arbitrator agrees.

So, Nano is liable to the MOM JV Entities for conversion and violation of Section 496.

## J. Claimants' Derivative Breach of Contract Claim Against Nano (FAC at 37)

Because the Arbitrator has determined Nano converted the Nano Loan proceeds by transferring them to Continuum, rather than to the MOM JV Entities, Claimants' "alternative" breach of contract claim based on the Nano Loan agreement is irrelevant.

## K. Claimants' Accounting Claim Against the MOM Parties (FAC at 26)

Claimants seek an accounting of the MOM JV Entities' books and records by an independent third party, from the creation of the JV to the present. "An action for an accounting has two elements: (1) 'that a relationship exists between the plaintiff and defendant that requires an accounting' and (2) 'that some balance is due the plaintiff that can only be ascertained by an accounting.'" (*Sass v. Cohen* (2020) 10 Cal. 5th 861, 869.)

Both prongs are satisfied here. First, the parties are in a business relationship with each other, as members and managers of the MOM JV Entities, responsible for owning and operating real estate assets worth hundreds of millions of dollars. Second, a balance is owed to Claimants that can only be ascertained by an accounting. The Operating Agreements required the MOM Parties to create and maintain adequate books and records for the MOM JV Entities, to provide regular financial reporting to Claimants, and to allow inspection of the complete books and records upon request; but they have failed to fulfill these obligations. (§ III.A.5. above; Ex. 313, 314, 315 §§ 12.1, 12.2; Ex. 1377, 6.24 Tr. at 250:1-254:1; Ex. 659; 7.8 Tr. at 2533:16-2539:19.) As a result, none of the damages experts could make an accurate determination of the JV's income, expenses, assets, or liabilities. (7.9 Tr. at 3008:6-3012:7, 3023:1-7.)

An accounting is particularly warranted here because, absent one, Claimants have no way to determine the full scope of the MOM Respondents' misconduct and the resulting damages. The MOM Parties remain in full control of the MOM JV Entities, and have excluded Claimants since Spring 2023.  (Ex. 677; 7.12 Tr. 3850:12-3851:5; 6.25 Tr. at 459:20-23.)  Claimants thus have no way of knowing what the MOM Respondents have done in almost two years.[29]

The MOM Respondents' arguments against an accounting are meritless.  They claim neither Claimants nor the MOM JV Entities are owed any money, because: (a) there is no validity to any of Claimants' claims; and (b) the undisputed evidence shows that, in addition to the initial $30 million capital contribution, the MOM Members advanced $89.5 million to the JV, $49.5 million of which remains outstanding.  The Arbitrator rejects these arguments.

The Arbitrator has found the majority of Claimants' claims are valid.  Arbitrator also finds there is no reliable evidence establishing the fact or amount of the claimed "advances."[30] More broadly, due to Respondents' active concealment, Claimants have been unable to verify the accuracy and completeness of the few financial records the MOM Respondents have provided. The accounting is also needed to verify the amount of the MOM Respondents' claimed offsets.

Claimants have proven they are entitled to an accounting.

**L.  Claimants' Declaratory Relief Claim Against the MOM Parties (FAC at 27)**

The parties have disputes as to their respective rights, duties, powers, and obligations under the Operating Agreements, and these disputes are generally amenable to declaratory relief. (CCP § 1060.)  The Arbitrator finds Claimants entitled to the declaratory relief they seek on the following specific issues and for the following reasons:

(1)  The MOM Respondents fraudulently induced Claimants into entering into the Operating Agreements.

(2)  On July 24, 2023, the MOM Respondents committed forcible entry and detainer at the 4G corporate offices.  As a result, Claimants are entitled to immediate possession of the 4G offices.  The MOM Respondents should be ordered to return all information and things removed from the 4G offices and to compensate Claimants for the value of any items lost or destroyed.

---

[29] The MOM Respondents admitted their discovery responses were incomplete as to what loans they obtained related to JV properties, and that they routinely did not inform Honarkar about large financial decisions because they "didn't think it was necessary."  (6.27 Tr. at 1008:2-17, 1012:14-16, 1071:19-1073:10; see also Exs. 967, 3623.)

[30] The MOM Respondents and Nano also euphemistically refer to these "advances" as "infusions," a term seemingly calculated to obfuscate whether they were Contributions or loans to the MOM JV Entities.

(3)  Palm Desert Collective Resorts LLC, 424 Marguerite Ave. LLC, and 8871 Research Dr. LLC are "Held-Back LLCs" under the ACA and the Operating Agreements and thus, were never contributed to the MOM JV Entities.  (Ex. 304 and Ex. E attached thereto; Exs. 313-315.)

(4)  The following entities appear on Exhibit C of the Operating Agreements and ACA but were never intended by the parties to be Contributed Entities to the JV:  4G (Ex. 583 [Letter Agreement – 4G is the MO Member]), Modan LLC (majority owned by Niazi), BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing82 LLC, and Brookline Aliso Viejo LLC.  (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

(5)  The sole "Projects" as defined in the Operating Agreements and ACA are Hotel Laguna LLC and Newport Crossing (Aryabhata LLC).  (Ex. 315, § 1.45; Ex. 689, § 1(a).)

As to issues (1) and (2), the Arbitrator has found in favor of Claimants on the fraudulent inducement, forcible entry, and forcible detainer claims.  The Arbitrator has considered and rejected all of the MOM Respondents' factual and legal arguments against these claims.

As to issue (3), the MOM Respondents make no reasoned argument to support their bare assertion that these "Held-Back LLCs" were intentionally contributed pursuant to the ACA.

As to issue (4), the parties make a host of legal and factual arguments, principally focused on 4G and Modan, and the proper interpretation of the Operating Agreements and the ACA.  However, the applicable law and the weight of the evidence, including the admissible parol evidence,[31] shows: 4G and Modan were not intended to be "Other Owned LLCs" under the Operating Agreements (Exs. 313-315, § 1.40 and Ex. C), nor were they intended to be "Contributed Assets" or "MOM CA LLCs" under the ACA (Ex. 304, §§ 1.40, 2(a) and Ex. C). The Letter Agreement (Ex. 583, ¶ 3) further supports these conclusions.  And, at least as to 4G (a corporation, not an LLC), the opposite conclusions would mean 4G is both a Member and an asset of the MOM JV Entities.  This interpretation would be absurd.

As to issue (5), the MOM Respondents make no argument in their briefs to support their claim it "fails for the reasons set forth above, section [*]."  (Brackets and content in original.)

---

[31] See *Nw. Nat'l Ins. Co. v. Esmark, Inc.* (Del 1996) 672 A.2d 41, 43 [courts may consider extrinsic evidence where there is an ambiguity in the contract] and *Peden v. Gray* (Del. 2005) 886 A.2d 1278, 2005 WL 2622746, at *2 ["parol evidence is admissible to resolve a contractual term that is ambiguous"]; see also *Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.* (2014) 226 Cal. App. 4th 886, 897 (same).

### M.      MOM Respondents' (Counter) Claims Against Honarkar

The MOM Respondents claim Honarkar is liable for trespass, conversion, violation of Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory and injunctive relief.[32]  All of these claims depend on the existence and enforceability of the Operating Agreements and the Other JV related Agreements.  But the Arbitrator has found Claimants may rescind these agreements for fraud in the inducement and failure of consideration.  In any event, the MOM Respondents' prior material breach of the Operating Agreements discharged Honarkar from any further duty to perform thereunder.  (*Level 4 Yoga*, *supra*, at *27 ["Delaware law firmly supports the principle that a party to a contract is excused from performance if the other party is in material breach of his contractual obligations"]; see also Honarkar Response to MOM Respondents' Demand, at 4-5, Twelfth Affirmative Defense.)  It follows the MOM Respondents' (counter) claims against Honarkar must fail.

### N.      Remedies

### 1.      Rescission With Restitution and Consequential Damages

Claimants are entitled to rescind the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, all on account of Respondents' fraud in the inducement. Claimants are also entitled to rescind the Operating Agreements and the Other JV Related Agreements, for the failure of consideration due to the failure to provide the initial contribution. (§§ III.A.6., III.B.2., III.G., and III.H. above.)

In cases like this, "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both."  (Cal. Civ. Code § 1691; *Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal. App. 5th 881, 888.)

"Rescission extinguishes the contract, terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. Thus, the relief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the status quo ante, returning him to his economic position before he entered the contract."  (*Sharabianlou v. Karp* (2010) 181 Cal. App. 4th 1133, 1145.)

---

[32] These claims (except the Section 496 claim) were asserted in the demand filed by the MOM Respondents and the MOM JV Entities in the MOM Arbitration on September 27, 2023, together with Attachment 1 and the exhibits thereto, including the First Amended Complaint originally filed in OCSC Case No. 30-2023-01322886.

Where rescission is warranted, "[t]he aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled." (Civ. Code § 1692; *Wong v. Stoler* (2015) 237 Cal. App. 4th 1375, 1387–88, 1389–90.) Although in general each party must return the consideration they received, if "defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiff," courts "are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff." (*Wong*, *supra*, 237 Cal. App. 4th at 1389.) And the defrauding party has the burden to prove any offsets to which they claim they are entitled. (*McCoy v. West* (1977) 70 Cal. App. 3d 295, 302-303; *Gentry v. Kelley Kar Co.* (1961) 193 Cal. App. 2d 324, 337; *Grill v. Hunt* (1992) 6 Cal. App. 4th 73, 79 ["The implicit rationale of these cases is that risk of any difficulty in proof should not inure to the benefit of the party responsible for the failure of the contract"].)

All told, if Claimants elect rescission, they will be entitled to restitution and consequential damages in amounts to be determined following the accounting, and Respondents will have the burden of proving their right to any offsets.

### 2. Damages Without Rescission

In the alternative, if Claimants elect to affirm and retain the benefits of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, then they will be entitled to recover damages for fraud in the inducement and breach of the Operating Agreements. (§§ III.A. and III.B. above.) While the fact of these damages is certain, and some amounts are known, the total amount will be determined following the accounting.

### 3. Derivative Damages

With or without rescission, Claimants are entitled to recover damages from Respondents, for the derivative conversion, Section 496, and unjust enrichment claims on behalf of the MOM JV Entities. (§§ III.D., III.E., III.F. and III.I. above.) Spindler calculated Respondents' actions caused at least $45,011,937 and at most $169,845,578 in damages to the MOM JV Entities themselves. (Exs. 1006, 1509; 7.9 Tr. at 3081:17-3082:1.) The Arbitrator will determine the amount of these damages (including any trebling) after the accounting is complete. The MOM Respondents are liable for the total, but Nano is only responsible for $21 million of the total ($20 million Nano Loan plus $1 million for the Tesoro Loan). (Exs. 1006, 1509; 7.9 Tr. at 3035:13-3036:14.) Also, Respondents may only be liable for the $20 million Nano Loan to the extent the MOM JV Entities remain as the borrowers, their properties are encumbered by the Nano deeds of trust, and their subsidiary LLC membership interests are pledged as security.

### 4. Punitive Damages

To recover punitive damages Claimants must prove, by clear and convincing evidence, that Respondents have "been guilty of oppression, fraud, or malice…." (Civ. Code § 3294.) Claimants argue they have proven oppression, fraud, and malice. The MOM Respondents argue they have not proven oppression, fraud, or malice. The Arbitrator has found Claimants have proven, by clear and convincing evidence, that Respondents committed fraud in the inducement. (§ III.A. above.) On this basis alone, Claimants are entitled to punitive damages. (Civ. Code § 3294(c)(3).) The Arbitrator further finds, based upon the totality of the evidence, Claimants have proven, by clear and convincing evidence, that Respondents have been guilty of oppression and malice as those terms are defined in Civil Code section 3294(c)(1) and (c)(2). However, until the accounting is complete, the full nature and extent of Respondents' wrongdoing, the damages Claimants have suffered as a result, and the other factors the Arbitrator will need to consider when awarding punitive damages cannot be determined. (See generally, 6 Witkin, Summary of California Law (11th ed. 2017) Torts, §§ 1727- 1785.) Therefore, the Arbitrator will determine the amount of punitive damages to be awarded after the accounting is complete.

### 5. Attorney Fees

As the prevailing parties in this arbitration, Claimants are entitled to recover their attorney fees, in an amount to be determined. (Ex. 313-315, § 17; Civ. Code § 1717; *Hastings v. Matlock* (1985) 171 Cal. App. 3d 826 [attorney fees proper when contract is rescinded for failure of consideration or for intentional misrepresentation]; Section 496(c); and 6 Del. C. § 18-1004.)

### 6. Interest

Claimants claims for pre and post-judgment interest will be resolved after the accounting is complete and the Arbitrator determines the amount of damages to be awarded.

### 7. Receiver

The MOM Respondents have had complete control of the JV since they excluded Honarkar in 2023. (Ex. 677; 6.25 Tr. at 459:20-23.) While the Arbitrator cannot appoint a receiver (*Marsch v. Williams* (1994) 23 Cal. App. 4th 238), one is necessary to place the JV in "safe hands" and to prevent the MOM Respondents from further dissipating the JV's assets before the accounting is completed and this arbitration is concluded. Claimants' interests in the JV's assets are more than "probable" and the MOM Respondents conduct prior to and during this arbitration shows the JV's assets are certainly "in danger of being lost, removed, or materially injured." (CCP § 564, subd. (b)(1).) In addition, a receiver is "necessary to preserve the [JV's] property [and] the rights of [Claimants]." (CCP § 564, subd. (b)(9).)

## IV.    SUMMARY OF CONCLUSIONS AND FURTHER PROCEEDINGS

1.    Claimants have proven their fraudulent inducement claim against Makhijani, Continuum and the MOM Members; and Claimants are therefore entitled to elect the alternative remedies of either compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A., III.G., and III.N.1 .above; ¶ 13 below; FAC at 22-23.)

2.    Claimants have proven their breach of contract (Operating Agreement) claims against the MOM Members and the MOM Managers; and Claimants are therefore entitled to the alternative remedies of compensatory damages or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.B.1.-B.5. and III.N.2. above; ¶ 13 below; FAC at 24-25.)

3.    Claimants have not proven their breach of contract (Management Agreement) claim against the MOM Members and the MOM Managers.  (§ III.B.6. above; not pleaded in FAC.)

4.    Claimants have proven their forcible entry and forcible detainer claims against Makhijani, Continuum and the MOM Parties; and Claimants are therefore entitled to restitution of the subject premises (775 Laguna Canyon Road) and incidental damages in amounts to be determined.  (§§ III.C. and III.G. above; ¶ 13 below; FAC at 31-33.)

5.    Claimants have proven their derivative conversion claim against Makhijani, Continuum, the MOM Parties and Nano; and the MOM JV Entities (as Derivative Claimants) are therefore entitled to recover compensatory damages in amounts to be determined.  (§§ III.D., III.G. and III.I. above; ¶ 13 below; FAC at 28-29.)

6.    Claimants have proven their derivative Section 496 claim against Makhijani, Continuum, the MOM Parties, and Nano; and the MOM JV Entities (as Derivative Claimants) are therefore entitled to recover compensatory damages in amounts to be determined.  (§§ III.E., III.G., and III.I. above; ¶ 13 below; FAC at 30-31.)

7.    Claimants have proven their derivative unjust enrichment claim against Makhijani, Continuum, and the MOM Parties; and the MOM JV Entities (as Derivative Claimants) are therefore entitled to recover compensatory damages in amounts to be determined.  (§§ III.F. and III.G. above; ¶ 13 below; FAC at 29-30.)

8.    Claimants have proven their conspiracy to commit and aiding and abetting fraudulent inducement claims against Nano; and Claimants are therefore entitled to the alternative remedies of compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A. and III.H. above; ¶ 13 below; FAC at 33-37.)

47

9.      Claimants have not proven their derivative breach of contract claim against Nano.  (§ III.J. above; FAC at 37.)

10.      Claimants have proven their accounting claim against the MOM Parties; Claimants are therefore entitled to the accounting requested; and the accounting shall be the subject of further proceedings in this arbitration.  (§ III.K. above; ¶¶'s 16 and 17 below; FAC at 26.)

11.      Claimants have proven their declaratory relief claim against the MOM Parties; and Claimants are therefore entitled to the declaratory relief requested.  (§ III.L. above; FAC at 27.)

12.      The MOM Respondents have not proven any of their (counter) claims against Honarkar (including trespass, conversion, Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory or injunctive relief).  (§ III.M. above.)

13.      All amounts of restitution, consequential damages, compensatory damages, incidental damages, punitive damages and interest (if any) to be awarded to Claimants shall be determined in further proceedings in this arbitration.  (¶¶'s 1, 2, and 4-8 above; and ¶¶'s 16 and 17 below.)

14.      Claimants shall recover from Respondents attorney fees and costs, in amounts to be determined.  (§ III.N.5. above; ¶¶'s 16 and 17 below; JAMS Rule 24(f) and 24(g).)  Claimants shall file an application for fees and costs within 20 days after this Partial Interim Award is served.  Respondents may file opposition within 10 days, and Claimants may file a reply within 5 days.  The Arbitrator may rule on the application without conducting a hearing.

15.      It is not intended this Partial Interim Award be subject to judicial review pursuant to the CAA (CCP §§ 1284, 1285) or the FAA (9 U.S.C. §§ 9, 10) or any other law, and the Arbitrator reserves jurisdiction over all claims submitted to arbitration until a Partial Final Award is issued.

16.      This Partial Interim Award, together with the determinations regarding the amounts of attorney fees and costs to be awarded (¶ 14 above), shall be embodied in a Partial Final Award. It is intended the Partial Final Award will be subject to judicial review as to those issues finally determined therein, so the parties may return to the Superior Court and seek (i) confirmation of the Partial Final Award, and (ii) appointment of a receiver (§ III.N.7. above) to oversee the JV during the period in which the accounting and the further proceedings in this arbitration are conducted.  The Arbitrator reserves jurisdiction to determine such additional issues as may arise between the parties, together with all issues not finally determined in the Partial Final Award, including those related in any way to the accounting and the determination of the amounts of restitution, damages, and interest to be awarded.  (See JAMS Rules 24 and 25; *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1437 [Arbitrator has the authority to issue a partial or interim award and to reserve jurisdiction to issue a final award on the remaining issues.].)

17.     After the accounting has been completed and the amounts of restitution, damages, and interest to be awarded have been determined; after all further proceedings in this arbitration have been concluded; and after all issues not finally determined in the Partial Final Award have been resolved; the Arbitrator will issue a Final Award which will include a supplemental award for attorney fees, costs, and expenses incurred in this arbitration through entry of the Final Award. (See JAMS Rules 24 and 25; ¶ 14 above; *Hightower*, *supra*, 86 Cal.App.4th at 1437-1441.

18.     Consolidated Scheduling Order No. 100 shall remain in full force and effect and shall govern all further proceedings in this arbitration.

19.     A virtual interim status conference shall take place at 8:30 a.m. on April 14, 2025.  A further interim status conference or a final status conference will be scheduled at that time.

DATED:  February 21, 2025                    _____

                                             Hon. David A. Thompson (Ret.)

# EXHIBIT 2

**JAMS ARBITRATION**
**No. 5220003126**
**(Consolidated with JAMS Case No. 5200001122)**

<table>
<tr>
<td>

Mohammad Honarkar and 4G Wireless, Inc.,
individually and on behalf of MOM AS Investco LLC,
MOM BS Investco LLC, and MOM CA Investco
LLC,

        Claimants and Derivative Claimants,

v.

Mahender Makhijani; Continuum Analytics, Inc.;
MOM AS Investor Group LLC; MOM BS Investor
Group LLC; MOM CA Investor Group LLC; MOM
AS Manager LLC; MOM BS Manager LLC; MOM
CA Manager LLC; and Nano Banc,

        Respondents,

        and,

MOM AS Investco LLC, MOM BS Investco LLC, and
MOM CA Investco LLC,

        Nominal Respondents.

―――――――――――――――――――――――

**Consolidated case:**

MOM AS Investco LLC, MOM BS Investco LLC,
MOM CA Investco LLC, MOM AS Investor Group
LLC, MOM BS Investor Group LLC, and MOM CA
Investor Group LLC,

        Claimants,

v.

Mohammad Honarkar,

        Respondent.

</td>
<td>

**PARTIAL FINAL AWARD**

</td>
</tr>
</table>

**Counsel:**

*For Claimant and Cross Respondent Mohammad Honarkar ("Honarkar"); Claimant 4G Wireless, Inc. (individually "4G," and collectively with Honarkar, the "Claimants"); and Derivative Claimants MOM AS Investco LLC ("MOM AS JV"), MOM BS Investco LLC ("MOM BS JV"), MOM CA Investco LLC ("MOM CA JV") (collectively, the "MOM JV Entities"):*

Aaron May, Esq., Joseph Ybarra, Esq., Abigail E. Marion, Esq., Thomas Rubinsky, Esq., and Halpern, May, Ybarra, Gelberg LLP; and Sam Maralan, Esq., and Maralan Law, P.C.

*For the MOM JV Entities:*

Anthony Bisconti, Esq., and Bienert Katzman Littrell Williams, LLP.

*Counsel for Respondents Mahender Makhijani ("Makhijani") and Continuum Analytics Inc. (individually "Continuum," and collectively with Makhijani, the "Makhijani Parties"):*

Marc Cohen, Esq., and Cohen Law Group, APC.

*For Respondents and Cross Claimants MOM AS Investor Group LLC ("MOM AS Member"), MOM BS Investor Group LLC ("MOM BS Member"), MOM CA Investor Group LLC ("MOM CA Member") (collectively, the "MOM Members") and MOM AS Manager LLC ("MOM AS Manager"), MOM BS Manager LLC ("MOM BS Manager"), MOM CA Manager LLC ("MOM CA Manager") (collectively, the "MOM Managers"):*[1]

Michael Farrell, Esq., Scott Leipzig, Esq., Tim Hsu, Esq., Stephanie Roberts, Esq., Gabriela Perez, Esq., Leilee Ghassemi, Esq., Shauna Woods, Esq., Suzanne Kenney, Esq., and Allen Matkins Leck Gamble Mallory & Natsis LLP.[2]

*For Respondent Nano Banc ("Nano"):*

Ann Marie Mortimer, Esq., Lawrence DeMeo, Esq., Hakop Stepanyan, Esq., and Hunton Andrews Kurth LLP.

**Arbitrator:** Hon. David A. Thompson (Ret.)

**Place of Arbitration:**  JAMS, Los Angeles, California

**Date of Partial Final Award:**  May 23, 2025

---

[1] At times, the Arbitrator will refer to the MOM Members and the MOM Managers together as the "MOM Parties;" to the MOM Parties and the Makhijani Parties as the "MOM Respondents;" and to the MOM Respondents and Nano Banc as the "Respondents."

[2] Allen Matkins also represented: (i) the MOM JV Entities, at all times prior to April 23, 2025, including during the Hearing and the post-Hearing briefing and argument, and (ii) Makhijani and Continuum, prior to November 9, 2023.

THE UNDERSIGNED ARBITRATOR, having been designated by JAMS in accordance with § 19.10 of the Operating Agreements (the "Operating Agreements") for the MOM JV Entities, dated as of June 8, 2021, and having examined the claims, defenses, evidence, and arguments of the parties; now finds, concludes, rules, orders, and issues this Partial Final Award:

## I.   INTRODUCTION AND KEY PROCEDURAL HISTORY

This is a real estate joint venture dispute centered on fraud and breach of contract claims. The joint venture ("JV") comprises a portfolio of commercial properties that were previously owned by Claimants and are now owned by the MOM JV Entities.  The MOM JV Entities are managed by the MOM Managers, and the members of the MOM JV Entities are the MOM Members and Honarkar.  Claimants filed the operative First Amended Statement of Claims in Arbitration ("FAC") on October 13, 2023.  Claimants claim they were fraudulently induced by Makhijani, Continuum, and the MOM Parties into signing the Operating Agreements (Exs. 313-315) and other JV related agreements (the "Other JV Related Agreements"),[3] and further claim Nano is liable for conspiracy to commit and aiding and abetting the commission of fraudulent inducement by the MOM Respondents.[4]  Claimants also claim the MOM Parties breached the Operating Agreements and a Management Agreement that predated the JV (Ex. 37, the "Management Agreement").  In addition, Claimants claim the MOM Respondents violated California's forcible entry and detainer laws in connection with an incident at the 4G offices.

Finally, Claimants assert derivative claims on behalf of the MOM JV Entities (as Derivative Claimants) against Makhijani, Continuum, the MOM Parties, and Nano for conversion and violation of Penal Code section 496 ("Section 496"), for unjust enrichment against the MOM Parties, and for breach of contract against Nano based on the loan agreement between the MOM JV Entities and Nano.

Nano filed an Answer to the FAC on November 3, 2023. The MOM Parties and the MOM JV Entities (represented by Allen Matkins) and Makhijani and Continuum (represented by the Cohen Law Group) filed Answers to the FAC on November 21, 2023.

In a separate (now consolidated) demand for arbitration filed with JAMS on September 28, 2023, and amended on June 6, 2024, the MOM JV Entities and the MOM Members alleged (counter) claims against Honarkar for conversion, intentional interference with contractual relations and prospective economic advantage, and declaratory relief in connection with the parties' rights and obligations under the Operating Agreements and other JV agreements.  They also brought claims for trespass related to incidents at two JV properties in Laguna Beach.

---

[3] The Other JV Related Agreements include: the June 8, 2021, Asset Contribution Agreement (Ex. 304, the "ACA"); the June 8, 2021, Release Agreement (Ex. 317, the "Release"); the June 07, 2021, Consulting Agreement (Ex. 232).

[4] Nano became a party pursuant to the October 11, 2023, Arbitration Agreement between Claimants and Nano.

**Motions Contesting Arbitrability and Jurisdiction**

On November 29, 2023, the MOM Parties, Makhijani and Continuum filed motions contesting arbitrability and jurisdiction.  Both motions were denied in the Arbitrator's "Rulings on Motions Contesting Arbitrability," dated January 3, 2024.  Among other things, the Arbitrator rejected: (1) the MOM Parties' arguments that the FAC was not arbitrable, and should be transferred back to state superior court for resolution because (i) Claimants' declaratory relief and accounting claims could not be arbitrated, and (ii) Claimants had waived their right to arbitration; and (2) Makhijani's and Continuum's assertions that (i) the issue of whether Makhijani and Continuum could be compelled to arbitrate under the Operating Agreements had to be determined by the court, not the Arbitrator, since they are not signatories to the Operating Agreements, and (ii) Makhijani and Continuum could not be compelled to arbitrate in any event.

**Other Pre-Hearing Proceedings, Orders and Rulings**

Preliminary, interim, final status, and discovery conferences, motion hearings, and other pre-hearing proceedings were conducted on the following dates:  February 2, March 15, March 20, March 22, May 25, May 29, and June 12, 2024.  The Arbitrator issued: Scheduling Order Nos. 1-5, and Consolidated Scheduling Order Nos. 100 and 101; and rulings on discovery disputes, claim amendments, hearing logistics, and motions to continue the arbitration hearing.

**The Evidentiary Hearing and the Partial Interim Award**

The evidentiary hearing ("Hearing") was conducted on June 24-28 and July 1-12, 2024.  The following witnesses testified: Honarkar, Brian Buchanan, Michael Kluchin ("Kluchin"), Makhijani, Kara Cobb, Marc Cohen, Glenn Taxman, Daniel Niazi, Anthony Gressak ("Gressak"), Michael Spindler (Claimant expert), Frederick Gartside, Joseph Pohlot (Respondent expert), Deba Shyam ("Shyam"), Max Prendergast, and Wayne Platt (Respondent expert).  The documents and deposition transcripts in the Joint Admitted Exhibit List dated August 22, 2024, were admitted into evidence.  The Hearing was reported by Katherine Thomas, CSR 14378.

At the conclusion of the Hearing, the parties confirmed there was no further evidence for the Arbitrator to consider.  The parties filed simultaneous closing, opposition and reply briefs on August 23, 2024, September 20, 2024, and October 4, 2024, respectively.

Virtual oral closing argument was conducted on December 17, 2024, the matter was then deemed "closed" by application of JAMS Rule 22(i) and by the agreement of the parties, and a Partial Interim Award (the "Partial Interim Award") was timely rendered on February 21, 2025.[5]

---

[5] *See* 7.12 Tr. at 3940:21 through 3941:5, and the discussion which follows; *see also* JAMS Rule 24(a) and the January 10, 2025, Notice of Award Due Date.

**Post-Hearing Proceedings, Orders and Rulings**

On February 28, 2025, the MOM JV Entities filed for Chapter 11 bankruptcy. On April 28, 2025, the Bankruptcy Court, modified the automatic stay "to allow the Honarkar Parties to: (i) pursue and obtain an award of attorneys' fees and costs in the Arbitration; and (ii) proceed in the … bankruptcy cases ... with the accounting granted in the Arbitration Award …."[6] The Arbitrator conducted Post-Hearing status conferences and motion hearings on April 14, May 2, and May 12, 2025; issued Consolidated Scheduling Order Nos. 102-106; and issued rulings on Claimants' request to clarify one aspect of the Partial Interim Award, and on Claimants' motion for attorney fees and costs (§ III.N.5.; and § IV.14. below).

## II.     FACTS

These factual findings are necessary to this Partial Final Award.  They are derived from admissions in the pleadings and the testimony, argument, and evidentiary exhibits presented at the Hearing.  All relevant evidence that has a tendency in reason to prove or disprove a fact of consequence to this decision has been considered, even if not specifically mentioned herein.  To the extent that these findings differ from any party's position, that difference is the result of determinations by the Arbitrator as to witness credibility, relevance, burdens of proof, legal principles, and weighing of the evidence, both oral and written.

**Honarkar's Cell Phone Business, Real Estate Business and Financial Distress**

Shortly after Honarkar moved to the United States from Iran, in the mid-1980's, he started a small business selling wireless cell phones.  Honarkar built the cell phone business, which ultimately became 4G, into a highly successful enterprise that included 160 stores in five states.  He currently owns 100% of 4G, though he sold the cell phone business assets of 4G to Verizon Wireless in January 2016.

With the proceeds from the sale of the cell phone business, Honarkar began amassing a real estate portfolio.  Properties were purchased both in his name and through 4G and held by various limited liability companies ("LLCs").  Over time, Honarkar developed the portfolio into an operation worth several hundred million dollars.  The properties ranged from large hotels to commercial real estate to individual homes used as luxury vacation rentals, most of which were located in Laguna Beach or Palm Desert and the surrounding areas.

By March 2020, COVID-19 surged and the global pandemic was declared.  Over the following year, the pandemic had a devastating effect on the hospitality and commercial industries.  Honarkar's real estate businesses were similarly affected.

---

[6] On May 5, 2025, the Bankruptcy Court also dismissed the Chapter 11 bankruptcy filed by the MOM Members.

At that time, Honarkar was also involved in a contentious divorce. In July 2020, his former wife obtained the appointment of a receiver, Blake Alsbrook, to oversee Honarkar's properties. (Ex. 3905.) In addition to the effects of the pandemic, Alsbrook reported the infrastructure, staff, and systems in place were "woefully inadequate" to profitably operate the properties in the portfolio. (Ex. 2008, ¶¶ 9(a), 9(b).) He also reported the accounting and tax practices were inadequate and corporate formalities were generally ignored, pointing out the "brazen" movement of funds after a special report on interference had been submitted to the court. (*Id.*, ¶¶ 9(b), 71.) Most importantly, Alsbrook reported the "cash on hand was woefully insufficient to make the vast loan, payroll, creditor and settlement payments." (*Id.*, ¶ 9(b).) To resolve the dispute with his wife and to remove the receivership, Honarkar entered into a stipulated judgment to pay his former spouse $17.5 million on or before June 12, 2021. (Ex. 2107.) Alsbrook was discharged as receiver in late December 2020.

Around that time, a loan from LoanCore Capital to Honarkar (the "LoanCore Loan") in the original principal amount of $195 million dollars was coming due. The LoanCore Loan was secured by, among other things, deeds of trust encumbering the majority of Honarkar's real estate assets, as well as a personal guarantee. In December 2020, Honarkar failed to make a $136 million balloon payment when due, and the LoanCore Loan went into default.

In January 2021, at the request of LoanCore, a new receiver, Douglas Wilson, was appointed over the Honarkar properties that secured the LoanCore Loan. (Ex. 3716, at 10-11, 13-17.) LoanCore obtained the receiver on the basis that Honarkar had been diverting rents from the properties in which LoanCore asserted it had a security interest. (Ex. 3716, at 8-9, 15.) The receivership was to be in place until Honarkar refinanced and paid off the LoanCore Loan.

A few months after Wilson was appointed as receiver, DIG PFSS LBCP Holding Company LLC ("DIG") purchased the LoanCore Loan. Honarkar and his team were concerned that DIG intended to foreclose on the properties that secured the LoanCore Loan. (Exs. 4085, at 182; 2411 at 4.) These concerns were legitimate. DIG immediately acted and scheduled foreclosure sales to begin on June 15, 2021. (*Id.*)

**Honarkar's Search for Funding and Introduction to Makhijani and Continuum**

During the first half of 2021, under considerable time pressure as a result of the DIG purchase of the LoanCore Loan, the pending foreclosures, and the payment due to his former wife, Honarkar sought funding from multiple sources, including Nano. As expected, it was challenging for Honarkar to obtain financing, given the extraordinary time pressures, dollar amounts and risks involved, together with the uncertainties created by the pandemic.

Honarkar had previously borrowed money from Nano and had an existing relationship with Gressak, Nano's then-Chief Credit Officer (and later interim CEO). Gressak referred Honarkar to Makhijani at Continuum, an entity that acquires and manages distressed real estate assets for groups of investors. (Ex. 52.)

Both Makhijani and Continuum had established, long-standing, and deeply ingrained affiliations with Nano. Nano was founded by, among others, Continuum's legal owner, Shyam, along with several of Continuum's largest investors (Gerald Marcil, Andrew Stupin, and Bhajneet Singh Malik), all of whom provided millions in seed capital, remain shareholders in Nano, and have borrowed over $100 million from the bank. (Ex. 1000 at 181:18-190:6.) Gressak, though no longer with Nano, remains a significant shareholder. (7.8 Tr. at 2609:22-25.) Makhijani is one of Nano's largest referral sources and is also involved in the bank's management. (Ex. 1000 at 200:20-203:3.) The relationships between Makhijani, Continuum, Nano, and their employees and investors including Shyam are interwoven and overlapping.

Ultimately, Nano and Continuum became the sole solution for Honarkar's financial difficulties. On May 19, 2021, Nano provided to Honarkar a letter of intent ("LOI") for a $150 million loan to pay off the LoanCore Loan. (Ex. 106.) This loan was to be made by Nano and "participant banks" and be secured by deeds of trust on a number of Honarkar's properties. Though Gressak was actively signaling otherwise, Daniel F. Patrick, Nano's Person Most Knowledgeable ("PMK") witness testified (via deposition admitted into evidence) Nano was incapable of extending that amount of financing to anyone. (Compare Exs. 139 [Gressak May 21 email to Honarkar: "We are aware of foreclosure sales starting June 15th on the properties and we can close prior to that date"], 211 [Gressak June 3 email to Honarkar *et al.*, seeking update from Honarkar's counsel: "[W]e are ready to fund man!!!], and 171 [email thread with Gressak, Makhijani, Honarkar et al. on "imminent" refinance with $150 million from Nano]; with Exs. 1000 at 40:9-41:6 [Patrick PMK testimony: $150 million is "well beyond the bank's legal lending limit for a single loan"]; 7.8 Tr. at 2600:15-21 [Gressak testimony – "Q: And Nano Banc never would have approved Mr. Honarkar for a $150 million loan, correct? A: Correct"].)

During this time, Honarkar was also negotiating the JV terms with Makhijani and Continuum. Most interesting, on May 20, 2021, one day after Nano provided the $150 million LOI to Honarkar, Nano provided to Shyam an LOI for a $20 million loan (the "Nano Loan") to the MOM JV Entities, entities that had not yet been formed, and the proceeds of the $20 million Nano Loan were to be used to help pay off the LoanCore Loan. (Ex. 130.) The $20 million Nano Loan was to be secured by an assignment of membership interests in 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC, and "abundance of caution" deeds of trusts encumbering properties held by these four subsidiary LLCs, all of which were then wholly owned by Claimants. (*Id.* at 2.) At that time there were no agreements between Honarkar and any of the MOM Parties.

7

**The Term Sheet**

On May 24, 2021, just days after Nano issued the $20 million Nano Loan LOI to Shyam, Honarkar, 4G, and Continuum entered into the Term Sheet for the JV. (Ex. 148, the "Term Sheet".) It was signed by Honarkar on behalf of 4G and by Makhijani on behalf of Continuum.

The Term Sheet contemplated an initial capital contribution of $35 million by Continuum, characterized as "cash equity," in addition to Continuum's obligation to secure refinancing to pay off the balance of the LoanCore Loan, then estimated at $140 million. (Ex. 148 at 2.) The initial contribution by Continuum was to be credited to two existing projects in Honarkar's portfolio, Hotel Laguna, and a property in Los Angeles' Koreatown, though both Honarkar and Kluchin, Director of Operations at Continuum, testified that half of the initial contribution ($17.5 million) was first intended to be used to pay off the stipulated judgment in favor of Honarkar's former wife. (*Id.*; 6.24 Tr. at 108:11-109.4; 6.28 Tr. at 1214:6-15.)

In exchange, Claimants were obligated to contribute their interests in the subsidiary LLCs that held title to some of the properties in their portfolio. (Ex. 148 at 2, Exs. A and C.) The Term sheet was binding on Honarkar but not Continuum. (Ex. 148 at 8-10.) So, Continuum could terminate at any time, but Honarkar could not pursue other refinancing options.

Aside from the Hotel Laguna and Koreatown projects, Honarkar was entitled to sell and/or refinance the other real estate assets covered by the Term Sheet, subject to Continuum's qualified consent rights. (Ex. 148 at 8 [Managers provision].) Further, assuming Continuum received a 20% preferred return on all of its capital contributions, Honarkar was entitled to the entirety of the sale proceeds of those other assets. (*Id.* at 4-6 [Distributions provision].)

**The Draft Operating Agreements**

Glenn Taxman, Honarkar's transactional counsel, offered to provide initial drafts of the Operating Agreements, but Continuum's lawyers took the lead instead. On May 28, 2021, Kluchin shared draft Operating Agreements, not with Honarkar but with First Choice Bank, one of the banks through which Continuum was seeking financing to pay off the LoanCore Loan. (Ex. 1479 [attachments include MOM Manager Operating Agreements].) Kluchin did not send Honarkar and Taxman draft Operating Agreements until June 2, 2021. (Ex. 191.)

Everyone agrees the JV document negotiation and drafting process was chaotic and frantic. Kluchin pressured Honarkar into signing early, before the documents were finalized. (*E.g.,* Ex. 288 [Kluchin to Honarkar team – "We are in a mad rush to produce documents for the bank. We need signature blocks…tonight asap with the understanding the JV is not final until both attorneys…send final versions of the full agreements"]; Exs. 347, 352.)

There was a constant flurry of emails back and forth between the parties and their respective counsel, in which it was unclear whether comments from Honarkar's side had been acknowledged and/or incorporated in existing drafts or if comments from Honarkar's side had even been solicited. All of this confused the process further and caused additional delay. (Ex. 0217 at 2-3 [Taxman to Kluchin – "Why are you sending us a different JV Agreement now?...We are sticking with the prior document you sent to us for negotiating purposes…My partner is already 80% thru the other draft….[This] makes zero sense and it actually delays the process…I am going to run a redline of what [Kluchin] originally sent against this new document…"]; Ex. 2382 at 3 [Taxman to Continuum "Guys, time to cut to the chase here if we have any chance of getting to final documents. Please include your outside counsel on an email to us so we can deal directly with them. [Kluchin] playing middleman is slowing down the process and getting a redline of Document A vs. Document B is not helping the process'"].)

Admittedly, the process included "lots of moving targets." (Ex. 217 at 3 [email from Makhijani to Taxman and Honarkar].) Many of the documents were approved piecemeal. The initial drafts of the Operating Agreements had blank or incomplete exhibits. (Compare Exs. 191 at 38-41; 276 at 14-18; 298 at 17-21, with Ex. 315 at 40-46.) Plus, Exhibit C to the draft Operating Agreements was supposed to list Honarkar's "Other Owned LLC's" to be contributed to the JV. (Ex. 315 at 43.) But Exhibit C was not finalized and sent to Honarkar and his team until after 11pm on June 7, 2021, the night before the JV formation and LoanCore refinancing closing date. (Ex. 2554.) To populate Exhibit C, Makhijani used a comprehensive list of entities owned by and affiliated with Honarkar's businesses provided by Dan Niazi, 4G's Chief Operating Officer, earlier that day, on June 7, 2021. (Ex. 1397.) According to Honarkar and Niazi, that list was provided only for the Continuum investor's due diligence purposes, not as a final inventory of contributed entities. (6.24 Tr. at 128:25-131:25; 7.5 Tr. at 2467:17-2471:13.)

**The Final Operating Agreements**

Because Continuum was unable to secure enough financing to pay off the LoanCore Loan, Makhijani proposed that Continuum reduce its initial contribution to $30 million, and use it to "close the gap," despite Continuum's $35 million initial contribution obligation in the Term Sheet. (Exs. 2411, 385; 6.24 Tr. at 139:7-141:6.) Honarkar testified these changes in the initial contribution terms prevented him from paying off his former spouse as agreed, and resulted in his loss of their former residence. (6.24 Tr. at 152:14-153:24.)

Still, the Operating Agreements were signed and the MOM JV Entities were formed on June 8, 2021. (Exs. 313 [MOM AS JV]; 314 [MOM BS JV]; 315 [MOM CA JV].) That same day, the parties also closed escrow on the LoanCore Loan refinancing. (Ex. 308.) The refinancing Escrow Closing Statement showed two separate wire transfers from Continuum to the escrow holder: one in the amount of $20 million and one in the amount of $10 million. (*Id.*)

The Operating Agreements are substantially similar and the pertinent provisions include:[7]

(1)     The parties to the MOM CA JV Operating Agreement are the MOM CA Manager as the Managing Manager, the MOM CA Member as the MOM Member, and Honarkar as the MO Member and the Administrative Manager.[8] (Ex. 315 at 6; §§ 9.1, 9.2, 9.3.) Honarkar signed for himself. Shyam signed as the Manager of the MOM CA Manager on behalf of both the MOM CA Manager and the MOM CA Member. (Ex. 315 at 38.)[9]

(2)     The MOM CA JV Operating Agreement obligated the MOM CA Member to make a $30 million "Contribution" to be used "for the Hotel Laguna Project, which shall be disbursed as set forth on Exhibit B…." (Ex. 315 at § 6.1(c) ["Initial Contributions"].) Exhibit B in turn stated, "Fund shortfalls in the refinance of debt completed on or about the date hereof." (*Id.* at Ex. B [Disbursement of Contribution for Hotel Laguna Project].) "Contribution" was defined as "money or property, or a promissory note or other binding obligation to contribute money or property" that a "Member contributes … as capital." (*Id.* at § 1.19.) But loans by the MOM CA Member "shall not be considered Contributions for purposes of this Agreement." (*Id.* at § 6.5.)

(3)     The Operating Agreements required Honarkar to contribute certain LLCs he and 4G owned or controlled, defined as either "Subsidiaries/Other Owned LLCs" or "Projects." (Ex. 315 at §§ 1.40, 1.48, 1.45, 6.1(a), Ex. C.) For the MOM CA JV, the only identified "Project" was the Hotel Laguna Project. (*Id.* at § 1.45.) Each of the other listed entities was a "Subsidiary/Other Owned LLC." (*Id.* at Exs. C, D.) Makhijani and Continuum through the MOM Member had the discretion to make a capital contribution to a "Subsidiary/Other Owned LLC" property and convert it to a "Project" under the Operating Agreement. (*Id.* at § 6.1.)

(4)     The Managing Member was not entitled to sell the assets of or ownership interests in the "Subsidiary/Other Owned LLCs" absent Honarkar's prior written consent, unless Honarkar was in default, as defined. (Ex. 315 at §§ 9.3(b), 1.36.)

(5)     Self-dealing transactions were prohibited without the written consent of both the Managing Manager and the Administrative Manager. (Ex. 315 at § 9.15.)

---

[7] The Arbitrator will use the MOM CA JV Operating Agreement as the reference agreement. (Ex. 315.) The material terms of the MOM AS JV and MOM BS JV Operating Agreements are substantially similar.

[8] On July 14, 2022, the parties executed a Letter Agreement (the "Letter Agreement") amending the Operating Agreements to clarify that 4G was the MO Member of the MOM JV Entities, not Honarkar personally. (Ex. 583 at § 3 ["It was intended for 4G and not [Honarkar] to be the MO Member of the Companies. Accordingly, the Salient Documents shall be deemed amended so that the MO Member is 4G without any further action by the parties"].)

[9] Similarly, Banayotis Haddad, a Continuum employee, signed the MOM AS JV Operating Agreement as the Manager of the MOM AS Manager on behalf of both the MOM AS Manager and the MOM AS Member. (Ex. 313 at 39.) And Jason Miller signed the MOM BS JV Operating Agreement as the Manager of the MOM BS Manager on behalf of the MOM BS Manager and the MOM BS Member. (Ex. 314 at 38.)

(6)    The Managing Manager was required to keep "full and accurate books and records" for
the MOM JV Entities, reflecting "all of the income, expenses and transactions." (Ex. 315 at §
12.1.)  The Managing Manager was also required to provide monthly and annual financial
reports, including balance sheets, profit and loss statements, and tax returns.  (*Id.* at § 12.2.)

That same day, Honarkar and the MOM Managers also executed the ACA, restructuring
and contributing Honarkar's and 4G's membership interests in the Other Owned LLCs to the
MOM JV Entities.  (Ex. 304 at § 2.)  The ACA specified certain entities (the "Held-Back LLCs")
were not subject to restructuring or contribution by Honarkar.  (*Id.* at Ex. E.)  But according to
Honarkar, the Operating Agreements mistakenly list multiple properties as Other Owned LLCs.[10]
(*E.g.*, Exs. 304, 315 at 43 [listing 4G itself and Modan LLC, which is owned by Niazi].[11])

Once the Operating Agreements were executed, Continuum assumed control of the MOM
JV Entities' bank accounts, as well as the bank accounts of the Other Owned LLCs.  Honarkar
continued the day-to-day business operations of the Other Owned LLCs.

**Continuum's Alleged Wrongdoing in Operating the JV**

Less than one month after the MOM JV Entities were formed, on or around July 1, 2021,
Continuum caused Tesoro Redlands DE LLC ("Tesoro Redlands"), an Other Owned LLC,[12] to
obtain a $1 million loan (the "Tesoro Loan") from Nano.  (Exs. 403, 409, 411.)  That same day,
one of the MOM investors, Enrico Arvielo, was repaid his $3 million investment in one of the
MOM Members.  (Ex. 405.)  The Tesoro Loan was secured by a deed of trust encumbering real
property owned by Tesoro Redlands, which was not recorded until March 2022.  (*Id.*)  When
Honarkar's staff received a monthly billing statement for the Tesoro Loan on September 23,
2021, an employee of Nano indicated it was "a billing error and not applicable to Tesoro."  (Ex.
2723.)  Honarkar was not involved in or aware of the Tesoro Loan.  (Ex. 488 [Tesoro Loan not
included in list of JV loans sent to Honarkar in Dec. 2021]; 6.27 Tr. at 960:14-961:7.)

---

[10] Notably, in September 2022 Kluchin sent a list of the "Contributed Entities" to an outside accounting firm to
prepare the MOM JV Entities' 2021 tax returns, but he did not include 4G, Modan LLC, BMV Apartments LLC, 7
Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach
Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E.
Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San
Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena
Vida RSM LLC, Pershing82 LLC, or Brookline Aliso Viejo LLC.  (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

[11] 6.24 Tr. at 130:10-17; 7.5 Tr. at 2469:16-2470:1; Ex. 622 [Kluchin email to Nano – "Modan LLC account has
nothing to do with Continuum or 4G.  This account belongs only to Dan Niazi"].

[12] Tesoro Redlands is owned by Tesoro Redlands LLC, an Other Owned LLC/Subsidiary of the MOM JV Entities.
(Ex. 279 at 2; Ex. 315 at 43.)

In early 2022, Honarkar proposed a sale of Tesoro Redlands, intending to use the proceeds to pay off debts owed to Makhijani/Continuum and other obligations. (Exs. 527, 533.) Makhijani refused to consent to the sale and instead refinanced the Tesoro Loan with Preferred Bank. (Exs. 530, 531, 533.) Though Honarkar ultimately consented to the Preferred Bank refinancing on February 25, 2022, conditioned upon his ability to sell the property after the refinance, Makhijani and Shyam (on behalf of the MOM CA Manager and MOM CA Member) set up the refinance and signed the relevant documents on February 22, 2022, prior to Honarkar's consent. (Exs. 529, 531, 533, 535.) Honarkar testified he was not informed where the refinance proceeds went and did not receive documentation relating to the refinance until over six months later. (Ex. 602 [email from Taxman on September 27, 2022 – "Mo has zero idea as to the amount of the refinance proceeds, the terms of the refinance loan and the use of the proceeds"].)

The evidence shows that when the Tesoro Redlands refinance with Preferred Bank closed on February 24, 2022, only some of the $39 million in proceeds were used to pay off existing debt. (Ex. 530.) Approximately $8.8 million was listed as a cash-out to the borrower, and $8.8 million was transferred directly into the Continuum bank account from the Tesoro Redlands bank account on March 1, 2022. (Ex. 541.) In addition, $2.8 million was held back by escrow and four months later transferred from the Tesoro Redlands bank account to the Continuum bank account. (Ex. 2894; 7.2 Tr. at 1528:5-1531:19.) It is unclear why these funds were transferred to Continuum or for what purpose they were ultimately used.

On April 10, 2022, the MOM Respondents sold a tenant-in-common (TIC) interest in Hotel Laguna, LLC for $1 million to Jaachak LLC ("Jaachak"), an entity owned and controlled by Continuum executive Jaspreet Singh Sethi. (Exs. 546, 549, 817; 6.27 Tr. at 983:19-990:17.) The TIC sale was consummated without using an escrow. Marc Cohen's client trust account was used instead because the trust company would not wire the sale proceeds to Continuum, which was not a party to the transaction. (Ex. 555 at 3-4; Ex. 558.) Upon receipt, Cohen sent the proceeds to Continuum. (Ex. 558; 7.5 Tr. at 2273:3-2280:14.) Both Honarkar and Niazi testified they were unaware of this transaction and did not receive any proceeds from it. In fact, the proceeds of the sale went directly to the MOM Members. (7.2 Tr. at 1766:6-1767:20 [Makhijani testimony that $1 million in TIC proceeds became Jaachak's capital contribution to a MOM Member].)

According to Honarkar and his attorney, Taxman, lack of transparency was a common theme in dealing with the MOM Respondents. Even when Honarkar and his team requested information, it seemed the complete financial picture was rarely provided. Taxman testified "[e]very time we met, we asked for information; we asked for financials. It was promised; it was never given. It was – you felt like Charlie Brown trying to kick the ball and Lucy pulling it up." (Tr. 7.5 at 2334:4-19.)

Also, Kluchin directed Nano to establish bank accounts for the LLCs contributed to the MOM JV Entities and to restrict access to Honarkar and his team.  On October 29, 2021, Kluchin directed Nano to "set up a new The Masters Building, LLC [account].  Signers are [Shyam] and me.  No one from 4G should be on this account.  This is very important.  [Honarkar], Chi Lu [4G's Controller] – no one.  Only [Shyam] and I….  Again no one from 4G should see or be on this account."  (Ex. 473; Ex. 590 [September 2022 email from Kluchin to Nano – "Note DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].)

**Honarkar's Alleged Discovery of the Nano Loan**

The Nano Loan closed and funded on June 7, 2021, one day prior to the effective date of the Operating Agreements and thus one day prior to the formation of the MOM JV Entities, and on that date all of the JV properties and subsidiary LLCs were still wholly owned by Claimants.  The $20 million Nano Loan proceeds were deposited in a Continuum bank account and then transferred to escrow that same day.  (Ex. 240 [Memorandum to Nano Loan Committee - "proceeds will need to be funded into a related DDA account (not owned by the Borrower) held at the Banc, Continuum Analytics…Nano Banc CCO, … Gressak, has spoken with the Borrower and has approved the funding of the account"]; Ex. 308 [June 8, 2021 escrow statement with two separate Continuum payments in the amount of $10 million and $20 million].)

In early 2023, Honarkar began exploring options to exit the JV.  In seeking alternative financing, on February 9, 2023, Honarkar discovered a deed of trust on one of the MOM JV Entities' properties, dated June 7, 2021, and securing the $20 million Nano Loan.  (Ex. 656.)  According to Honarkar, once he received the deed of trust, he ran title searches on the other properties in the MOM JV Entities.  He then discovered the $30 million initial contribution the MOM Members were obligated to make under the Operating Agreements had been funded in part by the $20 million Nano Loan obtained in the name of the MOM JV Entities themselves; and further, that the Nano Loan was secured by assignments of the MOM JV Entities membership interests in the four subsidiary LLCs,[13] and by deeds of trust encumbering properties owned by these subsidiary LLCs.[14]  (Ex. 239 at 78-82, 88-127; Exs. 234, 235, 236.)

On February 20, 2023, Honarkar sent a letter to Makhijani and Continuum, raising his concerns about several recorded instruments discovered as a result of the title searches, including deeds of trust relating to the Nano Loan, the Tesoro Loan, and loans from the Cantor Group V, and memoranda related to TIC transactions.  (Ex. 659.)  According to Honarkar, he received no response or further information pertaining to the issues raised in this letter.

---

[13] These are 689 South Coast Hwy LLC, Laguna HI LLC, Laguna HW LLC, and The Masters Building LLC.

[14] In these respects, the structure of the Nano Loan was similar to the structure of the loans from the other three lenders who participated in the LoanCore refinance (First Choice, Preferred, and Lone Oak).

On March 22, 2023, Honarkar's then-counsel (Latham & Watkins LLP) sent a formal books and records demand for each of the MOM JV Entities, seeking basic financial and transactional documents pursuant to the Operating Agreements. (Exs. 661-663.) On April 3, 2023, Respondents indicated they would provide documentation related to the $20 million Nano Loan only if Honarkar provided "a letter withdrawing the inspection demands." (Ex. 5480.) Honarkar refused. And, on April 27, 2023, Honarkar filed a Petition to Compel Books and Records in Los Angeles Superior Court, which Respondents opposed. (Ex. 1377.) Ultimately, on November 9, 2023, Judge James C. Chalfant granted Honarkar's Petition. (*Id.*)

**Honarkar's Demand for Arbitration**

On April 25, 2023, Honarkar filed his original Demand and Statement of Claim in this arbitration, seeking the recission of the Operating Agreements or, in the alternative, the appointment of a receiver over the MOM JV Entities, along with compensatory and punitive damages, a declaratory judgment regarding the Other Owned LLCs, and an injunction reinstating Honarkar as the Administrative Manager to protect his ownership interests.

**The MOM Respondents' Alleged Retaliation Against Honarkar**

Almost immediately following Honarkar's demand for books and records, on March 29, 2023, Makhijani, Continuum, and the MOM Parties utilized their power as Managing Managers and terminated Honarkar as the Administrative Manager of the MOM JV Entities. (Exs. 669-671, 3018.) The letters terminating Honarkar were drafted and sent by Marc Cohen, Esq., current counsel for Makhijani and Continuum in this arbitration. (*Id.*)

Two days later, a group of armed individuals working on behalf of Continuum and Makhijani entered and took control of numerous JV properties, including the Hotel Laguna, a Holiday Inn Hotel in Laguna Beach, and several other vacation rentals. (Exs. 681, 1196, 1198.)

In early May 2023, Honarkar returned to the Hotel Laguna, and there was a confrontation between Makhijani, Kluchin, and the MOM Respondents' agents. (Ex. 1165 [video of portion of incident, Makhijani stating "I'll put 32 fucking guards here"]; Ex. 1160 [video of portion of incident].) Each side blames the other, but the only person arrested that day was Banayotis Haddad, a Continuum employee and the Manager of MOM AS Manager, who was charged with assault. (Ex. 1305; 6.24 Tr. at 202:3-21; 7.2 Tr. at 1800:4-9.)

Both Honarkar and Kluchin also testified that, during the night of June 30, 2023 and the early morning of July 1, 2023, a group of armed individuals and other agents working on behalf of Continuum and Makhijani entered and took physical control of Terra (a restaurant located at the Laguna Festival of the Arts and operated by Honarkar for years).

On the afternoon of July 24, 2023, while Honarkar and the MOM Respondents were appearing before Orange County Superior Court Judge David J. Hesseltine arguing motions for injunctive relief, Kluchin, Haddad, and Jason Miller, along with more than a dozen men dressed in black broke into the 4G corporate headquarters, where both 4G and Honarkar maintained offices, while Honarkar's team was working.  (Ex. 773 [police report].)  A glass door located on the side of the building was shattered with a hammer to gain entry and the double doors at the front entrance were forced open.  (*Id.* at 4; Ex. 1212.)  Kluchin admitted he and his team broke into the offices.  Video of the incident appears to show the MOM Respondents' agents removing documents, banker's boxes of hardcopy files labelled "LEGAL," computer equipment, and other objects from the office, including employees' personal effects.  (Ex. 1158.)

On July 29, 2023, the MOM Respondents served eviction notices on Honarkar and both of his daughters at their residences, which were JV properties under the Operating Agreements.  (Ex. 772 at 4-8.)  In addition, Respondents initiated multiple eviction proceedings against tenants leasing other JV properties.  According to Kluchin, these eviction notices and proceedings were instituted against those tenants for not paying rent directly to the MOM Respondents.

Also, during this time, the MOM Respondents hired mobile billboards to drive around Laguna Beach, displaying pictures of Honarkar with disparaging messages.  One of the billboards included photos of police officer Jessie Schmidt (one of the officers present at the scene of the 4G offices break-in) and Shohreh Dupuis (city manager for the City of Laguna Beach), along with Honarkar's photo and the word "CORRUPTION??" in large bold capital letters.  (Ex. 11506.27 Tr. [Kluchin testimony – "Our PR consultant worked on this [billboard] and suggested it, and we approved it because we believe it to be true"].)  According to the MOM Respondents' testimony, they included Schmidt and Dupuis on the billboard because they felt Dupuis was "allow[ing] Mo [Honarkar] to get away with a lot [of] things that he probably shouldn't have" (Kluchin, 6.27 Tr. at 1049:6-9) and the police were "not protecting our rights to manage the property" (Makhijani, 7.2 Tr. at 1811:2-21).

Additional facts are set out in the analysis and discussion that follows.

## III.    ANALYSIS

The fraud and other non-contractual claims are governed by California law.  The claims for breach of the Operating Agreements are governed by Delaware law.  (*e.g.*, Ex. 315 at § 19.1.)  The claim for breach of the Management Agreement is governed by California law.  (Ex. 37 at § 13.4.)  The parties bear the burden of proof on their respective claims and defenses by a preponderance of the evidence, except for the punitive damages claim, which requires clear and convincing evidence.  (Civ. Code § 3294.)  The JAMS Comprehensive Arbitration Rules apply.

### A.    Claimants' Direct Fraudulent Inducement Claim Against Makhijani, Continuum and the MOM Members (FAC at 22-23)

Claimants allege they were fraudulently induced by Makhijani, Continuum and the MOM Members into signing the Operating Agreements by the MOM Respondents' promise to make a $30 million initial contribution.  They assert the MOM Respondents had no intent to perform the promise when they made it, and it was not performed.

The MOM Respondents argue the promise was performed because the Operating Agreements allowed them to use the $20 million Nano Loan to fund part of the $30 million initial contribution obligation.[15]  They also insist Honarkar was informed about the Nano Loan and about commitments the MOM Members made to pay off the Nano Loan.

"Promissory fraud [aka fraudulent inducement] is a subspecies of fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract."  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.)[16]  "[P]romissory fraud requires proof of (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promisee."  (*Gruber v. Gruber* (2020) 48 Cal. App. 5th 529, 540.)

### 1.    Initial Contribution Promise

It is undisputed the MOM Members promised to make the $30 million initial contribution to the MOM JV Entities.  (Ex. 315, § 6.1 [MOM CA Operating Agreement]; Ex. 148 at 2 [Term Sheet].)  The required *form* of the initial contribution is the crux of this dispute.  The Arbitrator's analysis will begin with the plain, unambiguous language of the Operating Agreements.

Recall the term "Contribution" is defined generally in the Operating Agreements as "any money or property, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement."  (Ex. 315, § 1.19.)  That defined term is used in connection with both Initial Contributions and Additional Contributions (compare Ex. 315, §§ 6.1 and 6.2) and throughout the Operating Agreements.

---

[15] Continuum also deposited $10 million in escrow but $3.9 million of that was immediately refunded.  (Ex. 308.)

[16] For simplicity internal citations and quotation marks have been omitted from case quotations throughout.

The MOM CA JV Operating Agreement specifically states: "6.1 <u>Initial Contributions</u>. … [¶] (c) Concurrently with execution hereof, by all of the Members, the MOM [CA] Member shall make a Contribution of $30 million to the Company for the Hotel Laguna Project, which shall be disbursed as set forth on <u>Exhibit B</u> attached hereto."  (Ex. 315, § 6.1(c).)  Exhibit B, titled "Disbursement of Contribution for Hotel Laguna Project," states it shall be used to: "Fund shortfalls in the refinance of debt completed on or about the date hereof."  (Ex. 315 at Ex. B.)

Reading these sections together reveals the term "Contribution," defined generally in Section 1.19, is also subject to the specific requirements of Section 6.1.  (*Kirkwood Knoll Maint. Corp. v. Warren* (Del. Com. Pls. Apr. 21, 2016) C.A. No. CPU4-14-003607, 2017 WL 8999315 at *5.)  Thus, the MOM Member's $30 million *initial* Contribution had to be made June 8, 2021 (upon execution) in a form that could be disbursed to fund shortfalls in the LoanCore Loan refinance that same day.  There is no other way to give meaning to both sections as required.

And the Nano Loan transaction itself did not satisfy the initial contribution obligation.

As a threshold matter, it appears the Nano Loan transaction was unauthorized and the Nano Loan documents are therefore invalid.  This is true because on the day the Nano Loan closed and funded, June 7, 2021: (a) the putative Nano Loan borrowers – the MOM JV Entities - did not yet exist; (b) the Term Sheet was still in effect; (c) the JV properties and the membership interests in the subsidiary LLCs that owned them still belonged to Claimants; and (d) neither the MOM Managers, nor any other MOM Respondents, including Continuum, had any authority to encumber those properties or to assign those membership interests.

Even if the Nano Loan transaction was authorized and the Nano Loan documents are valid, the Nano Loan itself was not a "Contribution" by the "MOM CA Member" (MOM CA Investor Group LLC) to the "Company" (MOM CA Investco LLC) "as capital in that Member's capacity as a Member pursuant to this [Operating] Agreement."  (Ex. 315, §§ 1.19, 6.1.)  In fact, the MOM CA Member was not even a party to the Nano Loan transaction.  Besides, nothing in either the Term Sheet or the Operating Agreements authorized the MOM Members to make the initial contribution in the form of a loan from Nano to the MOM JV Entities secured by their own assets.  In short, Makhijani and Continuum used Claimants' assets to secure the Nano Loan, and used the Nano Loan proceeds to acquire an interest in and gain control of those same assets.

Perhaps recognizing the Nano Loan transaction itself did not satisfy the initial contribution obligation, the MOM Respondents argue it was satisfied because they made a binding oral promise the MOM Members (not the MOM JV Entities) would pay the Nano Loan; and that the oral promise was memorialized in a "Contribution Agreement"  (Ex. 2433.)  The substance of the promise was the MOM Members would "step in and pay" the Nano Loan upon "the earlier of the Maturity Date or any date on which [Nano] demands" payment.  (*Id*. at 1.)

17

If the oral promise was made and if the Contribution Agreement is genuine, neither satisfied the initial contribution obligation, because neither obligated the MOM Members to make any payment on June 8, 2021.  And any payment made or to be made after that date could not be used to fund shortfalls in the refinance of the LoanCore debt on that date.[17]  What's more, the MOM JV Entities still owed Nano $20 million and the Nano Loan was still secured by the Nano Loan trust deeds and assignments of subsidiary LLC membership interests.  So, the MOM JV entities were still at risk of losing their assets if the MOM Members failed to pay.

In any event, there is substantial reason to doubt the oral promise was made and the Contribution Agreement is genuine.

The MOM Respondents maintain the oral promise to pay the Nano Loan was made at in-person meetings with Honarkar before the JV was formed.  Specifically, they note: Makhijani testified he informed Honarkar of this commitment (7.2 Tr. at 1897:3-1899:12; 7.3 Tr. 2018:24-2021:22); Kluchin testified it was explained to Honarkar during a meeting at the Corona del Mar restaurant (the "CdM Meeting") that flexibility was needed and that it would be the MOM Members' "binding obligation and promise to pay the loan" (6.28 Tr. at 1205:18 – 1507:7); Gressak testified "part of those discussions [at the CdM Meeting] was talking about how the MOM investors – with this [Nano] loan, and it would pay for the loan" (7.8 Tr. at 2548:13-16); Prendergast, a Nano employee, testified Honarkar was informed at the CdM Meeting the contribution would be made either in cash or through a loan (7.12 Tr. at 3714:14 – 3715:24.1); Prendergast testified about another meeting at the Montage (the "Montage Meeting"), where Honarkar was informed of the Nano Loan and that it would be used to refinance the LoanCore obligation (7.12 Tr. at 3716:16 – 3719:17); and finally, Kluchin and Gressak both testified there was also a meeting at Honarkar's house on June 6, 2021 where the matter was discussed.  (7.3 Tr. at 2018:24-2021:22; 6.27 Tr. at 1057:12-1059:4; 7.8 at 2550:18-2552:21.)

But the testimony about these meetings and the oral promise was not credible.  Regarding the CDM Meeting, the witnesses contradicted each other in parts.  For example, Makhijani, Kluchin, and Gressak insisted Makhijani drew a diagram of the Nano Loan on a napkin and described it to Honarkar.  But Prendergast remembered only that the diagram related to dilution of the MOM Members' capital percentages, an issue unrelated to the oral promise or the initial contribution.  (7.12 Tr. at 3805:4-3808:12.)  As for the Montage Meeting, no witness other than Prendergast even mentioned it.  Plus, as the Arbitrator observed several times during the Hearing, based on basic witness credibility considerations, Kluchin, Makhijani, and Gressak were just not credible.  (CACI 107 [Witness Credibility]; 7.1 Tr. at 1572:15-19 [re Kluchin]; 7.8 Tr. at 2506:3-2507:22 [re Kluchin and Makhijani]; 7.8 Tr. at 2773:8-13 [re Gressak].)

---

[17] For these same reasons, the Arbitrator rejects the MOM Respondents' claim additional funds they "infused" into the JV after June 8, 2021, satisfied the initial contribution obligation.  Besides, there is insufficient evidence in the record establishing the form or amount of these infusions, by whom they were made, or where funds came from.

These credibility findings about the oral promise testimony are buttressed by the Respondents' pre-hearing verified discovery responses and deposition testimony. The initial interrogatory responses of Makhijani, Continuum, and Nano made only general statements that Honarkar was aware of the Nano Loan "through conversations with Responding Parties and Nano Banc." (Ex. 950 at 004-005; Exs. 937 at 007, 949 at 007.) They made no mention of any specific conversations where the Nano Loan was disclosed to Honarkar. Later, Nano's PMK deposition witness testified he was not aware of any written or oral communications with Honarkar about the Nano Loan. (Ex. 1000 at 93:21-94:11.) Still later, Makhijani made no mention of the CdM Meeting in his PMK deposition for Continuum. (Ex. 1009 at 39:25-40:10.) Then, less than a week before the Hearing, Nano's second supplemental interrogatory responses mentioned the CdM Meeting and the napkin diagram for the first time. (Ex. 1527.)

These credibility findings are also supported by the fact that there is no evidence of any written communications to Honarkar or his team at any time discussing the oral promise, nor are there any internal written communications between Honarkar and his team about the oral promise. Finally, Honarkar, Niazi, and Taxman all testified they were not aware of the Nano Loan until 2023. (6.24 Tr. at 169:22-178:14, 247:23-248:4 (Honarkar); 7.5 Tr. at 2301:4-2302:1 (Taxman), 2481:24-2483:14 (Niazi); 7.8 Tr. at 2526:5-2528:12 (Niazi); Exs. 656, 664, 659-63.)

In total, the weight of the evidence supports finding the oral promise was not made.

Turning to the Contribution Agreement, Kluchin testified he drafted it in "the morning of June 7, 2021." (6.28 Tr. at 1208:14-21, 1208:14-1209:7; 7.1 Tr. at 1544:13-1547:21.) He also testified it "was printed out, so it was signed in the office," "on June 7th" and was "signed in person and then scanned" the same day. (7.1 Tr. at 1544:13-16, 1548:18-1550:25.) Makhijani testified it was signed "mid-morning time on June 7" and that it was signed either using "a pen or a stamp." (7.2 Tr. at 1699:22-1701:25; 7.1 Tr. at 1548:22-1551:9.) But their testimony about the existence, creation, and execution of the Contribution Agreement is not credible.

There is no contemporaneous evidence the Contribution Agreement existed as of June 7, 2021. There are no written communications (emails, texts, or memoranda) about it. (7.1 Tr. at 1544:13-16, 1554:15-1557:7.) The MOM Respondents admit they never shared it with Honarkar or Nano. (6.28 Tr. at 1208:14-1210:15; 7.1 Tr. at 1544:13-1554:22; 6.24 Tr. at 254:23-255:22.) And they did not assert it existed until July 2023, months after the litigation began.

At the Hearing, when Claimants proffered a handwriting expert to testify the signatures on the Contribution Agreement were placed by electronic means, not by pen or stamp (7.7.24 Joint Letter), the MOM Respondents stipulated, contrary to Kluchin and Makhijani's testimony about it being printed, signed, and scanned on June 7, 2021, "the signatures on the Contribution Agreement were placed onto the document by electronic means." (7.12.24 Stipulation.)

19

The text of the Contribution Agreement also suggests it could not have existed and been signed in the mid-morning of June 7, as Kluchin and Makhijani testified, because Paragraph 2 refers to the final Operating Agreement's definition of Contribution in "Section 1.19." But on the morning of June 7, the draft Operating Agreements had the definition of "Contribution" in section 1.20—not section 1.19. (Ex. 1505 at 001, 023 [draft circulated at 12:58 p.m. on 6.7.21]; 7.10 Tr. at 3261:13-3263:5 [Gartside testified Exhibit 1505 was then-current draft].) Moreover, the definition of Contribution was not moved to section 1.19, until subsequent drafts exchanged later in the evening of June 7. (Exs. 282, 315 at 009, 313 at 009, 314 at 009.) The MOM Respondents' explanation for all of this is based on speculation, not evidence.

Even if the Contribution Agreement was authentic, it was invalid. Claimants argue it violated the Affiliate Transaction restrictions under the Operating Agreements. (Ex. 315 at 027.) Perhaps. The Mom Respondents contend the Affiliate Transaction restrictions do not apply because the June 7 Contribution Agreement predates the June 8 Operating Agreements. But again, on June 7: (a) the MOM JV Entities – who are putative parties to and beneficiaries of the Contribution Agreement - did not exist; (b) the Term Sheet was still in effect; and (c) the Contribution Agreement promise was not "cash equity" as required by the Term Sheet.

All told, the Contribution Agreement did not satisfy the initial contribution obligation.

To the extent the MOM Respondents downplay the materiality of the initial contribution to Honarkar and his decision to enter into the JV, their position is untenable. At the outset, it was intended to immediately pay off the $17.5 million debt to Honarkar's ex-wife and then fund the Hotel Laguna Project. When Continuum was unable to secure enough financing to pay off LoanCore, the initial contribution was also to be used to "close the gap" in the refinance. As the MOM Respondents recognized: "The cash needs of the contributed businesses were staggering at the outset of the joint venture, particularly given the financial troubles faced by Honarkar through his divorce, the subsequent foreclosure action brought by DIG, and the multiple receivers imposed over Honarkar's assets." (MOM Respondents' Opposition brief at 36.)

For these reasons, Claimants proved the first element of their fraud claim.

## 2.      Intent Not to Perform

Claimants argue the MOM Respondents never intended to make the initial contribution from their own pockets, but instead planned to saddle the MOM JV Entities with debt in order to fund the initial contribution obligation. Again, "[a] promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Engalla*, *supra,* 15 Cal. 4th at 973.) And parol evidence is admissible to establish fraud. (Code Civ. Proc. ("CCP") § 1856(g).)

The evidence surrounding the JV negotiations is particularly instructive on this issue. While negotiating the Term Sheet, the drafts proposed by Continuum defined the form of the initial contribution as "debt with equity warrants and/or equity," whereas Honarkar's team repeatedly struck any reference to debt and inserted the term "cash." (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17.) Obviously, Honarkar had no intention of allowing the MOM Respondents to saddle the JV Entities with debt to help fund the initial contribution. Eventually, the parties settled on the term "cash equity," suggesting the MOM Respondents intended to mollify Honarkar by including the word "cash" but intending to use the Nano Loan proceeds anyway.[18]

That the Nano Loan closed and the proceeds were taken by Continuum the day before the Operating Agreements were finalized and executed, also suggests the MOM Respondents fully understood their promise to provide the initial contribution was false when made. Even more telling, on May 20, 2021, four days before the Term Sheet was signed and two weeks before the Operating Agreements were signed, Shyam signed the Nano Loan LOI, with the then-theoretical MOM JV Entities as the borrowers and Claimants' assets as the collateral. (Ex. 130.) According to Kluchin, this loan idea was always Continuum's plan. (6.27 Tr. at 850:17-852.11.)

These facts prove the MOM Respondents had no intention of providing the initial capital contribution without borrowing $20 million of it from Nano using Claimants' assets.

### 3. Intent to Deceive and Induce Reliance

Claimants argue the MOM Respondents' intent to deceive Honarkar as to the form of the contribution is evidenced by their active concealment of the Nano Loan. "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an intent to induce reliance on it." (*Engalla*, *supra*, 15 Cal. 4th at 976.)

When the Nano Loan funded on June 7, 2021, Continuum requested that the proceeds be sent directly to a Continuum bank account at Nano "until the escrow company indicates that they will be ready to receive funds." (Exs. 237, 240.) Because it was unusual to transfer the loan proceeds to any entity other than the borrower, Nano employee Brian Buchanan drafted a memorandum requesting permission from the Nano Loan Committee, which stated Gressak had "spoken with the Borrower and [] approved the funding of the account." (Ex. 240.) And when the escrow closed on June 8, 2021, the escrow closing statement showed two transfers from Continuum – one for $10 million and one for $20 million. (Ex. 308.)

---

[18] The MOM Respondents fail to explain how "cash equity" differs from "cash" or how a debt could be considered a "contribution." (See, 6.26 Tr. at 806:5-7 [Kluchin cash equity "wouldn't be a loan that has to convert to equity"].) And in the financial and real estate industries, the term "cash equity" is commonly used to describe the portion of an investment that can be easily converted into cash. *See*, https://www.investopedia.com/terms/c/cash-equity.asp.

The MOM Respondents offer two explanations for these unusual transfers. First, they argue there were concerns the escrow would be delayed if the money came from the MOM JV Entities as borrowers on the Nano Loan, because the MOM JV Entities were not parties to the LoanCore payoff in the escrow holder's files (a problem created by the MOM Respondents in the first instance). Second, they posit the Nano Loan proceeds were initially transferred to Continuum because they were being submitted as the MOM Members' contribution and, as such, should be received through the MOM Members' agent, Continuum.

But these explanations are not consistent with the reason provided to Nano at the time the Nano Loan funded – that the escrow holder was not ready to receive the funds. (Ex. 240.) Nor are they consistent with Kluchin's testimony that the funds were transferred to a Continuum bank account because the MOM JV Entities did not have their own bank accounts set up. (6.27 Tr. at 868:15-871:4.) Regardless of the actual reason for Continuum's receipt of the Nano Loan proceeds, the escrow statement offered no further explanation. It certainly did not disclose that the $20 million deposit was from the proceeds of the Nano Loan to the MOM JV Entities. And there is no evidence that Respondents conveyed any of these reasons to Honarkar or his team.

Aside from Nano, three other lenders participated in the LoanCore refinance – First Choice Bank, Lone Oak, and Preferred Bank. (Exs. 220-222.) On June 4, 2021, just days before the close of escrow, Kluchin sent copies of the loan documents for each of those three lenders to Honarkar and Taxman. (*Id.*) He did not send over copies of the loan documents for the Nano Loan, despite admitting he had them available. (6.27 Tr. at 886:5-889:12.) Kluchin also sent an email chain on June 6, 2021 to Honarkar and the escrow company, indicating there were only three lenders involved in the refinance. (Ex. 229 at 2.) Neither the body of the email nor the attachment mentions the Nano Loan. (Ex. 229.) And, when Honarkar requested a list of all outstanding loans on the MOM JV Entities' assets in December 2021, the MOM Respondents sent a list from which the Nano Loan was conspicuously absent.[19] (Ex. 716 at 3, ¶ 8; 22-24.)

Nano did not record the Nano Loan deeds of trust encumbering the MOM JV Entities' properties until March 2022. (Exs. 234, 235, 236.) The recording was initiated by Marc Cohen, acting as counsel for Nano, on January 18, 2022 (Ex. 515), the same day Nano received an Order to Cease and Desist from the Federal Deposit Insurance Corporation.[20] (Ex. 514.) Thus, the weight of the evidence suggests the MOM Respondents were hiding and intentionally omitting information about the Nano Loan in their communications with Honarkar.

---

[19] This list also did not include the $1 million Tesoro Loan from Nano to Tesoro Redlands in July 2021.

[20] The order required Nano to engage an independent third party to review extensions of credit to insiders, remediate extensions made "on preferential terms or presenting more than the normal risk of repayment or other unfavorable features," and submit new procedures to "strengthen the Bank's internal controls related to financial transactions between the Bank and senior executives, directors, and/or any entities which they control." (Ex. 514, ¶¶ 5-8.)

Still, the MOM Respondents insist Honarkar and his team were aware of the Nano Loan based on a flurry of due diligence emails from Nano during the JV negotiations, as well as oral communications with Honarkar. As to the Nano emails, context matters. During the JV negotiations, on May 19, 2021, Nano provided Honarkar with the LOI for the $150 million loan from Nano and other "participant banks." (Ex. 106.) The next day, on May 20, Nano provided Shyam with the $20 million Nano Loan LOI. (Ex. 130.) Remarkably, both LOI's list the same Honarkar and 4G properties and subsidiary LLCs as collateral. (Exs. 106 at 1-2; 130 at 2.)

It is not surprising then that Honarkar and his team were receiving emails from Nano seeking due diligence on these properties. (Exs. 115 [May 19 email from Buchanan re underwriting]; 4017 [May 20 emails from Nano employee re certificates of insurance]; 4018-4020 [May 20 response emails from Honarkar's team attaching requested documents]; 5517 [May 21 email, 4G employee requesting insurance certificates – "[w]e still have the current lender, that has not changed, the bank we are refinancing the loan portfolio with is Nano Banc (who might be syndicating the loan with other lenders). They need the current certificates no matter the lender"]; 5518; 2296.) But none of these emails referenced the Nano Loan or clarified that Nano was underwriting the Nano Loan.[21] It is reasonable to believe Honarkar and his team assumed Nano was seeking documents for underwriting the $150 million loan or another outstanding Honarkar loan previously obtained from Nano (Ex. 123.) More importantly, Honarkar's reaction to discovering one of the recorded Nano Loan trust deeds in 2023 is consistent with his claimed lack of knowledge of the Nano Loan before then. (Exs. 656, 659.)

As for oral communications, again, no credible evidence was presented that the Nano Loan was disclosed to Honarkar during the CdM Meeting, the Montage Meeting, or the June 6 meeting at Honarkar's house. Rather, the weight of the evidence proves otherwise.

Respondents point to a perceived discrepancy in Honarkar's testimony, suggesting he was aware $143 million in secured loans refinanced the LoanCore Loan. (6.25 Tr. at 351:9-14; Ex. 2637 at 2; Ex. 2582 ("144M payout of DiG [for LoanCore Loan refinance] with $143M of Loan"); Ex. 3934.) Respondents argue this proves Honarkar was aware of the Nano Loan, because $143 million was the total amount of loans including the $20 million Nano Loan. This argument is not persuasive. Again, the evidence shows Honarkar was not aware the $20 million Nano Loan had been obtained, much less that it had been used to fund the MOM Members' initial Contribution. Plus, Honarkar's testimony is consistent with Nano and the other participating banks performing under the $150 million Nano LOI.

---

[21] Though Respondents rely heavily on Buchanan's testimony that Honarkar was fully informed of the Nano Loan, the Arbitrator points out Buchanan was in fact unaware of the $150 million Nano LOI, despite his signature being on the document. (Ex. 106; 6.26 Tr. at 566:13-567:25.) There were also other LOIs from Nano to Honarkar of which Buchanan was unaware. (6.26 Tr. at 563:11-566:12; 569:22-571:7, 575:19-577:11, 584:20-585:13; 6.28 Tr. at 1118:17-1119:5.) It is likely Buchanan and Honarkar were both focusing on different Nano loans when discussing due diligence, as it seems neither knew the Nano Loan existed.

Moreover, Honarkar had several other Nano loans, in addition to the LoanCore refinance loans, which could explain his conclusion there was a total of $143 million in loans. (Exs. 29 [Nano credit memo showing prior debts], 5501 [demonstrative]; 6.25 Tr. at 358:7-361:11.)

The MOM Respondents were aware of Honarkar's position that the initial contribution should not be provided in the form of a debt. As explained above, the Nano Loan transaction itself did not satisfy the initial contribution obligation. Yet, the MOM Respondents obtained the Nano Loan, muddied the waters, omitted basic information from their communications with Honarkar that would have informed him of the Nano Loan and, given the timing, conflated due diligence on the $20 million Nano Loan with the $150 million Nano LOI and other Nano loans.

If, as the MOM Respondents insist, they informed Honarkar of the Nano Loan and the MOM Members' promise to repay it, they provided no explanation for omitting the form of the initial contribution in their written communications with Honarkar. The evidence supports a finding the MOM Respondents intended to deceive Honarkar with respect to the Nano Loan.

### 4. Actual and Reasonable Reliance

Claimants must prove both actual and justifiable reliance or reasonable reliance. (*Beckwith v. Dahl* (2012) 205 Cal. App. 4th 1039, 1062-67.) "Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction." (*Engalla*, *supra*, 15 Cal. 4th at 976.) "It is not necessary that a plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is enough that the representation has played a substantial part, and so has been a substantial factor in influencing his decision." (*Id.* at 976-77; *Whiteley v. Philip Morris Inc.* (2004) 117 Cal. App. 4th 635, 678 (same).) "Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." (*Engalla*, *supra*, 15 Cal. 4th at 977.)

Unquestionably, the $30 million initial contribution was material to Honarkar and his decision to enter into the JV, given his immediate needs for funds. And the evidence is certain Honarkar would not have agreed the initial contribution could be in the form of debt secured by the JV properties. (Exs. 77 at 3; 84 at 13; 91 at 13; 92 at 17; 6.24 Tr. at 150:24-151:7 ["That defeats the purpose. You're not putting money, you know; how could you be a partner?"].) The exclusivity provision in the Term Sheet also limited Honarkar's ability to pursue other options for financing prior to establishing the JV. (Ex. 148 at 8-9.)

So, the evidence shows the representations the MOM Respondents made about their initial contribution substantially influenced Honarkar's decision to enter into the JV and sign the Operating Agreements. (*Hoffman v. 162 N. Wolfe LLC* (2014) 228 Cal. App. 4th 1178, 1193-94 ["Reliance can be proved in a fraudulent omission case by establishing that had the omitted information been disclosed, the plaintiff would have been aware of it and behaved differently"].)

Honarkar must also show his "actual reliance on the representation was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." (*Beckwith*, 205 Cal. App. 4th at 1066.)  Justifiable reliance accounts for the particular "circumstances" of the plaintiff. (*Whiteley*, *supra*, 117 Cal. App. 4th at 684 [weighing, *inter alia*, plaintiff's "lack of sophistication" and "the evidence that she was addicted to cigarettes" in determining whether her reliance on statements about effects of cigarette use was reasonable or justified].)

The MOM Respondents argue Honarkar could not have justifiably relied on their representations because he failed to read the final Operating Agreements before execution. However, whether a plaintiff "read the entire [contract] is not dispositive" of reliance where there is "ample evidence of fraud." (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal. App. 5th 375, 392.)  Given the chaos surrounding the negotiation and due diligence processes and the frantic push to get the documents finalized, Honarkar was not provided "reasonable opportunity to know of the character or essential terms of the proposed contract[s]." (*Rosenthal v. Great W. Fin. Sec. Corp.* (1996) 14 Cal. 4th 394, 423; 6.25 Tr. at 336:14-25 ["every five minutes, there was a new version.  As soon as you get one, then it kicks in another version"].) He relied on his counsel to assist him with the documents.  (6.24 Tr. at 132:1-133:2; 6.25 Tr. at 337:1-19, 322:5-25.)  And again, Kluchin pressured Honarkar to sign early, before the Operating Agreements were finalized.  (Ex. 288 ["We are in a mad rush to produce documents for the bank.  We need signature blocks…tonight asap"]; Exs. 347, 352.)

Based on the financial wherewithal and resources available to the MOM Respondents, specifically Makhijani and Continuum, it was reasonable for Honarkar to assume Continuum's investors could and would follow through on their promises to fund the initial contribution. Honarkar was introduced to Makhijani by Gressak at Nano, a bank with which Honarkar already had an existing relationship and a "friend" in Gressak he trusted.  (6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.)  It is also important that many of the Continuum investors were also Nano shareholders and they had access to significant capital.  (Ex. 1000 at 181:18-190:12.)

And finally, given the MOM Respondents' intentional concealment of the Nano Loan, there was little Honarkar could have done to discover the initial contribution obligation was going to be made by encumbering the MOM JV Entities assets with debt. (*Whiteley*, *supra*, 117 Cal. App. 4th at 684 ["Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent"].)

Based on the evidence in the record, the Arbitrator finds Claimants actually and justifiably relied on the MOM Respondents' representations.

### 5.    Nonperformance

As discussed (§ III.A.1. above), the MOM Respondents failed to provide the $30 million capital contribution as required.  In addition, the MOM Respondents claimed the monthly payments on the Nano Loan as expenses of MOM JV Entities on at least two occasions (Exs. 574, 604; Exs. 2909, 5500 [Chi Lu, 4G's Controller, questioning payments to Nano]; 6.27 Tr. at 903:18-20, 904:1-4; 7.1 Tr. 1491:7-1492:3.)  The MOM Respondents contend these payment entries were made in error and subsequently reversed.  (Exs. 2909, 3625.)  The Arbitrator rejects these contentions as not supported by the evidence.  The MOM Respondents also insist the MOM Members alone have made all the payments on the Nano Loan.  (Ex. 5530 at 2; Exs. 3410, 1042.)  But the evidence supporting this position is of limited value since, as of July 2022, the MOM Respondents had recorded the Nano Loan on the JV's books and records as a long-term liability of the MOM JV Entities, and have provided no books and records since.  (Ex. 507.)  The fact remains - the MOM Respondents did not perform the promised capital contribution.

### 6.    Resulting Damage and Alternative Remedies

"To recover for fraud, a plaintiff must prove loss proximately caused by the defendant's tortious conduct."  (*Fladeboe v. Am. Isuzu Motors Inc.* (2007) 150 Cal. App. 4th 42, 65.)  The MOM Respondents contend Claimants have suffered no cognizable damages, as no MOM JV Entity funds were used to pay the Nano Loan.  But again, the evidence shows: (1) the MOM Respondents' misrepresentations in connection with their initial contribution played a substantial part in inducing Honarkar to enter into the JV and (2) the MOM Respondents then encumbered Claimants' properties with the $20 million Nano Loan, along with hundreds of millions of dollars of additional encumbrances over the course of the JV.  (Ex. 967.)  These findings alone satisfy Claimants' initial burden to prove the fact that they were damaged by the MOM Respondents' conduct.  (See also Exs. 1006 and 1509 [Spindler Reports].)  Claimants are not required to prove the specific amount of their damages to perfect this claim, particularly since it would be impossible to quantify them without an accounting of the MOM JV Entities' finances.

For these reasons, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed (§ III.K. below); or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet.  (*Chapman v. Skype Inc.* (2013) 220 Cal. App. 4th 217, 234 ["A party alleging that she was fraudulently induced to enter into a contract may either rescind the contract, offer to restore any benefits received, and seek restitution or retain the benefits of the contract and seek damages for fraud]"); Civ. Code § 1692.)

**B.    Claimants' Direct Breach of Contract Claims Against the MOM Members and the MOM Managers (FAC at 24-25)**

Claimants allege the MOM Parties breached the Operating Agreements and the Management Agreement.  (Exs. 313-315, 37.)  Each will be discussed in turn.

### 1.    Applicable Law and Elements of Contract Claims

Again, Delaware law applies to the claims for breach of the Operating Agreements (Exs. 313-315, § 19.1.), and California law applies to the claim for breach of the Management Agreement.  (Ex. 37, § 13.4.)  The elements of a breach of contract claim under Delaware law are substantially similar to those under California law.  (Compare *Humanigen, Inc. v. Savant Neglected Diseases, LLC* (Del. Super. Ct. 2020) 238 A.3d 194, 202 with *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal. App. 4th 221, 228.)

### 2.    Breach of Operating Agreements – Failure to Provide Initial Contribution

Claimants assert the MOM Parties breached the Operating Agreements by failing to provide the initial contribution.  (Ex. 315, § 6.1.)  The Arbitrator agrees for the reasons discussed at length in connection with the fraudulent inducement claim above (§ III.A.1.), and therefore finds Claimants proved this breach of contract claim.[22]  The Arbitrator further finds this breach was material and it resulted in a failure of consideration.  (*Level 4 Yoga, LLC v. CorePower Yoga, LLC*, C.A. No. 2020-0249-JRS, 2022 WL 601862, at *27 (Del. Ch. Mar. 1, 2022) [under Delaware law, "a breach is material if it goes to the root or essence of the agreement between the parties, or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract"]; *Alchemy LTD LLC v. Fanchise League Co.*, C.A. No. 2021-0476-LWW, 2023 WL 4670954, at *5 (Del. Ch. July 20, 2023) ["Failure of consideration occurs when the bargained-for consideration is not rendered by one of the parties"].)

Hence, as a separate and sufficient basis apart from fraud, the Arbitrator finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after the accounting is completed; or (b) rescission of the Operating Agreements and the Other JV Related Agreements.  (*United Engineers & Constructors, Inc. v. Babcock & Wilcox Co.*, C.A. No. 12540, 1993 WL 50309, at *3 (Del. Ch. Feb. 11, 1993) ["The courts of this State, of course, can grant rescission for a number of reasons, e.g., … failure of consideration"].)

---

[22] The MOM Respondents' arguments to the contrary based upon the Release Agreement fail because: (i) by its own terms it does not apply to "claims for breach of any operating agreement…" (Ex. 317 at § 1(a)); and (ii) "[a] release obtained through fraud is invalid."  (*Butler Am., LLC v. Aviation Assurance Co.* (2020) 55 Cal. App. 5th 136, 144.)

### 3.    Breach of Operating Agreements – Unauthorized TIC Sale in Property Owned by Laguna HI, LLC

Claimants assert the MOM Parties breached the Operating Agreements by causing Subsidiaries/Other Owned LLCs to engage in transactions, including the sale of TIC interests, without Honarkar's knowledge or consent.  (Exs. 313-315, § 9.3(b) ["Managing Member shall not be entitled to sell the ownership interests in an Other Owned LLC or the asset owned by an Other Owned LLC without the prior written consent of MH…"].)  Again, the Arbitrator agrees.

In December 2022, the MOM Managers sold for $4.1 million a TIC interest in property owned by Laguna HI, LLC, a Subsidiary/Other Owned LLC owned by the MOM JV Entities.  (Exs. 315 at 43; 632, 634, 645, 647.)  Honarkar was not informed or aware of the transaction.  (6.24 Tr. at 180:11-22, 254:12-19; 7.8 Tr. at 2539:20-2540:9.)

The MOM Parties do not dispute the application of Section 9.3 or claim Honarkar was aware of this TIC sale.  Instead, they argue Laguna HI, LLC became a "Project" through the First Amendment to the Operating Agreements (the "First Amendment") on June 30, 2021, such that Honarkar's consent was unnecessary to sell the TIC interest.  (Ex. 689 at 72, § 1(a).)  Not so.

The Operating Agreements required the MOM Members to provide notice, make a Contribution, and agree on a development budget, in order to convert a Subsidiary/Other Owned LLC from a "Potential Project" to a "Project."  (Ex. 315, § 6.1(d).)  Moreover, while the First Amendment allowed the MOM Members to designate Potential Projects as Projects without further action by the MOM Managers or Members, *i.e.*, without Honarkar's knowledge or consent, it did not change or remove the notice and contribution requirements of section 6.1(d).  (Ex. 689 at 72, § 1(a); Ex. 591 [Sep. 2022 Taxman email, noting there have been no notices or contributions to convert assets to Projects under amended agreements].)

In this way, the Operating Agreements still obligated the MOM Members to seek Honarkar's consent to recharacterize the asset.  (Ex. 315, § 6.1(d).)  Interpreting the interplay between the Operating Agreements and the First Amendment in any other way would negate the negotiated balance of power between the parties and lead to an absurd result, allowing the MOM Members to designate all properties as Projects as soon as the First Amendment was signed.

Further, there is no evidence, other than Makhijani's uncorroborated, self-serving testimony, that the proceeds from the sale of this TIC interest in the MOM JV Entities' assets were transferred to the MOM JV Entities or distributed to the MOM Members and MO Members as required by the waterfall provisions in the Operating Agreements.  (Exs. 313-315, § 8.)  Accordingly, the Arbitrator finds the MOM Parties breached the Operating Agreements by selling the TIC interest and that breach resulted in monetary damages to Claimants.

4.      **Breach of Operating Agreements – Unauthorized Insider/Self-Interested "Affiliate" Transactions With Cantor**

Claimants assert the MOM Parties breached the Operating Agreements by entering into "contribution agreements" with the Cantor Group and its related entities ("Cantor"), all of which are affiliates of Shyam.  Claimants contend the MOM JV Entities' assets are heavily encumbered with debt obligations, in part because of loans from Cantor, and they therefore have limited ability to obtain additional financing or liquidity.

The Operating Agreements plainly prohibit, without Honarkar's prior written approval, "Affiliate" transactions by the MOM Parties; that is, transactions between the MOM JV Entities and the MOM Managers or the MOM Members and entities controlled by or under common control of the Managing Managers or MOM Members.  (Exs. 313-315, §§ 9.15, 1.3, 1.17, 1.20.)  Cantor is surely an "Affiliate" of the MOM Managers or MOM Members.  Cantor consists solely of Shyam; it has no employees and shares the Continuum offices.  (7.12 Tr. at 3642:25-3643:8.)  Shyam is the founder, CEO, and owner of Continuum and the Managing Member of MOM CA Manager (as well as part of the investor group as a MOM Member).  (7.12 Tr. at 3640:17-3641:8.)  Kluchin also admitted Cantor was Continuum's "affiliate" and testified he had explained that to Honarkar.  (6.27 Tr. at 1086:4-19; 7.1 Tr. at 1567:24-1570:3.)

The evidence shows the MOM Parties caused the MOM JV Entities and some of the subsidiary LLCs to enter into "contribution agreements" regarding loans from Cantor Group IV LLC and Cantor Group V LLC, both Cantor affiliates.  (Ex. 967 at 16-17; 6.27 Tr. at 1009:18-1010:7 [Kluchin testified all Cantor loans have an associated contribution agreement].)  Shyam signed these contribution agreements as both the "borrower" and "lender."  (6.27 Tr. at 1002:4-1005:18.)  They permit the conversion of the loans made by Cantor into equity in the MOM JV Entities at the option of the MOM Members, if the MOM JV Entities that borrowed the money perform well.  (Ex. 469, § 4 [contribution provision].)  But if the MOM JV Entities do not perform well, then the MOM Parties can maintain the transaction as a loan, and require the MOM JV Entities to repay Cantor in full, with interest.[23]  However, there is no evidence the MOM Respondents ever received written consent from Honarkar, or even informed him of the existence of these loans from the Cantor affiliated entities.  (6.27 Tr. at 1008:2-1009:3 [Kluchin – "Q:…[Y]ou did not seek written consent from Mr. Honarkar for the contribution agreements associated with those loans before they were entered, correct?  A: Not that I recall"].)

For these reasons, the Arbitrator finds the MOM Parties breached the Operating Agreements by entering into unauthorized Affiliate transactions with Cantor; that breach resulted in monetary damages to Claimants, the amount of which will be determined after the accounting discussed below is completed; and the contribution agreements are likely invalid.

---

[23] The Arbitrator notes this is a peculiar "heads I win, tails you lose" structure.

5.    **Breach of Operating Agreements – Failure to Keep and Provide**
      **Books and Records for the MOM JV Entities**

Claimants assert the MOM Managers breached the Operating Agreements by failing to keep and provide books and records as required by section 12.1 which states: "Books of Account. The Managing Manager shall, at the [MOM JV Entities'] sole cost and expense, keep separate, full and accurate books and records of the [MOM JV Entities] wherein shall be recorded and reflected all of the Contributions and all of the income, expenses and transactions of the [MOM JV Entities] and a list of the names and addresses of the Members…. The Administrative Manager [Honarkar] or a Member [including the MO Member] shall have the right at any time to inspect the [MOM JV Entities] books and records.."  (Exs. 313-315, § 12.1.) Claimants contend they have been damaged as a result of these breaches, because they were forced to spend time and resources on needless litigation attempting to obtain these records.

This claim has merit.  Both Honarkar and Niazi testified they repeatedly sought financial information from the MOM Respondents and never received it.  (6.24 Tr. at 157:22-162:14; 7.8 Tr. at 2525:1-2526:4; Ex. 5480 [MOM Respondents willing to provide financial documents only if Honarkar submits "letter withdrawing inspection demands"].)  The MOM Parties admitted they only kept records for the MOM JV Entities for certain periods of time, despite evidence that transactions occurred outside of these time periods.  (Exs. 1385 at 3; 967 [loan on 11.15.23].)  Certainly, it is unclear where and how records of transactions between the MOM JV Entities and MOM Members were maintained, if at all, particularly since Kluchin testified he had "no information" on why QuickBooks data was not maintained for the MOM JV Entities during certain time periods.  (6.27 Tr. at 975:21-981:5.)  Finally, the spreadsheet submitted by the MOM Respondents carries minimal weight on this record.  (Ex. 3625 [fails to track income into the JV or funds transferred out to Continuum, Makhijani, or other investors].)

For these reasons, though the resulting damages may be nominal, the Arbitrator finds the MOM Managers breached the Operating Agreements by failing to keep and provide books and records as required.  (*In re P3 Health Grp. Holdings, LLC* (Del. Ch. Oct. 31, 2022) Consol. C.A. No. 2021-0518-JTL, 2022 WL 16548567, at *9 ["A court also can vindicate a breach of contract through an award of nominal damages"].)

6.    **Breach of Management Agreement – Failure to Pay Management Fee**

Claimants assert the MOM Parties breached the separate Management Agreement between Honarkar and 4G, under which Honarkar was supposed to be paid monthly management fees for management services provided to Hotel Laguna, the Holiday Inn Laguna Beach, and several Laguna Beach vacation rental properties.  (Ex. 37.)  Claimants insist the Management Agreement remains valid because it predates the Operating Agreements.

The Management Agreement claim was not specifically alleged in the FAC and the evidence offered to support it was nominal at best. There is simply not enough in the record to determine the parties' rights, duties, and obligations at issue. Consequently, the Arbitrator finds Claimants have failed to prove the MOM Parties breached the Management Agreement.

**C.    Claimants' Direct Forcible Entry and Forcible Detainer Claims Against Makhijani, Continuum, and the MOM Parties (FAC at 31-33)**

Claimants assert the MOM Respondents violated California's forcible entry and forcible detainer laws by breaking into and seizing the 4G offices. To establish this claim, "the plaintiff shall only be required to show, in addition to the forcible entry or forcible detainer complained of, that he was peaceably in the actual possession at the time of the forcible entry or was entitled to the possession at the time of the forcible detainer." (CCP § 1172.) The law explicitly prohibits entry "into any real property" "[b]y breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror." (CCP § 1159.) Similarly, the law prohibits "[b]y force, or by menaces and threats of violence, unlawfully hold[ing] or keep[ing] the possession of any real property, whether the same was acquired peaceably or otherwise." (CCP § 1160.)

On July 24, 2023, while Honarkar and Respondents were in court on this matter, Kluchin, Haddad, and Miller, along with a number of other individuals, broke into the 4G offices at 775 Laguna Canyon Road as 4G employees were working. (Ex. 773.) A glass door was shattered with a hammer and the doors at the front entrance were forced open. (*Id.* at 4.) Property was removed from the 4G offices.

While the MOM Respondents do not dispute these facts, they contend no forcible entry or detainer occurred, because they were joint owners of 4G. But the evidence shows 4G was not a Contributed Entity. (Exs. 583, 1354; 7.3 Tr. at 1915:7-1919:6.) Regardless, the MOM Respondents' actions bear all the hallmarks of improper self-help under California law.

A party's "title or right of possession is no defense;" possession is irrelevant to the determination of forcible entry. (*Daluiso v. Boone* (1969) 71 Cal. 2d 484, 486.) An unlawful detainer action is the only legal way to obtain possession of real property. (*Glass v. Najafi* (2000) 78 Cal. App. 4th 45, 48-49 [forcible detainer and entry statutes "reflect a policy, with deep roots in English law, barring the use of forceful self-help to enforce a right to possession of real property and requiring instead the use of judicial process to gain possession"]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal. App. 4th 1004, 1038 [landlords may enforce rights "only by judicial process, not by self-help"]; *Jordan v. Talbot* (1961) 55 Cal. 2d 597, 608 [forcible detainer found where forcible entry was followed by "removal of plaintiff's furniture and [defendant's] admonishment to 'Get the hell out of here.'"]; CCP § 1160.)

Accordingly, the Arbitrator finds the MOM Respondents violated both the forcible entry and forcible detainer statutes. Claimants are thus entitled to the restitution of the 4G offices and any property removed, plus incidental damages. (*Allen v. McMillion* (1978) 82 Cal.App.3d 211, 219 ["The plaintiff's interest in peaceable even if wrongful possession is secured against forcible intrusion by conferring on him the right to restitution of the premises, the primary remedy, and incidentally awarding damages proximately caused by the forcible entry"].)

### D.    Claimants' Derivative Conversion Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 28-29)

Claimants assert the MOM Respondents are liable to the MOM JV Entities for conversion of the MOM JV Entities' assets (*e.g.*, loan and sale proceeds) in six separate instances. Specifically, Claimants claim conversion of (1) $20 million in Nano Loan proceeds, (2) $1 million in Tesoro Loan proceeds, (3) $5.1 million in proceeds from the sale of TIC interests, (4) $11.6 million in Tesoro Redlands Preferred Bank loan proceeds, (5) excessive distributions the MOM Parties made to themselves, and (6) deeds of trust on properties at issue in the potential $175 million loan from Coastline Loans, LLC ("Coastline Loan") in June 2021. These derivative claims are stayed as a result of the MOM JV Entities' bankruptcy. Consequently, the analysis and disposition of these claims set forth in § III.D. of the Partial Interim Award has been omitted from this Partial Final Award. However, these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

### E.    Claimants' Derivative Penal Code Section 496 Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 30-31)

Claimants argue the acts of conversion also violated Section 496. This derivative claim is stayed as a result of the MOM JV Entities' pending bankruptcy. Therefore, the analysis and disposition of this claim set forth in § III.E. of the Partial Interim Award has been omitted from this Partial Final Award. But this claim will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

### F.    Claimants' Derivative Unjust Enrichment Claim Against Makhijani, Continuum, and the MOM Parties (FAC at 29-30)

Claimants assert an unjust enrichment claim, arguing the MOM Respondents have looted the MOM JV Entities, using them as personal slush funds and enriching themselves. This derivative claim is stayed as a result of the MOM JV Entities' bankruptcy. Accordingly, the analysis and disposition of this claim set forth in § III.F. of the Partial Interim Award has been omitted from this Partial Final Award. Still, this claim will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

### G.     Personal Liability of Makhijani

Claimants argue Makhijani is personally liable for fraudulent inducement and forcible entry and detainer because an agent is always liable for his own torts; and he is an alter ego of Continuum and the MOM Parties.  The MOM Respondents concede Makhijani is their agent, and is liable for his own torts, but argue Claimants failed to prove fraudulent inducement by Makhijani (apart from the other MOM Respondents) and failed to prove he is the alter ego of Continuum or the MOM Parties.[24]

The Arbitrator finds Claimants have proven Makhijani was personally involved in the fraudulent inducement and other non-contract claims discussed above.  He directed and participated in the negotiation of the Term Sheet (7.2 at 1873:14-17), the Operating Agreements and the Other JV Related Agreements.  (Exs. 2307, 2382, 319.)  He admitted he "was personally involved" with the Term Sheet and other JV agreement negotiations.  (Ex. 758 ¶ 5.)  He even admitted he was "personally involved" in obtaining the Nano Loan.  (Ex. 758 ¶¶ 10-11.)  Finally, other MOM Respondent agents testified Makhijani controls and manages the MOM JV Entities' daily operations.  (6.27 Tr. at 978:14-21.)  Therefore, Makhijani is personally liable for the fraudulent inducement and other non-contract claims based on his own actions.[25]

The Arbitrator finds Claimants have not proven Makhijani is the alter ego of Continuum or the MOM Parties.  Alter ego is "an extreme remedy, sparingly used."  (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal. App. 4th 523, 539.)  It requires proof of two conditions: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone."  (*Hasso v. Hapke* (2014) 227 Cal. App. 4th 107, 155.)

The evidence shows Shyam, not Makhijani, is the owner of Continuum.  (7.2 Tr. at 1650:5-14 [in the hierarchy of Continuum, Makhijani works under and reports to Shyam]; 7.11 Tr. at 3561:7-12, 3562:18-21, 3564:9-3565:5; *Hasso*, 227 Cal. App. 4th at 155.)  And there would be no inequitable result if the acts in question were treated as those of Continuum or the MOM Entities, rather than as Makhijani's acts.  (*Ibid.*)  That is, there is no evidence that either Continuum or the MOM Parties are "judgment proof," such that they could not pay for any damages awarded to Claimants.  (*Greenspan v. LADT, LLC* (2010) 191 Cal. App. 4th 486, 528 [adding alter ego manager and sister company to a judgment to avoid prejudice, when judgment debtors' actions caused assets to disappear].)  Therefore, Makhijani is not personally liable for the fraudulent inducement and other non-contract claims based on the alter ego theory.

---

[24] The MOM Respondents make no such argument relative to the other personal liability claims.

[25] The Arbitrator notes no claims for conspiracy or aiding and abetting were alleged against Makhijani (unlike Nano) in the FAC and none were argued in the closing briefs.  So, the Arbitrator expresses no opinion on those theories.

H.      **Claimants' Conspiracy and Aiding/Abetting Fraudulent Inducement Claims Against Nano (FAC at 33-37)**

Claimants argue Nano is liable for the fraudulent inducement/promissory fraud discussed above (§ III.A.), because Nano conspired with and aided and abetted the MOM Respondents.

Conspiracy is "a form of vicarious liability by which one defendant can be held liable for the acts of another," where all have "agreed to a common design to commit a wrong" that damages a plaintiff. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal. App. 5th 630, 652.) Each member of a conspiracy must have "acted in concert" and come to "a mutual understanding to accomplish a common and unlawful plan," wherein one or more of them "committed an overt act to further" the plan. *Id.* The elements of the claim are: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*AREI II Cases* (2013) 216 Cal. App. 4th 1004, 1022.) Participation, cooperation, or unity of action in a conspiracy is typically proven by circumstantial evidence, including, "the nature of the act done, the relation of the parties, [and] the interests of the alleged conspirators." (*Rickley v. Goodfriend* (2013) 212 Cal. App. 4th 1136, 1166.)

Liability for aiding and abetting an intentional tort may be imposed if the person "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." (*IIG Wireless*, 22 Cal. App. 4th at 653-654.) "[I]t necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." (*Id.* at 654.) However, a person may be liable even in the absence of any independent duty to the plaintiff. (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal. App. 4th 328, 345.)

The evidence shows Nano gave substantial assistance to, and acted in concert with, the MOM Respondents in fraudulently inducing Claimants to enter into the JV.[26] Gressak's actions in particular indicate Nano and the MOM Respondents reached a "mutual understanding to accomplish a common and unlawful plan," required for conspiracy.[27] Nano knew of the MOM Respondents' fraud, as required for aiding and abetting. (*IIG Wireless*, 13 Cal. 5th at 654.)

---

[26] A bank is not immune simply by virtue of its role as a bank – liability can be found where, for example, a bank "allow[s] a person to deposit a check, payable to someone else, into a personal account, under circumstances that should have alerted the bank to the possibility of fraud." (*Casey v. U.S. Bank Nat'l Ass'n* (2005) 127 Cal. App. 4th 1138, 1151, n.3.) The Arbitrator notes these circumstances are comparable to Nano's diversion of the Nano Loan proceeds from the MOM JV Entities directly into a Continuum bank account.

[27] The Arbitrator finds Gressak's self-serving contrary testimony carried little weight, as it was not credible or consistent with the documentary evidence. Regardless, his testimony as to Nano's obligations and responsibilities did not materially move the needle in either direction. The documents told the story.

As to Nano's knowledge of and active participation in the fraud, Nano had an existing relationship with Honarkar, having issued him multiple loans prior to the JV negotiations, and Nano was aware Honarkar and 4G were the owners of the properties used to secure the Nano Loan. (Exs. 123; 130; 215 at 3-7, 16, 18-21.)  Honarkar testified he sought out Gressak's advice because he believed he and Gressak were friends, and he trusted Gressak when Gressak introduced him to Makhijani for purposes of discussing a potential JV with Makhijani's investors. (Ex. 52; 6.24 Tr. at 100:12-102:15; 6.25 Tr. at 501:2-24.)  Again, the ties and cross-connections between Nano, Continuum, and Makhijani run deep. (Ex. 1000 at 102:12-103:14, 181:18-190:6, 200:20-201:3; 6.26 Tr. at 587:24-588:22, 797:12-799:16.)

Against that background, Nano issued the $150 million LOI to Honarkar on May 19, 2021, for a loan to refinance (with other lenders) the LoanCore debt. (Ex. 106.)  The $150 million Nano loan was to be secured by the same properties used to secure the $20 million Nano Loan. (Exs. 106, 130.)  Though Nano now claims it did not have the capacity to make a $150 million loan, Gressak actively perpetuated the pretense in the days ahead of the "closing." (Exs. 139, 211, 171; Ex. 1000 at 40:9-41:6; 6.26 Tr. at 606:20-607:16 [Buchanan – funding would have been "near impossible"].)  Gressak was aware the MOM Respondents had misrepresented only three lenders would be involved in the LoanCore refinance (First Choice, Preferred, and Lone Oak). (Exs. 187, 229.)  In fact, Nano used the $150 million LOI to gather information about Honarkar's properties, failing to differentiate between the $150 million Nano LOI and the $20 million Nano Loan in their due diligence communications. (Exs. 4017-4020, 123.)

Simultaneously, Nano was working with Continuum/Makhijani/Shyam on the $20 million Nano Loan to the MOM JV Entities.  On May 20, 2021, prior to the execution of the Term Sheet on May 24, 2021 (Ex. 148), Nano issued the Nano Loan LOI to Shyam, which contemplated securing the Nano Loan with properties Nano knew were owned by Claimants. (Exs. 130, 215.)  Nano did not include Honarkar on any correspondence about the $20 million Nano Loan nor did it seek his consent to encumber the properties it knew belonged to him and 4G.  Though Nano points to the Term Sheet as providing it authority to issue the Nano Loan to the MOM JV Entities, the Term Sheet does not mention the MOM JV Entities by name nor did they even exist before the Operating Agreements were signed on June 8, 2021.[28]

Nano knew the MOM Respondents intended to use the Nano Loan proceeds as their initial contribution to the JV because Makhijani told Gressak so before the Nano Loan LOI was even issued to Shyam. (7.8 Tr. at 2729:17-2730:6; 2549:5-2550:2.)  But Nano never revealed the MOM Respondents' intent as to the initial contribution in any written communications or documents that might have alerted Honarkar. (*Id.* at 2730:7-2731:13, 2734:6-2739:19.)

---

[28] While Nano says its actions were similar to the other banks involved in the LoanCore refinance, it is important to note the other banks are on different footing as to their connections with Continuum and Makhijani.  Also, Honarkar was aware of and consented to the other bank loans and related encumbrances on his properties. (Exs. 220-222.)

Internal records state Nano made the Nano Loan to "strengthen[] the Banc's position of the history and relationship with sponsors of the joint-venture [*i.e.*, Continuum and Makhijani]." (Ex. 215 at 4.) Gressak was "strongly advocating for this loan to get made" and "overrode opposition to it" from other bank officers, including Buchanan and the chief lending officer, who were concerned the loan was not secured and would be scrutinized by regulators. (6.26 Tr. at 573:15-577:11, 586:2-24, 588:15-589:23.)

Buchanan drafted the June 7, 2021 memo to the Nano Loan Committee to memorialize the unusual request for the loan proceeds to be transferred to an entity other than the borrower, placing the onus on Gressak. (Ex. 240; 6.26 Tr. at 593:8-597:3 [Buchanan was concerned about "direction that [Nano] had received, as well as the optics with this particular loan"]; Ex. 1000 [Nano PMK – "Q: Was the loan committee consulted about the change in disbursement? A: I don't think so"].)

But the June 7, 2021 internal memo falsely stated the loan proceeds had to be placed in Continuum's account because the MOM JV Entities had indicated the refinancing escrow was not open and could not receive transfers. (Ex. 240.) Both Makhijani and Shyam testified they never told Nano the refinancing escrow was not yet open. (7.3 Tr. at 2159:20-2164:11; 7.12 Tr. at 3685:10-3686:10.) And Nano obviously knew the refinancing escrow was open on June 7 – it wired $20 million from Continuum's bank account to the refinancing escrow less than an hour after first depositing the funds in Continuum's account. (Exs. 270, 272, 278 at 2.)

Nano closed and funded the $20 million Nano Loan on June 7, 2021, before the MOM JV Entities' Operating Agreements were finalized and executed, meaning the MOM JV Entities did not exist on the date the Nano Loan was made to them. (Ex. 4104 at 4-5.) Nano also issued the Nano Loan based only on the signatures of Continuum employees, not Honarkar. (Ex. 239.)

Nano also placed the $20 million Nano Loan proceeds into a bank account belonging to Continuum, knowing Continuum was not the borrower and the assets used to secure the loan belonged to Honarkar and 4G. (Ex. 240 ["Gressak has spoken with the Borrower and has approved the funding of the account"].) Nano routed this money to the Continuum bank account at Shyam's request, based on documents signed by Shyam, without verifying Shyam's authority to effectuate the transfer to his own corporate account on behalf of the MOM JV Entities. (Exs. 237, 270; 7.12 Tr. at 3794:20-3799:6 [Prendergast – "[Gressak] just told me that, yes, Deba Shyam, by reviewing the term sheet, he has the authority…I just took [Gressak's] word for it…."].) Shyam is not mentioned in the Term Sheet, the only JV document in existence at the time of the Nano Loan funding. (Ex. 148.) Nano also violated its own policy by failing to get a request in writing from all three of the MOM JV Entities as borrowers to reroute the funds from the approved use, since Shyam was the Manager of only the MOM CA Manager, not the MOM AS Manager or the MOM BS Manager. (Ex. 1000 at 139:10-15 [Nano PMK testimony].)

36

Nano then took security interests under the deeds of trust securing the Nano Loan, knowing they were Claimants' properties, and did so without Honarkar's consent. Nano only publicly recorded these deeds of trust after receiving a Cease and Desist Order from the Federal Reserve. (Exs. 234-236, 239 at 88-127, 515 at 6-47, 514 at 2; Ex. 4127 [Gressak – "these are nothing but AOC [abundance of caution] liens" and "I don't need to be on this anymore"].)

Finally, Nano collected fees and interest on the Nano Loan, despite knowing of the MOM Respondents' fraud. (Exs. 1087, 215, 389.) And after this action was filed, Nano obtained an indemnity from the MOM Respondents for Claimants' claims that, *inter alia,* the Nano Loan was obtained without "the necessary consent from Mohammad Honarkar." (Ex. 869, ¶ 19.)

Even after the JV was formed, Nano continued to assist the MOM Respondents by concealing material information from Honarkar. Nano issued the $1 million Tesoro Loan without Honarkar's knowledge. Then, in response to a 4G employee's question concerning receipt of a related monthly billing statement, Nano indicated it was "a billing error and not applicable to Tesoro." (Ex. 2723.) Nano also complied with Kluchin's instructions to conceal information from Honarkar and his team. (Ex. 473 [Kluchin - "No one from 4G should be on this account. This is very important…Only Deba and I"]; Ex. 590 [Kluchin – "DO NOT COPY CHI or anyone from 4g or laguna beach company on this email thread"].) Similarly, after the parties' dispute erupted in February 2023, Nano assisted the MOM Respondents by restricting Honarkar's access to all JV bank accounts, including those for 4G. (Ex. 677.)

Nano cites California's economic loss rule and argues Claimants' fraudulent inducement claim is barred. However, the California Supreme Court recently clarified, "[t]he doctrine only applies to bar tort recovery for negligently inflicted economic losses unaccompanied by physical or property damage under the limits recognized in *Sheen*." (*Rattagan v. Uber Techs., Inc.* (2024) 17 Cal. 5th 1, 38; citing *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal. 5th 905, 922.) The economic loss rule does not apply to the intentional fraudulent inducement at issue here.

In summary, the record is replete with evidence Nano acted in concert with, and was aware of, the MOM Respondents' fraudulent inducement. The Arbitrator therefore finds Nano jointly and severally liable with the MOM Respondents for conspiracy to commit and aiding and abetting the commission of the fraudulent inducement. As a consequence, the Arbitrator again finds Claimants are entitled to the alternative remedies of: (a) damages, the specific amount of which will be determined after an accounting is completed; or (b) rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet.[29] (*Chapman*, 220 Cal. App. 4th at 234; Civ. Code § 1692.)

---

[29] This finding may also constitute a basis for the MOM JV Entities to set aside the Nano Loan documents (including the loan agreement, the deeds of trust, and the subsidiary LLC membership interest assignments), in addition to their invalidity for lack of authority as discussed in § III.A.1. above.

I.      **Claimants' Derivative Conversion and Penal Code Section 496 Claims
        Against Nano (FAC at 28-29, 30-31)**

Claimants argue Nano is separately liable to the MOM JV Entities for conversion of the
$20 million Nano Loan and the $1 million Tesoro Loan proceeds, which belonged, respectively,
to the MOM JV Entities and Tesoro Redlands as the borrowers (Exs. 239, 411). Claimants also
argue Nano violated Section 496 because it concealed and withheld, and aided the MOM
Respondents in concealing and withholding, the Nano and Tesoro Loan proceeds. These
derivative claims are stayed as a result of the MOM JV Entities' bankruptcy. As a result, the
analysis and disposition of these claims set forth in § III.I. of the Partial Interim Award has been
omitted from this Partial Final Award. Nevertheless, these claims will be analyzed and disposed
of in the Final Award to be issued in this arbitration. (§ IV.17. below.)

J.      **Claimants' Derivative Breach of Contract Claim Against Nano (FAC at 37)**

Claimants assert as an "alternative" that Nano breached the Nano Loan agreement by
converting the Nano Loan proceeds and transferring them to Continuum, rather than to the MOM
JV Entities. This derivative claim is stayed as a result of the MOM JV Entities' bankruptcy. So,
the analysis and disposition of this claim set forth in § III.J. of the Partial Interim Award has
been omitted from this Partial Final Award. But this claim will be analyzed and disposed of in
the Final Award to be issued in this arbitration. (§ IV.17. below.)

K.      **Claimants' Accounting Claim Against the MOM Parties (FAC at 26)**

Claimants seek an accounting of the MOM JV Entities' books and records by an
independent third party, from the creation of the JV to the present. "An action for an accounting
has two elements: (1) 'that a relationship exists between the plaintiff and defendant that requires
an accounting' and (2) 'that some balance is due the plaintiff that can only be ascertained by an
accounting.'" (*Sass v. Cohen* (2020) 10 Cal. 5th 861, 869.)

Both prongs are satisfied here. First, the parties are in a business relationship with each
other, as members and managers of the MOM JV Entities, responsible for owning and operating
real estate assets worth hundreds of millions of dollars. Second, a balance is owed to Claimants
that can only be ascertained by an accounting. The Operating Agreements required the MOM
Parties to create and maintain adequate books and records for the MOM JV Entities, to provide
regular financial reporting to Claimants, and to allow inspection of the complete books and
records upon request; but they have failed to fulfill these obligations. (§ III.A.5. above; Ex. 313,
314, 315 §§ 12.1, 12.2; Ex. 1377, 6.24 Tr. at 250:1-254:1; Ex. 659; 7.8 Tr. at 2533:16-2539:19.)
As a result, none of the damages experts could make an accurate determination of the JV's
income, expenses, assets, or liabilities. (7.9 Tr. at 3008:6-3012:7, 3023:1-7.)

An accounting is particularly warranted here because, absent one, Claimants have no way to determine the full scope of the MOM Respondents' misconduct and the resulting damages. The MOM Parties remain in full control of the MOM JV Entities, and have excluded Claimants since Spring 2023.  (Ex. 677; 7.12 Tr. 3850:12-3851:5; 6.25 Tr. at 459:20-23.)  Claimants thus have no way of knowing what the MOM Respondents have done in almost two years.[30]

The MOM Respondents' arguments against an accounting are meritless.  They claim neither Claimants nor the MOM JV Entities are owed any money, because: (a) there is no validity to any of Claimants' claims; and (b) the undisputed evidence shows that, in addition to the initial $30 million capital contribution, the MOM Members advanced $89.5 million to the JV, $49.5 million of which remains outstanding.  The Arbitrator rejects these arguments.

The Arbitrator has found the majority of Claimants' claims are valid.  Arbitrator also finds there is no reliable evidence establishing the fact or amount of the claimed "advances."[31] More broadly, due to Respondents' active concealment, Claimants have been unable to verify the accuracy and completeness of the few financial records the MOM Respondents have provided. The accounting is also needed to verify the amount of the MOM Respondents' claimed offsets.

Claimants have proven they are entitled to an accounting.

**L.**     **Claimants' Declaratory Relief Claim Against the MOM Parties (FAC at 27)**

The parties have disputes as to their respective rights, duties, powers, and obligations under the Operating Agreements, and these disputes are generally amenable to declaratory relief. (CCP § 1060.)  The Arbitrator finds Claimants are entitled to the declaratory relief they seek on the following specific issues and for the following reasons:

(1)  The MOM Respondents fraudulently induced Claimants into entering into the Operating Agreements.

(2)  On July 24, 2023, the MOM Respondents committed forcible entry and detainer at the 4G corporate offices.  As a result, Claimants are entitled to immediate possession of the 4G offices.  The MOM Respondents should be ordered to return all information and things removed from the 4G offices and to compensate Claimants for the value of any items lost or destroyed.

---

[30] The MOM Respondents admitted their discovery responses were incomplete as to what loans they obtained related to JV properties, and that they routinely did not inform Honarkar about large financial decisions because they "didn't think it was necessary."  (6.27 Tr. at 1008:2-17, 1012:14-16, 1071:19-1073:10; see also Exs. 967, 3623.)

[31] The MOM Respondents and Nano also euphemistically refer to these "advances" as "infusions," a term seemingly calculated to obfuscate whether they were Contributions or loans to the MOM JV Entities.

(3)  Palm Desert Collective Resorts LLC, 424 Marguerite Ave. LLC, and 8871 Research Dr. LLC are "Held-Back LLCs" under the ACA and the Operating Agreements and thus, were never contributed to the MOM JV Entities.  (Ex. 304 and Ex. E attached thereto; Exs. 313-315.)

(4)  Although the following entities appear on Exhibit C of the Operating Agreements and ACA, they are not now and never have been owned by the MOM JV Entities:  4G (Ex. 583 [Letter Agreement – 4G is the MO Member]), Modan LLC (majority owned by Niazi), BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, Terra Laguna Beach Inc., Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing 82 LLC, and Brookline Aliso Viejo LLC.  (Ex. 1354; 7.3 Tr. at 1915:7-1919:6.)

(5)  The sole "Projects" as defined in the Operating Agreements and ACA are Hotel Laguna LLC and Newport Crossing (Aryabhata LLC).  (Ex. 315, § 1.45; Ex. 689, § 1(a).)

As to issues (1) and (2), the Arbitrator has found in favor of Claimants on the fraudulent inducement, forcible entry, and forcible detainer claims.  The Arbitrator has considered and rejected all of the MOM Respondents' factual and legal arguments against these claims.

As to issue (3), the MOM Respondents make no reasoned argument to support their bare assertion that these "Held-Back LLCs" were intentionally contributed pursuant to the ACA.

As to issue (4), the parties make a host of legal and factual arguments, principally focused on 4G and Modan, and the proper interpretation of the Operating Agreements and the ACA.  However, the applicable law and the weight of the evidence, including the admissible parol evidence,[32] shows:  4G and Modan were not intended to be "Other Owned LLCs" under the Operating Agreements (Exs. 313-315, § 1.40 and Ex. C), nor were they intended to be "Contributed Assets" or "MOM CA LLCs" under the ACA (Ex. 304, §§ 1.40, 2(a) and Ex. C). The Letter Agreement (Ex. 583, ¶ 3) further supports these conclusions.  And, at least as to 4G (a corporation, not an LLC), the opposite conclusions would mean 4G is both a Member and an asset of the MOM JV Entities.  This interpretation would be absurd.

As to issue (5), the MOM Respondents make no argument in their briefs to support their claim it "fails for the reasons set forth above, section [*]."  (Brackets and content in original.)

---

[32] See *Nw. Nat'l Ins. Co. v. Esmark, Inc.* (Del 1996) 672 A.2d 41, 43 [courts may consider extrinsic evidence where there is an ambiguity in the contract] and *Peden v. Gray* (Del. 2005) 886 A.2d 1278, 2005 WL 2622746, at *2 ["parol evidence is admissible to resolve a contractual term that is ambiguous"]; see also *Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.* (2014) 226 Cal. App. 4th 886, 897 (same).

## M.      MOM Members' (Counter) Claims Against Honarkar

The MOM Members claim Honarkar is liable for trespass, conversion, violation of Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory and injunctive relief.[33]  All of these claims depend on the existence and enforceability of the Operating Agreements and the Other JV related Agreements.  But the Arbitrator has found Claimants may rescind these agreements for fraud in the inducement and failure of consideration.  In any event, the MOM Parties' prior material breach of the Operating Agreements discharged Honarkar from any further duty to perform thereunder.  (*Level 4 Yoga*, *supra*, at *27 ["Delaware law firmly supports the principle that a party to a contract is excused from performance if the other party is in material breach of his contractual obligations"]; see also Honarkar Response to MOM Respondents' Demand, at 4-5, Twelfth Affirmative Defense.)  It follows the MOM Parties' claims against Honarkar must fail.

## N.      Remedies

### 1.      Rescission With Restitution and Consequential Damages

Claimants are entitled to rescind the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, all on account of Respondents' fraud in the inducement. Claimants are also entitled to rescind the Operating Agreements and the Other JV Related Agreements, for the failure of consideration due to the failure to provide the initial contribution. (§§ III.A.6., III.B.2., III.G., and III.H. above.)

In cases like this, "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both."  (Cal. Civ. Code § 1691; *Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal. App. 5th 881, 888.)

"Rescission extinguishes the contract, terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. Thus, the relief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the status quo ante, returning him to his economic position before he entered the contract."  (*Sharabianlou v. Karp* (2010) 181 Cal. App. 4th 1133, 1145.)

---

[33] These claims (except the Section 496 claim) were asserted in the demand filed by the MOM Respondents and the MOM JV Entities in the MOM Arbitration on September 27, 2023, together with Attachment 1 and the exhibits thereto, including the First Amended Complaint originally filed in OCSC Case No. 30-2023-01322886.  To the extent the MOM JV Entities assert these same claims, they are stayed as a result of their bankruptcy.  But these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration.  (§ IV.17. below.)

Where rescission is warranted, "[t]he aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled." (Civ. Code § 1692; *Wong v. Stoler* (2015) 237 Cal. App. 4th 1375, 1387–88, 1389–90.) Although in general each party must return the consideration they received, if "defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiff," courts "are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff." (*Wong, supra*, 237 Cal. App. 4th at 1389.) And the defrauding party has the burden to prove any offsets to which they claim they are entitled. (*McCoy v. West* (1977) 70 Cal. App. 3d 295, 302-303; *Gentry v. Kelley Kar Co.* (1961) 193 Cal. App. 2d 324, 337; *Grill v. Hunt* (1992) 6 Cal. App. 4th 73, 79 ["The implicit rationale of these cases is that risk of any difficulty in proof should not inure to the benefit of the party responsible for the failure of the contract"].)

All told, if Claimants elect rescission, they will be entitled to restitution and consequential damages in amounts to be determined following the accounting, and Respondents will have the burden of proving their right to any offsets.

### 2.   Damages Without Rescission

In the alternative, if Claimants elect to affirm and retain the benefits of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, then they will be entitled to recover damages for fraud in the inducement and breach of the Operating Agreements. (§§ III.A. and III.B. above.) While the fact of these damages is certain, and some amounts are known, the total amount will be determined following the accounting.

### 3.   Derivative Damages

Claimants contend they are entitled to recover damages from Respondents, for the derivative conversion, Section 496, and unjust enrichment claims asserted on behalf of the MOM JV Entities (§§ III.D., III.E., III.F. and III.I. above), with or without rescission. Spindler calculated Respondents' actions caused at least $45,011,937 and at most $169,845,578 in damages to the MOM JV Entities themselves. (Exs. 1006, 1509; 7.9 Tr. at 3081:17-3082:1.)

These derivative damages claims are stayed as a result of the MOM JV Entities' bankruptcy. The analysis and disposition of these derivative damages claims set forth in § III.N.3. of the Partial Interim Award has therefore been omitted from this Partial Final Award. But these claims will be analyzed and disposed of in the Final Award to be issued in this arbitration. (§ IV.17. below.) At that time, the accounting will be completed and the Arbitrator will have determined the amount of these damages to be awarded (including any trebling).

### 4.    Punitive Damages

To recover punitive damages Claimants must prove, by clear and convincing evidence, that Respondents have "been guilty of oppression, fraud, or malice…." (Civ. Code § 3294.) Claimants argue they have proven oppression, fraud, and malice.  The MOM Respondents argue they have not proven oppression, fraud, or malice.  The Arbitrator has found Claimants have proven, by clear and convincing evidence, that Respondents committed fraud in the inducement. (§ III.A. above.)  On this basis alone, Claimants are entitled to punitive damages.  (Civ. Code § 3294(c)(3).)  The Arbitrator further finds, based upon the totality of the evidence, Claimants have proven, by clear and convincing evidence, that Respondents have been guilty of oppression and malice as those terms are defined in Civil Code section 3294(c)(1) and (c)(2).  However, until the accounting is complete, the full nature and extent of Respondents' wrongdoing, the damages Claimants have suffered as a result, and the other factors the Arbitrator will need to consider when awarding punitive damages cannot be determined.  (See generally, 6 Witkin, Summary of California Law (11th ed. 2017) Torts, §§ 1727- 1785.)  Therefore, the Arbitrator will determine the amount of punitive damages to be awarded after the accounting is complete.

### 5.    Attorney Fees and Costs

As the prevailing parties, Claimants are awarded a total of $9,197,426.31 in attorney fees and costs.  The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total.  But of the $9,197,426.31 total, Nano is jointly and severally liable (with the other Respondents) for only $5,229,185.14.  (See Arbitrator's Ruling on Motion for Attorney Fees and Costs dated and filed concurrently herewith; § IV.14. below; FAC at 38.)

### 6.    Interest

Claimants claims for pre and post-judgment interest will be resolved in the Final Award after the accounting is completed and the amount of damages to be awarded is determined.

### 7.    Receiver

Claimants request the appointment of a receiver on the grounds the MOM Respondents have had complete control of the JV since they excluded Honarkar in 2023.  (FAC at 38; Ex. 677; 6.25 Tr. at 459:20-23.)  They argue a receiver is necessary to place the JV in "safe hands" and to prevent the MOM Respondents from further dissipating the JV's assets before the accounting is completed and this arbitration is concluded.  Claimants' request for a receiver is stayed as a result of the MOM JV Entities' bankruptcy.  The analysis and disposition of this request set forth in § III.N.5. of the Partial Interim Award has been omitted from this Partial Final Award but will be included in the Final Award in this arbitration.  (§ IV.17. below.)

## IV.    SUMMARY OF CONCLUSIONS AND FURTHER PROCEEDINGS

1.    Claimants have proven their fraudulent inducement claim against Makhijani, Continuum and the MOM Members; and Claimants are therefore entitled to elect the alternative remedies of either compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A., III.G., and III.N.1. above; ¶ 13 below; FAC at 22-23.)

2.    Claimants have proven their breach of contract (Operating Agreement) claims against the MOM Parties; and Claimants are therefore entitled to the alternative remedies of compensatory damages or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.B. and III.N.2. above; ¶ 13 below; FAC at 24-25.)

3.    Claimants have not proven their breach of contract (Management Agreement) claim against the MOM Parties.  (§ III.B.6. above; not pleaded in FAC.)

4.    Claimants have proven their forcible entry and forcible detainer claims against Makhijani, Continuum and the MOM Parties; and Claimants are therefore entitled to restitution of the subject premises (775 Laguna Canyon Road) and incidental damages in amounts to be determined.  (§§ III.C. and III.G. above; ¶ 13 below; FAC at 31-33.)

5.    Claimants derivative conversion claims against Makhijani, Continuum, the MOM Parties, and Nano (Partial Interim Award §§ III.D., III.G. and III.I.; ¶ 13 below; FAC at 28-29) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

6.    Claimants derivative Section 496 claims against Makhijani, Continuum, the MOM Parties, and Nano (Partial Interim Award §§ III.E., III.G., and III.I.; ¶ 13 below; FAC at 30-31) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

7.    Claimants derivative unjust enrichment claims against Makhijani, Continuum, and the MOM Parties (Partial Interim Award §§ III.F. and III.G.; ¶ 13 below; FAC at 29-30) are stayed as a result of the MOM JV Entities' bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

8.    Claimants have proven their conspiracy to commit and aiding and abetting fraudulent inducement claims against Nano; and Claimants are therefore entitled to the alternative remedies of compensatory damages, or rescission with restitution and consequential damages, all in amounts to be determined.  (§§ III.A. and III.H. above; ¶ 13 below; FAC at 33-37.)

9.      Claimants derivative breach of contract claim against Nano (Partial Interim Award § III.J.; FAC at 37) is stayed as a result of the MOM JV Entities' bankruptcy, but it will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

10.     Claimants have proven their accounting claim against the MOM Parties; Claimants are therefore entitled to the accounting requested; and the accounting shall be the subject of further proceedings in this arbitration.  (§ III.K. above; ¶¶'s 15 and 17 below; FAC at 26.)  The further proceedings shall abide by the Bankruptcy Court order which modified the automatic stay and allowed Claimants to: "(ii) proceed in the above-captioned bankruptcy cases with the accounting granted in the [Partial Interim and now Partial Final] Arbitration Award in accordance with protocols to be agreed upon by the parties to the Arbitration or otherwise entered by this Court."

11.     Claimants have proven their declaratory relief claim against the MOM Parties; and Claimants are therefore entitled to the declaratory relief requested.  (§ III.L. above; FAC at 27.)

12.     The MOM Members have not proven their (counter) claims against Honarkar (trespass, conversion, Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory or injunctive relief).  (§ III.M. above.)  To the extent the MOM JV Entities also assert these claims, they are stayed as a result of their bankruptcy, but they will be analyzed and disposed of in the Final Award.  (¶ 17 below.)

13.     All amounts of restitution, consequential damages, compensatory damages, incidental damages, punitive damages and interest (if any) to be awarded to Claimants shall be determined in further proceedings in this arbitration.  (¶¶'s 1, 2, and 4-8 above; and ¶¶'s 15 and 17 below.)

14.     Claimants are awarded a total of $9,197,426.31 in attorney fees and costs.  The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total; but of the $9,197,426.31 total, Nano is jointly and severally liable (with the other Respondents) for only $5,229,185.14.  (§ III.N.5. above; JAMS Rule 24(f) and (g); FAC at 38.)

15.     This Partial Final Award resolves all claims submitted to arbitration, with the exception of the issues (the "Remaining Issues") to be resolved in further proceedings in this arbitration including: (i) the claims stayed as a result of the MOM JV Entities' bankruptcy; (ii) the accounting; and (iii) the determination of the amounts of restitution, damages, interest, attorney fees and costs to be awarded.  The Arbitrator reserves jurisdiction to determine all aspects of the Remaining Issues, together with such additional issues as may arise between the parties.  It is intended this Partial Final Award will be subject to judicial review as to those issues finally determined herein, so Claimants may return to the Superior Court and seek to (i) confirm this Partial Final Award, and (ii) perfect their right to the accounting granted herein (§ III.K. above). (See JAMS Rules 24 and 25; *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1437.)

16.     This Partial Final Award shall be considered final, for purposes of a judicial proceeding to enforce, modify or vacate, this Partial Final Award pursuant to JAMS Rule 25, fourteen (14) calendar days after service if no request for a correction is made, or as of the effective date of service of a corrected Partial Final Award.  (JAMS Rule 24(i) and (j).)

17.     After the Remaining Issues are determined; and after all further proceedings in this arbitration are concluded; the Arbitrator will issue a Final Award which will resolve all claims submitted to arbitration and will include a supplemental award for attorney fees and costs incurred through entry of the Final Award in this arbitration.  (See JAMS Rules 24 and 25; ¶ 14 above; *Hightower*, *supra*, 86 Cal.App.4th at 1437-1441 [Arbitrator has authority to issue partial award and reserve jurisdiction to issue a final award on the remaining issues.].)

18.     Consolidated Scheduling Order No. 100 as amended by Scheduling Order Nos. 101-106 shall remain in full force and effect and shall govern all further proceedings in this arbitration.

19.     The virtual interim status conference previously scheduled for at 8:30 a.m. on June 12, 2025 is continued to 8:30 a.m. on July 17, 2025.  A further interim status conference or a final status conference will be scheduled at that time.

20.     Nothing contained in this Partial Final Award is intended to constitute or to require any act contrary to the automatic stay issued pursuant to 11 U.S.C. § 362(a) in the MOM JV Entities' Bankruptcy.  If the Bankruptcy Court determines there is a conflict between anything contained in this Partial Final Award and the automatic stay, the latter shall prevail; but the provision of this Partial Final Award so affected shall: (i) be curtailed and limited only to the extent necessary to bring it into conformity with the requirements of 11 U.S.C. § 362(a); and (ii) automatically become one of the Remaining Issues to be resolved in further proceedings in this arbitration.

DATED:  May 23, 2025

_____
Hon. David A. Thompson (Ret.)

46

# **EXHIBIT 3**

# JAMS ARBITRATION
## No. 5220003126

**MOHAMMAD HONARKAR AND 4G WIRELESS, INC.,**

**Claimants,**

**MAHENDER MAKHIJANI; CONTINUUM ANALYTICS, INC.; et al.,**

**Respondents,**

**and**

**MOM AS INVESTCO, LLC; MOM BS INVESTCO, LLC; et al.,**

**Nominal Respondents.**

_____

## CONSOLIDATED WITH JAMS ARBITRATION NO. 5200001122
_____

## RULING ON MOTION FOR ATTORNEY FEES AND COSTS

**Counsel:**

*Counsel for Honarkar and 4G (together, "Claimants")*:[1]

Aaron May, Esq., Joseph Ybarra, Esq., Abigail E. Marion, Esq., Thomas Rubinsky, Esq., and Halpern, May, Ybarra, Gelberg LLP; and Sam Maralan, Esq., and Maralan Law, P.C.

*Counsel for the MOM Members and the MOM Managers (together, the "MOM Parties")*:

Michael Farrell, Esq., Scott Leipzig, Esq., Tim Hsu, Esq., Stephanie Roberts, Esq., Gabriela Perez, Esq., Leilee Ghassemi, Esq., Shauna Woods, Esq., Suzanne Kenney, Esq., and Allen Matkins Leck Gamble Mallory & Natsis LLP.[2]

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Partial Interim Award dated February 21, 2025 (the "Partial Interim Award").

[2] Allen Matkins also represented: (i) the MOM JV Entities, at all times prior to April 23, 2025, including during the Hearing and this Motion, and (ii) Makhijani and Continuum, prior to November 9, 2023.

*Counsel for the MOM JV Entities:*

Anthony Bisconti, Esq., and Bienert Katzman Littrell Williams, LLP.

*Counsel for Makhijani and Continuum (together, the "Makhijani Parties"):*

Marc Cohen, Esq., and Cohen Law Group, APC.

*Counsel for Nano:*

Ann Marie Mortimer, Esq., Lawrence DeMeo, Esq., Hakop Stepanyan, Esq., and Hunton Andrews Kurth LLP.

## I.   INTRODUCTION AND RELEVANT PROCEDURAL HISTORY

The Partial Interim Award:

(1) found in favor of Claimants on their direct claims for: (A) fraudulent inducement against the Makhijani Parties and the MOM Members; (B) breach of contract (Operating Agreements) against the MOM Parties; (C) breach of the implied covenant of good faith and fair dealing against the MOM Parties; (D) accounting against the MOM Parties; (E) declaratory relief against the MOM Parties; (F) forcible entry and forcible detainer against the Makhijani Parties and the MOM Parties; (G) conspiracy to commit fraudulent inducement against Nano; and (H) aiding and abetting fraudulent inducement against Nano;

(2) found against Claimants on their direct claim for breach of contract (Management Agreement) against the MOM Parties;

(3) found in favor of Claimants on their derivative claims for: (A) conversion against the Makhijani Parties, the MOM Parties, and Nano; (B) violation of Section 496 against the Makhijani Parties, the MOM Parties, and Nano; and (C) unjust enrichment against the Makhijani Parties and the MOM Parties;

(4) found against Claimants on their derivative claim for breach of contract against Nano;

(5) found against the MOM Members and the MOM JV Entities on their direct (counter) claims against Honarkar for trespass, conversion, Section 496, intentional interference with contractual relations and prospective economic advantage, declaratory and injunctive relief;

(6) found that Claimants, as the prevailing parties in this arbitration, are entitled to recover their attorney fees and costs in amounts to be determined by a post-Hearing motion; and

2

(7) stated the Partial Interim Award, together with the determinations regarding the amounts of attorney fees and costs to be awarded would be embodied in a Partial Final Award.

On February 28, 2025, the MOM JV Entities filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court of the District of Delaware; but on April 28, 2025, that Court ordered: "To the extent applicable, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified pursuant to section 362(d) of the Bankruptcy Code to allow the Honarkar Parties to: (i) pursue and obtain an award of attorneys' fees and costs in the Arbitration…."  On May 5, 2025, that Court also dismissed the MOM Members' Chapter 11 bankruptcy.

Consequently, no bankruptcy stay precludes Arbitrator from issuing this ruling.

On March 5, 2025, Claimants filed their "Motion for Attorneys' Fees and Costs" (the "Motion").  On March 17, 2025, (A) the Makhijani Parties and the MOM Parties filed a joint opposition to the Motion (the "Makhijani/MOM Opposition"), and (B) Nano filed an opposition (individually the "Nano Opposition," and collectively with the Makhijani/MOM Opposition, the "Oppositions").  On May 9, 2025, Claimants filed a reply (the "Reply") to the Oppositions.  On April 14, 2025, Arbitrator entertained oral argument on the Motion.

The Partial Final Award of even date and filed concurrently herewith (the "Partial Final Award"), like the Partial Interim Award: (A) found in favor of Claimants on all but one of their direct claims against Respondents as detailed above; (B) found against the MOM Members on all of their (counter) claims against Honarkar, and (C) found Claimants, as the prevailing parties in this arbitration, are entitled to recover from Respondents their attorney fees and costs.  The Partial Final Award also found the MOM JV Entities' derivative claims and direct (counter) claims are currently stayed by the MOM JV Entities' bankruptcy and it therefore omitted the analysis and disposition of these claims which had been included in the Partial Interim Award.[3]

Claimants seek the following amounts in attorney's fees: $5,042,597.50 to Halpern May Ybarra Gelberg LLP ("HMYG"); $264,796 to Maralan, P.C. ("Maralan"); and $228,280.00 to Much Shelist, P.C. ("MS").  (Ybarra Decl., Ex. 1; Maralan Decl., Ex. A; Zfaty Decl., Ex. A.) They also seek a 1.5x multiplier on the fees incurred, based on their contingency fee agreement with Claimants, resulting in a total of $8,303,510.25 in attorney fees. And they seek $893,916.06 in costs and expenses.  (Ybarra Decl., ¶ 16, Exs. 2-15; Zfaty Decl., Ex. A.)

ARBITRATOR, having considered the Motion, the Oppositions, and the Reply, together with the oral arguments of counsel on April 14, 2025, the entirety of the record of the Hearing, the Partial Interim Award, and all of the other pleadings and papers on file herein, hereby FINDS, CONCLUDES, RULES, and ORDERS as follows:

---

[3] Claimants do not seek attorney fees or costs on any of the stayed claims at this time.

## II.    ANALYSIS

### A.    Claimants Are Entitled To Recover Their Attorney Fees And Costs

As the prevailing parties under the Partial Interim Award, Claimants argue they are entitled to recover their attorney fees and costs under the Operating Agreements (Exs. 313-315, §§ 17, 19.10),[4] the Term Sheet (Ex. 148, at 10), the October 11, 2023 Arbitration Agreement ("Nano Arbitration Agreement") between Claimants and Nano (Ybarra Decl, Ex. 18, § 2), and California law (Civ. Code § 1717(a) ("Section 1717"); Civ. Proc. Code § 1021).[5]  They maintain there is no reasonable dispute these agreements and applicable law entitle them to recover their attorney fees and costs.  The Arbitrator agrees.

The Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement all permit the Arbitrator to award attorney fees and costs to the prevailing party.  Claimants are the prevailing parties under Section 1717, which provides the "party prevailing on the contract" is the party that "recovered a greater relief in the action on the contract."  (§ 1717(a), (b)(1).)  Because the Arbitrator found Respondents breached the Operating Agreements but Claimants did not, the Claimants are the prevailing parties under the statute on the core contracts at issue.

Further, the arbitration and attorney fee provisions of the Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement are broad enough to permit the Arbitrator to award attorney fees and costs to the prevailing party on the contract and non-contract claims.  (*Maynard v. BTI Group, Inc.* (2013) 216 Cal. App. 4th 984, 992 ("*Maynard*") [attorney fee provision awarding fees based on the outcome of "any dispute" encompasses all claims, whether in contract, tort or otherwise, and apportionment is not required]; *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal. App. 4th 1338, 1341 [parties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract].)  Like the attorney fee provisions in *Maynard*, the arbitration clauses in the Operating Agreements provide that "***[a]ny dispute***, controversy or claim arising out of or relating to this Agreement (other than claims for injunctive or equitable relief), including, but not limited to, the interpretation, breach or termination thereof…shall be referred to and finally determined by arbitration…."  (Exs. 313-315, § 19.10 (emphasis added).)[6]

---

[4] Except as otherwise noted all exhibit references are to the exhibits admitted into evidence during the Hearing.

[5] While the fraud and other non-contractual claims are governed by California law, the claims for breach of the Operating Agreements are governed by Delaware law.  (Ex. 315 at § 19.1.)  Even so, the parties briefed and argued the Motion primarily as a matter of California law and Arbitrator will do the same in analyzing the Motion.

[6] Both the Term Sheet and the Nano Arbitration Agreement contain comparably broad arbitration provisions that do not differentiate between contract and tort claims.  (*See* Term Sheet, at 10 – "[a]ny dispute, controversy or claim arising out of or relating to this Term Sheet shall be referred to and finally determined by arbitration…."; Nano Arbitration Agreement, § 2 – "Claimants' claims against Nano Banc arising out of or related to the MOM Entities … shall be submitted to and finally determined by binding arbitration….".)

The similarly broad attorney fee and costs provisions in the Operating Agreements state: "Should any party hereto institute **any arbitration**, action or proceeding at law or in equity to enforce **any provision hereof**, including an action for declaratory relief or for damages by reason of an alleged breach of any provision of this Agreement, **or otherwise in connection with this Agreement, or any provision hereof,** the prevailing party shall be entitled to recover from the losing party or parties reasonable attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding." (Exs. 313-315, § 17 (emphasis added).)[7] And under broad provisions like these, "the prevailing party entitled to recover fees normally will be the party whose net recovery is greater, in the sense of most accomplishing its litigation objectives…." (*Maynard*, *supra*, 216 Cal. App. 4th at p. 992.)

Claimants accomplished virtually all of their litigation objectives in this case. Claimants prevailed on all but one of their direct claims against the Respondents and also prevailed on all of the (counter) claims asserted against them by the MOM Members. As a result, if Claimants elect rescission of the Operating Agreements, the Other JV Related Agreements, and the Term Sheet, they will be entitled to restitution and consequential damages. In the alternative, if Claimants elect to affirm and retain the benefits of those agreements, they will be entitled to recover compensatory damages for fraud in the inducement and breach of the Operating Agreements. The existence of these damages is certain. Claimants are also entitled to punitive damages and declaratory relief. Respondents accomplished none of their litigation objectives.

Thus, Claimants are the prevailing parties under Section 1717 and the provisions in the parties' agreements, and are entitled to recover their attorney fees and costs from Respondents.

Respondents' arguments do not support a contrary conclusion. As noted above, there is no bankruptcy stay which precludes Arbitrator from issuing this ruling, because the Bankruptcy Court modified the stay in the MOM JV Entities' bankruptcy to allow Claimants to pursue and obtain an award of attorney fees and costs in this Arbitration, and also dismissed outright the MOM Members' Chapter 11 bankruptcy. That the MOM JV Entities' derivative claims and direct (counter) claims are stayed by the MOM JV Entities' bankruptcy is of no moment because Claimants are not seeking attorney fees and costs on those claims at this time. That those claims are intertwined with Claimants' direct claims is immaterial. The uncontroverted evidence demonstrates that the entirety of the attorney fees and costs claimed by Claimants would have been incurred if their direct claims had been their only claims in this action, because the direct and derivative claims all arose out of the same facts and circumstances. (Ybarra Decl. ¶¶ 2, 3.)

---

[7] *See also*, Term Sheet, at 10 – "The arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator, and may award attorneys' fees and costs to the prevailing party."); Nano Arbitration Agreement, § 2 - "The Arbitrator may, in the Final Award, allocate all or part of the Arbitration Costs [fees and costs charged by JAMS and/or the Arbitrator], irrespective of which party paid those Arbitration Costs. Additionally, the Arbitrator may award attorneys' fees and other costs of litigation to the prevailing party.").

Respondents' arguments that Makhijani, Continuum, and Nano are not liable for Claimants' attorney fees and costs are unavailing. It is true Makhijani and Continuum are not signatories to the Operating Agreements. But the Arbitrator long ago ruled "Continuum and its agents are plainly third-party beneficiaries of the Operating Agreements, …. Plus, it is not and cannot be disputed that Makhijani is an agent of Continuum." (Rulings on Motions Contesting Arbitrability, p. 7.) Therefore, Makhijani and Continuum are both bound by the terms of the Operating Agreements, including the attorney fee and cost provisions. Continuum is also a party to the Term Sheet, which contains an identical attorney fee and cost provision, and again Makhijani is an agent of Continuum. So, Makhijani and Continuum are both bound by the attorney fee and cost provisions of the Term Sheet. And, as noted above, Nano is liable under the Nano Arbitration Agreement for Claimants' attorney fees and costs.

Respondents also argue the Motion is premature because, "Claimants have not just failed to show a specific amount of damages incurred, they have utterly failed to show by competent evidence that _any_ damages have been incurred at all …." (Makhijani/MOM Opposition, p. 11.) Not so. Again, the Partial Interim Award (and the Partial Final Award) determined Claimants are entitled to restitution, consequential damages, compensatory damages, incidental damages, and punitive damages; the fact of these damages is certain; and some of the amounts are known. Claimant's expert Spindler calculated these damages at between $45,011,937 and $169,845,578, and he estimated the rescission value of the JV's properties at more than $200,000,000.

The Makhijani Parties and the MOM Parties argue Spindler's opinions are defective. (Makhijani/MOM Opposition, p. 12.) But they made similar arguments in opposition to the Claimants' accounting claim and the Arbitrator rejected them. Besides, it is improper for them to reargue the admissibility, weight, or sufficiency of the damages evidence in this procedural context, particularly in light of the Arbitrator's findings that they failed to create and maintain adequate books and records for the MOM JV Entities, failed to provide regular financial reporting to Claimants, failed to allow inspection of the books and records, and otherwise actively concealed the very information Claimants needed to better quantify their damages. This intentional wrongdoing by the Makhijani Parties and the MOM Parties will not be rewarded. The Arbitrator also found there is no reliable evidence establishing the fact or amount of the "infusions," which the Makhijani Parties and the MOM Parties claim as offsets.

## B. Claimants' Lodestar Attorney Fees Are Reasonable

Section 1717 contemplates an award of "reasonable" attorney's fees and costs. HYMG, Maralan, and MS are seeking a total of $5,535,673.50 in attorney's fees, including fees incurred from March 2023 through the present. Each firm has provided declarations and comprehensive spreadsheets containing fee entries describing the work performed and the time expended, and listing the firms' hourly rates. (Ybarra Decl., Ex. 1; Maralan Decl., Ex. A; Zfaty Decl., Ex. A.)

6

The fee setting inquiry begins with a lodestar calculation, which involves an analysis of the reasonableness of both the hours expended and the hourly rate charged.  (*PLCM Group v. Drexler* (2000) 22 Cal. 4th 1084, 1095 (*PLCM*).)  In the lodestar analysis, the Arbitrator may also consider a number of factors as evidence of the value of the services rendered, including but not limited to the nature of the litigation and its difficulty, the skill displayed in presenting claims, the amount sought and the final amount recovered, the fee arrangement between counsel and his or her client, and Claimants' ultimate successes and failures.  (*Ibid.*; *see also, Holguin v. DISH Network LLC* (2014) 229 Cal. App. 4th 1310, 1332 (*Holguin*); and *Mahani v. Edix Media Group, Inc.*, 935 A.2d 242, 245-46 (Del. 2007) [listing Delaware reasonableness factors].)

The Arbitrator can also adjust the lodestar calculation based on his analysis of the relevant factors.  (*Serrano v. Priest (*1977) 20 Cal. 3d 25, 49 [after accepting the lodestar figure as a starting point, "the court then took into consideration various relevant factors, of which some militated in favor of augmentation and some in favor of diminution"]; *Holguin*, *supra*, 229 Cal. App. 4th at 1332, relying on *Ketchum v. Moses* (2001) 24 Cal. 4th 1122, 1132 ["Adjustment may be made upward or downward depending on the court's assessment of the fair market value for the particular action at issue."]; *Concepcion v. Amscan Holdings Inc.* (2014) 223 Cal. App. 4th 1309, 1321 ["There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation."].)

The Arbitrator has broad discretion to determine the reasonableness of a request for attorney fees.  (*PLCM*, *supra*, 22 Cal. 4th at 1096 ["it is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court."]; *see also, Vella v. Hudgins* (1984) 151 Cal. App. 3d 515, 520 ["The amount to be awarded as attorney's fees is left to the sound discretion of the trial court.  The trial judge is in the best position to evaluate the services rendered by an attorney in his courtroom.…"].  Not only is the Arbitrator "the best judge of the value of professional services rendered in his court…," but he is also entitled to rely on his own personal expertise gained from 15 years as a trial judge and 10 years as an appellate court justice.  (*PLCM*, *supra*, 22 Cal. 4th at 1095.)

Applying these principles, the Arbitrator finds Claimants' counsel are qualified, skilled and experienced trial lawyers in matters concerning issues similar to those in this case.  They have litigated multiple related matters in the Superior Court and with JAMS since March 2023, including considerable discovery disputes.  The arbitration culminated in a three-week Hearing with the Arbitrator and extensive post-hearing briefing and closing argument.  Counsel achieved an unqualified win for Claimants by securing an accounting, plus the right to a return of the JV properties, restitution, consequential, compensatory, incidental, and punitive damages.  Based on Arbitrator's experience, the hourly rates charged are well within reason for Southern California-based law firms in complex commercial cases.  (*See PLCM*, *supra*, 22 Cal. 4th at 1095 "[t]he reasonable hourly rate is that prevailing in the community for similar work.")

The Arbitrator further finds the hours billed for performing specific tasks related to asserting Claimants' claims and defending against Respondents' (counter) claims in this matter were justifiable and reasonable. This arbitration comprised a highly contentious dispute between multiple individuals and entities relating to the parties' rights and obligations in a complicated commercial real estate joint venture. Respondents also employed litigation strategies that led to delays and additional costs in the discovery process and a significant extension of the arbitration Hearing itself. (*See* JAMS Rule 24(g) [in determining reasonable fee award, the Arbitrator may consider failure to cooperate in discovery process that results in delay or additional costs].)

Overall, Claimants' lodestar attorney fees are prima facia reasonable and appropriate, subject to the following adjustments.

Nano argues it is not responsible for attorney fees that Claimants incurred before Nano joined this arbitration.[8] Claimants conceded the point and calculated the percentage of HYMG's fees allocated to the pre-October 11, 2023 period. (Ybarra Decl., ¶ 31; Maralan Decl., ¶ 6.) The post-October 11, 2023 attorney fees for which Nano is jointly and severally liable total $4,335,269.08, comprised of (i) HYMG: $4,134,929.95; and (ii) Maralan: $200,339.13.[9] These fees have also been redacted to remove those related to the LASC books and records action and other tasks unrelated to this arbitration.

The Arbitrator exercises his broad discretion and declines to otherwise allocate attorney fees between the claims and parties. (*Hill v. Affirmed Housing Group* (2014) 226 Cal. App. 4th 1192, 1197.) That Nano voluntarily agreed to join this arbitration does not mean its liability for fees should be reduced. Nano negotiated and agreed to the attorney fee provisions of the Nano Arbitration Agreement. Nano's argument that its "culpability is relatively minor" ignores the evidence. The Arbitrator found Nano gave substantial assistance to, and acted in concert with, the other Respondents in fraudulently inducing Claimants to enter into the JV at the core of this dispute. So, Nano was found liable for conspiracy to commit and aiding and abetting the commission of the fraudulent inducement by the MOM Parties and the Makhijani Parties.

The Arbitrator rejects all of Respondents' other arguments about the reasonableness of the lodestar attorney fees. As a threshold matter, Respondents have failed to sustain their burden to challenge the specific time entries or hourly rates charged by Claimants' counsel. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal. App. 4th 44, 101 ["When confronted with hundreds of pages of legal bills, trial courts are not required to identify each charge they find to be reasonable or unreasonable, necessary or unnecessary. The party opposing the fee award can be expected to identify the particular charges it considers objectionable."].)

---

[8] Nano became a party pursuant to the Nano Arbitration Agreement on October 11, 2023.

[9] All of MS's fees were incurred before October 11, 2023 and Claimants are not seeking any of them from Nano.

As to hourly rates, Nano makes no challenge whatsoever, and the other Respondents challenge only the rates of the HYMG associates - Thomas Rubinsky and Abigail Marion. The Arbitrator rejects this challenge and finds their hourly rates ($775 in 2023 and $850 in 2024) are reasonable in the Los Angeles market for attorneys with their experience (both practicing attorneys for more than 7 years as of 2023) and educational and professional background (graduates of Stanford and Columbia law schools; former law clerks for federal district court judges and, in Ms. Marion's case, a Second Circuit judge).

Regarding hours billed, Nano makes no specific challenge and the other Respondents challenge purported "unreasonable staffing" and "duplicative work." They complain: "Here, between March and September 2023, twelve attorneys were staffed on this case.[] Out of the twelve, six attorneys were partners at their respective law firms. There is no good reason for why six partners needed to be involved, especially at the outset of this dispute and before any heavy litigation. Nor is there any good reason for six partners, including two high profile founding partners of HMYG, to bill time on basic research and document review. … As another example, over a week in April 2023, Mr. Ybarra spent 11.5 hours drafting a straightforward timeline and outline of claims. *Thus, the Arbitrator should make a 50% deduction from the hours billed by the six partners*, Mr. Ybarra, Mr. May, Mr. Zfaty, Mr. Burns, Mr. Taxman, and Ms. Dogmetchi. [¶] … Naturally, the twelve attorneys staffed on this matter were doing duplicative work. For example, on July 11, 2023, attorneys at all three law firms billed around twenty hours reviewing an opposition to a preliminary injunction. On September 12, 2023, four partners across the three different law firms spent five hours preparing for and participating in a simple status conference. *Any time spent on duplicative work must be deducted from Claimants' requested fees*." (Makhijani/MOM Opposition, at 13-14 (italics added).)

The Arbitrator finds no unreasonable staffing, and certainly none which would support a 50% reduction in the hours billed by the partners. The first six months of this dispute (March through September 2023) were active, with multiple TROs and other emergency relief motions. And, unlike Allen Matkins, HMYG is a firm with fewer than 20 attorneys. This necessarily requires partners to perform work that larger firms might push down to associates. But partners typically perform that work in fewer hours than it would take an associate, as a result of their experience. So, it is speculation to assume the fees incurred for these tasks would have been lower if performed by associates. Plus, Claimants' trial team was small - two partners and two associates from HMYG, plus Mr. Maralan, attended the Hearing and performed the majority of the legal work. By comparison, Respondents had seven attorneys attend each day of the evidentiary hearing (Messrs. Leipzig, Farrell, Hsu, Cohen, Stepanyan, and DeMeo, as well as Ms. Mortimer), with additional Allen Matkins attorneys also working on the matter.

Likewise, the Arbitrator finds Respondents have not adequately identified any particular unreasonable, duplicative or unnecessary charges to be deducted from Claimants' lodestar fees.

## C. Claimants Are Entitled To A Multiplier

Claimants also request a multiplier of 1.5x on the $5,535,673.50 attorney fees incurred, to compensate for the contingency risk taken by Claimants and their counsel. "California law gives the trial court vast discretion in deciding whether to employ a multiplier and at what level to set it. No established criteria calibrate the precise size and direction of the multiplier, thus implying considerable deference to trial court decisionmaking about attorney fee awards." (*Pollock v. Kelso* (2025) 107 Cal. App. 5th 1190, 1197-1198 (*Pollock*).)

"In determining whether to apply a multiplier to a lodestar amount, a court should consider all relevant factors, including: '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.' A court may rely on these factors to increase or decrease the lodestar. Any one factor may be sufficient to apply a positive or negative multiplier." (*Kennedy Comm'n v. City of Huntington Beach* (2023) 91 Cal. App. 5th 436, 467.)

"The primary purpose of a fee multiplier is to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases." (*Pollock, supra*, 107 Cal. App. 5th at 1197.) "Here, a key factor was contingent risk. In contingent fee cases, a fee enhancement compensates the lawyer for having taken the case despite the risk of receiving no payment in the event of a loss or the risk of a delayed payment in the event of a victory. (Citation omitted.) The enhancement 'is intended to approximate market-level compensation for' cases taken on contingency, 'which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees.' (Citation omitted.)" (*Sonoma Land Trust v. Thompson* (2021) 63 Cal. App. 5th 978, 986.)

Considering these factors, the Arbitrator concludes a multiplier is warranted here. While Claimants initially retained counsel under an hourly fee arrangement, the evidence shows they were unable to keep up with the fees and costs because the MOM Parties and the Makhijani Parties cut them out of any income generated by the JV for nearly two years. These actions were designed, at least in part, to prevent Claimants from being able to litigate this case. As a result, Claimants were forced to secure litigation funding from a third-party funder, and their counsel was required to convert their engagement to a hybrid hourly-contingent fee agreement. The third-party funder is now entitled to recover the amount paid by the funder, plus a substantial contingency bonus on that amount. (Honarkar Decl. ¶ 7.) Further, Claimants' counsel incurred (and still bears) the risk they would not be paid for much of their work in this matter, which was fiercely litigated and required substantial attorney time. Indeed, HMYG alone is currently owed almost $2 million in outstanding attorney fees, and that amount has been due and payable since before the closing of post-Hearing briefing. (Ybarra Decl. ¶ 9.)

For these reasons, the Arbitrator applies a multiplier of 1.5x on the $5,535,673.50 attorney fees incurred, which brings the total attorney fee award to $ 8,303,510.25.  The MOM Parties and the Makhijani Parties are jointly and severally liable for 100% of this amount.

However, the Arbitrator concludes a multiplier is not warranted against Nano.  As Nano argues, and Claimants do not dispute, unlike the MOM Parties and the Makhijani Parties, Nano did not control the JV or the income generated by the JV, did not contest arbitrability, brought no claims against Honarkar, and had no role in any discovery delays or improprieties.  There is thus no basis for applying a multiplier against Nano.

The Arbitrator rejects the other Respondents' arguments in opposition to a multiplier. While HMYG's engagement agreement is privileged (Bus. & Prof. Code § 6149), Claimants submitted evidence of the contingency component.  (Ybarra Decl. ¶ 9.)  That evidence is sufficient.  Regarding risk of non-payment, the evidence shows HMYG is owed almost $2 million in fees and costs, and most of this amount has been owed since June 2024.  (Ybarra Decl. ¶¶ 8-9.)  Absent prevailing and collecting from Respondents, HMYG would have no plausible source from which to recover these amounts.  Finally, the Partial Interim Award demonstrated the MOM Parties and the Makhijani Parties caused the financial harm that necessitated a litigation funder and contingent fee arrangement.  Their attempt to relitigate those issues here amounts to an unpersuasive if not improper sub silentio request for reconsideration.

### D.    Claimants' Costs Are Reasonable

The Operating Agreements, the Term Sheet, and the Nano Arbitration Agreement all authorize the Arbitrator to award costs to the prevailing party.  Pursuant to these agreements and Code of Civil Procedure section 1033.5 ("Section 1033.5"), Claimants seek $893,916.06 in costs relating to JAMS fees and costs, discovery vendors, courier and postal expenses, court reporter and hearing transcript fees, deposition reporter and videographer fees, trial and deposition exhibit expenses, trial tech expenses, service of process fees, printing expenses, filing fees, and after-hours HVAC costs, as well as expert fees for two of Claimants' experts and expert fees charged by two of Respondents' experts for deposition.  (Ex. 315, § 19.10; Ybarra Decl., Ex. 18, § 2.)

Ultimately, Section 1033.5 provides discretion in determining what is a reasonable cost award, as do JAMS Rules 24(f) and (g).  While Section 1033.5 does not contemplate expert fees, where sophisticated parties have contracted for the recovery of costs, a prevailing party is entitled to costs beyond those specified in section 1033.5, including expert fees.  (*Arnst Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal. App. 4th 464, 491-492 [sophisticated parties may choose a broader standard authorizing recovery of reasonable litigation costs]; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal. App. 4th 1050, 1056-66 [expert witness fees recoverable based on contractual provision].)

Having reviewed the supporting declarations, and exercising discretion, the Arbitrator finds the $893,916.06 in costs requested by Claimants are reasonable.  The Arbitrator rejects Nano's argument that Section 1033.5(b)(1) precludes the recovery of expert fees as costs.

## III.    SUMMARY AND CONCLUSION

The Motion is granted and Claimants are awarded $8,303,510.25 in attorney fees ($5,535,673.50 x 1.5), plus $893,916.06 in costs, for a total of $9,197,426.31.  The MOM Parties and the Makhijani Parties are jointly and severally liable for the entire $9,197,426.31 total.  But of the $9,197,426.31 total, Nano is jointly and severally liable for only $5,229,185.14, which is comprised of $4,335,269.08 in (post-October 11, 2023) attorney fees, plus $893,916.06 in costs. This ruling resolves all attorney fee and cost claims presented by the Motion.  All arguments not expressly discussed are either unnecessary to this ruling or have been considered and rejected.

DATED:  May 23, 2025

_____

Hon. David A. Thompson (Ret.)

# EXHIBIT 4



## JUDICIAL ARBITRATION AND MEDIATION SERVICES

MOHAMMAD HONARKAR and 4G
WIRELESS, INC., individually and on behalf of
MOM AS INVESTCO LLC, MOM BS
INVESTCO LLC, and MOM CA INVESTCO
LLC,

        Claimants,

   vs.

MAHENDER MAKHIJANI; CONTINUUM
ANALYTICS, INC.; MOM AS INVESTOR
GROUP LLC; MOM BS INVESTOR GROUP
LLC; MOM CA INVESTOR GROUP LLC;
MOM CA MANAGER LLC; MOM BS
MANAGER LLC; MOM AS MANAGER LLC;
NANO BANC; and DOES 1-100, inclusive,

        Respondents,
   and

MOM AS INVESTCO, LLC, a Delaware limited
liability company; MOM BS INVESTCO, LLC, a
Delaware limited liability company; MOM CA
INVESTCO, LLC, a Delaware limited liability
company; and DOES 1-10, inclusive,

        Nominal Respondents.

)
)
)
)
)
)
)

JAMS REFERENCE NO.
5220003126

## PRELIMINARY[1] EXPERT REPORT OF
## Michael Spindler, CPA[2], CFE, CFF, ABV, CAMS
## May 20, 2024

---

[1] We anticipate receiving key documents that have not yet been produced or just recently produced but we have not had an opportunity to review – namely, a full set of financial statements, native Quickbooks data for the various entities, bank account statements (some account statements were only partially provided and/or were redacted), and fact witness depositions (which have yet to be taken). Accordingly, this report is preliminary and subject to revision as additional information is made available.

[2] Licensed in New York, Arizona, California, Nevada, Utah, and Hawaii.

# Table of Contents

I.   INTRODUCTION ............................................................................................................. 2

II.  PROFESSIONAL BACKGROUND ...................................................................................... 4

III. BACKGROUND .............................................................................................................. 5

IV.  DAMAGES..................................................................................................................... 7

V.   CONCLUSION ............................................................................................................... 23


 APPENDIX

Appendix 1 - Materials Considered

Appendix 2 - Michael Spindler Bio and Testimony Experience & Publications

SCHEDULES

Schedule 1 - Summary of Damages

Schedule 2 – Continuum Amounts Paid on Behalf of Properties

Schedules 3-3.1 – Appraisals

Schedules 4-4.1 – Lost Profits – Management Fees

Schedules 5-5.1 – Loan Interest

Schedule 6 – TICs Sold

Schedule 7 – Post-JV Loans

Schedule 8 – Inability to Sell Tesoro

Schedule 9 – Late Fees and Penalties on Property Tax

I.   INTRODUCTION

1.  GlassRatner Advisory & Capital Group LLC, dba B. Riley Advisory Services ("**B. Riley Advisory**") was retained to preform forensic accounting services under the direction of Halpern May Ybarra Gelberg LLP ("**Counsel**"), on behalf of Mohammad Honarkar in January of 2024. More specifically, we were retained to calculate damages for an arbitration in connection with a dispute between Mr. Honarkar and 4G Wireless, Inc. (collectively, "Mr. Honarkar" or the "Claimants") and Mahender Makhijani, Continuum Analytics, Inc., MOM CA Investor Group, LLC, MOM BS Investor Group, LLC, MOM AS Investor Group, LLC, MOM CA Manager LLC, MOM BS Manager, LLC and MOM AS Manager LLC and Nano Banc (collectively, "Respondents") and MOM AS Investco, LLC, MOM BS Investco, LLC and MOM CA Investco, LLC (collectively, "**Nominal**

**Respondents**" or "MOM LLCs") as more fully described in the First Amended Statement of Claim filed on October 13, 2023 ("**Pleading**").[3]

2. This report summarizes my analysis of the documents set forth in **Appendix 1**. My work was performed in accordance with the American Institute of Certified Public Accountants Statement on Standards for Forensic Services.

3. In order to perform this engagement, I relied on other B. Riley Advisory professionals with experience in financial analysis, economic damages, business valuation, and forensic accounting, which worked under my direct supervision and control. I have relied on the work of the team to support my review of information related to this matter, and references to "I," "our" and "we" recognize this reliance.

4. Any minor differences in amounts calculated or referenced in supporting documentation or the Schedules and Tables to this report are due to rounding.

5. This report is issued for purposes of this arbitration and is not to be used for any other purpose.

6. The claims referenced here and summarized in Section III are included herein for background only and I do not render an opinion on liability. For purposes of my calculations, I have assumed liability of the Respondents.

7. We anticipate that we may receive key documents that have not yet been produced or just recently produced but we have not had an opportunity to review – namely, a full set of financial statements, native Quickbooks data, bank account statements (some account statements were only partially provided), and fact witness depositions (which have not yet been taken). Accordingly, this report is preliminary and subject to revision as additional information is made available, including in connection with the submission of a Supplemental Expert Report.

8. I reserve the right to update, revise and/or supplement my analysis, opinions and this report to the extent additional relevant information becomes available to me. I anticipate that I will also consider the opinions of Respondents' experts and may issue a report thereon.

---

[3] Nano Banc is also a Respondent in the First Amended Statement of Claim filed October 13, 2023 and may be liable for, *inter alia*, a breach of contract claim for entering into a $20M loan secured by the properties with the MOM LLCs but providing the loaned proceeds directly to Continuum Analytics, Inc., as discussed in this Report. Nano Banc's damages on this claim amount to $20 million owed to the MOM LLCs. Nano Banc may also be liable for aiding and abetting the Claims made herein against the other Respondents, in which case Nano Banc may be responsible for the same damages set forth herein for the other Respondents.

## II.   PROFESSIONAL BACKGROUND

9.   I am a Certified Public Accountant (licensed in New York, Arizona, California, Nevada, Utah, and Hawaii). I am Certified in Financial Forensics and Accredited in Business Valuation (both issued by the American Institute of Certified Public Accountants).  I am a Certified Fraud Examiner (issued by the Association of Certified Fraud Examiners). I am a Certified Anti-Money Laundering Specialist (issued by ACAMS). I graduated from the State University of New York at Albany with a Bachelor of Science degree in Accounting and a minor degree in Economics in 1981.

10.  I have over 40 years of experience in auditing and forensic accounting, including complex disputes in litigation, forensic accounting investigations and business fraud investigations across a wide range of industries.

11.  I have provided expert testimony in bench trials, jury trials, and arbitration proceedings. I have conducted numerous investigations of public company financial statement fraud and other matters and have presented my findings to special committees and various government agencies on behalf of clients, including the Department of Justice, Federal Bureau of Investigation, Internal Revenue Service, and the Office of Thrift Supervision.

12.  My clients include law firms, corporations, individuals, government agencies, and non-profit organizations. I am currently a Senior Managing Director in the Los Angeles office of B. Riley Advisory Services and I have held senior leadership positions with several forensic accounting firms. I was also a Partner at two national public accounting firms. I have served as a Professional Practice Director for forensic accounting matters. I have authored or co-authored a number of publications on fraud-related topics and developed and presented seminars and courses on forensic accounting and litigation support issues.

13.  I am a past President of the Los Angeles Chapter of the California Society of CPAs ("CALCPA"), an organization of, at that time, approximately 11,000 members. I am also a past President of the Los Angeles Chapter of the Association of Certified Fraud Examiners. I have also served on CALCPA Council (a governing body of the State organization) and on the Board of Trustees of the CALCPA Education Foundation.

14.  I have provided a listing of expert testimony during the past 4 years, which is summarized and attached as **Appendix 2**. I have not authored any publications during the past 10 years.

15. The hourly rates charged by B. Riley Advisory for professional services provided in this matter range from $425 to $695, and my time has been billed at $695 per hour. B. Riley Advisory's compensation is not contingent upon the outcome of this matter.

## III.   BACKGROUND[4]

16. Mohammad Honarkar is a real estate developer and entrepreneur based in Laguna Beach, California who spent many years building an extensive real estate portfolio of properties in Southern California. Mr. Honarkar's portfolio included many hotels and restaurants in the affluent Laguna Beach area of Southern California. In the spring of 2021, due to certain financial obligations, Mr. Honarkar sought an infusion of capital to his real estate portfolio. Mr. Honarkar approached Nano Banc, a commercial bank based in Irvine, California, for a capital infusion; Nano Banc referred him to Mahender Makhijani, who had a close relationship with Nano Banc and its shareholders[5]. Mr. Honarkar and Mr. Makhijani, through certain corporate entities, ultimately formed three limited liability companies (hereinafter, the MOM LLCs, defined below).  As part of the transaction, Mr. Honarkar contributed his membership interests in certain limited liability companies holding title to his real estate portfolio, and Mr. Makhijani, either directly or through Continuum or other corporate entities, was to contribute at least $30 million in capital and arrange for the refinancing of existing debt on Mr. Honarkar's properties.[6] After the closing of the transaction, the MOM LLCs would own all membership interests in the entities contributed by Mr. Honarkar, with Messrs. Honarkar and Makhijani, through their corporate entities, owning the membership interests in the MOM LLCs.  Importantly, the distribution of profits and losses from the MOM LLCs varied by contributed entity. Mr. Makhijani's entities were to participate in the financial earnings of a real estate project *only* if he contributed capital to that specific real estate project, meaning Mr. Makhijani's participation was contingent on contributions and applicable only on a project-by-project basis.[7]

17. The MOM LLCs are comprised of three separate limited liability companies -- MOM CA Investco, LLC ("**MOM CA**"), MOM AS Investco, LLC ("**MOM AS**"), and MOM BS

---

[4] This section contains background information for context and does not contain any opinions.

[5] See First Amended Statement of Claim filed October 13, 2023, page 2.

[6] The capital contribution was originally supposed to be $35 million, according to the parties' Term Sheet dated May 2021.  It was modified to $30 million in the Operating Agreements dated June 8, 2021.

[7] See First Amended Statement of Claim filed October 13, 2023, page 2.

B. Riley Advisory Services

Investco, LLC ("**MOM BS**"). Each of the MOM LLCs is governed by a separate Operating Agreement. Each of the Operating Agreements is dated June 8, 2021 and contains similar terms.[8] Prior to the joint venture, Mr. Honarkar was party to a written Management Agreement dated January 1, 2021, entitling Mr. Honarkar to manage certain properties owned by limited liability companies for a ten-year term in exchange for a management fee.[9]  The membership interests in these limited liability companies were later contributed to the MOM LLCs.

18.  Instead of providing the agreed-upon $30 million initial capital contribution in cash, Mr. Makhijani caused the MOM LLCs themselves to borrow $20 million from Nano Banc. Mr. Makhijani then caused the $20 million in loan proceeds to be paid to his company, Continuum Analytics, Inc. ("**Continuum**"). Continuum, in turn, used those funds to make $20 million of the required $30 million initial capital contribution to the MOM LLCs. This $20 million loan was secured by properties owned by certain limited liability companies that Mr. Honarkar was contributing to the MOM LLCs.[10] Therefore, not only did Mr. Makhijani not contribute $20 million in capital to the MOM LLCs, but he also leveraged properties to be included in the joint venture with an interest-bearing loan. Importantly, the loan was issued and the properties were encumbered on June 7, 2021, a day before the limited liability companies owning the real properties at issue were contributed to the MOM LLCs, meaning Mr. Makhijani encumbered these properties before he ever had any ownership interest in them, directly or indirectly.[11] As to the remaining $10 million that Mr. Makhijani was required to contribute to the MOM LLCs, Mr. Honarkar is not aware of the source of the funds. The $10 million appears to have been contributed by Continuum (according to the Escrow Closing Statement), but Mr. Honarkar is not aware of how Continuum obtained the $10 million. Moreover, Continuum was paid approximately $4 million back from the escrow account used for the refinancing of Mr. Honarkar's debt.  So, at most, and assuming that Continuum's $10 million contribution was not also improperly obtained, Mr. Makhijani contributed a total of only $6 million of the required $30 million capital contribution specified in the Operating Agreements.

---

[8] See First Amended Statement of Claim filed October 13, 2023, Exhibits 2-4.

[9] See First Amended Statement of Claim filed October 13, 2023, Exhibit 1.

[10] See NANOBANC-000246.

[11] See Letter to Nano Banc from Halpern May Ybarra Gelberg, dated August 28, 2023 (HONARKAR-147254).

B. Riley Advisory Services

19. Furthermore, Mr. Makhijani has allegedly continued to breach the terms of the Operating Agreements from June 8, 2021 and the Management Agreement from January 1, 2021.[12] Instead of arranging the refinancing of debts on the properties, almost immediately following the formation of the MOM LLCs, Mr. Makhijani leveraged the properties with substantial loans, often without Mr. Honarkar's knowledge or consent. Further alleged wrongdoing by Mr. Makhijani includes refusing the sale of one property that would have produced significant proceeds and instead refinancing the property and incurring more debt, and the selling of tenant-in-common ("**TIC**") interests in the real estate properties without Mr. Honarkar's knowledge or consent. Mr. Honarkar alleges that after his discovery of the wrongdoings by Mr. Makhijani, Mr. Makhijani began a retaliatory campaign of retribution which included acts of physical intimidation and violence, resulting in the closure of some properties by the City of Laguna Beach. Additionally, Mr. Makhijani has caused Statements of Information to be filed with the Secretary of State, wrongfully altering the designated agents for service of process for several of Mr. Honarkar's entities.[13]

20. As noted in the Introduction above, Mr. Honarkar filed the First Amended Statement of Claim in October of 2023. The Complaint alleges multiple causes of action: i) fraudulent inducement, ii) breach of contract (against the MOM entities), iii) breach of implied covenant of good faith and fair dealing, iv) accounting, v) declaratory relief, vi) conversion, vii) unjust enrichment, viii) violation of California Penal Code Section 496(c), ix) forcible entry, x) forcible detainer, xi) conspiracy to commit fraudulent inducement, xii) aiding and abetting fraudulent inducement, and xiii) breach of contract (against Nano Banc).[14]

## IV.  DAMAGES

21. Based on the allegations set forth above, Mr. Honarkar has been financially damaged by the actions of the Defendants. Mr. Honarkar was allegedly fraudulently induced to enter into the joint venture agreements by Mr. Makhijani, who promised to make a $30 million capital contribution to the MOM LLCs but ultimately failed to do so and

---

[12] See First Amended Statement of Claim filed October 13, 2023, Exhibits 1-4.
[13] See First Amended Statement of Claim filed October 13, 2023, pp. 8-23.
[14] See First Amended Statement of Claim filed October 13, 2023, pp. 23-37.

apparently had no intent of doing so.[15]  Mr. Makhijani allegedly has continued to financially harm Mr. Honarkar through various other financial abuses of the joint venture.

22. The Statement of Claim sets forth various prayers for relief based on the causes of action set forth therein. These include: i) rescission of the joint venture enabling Mr. Honarkar to return to a pre-joint venture position, ii) compensatory damages and iii) derivative damages on behalf of the joint ventures. Rescission damages would entail an unwinding of the joint venture to return Mr. Honarkar to the position he was in prior to the joint venture or providing compensation for the economic impact of entering into the joint venture.

23. Rescission of the joint venture would require the return of 100% of the membership interests in the contributed entities to Mr. Honarkar. This assumes, of course, that the contributed entities continue to own the real property assets that they owned as of June 8, 2021--when the membership interests in the contributed entities were transferred from Mr. Honarkar to the MOM LLCs. (I am informed that, for some of the Subsidiary Entities, there were sales of properties after the formation of the joint venture. In such circumstances, Mr. Honarkar would be entitled to compensation for the proceeds of such sales.) Under a rescission scenario, equalizing payments would also need to be considered for the damages caused by Respondents' other wrongful acts beyond return of the membership interests, such as i) interest on the loan taken by Respondents in lieu of the capital contribution, ii) funds from the TICs sold, iii) funds from the many loans leveraged on properties in the joint venture, and iv) losses due to late fees and penalties on unpaid property tax.

24. Alternatively, we have calculated economic damages to both Mr. Honarkar and, derivatively, to the MOM LLCs. The damages as a result of the breach of contract and fraudulent inducement are comprised of i) lost value to Mr. Honarkar for the properties he contributed to the MOM LLCs, ii) lost profits damages, which include unpaid management fees (to Mr. Honarkar), iii) damages resulting from the failure to make the required initial capital contribution and to instead incur debt to fund the obligation, including the loan value and interest from the loan, iv) funds from the TICs sold without

---

[15] Note this capital contribution was initially set at $35 million, see Term Sheet dated May 24, 2021 (First Amended Statement of Claim, filed October 13, 2023, Exhibit 1), but was lowered to only $30 million in the subsequent Operating Agreements (First Amended Statement of Claim, filed October 13, 2023, Exhibits 2-4).

Mr. Honarkar's approval, v) funds from the many loans leveraged on properties in the joint venture, and vi) losses due to late fees and penalties on unpaid property taxes.

25. Therefore, we discuss three overall scenarios of damages in this matter: i) a rescission scenario with the return of the membership interests in the contributed entities to Mr. Honarkar and equalizing payments for other damages caused by Respondents, ii) derivative damages for breach of contract on behalf the MOM LLCs, and iii) damages suffered by Mr. Honarkar on account of Respondents' alleged fraud. The damages are summarized in **Schedule 1**.

26. The properties and entities at issue within the MOM LLCs are shown in **Chart 1**[16]:

### Chart 1

| MOM Investco | Subsidiary Entities |
|---|---|
| MOM AS | Retreat at Laguna Villas, LLC |
| MOM AS | Sunset Cove Villas LLC |
| MOM AS | Duplex at Sleepy Hollow, LLC |
| MOM AS | Cliff Drive Properties DE, LLC |
| MOM AS | 694 NCH Apartments LLC |
| MOM AS | Heisler Laguna LLC |
| MOM BS | 891 Laguna Canyon Road, LLC |
| MOM BS | 777 At Laguna, LLC |
| MOM BS | Laguna Art District Complex, LLC |
| MOM BS | Laguna Festival Center, LLC |
| MOM CA | The Masters Building, LLC |
| MOM CA | 689 S. Coast Hwy, LLC |
| MOM CA | 837 Park Ave, LLC |
| MOM CA | Laguna HI, LLC |
| MOM CA | Laguna HW, LLC |
| MOM CA | 314 S. Harvard DE, LLC |
| MOM CA | 4110 W. 3rd St. DE, LLC |
| MOM CA | Tesoro Redlands, LLC |
| MOM CA | Cliff Village, LLC |
| MOM CA | Hotel Laguna, LLC |
| MOM CA | Tustin Retail Properties, LLC |
| MOM CA | Aryabhata Group, LLC |

---

[16] See 2021 K1s for MOM AS Investco, LLC (MOMRESP_00009078), MOM BS Investco, LLC(MOMRESP_00009238), and MOM CA Investco, LLC (in draft, HONARKAR-029478). MOM CA's 2021 K1 listed other entities that are not believed to be included. This list refers to these as Subsidiary Entities, although some are referred to as "Projects" in the Operating Agreements (see Exhibits 2-4, First Amended Statement of Claim, filed October 13, 2023). The entities in Chart 1 will hereinafter be referred to as "Subsidiary Entities" or "Entities". Note that that there are other entities listed in Exhibit C to the Asset Contribution Agreement (see Exhibit 4, First Amended Statement of Claim, filed October 13, 2023) as being contributed to MOM CA, but the parties dispute whether those entities were, in fact, contributed entities. Additionally, there is at least one entity—8871 Research Drive, LLC—that is not listed in the Asset Contribution Agreement but nonetheless may have provided assets to Respondents. To the extent any of these other entities are deemed to have been included in MOM CA Investco, LLC, then they should be returned to Mr. Honarkar in a rescission scenario (Scenario 1 in this Report), or, if properties have already been sold, then compensation for those sales.

27. Honarkar is party to a Management Agreement with Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Duplex at Sleepy Hollow, LLC, Laguna HI, LLC, and Laguna HW, LLC. The only properties with the "project" designation (for which Mr. Makhijani was to make a specified contribution and thus be entitled to 50% of the distributions) is Hotel Laguna, LLC and Newport Crossing (a subsidiary of Aryabhata Group, LLC).

**A. Scenario One: Rescission with Return of Properties Plus Equalizing Payments**

28. As discussed above, one relief measure would be rescission of the formation of the joint venture, an "unwinding" of the deal to put Mr. Honarkar into the same position he was in prior to the joint venture. The rescission would entail reverting ownership of 100% of the membership interests in the Subsidiary Entities listed in in **Chart 1** (excluding Aryabhata Group, LLC, which was formed after the joint venture) back to Mr. Honarkar. This assumes, of course, that the Subsidiary Entities remain the owners of the same real property interests that they owned at the time of the formation of the MOM LLCs on June 8, 2021. As part of this, Mr. Honarkar would return the valid, reasonable, and necessary expenditures made by Respondents on these Subsidiary Entities in the period June 8, 2021 to the time of rescission ("Reimbursements").

29. To calculate monies owed to Respondents as "Reimbursements," we reviewed financial statements for all entities[17] and summed items from the account "Due to Continuum" for the period from June 8, 2021 through September 30, 2022. These items appear to be expenditures paid by Respondents on behalf of the entities.[18] Based on the documents we have been provided, the total amount of Reimbursements due to the Respondents, assuming the expenses were legitimate and can be substantiated by Respondents and are not offset by other money already paid to Continuum from the MOM LLCs or Subsidiary Entities, in a rescission scenario is **$17,645,313**. See **Schedule 2** for a summary.

---

[17] See General Ledgers and/or Balance Sheets for all entities described in Chart 1for the period following the joint venture, starting on 6/8/21, through the most recent available financials, 9/30/22. Statements were provided for 2023, but they lacked detail and were missing the bases (accrual/ cash) on which they were prepared.

[18] These amounts appear in the General Ledgers but are still subject to additional proof.

B. Riley Advisory Services

30. In a rescission scenario, Honarkar would not be responsible for the $20,000,000 debt to Nano Banc[19], the proceeds of which were deposited into Continuum Analytics, Inc.'s bank account. However, because the $20 million debt now encumbers real property owned by entities whose membership interests will be returned to Honarkar in the rescission scenario, Honarkar is entitled to an offset for the monetary loss caused by those encumbrances, which did not exist but for the formation of the parties' joint venture.

31. In a rescission scenario, Mr. Honarkar would reimburse the amount of Capital Contribution possibly contributed to the Subsidiary Entities, **$6,003,605,** which is the amount of the $10 million portion of Respondents' purported Capital Contribution less the $3,996,395 refunded to the Respondents out of the escrow used for the Loancore refinance.[20]

32. Therefore, the rescission scenario would include transferring the ownership of 100% of the membership interests in the Subsidiary Entities listed in **Chart 1** (with the sole exception of Arybhata Group, LLC, which was formed after the MOM LLCs) back to Mr. Honarkar, with Mr. Honarkar reimbursing Continuum $**17,645,313 and $6,003,605**. See **Chart 2** for a summary.

### Chart 2

| RESCISSION SCENARIO - PROPERTIES RETURNED | | |
|---|---|---|
| Damage Element | Net Present Value of Cash Flows | Reference |
| RESCISSION | | |
| Properties Returned | *****Properties**** | |
| Less: | | |
| Reimbursements to Continuum | $ 17,645,313 | Schedule 2 |
| Capital Contribution | $ 6,003,605 | Schedule 2 |
| **TOTAL RESCISSION VALUE (in addition to the return of the Properties to MH)** | **$ (23,648,918)** | |

33. Additionally, under the rescission scenarios, Mr. Honarkar would be owed equalizing payments to compensate him for alleged wrongdoing that occurred due to the actions of the Respondents. These equalizing payments include compensation for i) interest

---

[19] See Promissory Note NANOBANC-000245.

[20] See MOMRESP_00002833.

B. Riley Advisory Services

on the loan taken by Respondents in lieu of the capital contribution, as well as compensation for the harm caused by that loan continuing to encumber Honarkar's properties, ii) funds from the TICs sold without Mr. Honarkar's approval, iii) funds from the many loans leveraged on properties in the joint venture by Respondents[21], and iv) losses due to late fees and penalties on unpaid property tax.

**Interest on the $20M Loan**

34. Firstly, as discussed above, the terms of the Operating Agreements required Mr. Makhijani to make an initial capital contribution of $30 million. However, the $20 million transfer was actually the proceeds of a loan taken out by the MOM LLCs themselves. Continuum took the proceeds of this loan for itself and used it to purport to make its capital contribution of $20 million. The MOM LLCs were encumbered for this debt with Deeds of Trust, despite not having received the proceeds of the loan, on properties owned by The Masters Building, LLC, 689 S. Coast Hwy, LLC, Laguna HI, LLC, and Laguna HW, LLC. The loan was issued by Nano Banc on June 7, 2021, a day prior to the formation of the MOM LLCs, indicating that when Mr. Makhijani signed the Operating Agreements on June 8, 2021, he did not intend to make the required capital contribution.[22]

35. In other words, not only did Mr. Makhijani fail to make his capital contribution of $20 million, but he also burdened the joint venture with a liability placed on the properties. In addition, the loan's interest amounts incurred are also damages, since they would not have been incurred, but for the failure to contribute the required $20 million in capital. According to the note, all interest plus the principal is due on June 7, 2024, though I understand this date was subsequently extended by Nano Banc and Respondents.[23] Interest accrued through January 19, 2024 totaled $3,028,923.[24] Keeping interest rates static from January 19, 2024 throughout the end of the loan period of June 7, 2024, we calculated the remaining interest owed at $770,057, for a total interest amount on the $20 million loan of **$3,798,980.** See **Schedule 5** for a summary. Of course, if the loan due date has been extended, the total interest amount of the loan would be higher.

---

[21] Alternatively, the Deeds of Trust can be removed from the properties.

[22] See Letter to Nano Banc from Halpern May Ybarra Gelberg, dated August 28, 2023 (HONARKAR-147254).

[23] See Promissory Note NANOBANC-000245 and MOMRESP_00084876.

[24] See NANO_04206-8.

**Funds from TICs Sold without Mr. Honarkar's Approval**

36. Mr. Makhijani also sold tenant-in-common interests in at least two properties without the knowledge or consent of Mr. Honarkar. We have been unable to identify the proceeds of the sales in the accounts of the MOM LLCs and presume the proceeds went to the Respondents, unless shown otherwise. One TIC interest in a property, Hotel Laguna, LLC, was sold to Jaachak, LLC, an entity related to an executive for Mr. Makhijani's corporate entity, for $1,036,195 in April of 2022.[25] Damages from this TIC sold are therefore **$1,036,195,** and Respondents are required to pay this amount to Mr. Honarkar, as the sole owner of Hotel Laguna, LLC, in the rescission scenario.[26]

37. Mr. Makhijani proceeded to enact another TIC sale in December 2022, this time with Laguna HI, LLC, which, according to the Operating Agreement[27], required the consent of Mr. Honarkar before selling. The TIC was sold to Cheema & Ghuma Properties, LLC on December 30, 2022 for $4,066,500.[28] Damages from this TIC sold are therefore $4,066,500 and Respondents are required to pay this amount to Mr. Honarkar, as the sole owner of Laguna HI, LLC in the rescission scenario.

38. The damages from TIC interests being sold without Mr. Honarkar's consent are, based solely on the sales identified thus far, $**5,102,695.** See **Schedule 6** for a summary.

**Post-JV Loans**

39. Subsequent to the formation of the joint venture, Mr. Makhijani proceeded to take out substantial loans on the real estate assets owned by the MOM LLCs, often without Mr. Honarkar's knowledge or consent. The loans are secured by the Deeds of Trust of various properties of the MOM LLCs. A summary of certain of the loans taken out after the formation of the MOM LLC can be seen below in **Chart 3,** and total $**136,565,000.** These proceeds are owed to Mr. Honarkar[29]. See **Schedule 7** for a summary.[30]

---

[25] See Declaration of M. Honarkar ISO Receiver App., May 17, 2023, Exhibit 6.

[26] These TICs may be returned for the cash value, and in such a case, would not amount to damages.

[27] See First Amended Statement of Claim filed October 13, 2023, Exhibit 4.

[28] See Declaration of M. Honarkar ISO Receiver App., May 17, 2023, Exhibit 7 and NANO_27313 p. 10.

[29] Alternatively, the Deeds of Trust can be removed from the properties and the debt cancelled.

[30] Note that the Deeds of Trust related to the $175M coastline loan is not included here as that loan has, according to Respondents, not been drawn on. If this is not correct, the debt would need to be included. Additionally, there may

B. Riley Advisory Services

**Chart 3**

| Post-JV Loans | | | |
|---|---|---|---|
| Property/ies | Lender | Date | Loan Amount |
| Tesoro Redlands, LLC | Nano Banc | 7/1/2021 | $ 1,000,000 |
| The Masters Buildings, LLC | Cantor Group IV LLC | 10/26/2021 | $ 11,000,000 |
| Laguna HW, LLC | Cantor Group IV LLC | 10/26/2021 | $ 8,300,000 |
| Tustin Retail Properties | Cantor Group IV LLC | 10/26/2021 | $ 2,100,000 |
| Laguna HW, LLC | Loan Oak Fund, LLC | 12/28/2021 | $ 3,500,000 |
| The Masters Buildings, LLC | Loan Oak Fund, LLC | 12/28/2021 | $ 5,500,000 |
| Laguna HW, LLC, The Masters Buildings, LLC | Qualfax, Inc. c/o RTI Properties, Inc. | 12/28/2021 | $ 3,000,000 |
| Laguna HI, LLC | Cantor Group IV LLC | 2/11/2022 | $ 18,175,000 |
| Tesoro Redlands, LLC | Preferred Bank | 2/24/2022 | $ 11,400,000 |
| Laguna HW, LLC | Cantor Group V LLC | 5/2/2022 | $ 10,000,000 |
| Laguna Arts District Complex, LLC | Cantor Group IV LLC | 11/21/2022 | $ 16,500,000 |
| Hotel Laguna, LLC | Banc of California | 11/4/2022 | $ 27,000,000 |
| The Masters Buildings, LLC | PMF CA REIT, LLC | 8/31/2023 | $ 6,540,000 |
| Laguna HI, LLC | Wilshire Quinn Income Fund, LLC | 11/15/2023 | $ 12,550,000 |
| | | TOTAL | $ 136,565,000 |

**Late Fees and Penalties on Unpaid Property Tax**

40. Due to Mr. Makhijani's mismanagement of the properties, many of the properties within the MOM LLCs have accrued unpaid property taxes. The unpaid property tax amounts are liabilities owed by the Joint Ventures but the late fees and penalties due to nonpayment or late payments are amounts owed to Mr. Honarkar as damages due to mismanagement. The known late fees and penalties on the properties as of May 9, 2024 total **$382,508**.[31]  See **Schedule 9** for a summary.

41. Equalizing payments for alleged wrongdoings by Respondents total **$145,849,183**. Thus, in a rescission scenario with the return transferring the ownership of 100% of the membership interests in the Entities listed in **Chart 1** back to Mr. Honarkar, the damages (which include return of the LLC interests) total **$122,200,265**, which is the value of equalizing payments less reimbursements to the Respondents. See **Chart 4** for a summary.

---

be additional loans that have not been included in this list for which Respondents are responsible, in which case the chart will be supplemented.

[31] See HONARKAR-186618 ("Past Due Secured Property Taxes 2022-2024 as of 05.09.2024.pdf").

**Chart 4**

| RESCISSION SCENARIO - PROPERTIES RETURNED | | |
|---|---|---|
| **Damage Element** | **Net Present Value of Cash Flows** | **Reference** |
| RESCISSION | | |
| Properties Returned | *****Properties**** | |
| Less: | | |
| Reimbursements to Continuum | $ 17,645,313 | Schedule 2 |
| Capital Contribution | $ 6,003,605 | Schedule 2 |
| **TOTAL RESCISSION VALUE (in addition to the return of the Properties to MH)** | $ (23,648,918) | |
| EQUALIZING PAYMENTS | | |
| **Damages Resulting from Capital Contribution** | | |
| Interest on Loan | $ 3,798,980 | Schedule 5 |
| **Total Damages Resulting from Capital Contribution** | $ 3,798,980 | |
| **TIC Sold** | $ 5,102,695 | Schedule 6 |
| **Post-JV Loans** | $ 136,565,000 | Schedule 7 |
| **Late Fees and Penalties on Property Tax** | $ 382,508 | Schedule 9 |
| **TOTAL EQUALIZING PAYMENTS** | $ 145,849,183 | |
| **TOTAL DAMAGES (in addition to the return of the Properties to MH)** | $ 122,200,265 | |

## B. Scenario Two: Derivative Damages for Breach of Contract to MOM LLCs at 100% Ownership

42. Under a derivative claim, the MOM LLCs are owed damages for Respondents' alleged breach of contract and breach of implied covenant of good faith and fair dealing. The damages as a result of the breach of contract are comprised of i) damages resulting from the failure to make the required initial capital contribution and to instead cause the MOM LLCs to incur debt to fund the obligation, including the loan value and interest from the loan, ii) funds from the TICs sold without Mr. Honarkar's approval and not paid to the MOM LLCs, iii) funds from the many loans leveraged on properties in the joint venture,  and iv) losses due to late fees and penalties on unpaid property tax. In this scenario we consider these damages as being owed 100% to the MOM LLCs.

Page 15

B. Riley Advisory Services

**Damages Resulting from Mr. Makhijani's Failure to Contribute Capital of $20 Million**

43. As discussed above, the terms of the MOM LLC Operating Agreements required Mr. Makhijani, through his corporate entities, to make an initial capital contribution to the MOM LLCs in the amount of $30 million. As set forth above, Mr. Makhijani appears to have made an initial capital contribution of, at most, only $6 million to the MOM LLCs.[32]

44. Not only did Mr. Makhijani fail to make his capital contribution of $30 million, but he also burdened the MOM LLCs with a $20 million liability to Nano Banc that was secured by Deeds of Trusts on various properties. The loan's interest amounts incurred are also damages, since they would not have been incurred, but for the failure of Mr. Makhijani to make the required initial capital contribution. According to the note, all interest plus the principal is due on June 7, 2024.[33] Interest accrued through January 19, 2024 totaled $3,028,923.[34] Keeping interest rates static from January 19, 2024 throughout the end of the loan period of June 7, 2024, we calculated the remaining interest owed at $770,057, for a total interest amount on the $20 million loan of **$3,798,980.** The damages related to this transaction are therefore the loan amount of **$20,000,000**, the interest amount of **$3,789,980**, and the **$3,996,395** that was paid to Continuum out of the escrow used for the Loancore refinance[35], for a total of **$27,795,375**. See **Schedule 5** for a summary.

**TIC Interests Sold without Managing Member Approval**

45. Mr. Makhijani also sold tenant-in-common interests in two properties without the knowledge or consent of Mr. Honarkar. As discussed in the rescission scenario, the proceeds from these TIC interests sold are damages to the MOM LLCs, who should have received the proceeds from those sales, but it appears as though they did not. The damages from TIC interests being sold are, based solely on the sales identified thus far, **$5,102,695**. See **Schedule 6** for a summary**.**

---

[32] See Letter to Nano Banc from Halpern May Ybarra Gelberg, dated August 28, 2023 (HONARKAR-147254).

[33] See Promissory Note NANOBANC-000245.

[34] See NANO_04206-8.

[35] See MOMRESP_00002833.

B. Riley Advisory Services

**Post-JV Loans**

46. Similar to in the rescission scenario, we consider proceeds from the loans taken out post the formation of the MOM LLCs as damages totaling **$136,565,000**– see **Chart 3** above for a summary.

**Late Fees and Penalties on Unpaid Property Tax**

47. Due to Mr. Makhijani's mismanagement of the properties, most of the properties party to the MOM LLCs have accrued unpaid property taxes. The unpaid property tax amounts are liabilities owed by the Joint Ventures but the late fees and penalties due to nonpayment or late payments are amounts owed to Mr. Honarkar as damages due to mismanagement. The known late fees and penalties on the properties as of May 9, 2024 total **$382,508** See **Schedule 9** for a summary.

48. Derivative damages in this scenario as applied to a 100% interest in the MOM LLCs total **$169,845,578.** See **Chart 5** for a summary.

**Chart 5**

| DERIVATIVE DAMAGES - TO MOM LLCs | | |
|---|---|---|
| **Damage Element** | **Net Present Value of Cash Flows** | **Reference** |
| **Damages Resulting from Capital Contribution** | | |
| Loan Amount/ Equity - Relating to $20M Nano Banc Loan | $ 20,000,000 | *Schedule 5* |
| Amount of Purported $10M Contribution Refunded to Continuum out of the Escrow used for the Loancore Refinance | $ 3,996,395 | |
| Interest on Loan | $ 3,798,980 | *Schedule 5* |
| **Total Damages Resulting from Capital Contribution** | **$ 27,795,375** | |
| **TIC Sold** | **$ 5,102,695** | *Schedule 6* |
| **Post-JV Loans** | **$ 136,565,000** | *Schedule 7* |
| **Late Fees and Penalties on Property Tax** | **$ 382,508** | *Schedule 9* |
| **TOTAL DAMAGES** | **$ 169,845,578** | |

B. Riley Advisory Services

**C. Scenario Three: Damages to Mr. Honarkar**

49. Finally, we have calculated Mr. Honarkar's damages owed due to fraudulent inducement and breach of contract damages described above, assuming, for these purposes, that the transaction is not rescinded and thus Mr. Honarkar retains his membership interests in the MOM LLCs. Damages as a result of the alleged fraud and breach of contract and other causes are comprised of i) loss of monetary value in Mr. Honarkar's interest in the properties contributed to the MOM LLCs due to discounts for lack of control and marketability, ii) damages resulting from the failure to make the required initial capital contribution, including incurring debt to fund part of the obligation, (these two items representing "Day 1" damages from the initial formation of the joint venture, determined based on the difference between the value of Mr. Honarkar's interests that he gave up in forming the joint venture, and the value of what Mr. Honarkar received in formation as a result of Respondents' alleged fraud), and, the following ancillary or subsequent damages, including iii) interest from the loan, at 50% interest, iv) lost profits damages, which include unpaid management fees, v) funds from the TICs sold without Mr. Honarkar's approval (of which properties deemed "a project" would be only owed to Mr. Honarkar at 50%), vi) funds from the many loans leveraged on properties in the joint venture (of which properties deemed "a project" would be only owed to Mr. Honarkar at 50%), and vii) losses due to late fees and penalties on unpaid property tax.

**Monetary Value of Loss of Control and Marketability of Properties**

50. The damages owed to Mr. Honarkar due to valuation discounts for the lack of control and lack of marketability of the membership interests in the entities are calculated by valuing the properties as of the date of the formation of the Joint Ventures.

51. Because Mr. Honarkar owned 100% of the membership interests in the Subsidiary Entities (again, not including Aryabhata Group, LLC) prior to the formation of the joint venture, and because the primary assets of the Subsidiary Entities were the real properties to which they held title, we considered the appraised value of those properties as of the date the membership interests were contributed to the MOM

Page 18

LLCs[36] (June 8, 2021). The total appraised value of the properties on this basis was **$268,040,000**. Deducting the value of Tesoro Redlands, which we consider separately as part of this scenario, we then apply a 25% discount for the lack of control and marketability[37] to account for the value of the entities due to the lack on control and marketability at $53,892,500 (i.e., the decreased value of the properties to Mr. Honarkar after the formation of the MOM LLCs)**.** We also consider the value lost to Mr. Honarkar on the Subsidiary Entitiy considered a "project" – Hotel Laguna , which after applying a 25% factor for discounting for a lack of control and marketability, and applying Mr. Honarkar's 50% ownership stake post-formation of the MOM LLCs, we calculate the loss of value, and hence, his damages, to be $25,625,000. Mr. Honarkar's total damages due to the loss in value of the membership interests on account of the lack of control and lack of marketability caused by the MOM LLC transactions (excluding Aryabhata Group, LLC and Tesoro) total **$79,517,500.** See **Schedule 3** for a summary.

52. In February 2022, Mr. Honarkar received an offer to purchase one of the real estate properties held, indirectly. by MOM CA Investco, LLC – Tesoro Redlands DE, LLC – for $67,680,000 from Interest Capital Group.[38] Therefore, taking that as the value of Tesoro in June 2021, and applying a 25% discount for lack of control and discount for lack of marketability amounts to **$16,920,000** of the $67,680,000 fair market value implied in the offer price that was lost to Mr. Honarkar due to the lack of control and marketability. See **Schedule 8** for a summary**.**

**Failure to Make Capital Contributions**

53. Instead of the agreed-upon $30 million capital contribution in cash, Mr. Makhijani caused the MOM LLCs themselves to borrow $20 million from Nano Banc. Mr. Makhijani then caused the $20 million in loan proceeds to be paid to his company, Continuum Analytics, Inc. ("Continuum"). Continuum then used those funds to make $20 million of the required $30 million capital contribution. This $20 million loan was

---

[36] See MOMRESP_00009595-MOMRESP_00015200, HONARKAR-003580, MOMRESP_00027129, and Val-Chris Investments appraisal of Tustin Retail Properties from 8/15/18 (HONARKAR-155510) and BBG Real Estate Services appraisal of Cliff Village from 2/6/19 (NANO_08854).

[37] See https://www.bvresources.com/articles/bvwire/dloc-and-dlom-for-real-estate-entities-153-1 and https://eqvista.com/company-valuation/discount-for-lack-of-control/.

[38] See MOMRESP_00058018.

secured by the properties owned by certain limited liability companies that Mr. Honarkar was contributing to the MOM LLCs.[39] Therefore, not only did Mr. Makhijani not contribute $20 million in capital to the MOM LLCs, he also leveraged properties in the joint venture with an interest-bearing loan. As to the remaining $10 million that Mr. Makhijani was required to contribute to the MOM LLCs, the $10 million appears to have been contributed by Continuum (according to the Escrow Closing Statement), but Continuum was paid approximately $4 million back from the escrow account used for the refinancing of Mr. Honarkar's debt. Thus, Continuum's capital contribution to the MOM LLCs was only $6 million. Because Mr. Honarkar would not have received this capital contribution had the joint venture never been formed, we deduct this **$6 million** from Mr. Honarkar's damages.

54. Based on the foregoing numbers, Mr. Honarkar's "Day 1" damages from the initial formation of the joint venture is then **$90,433,895**. This is determined by the difference in the value between the assets that Mr. Honarkar transferred to the joint venture at formation (100% of the membership interests in the Subsidiary Entities [not including Arybhata Group, LLC), and the value of what Mr. Honarkar received from the joint venture at the time of formation on account of the alleged fraud.

55. The following are ancillary, or subsequent, damages incurred by Mr. Honarkar based on Respondents' wrongdoing in the operation of the joint venture after June 8, 2021:

**Lost Profits Damages**

56. Lost profits damages owed to Mr. Honarkar are the value of his unpaid management base fees for the five properties that fall under the Management Agreement: Retreat at Laguna Villas, LLC, Sunset Cove Villas, LLC, Duplex at Sleepy Hollow, LLC, Laguna HI, LLC, and Laguna HW, LLC. According to the Management Agreement effective January 1, 2021, Mr. Honarkar is to be paid a "Base Fee" of 5% of gross revenues in exchange for his management services.[40] Mr. Honarkar has not been paid these fees since the commencement of the joint venture on June 8, 2021. Financials available for the properties show some management fees paid in 2022 with the description "Due to Laguna HW, LLC," an entity within the MOM LLCs that Mr. Makhijani now has control

---

[39] See NANOBANC-000246.

[40] See First Amended Statement of Claim filed October 13, 2023, Exhibit 1.

over. Thus, it appears that Mr. Honarkar has not been paid these and other unpaid management fees.

57. We calculated the unpaid management fees due to Mr. Honarkar for the period from the date of the joint venture, June 8, 2021, through the expiration date of the Management Agreement, January 1, 2031. We analyzed the gross revenues of the properties under the Management Agreement for the period immediately prior to the joint venture, from January 1, 2021 to May 30, 2021. We then annualized the gross revenue to apply to the entire 2021 calendar year and applied the 5% "Base Fee" percentage to that annualized gross revenue number to calculate a base annual management fee for all five properties, amounting to $228,402. We then calculated a historical annual growth rate of gross revenues from 2018-2019 of 3.8%, conservatively considering the period prior to 2020 due to the severe impacts of COVID-19 on the hotel and restaurant industry after that period.[41] We apply that growth rate annually to the annual management fee amount through to the expiration date of January 1, 2031. We calculated the present value of the fees by using a discount rate of 8.5% based on an average of the discount rate range used for commercial real estate transactions.[42] The total unpaid management fees calculated are thus **$2,179,095.** See **Schedule 4** for a summary.

**Remaining Damages to Mr. Honarkar**

58. The remainder of the damages due to Mr. Honarkar are similar to the damages described in Scenario Two; these areas of damages are owed to Mr. Honarkar at varying percentages depending on their status as a "project" or not. Depending on the nature of the contribution from Respondents, Mr. Honarkar is owed either 100% or 50% of the damages resulting from various areas of damages for various properties. Therefore, we consider the damages resulting from the failure to make the required initial capital contribution of $30 million and to, instead, incur debt to fund the obligation, as the interest under the loan, which we calculated to total $3,996,395, and calculate 50% of that at **$1,889,490** (see **Schedule 5**). We calculate the funds from the TICs sold without Mr. Honarkar's approval, which we calculated at $5,102,695, and

---

[41] This 3.8% growth rate is conservative to use, as growth rates for the commercial real estate industry CAGR for Total Revenue from 2021-2022 was 8.8% (Source: Capital IQ, S&P Global, https://www.capitaliq.com/CIQDotNet/Lists/KeyStats.aspx?listObjectId=100887374).

[42] See https://fnrpusa.com/blog/discount-rate-commercial-real-estate-explained/.

apply 50% to the TIC sold for Hotel Laguna, so that Mr. Honarkar's damages for this amounts to **$4,584,597** (see **Schedule 6** for a summary). Damages resulting from funds from the many loans leveraged on properties in the joint venture, which totaled $136,565,000, are calculated at 50% for the loan on Hotel Laguna, which amounts to net damages for these post-Joint Ventures loans of **$105,419,687, after deducting amounts for valid, necessary, and reasonable reimbursements to Continuum for amounts they may have expended on behalf of the MOM LLCs, to the extent such amounts exceed only monies paid to Continuum during the joint venture** (see **Schedule 7**).

59. Finally, known losses due to late fees and penalties on unpaid property tax total **$382,508** (see **Schedule 9**). Ancillary damages thus total **$114,465,377.** In this scenario "day 1" plus ancillary damages to Mr. Honarkar total **$204,899,272.** See **Chart 6** for a summary.

**Chart 6**

| DAMAGES - TO MH | | |
|---|---|---|
| **Damage Element** | **Net Present Value of Cash Flows** | **Reference** |
| DAMAGES - TO MH - "DAY 1" | | |
| **Loss of Monetary Value due to Lack of Control/Marketability of Properties** | $        79,517,500 | *Schedule 3* |
| **Loss of Monetary Value in Tesoro** | $        16,920,000 | *Schedule 8* |
| **Less: Capital Contributions** | $          6,003,605 | *Schedule 2* |
| **Total Damages due to Initial Formation of the Joint Venture** | $        90,433,895 | |
| DAMAGES - TO MH - ANCILLARY DAMAGES | | |
| **Unpaid Management Base Fee** | $          2,179,095 | *Schedule 4* |
| **Interest on Nano Banc Loan** | $          1,899,490 | *Schedule 5* |
| **TIC Sold** | $          4,584,597 | *Schedule 6* |
| **Damages Resulting from Post-JV Loans** | | |
| Post-JV Loans | $      123,065,000 | *Schedule 7* |
| Less: Reimbursements to Continuum | $        17,645,313 | *Schedule 2* |
| **Net Damages Resulting from Post-JV Loans** | $      105,419,687 | |
| **Late Fees and Penalties on Property Tax** | $            382,508 | *Schedule 9* |
| **TOTAL ANCILLARY DAMAGES** | $      114,465,377 | |
| **TOTAL DAMAGES** | $      204,899,272 | |

## V.    CONCLUSION

60. We consider three scenarios to approach damages for Claimant. Scenario one involves a rescission in which all membership interests in the Subsidiary Entities are returned to Mr. Honarkar, reimbursements are made to Respondents, and equalizing payments for various alleged wrongdoings are paid to Mr. Honarkar which include interest on the Nano Banc loan, monies from TIC interest sold, monies from loans taken out of the property, and late fees and penalties on property tax, totaling, **(with a return of all the membership interests), $122,200,265.** The second scenario calculates derivative damages owed to the MOM LLCs due to alleged breach of contract; these damages include damages resulting from the Nano Banc loan value and interest from the loan, monies from TIC interest sold, monies from loans taken out of the property and losses due to late fees and penalties on unpaid property tax, totaling **$169,845,578.** The third scenario accounts for damages to Mr. Honarkar relating to his interests in the MOM LLCs; they total **$204,899,272**. See **Chart 7** below for a summary.

**Chart 7**

| DAMAGES SCENARIOS | |
|---|---|
| RESCISSION SCENARIO - PROPERTIES RETURNED | |
| TOTAL DAMAGES (in addition to the return of the Properties to MH) | $    122,200,265 |
| DERIVATIVE DAMAGES - TO MOM LLCS | |
| TOTAL DAMAGES | $    169,845,578 |
| DAMAGES - TO MH | |
| TOTAL DAMAGES | $    204,899,272 |

61. The above report represents my expert opinions and the conclusions to which I am prepared to testify. I reserve the right to modify my report and conclusions as additional information is provided.

Executed in Los Angeles, California on May 20, 2024.

B. Riley Advisory Services

_____
Michael Spindler
Senior Managing Director, B. Riley Advisory Services

# SCHEDULES

Schedule 1

**Mohammad Honarkar v. Mahender Makhijani et al.**
**Damages Summary**

| Mohammad Honarkar v. Mahender Makhijani et al. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **RESCISSION SCENARIO - PROPERTIES RETURNED** | | | | **DERIVATIVE DAMAGES - TO MOM LLCs** | | | | **DAMAGES - TO MH** | |
| **Damage Element** | **Net Present Value of Cash Flows** | **Reference** | | **Damage Element** | **Net Present Value of Cash Flows** | **Reference** | | **Damage Element** | **Net Present Value of Cash Flows** | **Reference** |

| **RESCISSION** | | | | | | | | **DAMAGES - TO MH - "DAY 1"** | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Properties Returned | *****Properties**** | | | | | | | Loss of Monetary Value due to Lack of Control/Marketability of Properties | $ 79,517,500 | Schedule 3 |
| Less: | | | | | | | | Loss of Monetary Value in Tesoro | $ 16,920,000 | Schedule 8 |
| Reimbursements to Continuum | $ 17,645,313 | Schedule 2 | | | | | | Less: Capital Contributions | $ 6,003,605 | Schedule 2 |
| Capital Contribution | $ 6,003,605 | Schedule 2 | | | | | | | | |
| TOTAL RESCISSION VALUE (in addition to the return of the Properties to MH) | $ (23,648,918) | | | | | | | Total Damages due to Initial Formation of the Joint Venture | $ 90,433,895 | |

| **EQUALIZING PAYMENTS** | | | | **DERIVATIVE DAMAGES - TO MOM LLCs** | | | | **DAMAGES - TO MH - ANCILLARY DAMAGES** | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Unpaid Management Base Fee | $ 2,179,095 | Schedule 4 |
| | | | | | | | | Interest on Nano Banc Loan | $ 1,899,490 | Schedule 5 |
| Damages Resulting from Capital Contribution | | | | Damages Resulting from Capital Contribution | | | | TIC Sold | $ 4,584,597 | Schedule 6 |
| | | | | | | | | Damages Resulting from Post-JV Loans | | |
| | | | | Loan Amount/ Equity - Relating to $20M Nano Banc Loan | $ 20,000,000 | Schedule 5 | | Post-JV Loans | $ 123,065,000 | Schedule 7 |
| | | | | Amount of Purported $10M Contribution Refunded to Continuum out of the Escrow used for the Loancore Refinance | $ 3,996,395 | | | Less: Reimbursements to Continuum | $ 17,645,313 | Schedule 2 |
| Interest on Loan | $ 3,798,980 | Schedule 5 | | Interest on Loan | $ 3,798,980 | Schedule 5 | | | | |
| Total Damages Resulting from Capital Contribution | $ 3,798,980 | | | Total Damages Resulting from Capital Contribution | $ 27,795,375 | | | Net Damages Resulting from Post-JV Loans | $ 105,419,687 | |
| TIC Sold | $ 5,102,695 | Schedule 6 | | TIC Sold | $ 5,102,695 | Schedule 6 | | Late Fees and Penalties on Property Tax | $ 382,508 | Schedule 9 |
| Post-JV Loans | $ 136,565,000 | Schedule 7 | | Post-JV Loans | $ 136,565,000 | Schedule 7 | | | | |
| Late Fees and Penalties on Property Tax | $ 382,508 | Schedule 9 | | Late Fees and Penalties on Property Tax | $ 382,508 | Schedule 9 | | | | |
| TOTAL EQUALIZING PAYMENTS | $ 145,849,183 | | | | | | | TOTAL ANCILLARY DAMAGES | $ 114,465,377 | |

| TOTAL DAMAGES (in addition to the return of the Properties to MH) | $ 122,200,265 | | | TOTAL DAMAGES | $ 169,845,578 | | | TOTAL DAMAGES | $ 204,899,272 | |
|---|---|---|---|---|---|---|---|---|---|---|

**Mohammad Honarkar v. Mahender Makhijani et al.**

Continuum Amounts Paid on Behalf of Properties

| Due to Continuum | | | | [1] |
|---|---|---|---|---|
| Entity Sub | 2021 | 2022 | TOTAL | |
| Retreat at Laguna Villas, LLC | $ - | $ 7,000 | $ 7,000 | |
| Sunset Cove Villas LLC | $ - | $ 81,000 | $ 81,000 | |
| Duplex at Sleepy Hollow, LLC | $ - | $ 14,000 | $ 14,000 | |
| Cliff Drive Properties DE, LLC | $ - | $ 46,849 | $ 46,849 | |
| 694 NCH Apartments LLC | $ - | $ 22,000 | $ 22,000 | |
| Heisler Laguna LLC | $ - | $ 161,421 | $ 161,421 | |
| 891 Laguna Canyon Road, LLC | $ - | $ 31,873 | $ 31,873 | |
| 777 At Laguna, LLC | $ - | $ 31,013 | $ 31,013 | |
| Laguna Art District Complex, LLC | $ - | $ 3,746 | $ 3,746 | |
| Laguna Festival Center, LLC | $ - | $ 63,000 | $ 63,000 | |
| The Masters Building, LLC | $ - | $ 288,333 | $ 288,333 | |
| 689 S. Coast Hwy, LLC | $ - | $ - | $ - | |
| 837 Park Ave, LLC | $ - | $ 3,018 | $ 3,018 | |
| Laguna HI, LLC | $ - | $ 97,801 | $ 97,801 | |
| Laguna HW, LLC | $ - | $ 317,433 | $ 317,433 | |
| 314 S. Harvard DE, LLC | $ - | $ 16,134 | $ 16,134 | |
| 4110 W. 3rd St. DE, LLC | $ - | $ 2,033,132 | $ 2,033,132 | |
| Tesoro Redlands, LLC | $ - | $ - | $ - | |
| Cliff Village, LLC | $ 1,850,906 | $ 6,383,385 | $ 8,234,291 | |
| Hotel Laguna, LLC | $ 3,181,941 | $ 3,002,299 | $ 6,184,240 | |
| Tustin Retail Properties, LLC | $ - | $ 9,029 | $ 9,029 | |
| | | | $ 17,645,313 | |

| Capital Contribution | | | | [2] |
|---|---|---|---|---|
| Entity Sub | | Purported Contribution Amount | TOTAL | |
| $20 Million | | $ 20,000,000 | $ - | |
| $10 Million | | $ 10,000,000 | $ 10,000,000 | |
| Refund on loancore Escrow | | | $ 3,996,395 | |
| | | | $ 6,003,605 | |

[1]  Source: General Ledgers and/or Balance Sheets for all entities, 6/8/21-12/31/31 and 1/1/22-9/30/22.

[2]  See MOMRESP_00002833.

**Mohammad Honarkar v. Mahender Makhijani et al.**

Summary of Appraisals and Calculation of Lost Value due to DLOC and DLOM

| Appraisal Closest to 6/8/21 (prior to) | | | [1] |
|---|---|---|---|
| Entity Sub | Appraisal Date | Apprised Value | |
| Retreat at Laguna Villas, LLC | 5/27/2021 | $ 9,300,000.00 | |
| Sunset Cove Villas LLC | 6/3/2021 | $ 15,550,000.00 | |
| Duplex at Sleepy Hollow, LLC | 5/28/2021 | $ 2,525,000.00 | |
| Cliff Drive Properties DE, LLC | 5/27/2021 | $ 7,900,000.00 | |
| 694 NCH Apartments LLC | 5/28/2021 | $ 5,800,000.00 | |
| Heisler Laguna LLC | 5/27/2021 | $ 24,800,000.00 | |
| 891 Laguna Canyon Road, LLC | 6/4/2021 | $ 39,700,000.00 | appraised together |
| 777 At Laguna, LLC | | | |
| Laguna Art District Complex, LLC | | | |
| Laguna Festival Center, LLC | | | |
| The Masters Building, LLC | 2/3/2020 | $ 11,900,000.00 | |
| 689 S. Coast Hwy, LLC | 1/27/2020 | $ 1,375,000.00 | |
| 837 Park Ave, LLC | 8/8/2018 | $ 500,000 | |
| Laguna HI, LLC | 1/27/2020 | $ 18,400,000.00 | |
| Laguna HW, LLC | 1/29/2020 | $ 6,800,000 | |
| 314 S. Harvard DE, LLC | 7/30/2018 | $ 2,700,000.00 | |
| 4110 W. 3rd St. DE, LLC | 4/30/2019 | $ 12,800,000.00 | |
| Tesoro Redlands, LLC | 6/4/2021 | $ 52,470,000.00 | |
| Cliff Village, LLC | 2/6/2019 | $ 13,100,000 | |
| Hotel Laguna, LLC | 1/8/2019 | $ 41,000,000.00 | |
| Tustin Retail Properties, LLC | 8/15/2018 | $ 1,420,000 | |
| | | $ 268,040,000 | |

| VALUE OF PROPERTIES Due to DLOC and DLOM | | | |
|---|---|---|---|
| Total Portfolio Appraised Value Pre-JV | [a] | $ 268,040,000 | |
| Less Tesoro | [b] | $ 215,570,000 | |
| Discount for Lack of Control (DLOC) and Discount for Lack of Marketability (DLOM) | [c] | 25% | [2] |
| Loss of Value due to DLOC and DLOM | [d] = [b] * [c] | $ 53,892,500 | |

| VALUE OF PROJECTS After DLOC and DLOM | | | |
|---|---|---|---|
| Total Projects (Hotel Laguna) Appraised Value Pre-JV | [e] | $ 41,000,000 | |
| Discount for Lack of Control (DLOC) and Discount for Lack of Marketability (DLOM) | [f] | 25% | |
| Total Portfolio Appraised Value Pre-JV after DLOC and DLOM Application | [g] = [e] * (1-[f]) | $ 30,750,000 | |
| Value to MH of Projects After DLOC and DLOM | [h] = 50% * [g] | $ 15,375,000 | |
| Loss of Value of Total Projects (Hotel Laguna and Newport Crossing) Appraised Value Pre-JV | [i] = [e] - [h] | $ 25,625,000 | |

| VALUE OF PROPERTIES Due to DLOC and DLOM and VALUE OF PROJECTS After DLOC and DLOM | | | |
|---|---|---|---|
| Damages to MH | [j] = [d] + [i] | $ 79,517,500 | |

[1]   See Schedule 3.1.
[2]   See https://www.bvresources.com/articles/bvwire/dloc-and-dlom-for-real-estate-entities-153-1
        and https://eqvista.com/company-valuation/discount-for-lack-of-control/.

**Mohammad Honarkar v. Mahender Makhijani et al.**

Appraisals Summary

| Entity | Address | Appraiser | Date | Value | Market Value | Cost Approach to Value | Sales Comparison Approach | Income Capitalization Approach | Source |
|---|---|---|---|---|---|---|---|---|---|
| Tesoro Redlands, LLC | 106 W Pennsylvania Ave | BBG Real Estate Services | 2/10/2022 | $ 58,300,000 | $ 58,300,000 | | $ 56,400,000 | $ 58,300,000 | 000000_MOMRESP_00009595 |
| Duplex at Sleepy Hollow | 689 Sleepy Hollow Ln | Keith G Olsen | 5/28/2021 | $ 2,525,000 | | $ 2,528,895 | $ 5,500,000 | $ 5,800,000 | 000001_MOMRESP_00009740 |
| 694 NCH Apartments LLC | 694 N Coast Hwy | CBRE | 5/28/2021 | $ 5,800,000 | | | | | 000002_MOMRESP_00009776 |
| Retreat at Laguna Villas, LLC | 749 Gaviota (729 ocean F | CBRE | 5/27/2021 | $ 9,300,000 | | | $ 8,800,000 | $ 9,300,000 | 000003_MOMRESP_00009919 |
| Laguna Arts District Complex, LLC; Laguna Festical; 777 at Laguna; 891 Laguna Canyon Rd | 775, 777, 835, 891 & 224 | CBRE | 6/4/2021 | $ 39,700,000 | | | $ 40,300,000 | $ 39,700,000 | 000004_MOMRESP_00010063 |
| Sunset Cove Villas LLC | 683 Sleepy Hollow Ln | CBRE | 6/3/2021 | $ 15,550,000 | | | $ 12,000,000 | $ 15,550,000 | 000005_MOMRESP_00010272 |
| Hotel Laguna, LLC (a Project) | 425-541 S Coast Hwy | CBRE | 8/15/2022 | $ 50,400,000 | | | $ 48,100,000 | $ 50,400,000 | 000006_MOMRESP_00010419 |
| Retreat at Laguna Villas, LLC | 749 Gaviota (729 ocean F | CBRE | 12/23/2019 | $ 8,500,000 | | | $ 8,000,000 | $ 8,500,000 | 000007_MOMRESP_00010657 |
| Cliff Drive Properties DE, LLC | 150-154 Cliff Dr (151-153 | CBRE | 5/27/2021 | $ 7,900,000 | | | $ 7,900,000 | $ 8,400,000 | 000008_MOMRESP_00010758 |
| Heisler Laguna LLC | Multiple (305, 331, 345, 3 | CBRE | 5/27/2021 | $ 24,800,000 | | | $ 25,200,000 | $ 24,800,000 | 000009_MOMRESP_00010953 |
| Laguna Arts District Complex, LLC; Laguna Festical; 777 at Laguna; 891 Laguna Canyon Rd | 775, 777, 835, 891 & 224 | Kearns & Lageveld .LLC | 10/19/2023 | $ 35,880,000 | $ 35,880,000 | $ 33,800,000 | $ 36,560,000 | $ 37,520,000 | 000010_MOMRESP_00011158 |
| Tesoro Redlands, LLC | 106 W Pennsylvania Ave | CBRE | 6/4/2021 | $ 52,470,000 | | | $ 52,600,000 | $ 52,470,000 | 000011_MOMRESP_00011496 |
| 14 West 694 NCH Apartments LLC | 688-690 S. Coast Highway | CBRE | 12/12/2019 | $ 6,800,000 | | | $ 7,100,000 | $ 6,800,000 | 000012_MOMRESP_00011642 |
| 694 N Coast Hwy LLC | 694 N Coast Hwy | CBRE | 1/27/2020 | $ 5,650,000 | | | $ 5,450,000 | $ 5,650,000 | 000013_MOMRESP_00011805 |
| Cliff Drive Properties DE, LLC | 150-154 Cliff Dr (151-153 | CBRE | 1/27/2020 | $ 8,130,000 | | | $ 8,130,000 | $ 4,900,000 | 000014_MOMRESP_00011921 |
| Laguna HL LLC | 696 S Coast Hwy | CBRE | 1/27/2020 | $ 18,400,000 | | | $ 16,900,000 | $ 18,400,000 | 000015_MOMRESP_00012065 |
| 8871 Research Dr, LLC | 8871 Research Dr | BBG Real Estate Services | 3/21/2018 | $ 4,700,000 | | | | | 000016_MOMRESP_00012219 |
| 424 Marguerite | 424 Marguerite | Berkshire Hathaway | 8/9/2020 | $ 2,650,000 | | | | | 000017_MOMRESP_00012353 |
| 424 1/2 Marguerite | 424 1/2 Marguerite | Berkshire Hathaway | 8/9/2020 | $ 1,528,750 | | | | | 000018_MOMRESP_00012389 |
| 600 Acacia Ave | 600 Acacia Ave | Berkshire Hathaway | 8/9/2020 | $ 4,650,000 | | | | | 000019_MOMRESP_00012425 |
| 689 S Coast Hwy, LLC | 689 S Coast Hwy | CBRE | 1/27/2020 | $ 1,375,000 | | | $ 1,425,000 | $ 1,375,000 | 000020_MOMRESP_00012457 |
| 837 Park Ave, LLC | 837 Park Ave | CBRE | 8/8/2018 | $ 500,000 | | | | | 000021_MOMRESP_00012577 |
| Tesoro Redlands, LLC | 106 W Pennsylvania Ave | CBRE | 12/17/2019 | $ 42,390,000 | | | $ 41,600,000 | $ 42,390,000 | 000022_MOMRESP_00012645 |
| Heisler Laguna LLC | Multiple (305, 331, 345, 3 | CBRE | 12/17/2019 | $ 27,200,000 | | | $ 27,300,000 | $ 27,200,000 | 000023_MOMRESP_00012835 |
| Sunset Cove Villas LLC | 683 Sleepy Hollow Ln | CBRE | 12/23/2019 | $ 15,400,000 | | $ 11,000,000 | $ 12,000,000 | $ 15,400,000 | 000024_MOMRESP_00013012 |
| Duplex at Sleepy Hollow | 689 Sleepy Hollow Ln | CBRE | 12/23/2019 | $ 2,400,000 | | $ 2,200,000 | $ 2,000,000 | $ 2,400,000 | 000025_MOMRESP_00013113 |
| Laguna Arts District Complex, LLC; Laguna Festical; 777 at Laguna; 891 Laguna Canyon Rd | 775, 777, 835, 891 & 224 | CBRE | 12/17/2019 | $ 39,100,000 | | | $ 39,100,000 | $ 39,100,000 | 000026_MOMRESP_00013212 |
| The Masters Building, LLC | 2711-2713 Pacific Coast | CBRE | 12/17/2019 | $ 11,900,000 | | | $ 11,800,000 | $ 11,900,000 | 000027_MOMRESP_00013388 |
| Palm Desert Collective (C | 74895 Frank Sinatra Dr | Hospitality Valuation Services | 3/24/2005 | $ 14,000,000 | | | | | 000028_MOMRESP_00013584 |
| Hotel Laguna, LLC (a Project) | 425-541 S Coast Hwy | BBG Real Estate Services | 1/8/2019 | $ 41,000,000 | | | $ 42,900,000 | $ 41,000,000 | 000029_MOMRESP_00013752 |
| 314 Harvard Blvd | 314 Harvard Blvd | HVS | 7/30/2018 | $ 2,700,000 | | | | | 000030_MOMRESP_00013900 |
| 4110 W 3rd St | 4110 W 3rd St | HVS | 7/30/2018 | $ 8,000,000 | | | | | 000030_MOMRESP_00013900 |
| 4110 W 3rd St | 4110 W 3rd St | HVS Hospitality Valuation n Services | 4/30/2019 | $ 12,800,000 | | | | | 000031_MOMRESP_00014003 |
| Palm Desert Collective (R | 38305 Cook St | CBRE | 3/24/2005 | $ 13,400,000 | | | | | 000032_MOMRESP_00014207 |
| 837 Park Ave, LLC | 837 Park Ave | CBRE | 8/8/2018 | $ 500,000 | | | | | 000033_MOMRESP_00014378 |
| Heisler Laguna, LLC | Multiple (305, 331, 345, 3 | CBRE | 2/3/2020 | $ 29,200,000 | | | $ 27,300,000 | $ 29,200,000 | 000034_MOMRESP_00014446 |
| Laguna Arts District Complex, LLC; Laguna Festical; 777 at Laguna; 891 Laguna Canyon Rd | 775, 777, 835, 891 & 224 | CBRE | 2/3/2020 | $ 41,700,000 | | | $ 39,000,000 | $ 41,700,000 | 000035_MOMRESP_00014624 |
| The Masters Building, LLC | 2711-2713 Pacific Coast | CBRE | 2/3/2020 | $ 11,900,000 | | | $ 11,800,000 | $ 11,900,000 | 000036_MOMRESP_00014802 |
| Retreat at Laguna Villas, LLC | 749 Gaviota (729 ocean F | CBRE | 1/27/2020 | $ 8,500,000 | | $ 7,600,000 | $ 8,000,000 | $ 8,500,000 | 000037_MOMRESP_00014998 |
| Sunset Cove Villas LLC | 683 Sleepy Hollow Ln | CBRE | 1/27/2020 | $ 15,400,000 | | $ 11,000,000 | $ 12,000,000 | $ 15,400,000 | 000038_MOMRESP_00015099 |
| Duplex at Sleepy Hollow | 689 Sleepy Hollow Ln | CBRE | 1/27/2020 | $ 2,400,000 | | $ 2,000,000 | $ 2,000,000 | $ 2,400,000 | 000039_MOMRESP_00015200 |
| Laguna HW, LLC | 688-690 S Coast Hwy | CBRE | 1/29/2020 | $ 6,800,000 | | | | | HONARKAR-003580 |
| Tustin Retail Properties, L | 18410 Irvine Blvd | Val-Chris Investments | 8/15/2018 | $ 1,420,000 | | | | | HONARKAR-155510 |
| Cliff Village | 521, 535, 577, 605 & 623 4251-4255 Martingale Way & 4200-4250 Scott Drive & 1701 Corinthian Drive & 1660 Dove Street Newport Beach, California 92660 | BBG Real Estate Services | 2/6/2019 | $ 13,100,000 | | | | | NANO_08854 |
| Newport Crossing | | BAAR Realty Advisors | 4/11/2019 | $ 40,000,000 | | | | | MOMRESP_00027129 |

**Mohammad Honarkar v. Mahender Makhijani et al.**

Lost Profits | Unpaid Management Fee | Forecasted Unpaid Management Fee

|  |  | Date |  |  |  |  | Rate |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | JV Date | 6/8/2021 |  |  |  |  |  |  |  |  |  |  |  |  |  |
| [1] | Management Agreement Effective Date | 1/1/2021 |  | Historical Growth Rate; 2018-2019 |  |  | 3.8% [2] |  |  |  |  |  |  |  |  |
|  | Management Agreement Expiration Date | 1/1/2031 |  | Discount Rate |  |  | 8.5% [3] |  |  |  |  |  |  |  |  |
|  | Discount Period Start Date | 6/24/2024 |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Optional Extension Expiration Date | 12/31/2041 |  |  |  |  |  |  |  |  |  |  |  |  |  |

|  | 9/19/2021 | 7/2/2022 | 7/2/2023 | 7/1/2024 | 7/2/2025 | 7/2/2026 | 7/2/2027 | 7/1/2028 | 7/2/2029 | 7/2/2030 | 1/1/2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mid-Point for PV and Mortality Factor | | | | | | | | | | | |
| Year | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |

| Description | | Forecasted Period - Management Fee | | | | | | | | | | | Sum of Forecasted Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 6/8/2021 | 1/1/2022 | 1/1/2023 | 1/1/2024 | 1/1/2025 | 1/1/2026 | 1/1/2027 | 1/1/2028 | 1/1/2029 | 1/1/2030 | 1/1/2031 | |
| | | 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 | 12/31/2029 | 12/31/2030 | 1/1/2031 | |
| [4] Management Fee for Period | | 228,402 | 237,033 | 245,990 | 255,285 | 264,932 | 274,943 | 285,332 | 296,114 | 307,303 | 318,915 | 330,966 | $ 3,045,216 |
| Portion of Year | | 0.56 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | - | |
| Total Management Fee for Portion of Year | a | 128,794 | 237,033 | 245,990 | 255,285 | 264,932 | 274,943 | 285,332 | 296,114 | 307,303 | 318,915 | | 2,614,641 |
| Discount Rate | | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | 8.5% | |
| Discount Period (mid-period convention) | | (2.7625) | (1.9795) | (0.9802) | 0.0205 | 1.0212 | 2.0205 | 3.0198 | 4.0205 | 5.0212 | 6.0205 | 6.5216 | |
| Present Value Factor | b | 1.0000 | 1.0000 | 1.0000 | 0.9983 | 0.9201 | 0.8480 | 0.7816 | 0.7204 | 0.6639 | 0.6119 | 0.5874 | |
| Present Value of Total Fees | c = a * b | $ 128,794 | $ 237,033 | $ 245,990 | $ 254,858 | $ 243,754 | $ 233,161 | $ 223,027 | $ 213,311 | $ 204,017 | $ 195,150 | $ - | $ 2,179,095 |

[1] See Schedule 1 for relevant dates.
[2] See Schedule 2.1 for revenue growth rate 2018-2019 (although pre-JV, most conservative growth rate to use without considering 2020's COVID effect.)
[3] Discount rate used is between 5% and 12% (see https://fnrpusa.com/blog/discount-rate-commercial-real-estate-explained/).
[4] See Schedule 2.1 for gross revenue amounts annualized for 2021 and management fees calculated using a 5% rate on gross revenue.

Schedule 4.1

**Mohammad Honarkar v. Mahender Makhijani et al.**
Lost Profits | Unpaid Management Fee | Historical Management Fee Calculation
Source: Profit and Loss Statements.

| Management Fee | | | | | |
|---|---|---|---|---|---|
| Entity Sub | Jan - May 2021 - Pre-JV Financials | Jan - May 2021 - Post-JV Financials | Pre-Post | Jan - May 2022 | |
| Retreat at Laguna Villas, LLC | $ 30,195 | $ 10,570 | $ 19,625 | $ 35,441 | Due to Laguna HW, LLC |
| Sunset Cove Villas LLC | $ 46,169 | $ 16,159 | $ 30,010 | $ 56,367 | Due to Laguna HW, LLC |
| Duplex at Sleepy Hollow, LLC | $ 7,011 | $ 2,461 | $ 4,550 | $ 6,240 | Due to Laguna HW, LLC |
| [1] Laguna HI, LLC | $ - | $ 26,136 | $ (26,136) | $ - | |
| Laguna HW, LLC | $ - | | $ - | $ - | |
| Total | $ 83,375 | $ 55,326 | | $ 98,048 | |

| Gross Revenue Growth Trend | | | | | | | Base Fee - 5% |
|---|---|---|---|---|---|---|---|
| Entity Sub | 2018 | 2019 | 2020 | 2021 - Pre-JV Financials - Annualized | Jan - May 2022 - Annualized | | 2021 - Pre-JV Financials - Annualized |
| Retreat at Laguna Villas, LLC | $ 801,568 | $ 798,151 | $ 754,488 | $ 724,681 | $ 850,577 | | $ 36,234 |
| Sunset Cove Villas LLC | $ 1,263,036 | $ 1,236,639 | $ 1,162,176 | $ 1,108,052 | $ 1,352,800 | | $ 55,403 |
| Duplex at Sleepy Hollow, LLC | $ 51,042 | $ 131,980 | $ 138,595 | $ 168,263 | $ 149,766 | | $ 8,413 |
| Laguna HI, LLC | $ 2,721,009 | $ 2,833,209 | $ 1,570,443 | $ 1,792,181 | $ 160,901 | | $ 89,609 |
| [2] Laguna HW, LLC | $ 828,950 | $ 879,713 | $ 738,058 | $ 774,873 | $ 3,026,906 | | $ 38,744 |
| Total | $ 5,665,604 | $ 5,879,691 | $ 4,363,760 | $ 4,568,049 | $ 5,540,950 | | $ 228,402 |
| | | 4% | -26% | 5% | 21% | | |



| Gross Revenue | | | | |
|---|---|---|---|---|
| Entity Sub | Jan - May 2021 - Pre-JV Financials | Jan - May 2022 | Jan - May 2021 - Pre-JV Financials | 5% of Gross Revenues as per Management Agreement |
| Retreat at Laguna Villas, LLC | $ 301,950 | $ 354,407 | 10% | $ 17,720 |
| Sunset Cove Villas LLC | $ 461,688 | $ 563,667 | 10% | $ 28,183 |
| Duplex at Sleepy Hollow, LLC | $ 70,109 | $ 62,403 | 10% | $ 3,120 |
| [1] Laguna HI, LLC | $ 746,742 | $ 67,042 | 0% | $ 3,352 |
| [2] Laguna HW, LLC | $ 322,864 | $ 1,261,211 | 0% | $ 63,061 |
| Total | $ 1,903,354 | $ 2,308,729 | | $ 115,436 |



Gross Revenue, 2018-2022 (2021-2022 annualized)

Retreat at Laguna Villas, LLC ■ Sunset Cove Villas LLC ■ Duplex at Sleepy Hollow, LLC ■ Laguna HI, LLC ■ Laguna HW, LLC

[1] Laguna HI, LLC P&L Statement for 2022 was blank, lodging sales (that only went through April 2022) taken from General Ledger.
[2] Laguna HW gross revenue is calculated by subtracting management fee revenues for management fee calculation.

## Mohammad Honarkar v. Mahender Makhijani et al.

**Interest on Loan | $20M Loan Account 7000353700**

| Loan Amount | $ | 20,000,000 |
|---|---|---|

| $20 M Nano Banc Loan | | |
|---|---|---|
| | **Interest Payments for Period** | |
| **2021** | $ | 413,333 |
| **2022** | $ | 989,444 |
| **2023** | $ | 1,626,145 |
| **2024** | $ | 770,057 |
| **TOTAL** $ | | **3,798,980** |

[1] See Promissory Note NANOBANC-000245 for Loan info and Schedule 4.1 for detail for interest payments.

**Mohammad Honarkar v. Mahender Makhijani et al.**

Interest on Loan | $20M Loan Account 7000353700
Source: NANO_04206-8 and Promissory Note NANOBANC-000245

Date of Arbitration    5/13/2024

T R A N S A C T I O N   H I S T O R Y   S T A T E M E N T

| Loan Account | Current Balance | Statement Date |
|---|---|---|
| 7000353700 | 19,184,817.74 | 01/19/2024 |

| Date Posted | Description | Effective Date | Transaction Amount | Principal | Interest | Period | Period - Days | Interest Rate | Escrow/ Other | Late Charge/ Fees | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/7/2024 | PRINCIPAL PAYMENT | 6/7/2024 | 19,311,650.70 | 19,184,817.74 | 126,832.96 | | 28.00 | 8.50% | - | - | 19,184,817.74 |
| 5/10/2024 | REGULAR PAYMENT | 5/10/2024 | 135,892.46 | - | 135,892.46 | | 30.00 | 8.50% | - | - | 19,184,817.74 |
| 4/10/2024 | REGULAR PAYMENT | 4/10/2024 | 140,422.21 | - | 140,422.21 | | 31.00 | 8.50% | - | - | 19,184,817.74 |
| 3/10/2024 | REGULAR PAYMENT | 3/10/2024 | 131,362.71 | - | 131,362.71 | | 29.00 | 8.50% | - | - | 19,184,817.74 |
| 2/10/2024 | REGULAR PAYMENT | 2/10/2024 | 140,422.21 | - | 140,422.21 | | 31.00 | 8.50% | - | - | 19,184,817.74 |
| 1/10/2024 | REGULAR PAYMENT | 1/10/2024 | 95,124.72 | - | 95,124.72 | | 21.00 | 8.50% | - | - | 19,184,817.74 |
| 12/20/2023 | REGULAR PAYMENT | 12/20/2023 | 135,892.46 | - | 135,892.46 | 0.078 | 28.00 | 9.11% | - | - | 19,184,817.74 |
| 11/22/2023 | INTEREST DUE PMT | 11/22/2023 | 140,422.21 | - | 140,422.21 | - | 33.00 | 7.98% | - | - | 19,184,817.74 |
| 11/22/2023 | INTEREST DUE PMT | 11/22/2023 | 135,892.46 | - | 135,892.46 | 0.006 | 33.00 | 7.73% | - | - | 19,184,817.74 |
| 11/20/2023 | Assessed Late Chg | 11/20/2023 | 7,021.11 | - | - | 0.083 | 31.00 | 0.00% | - | 7,021.11 | 19,184,817.74 |
| 10/20/2023 | Assessed Late Chg | 10/20/2023 | 6,794.62 | - | - | 0.106 | 38.00 | 0.00% | - | - | 19,184,817.74 |
| 9/12/2023 | REGULAR PAYMENT | 9/12/2023 | 143,521.49 | - | 143,521.49 | 0.072 | 33.00 | 8.16% | - | - | 19,184,817.74 |
| 8/16/2023 | PRINCIPAL PAYMENT | 8/16/2023 | 815,182.25 | 815,182.25 | - | 0.017 | 6.00 | 0.00% | - | 6,794.62 | 19,184,817.74 |
| 8/10/2023 | REGULAR PAYMENT | 8/10/2023 | 142,083.33 | - | 142,083.33 | 0.083 | 31.00 | 8.25% | - | - | 19,999,999.99 |
| 7/10/2023 | REGULAR PAYMENT | 7/10/2023 | 137,500.00 | - | 137,500.00 | 0.078 | 28.00 | 8.84% | - | - | 19,999,999.99 |
| 6/12/2023 | REGULAR PAYMENT | 6/12/2023 | 142,916.67 | - | 142,916.67 | 0.089 | 33.00 | 7.80% | - | - | 19,999,999.99 |
| 5/10/2023 | REGULAR PAYMENT | 5/10/2023 | 133,333.33 | - | 133,333.33 | 0.083 | 30.00 | 8.00% | - | - | 19,999,999.99 |
| 4/10/2023 | REGULAR PAYMENT | 4/10/2023 | 135,972.23 | - | 135,972.23 | 0.083 | 31.00 | 7.90% | - | - | 19,999,999.99 |
| 3/10/2023 | REGULAR PAYMENT | 3/10/2023 | 121,666.66 | - | 121,666.66 | 0.083 | 28.00 | 7.82% | - | - | 19,999,999.99 |
| 2/10/2023 | REGULAR PAYMENT | 2/10/2023 | 129,166.67 | - | 129,166.67 | 0.083 | 31.00 | 7.50% | - | - | 19,999,999.99 |
| 1/10/2023 | REGULAR PAYMENT | 1/10/2023 | 127,777.78 | - | 127,777.78 | 0.078 | 29.00 | 7.93% | - | - | 19,999,999.99 |
| 12/12/2022 | REGULAR PAYMENT | 12/12/2022 | 119,583.33 | - | 119,583.33 | 0.089 | 32.00 | 6.73% | - | - | 19,999,999.99 |
| 11/10/2022 | REGULAR PAYMENT | 11/10/2022 | 107,638.89 | - | 107,638.89 | 0.081 | 30.00 | 6.46% | - | - | 19,999,999.99 |
| 10/11/2022 | REGULAR PAYMENT | 10/11/2022 | 99,166.67 | - | 99,166.67 | 0.081 | 29.00 | 6.16% | - | - | 19,999,999.99 |
| 9/12/2022 | REGULAR PAYMENT | 9/12/2022 | 100,138.89 | - | 100,138.89 | 0.089 | 33.00 | 5.46% | - | - | 19,999,999.99 |
| 8/10/2022 | REGULAR PAYMENT | 8/10/2022 | 81,805.55 | - | 81,805.55 | 0.089 | 33.00 | 4.46% | - | - | 19,999,999.99 |
| 7/8/2022 | REGULAR PAYMENT | 7/8/2022 | 76,666.67 | - | 76,666.67 | 0.069 | 25.00 | 5.52% | - | - | 19,999,999.99 |
| 6/13/2022 | REGULAR PAYMENT | 6/13/2022 | 68,888.89 | - | 68,888.89 | 0.092 | 34.00 | 3.65% | - | - | 19,999,999.99 |
| 5/10/2022 | REGULAR PAYMENT | 5/10/2022 | 66,666.67 | 0.01 | 66,666.66 | 0.081 | 29.00 | 4.14% | - | - | 19,999,999.99 |
| 4/11/2022 | REGULAR PAYMENT | 4/11/2022 | 68,888.89 | - | 68,888.89 | 0.086 | 32.00 | 3.88% | - | - | 20,000,000.00 |
| 3/10/2022 | REGULAR PAYMENT | 3/10/2022 | 62,222.22 | - | 62,222.22 | 0.083 | 28.00 | 4.00% | - | - | 20,000,000.00 |
| 2/10/2022 | REGULAR PAYMENT | 2/10/2022 | 68,888.89 | - | 68,888.89 | 0.083 | 31.00 | 4.00% | - | - | 20,000,000.00 |
| 1/10/2022 | REGULAR PAYMENT | 1/10/2022 | 68,888.89 | - | 68,888.89 | 0.075 | 28.00 | 4.43% | - | - | 20,000,000.00 |
| 12/13/2021 | REGULAR PAYMENT | 12/13/2021 | 66,666.67 | - | 66,666.67 | 0.092 | 33.00 | 3.64% | - | - | 20,000,000.00 |
| 11/10/2021 | REGULAR PAYMENT | 11/10/2021 | 68,888.89 | - | 68,888.89 | 0.078 | 29.00 | 4.28% | - | - | 20,000,000.00 |
| 10/12/2021 | REGULAR PAYMENT | 10/12/2021 | 66,666.66 | - | 66,666.66 | 0.089 | 32.00 | 3.75% | - | - | 20,000,000.00 |
| 9/10/2021 | REGULAR PAYMENT | 9/10/2021 | 68,888.89 | - | 68,888.89 | 0.083 | 31.00 | 4.00% | - | - | 20,000,000.00 |
| 8/10/2021 | REGULAR PAYMENT | 8/10/2021 | 68,888.89 | - | 68,888.89 | 0.086 | 32.00 | 3.88% | - | - | 20,000,000.00 |
| 7/9/2021 | REGULAR PAYMENT | 7/9/2021 | 73,333.34 | - | 73,333.34 | 0.089 | 32.00 | 4.12% | - | - | 20,000,000.00 |
| 6/7/2021 | REGULAR PAYMENT | 6/7/2021 | 20,000,000.00 | | - | | - | | - | - | 20,000,000.00 |

$    23,812,796.06  $ 20,000,000.00  $    3,798,980.33                                          $    13,815.73

| Effective Date | | Old Rate | New Rate |
|---|---|---|---|
| | 7/27/2023 | 8.25% | 8.50% |
| | 5/4/2023 | 8.00% | 8.25% |
| | 3/23/2023 | 7.75% | 8.00% |
| | 2/2/2023 | 7.50% | 7.75% |
| | 12/15/2022 | 7.00% | 7.50% |
| | 11/3/2022 | 6.25% | 7.00% |
| | 9/22/2022 | 5.50% | 6.25% |
| | 7/28/2022 | 4.75% | 5.50% |
| | 6/16/2022 | 4.00% | 4.75% |

Schedule 6

**Mohammad Honarkar v. Mahender Makhijani et al.**

TIC Sold

| TIC Sold | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property | Buyer | Date | Interest % | Interest Amount | Damages Amount | Damages Amount - MH | |
| Hotel Laguna | Jaachak, LLC | 4/10/2022 | 5.18% | $ 1,036,195 | $ 1,036,195 | $ 518,097 | [1] |
| Laguna HI, LLC | Cheema & Ghuma Properties, L | 12/30/2022 | 8.313% | $ 4,066,500 | $ 4,066,500 | $ 4,066,500 | [2] |
| | **TOTAL** | | | **$ 5,102,695** | **$ 5,102,695** | **$ 4,584,597** | |

[1] See Declaration of M. Honarkar ISO Receiver App., May 17, 2023, Ex. 6.

[2] See Declaration of M. Honarkar ISO Receiver App., May 17, 2023, Ex. 7, and NANO_27313 p. 10, and BPM_MOM 002605.

Schedule 7

**Mohammad Honarkar v. Mahender Makhijani et al.**

Post-JV Loans

| Post-JV Loans | | | | | |
|---|---|---|---|---|---|
| Property/ies | Lender | Date | Loan Amount | Damages Amount | Damages Amount - MH |
| Tesoro Redlands, LLC | Nano Banc | 7/1/2021 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 [1] |
| The Masters Buildings, LLC | Cantor Group IV LLC | 10/26/2021 | $ 11,000,000 | $ 11,000,000 | $ 11,000,000 [2] |
| Laguna HW, LLC | Cantor Group IV LLC | 10/26/2021 | $ 8,300,000 | $ 8,300,000 | $ 8,300,000 [2] |
| Tustin Retail Properties | Cantor Group IV LLC | 10/26/2021 | $ 2,100,000 | $ 2,100,000 | $ 2,100,000 [2] |
| Laguna HW, LLC | Loan Oak Fund, LLC | 12/28/2021 | $ 3,500,000 | $ 3,500,000 | $ 3,500,000 [2] |
| The Masters Buildings, LLC | Loan Oak Fund, LLC | 12/28/2021 | $ 5,500,000 | $ 5,500,000 | $ 5,500,000 [2] |
| Laguna HW, LLC, The Masters Buildings, LLC | Qualfax, Inc. c/o RTI Properties, Inc. | 12/28/2021 | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 [2] |
| Laguna HI, LLC | Cantor Group IV LLC | 2/11/2022 | $ 18,175,000 | $ 18,175,000 | $ 18,175,000 [3] |
| Tesoro Redlands, LLC | Preferred Bank | 2/24/2022 | $ 11,400,000 | $ 11,400,000 | $ 11,400,000 [7] |
| Laguna HW, LLC | Cantor Group V LLC | 5/2/2022 | $ 10,000,000 | $ 10,000,000 | $ 10,000,000 [4] |
| Laguna Arts District Complex, LLC | Cantor Group IV LLC | 11/21/2022 | $ 16,500,000 | $ 16,500,000 | $ 16,500,000 [5] |
| Hotel Laguna, LLC | Banc of California | 11/4/2022 | $ 27,000,000 | $ 27,000,000 | $ 13,500,000 [6] |
| The Masters Buildings, LLC | PMF CA REIT, LLC | 8/31/2023 | $ 6,540,000 | $ 6,540,000 | $ 6,540,000 [2] |
| Laguna HI, LLC | Wilshire Quinn Income Fund, LLC | 11/15/2023 | $ 12,550,000 | $ 12,550,000 | $ 12,550,000 [2] |
| TOTAL | | | $ 136,565,000 | $ 136,565,000 | $ 123,065,000 |

[1]    See MOMRESP_00083487.
[2]    See MOMRESP_00119375.
[3]    See MOMRESP_00080952.
[4]    See MOMRESP_00080351.
[5]    See MOMRESP_00080495.
[6]    See Decl. of C. Lu ISO Receiver App., Exhibits 2-3.
[7]    See MOMRESP_00119375, Tesoro $39M loan less $27.6M of the Loancore refinance.

**Mohammad Honarkar v. Mahender Makhijani et al.**

Loss of Monetary Value in Tesoro Redlands, LLC

| Loss of Monetary Value in Tesoro Redlands, LLC | | | | | |
|---|---|---|---|---|---|
| Property | Buyer | Date | Proposed Sale Amount [1] | DLOC and DLOM [2] | Value due to DLOC and DLOM |
| Tesoro Redlands, LLC | Interest Capital Group | 2/23/2022 $ | 67,680,000 | 25% $ | 16,920,000 |

[1] See MOMRESP_00058018.

[2] See https://www.bvresources.com/articles/bvwire/dloc-and-dlom-for-real-estate-entities-153-1 and https://eqvista.com/company-valuation/discount-for-lack-of-control/.

**Mohammad Honarkar v. Mahender Makhijani et al.**

Late Fees and Penalties | Property Tax
Source: HONARKAR-186618 (Past Due Secured Property Taxes 2022-2024 as of 05.09.2024.pdf)

| Property Name | Property Tax | Parcel # | 2022-2023 | | | | | 2023-2024 | | | | Total Past-due Amount for 2022-2024 as of 5/9/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1st Installment Due Date | | 2nd Installment Due Date | | | 1st Installment Due Date | | 2nd Installment Due Date | | |
| | | | 12/10/2022 | 1st Installment-Late Fee | 4/10/2023 | 2nd Installment-Late Fee | Penalties | 12/11/2023 | 1st Installment-Late Fee | 4/10/2023 | 2nd Installment-Late Fee | |
| 694 NCH Apartments | 1 Parcel | 496-132-12 | 24,894.66 | 2,489.47 | 24,894.66 | 2,489.47 | 8,253.13 | 25,455.83 | 2,545.58 | 25,455.83 | 2,568.58 | 91,022.80 |
| 777 at Laguna | 1 Parcel | 641-241-12 | - | - | - | - | | 24,903.32 | 2,490.33 | 24,903.32 | 2,513.33 | 27,393.65 |
| 777 at Laguna | 1 Parcel - Parking Lot | 641-231-03 | | | | | | 6,425.29 | 642.53 | 6,425.29 | 665.52 | 7,067.82 |
| Duplex at Sleepy Hollow | 1 Parcel | 644-022-11 | 12,904.46 | 1,290.45 | 12,904.46 | 1,290.45 | 4,296.43 | 13,202.92 | 1,320.29 | 13,202.92 | 1,343.29 | 47,209.45 |
| Heisler Laguna | 7 Parcels - 397 | 496-082-01 | 17,385.99 | 1,738.60 | 17,385.99 | 1,738.60 | 5,775.27 | 18,028.43 | 1,802.84 | 18,028.43 | 1,825.84 | 63,855.72 |
| | 385 NCH | 496-082-02 | 11,452.16 | 1,145.22 | 11,452.16 | 1,145.22 | 3,817.16 | 11,688.18 | 1,168.82 | 11,688.18 | 1,191.81 | 41,868.91 |
| | 369 NCH | 496-082-03 | 8,439.04 | 843.90 | 8,439.04 | 843.90 | 2,822.87 | 8,612.90 | 861.29 | 8,612.90 | 884.29 | 30,862.95 |
| | 353 NCH | 496-082-04 | 18,218.29 | 1,821.83 | 18,218.29 | 1,821.83 | 6,049.94 | 18,583.63 | 1,858.36 | 18,583.63 | 1,881.36 | 66,572.17 |
| | 345 NCH | 496-082-05 | | - | 19,440.06 | 1,944.01 | 3,245.60 | 19,828.76 | 1,982.88 | 19,828.76 | 2,005.87 | 46,441.30 |
| | 331 NCH | 496-082-06 | | - | 20,803.12 | 2,080.31 | 3,470.44 | 19,320.40 | 1,932.04 | 19,320.40 | 1,955.04 | 47,606.31 |
| | 305 NCH | 496-082-07 | | - | 48,035.73 | 4,803.57 | 7,963.83 | 48,988.30 | 4,898.83 | 48,988.30 | 4,921.83 | 114,690.26 |
| Laguna Art District | 1 Parcel | 641-231-15 | | - | | | | 5,346.66 | 534.67 | 5,346.66 | 557.66 | 5,881.33 |
| Laguna Festival Center | 1 Parcel | 641-231-13 | | - | - | - | | 61,789.08 | 6,178.91 | 61,789.08 | 6,201.90 | 67,967.99 |
| Cliff Drive | 3 Parcels | 932-750-09 | 10,275.25 | 1,027.53 | 10,275.25 | 1,027.53 | 3,428.75 | 10,502.33 | 1,050.23 | 10,502.33 | 1,073.23 | 37,586.86 |
| | | 932-750-11 | 10,275.25 | 1,027.53 | 10,275.25 | 1,027.53 | 3,428.75 | 10,502.33 | 1,050.23 | 10,502.33 | 1,073.23 | 37,586.86 |
| | | 932-750-12 | 13,004.63 | 1,300.46 | 13,004.63 | 1,300.46 | 4,329.43 | 13,326.83 | 1,332.68 | 13,326.83 | 1,355.68 | 47,599.13 |
| Retreat at Laguna Villas | 1 Parcel | 644-023-12 | 39,680.68 | 3,968.07 | 39,680.68 | 3,968.07 | 13,132.62 | 40,553.26 | 4,055.33 | 40,553.26 | 4,078.32 | 145,038.70 |
| Sunset Cove | 1 Parcel | 644-022-10 | 64,840.73 | 6,484.07 | 64,840.73 | 6,484.07 | 21,435.42 | 82,049.62 | 8,204.96 | 82,049.62 | 8,227.96 | 254,339.61 |
| 837 Park Avenue | 1 Parcel | 644-111-55 | 3,088.56 | 308.86 | 3,088.56 | 308.86 | 1,057.15 | 3,160.19 | 316.02 | 3,160.19 | 339.01 | 11,328.19 |
| 891 Laguna Canyon | 1 Parcel | 641-231-07 | | - | - | - | | 34,124.73 | 3,412.47 | 34,124.73 | 3,435.47 | 37,537.20 |
| Tesoro Redlands | 1 Parcel | 0167-151-24-000 | 188,979.87 | 31,181.68 | 188,979.87 | 31,181.68 | 37,820.98 | 191,740.49 | 19174.049 | 191,740.49 | 19,184.05 | 689,058.62 |
| | | | $ 423,439.57 | $ 54,627.65 | $ 511,718.48 | $ 63,455.54 | $ 130,327.77 | $ 668,133.48 | $ 66,813.35 | $ 668,133.48 | $ 67,283.27 | $ 1,918,515.84 |

Total Late Fees and Penalties $ 382,508

# APPENDICES

## Mohammad Honarkar v. Mahender Makhijani et al.
**Materials Considered**

**Pleadings, Depositions, and Deposition Exhibits:**
First Amended Statement of Claim filed October 13, 2023
2023-05-03 [002] Complaint
2023.05.17 066 REVISED RJN ISO Receiver App
2024-01-19 Respondents Return to Writ (002)
2023-05-17 [068] REVISED Receiver Ex Parte Application
2023-05-17 [071] REVISED Decl. of C. Lu ISO Receiver App
2023-05-17 [072] REVISED Decl. of D. Stapleton ISO Receiver App
2023-05-17 [073] REVISED Decl. of J. Ybarra ISO Receiver App
2023-05-17 [074] REVISED Decl. of M. Honarkar ISO Receiver App
2023-05-17 [075] REVISED Decl. of M. Hope ISO Receiver App
2023-05-17 [076] REVISED Decl. of N. Gholizadeh ISO Receiver App
2023-05-17 [077] REVISED Decl. of S. Maralan ISO Receiver App
2023-05-17 [068] REVISED Receiver Ex Parte Application
2023-05-17 [071] REVISED Decl. of C. Lu ISO Receiver App
2023-05-17 [072] REVISED Decl. of D. Stapleton ISO Receiver App
2023-05-17 [073] REVISED Decl. of J. Ybarra ISO Receiver App
2023-05-17 [074] REVISED Decl. of M. Honarkar ISO Receiver App
2023-05-17 [075] REVISED Decl. of M. Hope ISO Receiver App
2023-05-17 [076] REVISED Decl. of N. Gholizadeh ISO Receiver App
2023-05-17 [077] REVISED Decl. of S. Maralan ISO Receiver App
2024-01-19 Respondents Return to Writ
Michael Kluchin Deposition (Superior Court of the State of California for the County
of Orange, Central Justice Center, Case No.
30-2023-01322886-CU-OR-CJC), June 16, 2023 and Exhibits


**Other Documents Considered:**
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BPM_MOM
BRILEYFIN_000001
BRILEYFIN_000007
BRILEYFIN_000008
BRILEYFIN_000009
BRILEYFIN_000013
BRILEYFIN_000020
BRILEYFIN_000021
BRILEYFIN_000022
BRILEYFIN_000027
BRILEYFIN_000031
BRILEYFIN_000035
BRILEYFIN_000039
BRILEYFIN_000043
BRILEYFIN_000044
BRILEYFIN_000048
BRILEYFIN_000052
BRILEYFIN_000053

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

BRILEYFIN_000058
BRILEYFIN_000059
BRILEYFIN_000065
BRILEYFIN_000069
BRILEYFIN_000074
BRILEYFIN_000079
BRILEYFIN_000084
BRILEYFIN_000090
BRILEYFIN_000091
BRILEYFIN_000092
BRILEYFIN_000098
BRILEYFIN_000104
BRILEYFIN_000105
BRILEYFIN_000106
BRILEYFIN_000109
BRILEYFIN_000110
BRILEYFIN_000111
BRILEYFIN_000116
BRILEYFIN_000121
BRILEYFIN_000122
BRILEYFIN_000124
BRILEYFIN_000125
BRILEYFIN_000126
BRILEYFIN_000130
BRILEYFIN_000134
BRILEYFIN_000136
BRILEYFIN_000138
BRILEYFIN_000139
BRILEYFIN_000140
BRILEYFIN_000141
BRILEYFIN_000143
BRILEYFIN_000145
BRILEYFIN_000146
BRILEYFIN_000147
BRILEYFIN_000148
BRILEYFIN_000149
BRILEYFIN_000151
BRILEYFIN_000153
BRILEYFIN_000154
BRILEYFIN_000156
BRILEYFIN_000157
BRILEYFIN_000160
BRILEYFIN_000161
BRILEYFIN_000162
BRILEYFIN_000164
BRILEYFIN_000165
BRILEYFIN_000166
BRILEYFIN_000167
BRILEYFIN_000168
BRILEYFIN_000169
BRILEYFIN_000170
BRILEYFIN_000172
BRILEYFIN_000173
BRILEYFIN_000174
BRILEYFIN_000175
BRILEYFIN_000180

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

BRILEYFIN_000182
BRILEYFIN_000188
BRILEYFIN_000190
BRILEYFIN_000191
BRILEYFIN_000192
BRILEYFIN_000194
BRILEYFIN_000195
BRILEYFIN_000196
BRILEYFIN_000198
BRILEYFIN_000200
BRILEYFIN_000201
BRILEYFIN_000202
BRILEYFIN_000203
BRILEYFIN_000204
BRILEYFIN_000206
BRILEYFIN_000207
BRILEYFIN_000208
BRILEYFIN_000209
BRILEYFIN_000210
BRILEYFIN_000212
BRILEYFIN_000213
BRILEYFIN_000214
BRILEYFIN_000215
BRILEYFIN_000217
BRILEYFIN_000218
BRILEYFIN_000219
BRILEYFIN_000220
BRILEYFIN_000221
BRILEYFIN_000222
BRILEYFIN_000223
BRILEYFIN_000224
BRILEYFIN_000225
BRILEYFIN_000226
BRILEYFIN_000227
BRILEYFIN_000228
BRILEYFIN_000229
BRILEYFIN_000230
BRILEYFIN_000231
BRILEYFIN_000232
BRILEYFIN_000233
BRILEYFIN_000234
BRILEYFIN_000235
BRILEYFIN_000236
BRILEYFIN_000237
BRILEYFIN_000238
BRILEYFIN_000239
BRILEYFIN_000240
BRILEYFIN_000241
BRILEYFIN_000242
BRILEYFIN_000243
BRILEYFIN_000244
BRILEYFIN_000245
BRILEYFIN_000246
BRILEYFIN_000247
BRILEYFIN_000248
BRILEYFIN_000249

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

BRILEYFIN_000250
BRILEYFIN_000251
BRILEYFIN_000252
BRILEYFIN_000253
BRILEYFIN_000254
BRILEYFIN_000255
BRILEYFIN_000256
BRILEYFIN_000258
BRILEYFIN_000259
BRILEYFIN_000260
BRILEYFIN_000261
BRILEYFIN_000262
BRILEYFIN_000263
BRILEYFIN_000264
BRILEYFIN_000265
BRILEYFIN_000266
BRILEYFIN_000267
BRILEYFIN_000268
BRILEYFIN_000269
BRILEYFIN_000270
BRILEYFIN_000271
BRILEYFIN_000272
BRILEYFIN_000273
BRILEYFIN_000274
BRILEYFIN_000275
BRILEYFIN_000276
BRILEYFIN_000277
BRILEYFIN_000278
BRILEYFIN_000279
BRILEYFIN_000280
BRILEYFIN_000281
BRILEYFIN_000282
BRILEYFIN_000283
BRILEYFIN_000284
BRILEYFIN_000285
BRILEYFIN_000286
BRILEYFIN_000287
BRILEYFIN_000288
BRILEYFIN_000289
BRILEYFIN_000290
BRILEYFIN_000291
BRILEYFIN_000292
BRILEYFIN_000293
BRILEYFIN_000294
BRILEYFIN_000295
BRILEYFIN_000296
BRILEYFIN_000297
BRILEYFIN_000298
BRILEYFIN_000299
BRILEYFIN_000301
BRILEYFIN_000302
BRILEYFIN_000303
BRILEYFIN_000304
BRILEYFIN_000305
BRILEYFIN_000306
BRILEYFIN_000307

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

BRILEYFIN_000308
BRILEYFIN_000309
BRILEYFIN_000310
BRILEYFIN_000311
BRILEYFIN_000312
BRILEYFIN_000313
BRILEYFIN_000314
BRILEYFIN_000315
BRILEYFIN_000316
BRILEYFIN_000317
BRILEYFIN_000318
BRILEYFIN_000319
BRILEYFIN_000320
BRILEYFIN_000321
BRILEYFIN_000322
BRILEYFIN_000323
BRILEYFIN_000324
BRILEYFIN_000325
BRILEYFIN_000326
BRILEYFIN_000327
BRILEYFIN_000328
BRILEYFIN_000329
BRILEYFIN_000330
BRILEYFIN_000331
BRILEYFIN_000332
BRILEYFIN_000333
BRILEYFIN_000334
BRILEYFIN_000335
BRILEYFIN_000337
BRILEYFIN_000343
BRILEYFIN_000344
BRILEYFIN_000348
BRILEYFIN_000354
BRILEYFIN_000360
BRILEYFIN_000366
BRILEYFIN_000372
BRILEYFIN_000378
BRILEYFIN_000381
BRILEYFIN_000387
BRILEYFIN_000391
BRILEYFIN_000396
BRILEYFIN_000401
BRILEYFIN_000404
BRILEYFIN_000410
BRILEYFIN_000413
BRILEYFIN_000419
BRILEYFIN_000425
BRILEYFIN_000428
BRILEYFIN_000431
BRILEYFIN_000435
BRILEYFIN_000438
BRILEYFIN_000444
BRILEYFIN_000451
BRILEYFIN_000458
BRILEYFIN_000459
BRILEYFIN_000462

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

BRILEYFIN_000464
BRILEYFIN_000465
BRILEYFIN_000466
BRILEYFIN_000468
BRILEYFIN_000470
BRILEYFIN_000472
BRILEYFIN_000474
BRILEYFIN_000476
BRILEYFIN_000477
BRILEYFIN_000478
BRILEYFIN_000480
BRILEYFIN_000481
BRILEYFIN_000482
BRILEYFIN_000484
BRILEYFIN_000486
BRILEYFIN_000487
BRILEYFIN_000488
BRILEYFIN_000489
BRILEYFIN_000490
Exhibit 1 to MOM Entities' Responses to Honarkar's Interrogatories, April 19, 2024
HONARKAR-003580
HONARKAR-029478 - MOM CA Investco, LLC 2021 K1
HONARKAR-147254 - Letter to Nano Banc from Halpern May Ybarra Gelberg, dated August 28, 2023
HONARKAR-155510 - Val-Chris Investments appraisal of Tustin Retail Properties from 8/15/18
HONARKAR-186618 - Past Due Secured Property Taxes 2022-2024 as of 05.09.2024
MOM_0000001
MOM_0000012
MOM_0000023
MOM_0000034
MOM_0000045
MOM_0000056
MOM_0000067
MOM_0000078
MOM_0000089
MOM_0000100
MOM_0000114
MOM_0000125
MOM_0000139
MOM_0000150
MOM_0000164
MOM_0000178
MOM_0000192
MOM_0000206
MOM_0000220
MOM_0000234
MOM_0000248
MOM_0000259
MOM_0000267
MOM_0000269
MOM_0000270
MOM_0000273
MOM_0000275
MOM_0000276
MOM_0000279
MOM_0000281
MOM_0000282

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOM_0000285
MOM_0000285
MOM_0000286
MOM_0000290
MOM_0000294
MOM_0000298
MOM_0000302
MOM_0000306
MOM_0000310
MOM_0000314
MOM_0000318
MOM_0000322
MOM_0000326
MOM_0000330
MOM_0000334
MOM_0000338
MOM_0000342
MOM_0000346
MOM_0000350
MOM_0000354
MOM_0000358
MOM_0000362
MOM_0000366
MOM_0000370
MOM_0000371
MOM_0000492
MOM_0000496
MOM_0000501
MOM_0000531
MOM_0000532
MOM_0000533
MOM_0000546
MOM_0000547
MOM_0000549
MOM_0000551
MOM_0000552
MOM_0000554
MOM_0000558
MOM_0000560
MOM_0000563
MOM_0000564
MOM_0000575
MOM_0000580
MOM_0000585
MOM_0000639
MOM_0000640
MOM_0000641
MOM_0000655
MOM_0000656
MOM_0000658
MOM_0000660
MOM_0000661
MOM_0000663
MOM_0000667
MOM_0000669
MOM_0000672

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOM_0000673
MOM_0000684
MOM_0000689
MOM_0000702
MOM_0000715
MOM_0000728
MOM_0000741
MOM_0000755
MOM_0000811
MOM_0000824
MOM_0000828
MOM_0000857
MOM_0000858
MOM_0000859
MOM_0000872
MOM_0000873
MOM_0000875
MOM_0000877
MOM_0000878
MOM_0000880
MOM_0000884
MOM_0000886
MOM_0000889
MOM_0000890
MOM_0000901
MOM_0000906
MOM_0000911
MOM_0000943
MOM_0000944
MOM_0000945
MOM_0000958
MOM_0000959
MOM_0000960
MOM_0000962
MOM_0000964
MOM_0000965
MOM_0000967
MOM_0000971
MOM_0000974
MOM_0000977
MOM_0000978
MOM_0000989
MOM_0000994
MOM_0000999
MOM_0001029
MOM_0001030
MOM_0001031
MOM_0001044
MOM_0001045
MOM_0001047
MOM_0001049
MOM_0001050
MOM_0001052
MOM_0001056
MOM_0001058
MOM_0001061

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOM_0001062
MOM_0001073
MOM_0001078
MOM_0001083
MOM_0001113
MOM_0001114
MOM_0001115
MOM_0001128
MOM_0001129
MOM_0001131
MOM_0001133
MOM_0001134
MOM_0001140
MOM_0001142
MOM_0001145
MOM_0001146
MOM_0001157
MOM_0001162
MOM_0001163
MOM_0001164
MOM_0001165
MOM_0001166
MOM_0001167
MOM_0001168
MOM_0001172
MOM_0001293
MOM_0001295
MOM_0001297
MOM_0001353
MOM_0001409
MOM_0001411
MOM_0001414
MOM_0001422
MOM_0001424
MOM_0001430
MOM_0001436
MOM_0001442
MOM_0001448
MOM_0001454
MOM_0001460
MOM_0001466
MOM_0001470
MOM_0001472
MOM_0001476
MOM_0001481
MOM_0001483
MOM_0001493
MOM_0001500
MOM_0001570
MOM_0001572
MOM_0001590
MOM_0001609
MOMCAGRP0004360
MOMCAGRP0004972
MOMCAGRP0004980
MOMRESP_00000001-MOMRESP_00000011

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00000012-MOMRESP_00000022
MOMRESP_00000023-MOMRESP_00000033
MOMRESP_00000034-MOMRESP_00000044
MOMRESP_00000045-MOMRESP_00000055
MOMRESP_00000056-MOMRESP_00000066
MOMRESP_00000067-MOMRESP_00000077
MOMRESP_00000078-MOMRESP_00000088
MOMRESP_00000089-MOMRESP_00000099
MOMRESP_00000100-MOMRESP_00000113
MOMRESP_00000114-MOMRESP_00000124
MOMRESP_00000125-MOMRESP_00000138
MOMRESP_00000139-MOMRESP_00000149
MOMRESP_00000150-MOMRESP_00000163
MOMRESP_00000164-MOMRESP_00000177
MOMRESP_00000178-MOMRESP_00000191
MOMRESP_00000192-MOMRESP_00000205
MOMRESP_00000206-MOMRESP_00000219
MOMRESP_00000220-MOMRESP_00000233
MOMRESP_00000234-MOMRESP_00000247
MOMRESP_00000248-MOMRESP_00000258
MOMRESP_00000259-MOMRESP_00000266
MOMRESP_00000267-MOMRESP_00000296
MOMRESP_00000297-MOMRESP_00000309
MOMRESP_00000310-MOMRESP_00000320
MOMRESP_00000321-MOMRESP_00000374
MOMRESP_00000375-MOMRESP_00000388
MOMRESP_00000389-MOMRESP_00000399
MOMRESP_00000400-MOMRESP_00000412
MOMRESP_00000413-MOMRESP_00000441
MOMRESP_00000442-MOMRESP_00000452
MOMRESP_00000453-MOMRESP_00000455
MOMRESP_00000456-MOMRESP_00000468
MOMRESP_00000469-MOMRESP_00000500
MOMRESP_00000501-MOMRESP_00000511
MOMRESP_00000512-MOMRESP_00000524
MOMRESP_00000525-MOMRESP_00000535
MOMRESP_00000536-MOMRESP_00000565
MOMRESP_00000566-MOMRESP_00000578
MOMRESP_00000579-MOMRESP_00000589
MOMRESP_00000590-MOMRESP_00000619
MOMRESP_00000620-MOMRESP_00000740
MOMRESP_00000741-MOMRESP_00000861
MOMRESP_00000862-MOMRESP_00000867
MOMRESP_00000868-MOMRESP_00000873
MOMRESP_00000874-MOMRESP_00000879
MOMRESP_00000880-MOMRESP_00000885
MOMRESP_00000886-MOMRESP_00000891
MOMRESP_00000892-MOMRESP_00000897
MOMRESP_00000898-MOMRESP_00000903
MOMRESP_00000904-MOMRESP_00000907
MOMRESP_00000908-MOMRESP_00000925
MOMRESP_00000926-MOMRESP_00000944
MOMRESP_00000945-MOMRESP_00000948
MOMRESP_00000949-MOMRESP_00000952
MOMRESP_00000953-MOMRESP_00000956
MOMRESP_00000957-MOMRESP_00000960

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00000961-MOMRESP_00000964
MOMRESP_00000965-MOMRESP_00000968
MOMRESP_00000969-MOMRESP_00000972
MOMRESP_00000973-MOMRESP_00000976
MOMRESP_00000977-MOMRESP_00000980
MOMRESP_00000981-MOMRESP_00000984
MOMRESP_00000985-MOMRESP_00000988
MOMRESP_00000989-MOMRESP_00000992
MOMRESP_00000993-MOMRESP_00000996
MOMRESP_00000997-MOMRESP_00001000
MOMRESP_00001001-MOMRESP_00001004
MOMRESP_00001005-MOMRESP_00001008
MOMRESP_00001009-MOMRESP_00001012
MOMRESP_00001013-MOMRESP_00001016
MOMRESP_00001017-MOMRESP_00001020
MOMRESP_00001021-MOMRESP_00001024
MOMRESP_00001025-MOMRESP_00001028
MOMRESP_00001029-MOMRESP_00001030
MOMRESP_00001031
MOMRESP_00001032-MOMRESP_00001034
MOMRESP_00001035-MOMRESP_00001036
MOMRESP_00001037
MOMRESP_00001041-MOMRESP_00001042
MOMRESP_00001043
MOMRESP_00001104
MOMRESP_00001229
MOMRESP_00001410
MOMRESP_00001917
MOMRESP_00002271
MOMRESP_00002272-MOMRESP_00002276
MOMRESP_00002277
MOMRESP_00002278
MOMRESP_00002279
MOMRESP_00002280-MOMRESP_00002281
MOMRESP_00002282-MOMRESP_00002283
MOMRESP_00002284
MOMRESP_00002285-MOMRESP_00002286
MOMRESP_00002287-MOMRESP_00002290
MOMRESP_00002291-MOMRESP_00002292
MOMRESP_00002293-MOMRESP_00002295
MOMRESP_00002296
MOMRESP_00002297-MOMRESP_00002301
MOMRESP_00002302-MOMRESP_00002306
MOMRESP_00002307
MOMRESP_00002308
MOMRESP_00002309
MOMRESP_00002310-MOMRESP_00002311
MOMRESP_00002312-MOMRESP_00002313
MOMRESP_00002314
MOMRESP_00002315-MOMRESP_00002316
MOMRESP_00002317-MOMRESP_00002320
MOMRESP_00002321-MOMRESP_00002322
MOMRESP_00002323-MOMRESP_00002325
MOMRESP_00002326
MOMRESP_00002327-MOMRESP_00002331
MOMRESP_00002332-MOMRESP_00002344

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00002345-MOMRESP_00002357
MOMRESP_00002358-MOMRESP_00002370
MOMRESP_00002371-MOMRESP_00002383
MOMRESP_00002384-MOMRESP_00002397
MOMRESP_00002398-MOMRESP_00002453
MOMRESP_00002454-MOMRESP_00002466
MOMRESP_00002467-MOMRESP_00002470
MOMRESP_00002471
MOMRESP_00002472
MOMRESP_00002473
MOMRESP_00002474-MOMRESP_00002475
MOMRESP_00002476-MOMRESP_00002477
MOMRESP_00002478
MOMRESP_00002479-MOMRESP_00002480
MOMRESP_00002481-MOMRESP_00002484
MOMRESP_00002485-MOMRESP_00002486
MOMRESP_00002487-MOMRESP_00002489
MOMRESP_00002490
MOMRESP_00002491-MOMRESP_00002495
MOMRESP_00002496-MOMRESP_00002500
MOMRESP_00002501
MOMRESP_00002502
MOMRESP_00002503
MOMRESP_00002504
MOMRESP_00002505-MOMRESP_00002506
MOMRESP_00002507-MOMRESP_00002508
MOMRESP_00002509
MOMRESP_00002510-MOMRESP_00002511
MOMRESP_00002512-MOMRESP_00002515
MOMRESP_00002516-MOMRESP_00002518
MOMRESP_00002519-MOMRESP_00002521
MOMRESP_00002522
MOMRESP_00002523-MOMRESP_00002527
MOMRESP_00002528-MOMRESP_00002532
MOMRESP_00002533
MOMRESP_00002534
MOMRESP_00002535
MOMRESP_00002536-MOMRESP_00002537
MOMRESP_00002538-MOMRESP_00002539
MOMRESP_00002540
MOMRESP_00002541-MOMRESP_00002542
MOMRESP_00002543-MOMRESP_00002546
MOMRESP_00002547-MOMRESP_00002548
MOMRESP_00002549-MOMRESP_00002551
MOMRESP_00002552
MOMRESP_00002553-MOMRESP_00002557
MOMRESP_00002558-MOMRESP_00002562
MOMRESP_00002563
MOMRESP_00002564
MOMRESP_00002565
MOMRESP_00002566-MOMRESP_00002567
MOMRESP_00002568-MOMRESP_00002569
MOMRESP_00002570
MOMRESP_00002571-MOMRESP_00002576
MOMRESP_00002577-MOMRESP_00002578
MOMRESP_00002579-MOMRESP_00002581

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00002582
MOMRESP_00002583-MOMRESP_00002587
MOMRESP_00002588
MOMRESP_00002589
MOMRESP_00002590
MOMRESP_00002591
MOMRESP_00002592
MOMRESP_00002593
MOMRESP_00002594-MOMRESP_00002597
MOMRESP_00002598-MOMRESP_00002599
MOMRESP_00002600-MOMRESP_00002601
MOMRESP_00002602-MOMRESP_00002657
MOMRESP_00002658-MOMRESP_00002713
MOMRESP_00002714-MOMRESP_00002715
MOMRESP_00002716-MOMRESP_00002718
MOMRESP_00002719-MOMRESP_00002726
MOMRESP_00002727-MOMRESP_00002728
MOMRESP_00002729-MOMRESP_00002732
MOMRESP_00002733-MOMRESP_00002734
MOMRESP_00002735-MOMRESP_00002738
MOMRESP_00002739-MOMRESP_00002743
MOMRESP_00002744-MOMRESP_00002745
MOMRESP_00002746-MOMRESP_00002755
MOMRESP_00002756-MOMRESP_00002762
MOMRESP_00002763-MOMRESP_00002832
MOMRESP_00002833
MOMRESP_00002833-MOMRESP_00002834
MOMRESP_00002835
MOMRESP_00004289
MOMRESP_00004290
MOMRESP_00004291
MOMRESP_00004292
MOMRESP_00004293
MOMRESP_00004294
MOMRESP_00004295
MOMRESP_00004296
MOMRESP_00004297
MOMRESP_00004298-MOMRESP_00004299
MOMRESP_00004300-MOMRESP_00004302
MOMRESP_00004303-MOMRESP_00004305
MOMRESP_00004306-MOMRESP_00004309
MOMRESP_00004310-MOMRESP_00004321
MOMRESP_00004322
MOMRESP_00004323-MOMRESP_00004324
MOMRESP_00004325
MOMRESP_00004326-MOMRESP_00004329
MOMRESP_00004330
MOMRESP_00004331-MOMRESP_00004332
MOMRESP_00004333-MOMRESP_00004334
MOMRESP_00004335-MOMRESP_00004337
MOMRESP_00004338
MOMRESP_00004339-MOMRESP_00004341
MOMRESP_00004342
MOMRESP_00004343-MOMRESP_00004345
MOMRESP_00004346-MOMRESP_00004349
MOMRESP_00004350

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00004351-MOMRESP_00004354
MOMRESP_00004355
MOMRESP_00004356-MOMRESP_00004360
MOMRESP_00004361-MOMRESP_00004365
MOMRESP_00004366-MOMRESP_00004368
MOMRESP_00004369
MOMRESP_00004370-MOMRESP_00004373
MOMRESP_00004374-MOMRESP_00004386
MOMRESP_00004387-MOMRESP_00004396
MOMRESP_00004397-MOMRESP_00004400
MOMRESP_00004401-MOMRESP_00004402
MOMRESP_00004403
MOMRESP_00004404-MOMRESP_00004407
MOMRESP_00004408
MOMRESP_00004409-MOMRESP_00004413
MOMRESP_00004414-MOMRESP_00004420
MOMRESP_00004421
MOMRESP_00004422-MOMRESP_00004425
MOMRESP_00004426-MOMRESP_00004432
MOMRESP_00004433-MOMRESP_00004439
MOMRESP_00004440-MOMRESP_00004443
MOMRESP_00004444-MOMRESP_00004445
MOMRESP_00004446-MOMRESP_00004451
MOMRESP_00004452-MOMRESP_00004456
MOMRESP_00004457-MOMRESP_00004463
MOMRESP_00004464-MOMRESP_00004466
MOMRESP_00004467-MOMRESP_00004471
MOMRESP_00004472-MOMRESP_00004477
MOMRESP_00004478-MOMRESP_00004481
MOMRESP_00004482
MOMRESP_00004483-MOMRESP_00004486
MOMRESP_00004487-MOMRESP_00004490
MOMRESP_00004491-MOMRESP_00004503
MOMRESP_00004504-MOMRESP_00004512
MOMRESP_00004513
MOMRESP_00004514-MOMRESP_00004518
MOMRESP_00004519-MOMRESP_00004525
MOMRESP_00004526-MOMRESP_00004531
MOMRESP_00004532-MOMRESP_00004540
MOMRESP_00004541
MOMRESP_00004542-MOMRESP_00004543
MOMRESP_00004544-MOMRESP_00004551
MOMRESP_00004552-MOMRESP_00004556
MOMRESP_00004557
MOMRESP_00004558-MOMRESP_00004561
MOMRESP_00004562-MOMRESP_00004565
MOMRESP_00004566-MOMRESP_00004571
MOMRESP_00004572-MOMRESP_00004578
MOMRESP_00004579-MOMRESP_00004583
MOMRESP_00004584-MOMRESP_00004588
MOMRESP_00004589-MOMRESP_00004593
MOMRESP_00004594-MOMRESP_00004598
MOMRESP_00004599
MOMRESP_00004600
MOMRESP_00004601
MOMRESP_00004602

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**
MOMRESP_00004603
MOMRESP_00004604
MOMRESP_00004605
MOMRESP_00004606
MOMRESP_00004607
MOMRESP_00004608
MOMRESP_00004609
MOMRESP_00004610
MOMRESP_00004611
MOMRESP_00004612
MOMRESP_00004613
MOMRESP_00004614
MOMRESP_00004615
MOMRESP_00004616
MOMRESP_00004617
MOMRESP_00004618
MOMRESP_00004619
MOMRESP_00004620
MOMRESP_00004621-MOMRESP_00004989
MOMRESP_00004990
MOMRESP_00004991
MOMRESP_00004992
MOMRESP_00004993
MOMRESP_00004994
MOMRESP_00004995
MOMRESP_00004996
MOMRESP_00004997
MOMRESP_00004998
MOMRESP_00004999
MOMRESP_00005000
MOMRESP_00005001
MOMRESP_00005002
MOMRESP_00005003
MOMRESP_00005004
MOMRESP_00005005
MOMRESP_00005006
MOMRESP_00005007
MOMRESP_00005008
MOMRESP_00005009
MOMRESP_00005010-MOMRESP_00005442
MOMRESP_00005443
MOMRESP_00005444
MOMRESP_00005445
MOMRESP_00005446
MOMRESP_00005447
MOMRESP_00005448
MOMRESP_00005449
MOMRESP_00005450
MOMRESP_00005451
MOMRESP_00005452
MOMRESP_00005453
MOMRESP_00005454
MOMRESP_00005455
MOMRESP_00005456
MOMRESP_00005457
MOMRESP_00005458

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00005459
MOMRESP_00005460
MOMRESP_00005461-MOMRESP_00005996
MOMRESP_00005997
MOMRESP_00005998
MOMRESP_00005999
MOMRESP_00006000
MOMRESP_00006001
MOMRESP_00006002
MOMRESP_00006003
MOMRESP_00006004
MOMRESP_00006005
MOMRESP_00006006
MOMRESP_00006007
MOMRESP_00006008
MOMRESP_00006009
MOMRESP_00006010
MOMRESP_00006011
MOMRESP_00006012
MOMRESP_00006013
MOMRESP_00006014
MOMRESP_00006015
MOMRESP_00006016
MOMRESP_00006017
MOMRESP_00006018
MOMRESP_00006019
MOMRESP_00006020
MOMRESP_00006021
MOMRESP_00006022
MOMRESP_00006023
MOMRESP_00006024
MOMRESP_00006025
MOMRESP_00006026
MOMRESP_00006027
MOMRESP_00006028
MOMRESP_00006029
MOMRESP_00006030
MOMRESP_00006031
MOMRESP_00006032
MOMRESP_00006033
MOMRESP_00006034
MOMRESP_00006035
MOMRESP_00006036
MOMRESP_00006037
MOMRESP_00006038
MOMRESP_00006039
MOMRESP_00006040
MOMRESP_00006041
MOMRESP_00006042
MOMRESP_00006043
MOMRESP_00006044
MOMRESP_00006045
MOMRESP_00006046
MOMRESP_00006047
MOMRESP_00006048
MOMRESP_00006049

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006050
MOMRESP_00006051
MOMRESP_00006052
MOMRESP_00006053
MOMRESP_00006054
MOMRESP_00006055
MOMRESP_00006056
MOMRESP_00006057
MOMRESP_00006058
MOMRESP_00006059
MOMRESP_00006060
MOMRESP_00006061
MOMRESP_00006062
MOMRESP_00006063
MOMRESP_00006064
MOMRESP_00006065
MOMRESP_00006066
MOMRESP_00006067
MOMRESP_00006068
MOMRESP_00006069
MOMRESP_00006070
MOMRESP_00006071
MOMRESP_00006072
MOMRESP_00006073
MOMRESP_00006074
MOMRESP_00006075
MOMRESP_00006076
MOMRESP_00006077
MOMRESP_00006078
MOMRESP_00006079
MOMRESP_00006080
MOMRESP_00006081
MOMRESP_00006082
MOMRESP_00006083
MOMRESP_00006084
MOMRESP_00006085
MOMRESP_00006086
MOMRESP_00006087
MOMRESP_00006088
MOMRESP_00006089
MOMRESP_00006090
MOMRESP_00006091
MOMRESP_00006092
MOMRESP_00006093
MOMRESP_00006094
MOMRESP_00006095
MOMRESP_00006096
MOMRESP_00006097
MOMRESP_00006098
MOMRESP_00006099
MOMRESP_00006100
MOMRESP_00006101
MOMRESP_00006102
MOMRESP_00006103
MOMRESP_00006104
MOMRESP_00006105

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006106
MOMRESP_00006107
MOMRESP_00006108
MOMRESP_00006109
MOMRESP_00006110
MOMRESP_00006111
MOMRESP_00006112
MOMRESP_00006113
MOMRESP_00006114
MOMRESP_00006115
MOMRESP_00006116
MOMRESP_00006117
MOMRESP_00006118
MOMRESP_00006119
MOMRESP_00006120
MOMRESP_00006121
MOMRESP_00006122
MOMRESP_00006123
MOMRESP_00006124
MOMRESP_00006125
MOMRESP_00006126
MOMRESP_00006127
MOMRESP_00006128
MOMRESP_00006129
MOMRESP_00006130
MOMRESP_00006131
MOMRESP_00006132
MOMRESP_00006133
MOMRESP_00006134
MOMRESP_00006135
MOMRESP_00006136
MOMRESP_00006137
MOMRESP_00006138
MOMRESP_00006139
MOMRESP_00006140
MOMRESP_00006141
MOMRESP_00006142
MOMRESP_00006143
MOMRESP_00006144
MOMRESP_00006145
MOMRESP_00006146
MOMRESP_00006147
MOMRESP_00006148
MOMRESP_00006149
MOMRESP_00006150
MOMRESP_00006151
MOMRESP_00006152
MOMRESP_00006153
MOMRESP_00006154
MOMRESP_00006155
MOMRESP_00006156
MOMRESP_00006157
MOMRESP_00006158
MOMRESP_00006159
MOMRESP_00006160
MOMRESP_00006161

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006162
MOMRESP_00006163
MOMRESP_00006164
MOMRESP_00006165
MOMRESP_00006166
MOMRESP_00006167
MOMRESP_00006168
MOMRESP_00006169
MOMRESP_00006170
MOMRESP_00006171
MOMRESP_00006172
MOMRESP_00006173
MOMRESP_00006174
MOMRESP_00006175
MOMRESP_00006176
MOMRESP_00006177
MOMRESP_00006178
MOMRESP_00006179
MOMRESP_00006180
MOMRESP_00006181
MOMRESP_00006182
MOMRESP_00006183
MOMRESP_00006184
MOMRESP_00006185
MOMRESP_00006186
MOMRESP_00006187
MOMRESP_00006188
MOMRESP_00006189
MOMRESP_00006190
MOMRESP_00006191
MOMRESP_00006192
MOMRESP_00006193
MOMRESP_00006194
MOMRESP_00006195
MOMRESP_00006196
MOMRESP_00006197
MOMRESP_00006198
MOMRESP_00006199
MOMRESP_00006200
MOMRESP_00006201
MOMRESP_00006202
MOMRESP_00006203
MOMRESP_00006204
MOMRESP_00006205
MOMRESP_00006206
MOMRESP_00006207
MOMRESP_00006208
MOMRESP_00006209
MOMRESP_00006210
MOMRESP_00006211
MOMRESP_00006212
MOMRESP_00006213
MOMRESP_00006214
MOMRESP_00006215
MOMRESP_00006216
MOMRESP_00006217

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006218
MOMRESP_00006219
MOMRESP_00006220
MOMRESP_00006221
MOMRESP_00006222
MOMRESP_00006223
MOMRESP_00006224
MOMRESP_00006225
MOMRESP_00006226
MOMRESP_00006227
MOMRESP_00006228
MOMRESP_00006229
MOMRESP_00006230
MOMRESP_00006231
MOMRESP_00006232
MOMRESP_00006233
MOMRESP_00006234
MOMRESP_00006235
MOMRESP_00006236
MOMRESP_00006237
MOMRESP_00006238
MOMRESP_00006239
MOMRESP_00006240
MOMRESP_00006241
MOMRESP_00006242
MOMRESP_00006243
MOMRESP_00006244
MOMRESP_00006245
MOMRESP_00006246
MOMRESP_00006247
MOMRESP_00006248
MOMRESP_00006249
MOMRESP_00006250
MOMRESP_00006251
MOMRESP_00006252
MOMRESP_00006253
MOMRESP_00006254
MOMRESP_00006255
MOMRESP_00006256
MOMRESP_00006257
MOMRESP_00006258
MOMRESP_00006259
MOMRESP_00006260
MOMRESP_00006261
MOMRESP_00006262
MOMRESP_00006263
MOMRESP_00006264
MOMRESP_00006265
MOMRESP_00006266
MOMRESP_00006267
MOMRESP_00006268
MOMRESP_00006269
MOMRESP_00006270
MOMRESP_00006271
MOMRESP_00006272
MOMRESP_00006273

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006274
MOMRESP_00006275
MOMRESP_00006276
MOMRESP_00006277
MOMRESP_00006278
MOMRESP_00006279
MOMRESP_00006280
MOMRESP_00006281
MOMRESP_00006282
MOMRESP_00006283
MOMRESP_00006284
MOMRESP_00006285
MOMRESP_00006286
MOMRESP_00006287
MOMRESP_00006288
MOMRESP_00006289
MOMRESP_00006290
MOMRESP_00006291
MOMRESP_00006292
MOMRESP_00006293
MOMRESP_00006294
MOMRESP_00006295
MOMRESP_00006296
MOMRESP_00006297
MOMRESP_00006298
MOMRESP_00006299
MOMRESP_00006300
MOMRESP_00006301
MOMRESP_00006302
MOMRESP_00006303
MOMRESP_00006304
MOMRESP_00006305
MOMRESP_00006306
MOMRESP_00006307
MOMRESP_00006308
MOMRESP_00006309
MOMRESP_00006310
MOMRESP_00006311
MOMRESP_00006312
MOMRESP_00006313
MOMRESP_00006314
MOMRESP_00006315
MOMRESP_00006316
MOMRESP_00006317
MOMRESP_00006318
MOMRESP_00006319
MOMRESP_00006320
MOMRESP_00006321
MOMRESP_00006322
MOMRESP_00006323
MOMRESP_00006324
MOMRESP_00006325
MOMRESP_00006326
MOMRESP_00006327
MOMRESP_00006328
MOMRESP_00006329

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**
MOMRESP_00006330
MOMRESP_00006331
MOMRESP_00006332
MOMRESP_00006333
MOMRESP_00006334
MOMRESP_00006335
MOMRESP_00006336
MOMRESP_00006337
MOMRESP_00006338
MOMRESP_00006339
MOMRESP_00006340
MOMRESP_00006341
MOMRESP_00006342
MOMRESP_00006343
MOMRESP_00006344
MOMRESP_00006345
MOMRESP_00006346
MOMRESP_00006347
MOMRESP_00006348
MOMRESP_00006349
MOMRESP_00006350
MOMRESP_00006351
MOMRESP_00006352
MOMRESP_00006353
MOMRESP_00006354
MOMRESP_00006355
MOMRESP_00006356
MOMRESP_00006357
MOMRESP_00006358
MOMRESP_00006359
MOMRESP_00006360
MOMRESP_00006361
MOMRESP_00006362
MOMRESP_00006363
MOMRESP_00006364
MOMRESP_00006365
MOMRESP_00006366
MOMRESP_00006367
MOMRESP_00006368
MOMRESP_00006369
MOMRESP_00006370
MOMRESP_00006371
MOMRESP_00006372
MOMRESP_00006373
MOMRESP_00006374
MOMRESP_00006375
MOMRESP_00006376
MOMRESP_00006377
MOMRESP_00006378
MOMRESP_00006379
MOMRESP_00006380
MOMRESP_00006381
MOMRESP_00006382
MOMRESP_00006383-MOMRESP_00006469
MOMRESP_00006470-MOMRESP_00006480
MOMRESP_00006481-MOMRESP_00006493

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00006494-MOMRESP_00006504
MOMRESP_00006505-MOMRESP_00006517
MOMRESP_00006518-MOMRESP_00006529
MOMRESP_00006530-MOMRESP_00006541
MOMRESP_00006542-MOMRESP_00006561
MOMRESP_00006562-MOMRESP_00006564
MOMRESP_00006565-MOMRESP_00006569
MOMRESP_00006570-MOMRESP_00006579
MOMRESP_00006580-MOMRESP_00006590
MOMRESP_00006591-MOMRESP_00006598
MOMRESP_00006599-MOMRESP_00006610
MOMRESP_00006611-MOMRESP_00006621
MOMRESP_00006622-MOMRESP_00006633
MOMRESP_00006634-MOMRESP_00006646
MOMRESP_00006647-MOMRESP_00006650
MOMRESP_00006651-MOMRESP_00006654
MOMRESP_00006655-MOMRESP_00006658
MOMRESP_00006659-MOMRESP_00006671
MOMRESP_00006672-MOMRESP_00006683
MOMRESP_00006684-MOMRESP_00006710
MOMRESP_00006711-MOMRESP_00006738
MOMRESP_00006739-MOMRESP_00006766
MOMRESP_00006767-MOMRESP_00006792
MOMRESP_00006793-MOMRESP_00006831
MOMRESP_00006832-MOMRESP_00006833
MOMRESP_00006834-MOMRESP_00006840
MOMRESP_00006841-MOMRESP_00006871
MOMRESP_00006872-MOMRESP_00006876
MOMRESP_00006877-MOMRESP_00006908
MOMRESP_00006909-MOMRESP_00006923
MOMRESP_00006924-MOMRESP_00006939
MOMRESP_00006940-MOMRESP_00006962
MOMRESP_00006963-MOMRESP_00006964
MOMRESP_00006965-MOMRESP_00006983
MOMRESP_00006984-MOMRESP_00007007
MOMRESP_00007008-MOMRESP_00007018
MOMRESP_00007019
MOMRESP_00007020-MOMRESP_00007040
MOMRESP_00007041-MOMRESP_00007062
MOMRESP_00007063-MOMRESP_00007081
MOMRESP_00007082-MOMRESP_00007092
MOMRESP_00007093-MOMRESP_00007105
MOMRESP_00007106-MOMRESP_00007124
MOMRESP_00007125-MOMRESP_00007148
MOMRESP_00007149-MOMRESP_00007168
MOMRESP_00007169-MOMRESP_00007188
MOMRESP_00007189-MOMRESP_00007211
MOMRESP_00007212-MOMRESP_00007234
MOMRESP_00007235-MOMRESP_00007255
MOMRESP_00007256
MOMRESP_00007257-MOMRESP_00007287
MOMRESP_00007288-MOMRESP_00007306
MOMRESP_00007307-MOMRESP_00007333
MOMRESP_00007334-MOMRESP_00007358
MOMRESP_00007359-MOMRESP_00007390
MOMRESP_00007391-MOMRESP_00007413

**Mohammad Honarkar v. Mahender Makhijani et al.**

| Materials Considered |
| --- |
| MOMRESP_00007414-MOMRESP_00007437 |
| MOMRESP_00007438 |
| MOMRESP_00007439 |
| MOMRESP_00007440 |
| MOMRESP_00007441 |
| MOMRESP_00007442 |
| MOMRESP_00007443 |
| MOMRESP_00007444 |
| MOMRESP_00007445 |
| MOMRESP_00007446 |
| MOMRESP_00007447 |
| MOMRESP_00007448 |
| MOMRESP_00007449 |
| MOMRESP_00007450 |
| MOMRESP_00007451 |
| MOMRESP_00007452 |
| MOMRESP_00007453 |
| MOMRESP_00007454 |
| MOMRESP_00007455 |
| MOMRESP_00007456 |
| MOMRESP_00007457 |
| MOMRESP_00007458 |
| MOMRESP_00007459 |
| MOMRESP_00007460 |
| MOMRESP_00007461 |
| MOMRESP_00007462 |
| MOMRESP_00007463 |
| MOMRESP_00007464 |
| MOMRESP_00007465 |
| MOMRESP_00007466 |
| MOMRESP_00007467 |
| MOMRESP_00007468 |
| MOMRESP_00007469 |
| MOMRESP_00007470 |
| MOMRESP_00007471 |
| MOMRESP_00007472 |
| MOMRESP_00007473 |
| MOMRESP_00007474 |
| MOMRESP_00007475 |
| MOMRESP_00007476 |
| MOMRESP_00007477-MOMRESP_00007482 |
| MOMRESP_00007483-MOMRESP_00007488 |
| MOMRESP_00007489-MOMRESP_00007494 |
| MOMRESP_00007495-MOMRESP_00007500 |
| MOMRESP_00007501-MOMRESP_00007506 |
| MOMRESP_00007507-MOMRESP_00007512 |
| MOMRESP_00007513-MOMRESP_00007518 |
| MOMRESP_00007519-MOMRESP_00007524 |
| MOMRESP_00007525-MOMRESP_00007530 |
| MOMRESP_00007531-MOMRESP_00007536 |
| MOMRESP_00007537-MOMRESP_00007541 |
| MOMRESP_00007542-MOMRESP_00007546 |
| MOMRESP_00007547-MOMRESP_00007551 |
| MOMRESP_00007552-MOMRESP_00007556 |
| MOMRESP_00007557-MOMRESP_00007561 |
| MOMRESP_00007562-MOMRESP_00007567 |

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00007568-MOMRESP_00007572
MOMRESP_00007573-MOMRESP_00007577
MOMRESP_00007578-MOMRESP_00007582
MOMRESP_00007583-MOMRESP_00007588
MOMRESP_00007589
MOMRESP_00007590
MOMRESP_00007591-MOMRESP_00007592
MOMRESP_00007593
MOMRESP_00007594-MOMRESP_00007595
MOMRESP_00007596-MOMRESP_00007597
MOMRESP_00007598-MOMRESP_00007599
MOMRESP_00007600-MOMRESP_00007605
MOMRESP_00007606-MOMRESP_00007610
MOMRESP_00007611
MOMRESP_00007612
MOMRESP_00007613-MOMRESP_00007618
MOMRESP_00007619-MOMRESP_00007620
MOMRESP_00007621-MOMRESP_00007622
MOMRESP_00007623-MOMRESP_00007624
MOMRESP_00007625-MOMRESP_00007630
MOMRESP_00007631-MOMRESP_00007636
MOMRESP_00007637
MOMRESP_00007638
MOMRESP_00007639-MOMRESP_00007644
MOMRESP_00007645-MOMRESP_00007646
MOMRESP_00007647-MOMRESP_00007648
MOMRESP_00007649
MOMRESP_00007650
MOMRESP_00007651-MOMRESP_00007652
MOMRESP_00007653-MOMRESP_00007654
MOMRESP_00007655
MOMRESP_00007656
MOMRESP_00007657
MOMRESP_00007658
MOMRESP_00007659
MOMRESP_00007660
MOMRESP_00007661
MOMRESP_00007662
MOMRESP_00007663
MOMRESP_00007664
MOMRESP_00007665
MOMRESP_00007666-MOMRESP_00007667
MOMRESP_00007668
MOMRESP_00007669
MOMRESP_00007670-MOMRESP_00007671
MOMRESP_00007672
MOMRESP_00007673
MOMRESP_00007674
MOMRESP_00007675-MOMRESP_00007679
MOMRESP_00007680-MOMRESP_00007681
MOMRESP_00007682
MOMRESP_00007683
MOMRESP_00007684
MOMRESP_00007685-MOMRESP_00007691
MOMRESP_00007692-MOMRESP_00007694
MOMRESP_00007695

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00007696
MOMRESP_00007697
MOMRESP_00007698-MOMRESP_00007701
MOMRESP_00007702-MOMRESP_00007704
MOMRESP_00007705
MOMRESP_00007706
MOMRESP_00007707-MOMRESP_00007715
MOMRESP_00007716-MOMRESP_00007718
MOMRESP_00007719
MOMRESP_00007720
MOMRESP_00007721-MOMRESP_00007727
MOMRESP_00007728-MOMRESP_00007732
MOMRESP_00007733
MOMRESP_00007734
MOMRESP_00007735-MOMRESP_00007738
MOMRESP_00007739-MOMRESP_00007744
MOMRESP_00007745-MOMRESP_00007750
MOMRESP_00007751-MOMRESP_00007756
MOMRESP_00007757-MOMRESP_00007758
MOMRESP_00007759
MOMRESP_00007760-MOMRESP_00007762
MOMRESP_00007763
MOMRESP_00007764
MOMRESP_00007765-MOMRESP_00007769
MOMRESP_00007770-MOMRESP_00007771
MOMRESP_00007772
MOMRESP_00007773
MOMRESP_00007774-MOMRESP_00007777
MOMRESP_00007778
MOMRESP_00007779-MOMRESP_00007783
MOMRESP_00007784-MOMRESP_00007790
MOMRESP_00007791-MOMRESP_00007796
MOMRESP_00007797-MOMRESP_00007801
MOMRESP_00007802-MOMRESP_00007803
MOMRESP_00007804
MOMRESP_00007805-MOMRESP_00007806
MOMRESP_00007807
MOMRESP_00007808
MOMRESP_00007809-MOMRESP_00007816
MOMRESP_00007817-MOMRESP_00007820
MOMRESP_00007821
MOMRESP_00007822
MOMRESP_00007823-MOMRESP_00007827
MOMRESP_00007828-MOMRESP_00007829
MOMRESP_00007830
MOMRESP_00007831-MOMRESP_00007836
MOMRESP_00007837
MOMRESP_00007838
MOMRESP_00007839
MOMRESP_00007840
MOMRESP_00007841-MOMRESP_00007866
MOMRESP_00007867
MOMRESP_00007868
MOMRESP_00007869
MOMRESP_00007870-MOMRESP_00007871
MOMRESP_00007872

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00007873
MOMRESP_00007874
MOMRESP_00007875-MOMRESP_00007880
MOMRESP_00007881-MOMRESP_00007884
MOMRESP_00007885-MOMRESP_00007890
MOMRESP_00007891-MOMRESP_00007896
MOMRESP_00007897-MOMRESP_00007900
MOMRESP_00007901-MOMRESP_00007906
MOMRESP_00007907
MOMRESP_00007908
MOMRESP_00007909
MOMRESP_00007910
MOMRESP_00007911
MOMRESP_00007912
MOMRESP_00007913
MOMRESP_00007914
MOMRESP_00007915
MOMRESP_00007916
MOMRESP_00007917
MOMRESP_00007918
MOMRESP_00007919
MOMRESP_00007920
MOMRESP_00007921
MOMRESP_00007922
MOMRESP_00007923
MOMRESP_00007924
MOMRESP_00007925
MOMRESP_00007926
MOMRESP_00007927
MOMRESP_00007928
MOMRESP_00007929
MOMRESP_00007930
MOMRESP_00007931
MOMRESP_00007932
MOMRESP_00007933
MOMRESP_00007934
MOMRESP_00007935
MOMRESP_00007936
MOMRESP_00007937
MOMRESP_00007938
MOMRESP_00007939
MOMRESP_00007940
MOMRESP_00007941
MOMRESP_00007942
MOMRESP_00007943
MOMRESP_00007944
MOMRESP_00007945
MOMRESP_00007946
MOMRESP_00007947
MOMRESP_00007948
MOMRESP_00007949
MOMRESP_00007950
MOMRESP_00007951
MOMRESP_00007952
MOMRESP_00007953
MOMRESP_00007954

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00007955
MOMRESP_00007956
MOMRESP_00007957
MOMRESP_00007958
MOMRESP_00007959
MOMRESP_00007960
MOMRESP_00007961
MOMRESP_00007962
MOMRESP_00007963
MOMRESP_00007964
MOMRESP_00007965
MOMRESP_00007966
MOMRESP_00007967
MOMRESP_00007968
MOMRESP_00007969
MOMRESP_00007970
MOMRESP_00007971
MOMRESP_00007972
MOMRESP_00007973
MOMRESP_00007974
MOMRESP_00007975
MOMRESP_00007976
MOMRESP_00007977
MOMRESP_00007978
MOMRESP_00007979
MOMRESP_00007980
MOMRESP_00007981
MOMRESP_00007982
MOMRESP_00007983
MOMRESP_00007984
MOMRESP_00007985
MOMRESP_00007986
MOMRESP_00007987
MOMRESP_00007988
MOMRESP_00007989
MOMRESP_00007990
MOMRESP_00007991
MOMRESP_00007992
MOMRESP_00007993
MOMRESP_00007994
MOMRESP_00007995
MOMRESP_00007996
MOMRESP_00007997
MOMRESP_00007998
MOMRESP_00007999
MOMRESP_00008000
MOMRESP_00008001
MOMRESP_00008002
MOMRESP_00008003-MOMRESP_00008222
MOMRESP_00008223
MOMRESP_00008224-MOMRESP_00008225
MOMRESP_00008226-MOMRESP_00008231
MOMRESP_00008232
MOMRESP_00008233
MOMRESP_00008234
MOMRESP_00008235

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00008236
MOMRESP_00008237
MOMRESP_00008238
MOMRESP_00008239
MOMRESP_00008240
MOMRESP_00008241
MOMRESP_00008242
MOMRESP_00008243
MOMRESP_00008244
MOMRESP_00008245
MOMRESP_00008246
MOMRESP_00008247
MOMRESP_00008248
MOMRESP_00008249
MOMRESP_00008250
MOMRESP_00008251
MOMRESP_00008252
MOMRESP_00008253
MOMRESP_00008254
MOMRESP_00008255
MOMRESP_00008256
MOMRESP_00008257
MOMRESP_00008258
MOMRESP_00008259
MOMRESP_00008260
MOMRESP_00008261
MOMRESP_00008262
MOMRESP_00008263
MOMRESP_00008264
MOMRESP_00008265
MOMRESP_00008266
MOMRESP_00008267
MOMRESP_00008268
MOMRESP_00008269
MOMRESP_00008270
MOMRESP_00008271
MOMRESP_00008272
MOMRESP_00008273
MOMRESP_00008274
MOMRESP_00008275
MOMRESP_00008276
MOMRESP_00008277
MOMRESP_00008278
MOMRESP_00008279
MOMRESP_00008280
MOMRESP_00008281-MOMRESP_00008286
MOMRESP_00008287
MOMRESP_00008288
MOMRESP_00008289-MOMRESP_00008341
MOMRESP_00008342-MOMRESP_00008427
MOMRESP_00008428-MOMRESP_00008480
MOMRESP_00008481-MOMRESP_00008487
MOMRESP_00008488-MOMRESP_00008540
MOMRESP_00008541-MOMRESP_00008593
MOMRESP_00008594-MOMRESP_00008607
MOMRESP_00008608-MOMRESP_00008620

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00008621-MOMRESP_00008634
MOMRESP_00008635-MOMRESP_00008649
MOMRESP_00008650-MOMRESP_00008660
MOMRESP_00008661-MOMRESP_00008730
MOMRESP_00008731
MOMRESP_00008732-MOMRESP_00008744
MOMRESP_00008745-MOMRESP_00008759
MOMRESP_00008760-MOMRESP_00008766
MOMRESP_00008767-MOMRESP_00008770
MOMRESP_00008771-MOMRESP_00008775
MOMRESP_00008776-MOMRESP_00008777
MOMRESP_00008778-MOMRESP_00008779
MOMRESP_00008780
MOMRESP_00008781-MOMRESP_00008782
MOMRESP_00008783-MOMRESP_00008795
MOMRESP_00008796-MOMRESP_00008810
MOMRESP_00008811-MOMRESP_00008814
MOMRESP_00008815-MOMRESP_00008850
MOMRESP_00008851-MOMRESP_00008857
MOMRESP_00008858-MOMRESP_00008884
MOMRESP_00008885-MOMRESP_00008890
MOMRESP_00008891-MOMRESP_00008894
MOMRESP_00008895-MOMRESP_00008899
MOMRESP_00008900-MOMRESP_00008904
MOMRESP_00008905-MOMRESP_00008908
MOMRESP_00008909-MOMRESP_00008935
MOMRESP_00008936-MOMRESP_00008950
MOMRESP_00008951-MOMRESP_00008986
MOMRESP_00008987-MOMRESP_00008991
MOMRESP_00008992-MOMRESP_00008999
MOMRESP_00009000-MOMRESP_00009028
MOMRESP_00009029-MOMRESP_00009043
MOMRESP_00009044-MOMRESP_00009077
MOMRESP_00009078
MOMRESP_00009078-MOMRESP_00009237
MOMRESP_00009238
MOMRESP_00009238-MOMRESP_00009338
MOMRESP_00009339-MOMRESP_00009478
MOMRESP_00009479-MOMRESP_00009594
MOMRESP_00009595-MOMRESP_00009739
MOMRESP_00009595-MOMRESP_00015200
MOMRESP_00009740-MOMRESP_00009775
MOMRESP_00009776-MOMRESP_00009918
MOMRESP_00009919-MOMRESP_00010062
MOMRESP_00010063-MOMRESP_00010271
MOMRESP_00010272-MOMRESP_00010418
MOMRESP_00010419-MOMRESP_00010656
MOMRESP_00010657-MOMRESP_00010757
MOMRESP_00010758-MOMRESP_00010952
MOMRESP_00010953-MOMRESP_00011157
MOMRESP_00011158-MOMRESP_00011495
MOMRESP_00011496-MOMRESP_00011641
MOMRESP_00011642-MOMRESP_00011804
MOMRESP_00011805-MOMRESP_00011920
MOMRESP_00011921-MOMRESP_00012064
MOMRESP_00012065-MOMRESP_00012218

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00012219-MOMRESP_00012352
MOMRESP_00012353-MOMRESP_00012388
MOMRESP_00012389-MOMRESP_00012424
MOMRESP_00012425-MOMRESP_00012456
MOMRESP_00012457-MOMRESP_00012576
MOMRESP_00012577-MOMRESP_00012644
MOMRESP_00012645-MOMRESP_00012834
MOMRESP_00012835-MOMRESP_00013011
MOMRESP_00013012-MOMRESP_00013112
MOMRESP_00013113-MOMRESP_00013211
MOMRESP_00013212-MOMRESP_00013387
MOMRESP_00013388-MOMRESP_00013583
MOMRESP_00013584-MOMRESP_00013751
MOMRESP_00013752-MOMRESP_00013899
MOMRESP_00013900-MOMRESP_00014002
MOMRESP_00014003-MOMRESP_00014206
MOMRESP_00014207-MOMRESP_00014377
MOMRESP_00014378-MOMRESP_00014445
MOMRESP_00014446-MOMRESP_00014623
MOMRESP_00014624-MOMRESP_00014801
MOMRESP_00014802-MOMRESP_00014997
MOMRESP_00014998-MOMRESP_00015098
MOMRESP_00015099-MOMRESP_00015199
MOMRESP_00015200-MOMRESP_00015298
MOMRESP_00015299-MOMRESP_00015315
MOMRESP_00015418
MOMRESP_00015419
MOMRESP_00015623
MOMRESP_00015624
MOMRESP_00015882
MOMRESP_00016033
MOMRESP_00016034
MOMRESP_00016185
MOMRESP_00016308
MOMRESP_00016309
MOMRESP_00016434
MOMRESP_00016435
MOMRESP_00017436
MOMRESP_00017437 (Slipsheet)
MOMRESP_00017437.xls
MOMRESP_00017438
MOMRESP_00017440
MOMRESP_00018145
MOMRESP_00018147
MOMRESP_00019709
MOMRESP_00019711
MOMRESP_00027129
MOMRESP_00034634
MOMRESP_00034635
MOMRESP_00034635 (Slipsheet)
MOMRESP_00034636
MOMRESP_00044727
MOMRESP_00044729
MOMRESP_00044731
MOMRESP_00044733
MOMRESP_00044735

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00044737
MOMRESP_00044739
MOMRESP_00044742
MOMRESP_00044744
MOMRESP_00044753
MOMRESP_00044755
MOMRESP_00044759
MOMRESP_00044761
MOMRESP_00044764
MOMRESP_00044767
MOMRESP_00044769
MOMRESP_00044771
MOMRESP_00044773
MOMRESP_00044774
MOMRESP_00044776
MOMRESP_00044778
MOMRESP_00044780
MOMRESP_00044783
MOMRESP_00044786
MOMRESP_00044788
MOMRESP_00044790
MOMRESP_00044794
MOMRESP_00044796
MOMRESP_00044797
MOMRESP_00044801
MOMRESP_00044807
MOMRESP_00044813
MOMRESP_00044820
MOMRESP_00044822
MOMRESP_00044826
MOMRESP_00044832
MOMRESP_00044838
MOMRESP_00044840
MOMRESP_00044848
MOMRESP_00047724
MOMRESP_00047730
MOMRESP_00047734
MOMRESP_00048443
MOMRESP_00048444
MOMRESP_00048446
MOMRESP_00048457
MOMRESP_00048460
MOMRESP_00048461
MOMRESP_00048471
MOMRESP_00048483
MOMRESP_00048531
MOMRESP_00048533
MOMRESP_00048535
MOMRESP_00048536
MOMRESP_00048547
MOMRESP_00048558
MOMRESP_00048570
MOMRESP_00048580
MOMRESP_00049635
MOMRESP_00049639
MOMRESP_00049641

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00049643
MOMRESP_00049645
MOMRESP_00049647
MOMRESP_00049648
MOMRESP_00049650
MOMRESP_00049651
MOMRESP_00049652
MOMRESP_00050691
MOMRESP_00050692
MOMRESP_00050694
MOMRESP_00050930
MOMRESP_00050931
MOMRESP_00055294
MOMRESP_00055296
MOMRESP_00055298
MOMRESP_00055300
MOMRESP_00055302
MOMRESP_00055304
MOMRESP_00055306
MOMRESP_00055308
MOMRESP_00055312
MOMRESP_00057621
MOMRESP_00057629
MOMRESP_00058018
MOMRESP_00058231
MOMRESP_00058232
MOMRESP_00058236
MOMRESP_00058238
MOMRESP_00058240
MOMRESP_00058242
MOMRESP_00058244
MOMRESP_00058246
MOMRESP_00058461
MOMRESP_00058464
MOMRESP_00058786
MOMRESP_00058788
MOMRESP_00058789
MOMRESP_00058791
MOMRESP_00058794
MOMRESP_00058798
MOMRESP_00058800
MOMRESP_00058801
MOMRESP_00058805
MOMRESP_00058806
MOMRESP_00058809
MOMRESP_00058810
MOMRESP_00058811
MOMRESP_00058812
MOMRESP_00058812 (Slipsheet)
MOMRESP_00058813
MOMRESP_00058816
MOMRESP_00058817
MOMRESP_00058820
MOMRESP_00058832
MOMRESP_00058836
MOMRESP_00058839

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00058841
MOMRESP_00058846
MOMRESP_00058848
MOMRESP_00058852
MOMRESP_00058855
MOMRESP_00058859
MOMRESP_00058866
MOMRESP_00058867
MOMRESP_00058872
MOMRESP_00058876
MOMRESP_00058886
MOMRESP_00058887
MOMRESP_00058891
MOMRESP_00058896
MOMRESP_00058903
MOMRESP_00058910
MOMRESP_00058912
MOMRESP_00058915
MOMRESP_00058928
MOMRESP_00058930
MOMRESP_00058934
MOMRESP_00058935
MOMRESP_00058936
MOMRESP_00058940
MOMRESP_00058944
MOMRESP_00058953
MOMRESP_00058954
MOMRESP_00058967
MOMRESP_00058972
MOMRESP_00058976
MOMRESP_00058985
MOMRESP_00058993
MOMRESP_00058999
MOMRESP_00059005
MOMRESP_00059012
MOMRESP_00059016
MOMRESP_00059023
MOMRESP_00059024
MOMRESP_00059028
MOMRESP_00059029
MOMRESP_00059030
MOMRESP_00059035
MOMRESP_00059039
MOMRESP_00059045
MOMRESP_00059047
MOMRESP_00059052
MOMRESP_00059056
MOMRESP_00059061
MOMRESP_00059136
MOMRESP_00059138
MOMRESP_00059503
MOMRESP_00060912
MOMRESP_00060914
MOMRESP_00061095
MOMRESP_00061096
MOMRESP_00061098

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00061100
MOMRESP_00061102
MOMRESP_00061103
MOMRESP_00061105
MOMRESP_00061107
MOMRESP_00061109
MOMRESP_00061111
MOMRESP_00061112
MOMRESP_00061114
MOMRESP_00061115
MOMRESP_00061117
MOMRESP_00061119
MOMRESP_00061121
MOMRESP_00061123
MOMRESP_00061125
MOMRESP_00061134
MOMRESP_00061135
MOMRESP_00061137
MOMRESP_00061143
MOMRESP_00061218
MOMRESP_00061221
MOMRESP_00061227
MOMRESP_00061232
MOMRESP_00061238
MOMRESP_00061244
MOMRESP_00061244 (Slipsheet)
MOMRESP_00061245
MOMRESP_00061250
MOMRESP_00061256
MOMRESP_00061261
MOMRESP_00061266
MOMRESP_00061271
MOMRESP_00061271 (Slipsheet)
MOMRESP_00061272
MOMRESP_00061278
MOMRESP_00061283
MOMRESP_00061289
MOMRESP_00061295
MOMRESP_00061301
MOMRESP_00061306
MOMRESP_00061311
MOMRESP_00061316
MOMRESP_00061322
MOMRESP_00061328
MOMRESP_00061334
MOMRESP_00061340
MOMRESP_00062158
MOMRESP_00062159
MOMRESP_00062160
MOMRESP_00062162
MOMRESP_00062163
MOMRESP_00062165
MOMRESP_00062167
MOMRESP_00062169
MOMRESP_00062170
MOMRESP_00062171

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00062173
MOMRESP_00062174
MOMRESP_00062175
MOMRESP_00062176
MOMRESP_00062178
MOMRESP_00062179
MOMRESP_00062181
MOMRESP_00062183
MOMRESP_00062184
MOMRESP_00062186
MOMRESP_00062279
MOMRESP_00062281
MOMRESP_00062283
MOMRESP_00062285
MOMRESP_00062287
MOMRESP_00062289
MOMRESP_00062291
MOMRESP_00062292
MOMRESP_00062294
MOMRESP_00062532
MOMRESP_00062533
MOMRESP_00062537
MOMRESP_00062543
MOMRESP_00062547
MOMRESP_00062548
MOMRESP_00062549
MOMRESP_00062554
MOMRESP_00062558
MOMRESP_00062562
MOMRESP_00062568
MOMRESP_00062575
MOMRESP_00062580
MOMRESP_00062581
MOMRESP_00062586
MOMRESP_00062587
MOMRESP_00062591
MOMRESP_00062591 (Slipsheet)
MOMRESP_00062592
MOMRESP_00062593
MOMRESP_00062594
MOMRESP_00062599
MOMRESP_00062600
MOMRESP_00062604
MOMRESP_00062609
MOMRESP_00062615
MOMRESP_00062619
MOMRESP_00063480
MOMRESP_00063483
MOMRESP_00063484
MOMRESP_00063486
MOMRESP_00063488
MOMRESP_00063490
MOMRESP_00063492
MOMRESP_00063494
MOMRESP_00063496
MOMRESP_00063518

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00063523
MOMRESP_00063525
MOMRESP_00063739
MOMRESP_00063740
MOMRESP_00064467
MOMRESP_00064479
MOMRESP_00064481
MOMRESP_00064483
MOMRESP_00064484
MOMRESP_00064486
MOMRESP_00064487
MOMRESP_00064489
MOMRESP_00064495
MOMRESP_00064496
MOMRESP_00064502
MOMRESP_00064504
MOMRESP_00064505
MOMRESP_00064511
MOMRESP_00064516
MOMRESP_00064518
MOMRESP_00064524
MOMRESP_00065339
MOMRESP_00065340
MOMRESP_00065342
MOMRESP_00065344
MOMRESP_00065346
MOMRESP_00065348
MOMRESP_00065349
MOMRESP_00065351
MOMRESP_00065353
MOMRESP_00065355
MOMRESP_00067229
MOMRESP_00067233
MOMRESP_00067235
MOMRESP_00067237
MOMRESP_00067239
MOMRESP_00067241
MOMRESP_00067242
MOMRESP_00067244
MOMRESP_00067375
MOMRESP_00067377
MOMRESP_00067597
MOMRESP_00067597 (Slipsheet)
MOMRESP_00067598
MOMRESP_00067600
MOMRESP_00067600 (Slipsheet)
MOMRESP_00067601
MOMRESP_00067601 (Slipsheet)
MOMRESP_00067602
MOMRESP_00067952
MOMRESP_00067954
MOMRESP_00067955
MOMRESP_00067960
MOMRESP_00067962
MOMRESP_00067970
MOMRESP_00067972

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00067973
MOMRESP_00067978
MOMRESP_00067984
MOMRESP_00067985
MOMRESP_00067986
MOMRESP_00067992
MOMRESP_00067993
MOMRESP_00067995
MOMRESP_00067996
MOMRESP_00068000
MOMRESP_00068002
MOMRESP_00068004
MOMRESP_00068005
MOMRESP_00068009
MOMRESP_00068016
MOMRESP_00068018
MOMRESP_00068024
MOMRESP_00068030
MOMRESP_00068036
MOMRESP_00068041
MOMRESP_00068042
MOMRESP_00068045
MOMRESP_00068046
MOMRESP_00068047
MOMRESP_00068048
MOMRESP_00068053
MOMRESP_00068758
MOMRESP_00068760
MOMRESP_00068761
MOMRESP_00068763
MOMRESP_00068764
MOMRESP_00068766
MOMRESP_00068768
MOMRESP_00068770
MOMRESP_00068772
MOMRESP_00068774
MOMRESP_00068776
MOMRESP_00070085
MOMRESP_00070086
MOMRESP_00070088
MOMRESP_00070090
MOMRESP_00070091
MOMRESP_00070093
MOMRESP_00070095
MOMRESP_00070097
MOMRESP_00070099
MOMRESP_00070101
MOMRESP_00070102
MOMRESP_00071210
MOMRESP_00071211
MOMRESP_00071212
MOMRESP_00071212 (Slipsheet)
MOMRESP_00071213
MOMRESP_00071213 (Slipsheet)
MOMRESP_00071214
MOMRESP_00071214 (Slipsheet)

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00071215
MOMRESP_00071215 (Slipsheet)
MOMRESP_00071216
MOMRESP_00071216 (Slipsheet)
MOMRESP_00071217
MOMRESP_00071217 (Slipsheet)
MOMRESP_00071218
MOMRESP_00071218 (Slipsheet)
MOMRESP_00071219
MOMRESP_00071219 (Slipsheet)
MOMRESP_00071220
MOMRESP_00071220 (Slipsheet)
MOMRESP_00071221
MOMRESP_00071221 (Slipsheet)
MOMRESP_00071222
MOMRESP_00071222 (Slipsheet)
MOMRESP_00071223
MOMRESP_00071223 (Slipsheet)
MOMRESP_00071224
MOMRESP_00071226
MOMRESP_00071231
MOMRESP_00071236
MOMRESP_00071241
MOMRESP_00071246
MOMRESP_00071252
MOMRESP_00071259
MOMRESP_00071259 (Slipsheet)
MOMRESP_00071260
MOMRESP_00071260 (Slipsheet)
MOMRESP_00071261
MOMRESP_00071261 (Slipsheet)
MOMRESP_00071262
MOMRESP_00071262 (Slipsheet)
MOMRESP_00071263
MOMRESP_00071263 (Slipsheet)
MOMRESP_00071264
MOMRESP_00071264 (Slipsheet)
MOMRESP_00071265
MOMRESP_00071267
MOMRESP_00071267 (Slipsheet)
MOMRESP_00071268
MOMRESP_00071268 (Slipsheet)
MOMRESP_00071269
MOMRESP_00071269 (Slipsheet)
MOMRESP_00071270
MOMRESP_00071270 (Slipsheet)
MOMRESP_00071271
MOMRESP_00071271 (Slipsheet)
MOMRESP_00071272
MOMRESP_00071272 (Slipsheet)
MOMRESP_00071273
MOMRESP_00071273 (Slipsheet)
MOMRESP_00071274
MOMRESP_00071274 (Slipsheet)
MOMRESP_00071275
MOMRESP_00071275 (Slipsheet)

Cases 2:25-cv-03059-JLS-DDL D.o.c.10-4554-4 Filed 05/27/25 Page 291 of 2349

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**
MOMRESP_00071276
MOMRESP_00071276 (Slipsheet)
MOMRESP_00071277
MOMRESP_00071277 (Slipsheet)
MOMRESP_00071278
MOMRESP_00071278 (Slipsheet)
MOMRESP_00071279
MOMRESP_00071279 (Slipsheet)
MOMRESP_00071537
MOMRESP_00071539
MOMRESP_00071541
MOMRESP_00071542
MOMRESP_00071544
MOMRESP_00071546
MOMRESP_00071547
MOMRESP_00071549
MOMRESP_00071551
MOMRESP_00071553
MOMRESP_00071762
MOMRESP_00071764
MOMRESP_00071766
MOMRESP_00071768
MOMRESP_00071770
MOMRESP_00071771
MOMRESP_00071773
MOMRESP_00071775
MOMRESP_00071776
MOMRESP_00071778
MOMRESP_00071780
MOMRESP_00071781
MOMRESP_00071783
MOMRESP_00071786
MOMRESP_00072037
MOMRESP_00072042
MOMRESP_00072051
MOMRESP_00072065
MOMRESP_00072076
MOMRESP_00072090
MOMRESP_00072101
MOMRESP_00072103
MOMRESP_00072114
MOMRESP_00072128
MOMRESP_00072142
MOMRESP_00072153
MOMRESP_00072167
MOMRESP_00072178
MOMRESP_00072189
MOMRESP_00072200
MOMRESP_00072211
MOMRESP_00072225
MOMRESP_00072239
MOMRESP_00072250
MOMRESP_00072261
MOMRESP_00072263
MOMRESP_00072274
MOMRESP_00072288

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00072371
MOMRESP_00072372
MOMRESP_00072386
MOMRESP_00072387
MOMRESP_00072389
MOMRESP_00072391
MOMRESP_00072392
MOMRESP_00072394
MOMRESP_00072396
MOMRESP_00072397
MOMRESP_00072399
MOMRESP_00072400
MOMRESP_00072402
MOMRESP_00072404
MOMRESP_00072523
MOMRESP_00072526
MOMRESP_00072530
MOMRESP_00072531
MOMRESP_00072532
MOMRESP_00072532 (Slipsheet)
MOMRESP_00072533
MOMRESP_00072534
MOMRESP_00072828
MOMRESP_00072830
MOMRESP_00072831
MOMRESP_00072833
MOMRESP_00072835
MOMRESP_00072837
MOMRESP_00072839
MOMRESP_00072841
MOMRESP_00072842
MOMRESP_00072844
MOMRESP_00072846
MOMRESP_00072848
MOMRESP_00074562-MOMRESP_00074563
MOMRESP_00074564-MOMRESP_00074565
MOMRESP_00074566-MOMRESP_00074568
MOMRESP_00074569-MOMRESP_00074570
MOMRESP_00074571-MOMRESP_00074572
MOMRESP_00074573-MOMRESP_00074574
MOMRESP_00074575-MOMRESP_00074576
MOMRESP_00074577-MOMRESP_00074578
MOMRESP_00074579-MOMRESP_00074580
MOMRESP_00074581-MOMRESP_00074583
MOMRESP_00074584-MOMRESP_00074585
MOMRESP_00074586-MOMRESP_00074590
MOMRESP_00074591-MOMRESP_00074595
MOMRESP_00074596-MOMRESP_00074600
MOMRESP_00074601-MOMRESP_00074605
MOMRESP_00074606-MOMRESP_00074610
MOMRESP_00074611-MOMRESP_00074615
MOMRESP_00074616-MOMRESP_00074618
MOMRESP_00074619-MOMRESP_00074621
MOMRESP_00074622-MOMRESP_00074624
MOMRESP_00074625-MOMRESP_00074628
MOMRESP_00074629-MOMRESP_00074631

Appendix 1

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00074632-MOMRESP_00074635
MOMRESP_00074636-MOMRESP_00074638
MOMRESP_00074639-MOMRESP_00074643
MOMRESP_00074644-MOMRESP_00074646
MOMRESP_00074647-MOMRESP_00074649
MOMRESP_00074650-MOMRESP_00074653
MOMRESP_00074654-MOMRESP_00074660
MOMRESP_00074661-MOMRESP_00074667
MOMRESP_00074668-MOMRESP_00074673
MOMRESP_00074674-MOMRESP_00074680
MOMRESP_00074681-MOMRESP_00074685
MOMRESP_00074686-MOMRESP_00074690
MOMRESP_00074691-MOMRESP_00074702
MOMRESP_00074703-MOMRESP_00074710
MOMRESP_00074711-MOMRESP_00074718
MOMRESP_00074719-MOMRESP_00074726
MOMRESP_00074727-MOMRESP_00074738
MOMRESP_00074739-MOMRESP_00074749
MOMRESP_00074750-MOMRESP_00074758
MOMRESP_00074759-MOMRESP_00074765
MOMRESP_00074766-MOMRESP_00074775
MOMRESP_00074776-MOMRESP_00074785
MOMRESP_00074786-MOMRESP_00074792
MOMRESP_00074793-MOMRESP_00074799
MOMRESP_00074800-MOMRESP_00074806
MOMRESP_00074807-MOMRESP_00074816
MOMRESP_00074817-MOMRESP_00074824
MOMRESP_00074825-MOMRESP_00074836
MOMRESP_00074837-MOMRESP_00074849
MOMRESP_00074850-MOMRESP_00074863
MOMRESP_00074864-MOMRESP_00074871
MOMRESP_00074872-MOMRESP_00074875
MOMRESP_00074876-MOMRESP_00074880
MOMRESP_00074881-MOMRESP_00074888
MOMRESP_00074889-MOMRESP_00074892
MOMRESP_00074893-MOMRESP_00074896
MOMRESP_00074897-MOMRESP_00074900
MOMRESP_00074901-MOMRESP_00074904
MOMRESP_00074905-MOMRESP_00074909
MOMRESP_00074910-MOMRESP_00074914
MOMRESP_00074915-MOMRESP_00074918
MOMRESP_00074919-MOMRESP_00074926
MOMRESP_00074927-MOMRESP_00074934
MOMRESP_00074935-MOMRESP_00074942
MOMRESP_00074943-MOMRESP_00074950
MOMRESP_00074951-MOMRESP_00074956
MOMRESP_00074957-MOMRESP_00074958
MOMRESP_00074959-MOMRESP_00074960
MOMRESP_00074961-MOMRESP_00074963
MOMRESP_00074964-MOMRESP_00074965
MOMRESP_00074966-MOMRESP_00074967
MOMRESP_00074968-MOMRESP_00074969
MOMRESP_00074970-MOMRESP_00074971
MOMRESP_00074972-MOMRESP_00074973
MOMRESP_00074974-MOMRESP_00074976
MOMRESP_00074977-MOMRESP_00074979

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00074980-MOMRESP_00074981
MOMRESP_00074982-MOMRESP_00074986
MOMRESP_00074987-MOMRESP_00074991
MOMRESP_00074992-MOMRESP_00074996
MOMRESP_00074997-MOMRESP_00075001
MOMRESP_00075002-MOMRESP_00075006
MOMRESP_00075007-MOMRESP_00075011
MOMRESP_00075012-MOMRESP_00075120
MOMRESP_00075121-MOMRESP_00075190
MOMRESP_00075191-MOMRESP_00075192
MOMRESP_00075193-MOMRESP_00075194
MOMRESP_00075195-MOMRESP_00075196
MOMRESP_00075197-MOMRESP_00075199
MOMRESP_00075200-MOMRESP_00075201
MOMRESP_00075202-MOMRESP_00075206
MOMRESP_00075207-MOMRESP_00075211
MOMRESP_00075212-MOMRESP_00075216
MOMRESP_00075217-MOMRESP_00075221
MOMRESP_00075222-MOMRESP_00075226
MOMRESP_00075227-MOMRESP_00075231
MOMRESP_00075232-MOMRESP_00075304
MOMRESP_00075305-MOMRESP_00075401
MOMRESP_00075402-MOMRESP_00075405
MOMRESP_00075406-MOMRESP_00075408
MOMRESP_00075409-MOMRESP_00075412
MOMRESP_00075413-MOMRESP_00075416
MOMRESP_00075417-MOMRESP_00075420
MOMRESP_00075421-MOMRESP_00075425
MOMRESP_00075426-MOMRESP_00075429
MOMRESP_00075430-MOMRESP_00075434
MOMRESP_00075435-MOMRESP_00075438
MOMRESP_00075439-MOMRESP_00075442
MOMRESP_00075443-MOMRESP_00075445
MOMRESP_00075446-MOMRESP_00075452
MOMRESP_00075453-MOMRESP_00075458
MOMRESP_00075459-MOMRESP_00075465
MOMRESP_00075466-MOMRESP_00075472
MOMRESP_00075473-MOMRESP_00075479
MOMRESP_00075480-MOMRESP_00075485
MOMRESP_00075486-MOMRESP_00075488
MOMRESP_00075489-MOMRESP_00075492
MOMRESP_00075493-MOMRESP_00075497
MOMRESP_00075498-MOMRESP_00075501
MOMRESP_00075502-MOMRESP_00075505
MOMRESP_00075506-MOMRESP_00075509
MOMRESP_00075510-MOMRESP_00075513
MOMRESP_00075514-MOMRESP_00075517
MOMRESP_00075518-MOMRESP_00075521
MOMRESP_00075522-MOMRESP_00075525
MOMRESP_00075526-MOMRESP_00075532
MOMRESP_00075533-MOMRESP_00075539
MOMRESP_00075540-MOMRESP_00075546
MOMRESP_00075547-MOMRESP_00075553
MOMRESP_00075554-MOMRESP_00075560
MOMRESP_00075561-MOMRESP_00075567
MOMRESP_00075568-MOMRESP_00075678

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00075679-MOMRESP_00075791
MOMRESP_00075792-MOMRESP_00075795
MOMRESP_00075796-MOMRESP_00075799
MOMRESP_00075800-MOMRESP_00075804
MOMRESP_00075805-MOMRESP_00075808
MOMRESP_00075809-MOMRESP_00075812
MOMRESP_00075813-MOMRESP_00075817
MOMRESP_00075818-MOMRESP_00075822
MOMRESP_00075823-MOMRESP_00075828
MOMRESP_00075829-MOMRESP_00075833
MOMRESP_00075834-MOMRESP_00075837
MOMRESP_00075838-MOMRESP_00075841
MOMRESP_00075842-MOMRESP_00075849
MOMRESP_00075850-MOMRESP_00075858
MOMRESP_00075859-MOMRESP_00075866
MOMRESP_00075867-MOMRESP_00075874
MOMRESP_00075875-MOMRESP_00075881
MOMRESP_00075882-MOMRESP_00075888
MOMRESP_00075889-MOMRESP_00076027
MOMRESP_00076028-MOMRESP_00076063
MOMRESP_00076064-MOMRESP_00076068
MOMRESP_00076069-MOMRESP_00076073
MOMRESP_00076074-MOMRESP_00076131
MOMRESP_00076132-MOMRESP_00076234
MOMRESP_00076235-MOMRESP_00076614
MOMRESP_00076615-MOMRESP_00076952
MOMRESP_00076953-MOMRESP_00077051
MOMRESP_00077052-MOMRESP_00077122
MOMRESP_00077123-MOMRESP_00077236
MOMRESP_00077237-MOMRESP_00077339
MOMRESP_00077340-MOMRESP_00077499
MOMRESP_00077500-MOMRESP_00077652
MOMRESP_00077653-MOMRESP_00077828
MOMRESP_00077829-MOMRESP_00077832
MOMRESP_00077833-MOMRESP_00077837
MOMRESP_00077838-MOMRESP_00077841
MOMRESP_00077842-MOMRESP_00077846
MOMRESP_00077847-MOMRESP_00077850
MOMRESP_00077851-MOMRESP_00077857
MOMRESP_00077858-MOMRESP_00077864
MOMRESP_00077865-MOMRESP_00077871
MOMRESP_00077872-MOMRESP_00077878
MOMRESP_00077879-MOMRESP_00077885
MOMRESP_00077886-MOMRESP_00077892
MOMRESP_00077893-MOMRESP_00077894
MOMRESP_00077895-MOMRESP_00077896
MOMRESP_00077897-MOMRESP_00077898
MOMRESP_00077899-MOMRESP_00077900
MOMRESP_00077901-MOMRESP_00077902
MOMRESP_00077903-MOMRESP_00077907
MOMRESP_00077908-MOMRESP_00077912
MOMRESP_00077913-MOMRESP_00077917
MOMRESP_00077918-MOMRESP_00077923
MOMRESP_00077924-MOMRESP_00077928
MOMRESP_00077929-MOMRESP_00077933
MOMRESP_00077934-MOMRESP_00078060

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00078061-MOMRESP_00078215
MOMRESP_00078216-MOMRESP_00078223
MOMRESP_00078224-MOMRESP_00078236
MOMRESP_00078237-MOMRESP_00078245
MOMRESP_00078246-MOMRESP_00078251
MOMRESP_00078252-MOMRESP_00078260
MOMRESP_00078261-MOMRESP_00078270
MOMRESP_00078271-MOMRESP_00078278
MOMRESP_00078279-MOMRESP_00078290
MOMRESP_00078291-MOMRESP_00078302
MOMRESP_00078303-MOMRESP_00078316
MOMRESP_00078317-MOMRESP_00078325
MOMRESP_00078326-MOMRESP_00078335
MOMRESP_00078336-MOMRESP_00078348
MOMRESP_00078349-MOMRESP_00078363
MOMRESP_00078364-MOMRESP_00078375
MOMRESP_00078376-MOMRESP_00078387
MOMRESP_00078388-MOMRESP_00078397
MOMRESP_00078398-MOMRESP_00078408
MOMRESP_00078409-MOMRESP_00078420
MOMRESP_00078421-MOMRESP_00078428
MOMRESP_00078429-MOMRESP_00078441
MOMRESP_00078442-MOMRESP_00078453
MOMRESP_00078454-MOMRESP_00078468
MOMRESP_00078469-MOMRESP_00078475
MOMRESP_00078476-MOMRESP_00078481
MOMRESP_00078482-MOMRESP_00078490
MOMRESP_00078491-MOMRESP_00078495
MOMRESP_00078496-MOMRESP_00078504
MOMRESP_00078505-MOMRESP_00078518
MOMRESP_00078519-MOMRESP_00078524
MOMRESP_00078525-MOMRESP_00078530
MOMRESP_00078531-MOMRESP_00078539
MOMRESP_00078540-MOMRESP_00078549
MOMRESP_00078550-MOMRESP_00078561
MOMRESP_00078562-MOMRESP_00078571
MOMRESP_00078572-MOMRESP_00078577
MOMRESP_00078578-MOMRESP_00078583
MOMRESP_00078584-MOMRESP_00078590
MOMRESP_00078591-MOMRESP_00078598
MOMRESP_00078599-MOMRESP_00078607
MOMRESP_00078608-MOMRESP_00078613
MOMRESP_00078614-MOMRESP_00078620
MOMRESP_00078621-MOMRESP_00078626
MOMRESP_00078627-MOMRESP_00078635
MOMRESP_00078636-MOMRESP_00078644
MOMRESP_00078645-MOMRESP_00078653
MOMRESP_00078654-MOMRESP_00078662
MOMRESP_00078663-MOMRESP_00078669
MOMRESP_00078670-MOMRESP_00078673
MOMRESP_00078674-MOMRESP_00078677
MOMRESP_00078678-MOMRESP_00078680
MOMRESP_00078681-MOMRESP_00078684
MOMRESP_00078685-MOMRESP_00078688
MOMRESP_00078689-MOMRESP_00078695
MOMRESP_00078696-MOMRESP_00078699

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00078700-MOMRESP_00078703
MOMRESP_00078704-MOMRESP_00078706
MOMRESP_00078707-MOMRESP_00078710
MOMRESP_00078711-MOMRESP_00078714
MOMRESP_00078715-MOMRESP_00078718
MOMRESP_00078719-MOMRESP_00078722
MOMRESP_00078723-MOMRESP_00078725
MOMRESP_00078726-MOMRESP_00078729
MOMRESP_00078730-MOMRESP_00078735
MOMRESP_00078736-MOMRESP_00078742
MOMRESP_00078743-MOMRESP_00078748
MOMRESP_00078749-MOMRESP_00078753
MOMRESP_00078754-MOMRESP_00078758
MOMRESP_00078759-MOMRESP_00078891
MOMRESP_00078892-MOMRESP_00079042
MOMRESP_00079043-MOMRESP_00079251
MOMRESP_00079252-MOMRESP_00079527
MOMRESP_00079528-MOMRESP_00079529
MOMRESP_00079530-MOMRESP_00079531
MOMRESP_00079532-MOMRESP_00079536
MOMRESP_00079537-MOMRESP_00079538
MOMRESP_00079539-MOMRESP_00079540
MOMRESP_00079541-MOMRESP_00079542
MOMRESP_00079543-MOMRESP_00079544
MOMRESP_00079545-MOMRESP_00079546
MOMRESP_00079547-MOMRESP_00079548
MOMRESP_00079549-MOMRESP_00079550
MOMRESP_00079551-MOMRESP_00079552
MOMRESP_00079553-MOMRESP_00079557
MOMRESP_00079558-MOMRESP_00079562
MOMRESP_00079563-MOMRESP_00079567
MOMRESP_00079568-MOMRESP_00079572
MOMRESP_00079573-MOMRESP_00079577
MOMRESP_00079578-MOMRESP_00079579
MOMRESP_00079580-MOMRESP_00079581
MOMRESP_00079582-MOMRESP_00079583
MOMRESP_00079584-MOMRESP_00079589
MOMRESP_00079590-MOMRESP_00079591
MOMRESP_00079592-MOMRESP_00079593
MOMRESP_00079594-MOMRESP_00079595
MOMRESP_00079596-MOMRESP_00079597
MOMRESP_00079598-MOMRESP_00079599
MOMRESP_00079600-MOMRESP_00079602
MOMRESP_00079603-MOMRESP_00079604
MOMRESP_00079605-MOMRESP_00079607
MOMRESP_00079608-MOMRESP_00079612
MOMRESP_00079613-MOMRESP_00079617
MOMRESP_00079618-MOMRESP_00079622
MOMRESP_00079623-MOMRESP_00079627
MOMRESP_00079628-MOMRESP_00079632
MOMRESP_00079633-MOMRESP_00079639
MOMRESP_00079640-MOMRESP_00079648
MOMRESP_00079649-MOMRESP_00079655
MOMRESP_00079656-MOMRESP_00079664
MOMRESP_00079665-MOMRESP_00079671
MOMRESP_00079672-MOMRESP_00079679

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00079680-MOMRESP_00079685
MOMRESP_00079686-MOMRESP_00079691
MOMRESP_00079692-MOMRESP_00079697
MOMRESP_00079698-MOMRESP_00079703
MOMRESP_00079704-MOMRESP_00079710
MOMRESP_00079711-MOMRESP_00079717
MOMRESP_00079718-MOMRESP_00079727
MOMRESP_00079728-MOMRESP_00079736
MOMRESP_00079737-MOMRESP_00079746
MOMRESP_00079747-MOMRESP_00079756
MOMRESP_00079757-MOMRESP_00079767
MOMRESP_00079768-MOMRESP_00079771
MOMRESP_00079772-MOMRESP_00079775
MOMRESP_00079776-MOMRESP_00079779
MOMRESP_00079780-MOMRESP_00079786
MOMRESP_00079787-MOMRESP_00079790
MOMRESP_00079791-MOMRESP_00079794
MOMRESP_00079795-MOMRESP_00079799
MOMRESP_00079800-MOMRESP_00079803
MOMRESP_00079804-MOMRESP_00079807
MOMRESP_00079808-MOMRESP_00079811
MOMRESP_00079812-MOMRESP_00079816
MOMRESP_00079817-MOMRESP_00079820
MOMRESP_00079821-MOMRESP_00079828
MOMRESP_00079829-MOMRESP_00079836
MOMRESP_00079837-MOMRESP_00079843
MOMRESP_00079844-MOMRESP_00079851
MOMRESP_00079852-MOMRESP_00079853
MOMRESP_00079854-MOMRESP_00079855
MOMRESP_00079856-MOMRESP_00079857
MOMRESP_00079858-MOMRESP_00079859
MOMRESP_00079860-MOMRESP_00079861
MOMRESP_00079862-MOMRESP_00079863
MOMRESP_00079864-MOMRESP_00079865
MOMRESP_00079866-MOMRESP_00079867
MOMRESP_00079868-MOMRESP_00079870
MOMRESP_00079871-MOMRESP_00079872
MOMRESP_00079873-MOMRESP_00079874
MOMRESP_00079875-MOMRESP_00079876
MOMRESP_00079877-MOMRESP_00079884
MOMRESP_00079885-MOMRESP_00079892
MOMRESP_00079893-MOMRESP_00079896
MOMRESP_00079897-MOMRESP_00079898
MOMRESP_00079899-MOMRESP_00079904
MOMRESP_00079905-MOMRESP_00079911
MOMRESP_00079912-MOMRESP_00079918
MOMRESP_00079919-MOMRESP_00079925
MOMRESP_00079926-MOMRESP_00079931
MOMRESP_00079932-MOMRESP_00079937
MOMRESP_00079938-MOMRESP_00079945
MOMRESP_00079946-MOMRESP_00079951
MOMRESP_00079952-MOMRESP_00079956
MOMRESP_00079957-MOMRESP_00079961
MOMRESP_00079962-MOMRESP_00079966
MOMRESP_00079967-MOMRESP_00079968
MOMRESP_00079969-MOMRESP_00079972

Appendix 1

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00079973-MOMRESP_00079977
MOMRESP_00079978-MOMRESP_00079982
MOMRESP_00079983-MOMRESP_00079986
MOMRESP_00079987-MOMRESP_00079990
MOMRESP_00079991-MOMRESP_00079994
MOMRESP_00079995-MOMRESP_00079998
MOMRESP_00079999-MOMRESP_00080002
MOMRESP_00080003
MOMRESP_00080004
MOMRESP_00080005
MOMRESP_00080006
MOMRESP_00080007
MOMRESP_00080008-MOMRESP_00080013
MOMRESP_00080014-MOMRESP_00080017
MOMRESP_00080018-MOMRESP_00080024
MOMRESP_00080025-MOMRESP_00080051
MOMRESP_00080052-MOMRESP_00080054
MOMRESP_00080055-MOMRESP_00080056
MOMRESP_00080057-MOMRESP_00080071
MOMRESP_00080072-MOMRESP_00080086
MOMRESP_00080087-MOMRESP_00080090
MOMRESP_00080091-MOMRESP_00080126
MOMRESP_00080127-MOMRESP_00080133
MOMRESP_00080134-MOMRESP_00080160
MOMRESP_00080161-MOMRESP_00080167
MOMRESP_00080168-MOMRESP_00080179
MOMRESP_00080180
MOMRESP_00080181
MOMRESP_00080182-MOMRESP_00080198
MOMRESP_00080199
MOMRESP_00080200-MOMRESP_00080205
MOMRESP_00080206-MOMRESP_00080212
MOMRESP_00080213-MOMRESP_00080219
MOMRESP_00080220-MOMRESP_00080226
MOMRESP_00080227-MOMRESP_00080236
MOMRESP_00080237-MOMRESP_00080246
MOMRESP_00080247-MOMRESP_00080256
MOMRESP_00080257-MOMRESP_00080262
MOMRESP_00080263-MOMRESP_00080267
MOMRESP_00080268-MOMRESP_00080274
MOMRESP_00080275-MOMRESP_00080280
MOMRESP_00080281-MOMRESP_00080289
MOMRESP_00080290-MOMRESP_00080296
MOMRESP_00080297-MOMRESP_00080303
MOMRESP_00080304-MOMRESP_00080310
MOMRESP_00080311-MOMRESP_00080318
MOMRESP_00080319-MOMRESP_00080350
MOMRESP_00080351-MOMRESP_00080392
MOMRESP_00080393-MOMRESP_00080397
MOMRESP_00080398-MOMRESP_00080401
MOMRESP_00080402-MOMRESP_00080407
MOMRESP_00080408-MOMRESP_00080412
MOMRESP_00080413-MOMRESP_00080417
MOMRESP_00080418-MOMRESP_00080423
MOMRESP_00080424-MOMRESP_00080428
MOMRESP_00080429-MOMRESP_00080434

Appendix 1

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00080435-MOMRESP_00080439
MOMRESP_00080440-MOMRESP_00080444
MOMRESP_00080445-MOMRESP_00080450
MOMRESP_00080451-MOMRESP_00080455
MOMRESP_00080456-MOMRESP_00080461
MOMRESP_00080462-MOMRESP_00080467
MOMRESP_00080468-MOMRESP_00080472
MOMRESP_00080473-MOMRESP_00080477
MOMRESP_00080478-MOMRESP_00080484
MOMRESP_00080485-MOMRESP_00080489
MOMRESP_00080490-MOMRESP_00080494
MOMRESP_00080495-MOMRESP_00080544
MOMRESP_00080545-MOMRESP_00080549
MOMRESP_00080550-MOMRESP_00080554
MOMRESP_00080555-MOMRESP_00080560
MOMRESP_00080561-MOMRESP_00080565
MOMRESP_00080566-MOMRESP_00080570
MOMRESP_00080571-MOMRESP_00080575
MOMRESP_00080576-MOMRESP_00080580
MOMRESP_00080581-MOMRESP_00080585
MOMRESP_00080586-MOMRESP_00080592
MOMRESP_00080593-MOMRESP_00080598
MOMRESP_00080599-MOMRESP_00080603
MOMRESP_00080604-MOMRESP_00080611
MOMRESP_00080612-MOMRESP_00080618
MOMRESP_00080619-MOMRESP_00080624
MOMRESP_00080625-MOMRESP_00080631
MOMRESP_00080632-MOMRESP_00080638
MOMRESP_00080639-MOMRESP_00080645
MOMRESP_00080646-MOMRESP_00080652
MOMRESP_00080653-MOMRESP_00080659
MOMRESP_00080660-MOMRESP_00080665
MOMRESP_00080666-MOMRESP_00080672
MOMRESP_00080673-MOMRESP_00080679
MOMRESP_00080680-MOMRESP_00080686
MOMRESP_00080687-MOMRESP_00080693
MOMRESP_00080694-MOMRESP_00080700
MOMRESP_00080701-MOMRESP_00080705
MOMRESP_00080706-MOMRESP_00080711
MOMRESP_00080712-MOMRESP_00080720
MOMRESP_00080721-MOMRESP_00080727
MOMRESP_00080728-MOMRESP_00080734
MOMRESP_00080735-MOMRESP_00080742
MOMRESP_00080743-MOMRESP_00080750
MOMRESP_00080751-MOMRESP_00080757
MOMRESP_00080758-MOMRESP_00080765
MOMRESP_00080766-MOMRESP_00080772
MOMRESP_00080773-MOMRESP_00080779
MOMRESP_00080780-MOMRESP_00080786
MOMRESP_00080787-MOMRESP_00080794
MOMRESP_00080795-MOMRESP_00080812
MOMRESP_00080813-MOMRESP_00080830
MOMRESP_00080831-MOMRESP_00080854
MOMRESP_00080855-MOMRESP_00080875
MOMRESP_00080876-MOMRESP_00080900
MOMRESP_00080901-MOMRESP_00080944

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00080945-MOMRESP_00080951
MOMRESP_00080952-MOMRESP_00080994
MOMRESP_00080995-MOMRESP_00081002
MOMRESP_00081003-MOMRESP_00081009
MOMRESP_00081010-MOMRESP_00081017
MOMRESP_00081018-MOMRESP_00081022
MOMRESP_00081023-MOMRESP_00081030
MOMRESP_00081031-MOMRESP_00081035
MOMRESP_00081036-MOMRESP_00081043
MOMRESP_00081044-MOMRESP_00081049
MOMRESP_00081050-MOMRESP_00081054
MOMRESP_00081055-MOMRESP_00081061
MOMRESP_00081062-MOMRESP_00081066
MOMRESP_00081067-MOMRESP_00081071
MOMRESP_00081072-MOMRESP_00081079
MOMRESP_00081080-MOMRESP_00081086
MOMRESP_00081087-MOMRESP_00081091
MOMRESP_00081092-MOMRESP_00081097
MOMRESP_00081098-MOMRESP_00081102
MOMRESP_00081103-MOMRESP_00081108
MOMRESP_00081109-MOMRESP_00081113
MOMRESP_00081114-MOMRESP_00081122
MOMRESP_00081123-MOMRESP_00081124
MOMRESP_00081125-MOMRESP_00081129
MOMRESP_00081130-MOMRESP_00081134
MOMRESP_00081135-MOMRESP_00081139
MOMRESP_00081140-MOMRESP_00081144
MOMRESP_00081145-MOMRESP_00081151
MOMRESP_00081152-MOMRESP_00081159
MOMRESP_00081160-MOMRESP_00081166
MOMRESP_00081167-MOMRESP_00081181
MOMRESP_00081182-MOMRESP_00081196
MOMRESP_00081197-MOMRESP_00081201
MOMRESP_00081202-MOMRESP_00081206
MOMRESP_00081207-MOMRESP_00081212
MOMRESP_00081213-MOMRESP_00081218
MOMRESP_00081219-MOMRESP_00081225
MOMRESP_00081226-MOMRESP_00081230
MOMRESP_00081231-MOMRESP_00081252
MOMRESP_00081253-MOMRESP_00081263
MOMRESP_00081264-MOMRESP_00081286
MOMRESP_00081287-MOMRESP_00081311
MOMRESP_00081312-MOMRESP_00081332
MOMRESP_00081333-MOMRESP_00081353
MOMRESP_00081354-MOMRESP_00081368
MOMRESP_00081369-MOMRESP_00081374
MOMRESP_00081375-MOMRESP_00081383
MOMRESP_00081384-MOMRESP_00081393
MOMRESP_00081394-MOMRESP_00081399
MOMRESP_00081400-MOMRESP_00081406
MOMRESP_00081407-MOMRESP_00081411
MOMRESP_00081412-MOMRESP_00081416
MOMRESP_00081417-MOMRESP_00081422
MOMRESP_00081423-MOMRESP_00081429
MOMRESP_00081430-MOMRESP_00081434
MOMRESP_00081435-MOMRESP_00081442

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00081443-MOMRESP_00081449
MOMRESP_00081450-MOMRESP_00081454
MOMRESP_00081455-MOMRESP_00081464
MOMRESP_00081465-MOMRESP_00081469
MOMRESP_00081470-MOMRESP_00081477
MOMRESP_00081478-MOMRESP_00081485
MOMRESP_00081486-MOMRESP_00081493
MOMRESP_00081494-MOMRESP_00081497
MOMRESP_00081498-MOMRESP_00081504
MOMRESP_00081505-MOMRESP_00081512
MOMRESP_00081513-MOMRESP_00081518
MOMRESP_00081519-MOMRESP_00081523
MOMRESP_00081524-MOMRESP_00081528
MOMRESP_00081529-MOMRESP_00081533
MOMRESP_00081534-MOMRESP_00081535
MOMRESP_00081536-MOMRESP_00081540
MOMRESP_00081541-MOMRESP_00081548
MOMRESP_00081549-MOMRESP_00081557
MOMRESP_00081558-MOMRESP_00081565
MOMRESP_00081566-MOMRESP_00081573
MOMRESP_00081574-MOMRESP_00081579
MOMRESP_00081580-MOMRESP_00081584
MOMRESP_00081585-MOMRESP_00081591
MOMRESP_00081592-MOMRESP_00081598
MOMRESP_00081599-MOMRESP_00081603
MOMRESP_00081604-MOMRESP_00081609
MOMRESP_00081610-MOMRESP_00081615
MOMRESP_00081616-MOMRESP_00081621
MOMRESP_00081622-MOMRESP_00081629
MOMRESP_00081630-MOMRESP_00081647
MOMRESP_00081648-MOMRESP_00081655
MOMRESP_00081656-MOMRESP_00081663
MOMRESP_00081664-MOMRESP_00081671
MOMRESP_00081672-MOMRESP_00081679
MOMRESP_00081680-MOMRESP_00081687
MOMRESP_00081688-MOMRESP_00081699
MOMRESP_00081700-MOMRESP_00081714
MOMRESP_00081715-MOMRESP_00081719
MOMRESP_00081720-MOMRESP_00081724
MOMRESP_00081725-MOMRESP_00081729
MOMRESP_00081730-MOMRESP_00081734
MOMRESP_00081735-MOMRESP_00081739
MOMRESP_00081740-MOMRESP_00081745
MOMRESP_00081746-MOMRESP_00081750
MOMRESP_00081751-MOMRESP_00081752
MOMRESP_00081753-MOMRESP_00081791
MOMRESP_00081792-MOMRESP_00081819
MOMRESP_00081820-MOMRESP_00081830
MOMRESP_00081831-MOMRESP_00081849
MOMRESP_00081850-MOMRESP_00081865
MOMRESP_00081866-MOMRESP_00081879
MOMRESP_00081880-MOMRESP_00081908
MOMRESP_00081909-MOMRESP_00081921
MOMRESP_00081922-MOMRESP_00081934
MOMRESP_00081935-MOMRESP_00081947
MOMRESP_00081948-MOMRESP_00081958

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00081959-MOMRESP_00081988
MOMRESP_00081989-MOMRESP_00081997
MOMRESP_00081998-MOMRESP_00082005
MOMRESP_00082006-MOMRESP_00082014
MOMRESP_00082015-MOMRESP_00082024
MOMRESP_00082025-MOMRESP_00082033
MOMRESP_00082034-MOMRESP_00082042
MOMRESP_00082043-MOMRESP_00082046
MOMRESP_00082047-MOMRESP_00082048
MOMRESP_00082049-MOMRESP_00082052
MOMRESP_00082053-MOMRESP_00082056
MOMRESP_00082057-MOMRESP_00082058
MOMRESP_00082059-MOMRESP_00082060
MOMRESP_00082061-MOMRESP_00082062
MOMRESP_00082063-MOMRESP_00082064
MOMRESP_00082065-MOMRESP_00082066
MOMRESP_00082067-MOMRESP_00082070
MOMRESP_00082071-MOMRESP_00082074
MOMRESP_00082075-MOMRESP_00082078
MOMRESP_00082079-MOMRESP_00082080
MOMRESP_00082081-MOMRESP_00082082
MOMRESP_00082083-MOMRESP_00082084
MOMRESP_00082085-MOMRESP_00082088
MOMRESP_00082089-MOMRESP_00082090
MOMRESP_00082091-MOMRESP_00082092
MOMRESP_00082093-MOMRESP_00082096
MOMRESP_00082097-MOMRESP_00082098
MOMRESP_00082099-MOMRESP_00082100
MOMRESP_00082101-MOMRESP_00082102
MOMRESP_00082103-MOMRESP_00082104
MOMRESP_00082105-MOMRESP_00082106
MOMRESP_00082107-MOMRESP_00082110
MOMRESP_00082111-MOMRESP_00082114
MOMRESP_00082115-MOMRESP_00082118
MOMRESP_00082119-MOMRESP_00082120
MOMRESP_00082121-MOMRESP_00082122
MOMRESP_00082123-MOMRESP_00082124
MOMRESP_00082125-MOMRESP_00082126
MOMRESP_00082127-MOMRESP_00082128
MOMRESP_00082129-MOMRESP_00082130
MOMRESP_00082131-MOMRESP_00082132
MOMRESP_00082133-MOMRESP_00082134
MOMRESP_00082135-MOMRESP_00082136
MOMRESP_00082137-MOMRESP_00082138
MOMRESP_00082139-MOMRESP_00082140
MOMRESP_00082141-MOMRESP_00082142
MOMRESP_00082143-MOMRESP_00082144
MOMRESP_00082145-MOMRESP_00082146
MOMRESP_00082147-MOMRESP_00082148
MOMRESP_00082149-MOMRESP_00082150
MOMRESP_00082151-MOMRESP_00082152
MOMRESP_00082153-MOMRESP_00082155
MOMRESP_00082156-MOMRESP_00082157
MOMRESP_00082158-MOMRESP_00082159
MOMRESP_00082160-MOMRESP_00082161
MOMRESP_00082162-MOMRESP_00082164

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00082165-MOMRESP_00082166
MOMRESP_00082167-MOMRESP_00082168
MOMRESP_00082169-MOMRESP_00082170
MOMRESP_00082171-MOMRESP_00082173
MOMRESP_00082174-MOMRESP_00082175
MOMRESP_00082176-MOMRESP_00082178
MOMRESP_00082179-MOMRESP_00082187
MOMRESP_00082188-MOMRESP_00082233
MOMRESP_00082234-MOMRESP_00082236
MOMRESP_00082237-MOMRESP_00082238
MOMRESP_00082239-MOMRESP_00082240
MOMRESP_00082241-MOMRESP_00082242
MOMRESP_00082243-MOMRESP_00082245
MOMRESP_00082246-MOMRESP_00082250
MOMRESP_00082251-MOMRESP_00082255
MOMRESP_00082256-MOMRESP_00082260
MOMRESP_00082261-MOMRESP_00082266
MOMRESP_00082267-MOMRESP_00082271
MOMRESP_00082272-MOMRESP_00082276
MOMRESP_00082277-MOMRESP_00082279
MOMRESP_00082280-MOMRESP_00082281
MOMRESP_00082282-MOMRESP_00082283
MOMRESP_00082284-MOMRESP_00082285
MOMRESP_00082286-MOMRESP_00082288
MOMRESP_00082289-MOMRESP_00082293
MOMRESP_00082294-MOMRESP_00082298
MOMRESP_00082299-MOMRESP_00082303
MOMRESP_00082304-MOMRESP_00082308
MOMRESP_00082309-MOMRESP_00082313
MOMRESP_00082314-MOMRESP_00082318
MOMRESP_00082319-MOMRESP_00082320
MOMRESP_00082321-MOMRESP_00082323
MOMRESP_00082324-MOMRESP_00082325
MOMRESP_00082326-MOMRESP_00082327
MOMRESP_00082328-MOMRESP_00082330
MOMRESP_00082331-MOMRESP_00082332
MOMRESP_00082333-MOMRESP_00082334
MOMRESP_00082335-MOMRESP_00082336
MOMRESP_00082337-MOMRESP_00082338
MOMRESP_00082339-MOMRESP_00082340
MOMRESP_00082341-MOMRESP_00082342
MOMRESP_00082343-MOMRESP_00082344
MOMRESP_00082345-MOMRESP_00082346
MOMRESP_00082347-MOMRESP_00082348
MOMRESP_00082349-MOMRESP_00082353
MOMRESP_00082354-MOMRESP_00082355
MOMRESP_00082356-MOMRESP_00082357
MOMRESP_00082358-MOMRESP_00082359
MOMRESP_00082360-MOMRESP_00082361
MOMRESP_00082362-MOMRESP_00082363
MOMRESP_00082364-MOMRESP_00082365
MOMRESP_00082366-MOMRESP_00082367
MOMRESP_00082368-MOMRESP_00082369
MOMRESP_00082370-MOMRESP_00082371
MOMRESP_00082372-MOMRESP_00082376
MOMRESP_00082377-MOMRESP_00082382

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00082383-MOMRESP_00082388
MOMRESP_00082389-MOMRESP_00082393
MOMRESP_00082394-MOMRESP_00082400
MOMRESP_00082401-MOMRESP_00082405
MOMRESP_00082406-MOMRESP_00082410
MOMRESP_00082411-MOMRESP_00082417
MOMRESP_00082418-MOMRESP_00082422
MOMRESP_00082423-MOMRESP_00082426
MOMRESP_00082427-MOMRESP_00082431
MOMRESP_00082432-MOMRESP_00082433
MOMRESP_00082434-MOMRESP_00082438
MOMRESP_00082439-MOMRESP_00082440
MOMRESP_00082441-MOMRESP_00082442
MOMRESP_00082443-MOMRESP_00082444
MOMRESP_00082445-MOMRESP_00082446
MOMRESP_00082447-MOMRESP_00082448
MOMRESP_00082449-MOMRESP_00082450
MOMRESP_00082451-MOMRESP_00082455
MOMRESP_00082456-MOMRESP_00082468
MOMRESP_00082469-MOMRESP_00082474
MOMRESP_00082475-MOMRESP_00082483
MOMRESP_00082484-MOMRESP_00082489
MOMRESP_00082490-MOMRESP_00082491
MOMRESP_00082492-MOMRESP_00082495
MOMRESP_00082496-MOMRESP_00082497
MOMRESP_00082498-MOMRESP_00082502
MOMRESP_00082503
MOMRESP_00082504
MOMRESP_00082505-MOMRESP_00082506
MOMRESP_00082507-MOMRESP_00082508
MOMRESP_00082509-MOMRESP_00082512
MOMRESP_00082513-MOMRESP_00082519
MOMRESP_00082520-MOMRESP_00082531
MOMRESP_00082532-MOMRESP_00082544
MOMRESP_00082545-MOMRESP_00082559
MOMRESP_00082560-MOMRESP_00082564
MOMRESP_00082565-MOMRESP_00082576
MOMRESP_00082577-MOMRESP_00082582
MOMRESP_00082583-MOMRESP_00082588
MOMRESP_00082589-MOMRESP_00082596
MOMRESP_00082597-MOMRESP_00082602
MOMRESP_00082603-MOMRESP_00082612
MOMRESP_00082613-MOMRESP_00082622
MOMRESP_00082623-MOMRESP_00082630
MOMRESP_00082631-MOMRESP_00082637
MOMRESP_00082638-MOMRESP_00082644
MOMRESP_00082645-MOMRESP_00082652
MOMRESP_00082653-MOMRESP_00082659
MOMRESP_00082660-MOMRESP_00082674
MOMRESP_00082675-MOMRESP_00082682
MOMRESP_00082683-MOMRESP_00082694
MOMRESP_00082695-MOMRESP_00082702
MOMRESP_00082703-MOMRESP_00082714
MOMRESP_00082715-MOMRESP_00082717
MOMRESP_00082718-MOMRESP_00082720
MOMRESP_00082721-MOMRESP_00082723

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00082724-MOMRESP_00082725
MOMRESP_00082726-MOMRESP_00082729
MOMRESP_00082730-MOMRESP_00082733
MOMRESP_00082734-MOMRESP_00082735
MOMRESP_00082736-MOMRESP_00082739
MOMRESP_00082740-MOMRESP_00082741
MOMRESP_00082742
MOMRESP_00082743
MOMRESP_00082744
MOMRESP_00082745
MOMRESP_00082746
MOMRESP_00082747
MOMRESP_00082748
MOMRESP_00082749
MOMRESP_00082750
MOMRESP_00082751
MOMRESP_00082752
MOMRESP_00082753
MOMRESP_00082754
MOMRESP_00082755
MOMRESP_00082756
MOMRESP_00082757
MOMRESP_00082758
MOMRESP_00082759
MOMRESP_00082760
MOMRESP_00082761
MOMRESP_00082762
MOMRESP_00082763
MOMRESP_00082764
MOMRESP_00082765
MOMRESP_00082766
MOMRESP_00082767
MOMRESP_00082768
MOMRESP_00082769
MOMRESP_00082770
MOMRESP_00082771
MOMRESP_00082772
MOMRESP_00082773
MOMRESP_00082774
MOMRESP_00082775
MOMRESP_00082776
MOMRESP_00082777
MOMRESP_00082778
MOMRESP_00082779
MOMRESP_00082780
MOMRESP_00082781
MOMRESP_00082782
MOMRESP_00082783
MOMRESP_00082784
MOMRESP_00082785
MOMRESP_00082786
MOMRESP_00082787
MOMRESP_00082788
MOMRESP_00082789
MOMRESP_00082790
MOMRESP_00082791

Appendix 1

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00082792
MOMRESP_00082793
MOMRESP_00082794
MOMRESP_00082795
MOMRESP_00082796-MOMRESP_00082843
MOMRESP_00082844-MOMRESP_00082848
MOMRESP_00082849-MOMRESP_00082851
MOMRESP_00082852-MOMRESP_00082855
MOMRESP_00082856-MOMRESP_00082858
MOMRESP_00082859-MOMRESP_00082861
MOMRESP_00082862-MOMRESP_00082863
MOMRESP_00082864-MOMRESP_00082866
MOMRESP_00082867-MOMRESP_00082871
MOMRESP_00082872-MOMRESP_00082873
MOMRESP_00082874-MOMRESP_00082877
MOMRESP_00082878-MOMRESP_00082879
MOMRESP_00082880
MOMRESP_00082881-MOMRESP_00082884
MOMRESP_00082885
MOMRESP_00082886-MOMRESP_00082891
MOMRESP_00082892-MOMRESP_00082897
MOMRESP_00082898-MOMRESP_00082903
MOMRESP_00082904-MOMRESP_00082908
MOMRESP_00082909-MOMRESP_00082916
MOMRESP_00082920-MOMRESP_00082921
MOMRESP_00082922
MOMRESP_00082923-MOMRESP_00082925
MOMRESP_00082926-MOMRESP_00082927
MOMRESP_00082928-MOMRESP_00082929
MOMRESP_00082930-MOMRESP_00082931
MOMRESP_00082932-MOMRESP_00082963
MOMRESP_00082964-MOMRESP_00082998
MOMRESP_00082999-MOMRESP_00083005
MOMRESP_00083006-MOMRESP_00083015
MOMRESP_00083016-MOMRESP_00083034
MOMRESP_00083035-MOMRESP_00083037
MOMRESP_00083038-MOMRESP_00083040
MOMRESP_00083041-MOMRESP_00083042
MOMRESP_00083043-MOMRESP_00083044
MOMRESP_00083045-MOMRESP_00083046
MOMRESP_00083047-MOMRESP_00083048
MOMRESP_00083049-MOMRESP_00083050
MOMRESP_00083051-MOMRESP_00083052
MOMRESP_00083053-MOMRESP_00083054
MOMRESP_00083055-MOMRESP_00083056
MOMRESP_00083057-MOMRESP_00083058
MOMRESP_00083059-MOMRESP_00083063
MOMRESP_00083064-MOMRESP_00083065
MOMRESP_00083066-MOMRESP_00083067
MOMRESP_00083068-MOMRESP_00083069
MOMRESP_00083070-MOMRESP_00083071
MOMRESP_00083072-MOMRESP_00083073
MOMRESP_00083074-MOMRESP_00083075
MOMRESP_00083076-MOMRESP_00083077
MOMRESP_00083078-MOMRESP_00083079
MOMRESP_00083080-MOMRESP_00083081

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083082-MOMRESP_00083086
MOMRESP_00083087-MOMRESP_00083091
MOMRESP_00083092-MOMRESP_00083096
MOMRESP_00083097-MOMRESP_00083101
MOMRESP_00083102-MOMRESP_00083106
MOMRESP_00083107-MOMRESP_00083111
MOMRESP_00083112-MOMRESP_00083116
MOMRESP_00083117-MOMRESP_00083121
MOMRESP_00083122-MOMRESP_00083126
MOMRESP_00083127-MOMRESP_00083128
MOMRESP_00083129-MOMRESP_00083133
MOMRESP_00083134-MOMRESP_00083135
MOMRESP_00083136-MOMRESP_00083137
MOMRESP_00083138-MOMRESP_00083139
MOMRESP_00083140-MOMRESP_00083141
MOMRESP_00083142-MOMRESP_00083143
MOMRESP_00083144-MOMRESP_00083145
MOMRESP_00083146-MOMRESP_00083147
MOMRESP_00083148-MOMRESP_00083149
MOMRESP_00083150-MOMRESP_00083151
MOMRESP_00083152-MOMRESP_00083153
MOMRESP_00083154-MOMRESP_00083158
MOMRESP_00083159-MOMRESP_00083160
MOMRESP_00083161-MOMRESP_00083162
MOMRESP_00083163-MOMRESP_00083164
MOMRESP_00083165-MOMRESP_00083166
MOMRESP_00083167-MOMRESP_00083168
MOMRESP_00083169-MOMRESP_00083170
MOMRESP_00083171-MOMRESP_00083172
MOMRESP_00083173-MOMRESP_00083174
MOMRESP_00083175-MOMRESP_00083176
MOMRESP_00083177-MOMRESP_00083181
MOMRESP_00083182-MOMRESP_00083186
MOMRESP_00083187-MOMRESP_00083191
MOMRESP_00083192-MOMRESP_00083196
MOMRESP_00083197-MOMRESP_00083201
MOMRESP_00083202-MOMRESP_00083206
MOMRESP_00083207-MOMRESP_00083211
MOMRESP_00083212-MOMRESP_00083216
MOMRESP_00083217-MOMRESP_00083221
MOMRESP_00083222-MOMRESP_00083223
MOMRESP_00083224-MOMRESP_00083228
MOMRESP_00083229-MOMRESP_00083230
MOMRESP_00083231
MOMRESP_00083232-MOMRESP_00083233
MOMRESP_00083234-MOMRESP_00083235
MOMRESP_00083236-MOMRESP_00083237
MOMRESP_00083238-MOMRESP_00083239
MOMRESP_00083240-MOMRESP_00083241
MOMRESP_00083242-MOMRESP_00083243
MOMRESP_00083244-MOMRESP_00083245
MOMRESP_00083246-MOMRESP_00083247
MOMRESP_00083248-MOMRESP_00083249
MOMRESP_00083250-MOMRESP_00083251
MOMRESP_00083252-MOMRESP_00083253
MOMRESP_00083254-MOMRESP_00083255

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083256-MOMRESP_00083257
MOMRESP_00083258-MOMRESP_00083259
MOMRESP_00083260-MOMRESP_00083261
MOMRESP_00083262-MOMRESP_00083263
MOMRESP_00083264-MOMRESP_00083265
MOMRESP_00083266-MOMRESP_00083267
MOMRESP_00083268-MOMRESP_00083269
MOMRESP_00083270
MOMRESP_00083271
MOMRESP_00083272
MOMRESP_00083273
MOMRESP_00083274
MOMRESP_00083275
MOMRESP_00083276
MOMRESP_00083277
MOMRESP_00083278
MOMRESP_00083279
MOMRESP_00083280
MOMRESP_00083281
MOMRESP_00083282
MOMRESP_00083283
MOMRESP_00083284
MOMRESP_00083285
MOMRESP_00083286
MOMRESP_00083287
MOMRESP_00083288
MOMRESP_00083289
MOMRESP_00083290
MOMRESP_00083291
MOMRESP_00083292
MOMRESP_00083293
MOMRESP_00083294
MOMRESP_00083295
MOMRESP_00083296
MOMRESP_00083297
MOMRESP_00083298
MOMRESP_00083299
MOMRESP_00083300
MOMRESP_00083301
MOMRESP_00083302
MOMRESP_00083303
MOMRESP_00083304
MOMRESP_00083305
MOMRESP_00083306
MOMRESP_00083307
MOMRESP_00083308
MOMRESP_00083309
MOMRESP_00083310
MOMRESP_00083311
MOMRESP_00083312
MOMRESP_00083313
MOMRESP_00083314
MOMRESP_00083315
MOMRESP_00083316
MOMRESP_00083317
MOMRESP_00083318

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083319
MOMRESP_00083320
MOMRESP_00083321
MOMRESP_00083322
MOMRESP_00083323
MOMRESP_00083324
MOMRESP_00083325
MOMRESP_00083326
MOMRESP_00083327
MOMRESP_00083328
MOMRESP_00083329
MOMRESP_00083330
MOMRESP_00083331
MOMRESP_00083332
MOMRESP_00083333-MOMRESP_00083334
MOMRESP_00083335-MOMRESP_00083336
MOMRESP_00083337-MOMRESP_00083338
MOMRESP_00083339-MOMRESP_00083340
MOMRESP_00083341-MOMRESP_00083342
MOMRESP_00083343-MOMRESP_00083344
MOMRESP_00083345-MOMRESP_00083346
MOMRESP_00083347-MOMRESP_00083348
MOMRESP_00083349-MOMRESP_00083350
MOMRESP_00083351-MOMRESP_00083352
MOMRESP_00083353-MOMRESP_00083354
MOMRESP_00083355-MOMRESP_00083356
MOMRESP_00083357-MOMRESP_00083358
MOMRESP_00083359-MOMRESP_00083360
MOMRESP_00083361-MOMRESP_00083362
MOMRESP_00083363-MOMRESP_00083364
MOMRESP_00083365-MOMRESP_00083366
MOMRESP_00083367-MOMRESP_00083368
MOMRESP_00083369-MOMRESP_00083370
MOMRESP_00083371-MOMRESP_00083372
MOMRESP_00083373-MOMRESP_00083374
MOMRESP_00083375-MOMRESP_00083376
MOMRESP_00083377
MOMRESP_00083378-MOMRESP_00083379
MOMRESP_00083380-MOMRESP_00083381
MOMRESP_00083382-MOMRESP_00083383
MOMRESP_00083384-MOMRESP_00083385
MOMRESP_00083386-MOMRESP_00083387
MOMRESP_00083388-MOMRESP_00083389
MOMRESP_00083390-MOMRESP_00083391
MOMRESP_00083392-MOMRESP_00083393
MOMRESP_00083394-MOMRESP_00083395
MOMRESP_00083396-MOMRESP_00083397
MOMRESP_00083398-MOMRESP_00083399
MOMRESP_00083400-MOMRESP_00083401
MOMRESP_00083402-MOMRESP_00083403
MOMRESP_00083404-MOMRESP_00083405
MOMRESP_00083406-MOMRESP_00083407
MOMRESP_00083408
MOMRESP_00083409-MOMRESP_00083410
MOMRESP_00083411-MOMRESP_00083412
MOMRESP_00083413-MOMRESP_00083414

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083415-MOMRESP_00083416
MOMRESP_00083417-MOMRESP_00083418
MOMRESP_00083419-MOMRESP_00083420
MOMRESP_00083421-MOMRESP_00083422
MOMRESP_00083423
MOMRESP_00083424-MOMRESP_00083425
MOMRESP_00083426-MOMRESP_00083427
MOMRESP_00083428-MOMRESP_00083429
MOMRESP_00083430-MOMRESP_00083431
MOMRESP_00083432-MOMRESP_00083433
MOMRESP_00083434-MOMRESP_00083435
MOMRESP_00083436-MOMRESP_00083437
MOMRESP_00083438-MOMRESP_00083439
MOMRESP_00083440-MOMRESP_00083441
MOMRESP_00083442-MOMRESP_00083443
MOMRESP_00083444-MOMRESP_00083445
MOMRESP_00083446-MOMRESP_00083447
MOMRESP_00083448-MOMRESP_00083449
MOMRESP_00083450-MOMRESP_00083451
MOMRESP_00083452-MOMRESP_00083453
MOMRESP_00083454-MOMRESP_00083455
MOMRESP_00083456-MOMRESP_00083457
MOMRESP_00083458-MOMRESP_00083459
MOMRESP_00083460-MOMRESP_00083461
MOMRESP_00083462-MOMRESP_00083463
MOMRESP_00083464-MOMRESP_00083465
MOMRESP_00083466-MOMRESP_00083467
MOMRESP_00083468-MOMRESP_00083469
MOMRESP_00083470-MOMRESP_00083471
MOMRESP_00083472-MOMRESP_00083473
MOMRESP_00083474-MOMRESP_00083475
MOMRESP_00083476-MOMRESP_00083477
MOMRESP_00083478-MOMRESP_00083479
MOMRESP_00083480-MOMRESP_00083481
MOMRESP_00083482-MOMRESP_00083483
MOMRESP_00083484-MOMRESP_00083486
MOMRESP_00083487-MOMRESP_00083493
MOMRESP_00083494-MOMRESP_00083499
MOMRESP_00083500-MOMRESP_00083510
MOMRESP_00083511-MOMRESP_00083520
MOMRESP_00083521
MOMRESP_00083522
MOMRESP_00083523-MOMRESP_00083524
MOMRESP_00083525
MOMRESP_00083526-MOMRESP_00083528
MOMRESP_00083529-MOMRESP_00083531
MOMRESP_00083532-MOMRESP_00083533
MOMRESP_00083534-MOMRESP_00083535
MOMRESP_00083536-MOMRESP_00083537
MOMRESP_00083538-MOMRESP_00083558
MOMRESP_00083559-MOMRESP_00083578
MOMRESP_00083579-MOMRESP_00083583
MOMRESP_00083584-MOMRESP_00083587
MOMRESP_00083588-MOMRESP_00083591
MOMRESP_00083592-MOMRESP_00083595
MOMRESP_00083596-MOMRESP_00083599

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083600-MOMRESP_00083603
MOMRESP_00083604-MOMRESP_00083607
MOMRESP_00083608-MOMRESP_00083611
MOMRESP_00083612-MOMRESP_00083615
MOMRESP_00083616-MOMRESP_00083619
MOMRESP_00083620-MOMRESP_00083623
MOMRESP_00083624-MOMRESP_00083627
MOMRESP_00083628-MOMRESP_00083631
MOMRESP_00083632-MOMRESP_00083635
MOMRESP_00083636-MOMRESP_00083639
MOMRESP_00083640-MOMRESP_00083643
MOMRESP_00083644-MOMRESP_00083647
MOMRESP_00083648-MOMRESP_00083651
MOMRESP_00083652-MOMRESP_00083655
MOMRESP_00083656-MOMRESP_00083659
MOMRESP_00083660-MOMRESP_00083663
MOMRESP_00083664-MOMRESP_00083667
MOMRESP_00083668-MOMRESP_00083671
MOMRESP_00083672-MOMRESP_00083675
MOMRESP_00083676-MOMRESP_00083679
MOMRESP_00083680
MOMRESP_00083681
MOMRESP_00083682
MOMRESP_00083683
MOMRESP_00083684
MOMRESP_00083685
MOMRESP_00083686-MOMRESP_00083709
MOMRESP_00083710-MOMRESP_00083733
MOMRESP_00083734-MOMRESP_00083757
MOMRESP_00083758
MOMRESP_00083759
MOMRESP_00083760
MOMRESP_00083761
MOMRESP_00083762-MOMRESP_00083763
MOMRESP_00083764
MOMRESP_00083765-MOMRESP_00083781
MOMRESP_00083782-MOMRESP_00083783
MOMRESP_00083784-MOMRESP_00083785
MOMRESP_00083786-MOMRESP_00083787
MOMRESP_00083788-MOMRESP_00083789
MOMRESP_00083790-MOMRESP_00083791
MOMRESP_00083792-MOMRESP_00083793
MOMRESP_00083794
MOMRESP_00083795-MOMRESP_00083796
MOMRESP_00083797-MOMRESP_00083798
MOMRESP_00083799-MOMRESP_00083800
MOMRESP_00083801-MOMRESP_00083802
MOMRESP_00083803-MOMRESP_00083804
MOMRESP_00083805-MOMRESP_00083806
MOMRESP_00083807-MOMRESP_00083808
MOMRESP_00083809-MOMRESP_00083810
MOMRESP_00083811-MOMRESP_00083812
MOMRESP_00083813-MOMRESP_00083814
MOMRESP_00083815-MOMRESP_00083816
MOMRESP_00083817-MOMRESP_00083818
MOMRESP_00083819-MOMRESP_00083820

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083821-MOMRESP_00083822
MOMRESP_00083823-MOMRESP_00083824
MOMRESP_00083825-MOMRESP_00083826
MOMRESP_00083827-MOMRESP_00083828
MOMRESP_00083829-MOMRESP_00083830
MOMRESP_00083831-MOMRESP_00083832
MOMRESP_00083833-MOMRESP_00083834
MOMRESP_00083835-MOMRESP_00083836
MOMRESP_00083837-MOMRESP_00083838
MOMRESP_00083839-MOMRESP_00083840
MOMRESP_00083841
MOMRESP_00083842-MOMRESP_00083845
MOMRESP_00083846-MOMRESP_00083847
MOMRESP_00083848-MOMRESP_00083849
MOMRESP_00083850-MOMRESP_00083851
MOMRESP_00083852-MOMRESP_00083853
MOMRESP_00083854-MOMRESP_00083855
MOMRESP_00083856-MOMRESP_00083857
MOMRESP_00083858-MOMRESP_00083859
MOMRESP_00083860-MOMRESP_00083861
MOMRESP_00083862-MOMRESP_00083863
MOMRESP_00083864-MOMRESP_00083865
MOMRESP_00083866-MOMRESP_00083867
MOMRESP_00083868-MOMRESP_00083869
MOMRESP_00083870-MOMRESP_00083871
MOMRESP_00083872-MOMRESP_00083873
MOMRESP_00083874-MOMRESP_00083875
MOMRESP_00083876-MOMRESP_00083877
MOMRESP_00083878-MOMRESP_00083879
MOMRESP_00083880-MOMRESP_00083881
MOMRESP_00083882-MOMRESP_00083883
MOMRESP_00083884-MOMRESP_00083885
MOMRESP_00083886-MOMRESP_00083887
MOMRESP_00083888-MOMRESP_00083889
MOMRESP_00083890-MOMRESP_00083891
MOMRESP_00083892-MOMRESP_00083893
MOMRESP_00083894-MOMRESP_00083895
MOMRESP_00083896-MOMRESP_00083897
MOMRESP_00083898-MOMRESP_00083899
MOMRESP_00083900-MOMRESP_00083901
MOMRESP_00083902-MOMRESP_00083903
MOMRESP_00083904
MOMRESP_00083905-MOMRESP_00083906
MOMRESP_00083907-MOMRESP_00083908
MOMRESP_00083909-MOMRESP_00083910
MOMRESP_00083911-MOMRESP_00083912
MOMRESP_00083913-MOMRESP_00083914
MOMRESP_00083915-MOMRESP_00083916
MOMRESP_00083917-MOMRESP_00083918
MOMRESP_00083919-MOMRESP_00083920
MOMRESP_00083921-MOMRESP_00083922
MOMRESP_00083923-MOMRESP_00083924
MOMRESP_00083925-MOMRESP_00083926
MOMRESP_00083927-MOMRESP_00083928
MOMRESP_00083929-MOMRESP_00083930
MOMRESP_00083931-MOMRESP_00083932

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00083933-MOMRESP_00083934
MOMRESP_00083935-MOMRESP_00083936
MOMRESP_00083937-MOMRESP_00083938
MOMRESP_00083939-MOMRESP_00083940
MOMRESP_00083941-MOMRESP_00083942
MOMRESP_00083943-MOMRESP_00083944
MOMRESP_00083945-MOMRESP_00083946
MOMRESP_00083947-MOMRESP_00083948
MOMRESP_00083949-MOMRESP_00083950
MOMRESP_00083951-MOMRESP_00083952
MOMRESP_00083953-MOMRESP_00083954
MOMRESP_00083955-MOMRESP_00083956
MOMRESP_00083957-MOMRESP_00083958
MOMRESP_00083959-MOMRESP_00083960
MOMRESP_00083961
MOMRESP_00083962-MOMRESP_00083963
MOMRESP_00083964-MOMRESP_00083965
MOMRESP_00083966-MOMRESP_00083967
MOMRESP_00083968-MOMRESP_00083969
MOMRESP_00083970-MOMRESP_00083971
MOMRESP_00083972-MOMRESP_00083973
MOMRESP_00083974-MOMRESP_00083975
MOMRESP_00083976-MOMRESP_00083977
MOMRESP_00083978-MOMRESP_00083979
MOMRESP_00083980-MOMRESP_00083981
MOMRESP_00083982-MOMRESP_00083983
MOMRESP_00083984-MOMRESP_00083985
MOMRESP_00083986-MOMRESP_00083987
MOMRESP_00083988-MOMRESP_00083989
MOMRESP_00083990-MOMRESP_00083991
MOMRESP_00083992-MOMRESP_00083993
MOMRESP_00083994-MOMRESP_00083995
MOMRESP_00083996-MOMRESP_00083997
MOMRESP_00083998-MOMRESP_00083999
MOMRESP_00084000-MOMRESP_00084001
MOMRESP_00084002-MOMRESP_00084003
MOMRESP_00084004-MOMRESP_00084005
MOMRESP_00084006-MOMRESP_00084007
MOMRESP_00084008-MOMRESP_00084009
MOMRESP_00084010-MOMRESP_00084011
MOMRESP_00084012-MOMRESP_00084013
MOMRESP_00084014-MOMRESP_00084015
MOMRESP_00084016-MOMRESP_00084017
MOMRESP_00084018-MOMRESP_00084019
MOMRESP_00084020-MOMRESP_00084021
MOMRESP_00084022-MOMRESP_00084023
MOMRESP_00084024-MOMRESP_00084025
MOMRESP_00084026-MOMRESP_00084027
MOMRESP_00084028-MOMRESP_00084029
MOMRESP_00084030-MOMRESP_00084031
MOMRESP_00084032-MOMRESP_00084035
MOMRESP_00084036-MOMRESP_00084037
MOMRESP_00084038
MOMRESP_00084039
MOMRESP_00084040
MOMRESP_00084041

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00084042-MOMRESP_00084043
MOMRESP_00084044-MOMRESP_00084045
MOMRESP_00084046-MOMRESP_00084047
MOMRESP_00084048-MOMRESP_00084049
MOMRESP_00084050-MOMRESP_00084051
MOMRESP_00084052-MOMRESP_00084053
MOMRESP_00084054-MOMRESP_00084055
MOMRESP_00084056-MOMRESP_00084057
MOMRESP_00084058-MOMRESP_00084059
MOMRESP_00084060-MOMRESP_00084061
MOMRESP_00084062-MOMRESP_00084063
MOMRESP_00084064-MOMRESP_00084065
MOMRESP_00084066-MOMRESP_00084067
MOMRESP_00084068-MOMRESP_00084069
MOMRESP_00084070-MOMRESP_00084071
MOMRESP_00084072-MOMRESP_00084073
MOMRESP_00084074-MOMRESP_00084075
MOMRESP_00084076-MOMRESP_00084077
MOMRESP_00084078-MOMRESP_00084079
MOMRESP_00084080-MOMRESP_00084081
MOMRESP_00084082-MOMRESP_00084083
MOMRESP_00084084-MOMRESP_00084085
MOMRESP_00084086-MOMRESP_00084087
MOMRESP_00084088-MOMRESP_00084089
MOMRESP_00084090-MOMRESP_00084091
MOMRESP_00084092-MOMRESP_00084093
MOMRESP_00084094
MOMRESP_00084095-MOMRESP_00084096
MOMRESP_00084097-MOMRESP_00084098
MOMRESP_00084099-MOMRESP_00084100
MOMRESP_00084101-MOMRESP_00084102
MOMRESP_00084103-MOMRESP_00084104
MOMRESP_00084105-MOMRESP_00084106
MOMRESP_00084107-MOMRESP_00084108
MOMRESP_00084109-MOMRESP_00084110
MOMRESP_00084111-MOMRESP_00084112
MOMRESP_00084113-MOMRESP_00084114
MOMRESP_00084115-MOMRESP_00084116
MOMRESP_00084117-MOMRESP_00084118
MOMRESP_00084119-MOMRESP_00084120
MOMRESP_00084121-MOMRESP_00084122
MOMRESP_00084123-MOMRESP_00084124
MOMRESP_00084125-MOMRESP_00084126
MOMRESP_00084127-MOMRESP_00084128
MOMRESP_00084129-MOMRESP_00084130
MOMRESP_00084131-MOMRESP_00084132
MOMRESP_00084133-MOMRESP_00084134
MOMRESP_00084135-MOMRESP_00084136
MOMRESP_00084137-MOMRESP_00084138
MOMRESP_00084139-MOMRESP_00084140
MOMRESP_00084141-MOMRESP_00084142
MOMRESP_00084143-MOMRESP_00084144
MOMRESP_00084145-MOMRESP_00084146
MOMRESP_00084147-MOMRESP_00084148
MOMRESP_00084149
MOMRESP_00084150-MOMRESP_00084151

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00084152-MOMRESP_00084155
MOMRESP_00084156-MOMRESP_00084157
MOMRESP_00084158-MOMRESP_00084159
MOMRESP_00084160-MOMRESP_00084161
MOMRESP_00084162-MOMRESP_00084163
MOMRESP_00084164-MOMRESP_00084165
MOMRESP_00084166-MOMRESP_00084167
MOMRESP_00084168-MOMRESP_00084169
MOMRESP_00084170-MOMRESP_00084171
MOMRESP_00084172-MOMRESP_00084173
MOMRESP_00084174-MOMRESP_00084175
MOMRESP_00084176-MOMRESP_00084177
MOMRESP_00084178-MOMRESP_00084179
MOMRESP_00084180-MOMRESP_00084181
MOMRESP_00084182-MOMRESP_00084183
MOMRESP_00084184-MOMRESP_00084185
MOMRESP_00084186-MOMRESP_00084187
MOMRESP_00084188-MOMRESP_00084189
MOMRESP_00084190-MOMRESP_00084191
MOMRESP_00084192-MOMRESP_00084193
MOMRESP_00084194-MOMRESP_00084195
MOMRESP_00084196-MOMRESP_00084197
MOMRESP_00084198-MOMRESP_00084207
MOMRESP_00084208
MOMRESP_00084208-MOMRESP_00084214
MOMRESP_00084215
MOMRESP_00084216-MOMRESP_00084222
MOMRESP_00084223-MOMRESP_00084262
MOMRESP_00084263-MOMRESP_00084271
MOMRESP_00084272-MOMRESP_00084282
MOMRESP_00084283-MOMRESP_00084288
MOMRESP_00084289
MOMRESP_00084290-MOMRESP_00084293
MOMRESP_00084294-MOMRESP_00084320
MOMRESP_00084321-MOMRESP_00084334
MOMRESP_00084335-MOMRESP_00084344
MOMRESP_00084345-MOMRESP_00084350
MOMRESP_00084351-MOMRESP_00084352
MOMRESP_00084353-MOMRESP_00084356
MOMRESP_00084357-MOMRESP_00084360
MOMRESP_00084361-MOMRESP_00084364
MOMRESP_00084365-MOMRESP_00084368
MOMRESP_00084369-MOMRESP_00084372
MOMRESP_00084373-MOMRESP_00084375
MOMRESP_00084376-MOMRESP_00084377
MOMRESP_00084378-MOMRESP_00084379
MOMRESP_00084380-MOMRESP_00084381
MOMRESP_00084382-MOMRESP_00084383
MOMRESP_00084384-MOMRESP_00084385
MOMRESP_00084386-MOMRESP_00084387
MOMRESP_00084388-MOMRESP_00084389
MOMRESP_00084390-MOMRESP_00084393
MOMRESP_00084394-MOMRESP_00084397
MOMRESP_00084398-MOMRESP_00084401
MOMRESP_00084402-MOMRESP_00084404
MOMRESP_00084405-MOMRESP_00084408

Appendix 1

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00084409-MOMRESP_00084413
MOMRESP_00084414-MOMRESP_00084415
MOMRESP_00084416-MOMRESP_00084418
MOMRESP_00084419-MOMRESP_00084420
MOMRESP_00084421-MOMRESP_00084423
MOMRESP_00084424-MOMRESP_00084425
MOMRESP_00084426-MOMRESP_00084428
MOMRESP_00084429-MOMRESP_00084431
MOMRESP_00084432-MOMRESP_00084433
MOMRESP_00084434-MOMRESP_00084435
MOMRESP_00084436-MOMRESP_00084439
MOMRESP_00084440-MOMRESP_00084443
MOMRESP_00084444-MOMRESP_00084445
MOMRESP_00084446-MOMRESP_00084447
MOMRESP_00084448-MOMRESP_00084449
MOMRESP_00084450-MOMRESP_00084451
MOMRESP_00084452-MOMRESP_00084453
MOMRESP_00084454-MOMRESP_00084455
MOMRESP_00084456-MOMRESP_00084457
MOMRESP_00084458-MOMRESP_00084459
MOMRESP_00084460-MOMRESP_00084461
MOMRESP_00084462-MOMRESP_00084463
MOMRESP_00084464-MOMRESP_00084465
MOMRESP_00084466-MOMRESP_00084468
MOMRESP_00084469-MOMRESP_00084470
MOMRESP_00084471-MOMRESP_00084472
MOMRESP_00084473-MOMRESP_00084474
MOMRESP_00084475-MOMRESP_00084476
MOMRESP_00084477-MOMRESP_00084480
MOMRESP_00084481-MOMRESP_00084483
MOMRESP_00084484-MOMRESP_00084487
MOMRESP_00084488-MOMRESP_00084490
MOMRESP_00084491-MOMRESP_00084494
MOMRESP_00084495-MOMRESP_00084498
MOMRESP_00084499-MOMRESP_00084502
MOMRESP_00084503-MOMRESP_00084506
MOMRESP_00084507-MOMRESP_00084508
MOMRESP_00084509-MOMRESP_00084510
MOMRESP_00084511-MOMRESP_00084512
MOMRESP_00084513-MOMRESP_00084514
MOMRESP_00084515-MOMRESP_00084516
MOMRESP_00084517-MOMRESP_00084518
MOMRESP_00084519-MOMRESP_00084520
MOMRESP_00084521-MOMRESP_00084522
MOMRESP_00084523-MOMRESP_00084524
MOMRESP_00084525-MOMRESP_00084528
MOMRESP_00084529-MOMRESP_00084533
MOMRESP_00084534-MOMRESP_00084537
MOMRESP_00084538-MOMRESP_00084541
MOMRESP_00084542-MOMRESP_00084545
MOMRESP_00084546-MOMRESP_00084549
MOMRESP_00084550-MOMRESP_00084553
MOMRESP_00084554-MOMRESP_00084557
MOMRESP_00084558-MOMRESP_00084561
MOMRESP_00084562-MOMRESP_00084565
MOMRESP_00084566-MOMRESP_00084569

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00084570-MOMRESP_00084574
MOMRESP_00084575-MOMRESP_00084578
MOMRESP_00084579-MOMRESP_00084581
MOMRESP_00084582-MOMRESP_00084586
MOMRESP_00084587-MOMRESP_00084588
MOMRESP_00084589-MOMRESP_00084592
MOMRESP_00084593-MOMRESP_00084595
MOMRESP_00084596-MOMRESP_00084598
MOMRESP_00084599-MOMRESP_00084600
MOMRESP_00084601-MOMRESP_00084602
MOMRESP_00084603-MOMRESP_00084604
MOMRESP_00084605-MOMRESP_00084606
MOMRESP_00084607-MOMRESP_00084608
MOMRESP_00084609-MOMRESP_00084610
MOMRESP_00084611-MOMRESP_00084614
MOMRESP_00084615-MOMRESP_00084622
MOMRESP_00084623-MOMRESP_00084630
MOMRESP_00084631-MOMRESP_00084632
MOMRESP_00084633-MOMRESP_00084637
MOMRESP_00084638-MOMRESP_00084642
MOMRESP_00084643-MOMRESP_00084647
MOMRESP_00084648-MOMRESP_00084650
MOMRESP_00084651-MOMRESP_00084652
MOMRESP_00084653-MOMRESP_00084655
MOMRESP_00084656-MOMRESP_00084658
MOMRESP_00084659-MOMRESP_00084661
MOMRESP_00084662-MOMRESP_00084664
MOMRESP_00084665-MOMRESP_00084668
MOMRESP_00084669-MOMRESP_00084671
MOMRESP_00084672-MOMRESP_00084674
MOMRESP_00084675-MOMRESP_00084677
MOMRESP_00084678-MOMRESP_00084679
MOMRESP_00084680-MOMRESP_00084683
MOMRESP_00084684-MOMRESP_00084686
MOMRESP_00084687-MOMRESP_00084689
MOMRESP_00084690-MOMRESP_00084691
MOMRESP_00084692-MOMRESP_00084693
MOMRESP_00084694-MOMRESP_00084695
MOMRESP_00084696-MOMRESP_00084697
MOMRESP_00084698-MOMRESP_00084702
MOMRESP_00084703-MOMRESP_00084707
MOMRESP_00084708-MOMRESP_00084712
MOMRESP_00084713-MOMRESP_00084717
MOMRESP_00084718-MOMRESP_00084722
MOMRESP_00084723-MOMRESP_00084727
MOMRESP_00084728-MOMRESP_00084736
MOMRESP_00084737-MOMRESP_00084746
MOMRESP_00084747-MOMRESP_00084754
MOMRESP_00084755-MOMRESP_00084762
MOMRESP_00084763-MOMRESP_00084772
MOMRESP_00084773-MOMRESP_00084780
MOMRESP_00084781-MOMRESP_00084788
MOMRESP_00084789-MOMRESP_00084794
MOMRESP_00084795-MOMRESP_00084798
MOMRESP_00084799-MOMRESP_00084802
MOMRESP_00084803-MOMRESP_00084805

Appendix 1

## Mohammad Honarkar v. Mahender Makhijani et al.

**Materials Considered**

MOMRESP_00084806-MOMRESP_00084809
MOMRESP_00084810-MOMRESP_00084813
MOMRESP_00084814-MOMRESP_00084817
MOMRESP_00084818-MOMRESP_00084821
MOMRESP_00084822-MOMRESP_00084825
MOMRESP_00084826-MOMRESP_00084833
MOMRESP_00084834-MOMRESP_00084839
MOMRESP_00084840-MOMRESP_00084841
MOMRESP_00084842-MOMRESP_00084844
MOMRESP_00084845-MOMRESP_00084847
MOMRESP_00084848-MOMRESP_00084849
MOMRESP_00084850-MOMRESP_00084875
MOMRESP_00084876
MOMRESP_00084876-MOMRESP_00085008
MOMRESP_00085009-MOMRESP_00085215
MOMRESP_00085216-MOMRESP_00085217
MOMRESP_00085218-MOMRESP_00085225
MOMRESP_00085226-MOMRESP_00085247
MOMRESP_00085248
MOMRESP_00085248-MOMRESP_00085385
MOMRESP_00085386
MOMRESP_00085387
MOMRESP_00085388
MOMRESP_00085389
MOMRESP_00085390-MOMRESP_00085394
MOMRESP_00085395-MOMRESP_00085409
MOMRESP_00085410-MOMRESP_00085412
MOMRESP_00085413-MOMRESP_00085414
MOMRESP_00085415
MOMRESP_00085415
MOMRESP_00085416-MOMRESP_00085451
MOMRESP_00085452-MOMRESP_00085456
MOMRESP_00085457-MOMRESP_00085461
MOMRESP_00085462-MOMRESP_00085467
MOMRESP_00085468-MOMRESP_00085474
MOMRESP_00085475-MOMRESP_00085477
MOMRESP_00089376
MOMRESP_00089479
MOMRESP_00089481
MOMRESP_00089482
MOMRESP_00089484
MOMRESP_00089485
MOMRESP_00089486
MOMRESP_00089486 (Slipsheet)
MOMRESP_00089487
MOMRESP_00089487 (Slipsheet)
MOMRESP_00089488
MOMRESP_00089498
MOMRESP_00089507
MOMRESP_00089509
MOMRESP_00089531
MOMRESP_00089547
MOMRESP_00089591
MOMRESP_00089600
MOMRESP_00089668
MOMRESP_00089722

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00089764
MOMRESP_00089818
MOMRESP_00090016
MOMRESP_00090150
MOMRESP_00090244
MOMRESP_00090340
MOMRESP_00090392
MOMRESP_00090401
MOMRESP_00090413
MOMRESP_00090423
MOMRESP_00090435
MOMRESP_00090447
MOMRESP_00090481
MOMRESP_00090529
MOMRESP_00090566
MOMRESP_00090598
MOMRESP_00090609
MOMRESP_00090628
MOMRESP_00090678
MOMRESP_00090722
MOMRESP_00090804
MOMRESP_00090891
MOMRESP_00091019
MOMRESP_00091138
MOMRESP_00091198
MOMRESP_00091253
MOMRESP_00091555
MOMRESP_00091633
MOMRESP_00091787
MOMRESP_00091935
MOMRESP_00091938
MOMRESP_00091941
MOMRESP_00091944
MOMRESP_00091947
MOMRESP_00091949
MOMRESP_00091952
MOMRESP_00091955
MOMRESP_00092025
MOMRESP_00092028
MOMRESP_00092031
MOMRESP_00092042
MOMRESP_00092060
MOMRESP_00092074
MOMRESP_00092088
MOMRESP_00092101
MOMRESP_00092114
MOMRESP_00092127
MOMRESP_00092140
MOMRESP_00092153
MOMRESP_00092159
MOMRESP_00092201
MOMRESP_00092229
MOMRESP_00092244
MOMRESP_00092249
MOMRESP_00092261
MOMRESP_00092272

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00092283
MOMRESP_00092303
MOMRESP_00092317
MOMRESP_00092332
MOMRESP_00092361
MOMRESP_00092376
MOMRESP_00092395
MOMRESP_00092411
MOMRESP_00092430
MOMRESP_00092450
MOMRESP_00092460
MOMRESP_00092470
MOMRESP_00092488
MOMRESP_00092498
MOMRESP_00092516
MOMRESP_00092536
MOMRESP_00092563
MOMRESP_00092590
MOMRESP_00092601
MOMRESP_00092606
MOMRESP_00092612
MOMRESP_00092620
MOMRESP_00092642
MOMRESP_00092670
MOMRESP_00092694
MOMRESP_00092705
MOMRESP_00092728
MOMRESP_00092751
MOMRESP_00092756
MOMRESP_00092759
MOMRESP_00092762
MOMRESP_00092783
MOMRESP_00092813
MOMRESP_00092871
MOMRESP_00092959
MOMRESP_00093097
MOMRESP_00093117
MOMRESP_00093120
MOMRESP_00093123
MOMRESP_00093125
MOMRESP_00093128
MOMRESP_00093131
MOMRESP_00093191
MOMRESP_00093253
MOMRESP_00093316
MOMRESP_00093380
MOMRESP_00093494
MOMRESP_00093515
MOMRESP_00093520
MOMRESP_00093589
MOMRESP_00093602
MOMRESP_00093607
MOMRESP_00093625
MOMRESP_00093627
MOMRESP_00093628
MOMRESP_00093630

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Materials Considered**

MOMRESP_00093631
MOMRESP_00093633
MOMRESP_00093636
MOMRESP_00093641
MOMRESP_00093655
MOMRESP_00093671
MOMRESP_00093732
MOMRESP_00093735
MOMRESP_00095267
MOMRESP_00095271
MOMRESP_00095275
MOMRESP_00095279
MOMRESP_00095283
MOMRESP_00095288
NANO_00183-NANO_05357 1-31-2024.zip
NANO_04206-8
NANO_08854 - BBG Real Estate Services appraisal of Cliff Village from 2/6/19
NANO_27313
NANOBANC-000245
NANOBANC-000246
Petition_Supp0000001_CONFIDENTIAL
Petition_Supp0000011_CONFIDENTIAL
Petition_Supp0000021_CONFIDENTIAL
Petition_Supp0000033_CONFIDENTIAL
Petition_Supp0000045_CONFIDENTIAL
Petition_Supp0000057_CONFIDENTIAL
Petition_Supp0000069_CONFIDENTIAL
Petition_Supp0000081_CONFIDENTIAL
Petition_Supp0000092_CONFIDENTIAL
Petition_Supp0000106_CONFIDENTIAL
Petition_Supp0000120_CONFIDENTIAL
Petition_Supp0000132_CONFIDENTIAL
Petition_Supp0000146_CONFIDENTIAL
Petition_Supp0000158_CONFIDENTIAL
Petition_Supp0000170_CONFIDENTIAL
Petition_Supp0000182_CONFIDENTIAL
Petition_Supp0000194_CONFIDENTIAL
Petition_Supp0000206_CONFIDENTIAL
Petition_Supp0000220_CONFIDENTIAL
Petition_Supp0000232_CONFIDENTIAL
Petition_Supp0000242_CONFIDENTIAL
Petition_Supp0000254_CONFIDENTIAL
Petition_Supp0000268_CONFIDENTIAL
Petition_Supp0000283_CONFIDENTIAL
Petition_Supp0000297_CONFIDENTIAL
Petition_Supp0000311_CONFIDENTIAL
Petition_Supp0000323_CONFIDENTIAL
Petition_Supp0000335_CONFIDENTIAL
Petition_Supp0000350_CONFIDENTIAL
Petition_Supp0000364_CONFIDENTIAL
Petition_Supp0000379_CONFIDENTIAL
Petition_Supp0000394_CONFIDENTIAL

**Mohammad Honarkar v. Mahender Makhijani et al.**

**Testimony Experience of Michael Spindler during the last 4 years**

**Trial Testimony:**
Scott Crane v. Rave Restaurant Group, Inc.
John C. Depp, II v. Amber Laura Heard
Ryan Kime, M.D. v. Adventist Health Clearlake Hospital, Inc., et al.
Takeya USA Corporation v. Power Play Marketing Group, LLC
Kenneth R. Seeley, et al. v. Zenith Homes, LLC, et al.
Jill M. Hall v. Brad Arthur Manger, as Trustee of the Manger Trust dated December 20, 1990 and as an individual
Shashikant Jogani v. Haresh Jogani, et al.
Brett Iannuccillo v. Anesco North Broward, LLC, et al.

**Arbitration Testimony:**
Marc Haberman and United Partners Limited, LLC v. Michael Call and Jordison LLC
M. James Schulz, et al. v. Ryan Millsap, et al.
Blue Ribbon Dispatch Holdings, Inc. v. Rozita Korori and Sina Elyasi
Robert Ferguson v. ServiceNow, Inc.

**Deposition Testimony:**
CashCall, Inc., et al. v. Katten Muchin Rosenman, LLP, et al.
JTS Communities, Inc., et al. v. ZB, N.A. dba California Bank and Trust, et al.
Five Towns Pediatrics, P.C. d/b/a Pediatric Healthcare of Long Island v. Billet Feit & Preis, P.C., et al.
M. James Schulz, et al. v. Ryan Millsap, et al.
Re-Marketing Group, Inc. v. Mark Miller and Wow Bargains & Closeouts., Inc.
Ryan Kime, M.D. v. Adventist Health Clearlake Hospital, Inc., et al.
John C. Depp, II v. Amber Laura Heard
Matthew D. Van Steenwyck, et al. v. Kedrin E. Van Steenwyck, et al.
Shashikant Jogani v. Harsh Jogani, et al.
San Juan Products, Inc. et al. v. River Pools & Spas, Inc., et al.
Kenneth R. Seeley, et al. v. Zenith Homes, LLC, et al.
Clean Safety, Inc. v. HNC Enterprises, LLC
Monarch Air Group, LLC d/b/a Mercury Jets, et al. v. JPMorgan Chase Bank, N.A.
Brendan Thompson v. Enfants Riches Deprimes, et al and related cross-action
Jill M. Hall v. Brad Arthur Manger, as Trustee of the Manger Trust dated December 20, 1990 and as an individual
Emi Ito, Olympia West Plaza, LLC & Glendale West Shopping Center, LLC v. Dongsik Benjamin Park, Henry Hough & Chon & Hough, a Professional Corporation
Purocol, LLC v. Circle K Stores, Inc.
Christopher Fenton v. DMG Entertainment, LLC, et al.
Jane Doe v. Robert Lovell and Home Marketing Services, Inc. d/b/a HMS, Inc.
Robert Ferguson v. ServiceNow, Inc.
Brett Iannuccillo v. Anesco North Broward, LLC, et al.
Kevin Neal v. Trinsic Residential Group GP LLC and Brian Tusa
Sandra K. McBeth, Chapter 7 Trustee of Rajysan, Inc. v. Gurpreet Sahani, et al.

# MICHAEL SPINDLER
**CPA, CFF, CFE, ABV, CAMS**

## SENIOR MANAGING DIRECTOR

mspindler@brileyfin.com
(213) 409-6230
vCard



### Prominent Matters

- Expert witness on behalf of Mr. Depp in the Depp v. Heard trial. Testified on the damages incurred by Mr. Depp and in rebuttal to the damages testimony of Ms. Heard's expert.

- Expert Witness on behalf of the SEC in a successful disgorgement proceeding against promoters of oil & gas partnerships

- Witness on behalf of the State of Arizona in a criminal matter alleging an embezzlement at a Fortune 500 company

- Expert witness on damages in a large award related to the mismanagement of a casino

- Expert witness on alter ego on behalf of a writer/director against a film producer, successfully piercing through the corporate veil

- Expert Witness on behalf of successful plaintiff Chevron U.S.A. in litigation alleging violations of the Petroleum Marketing Practices Act

### Specialties:
Accounting
Alter Ego
Damages & Lost Profit Analysis
Expert Witness
Forensic Accounting
Fraud Investigation
Internal Investigations
Litigation Support
Ponzi Schemes
White Collar Crime

### Industries:
Financial Institution
Manufacturing
Media & Entertainment
Real Estate
Retail

Michael Spindler is a CPA and Certified Fraud Examiner who brings approximately 40 years of experience to complex disputes including matters related to forensic accounting and business fraud investigations across a wide range of industries. He has provided expert testimony on dozens of occasions in bench trials, jury trials and arbitration proceedings. He has provided Foreign Corrupt Practices Act investigations and training services in various countries around the world, including China, Russia, India and Saudi Arabia. Having conducted numerous high-profile investigations of public company financial statement fraud and other matters, Mr. Spindler has presented his findings to special committees and various government agencies on behalf of clients, including the Department of Justice, Federal Bureau of Investigation, Internal Revenue Service and the Office of Thrift Supervision.

Michael's clients include law firms, corporations, individuals, government agencies and non-profit organizations.

Prior to joining B. Riley Advisory Services (formerly GlassRatner), Michael held senior leadership positions with several forensic accounting firms and was a Partner at two national public accounting firms. An experienced public speaker, Michael has authored or co-authored a number of publications on fraud-related topics and developed and presented seminars and courses on forensic accounting and litigation support issues. He is a past President of the Los Angeles Chapter of CALCPA and of the Los Angeles Chapter of the Association of Certified Fraud Examiners. He is also a past member of the Board of Trustees of the CALCPA Education Foundation and of CALCPA Council.

Representative assignments on which Mr. Spindler has worked include:

- Lost Profits/Economic Damage Assessments on behalf of Plaintiffs and Defendants

- Joint venture and shareholder disputes

- Earn-out and compensation disputes

**B | RILEY** *Advisory Services*
a B. Riley Financial company

# MICHAEL SPINDLER CPA, CFF, CFE, ABV, CAMS

mspindler@brileyfin.com
(213) 409-6230
vCard

- Fraud Investigations

- Royalty Inspections

- Film and participation audits

- Business manager reviews

- Internal Corporate Investigations in connection with allegations of management fraud, financial statement fraud and internal embezzlements

- Alter ego assessments

- Ponzi scheme investigations

- FCPA investigations and consulting

Michael is a Certified Public Accountant (licensed in California, New York, Nevada, Arizona, Utah and Hawaii), is Certified in Financial Forensics, is Accredited in Business Valuation (both issued by the AICPA) is a Certified Fraud Examiner (issued by the Association of Certified Fraud Examiners) and is a Certified Anti-Money Laundering Specialist ("CAMS"). Mr. Spindler graduated from the State University of New York at Albany with a bachelor of science degree in accounting in 1981.

B∙RILEY *Advisory Services*
a B. Riley Financial company

# **EXHIBIT 5**

# JAMS ARBITRATION
## No. 5220003126

**MOHAMMAD HONARKAR AND 4G WIRELESS, INC.,**

**Claimants,**

**MAHENDER MAKHIJANI; CONTINUUM ANALYTICS, INC.; et al.,**

**Respondents,**

**and**

**MOM AS INVESTCO, LLC; MOM BS INVESTCO, LLC; et al.,**

**Nominal Respondents.**

_____

## CONSOLIDATED WITH JAMS ARBITRATION NO. 5200001122

_____

## RULING ON REQUEST FOR CLARIFICATION AND CONSOLIDATED SCHEDULING ORDER NO. 106

A virtual interim arbitration management conference was conducted on May 12, 2025. Joseph Ybarra, Esq., and Sam Maralan, Esq., appeared on behalf of the Claimants.[1] Michael Farrell, Esq., and Scott Leipzig, appeared on behalf of the MOM Members and the MOM Managers. Anthony, Bisconti, Esq. appeared on behalf of the MOM JV Entities. There was no appearance on behalf of Makhijani and Continuum. Lawrence DeMeo, Esq., and Hakop Stepanyan, Esq. appeared on behalf of respondent Nano Banc. This Consolidated Scheduling Order No. 106 supplements Consolidated Scheduling Order No. 100 ("SO 100") dated March 22, 2024, as previously amended.

**A.     Primary Focus.** The primary focus of the conference was to discuss the request for clarification addressed in Scheduling Order No. 105 and in Paragraph B below.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Partial Interim Award dated February 21, 2025 (the "Interim Award").

**B.     Ruling on Request for Clarification.** In their May 1, 2025, status report Claimants requested Arbitrator to clarify one aspect of the Partial Interim Award (the "Request"). The MOM JV Entities opposed the Request in their supplemental status report dated May 1, 2025. On May 8, 2025, the MOM JV Entities filed a supplemental brief regarding the Request, and the MOM Managers filed an opposition to the Request. (The May 1 and May 8 oppositions will be referred to collectively as the "Oppositions.") On May 9, 2025, Claimants filed a reply (the "Reply") to the Oppositions. On May 12, 2025, Arbitrator entertained argument on the Request.

The Request pertains to the sections of the Interim Award that state:

(i) "the joint venture ("JV") comprises a portfolio of commercial properties that **were previously owned by [the Honarkar Parties] and are now owned by the MOM JV Entities**." (Interim Award, p. 3, § 1 (emphasis added));

(ii) "Palm Desert Collective Resorts LLC, 424 Marguerite Ave. LLC, and 8871 Research Dr. LLC are "Held-Back LLCs" under the ACA and the Operating Agreements and thus, **were never contributed to the MOM JV Entities**." (Interim Award, p. 43, § L (3) (emphasis added)); and

(iii) "The following entities appear on Exhibit C of the Operating Agreements and ACA **but were never intended by the parties to be Contributed Entities to the JV**: 4G (Ex. 583 [Letter Agreement – 4G is the MO Member]), Modan LLC (majority owned by Niazi), BMV Apartments LLC, 7 Star Trade-In LLC, Marquis Marine LLC, Poppy and Seed LLC, The Fullest LLC, Pizza 90 Inc., Laguna Beach Company Inc., MJA Restaurants Inc., MS Nosh LLC, 331 N. Coast LLC, 331 North Coast Hwy. LLC, 2711 E. Coast Hwy. LLC, 113 Canyon Acres LLC, **Terra Laguna Beach Inc.**, Seven Degrees Laguna Inc., Rancho San Joaquin Golf Course LLC, 14 West Coast LLC, Cliff Drive NB Properties LLC, Blue Lagoon Resort LLC, Buena Vida RSM LLC, Pershing 82 LLC, and Brookline Aliso Viejo LLC." (Interim Award, p. 43, § L (4) (emphasis added).)

The Request seeks clarification as to whether the Interim Award determined the entities listed in (iii) above (the "Declaratory Relief Entities") are owned by the MOM JV Entities. Claimants contend the Interim Award determined the Declaratory Relief Entities are not owned by the MOM JV Entities. The MOM Managers, the MOM Members, Makhijani, and Continuum dispute this contention.

Arbitrator, having fully considered the Request, the Oppositions, and the Reply, together with the oral arguments of counsel on May 12, 2025, and all of the other pleadings and papers on file herein, hereby FINDS, RULES, and ORDERS as follows:

The Request is GRANTED, and Arbitrator therefore CLARIFIES the Interim Award was intended to and did in fact determine the Declaratory Relief Entities (including Terra Laguna Beach, Inc.) are not now and never have been owned by the MOM JV Entities. Any ambiguity in the Interim Award on this point is a result of my imprecise writing not my thinking. The Partial Final Award will reflect this clarification.

**C.**   **Further Interim Conference.** An interim status conference shall take place at 8:30 a.m. on June 12, 2025.

**D.**   **Effect.** SO 100 remains in full force and effect, as supplemented herein.

Dated: May 12, 2025

_____
Hon. David A Thompson (Ret.)
Arbitrator