## EXHIBIT A

**PSA**

**PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS**

**for**

**106 West Pennsylvania Avenue, Redlands, California 92374**

**By and Between**

**TESORO REDLANDS DE, LLC,**

**a Delaware limited liability company**

**("Seller")**

**and**

**PATRICK THEODORA**

**an individual**

**("Buyer")**

**May 29, 2025**

1

# TABLE OF CONTENTS

**Page**

1.  Defined Terms; Interpretation...........................................................................1

    (a)  Defined Terms ...........................................................................................1

    (b)  Interpretation .............................................................................................3

2.  Agreement to Purchase ...................................................................................4

3.  Purchase Price .................................................................................................4

    (a)  Purchase Price ...........................................................................................4

    (b)  Earnest Money ...........................................................................................4

    (c)  Independent Contract Consideration.........................................................5

4.  Escrow and Closing .........................................................................................5

    (a)  Escrow........................................................................................................5

    (b)  Closing .......................................................................................................6

    (c)  Seller Closing Deliveries ...........................................................................6

    (d)  Buyer Closing Deliveries ...........................................................................7

    (e)  IRS Form 1099-S Designation...................................................................7

    (f)  Return of Closing Deliveries .....................................................................7

    (g)  Deliveries Outside of Escrow....................................................................8

    (h)  Deliveries Upon Close of Escrow..............................................................8

5.  Waiver of Due Diligence ..................................................................................8

    (a)  Due Diligence ............................................................................................8

    (b)  Return of Reports ......................................................................................9

    (c)  Proprietary Information; Confidentiality ....................................................9

    (d)  No Representation or Warranty by Seller................................................10

    (e)  Buyer's Responsibilities ..........................................................................10

    (f)  Buyer's Agreement to Indemnify ............................................................11

6.  Seller's Conditions.........................................................................................11

7.  Buyer's Conditions .........................................................................................11

8.  Title And Survey .............................................................................................12

    (a)  Title Report ..............................................................................................12

    (b)  Amended Commitment ............................................................................12

i

9.      Closing Costs and Prorations ....................................................................... 12

        (a)     Closing Costs ............................................................................... 12

        (b)     Prorations .................................................................................... 13

        (c)     Delinquent Rents .......................................................................... 13

        (d)     Deposits and Letters of Credit ...................................................... 13

        (e)     Leasing Commissions and Tenant Inducements ............................ 14

10.     Representations and Warranties .................................................................. 14

        (a)     Seller's Representations and Warranties ........................................ 14

        (b)     Buyer's Representations and Warranties ........................................ 16

        (c)     Disclaimers ................................................................................. 18

        (d)     Release ........................................................................................ 20

        (e)     Survival ...................................................................................... 21

11.     Specific Rights and Obligations .................................................................. 21

        (a)     Maintenance of Insurance .............................................................. 21

        (b)     Conduct of Business ...................................................................... 21

        (c)     Leasing ........................................................................................ 21

12.     Remedies .................................................................................................. 21

        (a)     SELLER'S REMEDIES ................................................................ 21

        (b)     Buyer's Remedies ......................................................................... 22

        (c)     Limitation on Liability .................................................................. 22

13.     Brokerage ................................................................................................. 23

14.     Possession ................................................................................................ 23

15.     Casualty and Condemnation ....................................................................... 23

        (a)     Notice of Casualty or Condemnation ............................................. 23

        (b)     Casualty Losses ............................................................................ 24

        (c)     Condemnation ............................................................................... 24

16.     Consequences of Termination ..................................................................... 24

17.     Miscellaneous ........................................................................................... 25

        (a)     Survival ...................................................................................... 25

        (b)     Attorneys' Fees ............................................................................ 25

        (c)     Notices ........................................................................................ 25

        (d)     Parties Bound ............................................................................... 26

        (e)     Construction ................................................................................. 26

BN 89627986v2

(f)     Counterparts ................................................................................26

(g)     Entirety and Amendments...........................................................26

(h)     Invalidity ....................................................................................27

(i)     Assignment .................................................................................27

(j)     Governing Law ...........................................................................27

(k)     No Liability of Related Parties ..................................................27

(l)     Waiver of Jury Trial ...................................................................27

(m)     Time ............................................................................................27

(n)     Confidentiality ...........................................................................27

(o)     No Recordation ...........................................................................28

(p)     Further Assurances......................................................................28

(q)     Joint and Several Liability .........................................................28

(r)     Natural Hazards Disclosure ........................................................28

(a)     Electronic Signatures ..................................................................28

SCHEDULE AND EXHIBITS

SCHEDULE 1          LAND DESCRIPTION
SCHEDULE 9(e)       OUTSTANDING TENANT INDUCEMENT COSTS AND FREE RENT
EXHIBIT A           FORM OF GRANT DEED
EXHIBIT B           FORM OF BILL OF SALE
EXHIBIT C           FORM OF ASSIGNMENT OF LEASES AND RENTS
EXHIBIT D           NOTICE TO TENANTS
EXHIBIT E           FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT F           [RESERVED]
EXHIBIT G           LIST OF SERVICE CONTRACTS

BN 89627986v2

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement"), dated as of _____, 2025 (the "Effective Date"), is between TESORO REDLANDS DE, LLC, a Delaware limited liability company ("Seller"), and, PATRICK THEODORA, an individual ("Buyer").

1.    Defined Terms; Interpretation.

(a)    Defined Terms.    Definitions of certain defined terms are provided throughout the text of this Agreement.  Defined terms listed in this Section 1 have the meaning assigned to them below.

"Buildings" means the Improvements located on the Land situated in San Bernardino County, California and commonly known as 106 West Pennsylvania Avenue, Redlands, 92374.

"Business Day" means any day, Monday through Friday, that the national banks in San Bernardino County, California are open for business.  Whenever under the terms of this Agreement the time for performance of any act, covenant or condition or the expiration of any time period falls on a day that is not a Business Day, such expiration time or time for performance shall be extended to the next Business Day.

"Closing Date" has the meaning given that term in Section 4(b).

"Deposits" means refundable deposits under Leases and advance payments of Rent.

"Earnest Money Deposit" has the meaning set forth in Section 3(b).

"Environmental Law" means any law relating to the protection of the environment or, to the extent related to environmental conditions, human health or safety, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended; the Hazardous Materials Transportation Act, as amended; the Resource Conservation and Recovery Act, as amended; the Toxic Substances Control Act, as amended; the Federal Water Pollution Control Act, as amended; and similar laws of the State of California.

"Hazardous Materials" means (a) any substance that constitutes hazardous materials, hazardous waste or toxic waste within the meaning of any Environmental Law or that otherwise is subject to regulation under any Environmental Law and (b) regardless of whether it is so classified, any radioactive material, radon, mold, mildew, microorganisms, asbestos, any medical waste, polychlorinated biphenyls (PCBs), lead-based paint, urea formaldehyde foam insulation and petroleum or petroleum derivatives.

"Improvements" means all buildings, structures, fixtures, parking areas, sidewalks, landscaping and other improvements located on the Land.

"Information" means all information, documents, plans, specifications, pictures, projections and other written or verbal information and materials that is not in the public domain and that is furnished to Buyer or any of its subsidiaries or affiliates or any of their respective

1

employees, representatives or agents by Seller or its Related Entities or any partner, member, officer, director, trustee, agent, employee or other person acting or purporting to act on behalf of Seller or any of its Related Entities (including any materials delivered in accordance with <u>Section 5(a)</u>), together with any excerpt from or copy of such information that is prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives and all written, diskettes or electronically stored or transmitted. documentation furnished to or prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives based upon or derived from, reflecting or incorporating, in whole or in part, such information.

"<u>Intangibles</u>" means all right, title, interest and estate of Seller, if any, in, to and under (a) all Service Contracts, (b) all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, granted by governmental authorities, and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties, covering all or any part of the Property (collectively, the "<u>Guaranties</u>"). Intangibles shall not include, and Buyer shall not utilize (i) any internet addresses or websites used in connection with the Property or (ii) the name Tesoro or any reference thereto or derivative thereof. The terms of the foregoing sentence shall survive Closing. Notwithstanding any other provision hereof, Seller makes no representation or warranty relating to the assignability of any of the Service Contracts, Guaranties or other Intangibles and shall not be required to obtain any consents relating to any such assignment.

"<u>Land</u>" means the tract or tracts of land described in <u>Schedule 1</u> attached hereto, including all riparian rights, privileges, and easements in any way pertaining thereto, all right, title and interest in and to any adjoining sidewalk and in and to any adjoining street or alley.

"<u>Leases</u>" collectively means the leases or other agreements permitting occupancy or use of any space in the Improvements or on the Land.

"<u>New Contracts</u>" means any contract executed by Seller after the Effective Date that is (i) terminable on not more than thirty (30) days' notice at no cost to Buyer, (ii) related to the operation, maintenance or management of the Property, and (iii) entered into by Seller with the consent of Buyer.

"<u>Permitted Exceptions</u>" means (a) preprinted standard exceptions on the Title Policy, (b) exceptions approved or deemed approved by Buyer pursuant to <u>Section 8(c)</u>of this Agreement, (c) rights of tenants as tenants under Leases, (d) any matters disclosed by the Survey, (e) property taxes and assessments which are not delinquent as of Closing, and (f) matters created by Buyer or any of its affiliates or any of their respective representatives, consultants or contractors.

"<u>Person</u>" means an individual, corporation, association, joint venture, partnership, limited liability company, association, trust or other entity or organization, including a governmental authority.

"<u>Personalty</u>" means all fixtures, equipment, machinery, building materials, supplies, inventory and other tangible property owned by Seller, used in connection with the ownership, maintenance, use, leasing, service or operation of the Land or Improvements, and located on the

Land or to be located on the Land on the Closing Date, but specifically excluding (i) any personal property owned, financed or leased by any tenant, (ii) any personal property which is owned by Property Manager or any party to a Service Contract, and (iii) any computer software which either is licensed to Seller or Property Manager, or which Seller deems proprietary.

"Property" means, collectively, the Land, the Improvements, the Intangibles, the Personalty and the Related Assets.

"Property Management Agreement" means that certain property management agreement with Property Manager in connection with the Property, as amended and supplemented.

"Property Manager" means Vierergruppe Management, a California corporation.

"Purchase Price" means has the meaning given that term in Section 3(a).

"Related Assets" means all right, title, interest and estate of Seller in, to and under (a) all Leases and all guaranties of Leases, (b) all security deposits and Rents due after the Closing and (c) all Intangibles.

"Related Entities" or a "Related Entity" means, with respect to any Person, all direct and indirect affiliates and subsidiaries thereof, all entities related thereto and all partners, shareholders, members, directors, officers, trustees, managers, authorized agents and employees thereof.

"Rents" means all rents, revenues, income, profits and receipts due under Leases or otherwise receivable by the owner of the Property for use or occupancy of any of the Property.

"Seller Closing Documents" has the meaning given in Section 4(c).

"Seller's Trustee Counsel" shall mean Porter Anderson & Corroon LLP.

"Service Contracts" means the contracts to which Seller is a party relating to the operation, maintenance or management of the Property as of the Effective Date, including, any New Contracts, but excluding the Property Management Agreement.

"Title Commitment" has the meaning set forth in Section 8(a).

