## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
|  | **Requested Hearing Date: June 10, 2025 at 10:00 a.m. (ET)**<br>**Requested Obj. Deadline: At or Before the Hearing** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE DEBTORS TO AMEND THE DIP CREDIT
### AGREEMENT AND (II) GRANTING RELATED RELIEF

The Debtors (defined below) hereby submit this motion (the "<u>Motion</u>")[2] for the entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Order</u>"), (i) approving the Debtors' amendment to the DIP Credit Agreement substantially in the form attached to the Proposed Order as <u>Exhibit 1</u> (the "<u>DIP Amendment</u>"), providing for, among other things, (a) an increase in the DIP Loan in an aggregate principal amount of $14,500,000.00; and (b) certain other technical modifications to the DIP Credit Agreement; and (ii) granting related relief.  In support of this Motion the Debtors rely on (i) the *Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition*

---

[1]  The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Motion (as defined herein) the DIP Orders (as defined herein), the Initial DIP Declaration (as defined herein), or the Supplemental DIP Declaration (as defined herein), as applicable.

*Financing; and (ii) Granting Related Relief* [Docket No. 89-4] (the "Initial DIP Declaration"), which is incorporated herein by reference, (ii) the *Supplemental Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing; and (ii) Granting Related Relief* [Docket No. 142] (the "Supplemental DIP Declaration"), which is incorporated herein by reference, and (iii) the *Declaration of Mark Shinderman in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* (the "Shinderman Declaration"), attached hereto as Exhibit B, and further represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over the above-captioned chapter 11 cases (the "Chapter 11 Cases"), the Debtors, property of the Debtors' estates, and these matters under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2.      Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Chapter 11 Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 361, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy

Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2.

## BACKGROUND

**A.    General Background**

5.    The Debtors constitute a real estate joint venture comprised of a portfolio of commercial properties owned by the Debtors.  The properties that make up the portfolio include hotels, an apartment complex, office buildings, other commercial real estate, and individual homes used as luxury vacation rentals.

6.    On February 28, 2025 (the "Investco Petition Date"), Debtor MOM CA Investco LLC ("MOM CA"), Debtor MOM AS Investco LLC ("MOM AS"), and Debtor MOM BS Investco LLC ("MOM BS," collectively with MOM CA and MOM AS, the "MOM Investcos") each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The MOM Investcos were founded in June of 2021 for the purpose of managing a robust real estate investment portfolio.

7.    Each of the MOM Investcos owns a number of subsidiary special purpose entities (each an "SPE"), which each own and hold a separate investment property.  Collectively, the MOM Investcos have ownership interests in roughly sixty (60) SPEs for properties across the country.  Each of the MOM Investcos holds one-hundred percent (100%) of the ownership interests for each of their respective SPEs.

8.    On March 10, 2025 and March 31, 2025, as applicable (the "SPE Petition Date," together with the Investco Petition Date, the "Petition Date", as applicable), twenty of the SPEs (collectively, the "SPE Debtors,"[3] together with the MOM Investcos, the "Debtors") each filed a

---

[3]    The "SPE Debtors" are: Retreat at Laguna Villas, LLC; Sunset Cove Villas, LLC; Duplex at Sleepy Hollow, LLC; Cliff Drive Properties DE, LLC; 694 NCH Apartments, LLC; Heisler Laguna, LLC; Laguna Festival Center, LLC; 891 Laguna Canyon Road, LLC; 777 AT Laguna, LLC; Laguna Art District Complex, LLC; Tesoro Redlands DE, LLC; Aryabhata Group LLC; Hotel Laguna, LLC; 4110 West 3rd Street DE, LLC; 314 S. Harvard

voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  These Chapter 11 Cases are jointly administered pursuant to Bankruptcy Rule 1015(b).  *See* Docket Nos. 56, 220.

9.    The Debtors are operating their business and managing their properties, as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committees have been appointed in these Chapter 11 Cases.

10.    Additional factual background regarding the Debtors is set forth in the *Declaration of Mark Shinderman in Support of Petitions and First Day Motions* [Docket No. 152] (as amended, the "First Day Declaration"), which is incorporated herein by reference.

**B.    The Existing DIP Loan**

11.    As evidenced in the Initial DIP Declaration and the Supplemental DIP Declaration, it was clear at the outset of these Chapter 11 Cases that the Debtors were in dire need of financing, without which, these Chapter 11 Cases would have immediately converted to a case under Chapter 7 of the Bankruptcy Code.  Under the circumstances of the cases, including the free fall nature in which they were filed, the Debtors decided that the best option was to bring in a short-term, smaller loan to stabilize the Debtors' operations and bridge to an end game resolution of these Chapter 11 Cases.

12.    To that end, on March 19, 2025, the Debtors filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89] (the "DIP Motion") seeking approval of the short-term bridge the gap DIP Loan in the aggregate principal amount of $5 million.  On April 4, 2025, the Court entered an interim order [Docket No. 187] (the "Interim DIP Order") approving the DIP

---

DE, LLC; Laguna, HI, LLC; Laguna HW, LLC; The Masters Building, LLC; 837 Park Avenue, LLC, and Terra Laguna Beach, Inc. (interim).

Loan on an interim basis and authorizing the Debtors to, among other things, borrow up to $3.5 million. On May 1, 2025, the Court entered the final order [Docket No. 316] (the "Final DIP Order" together with the Interim DIP Order, the "DIP Orders"), authorizing among other things, the Debtors to borrow the remaining $1.5 million under the DIP Loan.