"Title Company" means Chicago Title Insurance Company, National Commercial Services, 3780 Kilroy Airport Way, Suite 100, Long Beach, CA 90806, Attn: John Balassi, Title Officer, Phone: (949) 724-3117, e-mail: ctcommtitlenpb@ctt.com; Jody Kelly, Commercial Escrow Officer, Phone: (213) 330-3027, e-mail: jody.kelly@ctt.com; Attention: Chris Miller, National Account Executive, Phone: (949) 724-3101, e-mail: chris.miller@ctt.com.

(b)    Interpretation.  When the context so requires in this Agreement, words of one gender include one or more other genders, singular words include the plural, and plural words include the singular.  Use of the words "include" and "including" are intended as an introduction to illustrative matters and not as a limitation.  When either party is granted permission to exercise its discretion in this Agreement, there shall be no requirement, unless the Agreement expressly states to the contrary, to exercise such discretion reasonably or in accordance with commercial

3

standards and instead such discretion may be exercised in the sole, absolute and unilateral discretion of such party.  References in this Agreement to "Sections" are to the numbered subdivisions of this Agreement, unless another document is specifically referenced.  The word "party" when used in this Agreement means either Buyer or Seller unless another meaning is required by the context.  The word "person" includes individuals, entities and governmental authorities.  The word "governmental authority" is intended to be construed broadly and includes federal, state and local governmental entities, commissions, councils, instrumentalities, bodies, boards, departments and officers and individuals acting in any official capacity.  When used in this Agreement, the word "laws" is intended to be construed broadly and includes all codes, statutes, rules, regulations, ordinances, pronouncements, case law, requirements, orders, directives, decisions, decrees, judgments and formal or informal guidance or interpretations of any court or governmental authority having jurisdiction over the Property and construction and operation of the Improvements thereon (including but not limited to all Environmental Laws, the Americans with Disabilities Act and any local Board of Fire Underwriters).

    2.      Agreement to Purchase.

    Buyer agrees to purchase the Property from Seller, and Seller agrees to sell the Property to Buyer, all on the terms provided in this Agreement.

    3.      Purchase Price.

        (a)      Purchase Price.  The purchase price for the Property shall be Fifty Five Million and No/100 Dollars ($55,000,000.00) (the "Purchase Price") and Buyer shall pay the balance of the Purchase Price, and such other funds as may be necessary in accordance with the terms hereof to pay for Buyer's share of closing costs and charges set forth in Section 9 below and Buyer's share of prorations set forth on Buyer's closing statement delivered pursuant to Section 4(d)(vi)) shall be due and payable by Buyer to Seller in immediately available funds at Closing (as defined below).

        (b)      Earnest Money.  Buyer agrees to deposit Three Million and No/100 Dollars ($3,000,000.00) as earnest money (the "Earnest Money Deposit") with Seller's Trustee Counsel concurrently with the execution of this Agreement by Buyer and Seller, receipt of which shall be acknowledged by Seller's Trustee Counsel and the Title Company.  The Earnest Money Deposit shall also be referred to as the "Earnest Money" as and when Buyer delivers the same under this Agreement.  Except as otherwise provided in the last paragraph of Section 7, Section 12(b), Section 15(b) or Section 15(c), the Earnest Money shall become non-refundable upon the issuance of the Approval Order (as defined in the Addendum to Purchase Agreement).  The Earnest Money shall be applied as a credit to the Purchase Price at Closing.  If the Approval Order is not issued in accordance with the terms herein or if Buyer elects to terminate this Agreement as permitted hereunder, the Earnest Money shall be returned to Buyer without any further instruction by either Buyer or Seller.  In the event of a termination of this Agreement by either Seller or Buyer for any other reason, the Earnest Money shall be delivered to the party hereto entitled to same pursuant to the terms hereof on or before the fifth day following receipt by Seller's Trustee Counsel or the Title Company, as applicable, and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies Seller's Trustee Counsel or the Title Company, as applicable, that it disputes the right of the other party to receive the Earnest

Money prior to the end of the fourth (4th) day following receipt of termination.  In the event of such a dispute, Seller's Trustee Counsel or the Title Company, as applicable, may interplead the Earnest Money into a court of competent jurisdiction in the county in which the Earnest Money has been deposited.  All attorneys' fees and costs and Seller's Trustee Counsel's or the Title Company's, as applicable, costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.  In the event Buyer fails to timely deliver the Earnest Money Deposit as provided in this Section, Seller may elect, in its sole and absolute discretion, and without any instruction from the Buyer, to terminate this Agreement and cancel any escrow opened in connection therewith.  Prior to the issuance of the Approval Order, Seller's Trustee Counsel shall be deemed to be the escrow agent and following the issuance of the Approval Order, Seller's Trustee Counsel shall transfer the Earnest Money Deposit to the Title Company who shall thereafter be escrow agent under this Agreement.  Seller's Trustee Counsel and the Title Company each acknowledge that so long as they are holding the Earnest Money Deposit, they shall be responsible for all escrow matters under this Agreement; provided, however, Seller's Trustee Counsel shall have no obligation to close the transactions contemplated herein with Closing being handled by the Title Company.

(c)     Independent Contract Consideration.  Buyer agrees that it shall expend significant time and material sums of money in connection with negotiating and executing this Agreement, and preparing for the Closing, all in reliance on Seller's obligations under this Agreement. Accordingly, separate consideration exists to support Seller's obligations hereunder. Without limitation upon the foregoing, $100.00 of the Earnest Money (the "Independent Consideration") shall in all events be deemed earned by Seller upon execution and delivery of this Agreement by Seller and Buyer and shall be immediately released by the Title Company to Seller upon the Title Company's receipt of the initial Earnest Money. The Independent Consideration represents adequate, bargained for consideration for Seller's execution and delivery of this Agreement and Buyer's right to inspect the Property pursuant to the terms hereof. The Independent Consideration is in addition to and independent of any other consideration or payment provided for herein and is nonrefundable in all events.

4.     Escrow and Closing.

(a)     Escrow. Seller and Buyer shall promptly deliver a fully executed copy of this Agreement to the Title Company.  Seller and Buyer shall execute and deliver to the Title Company any additional or supplementary instructions as may be necessary or convenient to implement the terms of this Agreement and close the transactions contemplated hereby, provided such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement.  Such supplementary instructions, together with the escrow instructions set forth in this Agreement, as they may be amended from time to time by the parties, shall collectively be referred to as the "Escrow Instructions." The Escrow Instructions may be amended and supplemented by such standard terms and provisions as the Title Company, as escrow holder, may request the parties hereto to execute; provided, however, that the parties hereto and the Title Company acknowledge and agree that in the event of a conflict between any provision of such standard terms and provisions supplied by the Title Company and the Escrow Instructions, the Escrow Instructions shall prevail.

(b)    Closing.    The closing of the transactions contemplated hereby (the "Closing") shall occur at the offices of the Title Company thirty (30) days following the Effective Date (the "Closing Date"), as may be extended by Seller hereunder.

(c)    Seller Closing Deliveries.    As of or prior to the Closing Date, Seller will deposit with the Title Company the following items (collectively, the "Seller Closing Documents"):

(i)    a grant deed (the "Deed"), in the form attached to this Agreement as Exhibit A, executed and acknowledged by Seller, conveying to Buyer the Land and the Improvements, which Deed shall be recorded by the Title Company in the official records of San Bernardino County, (the "Official Records"), on the Closing Date;

(ii)    a bill of sale ("Bill of Sale"), in the form attached to this Agreement as Exhibit B, executed by Seller;

(iii)    an Assignment and Assumption of the Leases and Rents, in the form attached to this Agreement as Exhibit C (the "Assignment of Leases"), executed by Seller;

(iv)    a notice to the tenants ("Notice to Tenants") of the Property in the form of Exhibit D attached hereto, which Seller shall sign along with Buyer, notifying the tenant of the transfer of the Property and advising the tenant as to future payment of rent and that Buyer has assumed exclusive responsibility for Deposits made by such tenant;

(v)    an Assignment and Assumption Agreement with respect to Service Contracts and other matters, in the form attached to this Agreement as Exhibit E (the "Assignment and Assumption Agreement"), executed by Seller;

(vi)    a certificate of Seller ("Seller's Update Certificate"), dated as of the Closing, stating that the representations and warranties of Seller contained in Section 10(a) of this Agreement are true and correct in all material respects as of the Closing (with appropriate modifications of those representations and warranties made in Section 10(a) hereof to reflect changes in factual circumstances occurring from and after the Effective Date, or identifying any representation or warranty which is not, or no longer is, true and correct in any material respect and explaining the state of facts giving rise to the change).    In no event shall Seller be liable to Buyer for, or be deemed to be in default hereunder by reason of, any breach of a representation or warranty which results from any change that (i) occurs between the Effective Date and the Closing and (ii) is permitted under the terms of this Agreement or is beyond the reasonable control of Seller to prevent; provided, however, that the occurrence of a change which is not permitted hereunder or is beyond the reasonable control of Seller to prevent shall, if the same materially impairs the value, use or occupancy of the Property, constitute the non-fulfillment of the condition set forth in Section 7(a).    If, despite changes or other matters described in such certificate, the Closing occurs, Seller's representations and warranties set forth in this Agreement shall be deemed to have been modified by all statements made in Seller's Update Certificate;

(vii)    An owner's affidavit on Title Company's standard form subject to commercially reasonable comments and modifications;

(viii)    such documents as the Title Company may reasonably require to establish the authority of Seller to complete the transfer of the Property contemplated by this Agreement;

(ix)    an affidavit, dated as of the Closing Date and executed by an appropriate representative of Seller under penalty of perjury, stating that Seller is not a person with respect to whom withholding is required under Section 1445 of the Internal Revenue Code of 1986, as amended (as well as any California state law equivalent form);

(x)    a closing statement; and

(xi)    any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(d)    <u>Buyer Closing Deliveries</u>.  Buyer will deposit with the Title Company (i) the Purchase Price, net of credit for the Earnest Money and adjustments for prorations and other items charged or credited to Buyer in accordance with this Agreement on or before 11:00 am Pacific Time on the Closing Date, and (ii) at least one (1) Business Day prior to the Closing Date, the following documents (collectively, the "<u>Buyer Closing Documents</u>"):

(i)    such documents as the Title Company may require to complete the transfer of the Property contemplated by this Agreement to Buyer;

(ii)    executed counterpart of the Assignment and Assumption Agreement;

(iii)    executed counterpart of the Assignment of Leases;

(iv)    executed counterpart of the Notice to Tenants;

(v)    a duly executed Preliminary Change in Ownership Report, in a form approved by the Title Company;

(vi)    the closing statement; and

(vii)    any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(e)    <u>IRS Form 1099-S Designation</u>. In order to comply with information reporting requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder, the parties agree (i) to execute an IRS Form 1099-S Designation Agreement to designate the Title Company (the "<u>Designee</u>") as the party who shall be responsible for reporting the contemplated sale of the Property to the Internal Revenue Service (the "<u>IRS</u>") on IRS Form 1099-S; and (ii) to provide the Designee with the information necessary to complete Form 1099-S.

(f)    <u>Return of Closing Deliveries</u>.  Documents and funds deposited in escrow under <u>Section 4(c)</u> or <u>4(d)</u> will be returned to the Person who deposited them if Seller or Buyer

7

terminates its obligation to complete the transfer of the Property contemplated by this Agreement under circumstances allowed by this Agreement.

(g)    Deliveries Outside of Escrow.    Promptly following the Closing (if not previously delivered to Buyer or located at the Property), Seller will deliver to Buyer, outside of the closing escrow, originals or, if originals are not in Seller's possession, copies of (i) any Leases, Service Contracts and files related thereto in the possession of Seller, and (ii) all keys to all locks on the Property in the possession of Seller.