## C.    The Debtors' Need for Additional DIP Financing

13.    Since the Petition Date, the Debtors have continuously engaged in efforts to maintain stable business operations, improve liquidity, and maximize the value of their businesses for the benefit of all interested parties. While the Debtors have made substantial progress in advancing their sale process, stabilizing business operations, preparing for a value maximizing sale process, and addressing issues necessary to administer these Chapter 11 Cases, the Debtors have been transparent about the fact that the complexity of the Debtors' business and the issues surrounding these Chapter 11 Cases would require the procurement of a more robust longer-term DIP loan to enable the Debtors to consummate a value maximizing sale process or to confirm a plan of reorganization and exit bankruptcy. *See e.g.*, Initial DIP Declaration, ¶ 13 (providing that during "Phase 2" of these cases, the Debtors would "assess the various exit options and replace the short-term DIP Loan with a more traditional DIP loan following a marketing period."); Supplemental DIP Declaration, ¶ 26 ("First, the Debtors need an initial short-term loan to stabilize the businesses and administer these Chapter 11 Cases and build the VDR. Second, the Debtors would utilize the VDR to bring in more substantial financing for these Chapter 11 Cases. Third, with longer-term financing in hand, the Debtors would proceed to an end-game—either a plan of reorganization or sale."); Apr. 22, 2025 H'rg Tr. at 37:18-22 [Docket No. 301] ("But we are moving expeditiously to, either, you know, acquire a long – you know, a long-term DIP; or, alternatively, monetize some of the Debtors' assets to make this process work as we move forward."); Mar. 31, 2025 H'rg Tr.

at 54:19-55:1 [Docket No. 185] ("We need the time to establish the data room, that's in process. As you heard, that will be done soon. That will allow us to engage with parties on a plan process, that will allow us to engage with parties on the sale process; that will allow us to engage with parties on DIP financing longer-term, which we've already received proposals of and the debtors' professionals are working with those parties.").

14.     Consistent therewith, the Debtors, in consultation with their professional advisors, have determined that it is desirable, necessary, and in the best interests of the Debtors and their estates to increase the principal amount available under the DIP Loan. Specifically, the additional liquidity is necessary for the Debtors to operate their businesses and administer these Chapter 11 Cases through consummation of the Debtors' proposed sale process, which will extend into the end of September. With respect to operations, the Debtors need funding to, among other things, make payroll, pay property taxes that continue to accrue postpetition, pay vendors, provide and maintain insurance for all properties, and to pay administrative expenses of the Debtors' Chapter 11 Cases. These payments are critical to the Debtors' many secured creditors as well as other stakeholders. Accordingly, the Debtors approached the Specialty DIP, LLC (the "DIP Lender") to request that it increase the DIP Loan and entered into negotiations with respect thereto. Following arms'-length negotiations, the DIP Lender has agreed to provide an additional $14.5 million in immediate additional liquidity.

**D.      The Alternative DIP Proposals were Inadequate.**

15.     As detailed in the Initial DIP Declaration, Supplemental DIP Declaration, and Shinderman Declaration, the Debtors have marketed, solicited, and explored alternative long term DIP financing options since the initial DIP loan was approved on May 1, 2025. Shinderman Decl. ¶ 12. This process has been challenging because, among other things, the Debtors faced an

informational gap due to the true free fall nature of these Chapter 11 Cases and a lack of reliable books and records resulting from the ownership dispute that necessitated the commencement of same.  The solicitation of alternative DIP proposals has been further complicated by the fact that any proposed financing options would have to be subordinate to existing secured first lien debt, could not be secured by any of the estates' causes of actions, and could not be secured by liens on the equity held by the Debtors in their subsidiaries.  Shinderman Decl. ¶ 12.  Since gaining access to the Debtors' books and records, however, the Debtors have compiled a virtual data room (the "VDR") and have provided all interested parties, including potential post-petition lenders, with extensive diligence related to the Debtors' operations and properties.  Such information includes, but is not limited to, insurance policies, title reports, rent rolls, cash flow statements, and other relevant and necessary financial data of the Debtors' operations and properties.  Shinderman Decl. ¶ 13.

16.    Notwithstanding the hurdles faced by the Debtors in marketing alternative financing, the Debtors under the CRO's direction contacted 71 parties with respect to providing junior financing, 39 parties executed non-disclosure agreements and were provided access to the VDR, 1 potential lender conducted site visits of the Debtors' properties, and 4 parties submitted term sheets.  The Debtors also communicated with the Honarkar Parties on several occasions requesting that they provide DIP financing or introduce the Debtors to financiers that would be willing to provide post-petition financing.  The Honkarkar Parties failed to do so.  Instead, the Honarkar Parties provided a draft term sheet for a plan structure that the Debtors believe is patently unconfirmable and which lacks committed funding.  Shinderman Decl. ¶ 14.

17.    The Debtors negotiated with the four parties that provided term sheets simultaneously to reach an agreement as expeditiously as possible.  Although these efforts resulted

in interest from several parties seeking to provide the Debtors with a loan to fund these Chapter 11 Cases, none were on terms nearly as favorable to the Debtors' estates as those contained in the DIP Amendment.  Shinderman Decl. ¶ 15.  More specifically, the alternative proposals, which are confidential, fell short because, among other things, (i) the aggregate principal amount of financing was well below the amount offered in the DIP Amendment and needed to fund these Chapter 11 Cases, (ii) the offers were tied to the lender having the right to serve as a stalking horse bidder in connection with the Debtors' sale process and the proposed purchase price was well below what the Debtors believe the properties are worth, (iii) the proposal was tied to the ability of the lender to match any sale price, which would chill bidding, and/or (iv) the interest rates and fees resulted in a staggering annualized return on the loan, to which the Debtors could not agree. Shinderman Decl. ¶ 15-16.

18.    Ultimately, the alternative proposals contained too much risk and not enough reward and the terms of the DIP Amendment are much more favorable to the Debtors' estates. Moreover, as was done with the initial DIP Loan, the Debtors have not given up any control over these Chapter 11 Cases by agreeing to the DIP Amendment.  Rather, the DIP Amendment and increased loan amount provide funding to provide the necessary runway to permit the Debtors to implement the value maximizing sale process that was developed by the Debtors in consultation with their advisors and discussions with key third parties such as the Real Property Lenders.[4] Finally, the DIP Amendment does not grant liens on estate causes of action, and does not include other bells and whistles often seen in DIP financing.  Accordingly, the Debtors believe entry into the DIP Amendment is a sound exercise of their business judgment and should be approved by the Court.