(h)    Deliveries Upon Close of Escrow.    Upon the Closing, the Title Company shall promptly undertake all of the following: Disburse from funds deposited by Buyer with the Title Company towards payment of all items and costs (including, without limitation, the Purchase Price) chargeable to the account of Buyer pursuant hereto in payment of such items and costs;

(i)    Issue the Title Policy to Buyer;

(ii)    Deduct all items chargeable to the account of Seller pursuant to Section 9.  If, as the result of the net prorations and credits pursuant to Section 9, amounts are to be charged to the account of Seller, deduct the total amount of such charges from the Purchase Price (unless Seller elects to deposit additional funds for such items in escrow); and if amounts are to be credited to the account of Seller, disburse such amounts to Seller, or in accordance with Seller's instructions, at the Closing;

(iii)    Disburse the Purchase Price (or balance thereof) to Seller, or as otherwise directed by Seller, promptly upon the Closing, in accordance with Seller's wire transfer instructions;

(iv)    Cause the Deed, and any other documents which the parties hereto may direct, to be recorded in the Official Records in the order directed by the parties;

(v)    Deliver to Seller counterpart originals of the Assignment of Leases, the Assignment and Assumption Agreement, a copy of the Notice to Tenants executed by Buyer, a copy of the Bill of Sale, a conformed recorded copy of the recorded Deed, and copies of all other Seller Closing Documents not otherwise listed here; and

(vi)    Deliver to Buyer counterpart originals of the Assignment of Leases, Assignment and Assumption Agreement, Bill of Sale, Notice to Tenants, a conformed recorded copy of the Deed, the Title Policy, and copies of all other Seller Closing Documents not otherwise listed here.

5.    Waiver of Due Diligence.

(a)    Due Diligence.    Buyer expressly acknowledges that as of the Effective Date, Buyer has performed any and all inspections, investigations or tests of the Property and has satisfied itself in accordance with such due diligence.  Buyer hereby acknowledges that except as is otherwise expressly provided in this Agreement and subject to Seller's representations and warranties expressly set forth herein, or in any document executed by Seller, it is purchasing the Property in an "AS IS" "WHERE IS" AND "WITH ALL FAULTS" condition at Closing and that

it shall have no right to terminate this Agreement for any reason related to the condition of the Property. Notwithstanding anything to the contrary in the foregoing, commencing on the Effective Date and continuing until Closing (or earlier termination of this Agreement), Buyer shall have reasonable access to the Land at all reasonable times during normal business hours, upon appropriate notice to tenants as permitted or required under the Leases, for the purpose of making copies of documents relating to the Property and conducting physical inspections and tests, including surveys and architectural, engineering, geotechnical and environmental inspections and tests, provided that (i) Buyer must give Seller 48 hours' prior telephone or written notice of any such inspection or test, and with respect to any intrusive inspection or test (i.e., core sampling) must obtain Seller's prior written consent (which consent may be given, withheld or conditioned in Seller's sole discretion), (ii) prior to performing any inspection or test, Buyer must deliver a certificate of insurance to Seller evidencing that Buyer and its contractors, agents and representatives have in place insurance with the following coverage: (1) a per occurrence limit of no less than One Million Dollars ($1,000,000); and (2) an aggregate limit of no less than Three Million Dollars ($3,000,000), which insurance shall cover Buyer's activities on the Land and any accident arising in connection with the presence of Buyer, its contractors, agents and representatives on the Land, and which insurance shall name Seller as an additional insured thereunder and (iii) all such tests shall be conducted by Buyer in compliance with Buyer's responsibilities set forth in this Section 5. Buyer shall bear the cost of all such inspections or tests. Subject to the provisions of this Section 5, Buyer or Buyer's representatives may meet with any tenant; provided, however, Buyer must contact Seller at least three (3) Business Days in advance to inform Seller of Buyer's intended meeting and to allow Seller the opportunity to attend such meeting if Seller desires. Subject to the provisions of this Section 5, Buyer or Buyer's representatives may meet with any governmental authority for any good faith, reasonable purpose in connection with the transaction contemplated by this Agreement; provided, however, Buyer must contact Seller at least 24 hours in advance to inform Seller of Buyer's intended meeting and to allow Seller the reasonable opportunity to attend such meeting if Seller desires.

(b)     Return of Reports. If this Agreement terminates for any reason, Buyer shall promptly return and/or deliver to Seller all Information and copies thereof. Additionally, if this Agreement terminates for any reason other than Seller's default, then upon request by Seller, Buyer shall deliver to Seller copies of all third-party reports, surveys, investigations and studies relating to the Property (collectively, the "Reports" and, individually, a "Report") prepared for Buyer in connection with its due diligence review of the Property. The Reports shall be delivered to Seller without any representation or warranty as to the completeness or accuracy of the Reports or any other matter relating thereto. Buyer's obligation to deliver the Information and the Reports to Seller shall survive the termination of this Agreement.

(c)     Proprietary Information; Confidentiality. Buyer acknowledges that the Information is proprietary and confidential and will be delivered to Buyer or made available for Buyer's review solely to assist Buyer in determining the feasibility of purchasing the Property. Buyer shall not use the Information for any purpose other than as set forth in the preceding sentence. Buyer shall not disclose the Information to any person other than its Representatives who are responsible for determining the feasibility of Buyer's acquisition of the Property or financing thereof or brokers, attorneys, title and escrow companies and others as may be involved in the negotiation and consummation of this transaction and who have agreed to or are required to preserve the confidentiality of such information as required hereby (collectively, "Permitted

<u>Outside Parties</u>").  Buyer shall not divulge the Information except in strict accordance with the confidentiality standards set forth in this <u>Section 5(c)</u>.  In permitting Buyer to review the Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third party benefits or relationships of any kind, either express or implied, have been offered, intended or created. Notwithstanding any contrary provision of this Agreement, Buyer is permitted to disclose any Information otherwise deemed confidential under this paragraph (i) that was or becomes generally available to the public or otherwise available from a third party (other than as a result of the wrongful disclosure by Buyer or a party that received such confidential Information from Buyer), (ii) that was in the possession of or known to Buyer or the Permitted Outside Parties on a non-confidential basis prior to its disclosure by Seller, (iii) that is disclosed to Buyer or the Permitted Outside Parties on a non-confidential basis from a source other than Seller or Sellers's Parties, which source Buyer believes in good faith is entitled to make such disclosure, (iv) that is independently developed by Buyer or the Permitted Outside Parties without reference to or use of such confidential Information of Seller, (v) in connection with a court order or as otherwise required by applicable law or legal process, (vi) in connection with any litigation that may arise between the parties in connection with the transactions contemplated by this Agreement, or (vii) after the Closing, subject to restrictions reasonably necessary to comply with federal or state securities laws, Buyer or the Permitted Outside Parties may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure.

      (d)    <u>No Representation or Warranty by Seller</u>.  Buyer acknowledges that, except as expressly set forth in this Agreement or the Seller Closing Documents, Seller has not made nor makes any warranty or representation regarding the truth, accuracy or completeness of the Information or the source(s) thereof.  Buyer further acknowledges that some, if not all, of any such information was prepared by third parties other than Seller.  Seller expressly disclaims any and all liability for representations or warranties, express or implied, statements of fact and other matters contained in such information, or for omissions from the information, or in any other written or oral communications transmitted or made available to Buyer.  Buyer shall rely solely upon its own investigation with respect to the Property, concerning all matters related to the design, financing, development, entitlement, construction, maintenance, management, or performance of the Property, including, without limitation, the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit or regulation or any other attribute or matter relating thereto.  Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Information and is providing the Information or making the same available for Buyer's review solely as an accommodation to Buyer.

      (e)    <u>Buyer's Responsibilities</u>. In conducting any inspections, investigations or tests of the Property and/or the Information, Buyer and its agents and representatives shall:  (i) not unreasonably disturb the tenants or interfere with their use of the Property pursuant to their respective Leases; (ii) not unreasonably interfere with the operation and maintenance of the Property; (iii) not damage any part of the Property or any personal property owned or held by any tenant or any third party; (iv) not injure or otherwise cause bodily harm to Seller, Property Manager, or their respective agents, guests, invitees, contractors and employees or any tenants or their guests or invitees; (v) comply with all applicable laws; (vi) promptly pay when due the costs

of all tests, investigations and examinations done with regard to the Property, conducted by Buyer; (vii) not permit any liens to attach to the Property by reason of the exercise of Buyer's rights hereunder; (viii) repair any damage to the Property resulting directly or indirectly from any such inspection or tests caused by Buyer (or its agents and representatives); and (ix) not reveal or disclose prior to Closing any Information to anyone other than the Permitted Outside Parties, in accordance with the confidentiality standards set forth in <u>Section 5(e)</u>, or except as may be otherwise required by law.

(f)     <u>Buyer's Agreement to Indemnify.</u>  Buyer indemnifies and holds Seller harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Buyer's inspections or tests of the Property or any violation of the provisions of <u>Section 5(a)</u>, <u>Section 5(c)</u> or <u>Section 5(e)</u>; provided, however, the indemnity shall not apply to claims arising from (i) a diminution in value of the Property caused solely by the disclosure to Buyer, Seller or Permitted Outside Parties of Information regarding the discovery of any pre-existing Hazardous Materials at the Property, (ii) any release on or about the Property of any pre-existing Hazardous Materials at the Property, except and to the extent such release was contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties, or (iii) any conditions on or about the Property in existence as of the Effective Date, except and to the extent contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties.  Buyer's obligations under this <u>Section 5(f)</u> shall survive the termination of this Agreement and shall survive the Closing.

6.     <u>Seller's Conditions</u>.  Seller's obligation to sell the Property is conditioned on satisfaction or waiver in writing by Seller of each of the following conditions precedent:

(a)     all representations of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and on and as of the Closing (as if re-made on and as of the Closing);

(b)     Buyer shall have timely (i) executed, acknowledged (where required) and delivered to the Title Company all documents, instruments and agreements described in <u>Section 4(d)</u>, and (ii) delivered to the Title Company, in immediately available funds and lawful monies of the United States of America, all funds required by <u>Section 4(d)</u> including, but not limited to, the balance of the Purchase Price in accordance with <u>Section 4(d)</u>;

(c)     as of the Closing, Buyer shall have materially performed all of its other obligations hereunder; and

If any of the conditions in this <u>Section 6</u> are not satisfied as of the Closing Date, Seller may elect to terminate this Agreement, in which case the Earnest Money shall be immediately disbursed by the Title Company to Seller pursuant to the terms and conditions of <u>Section 12(a)</u>.

7.     <u>Buyer's Conditions</u>.  Buyer's obligation to purchase the Property is conditioned on satisfaction or waiver in writing by Buyer of the following conditions:

(a)     all representations of Seller contained in this Agreement are true and correct in all material respects at the time of the Closing;

(b)     the Title Company shall have issued at the Closing, or be unconditionally and irrevocably committed at the Closing to issue, to Buyer, an ALTA owner's title policy, on the Title Company's standard form issued in the State of California, showing title to the Property vested in Buyer, subject only to the Permitted Exceptions (the "Title Policy"); and

(c)     as of the Closing, Seller shall have materially performed all of its obligations hereunder.