---

[4]    "Real Property Lenders" means Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, Banc of California, and Pacific High Yield Fund 1, LLC.

E.    **The DIP Amendment.**

19.    Under section 11.01 of the DIP Credit Agreement, the DIP Credit Agreement may be amended or modified "in writing signed by [the DIP Lender]." DIP Credit Agreement, § 11.01. Additionally, the Final DIP Order provides, among other things, that the Debtors and the DIP Lender may agree to amendments, waivers, or other modifications to and under the DIP Credit Agreement so long as material amendments are approved by the Court. Final DIP Order, ¶ 2(d)(2).

20.    The Debtors and the DIP Lender have agreed to the terms of the DIP Amendment that will (a) increase the DIP Loan in an aggregate principal amount of $14,500,000.00; and (b) make certain other technical modifications to the DIP Credit Agreement. The following chart summarizes certain principal terms of the DIP Amendment that reflect amendments to the DIP Credit Agreement:

**Local Rule 4001-2(a)(i) Summary of Principal Terms of the DIP Amendment**[5]

| Material Term | Summary Description |
|---|---|
| **Parties to DIP Loan:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **Borrowers:** The Debtors[6]<br><br>**DIP Lender:** Specialty DIP LLC, a Delaware limited liability company |
| **DIP Loan and Borrowing Limits:**<br><br>*Bankruptcy Rule* | The DIP Amendment makes the following changes to section 2.01 of the DIP Credit Agreement regarding the DIP Loan and Borrowing Limits: |

---

[5]    The following summary of the DIP Amendment is qualified in its entirety by reference to the applicable provisions of the DIP Amendment attached to the Proposed Order as Exhibit 1. To the extent there are any inconsistencies between this summary and the provisions of the DIP Amendment and the Debtor-in-Possession Term Sheet dated June 3, 2025 (the "Term Sheet"), the provisions of the DIP Amendment and the Term Sheet, as applicable, shall control. Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Amendment. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein. For the avoidance of doubt, except as expressly amended by the DIP Amendment and the Proposed Order, the DIP Credit Agreement shall continue to be in full force and effect and terms that have not been materially amended were summarized in the chart included in paragraph 33 of the DIP Motion.

[6]    Notwithstanding anything contained in the DIP Credit Agreement to the contrary, the maximum amount of Obligations that Terra Laguna Beach, Inc. shall be responsible for repaying shall be equal to the amount of proceeds from the Loan that are funded to, or used by, Terra Laguna Beach, Inc.

| Material Term | Summary Description |
|---|---|
| *4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(A), (B)*<br><br>*Local Rule 4001-2(a)(ii)* | Section 2.01   The Loan. Subject to the terms and conditions set forth herein and in the Final DIP ~~Orders~~Order, the Lender agrees to make the Loan to the Borrowers, in accordance with the Budget, on and after the Closing Date as follows:<br><br>~~(a) Upon the entry by the Bankruptcy Court of the Interim DIP Order approving the Loan and the Loan Documents, the Lender made available to the Borrowers an advance of Loan proceeds in an amount not to exceed $3,500,000; and~~<br><br>~~(b) Upon the earlier to occur of (i) the Bankruptcy Court's entry of the Final DIP Order; or (ii) the filing by the applicable Borrowers of a motion with the Bankruptcy Court seeking authority for the sale of real estate pursuant to which the Net Proceeds of such sale shall result in the indefeasible payment in full in cash of the Obligations, the Lender will make available to the Borrowers an advance of Loan proceeds in an amount not to exceed $1,500,000 (the "**Final Loan Amount**").  The Lender shall fund the Final Loan Amount no less than two (2) Business Days (or such earlier date agreed to by the Lender in its sole discretion) following (i) the entry of the Final DIP Order, and (ii) the Borrowers' certification of its satisfaction of the applicable conditions precedent to the funding of the Final Loan Amount~~<br><br>(a)   Within three (3) Business Days of the entry of the Final DIP Order the following amounts shall be advanced by the Lender:<br><br>(i)   Five Million Dollars ($5,000,000) to satisfy the outstanding principal balance of the Prior DIP Loan;<br><br>(ii)   up to One Million Dollars ($1,000,000) for payment of interest, fees, costs and expenses that have accrued on the Prior DIP Loan;<br><br>(iii)   One Million Five Hundred Thousand Dollars ($1,500,000) for the funding of the Professional Fees Escrow Account; and<br><br>(iv)   up to Two Million Five Hundred Thousand Dollars ($2,500,000) for the operating expense requirements of the Borrowers that are single purpose entities, which expenses shall be acceptable to the Lender upon consultation with FTI Consulting, Inc.<br><br>(b)   Within three (3) Business Days after entry of an order of the Bankruptcy Court approving the retention of an accounting firm engaged by the Borrowers to perform a forensic accounting, Three Million Dollars ($3,000,000) for the allowed fees and expenses of such accounting firm, provided that the engagement agreement with the Borrowers sets forth a reasonable estimate of the fees to be incurred for such forensic accounting, with the hourly rates of the professionals who will staff the project and estimated hours to be expended by each; and<br><br>(c)   Within thirty (30) days after the entry of the Final DIP Order, an additional One Million Five Hundred Thousand Dollars ($1,500,000) for funding of the Professional Fees Escrow Account upon the submission to Lender of billing records (redacted to preserve any applicable privileges and confidential information) reflecting hours expended and fees incurred to date. |