If the conditions in this Section 7 are not satisfied as of the Closing Date and are not waived by Buyer, Seller may, by written notice to Buyer on or prior to the Closing Date, extend the Closing Date for up to fifteen (15) days to allow for correction of the matter and satisfaction of the condition(s) precedent to Buyer's Closing obligations, including, without limitation, changing title company to a title company of Seller's sole and absolute discretion to satisfy issuance of the Title Policy in accordance with (b) above.  If the conditions in this Section 7 are not satisfied as of the Closing Date (as extended by Seller, if applicable), Buyer may elect to terminate this Agreement and receive a refund of the Earnest Money or waive the condition and proceed to Closing.

8.     Title And Survey.

(a)     Title Report.  Prior to the Effective Date, the Title Company has delivered to Buyer (i) a current commitment for title insurance for a standard ALTA owner's policy on the Title Company's most current form issued by the Title Company in the State of California (the "Title Commitment"), and (ii) copies of all documents of record referred to in the Title Commitment as exceptions to title to the Land (collectively, the "Title Documents").

(b)     Amended Commitment.  If at any time prior to Closing, the Title Company gives Buyer written notice of a new title exception or exceptions not reflected in any of the initial Title Commitment (and not caused or consented to by Buyer) (a "New Title Defect"), then, within two (2) Business days after the giving of such notice, Buyer may submit to Seller a Title Objection Notice relating only to such new exceptions ("Buyer's Title Objection Notice"). Within two (2) Business Days after receipt of Buyer's Title Objection Notice, Seller shall notify Buyer pursuant to a revised Seller's Title Notice of Seller's election either to cure or not to cure a New Title Defect listed in Buyer's Title Objection Notice. Seller's failure to timely respond to a Buyer's Title Objection Notice shall be deemed a decision by Seller not to cure the New Title Defects listed in the Buyer's Title Objection Notice. Within three (3) days after Seller elects (or is deemed to have elected) not to cure a New Title Defect listed in a Buyer's Title Objection Notice, Buyer may, by written notice to Seller, elect as its sole remedy to either (i) waive the uncured New Title Defects or (ii) terminate this Agreement, in which event Buyer shall receive a return of the Earnest Money, and neither party shall have any further obligations to the other party. The outside Closing Date shall be extended if and to the minimum extent necessary to accommodate the time periods in this Section 8(b).

9.     Closing Costs and Prorations.

(a)     Closing Costs.  Buyer will pay (i) all recording costs, including the recording cost for the recordation of the Deed, (ii) the cost of any Survey, if Buyer elects to obtain one, (iii) all financing costs, including documentary stamps or tax on any note or mortgage

procured by Buyer, (iv) one-half of any escrow fee charged by the Title Company, (v) [intentionally omitted], and (vi) any inspection fee charged by the Title Company. Buyer and Seller each will pay its own attorneys' fees, subject to Section 17(b). Seller will pay for (1) all state, county and local transfer taxes, and (2) one-half (1/2) of any escrow fee charged by the Title Company. Other costs will be paid by Seller or Buyer, as applicable, as specified by other provisions of this Agreement or, if no provision is made in this Agreement, in accordance with local custom in San Bernardino County, California

(b)    Prorations. Seller and Buyer will prorate collected Rents and all expenses of operation of the Property, if any (including utilities, personal property taxes and real property taxes and property assessments taking into account maximum discounts), except for insurance premiums, as of 11:59 PM (Pacific Time) on the day before the Closing. Amounts allocable to the Closing Date will be for the account of Buyer. If any expenses cannot be finally determined as of the Closing Date, such expense will be prorated on the best available information or, with respect to real property taxes, on the latest available tax bill from the San Bernardino County tax assessor. Adjustments to the prorations (other than the tax proration) will be made from time to time but not later than sixty (60) days after the Closing Date, to take into account final information as to expenses estimated as of the Closing Date or to adjust Rents or expenses that were not included in the prorations done at the Closing, and Buyer or Seller, as applicable, will pay the other, promptly on demand, such amounts as may be appropriate based on such adjustments, together with interest at 10% per annum from the date of demand if such amount remains unpaid more than ten (10) days after demand. Any reproration of expenses (other than taxes) or Rents must be completed not later than sixty (60) days after the Closing Date, and, subject to Section 9(c), and except for real property taxes and assessments, neither Buyer nor Seller will be entitled to request a payment on account of reprorations after such date. The determination of real property taxes on the Closing Date under this Section 9(b) shall be conclusively binding upon Seller and Buyer without the requirement or burden of any post-Closing adjustment, "true-up" or reconciliation once the actual tax assessments are known.

(c)    Delinquent Rents. Rents delinquent as of the Closing Date will not be prorated. Rents collected after the Closing by Buyer must be applied first against Rents attributable to the period after the Closing, until all of such Rents have been collected, and then to Rents attributable to the period before the Closing. Buyer will remit to Seller any Rents collected by Buyer that, in accordance with this Section 9(c), are allocable to the period before the Closing.

(d)    Deposits and Letters of Credit. Buyer will be entitled to a credit through the Closing Date for all Deposits held and retained by Seller as of the Closing Date. Nonrefundable deposits, fees and upfront payments will not be prorated, nor will Buyer be entitled to a credit on account of such amounts. Seller shall also transfer to Buyer any security deposits held in the form of a letter of credit at Buyer's cost (including Buyer's payment of any third party transfer fees and expenses); if the applicable letter of credit is not capable of being transferred at Closing, Seller shall request the applicable tenant to cause a new letter of credit to be issued in favor of Buyer in replacement thereof or Seller shall request the issuing bank to transfer the same to Buyer immediately after Closing, as applicable, and in the event a new letter of credit is not issued in favor of Buyer by Closing or such transfer is not effected by Closing, Buyer and Seller shall diligently pursue such replacement letter or transfer after Closing and Seller shall take all reasonable action, as directed by Buyer and at Buyer's expense, in connection with the presentment

of such letter of credit for payment as permitted under the terms of the applicable Lease, and in consideration of Seller's agreement as aforesaid, Buyer shall indemnify, defend and hold Seller harmless from any liability, damage, loss, cost or expense resulting from an alleged wrongful drawing upon any of the letters of credit after the Closing.

(e)      Leasing Commissions and Tenant Inducements.  Buyer shall be responsible for the payment of (A) all Tenant Inducement Costs (as defined below) and leasing commissions which become due and payable (whether before or after Closing) as a result of any new Leases first entered into after the Effective Date or any amendments, renewals, extensions or expansions of existing Leases first entered into or exercised after the Effective Date (collectively, "New Leases") and (B) all Tenant Inducement Costs and leasing commissions which become due and payable from and after the Closing Date with respect to the Leases.  Notwithstanding the foregoing, Buyer will be entitled to a credit at Closing for any Tenant Inducement Costs and leasing commissions relating to the existing Leases as of the Effective Date with the tenants listed on Schedule 9(e) which have not been paid by Seller on or before the Closing Date.  If Seller has paid any Tenant Inducement Costs or leasing commissions prior to the Closing Date for which Buyer is responsible, Seller shall receive a credit for such amounts at Closing.  The payment or satisfaction of all leasing commissions and Tenant Inducement Costs which are not the responsibility of Buyer as described in the preceding three sentences or otherwise agreed to by the parties, shall be the responsibility of Seller.  For purposes hereof, the term "Tenant Inducement Costs" shall mean any out-of-pocket payments required under a Lease to be paid or incurred by the landlord to or for the benefit of the tenant which is in the nature of a tenant inducement, including specifically, without limitation, tenant improvement costs, lease buyout costs, and moving, design and refurbishment allowances.  Notwithstanding anything to the contrary contained herein, (i) Buyer shall bear the loss resulting from any free, reduced or abated rent prior to the Closing Date under the Leases; and (ii) Buyer shall bear the loss resulting from any free, reduced or abated rent from and after the Closing Date for all Leases.

10.      Representations and Warranties.

(a)      Seller's Representations and Warranties.  In order to induce Buyer to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement, Seller represents and warrants to Buyer that, as of the date of this Agreement:

(i)      Seller has duly been organized and is validly existing under the laws of the State of Delaware.  Seller has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement.  Seller has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement.

(ii)      This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(iii)      To its knowledge, Seller and its subsidiaries have conducted and will conduct their businesses in compliance with (a) the Foreign Corrupt Practices Act of 1977 and

any other applicable law, regulation, order, decree or directive having the force of law and relating to bribery or corruption (collectively, the "<u>Anti-Corruption Laws</u>"; (b) the applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act of 1970, as amended, applicable provisions of the USA PATRIOT Act of 2001, including all amendments thereto and regulations promulgated thereunder, and the anti-money laundering statutes, rules, regulations and guidelines of all jurisdictions to the extent applicable to Seller or any of its subsidiaries (collectively, the "<u>Anti-Money Laundering Laws</u>"); and (c) all sanctions administered or enforced by the United States Government (including the U.S. Department of the Treasury's Office of Foreign Assets Control and the U.S. Department of State) and any other relevant sanctions authority (collectively, "<u>Sanctions</u>").

(iv)     No investigation, inquiry, action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Seller or any of its subsidiaries with respect to the Anti-Corruption Laws, the Anti-Money Laundering Laws or Sanctions is pending or, to the knowledge of the Seller, threatened.

(v)     Seller will not knowingly, directly or indirectly, use the proceeds of the Purchase Price or lend, contribute or otherwise make available such proceeds to any Person, (i) to fund any activities or business of or with any Person or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions; (ii) to fund or facilitate any money laundering or terrorist financing activities; or (iii) in any other manner that would cause or result in a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any Person (including any party to this Agreement).

(vi)     To Seller's knowledge, the Service Contracts listed on <u>Exhibit G</u> attached hereto are all of the material contracts and agreements concerning the operation and maintenance of the Property entered into by Seller or Property Manager and affecting the Property. Notwithstanding anything to the contrary in this Agreement, Buyer and Seller acknowledge that <u>Exhibit G</u> does not include all amendments, modifications and supplements relating to those Service Contracts.

(vii)     Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended and the Income Tax Regulations thereunder. Seller is exempt from withholding taxes under Section 18662 of the California Revenue and Taxation Code, as amended.

(viii)     As used in this <u>Section 10(a)</u>, the phrase "to Seller's actual knowledge" and similar expressions means the actual knowledge of Mark Shinderman who is the individual at Seller most knowledge about the Property, without inquiry of any sort and without imputation of knowledge of others, and without any personal liability under or in connection with this Agreement.

Notwithstanding anything to the contrary in this Agreement, Seller shall have no liability, and Buyer shall make no claim against Seller, for (and Buyer shall be deemed to have waived any failure of a condition hereunder by reason of) a failure of any condition or a breach of any representation or warranty, covenant or other obligation of Seller under this Agreement or any closing document executed by Seller if (a) the failure or breach in question constitutes or results

from a condition, state of facts or other matter that was actually known to Buyer or (b) the failure or breach in question constitutes or results from a condition, state of facts or other matter that was actually known to Buyer prior to Closing and Buyer proceeds with the Closing.

      (b)  <u>Buyer's Representations and Warranties</u>.  In order to induce Seller to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement, Buyer represents and warrants to Seller that, as of the date of this Agreement and as of the date of Closing:

      (i)  Buyer has been duly organized and is validly existing under its state of formation.  Buyer has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement.

      (ii)  Buyer and any equity holder or other financial backer of Buyer is a Qualified Bidder, as defined in that certain Order (I) Approving Bidding Procedures; (II) Scheduling the Bid Deadlines; (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of Tesoro Property; (IV) Approving the Form and Manner of Notice Thereof; (V) Approving Contract Assumption and Assignment Procedures; and (VI) Granting Related Relief dated May 15, 2025 in connection with Bankruptcy Case No. 25-10321 (BLS) (the "<u>Tesoro Bid Procedures Order</u>") and Buyer has provided all requisite formation and corporate structure documentation in connection therewith.