| Material Term | Summary Description |
|---|---|
| **Use of DIP Loan Proceeds and Cash Collateral:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)*<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(L)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Amendment makes the following changes to section 7.12 of the DIP Credit Agreement regarding the Use of DIP Loan Proceeds and Cash Collateral:<br><br>Section 7.12    Use of Proceeds.  The Borrowers shall use the proceeds of the Loan and its cash and cash equivalents to (a) refinance the Prior DIP Loan, (b) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the Loan Documents or the ~~Interim~~Final DIP Order as such become due, (~~b~~c) fund the administration of the Bankruptcy Cases, (~~c~~d) fund (i) ~~reasonable, documented, and~~escrow to hold the amounts for Professional Fees (as defined herein) in accordance with the amendment to this Agreement and the Budget, and (ii) allowed fees and expenses of the Borrowers' and the Lender's professionals, (~~d~~e) provide financing for working capital and other general corporate purposes, in each case, in accordance with the Budget, the Final ~~Orders~~Order, and the Loan Documents, and (~~e~~f) pay other amounts with the prior written consent of the Lender. |
| **Maturity Date and Termination/Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(M)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Amendment makes the following changes to the definition of "Maturity Date" as defined in section 1.01 of the DIP Credit Agreement:<br><br>**_"Maturity Date"_** means ~~earlier of (a) 90 days after entry of the Interim DIP Order, provided, however that such 90 day period shall be extended for an additional 90 day period provided that (i) no Event of Default has occurred and is continuing, and (ii) a motion has been filed with the Bankruptcy Court seeking the sale of assets of the Borrowers pursuant to which the net sale proceeds of such sale shall result in the indefeasible payment in full in cash of the Obligations, (b) the~~earliest to occur of the following: (a) the later of (i) August 31, 2025, and (ii) the consummation of a sale of all or substantially all of the assets of the Borrowers, which sale shall occur no later than September 30, 2025; (~~c~~b) acceleration of or termination of the Loan pursuant to the terms ~~hereof~~of the Loan Documents; and (~~d~~c) the substantial consummation (as defined in Section 1101 of ~~chapter 11 of Title 11 of~~the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan filed in the Bankruptcy Cases that is confirmed pursuant to an order entered by the Bankruptcy Court.<br><br>Further, the DIP Amendment makes the following changes to section 10.01 of the DIP Credit Agreement regarding Events of Default:<br><br>(a)    The failure by the Borrowers to perform or comply with any material term, condition, covenant (including but not limited to all negative covenants contained herein) or obligation (including a payment obligation) contained in the Loan Documents or ~~any of the Interim DIP Order or~~the Final DIP Order; |

| Material Term | Summary Description |
|---|---|
| | **(b)** The cessation of the Loan to be in full force and effect, the Loan being declared by the Bankruptcy Court to be null and void, or the Lender ceasing to have the benefit of the Liens granted by the ~~Interim DIP Order and/or the~~ Final DIP Order; |
| | **(c)** Except for liens granted to the holders of existing senior liens, who demonstrate on notice to the Lender with an opportunity to object, that the Liens are entitled to adequate protection based on the value of the Collateral, the entry of any order of the Bankruptcy Court granting to any third party a lien *pari passu* with or senior to the Liens granted to the Lender hereunder; |
| | **(d)** Until the Obligations are indefeasibly repaid in full in cash (other than contingent obligations for which no claim has been made or threatened) and all commitments under the Loan terminated: (i) the Borrowers make any payment of prepetition principal or interest or otherwise on account of any prepetition indebtedness for borrowed money or payables other than any payment made for indebtedness with respect to valid, perfected and nonavoidable liens existing as of the Petition Date in favor of any party, including a bank, other lending institution; (ii) the validity or enforceability of any provision of the Loan Documents or the Obligations are contested by the Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate); and (~~ii~~iii) the Borrowers (or any party acting on its behalf or on behalf of the bankruptcy estate) deny in writing that it has any further liability or obligation under any provision of the Loan Documents; |
| | **(e)** The Borrowers fail to make any payments, including interest payments, due under any of the Loan Documents~~, the Interim DIP Order~~ or the Final DIP Order within three (3) Business Days of when due; |
| | **(f)** The entry of an order converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code; |
| | **(g)** The entry of an order dismissing the Bankruptcy Cases, or the applicable Borrowers filing a motion or not timely opposing a motion seeking such relief without the consent of the Lender; |
| | **(h)** The entry of an order appointing an examiner having expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee to operate all or any material part of the Borrowers' business; |
| | ~~(i) The entry of an order in the Bankruptcy Cases granting relief from the automatic stay so as to allow any party to proceed against any property of the Borrowers with a value in excess of $100,000, including the Collateral of the applicable Borrowers, or to commence or continue any prepetition litigation against the Borrowers involving potential liability in excess of $100,000 in the aggregate;~~ |
| | **(i)** [reserved]; |

| Material Term | Summary Description |
|---|---|
| | (j)    The commencement of any actions by the Borrowers or any respective Affiliate or Subsidiaries thereof that challenges the rights and remedies of any of the Lender under the Loan Documents; |
| | (k)    Without the prior written consent of the Lender which shall not be unreasonably withheld and other than as provided for in the Loan Documents, the bringing of any motion or taking of any action, seeking entry of an order, or the entry of an order by the Court, in the Bankruptcy Cases (i) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the Lender, (ii) permitting the Borrower to obtain financing under section 364 of the Bankruptcy Code without providing full repayment of the Loan upon the filing of the motion as a condition thereto, (iii) permitting the Borrower to grant security interests or liens under section 364 of the Bankruptcy Code without providing full repayment of the Loan upon the filing of the motion as a condition thereto, (iv) permitting the Borrower to use cash collateral under section 364 of the Bankruptcy Code other than as contemplated herein or as otherwise approved by Court order, or (v) authorizing the Borrower to take other actions adverse to the Lender or its rights and remedies under the Loan Documents, or its interest in  Collateral under section 364 of the Bankruptcy Code; |
| | (l)    The entry of any order terminating the Borrowers' exclusive right to file a plan or the expiration of the Borrowers' exclusive right to file a plan; |
| | (m)    ~~(l)~~ The Borrowers or any of their respective Affiliates or Subsidiaries, or any Person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, fail to object to after the Lender so requests, or otherwise ~~participate~~ participates as an adverse party in any suit or other proceeding against the Lender regarding the Loan Documents or the Obligations; |
| | (n)    A plan shall be filed by the Borrowers, or be confirmed in the Bankruptcy Cases, or any order shall be entered which dismisses the Bankruptcy Cases and which plan or order (i) (x) does not provide for termination of the unused commitments under the Loan and the indefeasible payment in full in cash on the effective date of such plan or order of the Obligations (other than contingent indemnity obligations for which no claim has been made or threatened); or (y) is not satisfactory to the Lender in its sole and absolute discretion, and (ii) does not provide, to the extent permitted by applicable law, for release and exculpatory provisions relating to the Lender that are satisfactory to the Lender in its sole and absolute discretion, or the Borrowers or any of their respective Subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order; |
| | (o)    The Bankruptcy Court shall enter an order authorizing the sale or sales of all or substantially all of the assets of the Borrower unless (i) the Net Proceeds from such sale(s), if any, after payment of the prior secured first lien debt, are paid to the Lender to reduce the DIP Obligations; or (ii) such sale is otherwise approved by the Lender; |
| | (p)    ~~(m)~~ The entry of an order in the Bankruptcy Cases avoiding or permitting avoidance of any portion of the payments made on account of the Obligations, the Loan Documents, or in each case any related documents or any other indebtedness provided to the Borrower by the Lender, or the taking of any action by the Borrowers (or any party acting on its |