      (iii)  Buyer is not, and no equity holder or other financial backer of Buyer, a current or former officer, director or equity holder of the Seller, or any entity affiliated with any current or former officer, director or equity holder of the Seller.  Buyer has disclosed the names, contact information, and counsels for all equity holders or other financial backers and there are no undisclosed insiders, principals, equity holders, or financial backers of Buyer.

      (iv)  Buyer has (a) in addition to the Leases, identified any executory contracts and unexpired leases to be assumed and assigned in connection with the proposed transactions, (b) provided for the payment of all cure costs related to such executory contracts and unexpired leases, and (iii) demonstrated that it can provide adequate assurance of future performance under all executory contracts and unexpired leases, including the Leases.

      (v)  Buyer shall abide by and honor the terms of the bidding procedures as set forth in the Tesoro Bid Procedures Order.

      (vi)  Buyer disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, Buyer agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

      (vii)  Buyer acknowledges and representations that it: (a) has not engaged in any collusion with respect to the transactions described herein; and (ii) is a good-faith purchaser and has made a good-faith *bona fide* offer.

(viii)    This Agreement has been duly executed and delivered by Buyer and constitutes a valid, binding and enforceable obligation of Buyer, subject to bankruptcy and other debtor relief laws and principles of equity.

(ix)    The execution and delivery of this Agreement by Buyer, the performance by Buyer of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement will not result in (1) a breach of, or a default under, any contract, agreement, commitment or other document or instrument to which Buyer is party or by which Buyer is bound or (2) a violation of any law, ordinance, regulation or rule of any governmental authority applicable to Buyer or any judgment, order or decree of any court or governmental authority that is binding on Buyer.

(x)    Except for consents, approvals, authorizations and filings already completed, Buyer is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement or the completion of the transfer of the Property contemplated by this Agreement.

(xi)    In connection with this Agreement and to its knowledge, neither Buyer nor any of its affiliates nor any brokers or other agents of same, have engaged in any dealings or transactions, (a) directly or indirectly, with any Prohibited Person (defined below), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person, (b) in contravention of any applicable money laundering laws or regulations, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the USA Patriot Act of 2001, the Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), or any enabling legislation or executive order relating thereto, (c) in contravention of Executive Order no. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), as may be amended or supplemented from time to time ("Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the Office of Foreign Assets Control of the U.S. Department of Treasury ("OFAC"), or (d) that violate the U.S. Foreign Corrupt Practices Act . In connection with this Agreement, neither Buyer nor any of its affiliates nor, to its knowledge, any brokers or other agents of same are or will be conducting any business or engaging in any transaction with any person appearing on OFAC's list of Specially Designated Nationals List. As used herein, the following terms shall have the following meanings: (1) "Prohibited Person" means any Person that is now or shall be at any time until Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, under United States law, including regulations, executive orders and lists administered, enforced or published by OFAC; and (2) "U.S. Person" means a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories.

(xii)    (a) in connection with this Agreement, Buyer and its subsidiaries have maintained compliance with all Anti-Money Laundering Laws and Anti-Corruption Laws; and (b) Buyer and its subsidiaries have instituted and maintained and will continue to maintain policies and procedures reasonably designed to promote and achieve compliance with the Anti-Money Laundering Laws and the Anti-Corruption Laws.

(xiii)    Buyer is not an employee benefit plan as defined in Section 3(3) of ERISA.  Buyer is not acquiring the Property with assets that constitute "plan assets" within the meaning of the plan asset regulations promulgated by the U.S. Department of Labor at 29 C.F.R. 2510.3-101 et seq., as amended or modified from time to time.

(xiv)    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under federal or state bankruptcy laws in pending against or contemplated by Buyer or its general partner(s) or controlling shareholders or members.

(c)    <u>Disclaimers</u>.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN <u>SECTION 10(a)</u> AND ANY SELLER CLOSING DOCUMENT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (<u>INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER</u>) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY AND BUYER ACCEPTS SUCH DISCLAIMERS.  THE DISCLAIMERS IN THIS SECTION 12(c) SPECIFICALLY EXTEND TO (1) MATTERS RELATING TO HAZARDOUS MATERIALS AND COMPLIANCE WITH ENVIRONMENTAL LAWS, (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER, EARTHQUAKE FAULTS, AND MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARDS, (3) STORMWATER DETENTION, RETENTION, DISCHARGE OR DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF UNSTABLE SOILS, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES, AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND PROFIT POTENTIAL OF THE PROPERTY, (7) DESIGN, CONSTRUCTION, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE PROPERTY AND (8) COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE FAIR HOUSING AMENDMENTS ACT OF 1988). BUYER REPRESENTS AND WARRANTS TO SELLER AND ITS RELATED ENTITIES THAT BUYER IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE.

BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN <u>SECTION 10(a)</u> AND ANY SELLER CLOSING DOCUMENT, BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY STATEMENT OF SELLER OR ANY OF ITS RELATED ENTITIES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE OR OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER OR ANY OF ITS RELATED ENTITIES.  BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF THE PROPERTY AND ALL MATTERS BEARING UPON THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS AND DETERMINE THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN <u>SECTION 10(a)</u> AND ANY SELLER CLOSING DOCUMENT, <u>BUYER IS ACQUIRING THE PROPERTY "AS IS" AND "WHERE IS" AND SUBJECT TO ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, WHETHER PATENT OR LATENT.</u> UPON CLOSING, BUYER WILL ACCEPT THE PROPERTY SUBJECT TO BOTH PATENT AND LATENT ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS OR DEFECTS THAT MAY THEN EXIST, WHETHER OR NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY BUYER.  BUYER SPECIFICALLY WAIVES AND RELEASES (1) ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (<u>INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY SELLER BUT EXCLUDING THE REPRESENTATIONS  AND WARRANTIES IN SECTION 10(a) AND ANY SELLER CLOSING DOCUMENTS</u>) WITH RESPECT TO THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AND (2) EXCEPT FOR ANY BREACH BY SELLER UNDER THIS AGREEMENT OR ANY SELLER CLOSING DOCUMENT, ALL RIGHTS, REMEDIES, RECOURSE OR OTHER BASIS FOR RECOVERY (<u>INCLUDING ANY RIGHTS, REMEDIES, RECOURSE OR BASIS FOR RECOVERY BASED ON NEGLIGENCE OR STRICT LIABILITY</u>) THAT BUYER WOULD OTHERWISE HAVE AGAINST SELLER OR ANY OF ITS RELATED ENTITIES, ANY PERSON WHO HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST IN SELLER OR ANY RELATED ENTITY AND THE RESPECTIVE MEMBERS, PARTNERS, OFFICERS, DIRECTORS, TRUSTEES, AGENTS AND EMPLOYEES OF EACH SUCH PERSON IN RESPECT OF THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS

AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS. BUYER ACKNOWLEDGES AND AGREES THAT: (i) THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c) ARE AN INTEGRAL PART OF THIS AGREEMENT, (ii) SELLER WAS MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT AND SELL THE PROPERTY TO BUYER IN MATERIAL RELIANCE UPON SUCH DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c), (iii) SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT, WITHOUT THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c). THE PROVISIONS OF THIS SECTION 10(c) AND THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH HEREIN SHALL EXPRESSLY INCLUDE AND BE FOR THE BENEFIT OF ALL RELATED ENTITIES AND ALL RELATED ENTITIES ARE EXPRESSLY THIRD PARTY BENEFICIARIES OF THIS SECTION 10(c).

(d)     Release. (a)   In furtherance of the "AS IS, WHERE IS" nature of the sale, Buyer shall rely solely upon Buyer's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition. Except with respect to Seller's representations and warranties under Section 10(a) or in the Seller Closing Documents, Buyer and anyone claiming by, through or under Buyer hereby waives its right to recover from and fully and irrevocably releases Seller and the Seller Related Entities from any and all Claims that it may now have or hereafter acquire against any of the Seller Related Entities arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters, affecting the Property, or any portion thereof. This release includes Claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller. From and after the Closing, in connection with the above release, Buyer specifically waives the provision of, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that from and after the Closing, Buyer nevertheless hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section 10(d). Buyer has initialed this Section 10(d) to further indicate its awareness and acceptance of each and every provision hereof. This Section 10(d) shall survive any termination of this Agreement and the Closing.

BUYER'S INITIALS: _____

      (e)    Survival. The representations and warranties in Section 10(a) and Section 10(b) will survive Closing, but only for a period (the "Survival Period") of three (3) months, and no claim shall be allowed on any such representation or warranty unless notice of the claim and a detailed statement of the basis for the claim is delivered by the claimant to the other party within such three-month Survival Period. Nothing in this Section 10(e) limits the disclaimers, waivers, releases and other provisions in Section 10(c), all of which will survive Closing without limit as to time.

     11.    Specific Rights and Obligations.

      (a)    Maintenance of Insurance. Seller agrees that it will maintain all insurance in effect as of the date of this Agreement with respect to the Property (or, if such insurance is cancelled or expires, comparable insurance to the extent it is available on commercially reasonable terms) until the earlier of the Closing or the termination by Buyer or Seller of its obligation to complete the transfer of the Property contemplated by this Agreement.

      (b)    Conduct of Business. Until the earlier of the Closing Date or the termination by Buyer or Seller of its obligation to complete the transfer of the Property, Seller will carry on its business with respect to maintaining and operating the Property in a manner that is consistent with Seller's past practices, subject to changes in asset management and leasing parameters as Seller considers desirable or necessary to meet market conditions in the exercise of its reasonable discretion.

      (c)    Leasing. Seller will not enter into any New Leases without Buyer's prior written consent, which consent may be withheld in Buyer's reasonable discretion, and which consent will be deemed to have been given by Buyer if Buyer does not notify Seller in writing to the contrary within three (3) Business Days after Seller provides written notice to Buyer of such proposed New Lease.

     12.    Remedies.

      (a)    SELLER'S REMEDIES. IF BUYER FAILS TO PURCHASE THE PROPERTY IN VIOLATION OF THIS AGREEMENT, THEN SELLER, AS ITS SOLE AND EXCLUSIVE REMEDY, MAY TERMINATE ITS OBLIGATION TO COMPLETE THE TRANSFER OF THE PROPERTY AND, UPON SO DOING, WILL BE ENTITLED TO RECEIVE THE EARNEST MONEY AS LIQUIDATED DAMAGES. SELLER WAIVES ALL REMEDIES FOR BUYER'S FAILURE TO COMPLETE THE TRANSFER OF THE PROPERTY, EXCEPT THOSE SPECIFICALLY PROVIDED FOR IN THIS SECTION 12(a). SELLER AND BUYER ACKNOWLEDGE THAT SELLER'S DAMAGE WOULD BE DIFFICULT OR IMPOSSIBLE TO ASCERTAIN IN THE EVENT OF BUYER'S DEFAULT IN ITS OBLIGATION TO PURCHASE THE PROPERTY AND THAT THE LIQUIDATED

DAMAGES PROVIDED FOR IN THIS <u>SECTION 12(a)</u> ARE A REASONABLE ESTIMATE OF SELLER'S DAMAGES. SELLER AND BUYER ACKNOWLEDGE THAT THE AMOUNT OF THE LIQUIDATED DAMAGES HAS BEEN SET TAKING INTO ACCOUNT VARIOUS FACTORS, INCLUDING THE POTENTIAL FOR CHANGE IN VALUE OF THE PROPERTY. THE REMEDIES PROVIDED IN THIS <u>SECTION 12(a)</u> ARE EXCLUSIVE, PROVIDED, HOWEVER, THAT NOTHING IN THIS <u>SECTION 12(a)</u> LIMITS SELLER'S ABILITY TO COLLECT ATTORNEYS' FEES UNDER SECTION 17(b), REMEDIES FOR ANY BREACH BY BUYER OF ANY REPRESENTATION, WARRANTY, OBLIGATION, UNDERTAKING OR INDEMNITY THAT SURVIVES THE TERMINATION OF THIS AGREEMENT, AS EXPRESSLY SET FORTH IN THIS AGREEMENT. IF CLOSING IS CONSUMMATED, THEN SELLER SHALL HAVE ALL REMEDIES AVAILABLE AT LAW OR IN EQUITY IF BUYER FAILS TO PERFORM ANY OBLIGATION OF BUYER UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE), BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE). THE PARTIES HAVE SET FORTH THEIR INITIALS BELOW TO INDICATE THEIR AGREEMENT WITH THE LIQUIDATED DAMAGES PROVISION CONTAINED IN THIS SECTION.