| Material Term | Summary Description |
|---|---|
| | behalf or on behalf of the Borrowers' bankruptcy estates) to challenge or support a challenge of any such payments;<br><br>(q) (n) The Interim DIP Order or the Final DIP Order and the terms thereof shall cease to create valid and perfected Liens on the Collateral and claims as required hereunder (other than an immaterial portion thereof);<br><br>(r) (o) The filing or supporting any pleading by the Borrowers, including the entry of an Orderorder sought by the Borrowers (or any other estate representative) seeking, or otherwise consenting to, any relief, the granting or prosecution of which could reasonably be expected to result in the occurrence of an Event of Default;<br><br>(s) Any non-monetary final judgment or order with respect to a post-petition event shall be rendered against the Borrower which does or could reasonably be expected to have a material adverse effect, and, in each case, there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;<br><br>(t) (p) The Interim DIP Order or the Final DIP Order being amended or modified without the consent of the Lender; or<br><br>(u) (q) Failure to repay the Obligations on the Maturity Date.; or<br><br>(v) Failure to timely comply with any Milestone. |

| Material Term | Summary Description |
|---|---|
| **DIP Collateral:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(G), (P)* | The DIP Amendment makes the following changes to the definition of "Collateral" as defined in section 1.01 of the DIP Credit Agreement:<br><br>"***Collateral***" has the meaning specified in Section 4.01 and shall at all times include any collateral granted to the Lender pursuant to the ~~Interim DIP Order~~Final DIP Order; provided, however, and for the avoidance of doubt, the Carve-Out (which includes the Professional Fee Cap and Post Carve-Out Trigger Notice Cap) and the Professional Fee Escrow Account are excluded and shall not be included as collateral granted to the Lender.<br><br>Further, the DIP Amendment makes the following changes to section 4.02 of the DIP Credit Agreement regarding the Priority of Security Interests in the Collateral:<br><br>**Section 4.02** Priority of Security Interests in the Collateral. Pursuant to the ~~Interim~~Final DIP Order, and subject to the Carve-Out, the Lender shall have a valid, binding, enforceable, non-avoidable, and automatically and properly perfected (i) a first priority security ~~interests~~interest in and continuing ~~liens~~lien on all of such Borrowers' right, title and interest in, to and under ~~all the Collateral that as of entry of this Interim DIP Order were not encumbered by a prior lien~~all the Borrowers' assets that are not already encumbered by a valid, perfected and nonavoidable lien existing as of the Petition Date in favor of any party, including a bank or other lending institution, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, (ii) a junior security interest in and continuing lien on all Borrowers' assets that are encumbered by a valid, perfected and nonavoidable lien existing as of the Petition Date in favor of a bank or other lending institution, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, and ~~(ii) a junior~~iii) a senior security interest in and continuing lien on all ~~of such~~Borrowers' assets that ~~were encumbered by one or more valid, perfected and non-avoidable liens, and all junior~~are encumbered by a valid, perfected and nonavoidable lien existing as of the Petition Date in favor of any person or entity, other than a bank or other lending institution, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.<br><br>~~Section 4.02~~ For the avoidance of doubt, the Collateral shall not include (i) any derivative actions or other claims and causes of action of the Borrowers and their bankruptcy estates, or the proceeds thereof; or (ii) the Carve-Out (which includes the escrow for Professional Fees, the Professional Fee Cap, and Post Carve-Out Trigger Notice Cap). With respect to assets upon which the Lender is granted a junior security interest hereunder, the Lender shall be deemed to consent under section 363(f)(2) of the Bankruptcy Code to a properly noticed sale of such asset(s) if the senior lender(s) also consents unless a written objection is timely filed by the Lender. |
| **Conditions Precedent**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E)* | The DIP Amendment makes the following changes to sections 5.01(b), (f), and (g) of the DIP Credit Agreement regarding Conditions Precedent:<br><br>(b) ~~Interim DIP Order;~~ Final DIP Order. The ~~Interim~~Final DIP Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Lender in its sole discretion, which order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended (in whole or in part). ~~With respect to advances in excess of $3,500,000 in the aggregate, the Final DIP Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Lender in its sole discretion, which order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended (in whole or in part).~~<br><br>(f) Lender's Fees and Expenses. All reasonable and documented out-of-pocket costs, fees and expenses required to be paid to the Lender pursuant to this Agreement or the ~~Interim DIP Order and/or~~Final DIP Order shall have been paid. |