BUYER _____    SELLER _____

(b)     <u>Buyer's Remedies</u>.  If the Closing does not occur solely as a result of Seller's failure to materially perform any of its obligations under this Agreement, such failure shall constitute a Seller default, and if such default is not cured within fifteen (15) days after written demand for performance delivered to Seller by Buyer, then Buyer may either (i) terminate its obligation to complete its purchase of the Property, in which event Buyer shall be entitled to the Earnest Money, or (ii) enforce specific performance of Seller's obligation; provided, however, that the remedy of specific performance shall only be available if  (i) Seller has willfully and intentionally breached its obligation to close under this Agreement, (ii) Buyer has deposited with the Title Company, prior to the Closing Date, all documents and funds required to be deposited by Buyer under this Agreement in order to close the transactions contemplated under this Agreement, and (iii) any suit for specific performance is filed and served by Buyer no later than thirty (30) days after the Closing Date (and if Buyer fails to commence and serve a suit for specific performance within such thirty (30)-day period, Buyer will be deemed to have irrevocably waived its right to bring suit for specific performance at any later date).  The remedies provided in this <u>Section 12(b)</u> are exclusive, and Buyer expressly waives all other remedies, claims and causes of action (including any right to obtain lost profits or actual, consequential, special or any other damages from Seller) for Seller's failure in performance prior to Closing or for any inaccuracy of Seller's representations and warranties that is discovered by Buyer prior to Closing.

(c)     <u>Limitation on Liability</u>. Notwithstanding anything to the contrary contained elsewhere herein, no claim for any breach by Seller of any representation, warranty, covenant, indemnity or obligation of Seller under this Agreement, or under any document, instrument or

BN 89627986v2

agreement delivered by Seller at the Closing (including any Seller Closing Documents), which is asserted by Buyer after the Closing, shall be actionable or payable unless each of the following conditions is satisfied: (i) the breach in question results from or is based on a condition, state of facts or other matter which was not known to Buyer prior to Closing, (ii) the valid claims for all such breaches, if any, collectively aggregate more than Fifty Thousand Dollars ($50,000), in which event the amount of claims in excess of such amount shall be actionable subject to the Cap (defined below); and (iii) written notice containing a description of the specific nature of such breach shall have been given by Buyer to Seller prior to the expiration of the Survival Period, and an action shall have been commenced by Buyer against Seller within thirty (30) days after the termination of the Survival Period. Buyer agrees to first seek recovery under any insurance policies, the Title Policy and the Service Contracts prior to seeking recovery from Seller, and Seller shall not be liable to Buyer if Buyer's claim is satisfied from such insurance policies, Title Policy or Service Contracts.  In addition, and notwithstanding anything to the contrary contained in this Agreement or any document or certificate executed in connection with this Agreement (including the Seller Closing Documents), the aggregate liability of Seller and Seller Related Entities arising directly or indirectly pursuant to or in connection with the representations and warranties (whether express or implied), covenants, indemnities and other obligations of Seller under this Agreement and all documents and certificates executed in connection with this Agreement (including the Seller Closing Documents) shall be limited to $250,000 (the "Cap"), regardless of whether any such liability arises from the actual or alleged negligent, willful or intentional act or omission of Seller or any Related Entity. The provisions of this <u>Section 12(c)</u> shall survive Closing and any earlier termination of this Agreement.

13.    <u>Brokerage</u>.

Seller represents and warrants that it has been represented by Marcus & Millichap with respect to the transaction contemplated hereby.  Subject to the preceding sentence, Seller and Buyer each agrees to indemnify and defend the other and hold the other harmless against any claim for a commission, finder's fee or similar compensation asserted by any person retained by or claiming through the indemnifying party or its affiliates in connection with the transfer of the Property or the execution of this Agreement, and all related loss, damage, liability, obligation, claim, suit, cause of action, judgment, settlement, penalty, fine or cost or expense (including fees and disbursements of attorneys and other professionals and court costs).  The provisions of this <u>Section 13</u> shall survive the Closing and any termination of this Agreement.

14.    <u>Possession</u>.

Seller will deliver possession of the Property to Buyer at the time of Closing, subject to the Permitted Exceptions.

15.    <u>Casualty and Condemnation</u>.

(a)    <u>Notice of Casualty or Condemnation</u>.  Seller will notify Buyer within ten (10) days after receiving notice of, or otherwise becoming aware of, (1) any Casualty Loss (as defined below) or (2) the commencement of any proceedings for the taking by eminent domain of all or any part of the Property.

(b)  <u>Casualty Losses</u>.  If, prior to Closing, the Property is damaged by fire, windstorm, rioting or other civil disturbance, acts of war, earthquake or other casualty (a "<u>Casualty Loss</u>") and the cost to repair the related damage is more than $5,000,000 (a "<u>Material Casualty Loss</u>"), then Buyer, at its option, may terminate its obligation to complete the transfer of the Property contemplated by this Agreement upon notice to Seller of Buyer's intent to terminate within five (5) days after receiving notice from Seller of such Casualty Loss, in which case the Earnest Money will be returned to Buyer.  If Buyer elects to complete the transfer of the Property notwithstanding a Material Casualty Loss, then Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected insurance proceeds and Seller will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.  All amounts payable under this <u>Section 15(b)</u> shall be less the proceeds of rental loss and business interruption insurance allocable to the period through the Closing Date, amounts expended by Seller to stabilize or repair the Property and costs incurred by Seller in making proof of loss or settling claims with insurers.  If the Casualty Loss is not a Material Casualty Loss, then Buyer shall not have the right to terminate this Agreement, and Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller, together with an assignment of Seller's rights with respect to all uncollected insurance proceeds, and Seller, at no cost or expense to Seller, will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.

(c)  <u>Condemnation</u>.  If, prior to Closing, all or a "material part" of the Property is taken by eminent domain or any proceedings for the taking by eminent domain of all or a material part of the Property are commenced or Seller and the condemning authority enter into discussions regarding Seller's delivery of a deed in lieu thereof, then Buyer, at its option within five (5) days after receiving notice thereof from Seller, may terminate its obligation to complete the transfer of the Property, in which case the Earnest Money will be returned to Buyer.  If Buyer elects to complete the transfer of the Property notwithstanding a taking by eminent domain or proceeding therefore or deed in lieu thereof, Seller will deliver to Buyer at Closing, through the closing escrow, all condemnation proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected condemnation proceeds (in either case, net of proceeds allocable to loss of use of the Property for the period through the Closing Date and costs reasonably incurred by Seller in connection with such proceedings) and such documents as Buyer may reasonably request to substitute itself for Seller in any pending eminent domain proceedings.  For purposes of this <u>Section 15(c)</u>, a "material part of the Property" shall mean the loss of any material means of access or any other portion of the Property that will result in a loss of more than 10,000 square feet of space within the Improvements or cost more than $5,000,000 to repair.

16.  <u>Consequences of Termination</u>.

If Buyer or Seller terminates its obligation to complete the transfer of the Property under circumstances permitted by this Agreement, neither Buyer nor Seller will have any further liability or obligation under this Agreement, except indemnity provisions and obligations under <u>Section 5(f)</u>, <u>Section 12</u> (if applicable) and <u>Section 13</u> and any other term that expressly survives the termination of this Agreement.  Nothing in this <u>Section 16</u> is intended to limit the obligations of the Title Company or the provisions of this Agreement dealing with the disposition of funds or documents held in escrow following termination of the obligations of Buyer or Seller.  If Buyer or

Seller terminates its obligation to complete the transfer of the Property, Buyer will deliver the Information to Seller.  Return of materials as required by this <u>Section 16</u> will not limit Buyer's obligations under <u>Section 5(f)</u>.

17.    <u>Miscellaneous</u>.

(a)    <u>Survival</u>.  Except as specifically provided for in <u>Section 9(b)</u>, <u>Section 10(e)</u> and <u>Section 12(c)</u>, all disclaimers, waivers, releases, covenants, undertakings and obligations under this Agreement and all representations and warranties contained in this Agreement will survive the Closing and will not be merged into the Deed or other documents delivered pursuant to this Agreement.

(b)    <u>Attorneys' Fees</u>.  If litigation is commenced by Buyer or Seller against the other party in connection with this Agreement or the Property, the party prevailing in the litigation will be entitled to collect from the other party the expense (including fees, costs and disbursements of attorneys, experts and other professionals and court costs) incurred in connection with the litigation, both prior to and during any appellate proceedings.  The terms and conditions of this <u>Section 17(b)</u> shall survive Closing and any termination of this Agreement.

(c)    <u>Notices</u>.  Any notice or other communication to any party given under this Agreement will be effective only if in writing delivered to whichever of the following addresses is applicable:

| If to Seller: | Tesoro Redlands DE, LLC<br>c/o FTI Consulting<br>350 S. Grand Avenue, Suite 3000<br>Los Angeles, CA 90071<br>Attention: Mark Shinderman<br>Phone: (213) 402-1628<br>Email: mark.shinderman@fticonsulting.com |
|---|---|
| With a copy to: | Buchalter<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017<br>Attention: David Hitchcock, Esq. and William S. Brody<br>Phone: (213) 891-0700<br>Email: dhitchcock@buchalter.com; wbrody@buchalter.com |
| If to Buyer: | Patrick Theodora<br>43 Malaga Cove, Suite A<br>Rancho Palos Verdes, CA 90274<br>Phone: (310) 612-8015<br>Email: pattheodora@gmail.com |
| If to Seller's Trustee Counsel: | Potter Anderson & Corroon LLP<br>1313 N. Market Street, 6th Floor<br>Wilmington, DE 19801 |

| | Attn: Aaron H. Stulman, Esq.<br>Phone: (302) 984-6081<br>Email: astulman@potteranderson.com |
|---|---|
| If to Title Company: | Chicago Title Insurance Company<br>National Commercial Services<br>3780 Kilroy Airport Way, Suite 100<br>Long Beach, CA 90806<br>Jody Kelly, Commercial Escrow Officer<br>Phone: (213) 330-3027<br>Email: jody.kelly@ctt.com |

Any notice or other communication will be deemed received only upon delivery to the address provided for in this Section 17(c) or rejection of delivery at such address. Notice may be given by (i) a national overnight delivery service in which event delivery shall be deemed to occur the next Business Day after depositing the notice with such delivery service, or (ii) by facsimile transmission or electronic mail transmission in which event notice shall be deemed to occur the same day if given before 5:00 p.m. San Bernardino County, California time on a Business Day and, if not so received, the next Business Day. The addresses and addressees to which notice is to be given may be changed by written notice given in the manner specified in this Section 17(c) and actually received by the addressee. Counsel to any party to this Agreement may, on behalf of its client, give any notice which may be, or is required to be, given by its client under this Agreement (and any notice so given by such counsel shall be as effective as if given by its client).