| Material Term | Summary Description |
|---|---|
| | (g)     Subordination of Certain Claims.  It shall be a condition precedent to the consummation of the transactions contemplated in the First Amendment and the validity of the Lender's security interests in any of the Collateral that is granted by the First Amendment, and the obligations of the Borrowers as set forth in the First Amendment, that the Borrowers shall have reached an agreement with Cantor Group IV, LLC, Cantor Group V, LLC, Coastline Santa Monica Investments, LLC, and Coastline Loans, LLC, as applicable, that their claims, if any, shall be subordinate to administrative expense claims (including Professional Fees) incurred during the Bankruptcy Cases. |
| **Affirmative Covenants**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E), (H)* | The DIP Amendment makes the following changes to sections 7.11 through 7.15 of the DIP Credit Agreement regarding Affirmative Covenants:<br><br>Section 7.11    Bankruptcy Actions.  Each Borrower shall at all times comply with the requirements contained in the Final DIP OrdersOrder and shall not seek any reversal, vacatur, stay, amendment or modification thereto.<br><br>Section 7.12    Use of Proceeds.  The Borrowers shall use the proceeds of the Loan and its cash and cash equivalents to (a) refinance the Prior DIP Loan, (b) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the Loan Documents or the InterimFinal DIP Order as such become due, (bc) fund the administration of the Bankruptcy Cases, and (cd) fund (i) the reasonable, documented, andescrow to hold the amounts for Professional Fees (as defined herein) in accordance with the amendment to this Agreement and the Budget, and (ii) allowed fees and expenses of the Borrowers' and the Lender's professionals, (de) provide financing for working capital and other general corporate purposes, in each case, in accordance with the Budget, the Final DIP OrdersOrder, and the Loan Documents, and (ef) pay other amounts with the prior written consent of the Lender.<br><br>Section 7.13    Communication with Lender.  Cause one or more responsible officers of Borrowers and the financial advisor to Borrowers to participate in one conference call per week with the Lender at a date and time mutually agreed to by Borrowers and the Lender and<br><br>Borrowers hereby acknowledge and agree that the Lender shall be entitled to communicate directly with the financial advisor to Borrowers. |

| Material Term | Summary Description |
|---|---|
| | **Section 7.14    Claims and Actions.** |
| | (a)    Provide the Lender with written notice promptly after it is aware that any of the following events shall occur (a) any Borrower becomes aware of any claim, action, suit, proceeding, arbitration, complaint, charge or investigation threatened or pending, or is enjoined or in any way prevented by court or governmental order from conducting any part of its business as currently conducted or contemplated to be conducted; or (b) the ceasing of operations of its business as such business is normally conducted or the termination of substantially all of the Borrowers' employees-; |
| | (b)    Use best efforts under the circumstances to prosecute and defend all litigation related to the Borrowers' estates and assets, including but not limited to using best efforts to recover any misappropriated estate property; |
| | (c)    Use best efforts to stop any existing and prospective misappropriation of estate assets; and |
| | (d)    Use best efforts to contest any motion requesting relief from the automatic stay. |
| | Section 7.15    Sale Efforts; Milestones.  So long as the Loan or any other Obligation of each Borrower under any Loan Document shall remain unpaid, the Borrowers shall: |
| | (a)    Use best efforts to undertake all reasonable steps to maximize value for all assets of the Borrowers and their estates, including if determined by the Borrowers to be in the best interests of their estates, to allow for intra-company advances among the Borrowers in the ordinary course of their businesses consistent with pre-petition practices after June 10, 2025; |
| | (b)    Afford consulting rights to the Lender with respect to the sale of any of the Borrowers' assets and the assets of any subsidiary of the Borrowers; provided, however, that the Lender's consultation rights shall cease to the extent that the Lender becomes an active bidder in the Borrowers' sale process either by itself, through an Affiliate, or as part of a bid with an Affiliate or third party entities; |
| | (c)    Use best efforts under the circumstances to close on the sales of all, or substantially all, of the Borrowers' assets on or before September 30, 2025, in consultation with the Lender regarding the (i) sequencing of the sales and closings, (ii) allocations of the sale price, and (iii) target sale prices; provided, however, that the foregoing shall be subject to the Borrowers' fiduciary duties to elicit the highest and best offer for its assets; and |
| | (d)    Use best efforts to distribute all proceeds of the sale(s) of the Borrowers' assets to holders of claims and interests on or before (i) October 1, 2025 with respect to allowed claims of distributees and (ii) November 15, 2025 with respect to all other distributees' claims, through one or more structured dismissals, confirmed plan(s) of reorganization, Order(s) approving one or more Bankruptcy Rule 9019 Motion(s), or otherwise; provided, however, that the foregoing shall be subject to the Borrowers' fiduciary duties to elicit the highest and best offer for its assets; and |
| | (e)    Comply with each of the Milestones. |

| Material Term | Summary Description |
|---|---|
| **Negative Covenants**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E)* | The DIP Amendment makes the following changes to sections 8.05, 8.13, 8.17, and 8.26 of the DIP Credit Agreement regarding Negative Covenants:<br><br>    Section 8.05   Sales, Etc. of Assets.  Except in the ordinary course of business, each Borrower will not sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets (each a "***Disposition***"), and will not permit any of its respective Subsidiaries to effect any Disposition other than sales of inventory and services in the ordinary course or business consistent with past practice, except in each instance <u>that</u> (i) ~~if such sale results in the indefeasible payment in full in cash of the~~<u>the Net Proceeds from such sale(s), if any, after payment of the prior secured first lien debt, are paid to the Lender to reduce the DIP</u> Obligations~~.~~<u>; or</u> (ii) such sale is otherwise approved ~~in writing~~ by the Lender.<br><br>    Section 8.13   Amendments to <u>Final</u> DIP <s>Orders</s><u>Order</u>.  Each Borrower shall not amend the ~~Interim DIP Order, the~~ Final DIP Order or any Bankruptcy Court order relating to cash management, any other motion or filing that involves cash disbursements, or any motion or filing that involves the sale of the applicable Borrower's assets which revision does not provide for a sale for fair value under the circumstances, without the prior written consent of the Lender in its sole and absolute discretion; provided that this provision shall not restrict a secured party's right to seek and receive adequate protection.<br><br>    Section 8.17   Adequate Protections.  Each Borrower shall not, other than as contemplated by the ~~Interim DIP Order, the~~ Final DIP Order, interim or final cash collateral orders, consent to the granting of adequate protection payments or Liens, superpriority administrative expense claims or Liens having priority senior to or *pari passu* with those granted to the Lender; provided that this provision shall not restrict a secured party's right to seek and receive adequate protection.<br><br>    Section 8.26   Additional Bankruptcy Related Negative Covenants.  Each Borrower will not seek, consent to, or permit to exist any of the following:<br><br>        (a)   any modification, stay, vacation or amendment to the <u>Final</u> DIP <s>Orders</s><u>Order</u> as to which the Lender has not consented in writing;<br><br>        (b)   a priority claim or administrative expense claim or unsecured claim against such Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except as set forth in the <u>Final</u> DIP <s>Orders</s><u>Order</u> and with respect to the Carve-Out;<br><br>        (c)   any Lien on any Collateral (other than Permitted Liens or as may be granted by the <u>Final</u> DIP <s>Orders</s><u>Order</u>) having a priority equal or superior to the Lien securing the Obligations other than as set forth in the <u>Final</u> DIP <s>Orders</s><u>Order</u> and with respect to the Carve-Out; |