(d)    Parties Bound. This Agreement will be binding upon and will inure to the benefit of Buyer and Seller and their respective successors and permitted assigns. Neither the Title Company nor any broker is a third-party beneficiary of this Agreement, nor may the Title Company or any broker enforce this Agreement or any obligation under this Agreement.

(e)    Construction. Prior to Closing, Buyer shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Buyer may, subject to the provisions of Section 5(c), make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Buyer.

(f)    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which, taken together, will constitute one instrument. Buyer and Seller may execute different counterparts of this Agreement and, if they do so, the signature pages from the different counterparts may be combined to provide one integrated document.

(g)    Entirety and Amendments. This Agreement embodies the entire agreement and understanding between Buyer and Seller with respect to its subject matter and supersedes all prior agreements and understandings, written and oral, between Buyer and Seller related to that subject matter, including any letter of intent. This Agreement and the obligations of the parties under this Agreement may be amended, waived and discharged only by an instrument in writing

executed by the party against which enforcement of the amendment, waiver or discharge is sought. Joinder of the Title Company and any broker will not be necessary to make any amendment, waiver or discharge effective between Buyer and Seller.

(h)     Invalidity.  The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or enforceability of the remaining provisions or of that provision under other circumstances.  Any invalid or unenforceable provision will be enforced to the maximum extent permitted by law.

(i)     Assignment.  Buyer shall not sell, transfer, convey, encumber or otherwise dispose of all or any part of this Agreement without the prior written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion.   For purposes of this Section 17(i), Buyer shall be deemed to have transferred its right, title and interest under this Agreement if any direct and/or indirect ownership interest in Buyer is sold, assigned, conveyed, transferred, encumbered or otherwise disposed of, in whole or in part, voluntarily or involuntarily. Notwithstanding the foregoing, Buyer may, at any time prior to the date which is ten (10) Business Days prior to the Closing, upon advance written notice to Seller, assign this Agreement without Seller's consent to a wholly-owned affiliate of Buyer.  In the event of any assignment by Buyer, Buyer shall continue to remain fully liable hereunder as totally and completely as if such assignment had not occurred.

(j)     Governing Law.  This Agreement will be governed by the laws of the State of California, without giving effect to principles of conflicts of law.

(k)     No Liability of Related Parties.  No Related Entity, nor any person who holds a direct or indirect ownership interest in Seller or any Related Entity, nor any of the respective officers, directors, trustees, agents and employees of any such person shall have any liability, directly or indirectly, under or in connection with this Agreement, any document or certificate executed in connection with this Agreement (including the Seller Closing Documents) or any amendment of any of the foregoing made at any time, whether prior to, contemporaneous with or after this Agreement.  Buyer and its successors and assigns, as well as all other persons, may look solely to Seller's assets for the payment of any claim or any performance, and Buyer, on behalf of itself and its successors and assigns, hereby waives any and all other claims, demands, causes of action and liability.

(l)     Waiver of Jury Trial.  BUYER AND SELLER EACH WAIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION BETWEEN THEM RELATED TO THIS AGREEMENT, THE TRANSACTION CONTEMPLATED HEREBY OR THE PROPERTY. The provisions of this Section 17(l) shall survive the Closing and any termination of this Agreement.

(m)     Time.  Time is of the essence in the performance of this Agreement.

(n)     Confidentiality.    Prior to Closing, Buyer shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Buyer may make

disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Buyer.

(o)    No Recordation.  Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Buyer without the prior written consent of Seller shall constitute a default hereunder by Buyer, whereupon Seller shall have the remedies set forth in Section 12(a).

(p)    Further Assurances.  In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Buyer.

(q)    Joint and Several Liability.  In the event there are multiple assignees of Buyer who take title to the Property, the liability of such assignees with respect to the obligations of Buyer under this Agreement shall be joint and severable.

(r)    Natural Hazards Disclosure.  Buyer and Seller acknowledge that Seller may be required under California law to disclose if the Property lies within the following natural hazard areas or zones:  (i) a special flood hazard area designated by the Federal Emergency Management Agency; (ii) an area of potential flooding; (iii) a very high fire hazard severity zone; (iv) a wild land area that may contain substantial forest fire risks and hazards; (v) an earthquake fault zone; or (vi) a seismic hazard zone.  Buyer acknowledges that Seller will employ the services of the Title Company or another third party selected by Seller ("Natural Hazard Expert") to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill Seller's disclosure obligations, and to report the result of the Natural Hazard Expert's examination to Buyer and Seller in writing.  The written reports prepared by the Natural Hazard Expert regarding the results of the Natural Hazard Expert's examination fully and completely discharge Seller from Seller's disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1103.4 regarding non-liability of Seller for errors or omissions not within Seller's personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of the Natural Hazard Expert's expertise with respect to the examination and written report regarding the natural hazards referred to above.

(a)    Electronic Signatures.  The facsimile, email, PDF signature or electronic signature (including, without limitation, DocuSign or similar electronic signature technology) of any party on this Agreement will be deemed an original for all purposes. The contract formation pursuant to this Agreement and record-keeping of this Agreement though electronic means shall have the same legal validity and enforceability as a manually executed or paper-based recordkeeping system to the fullest extent permitted by applicable law, including, without limitation, the Federal Electronic Signatures in Global and National Commerce Act, the Uniform

28

Electronic Transactions Act or any similar state law, and the parties to this Agreement hereby waive any objection to the contrary.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER**:

**TESORO REDLANDS DE, LLC**,
a Delaware limited liability company

By: _Mark Shinderman_
Name: _Mark Shinderman_
Title: _Chief Restructuring Officer_

S-1

**BUYER:**

PATRICK THEODORA, an individual

Docusign Envelope ID: 46DC0460-EF53-4563-B28D-2B9272B314E

## ACKNOWLEDGEMENT AND AGREEMENT

The Title Company (as defined in Section 1 above) hereby acknowledges that it has received this Agreement executed by Seller and Buyer and accepts the obligations of and instructions for the Title Company set forth in this Agreement.  The Title Company, as escrow holder, agrees to receive, disburse and/or handle the Earnest Money, the Purchase Price and all closing documents in accordance with this Agreement.

CHICAGO TITLE INSURANCE COMPANY

By: _____
Name: _____
Title: _____

S-3

Docusign Envelope ID: D4D8208A-4AE1-43BB-A716-04E910495217

## ACKNOWLEDGEMENT AND AGREEMENT

Seller's Trustee Counsel (as defined in <u>Section 1</u> above) hereby acknowledges that it has received this Agreement executed by Seller and Buyer and accepts the obligations of and instructions for the Seller's Trustee Counsel set forth in this Agreement.  Seller's Trustee Counsel, as escrow holder, agrees to receive, disburse and/or handle the Earnest Money in accordance with this Agreement.

POTTER ANDERSON & CORROON LLP

By: _____
Name: Aaron Stulman_____
Title: Partner_____

## SCHEDULE 1

## LEGAL DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF REDLANDS, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL 3 OF PARCEL MAP NO. 9105, IN THE CITY OF REDLANDS, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 95, PAGES 98 AND 99, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 0167-151-24-0-000

BN 89627986v2

SCHEDULE 9(e)

OUTSTANDING TENANT INDUCEMENT COSTS AND FREE RENT

Any leasing commissions due to Property Manager in connection with the Leases prior to the Closing Date.

## EXHIBIT A

## FORM OF DEED

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:



MAIL TAX STATEMENTS TO:

APN: _____

---

The undersigned grantor(s) declare(s):        SPACE ABOVE THIS LINE FOR RECORDER'S USE
DOCUMENTARY TRANSFER TAX IS $_____

**[Enter R&T Code exemption, if any (otherwise delete)]**

....... Computed on the consideration or value of property conveyed; OR
....... Computed on the consideration or value less liens or encumbrances remaining at time of sale.
....... Unincorporated area; ....... City of _____.

## GRANT DEED

FOR VALUE RECEIVED, _____, a _____ ("Grantor"), grants to _____, a _____, all that certain real property (the "Property") situated in the County of San Bernardino, State of California, described on Exhibit A attached hereto and by this reference incorporated herein.

THE PROPERTY IS CONVEYED TO GRANTEE SUBJECT TO:

(i)     the lien of all real estate taxes and assessments not yet delinquent as of the date hereof;

(ii)    all local, state and federal laws, rules, ordinances and governmental regulations, including but not limited to, building and zoning laws, rules, ordinances and regulations now or hereafter in effect relating to the Property; and

(iii)   all items appearing of record and all matters which would be disclosed by an accurate survey of the Property.

DATED as of this ___ day of _____, 20__.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                         )
                                            ) ss
County of _____               )

On _____, 20___ before me,

_____, a Notary Public, personally

appeared _____, who proved to me on the basis of

satisfactory evidence to be the person (s) whose name (s) is/are subscribed to the within

instrument and acknowledged to me that he/she/they executed the same in his/her their

authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person (s),

or the entity upon behalf of which the person (s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the

foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____                    (SEAL)**]**

EXHIBIT A TO DEED
Legal Description

# EXHIBIT B
# FORM OF BILL OF SALE

For good and valuable consideration, _____, a _____ ("Seller"), sells and conveys to _____, a _____ ("Buyer"), the following (collectively, "Personalty"): all fixtures, equipment, machinery, building materials, supplies, inventory and other tangible property owned by Seller and located on the Land (as defined below).  This Bill of Sale expressly excludes Personalty located on the Land that is leased or rented.

EXCEPT AS SET FORTH HEREIN OR IN THE PURCHASE CONTRACT, (A) THE PERSONALTY IS TRANSFERRED TO BUYER "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, AND (B) SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PERSONALTY OR ITS CONDITION.  CONVEYANCE OF THE PERSONALTY IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT (AS DEFINED BELOW).

As used herein, (1) "Land" means that certain real property in San Bernardino County, California, as described on Exhibit A attached to and made a part of this Bill of Sale for all purposes; and (2) "Purchase Contract" means the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20___, between Seller and Buyer.

      IN WITNESS WHEREOF, the Seller has executed this Bill of Sale this _____ day of _____, 20___.

_____,
a _____

By:      _____
Name:   _____
Title:    _____

EXHIBIT A TO BILL OF SALE
Legal Description

BN 89627986v2

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS (this "Assignment"), made as of the _____ day of _____, 20__, by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, Assignor is the landlord under the leases set forth on Schedule A attached hereto and made a part hereof (the "Leases"), pursuant to which Leases, Assignor has demised to the tenants thereunder a portion of certain premises located in San Bernardino County, California, and more particularly described in Schedule B attached hereto (the "Premises");

WHEREAS, Assignor and Assignee are parties to the Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20___ (the "Agreement"), pursuant to which Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, the Premises; and

WHEREAS, in connection with the Agreement (i) Assignor is required to assign, transfer and convey to Assignee all of Assignor's right, title and interest in, to and under the Leases, together with any and all right, title, estate and interest of Assignor in and to such security deposits and prepaid Rents, if any, as have been paid to Assignor pursuant to such Leases (collectively, the "Deposits"), and (ii) Assignee is required to accept such assignment and to assume Assignor's obligations under the Leases and the Deposits from and after the Closing Date.