| Material Term | Summary Description |
|---|---|
| | (d)    any order that authorizes the return of any of the Borrower's property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the consent of the Lender;<br><br>(e)    any order which authorizes the payment of any Debt incurred prior to the Petition Date, unless such payments are in compliance with the Budget, or otherwise approved by Lender in writing;<br><br>(f)    any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or<br><br>(g)    any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Final DIP OrdersOrder or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Final DIP OrdersOrder. |
| **Carve Out/Superpriority Claims:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(F)* | The DIP Amendment makes the following changes to the definition of "Carve-Out" as defined in section 1.01 of the DIP Credit Agreement<br><br>"***Carve-Out***" means the sum, without duplication, of the following (i) (a) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717, which shall not be limited by the Budget; (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (c) unpaid allowed professional fees, costs and expenses (the "***Professional Fees***") incurred by the Borrowers and any statutory committee of unsecured creditors (the "***Committee***") appointed in the Chapter 11 Cases (including agents appointed under section 156(c) of title 28 of the United States Code), in each case not to exceed $3,000,000.7,500,000 in the aggregate, plus the amount of the positive variance, if any, in the Budget as to which Borrowers shall provide Lender and its counsel a variance report twice monthly in a form reasonably acceptable to Lender together with (i) an explanation of the positive variance(s), if any, by category of specific expense and any intended use of the positive variance in each report and (ii) the Borrowers' statement as to the amount it intends to add to the Carve-Out for Professional Fees in excess of $7,500,000 upon notice and consultation with the Lender of Professional Fees of the Borrowers' professionals, and a reasonable amount of aggregate Professional Fees of the Committee's professionals (the "**Professional Fee Cap**") as of the delivery of a Carve-Out Trigger Notice, and (ii) after the delivery of a Carve-Out Trigger Notice, allowed Professional Fees in an additional aggregate amount not to exceed $125,000250,000.00 (the "***Post Carve-Out Trigger Notice Cap***"). For the avoidance of doubt, the Post Carve-Out Trigger Notice Cap is in addition to and not subsumed by the Professional Fee Cap.<br><br>Further, the DIP Amendment makes the following changes to section 4.03 of the DIP Credit Agreement:<br><br>Section 4.03    DIP Superiority Claims.    Effective immediately upon entry of the InterimFinal DIP Order, the Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Bankruptcy Cases on account of the Obligations, with the priority as set forth in section 364(c)(1) of the Bankruptcy Code (the "***DIP Superpriority Claims***") but subject to both the Prepetition Senior Lenders Administrative Claims (as defined in the Interim Order)allowed superpriority administrative claims of senior lien holders based on diminution, if any, and the Carve-Out. The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall have recourse against the Borrowers.<br><br>Further, the DIP Amendment makes the following changes to section 4.04 of the DIP Credit Agreement regarding the Professional Fee Escrow: |

| Material Term | Summary Description |
|---|---|
| | Section 4.04   _Professional Fee Escrow._  The Borrower shall open a new bank account at a depository approved by the Lender (an "**_Approved Depository_**"), designate an existing bank account at an Approved Depository, or designate a third party's bank account at an Approved Depository that shall function as a segregated account held in trust for and exclusively available for the payment of Professional Fees (the "**_Professional Fees Escrow Account_**") in the amount equal to the Professional Fee Cap, provided that any such bank account be with a bank that has executed a Uniform Depository Agreement with the U.S. Trustee's Office. The Borrower shall fund the Professional Fees Escrow Account up to the full amount of the Professional Fee Cap. Such funds shall be held in the Professional Fees Escrow Account for the benefit of the professionals to be applied to the allowed Professional Fees of the professionals that are approved for payment pursuant to one or more orders of the Bankruptcy Court.  Any allowed Professional Fees payable to the professionals shall be paid first out of the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the Lender or any liens or claims granted as adequate protection and shall not constitute Collateral~~; provided, that, notwithstanding anything to the contrary herein, the Collateral shall include the Borrowers' reversionary interest in funds traceable to the Loan held in the Professional Fee Escrow Account and such reversionary interest shall be treated as Collateral and subject to all Liens securing the Loan~~. |
| **Milestones:**<br><br>_Bankruptcy Rule 4001(c)(1)(B)_<br><br>_Local Rule 4001-2(a)(i)(H)_ | The DIP Amendment includes the following milestones attached to the DIP Amendment as Exhibit A:<br><br>1.   Accounting<br>    a.   Accountant in place by June 30, 2025<br>    b.   Target completion:  September 30, 2025 (3 months)<br>    c.   Outside date:  October 30, 2025 (4 months)<br>2.   Sales<br>    a.   Target date for closing:  August 31, 2025<br>    b.   Outside date for closing:  September 30, 2025<br>3.   Distribution of Sale Proceeds:  where structured dismissal is possible<br>    a.   Target:  November 15, 2025 (45 days from outside closing date)<br>    b.   Outside date:  November 30, 2025 (60 days from outside closing date)<br>4.   Distribution of Sale Proceeds:  where plan is needed<br>    a.   Target:  January 15, 2026 (approx. 100 days from outside closing date)<br>    b.   Outside date:  January 31, 2026 (approx. 115 days from outside date)<br>5.   Lender stay relief to start the foreclosure process<br>    a.   Notice:  no sooner than July 15, 2025<br>    b.   Sale:  no sooner than November 1, 2025 (30 days after outside date for closing) |