NOW, THEREFORE, in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Unless otherwise stated herein, all capitalized terms used in this Assignment shall have the meanings specified in the Agreement.

2.      Subject to the terms of the Agreement, Assignor hereby assigns, transfers, releases and sets over unto Assignee all of the right, title and interest of Assignor in and to (i) the Leases and all guarantees of the Leases and (ii) the Deposits not otherwise applied to the payment of rent under the applicable Leases.

3.      Assignee hereby accepts the foregoing assignment and hereby assumes (a) all of the obligations of Assignor under the Leases from and after the Closing Date and (b) all obligations of Assignor with respect to the Deposits actually received by Assignee, including, without limitation, the obligation to return same to the tenants under the Leases in accordance with the terms of such Leases.

4.      This Assignment may not be amended, modified or terminated except by an instrument in writing executed by the parties hereto.

Exhibit C
Page 1

5.      This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.      This Assignment may be executed in counterparts, each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

7.      This Assignment shall not in any way affect, limit, modify or amend the disclaimers, waivers and releases benefiting Assignor and the Seller Related Entities set forth in the Agreement.

Exhibit C
Page 2

BN 89627986v2

IN WITNESS WHEREOF, intending to be legally bound the parties hereto have executed this Assignment as of the day and year first above written.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By:      _____
Name:    _____
Title:   _____


_____,
a _____


By:      _____
Name:    _____
Title:   _____

Exhibit C
Page 3

Schedule A to Assignment and Assumption of Leases and Rents

Exhibit C
Page 4

BN 89627986v2

Schedule B to Assignment and Assumption of Leases and Rents

Premises

Exhibit C
Page 5

# EXHIBIT D

## FORM OF NOTICES TO TENANT

_____ , 20___

***VIA UPS & EMAIL***

[TENANT]

RE:   Lease Agreement dated [_____], between Seller and Tenant (collectively, the "Lease"), for property located at _____ ("Premises").

Dear Tenant:

      We are pleased to advise you that the real property and improvements located _____, has been acquired by _____ ("Purchaser") effective as of the date set forth above. Your lease agreement has been assigned to and accepted by Purchaser and Seller has agreed to transfer any security deposit or Letter of Credit, if any, currently held under the Lease to Purchaser. Purchaser has assumed and agreed to perform all of the landlord's obligations under the Lease (including any obligations set forth in the Lease to repay or account for any security deposits or Letter or Credit) arising after the date hereof. Purchaser has received and is responsible for your security deposit under the Lease in the amount of $_____.

      All future correspondence relating to your tenancy, as well as rent checks and other charges, should be made to:

_____
_____
_____
_____
Attn: _____

      All future rent payments should be sent to the following address:

      By U.S. Mail:

_____
_____
_____
_____
Attn: _____

Electronically:

_____
_____
_____
_____
Attn: _____

Lastly, please notify your insurance carrier and request that they change the name of the additional insured under any policies of insurance required in the Lease to _____ and their affiliated companies, successors and assigns.

Thank you for your cooperation.

Very truly yours,

## EXHIBIT E

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement"), dated _____, 20\_\_\_, is executed by and between _____, a _____ ("Buyer"), and _____, a _____ ("Seller").

1.      Background.  Seller and Buyer have entered into a Purchase and Sale Agreement and Joint Escrow Instructions, dated as of _____, 20\_\_\_ (the "Purchase Contract"), pursuant to which Seller is conveying to Buyer the real property commonly known as _____ (the "Property"), located in the _____. All capitalized terms in this Agreement, if not defined in this Agreement, will have the meaning ascribed to them in the Purchase Contract.  Buyer has agreed to execute and deliver this Agreement pursuant to the Purchase Contract and this Agreement shall survive Closing under the Purchase Contract.

2.      Assignment.  Seller assigns Buyer the following (collectively, the "Miscellaneous Assets"): (a) all right, title and interest of Seller in, to and under any assignable contract listed in Exhibit A attached to and by reference made a part of this Assignment (collectively, "Assigned Contracts"); (b) all right, title and interest of Seller in and to all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, whether granted by governmental authorities or private persons; and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties covering all or any part of the Property, excluding warranties or guaranties provided by Seller or any Related Entity, it being the intent of the parties hereto that no such warranties or guaranties are being provided by Seller or any Related Entity.  The Miscellaneous Assets shall not include (i) any internet addresses or websites used in connection with the Property or (ii) the name Tesoro and the logo including such names and any brochures, marketing materials, other branded items of personal property and signage in connection with the Property.  Seller makes no representation or warranty relating to any of the Miscellaneous Assets or the assignability thereof and shall not be required to obtain any consents relating to such assignment.

EXCEPT FOR REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE PURCHASE CONTRACT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE MISCELLANEOUS ASSETS OR THE ASSIGNABILITY OF THE MISCELLANEOUS ASSETS.  CONVEYANCE OF THE MISCELLANEOUS ASSETS IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND OTHER LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT.

3.      Assumption.  Buyer hereby assumes and agrees to pay and perform all of the terms, covenants, conditions and obligations of Seller or the owner of the Property under or with respect to the Assigned Contracts to the extent those terms, covenants, conditions and obligations are to be performed on or after the date of this Agreement.

Docusign Envelope ID: 46DC0460-EF53-4563-B28D-2B977F2B314E

4.       <u>Purchase Contract Not Affected</u>.  The obligations of Buyer under this Agreement have no effect on any obligations (whether similar or dissimilar) that Buyer has under the Purchase Contract.  The undertakings of Buyer in this Agreement and the Purchase Contract shall be independent of each other.  This Agreement shall not in any manner affect, limit, modify or amend the disclaimers, waivers and releases benefiting Seller and the Related Entities set forth in the Purchase Contract.

BN 89627986v2

IN WITNESS WHEREOF, the parties have executed this Assumption and Assumption Agreement this __ day of _____, 20__.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company


By:      _____
Name:    _____
Title:   _____

_____,
a _____


By:     _____
Name:   _____
Title:  _____

Exhibit A to Assignment and Assumption Agreement

Assigned Contracts

BN 89627986v2

Docusign Envelope ID: 46DC0460-EF53-4563-B28D-2B937F2B314E

**EXHIBIT F: RESERVED**

BN 89627986v2

**EXHIBIT G**

**LIST OF SERVICE CONTRACTS**

| Contract Counterparty | Contract Description | Cure Amount |
|---|---|---|
| Hook Private Security Service | Continuing Service Agreement | $9,751.13 |
| Liberty Landscaping, Inc. | Continuing Service Agreement | $24,833.32 |

BN 89627986v2

ADDENDUM TO PURCHASE AND SALE AGREEMENT

This Addendum (this "**Addendum**") is part of and modifies and supplements the attached Purchase and Sale Agreement dated as of May 29, 2025 (the "**Agreement**") by and between TESORO REDLANDS DE, LLC, a Delaware limited liability company, as debtor and debtor in possession ("**Seller**") and PATRICK THEODORA, an individual ("**Buyer**" and collectively with Seller, the "**Parties**" and each a "**Party**").

The Parties acknowledge, affirm, and agree as follows:

1.    <u>Addendum</u>.  This Addendum modifies, deletes, and amends certain terms and conditions set forth in the Agreement.  Any inconsistency, conflict, or ambiguity between this Addendum and the Agreement is resolved by giving precedence and effect to this Addendum. Except as explicitly amended by this Addendum, all of the terms and conditions of the Agreement remain in full force and effect.  The Agreement, as amended by this Addendum, constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and thereof, and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  All initially capitalized terms used but not defined herein have the meanings assigned to such terms in the Agreement.

2.    <u>Bankruptcy Case</u>.

a.    Seller is a debtor in a bankruptcy case (the "**Bankruptcy Case**") filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which is jointly administered under the bankruptcy case entitled *In re MOM CA Investco LLC, et al.*, Case No. 25-10321 (BLS) (the "<u>Lead Case</u>").

b.    The Property is an asset of Seller's bankruptcy estate in the Bankruptcy Case (the "**Bankruptcy Estate**").

c.    Seller is in possession of the assets of its Bankruptcy Estate and is administering its Bankruptcy Estate, including the Property, as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.    <u>Court Approval; Effective Date</u>. This Agreement and the Parties' obligations to perform and liability under this Agreement (other than Seller's obligation under this section to request the approval of this Agreement by the Bankruptcy Court and to use reasonable efforts to obtain such approval as provided herein) is subject to and shall become effective and binding on the Parties only upon entry by the Bankruptcy Court of a final, non-appealable order in the Lead Case (the "**Approval Order**") approving: (i) this Agreement, and (ii) the sale of the Property by Seller to Buyer pursuant section 363 of the Bankruptcy Code, including the assumption and assignment to Buyer of the Leases and Service Contracts pursuant to section 365 of the Bankruptcy Code (the "**Effective Date**"). The Parties anticipate that, assuming no appeal or other challenge to the Approval Order, the Effective Date will be not later than fifteen days after the entry of the Approval Order by the Bankruptcy Court. Seller shall use its reasonable efforts to request entry of

the Approval Order by the Bankruptcy Court as promptly as practicable after the execution by Seller and Buyer of the Agreement.  This Agreement shall be null and void and of no legal effect if the Approval Order is not entered by the Bankruptcy Court within sixty (60) days of the date of full execution of this Agreement (the "**Approval Deadline**"), unless extended in writing by the Parties. Seller shall have no obligation or liability to Buyer in the event that the Approval Order is not timely entered by the Bankruptcy Court and is final and non-appealable prior to the Approval Deadline, other than that the Earnest Money shall be returned to Buyer promptly following the Approval Deadline without any further instruction by either Buyer or Seller.

4.       Assumption and Assignment of Leases and Service Contracts.  Seller will request authority from the Bankruptcy Court through the Approval Order to assume and assign Leases and Service Contracts to Buyer or reject Service Contracts, as applicable.  Notwithstanding anything in the Agreement to the contrary, the Parties agree that: (i) all Leases shall be assumed and assigned to Buyer pursuant to the Agreement, and Buyer agrees to assume all obligations to the tenants thereunder; and (ii) on or prior to the Closing Date, Buyer will advise Seller in writing of which Service Contracts it will assume and which Service Contracts Buyer requests that Seller reject in accordance with the Approval Order.  Buyer shall be deemed to have elected to assume all Service Contracts if Buyer fails to specify in writing to Seller which, if any, Service Contracts Buyer wishes to assume and/or reject prior to the Closing Date.  Buyer shall be solely liable for and shall cure any monetary defaults under Service Contracts Buyer elects or is deemed to have elected to assume ("**Assumed Service Contracts**") in accordance with the Approval Order and assumes the obligations arising from and after the Closing Date under the New Contracts and the Assumed Service Contracts.

5.       Exclusive Jurisdiction. The Parties agree that notwithstanding any other term in the Agreement to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over any and all disputes between the Parties, whether in law or equity, arising out of this Agreement, or any provision thereof, and the Parties hereby consent to and submit to the jurisdiction of the Bankruptcy Court for any such action.

6.       Seller Representations.  Seller's representations regarding its power and authority to enter into this Agreement or consummate the transactions contemplated hereunder are expressly subject to and conditioned upon the approval of this Agreement by the Bankruptcy Court.

TESORO REDLANDS DE, LLC,
a Delaware limited liability company

By: _____ Mark Shinderman _____          PATRICK THEODORA, an individual
Name: _____ Mark Shinderman _____
Title: _____ Chief Restructuring Officer _____