21.    The DIP Amendment will provide the Debtors with $14.5 million to be available upon entry of the Proposed Order, pursuant to the terms of the DIP Amendment and Budget, that is not presently available to the Debtors.  The DIP Amendment was the subject of extensive arms'-length negotiations among the Debtors and the DIP Lender and there is no viable alternative financing available to bridge the Debtors to the consummation of value maximizing sales and exit

from chapter 11 aside from the DIP Amendment.  Shinderman Decl. ¶ 18.  Accordingly, the Debtors submit that they should be authorized to effectuate the DIP Amendment as an exercise of sound business judgment.  The terms of the DIP Amendment shall remain the same as the terms in the DIP Credit Agreement with some minor exceptions and specifically, the incremental DIP Loan will be subject to the same fees and interest rates as the current loan under the DIP Credit Agreement.  Except as expressly amended by the DIP Amendment and the Proposed Order, the DIP Credit Agreement shall continue to be in full force and effect.  Thus, the DIP Amendment is fair and reasonable under the circumstances and the Debtors submit that the requested relief is appropriate and should be granted.

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek entry of the Proposed Order (i) approving the DIP Amendment, providing for, among other things, (a) an increase in the DIP Loan in an aggregate principal amount of $14,500,000.00; and (b) certain other technical modifications to the DIP Credit Agreement; and (ii) granting related relief.

## BASIS FOR RELIEF

**A.     Entry into the DIP Amendment Is a Reasonable Exercise of the Debtors' Sound Business Judgment and is in the Debtors' Best Interests**.

23.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to amend the DIP Credit Agreement to increase the DIP Loan amount.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011)

("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

24.    To determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 799 (Bankr. D. Del. 2007) (declining to "entertain an objection to [a] transaction . . . that . . . involves a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy Code]").

25.    Further, courts must consider the terms of postpetition financing "in context" and based on the "relative circumstances of the parties" in determining whether they are fair and reasonable. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that it may be "necessary, and indeed prudent, for a postpetition debtor to enter into a 'hard' bargain with a creditor . . . to acquire needed funds to complete a reorganization").

26.    Additionally, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). Pursuant to § 105(a), the bankruptcy courts have broad

equitable powers. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235 (3d Cir. 2004) ("As courts of

equity, bankruptcy courts 'have broad authority to modify creditor-debtor relationships.'" (quoting

*U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990))); *In re LTL Mgmt., LLC*, 638 B.R. 291, 323 (Bankr.

D.N.J. 2022) ("Congress . . . granted the bankruptcy court broad equitable powers under § 105(a).");

*see Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136

(2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke

equitable principles to achieve fairness and justice in the reorganization process.").

27.     The Debtors' decision to execute the DIP Amendment, which effectuates, among

other things, borrowing an additional amount of $14,500,000.00 on a final basis and certain technical

modifications to the DIP Credit Agreement, is an exercise of their sound business judgement.  The

DIP Amendment was the product of good faith and hard-fought negotiations with the DIP Lender

and follows careful evaluation of necessity for the Debtors to operate their businesses and to avoid

irreparable harm to the Debtors' estates and the Debtors sale process.  Put simply, the Debtors

require an incremental liquidity infusion to continue operating their business in the ordinary course

and to fund these Chapter 11 Cases.  The incremental funding offered under the DIP Amendment is

fair and reasonable under the circumstances because, among other things, parties have already

received notice and an opportunity to object to the DIP Motion.  Further, the fees required by the DIP

Amendment are on the same terms as those previously approved under the DIP Orders, which as

detailed in the DIP Motion and supporting declarations, are fair and reasonable under the

circumstances, and in line with debtor in possession financings of this kind.  While the additional

funding will be secured by and have recourse to the DIP Liens and DIP Superpriority Claims, the

Debtors are not agreeing to encumber any additional collateral nor are they granting any additional

claims beyond those already provided for pursuant to the DIP Orders.  As a result, the Debtors ultimately decided that moving forward with the DIP Amendment ensures that the Debtors have adequate funds to continue to operate in the ordinary course of businesses postpetition and to fund the administration of these Chapter 11 Cases and complete the proposed sale process to preserve and maximize the value of their assets for the benefit of all parties in interest.

28.     Accordingly, the DIP Amendment is an exercise of the Debtors' sound business judgment, and the relief requested is appropriate and should be granted.

## NOTICE

29.     Notice of this Motion will be provided to the following parties or their respective counsel: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' thirty largest unsecured creditors on a consolidated basis; (c) Mohammad Honarkar and 4G Wireless, Inc.; (d) the Real Property Lenders[7]; (e) counsel to the DIP Lender; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Office of the United States Attorney for the District of Delaware; (i) the financial institutions at which the Debtors' bank accounts are maintained; (j) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtor's assets; (k) any other party that has asserted a lien on or security interest in the Debtors' assets; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

---

[7]    "Real Property Lenders" means Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, Banc of California, and Pacific High Yield Fund 1, LLC.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter the Proposed Order, substantially in the form attached as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: June 3, 2025
       Wilmington, Delaware

Respectfully submitted,

*/s/ Gregory J. Flasser*
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
R. Stephen McNeill (No. 5210)
Gregory J. Flasser (No. 6154)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
      astulman@potteranderson.com
      rmcneill@potteranderson.com
      gflasser@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*