## EXHIBIT B

**(Shinderman Declaration)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 89, 114, & 187 |

### DECLARATION OF MARK SHINDERMAN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO AMEND THE DIP CREDIT AGREEMENT AND (II) GRANTING RELATED RELIEF

I, Mark Shinderman, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am generally familiar with the Debtors' business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2.      I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information I have received from the Debtors' advisors, and conversations

---

[1]   The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

with the prior managers of the enterprise and property managers.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3.      Additional evidence of, among other things, my personal qualifications, experience and capacity, my role and involvement with the Debtors and these Chapter 11 Cases, my decisions made, and actions and efforts taken, in furtherance of my duties as CRO, and relevant facts and other information and findings regarding the Debtors' history, present circumstances and intended course of action during these Chapter 11 Cases is set forth in detail in my *Declaration of Mark Shinderman in Support of Debtors' First Day Motions* [Docket No. 152] (as amended, the "First Day Declaration"), the *Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89-4] (the "Initial DIP Declaration"), and the *Supplemental Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 157] (the "Supplemental DIP Declaration"), all of which are incorporated herein by reference.[2]

4.      I submit this Declaration in further support of the *Debtors Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* (the "Motion").  I have reviewed the Motion, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and to the success of these Chapter 11 Cases.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion (as defined below), First Day Declaration, Initial DIP Declaration, Supplemental DIP Declaration, DIP Motion (as defined below), or DIP Orders (as defined below), as applicable.

## BACKGROUND

5.        On March 19, 2025, the Debtors filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89] (the "<u>DIP Motion</u>") seeking approval of the short-term bridge the gap DIP Loan in the aggregate principal amount of $5 million.  On April 4, 2025, the Court entered an interim order [Docket No. 187] (the "<u>Interim DIP Order</u>") approving the DIP Loan on an interim basis and authorizing the Debtors to, among other things, borrow up to $3.5 million.  On May 1, 2025, the Court entered the final order [Docket No. 316] (the "<u>Final DIP Order</u>" together with the Interim DIP Order, the "<u>DIP Orders</u>"), authorizing among other things, the Debtors to borrow the remaining $1.5 million under the DIP Loan.

## THE DEBTORS' NEED FOR ADDITIONAL DIP FINANCING

6.        From the outset of these Chapter 11 Cases, the Debtors have continuously engaged in efforts to maintain stable business operations, improve liquidity, and maximize the value of their businesses for the benefit of all interested parties.  While the Debtors have made substantial progress in advancing their sale process, stabilizing business operations, and addressing issues necessary to administer these Chapter 11 Cases, the Debtors have always known that additional liquidity would be needed to run them.  In fact, the Debtors have been transparent that the complexity of the Debtors' business and the issues surrounding these Chapter 11 Cases would require the procurement of a more robust longer-term DIP loan to enable the Debtors to consummate a value maximizing sale process or to confirm a plan of reorganization.

7.        Since the entry of the DIP Orders, the Debtors have utilized nearly the full $5.0 million of the DIP Loan, and the Debtors project that an additional $9.5 million in financing is critical to the Debtors' businesses, the on-going administration of these Chapter 11 Cases, and the

Debtors' ability to maximize value for all constituencies. Accordingly, I, in consultation with the Debtors' professionals, have determined that it is desirable, necessary, and in the best interests of the Debtors and their estates to increase the principal amount available under the DIP Loan by such amount. The additional liquidity will be used to, among other things: (a) cover approximately 50% of the anticipated professional fees for the advisors of the Debtors; (b) fund the pursuit and consummation of the Debtors' proposed value maximizing sale process, which will extend into mid-September; (c) to pay off the existing loan made by the DIP Lender under the DIP Orders; (d) fund operations, including payment of payroll, property taxes that continue to accrue post petition, vendors, and amounts needed to maintain insurance for all properties; and (e) fund other administrative and ordinary course operational expenses of the Debtors. These payments are critical to the Debtors' many secured creditors as well as other stakeholders.

8.    In addition to funding operations, approval of the Motion is needed to assure the marketplace that business will proceed as normal and value of the assets is preserved pending implementation of an end game. Indeed, the Debtors have a standing weekly call with the Real Property Lenders[3] who have raised concerns about, among other things, whether the Debtors will be able to fund operations, maintain insurance, and consummate sales of the Debtors' properties. It is crucial that the Debtors obtain increased funding under the DIP Loan to be able to run the sale process and close the sales prior to October and the Debtors believe the Real Property Lenders are supportive of the sale process. Further, the Debtors' property managers and other third parties, including the local governments, have raised concerns about the Debtors' ability to proceed with committed events and obligations, like weddings, festivals, and other events that are scheduled in

---

[3]    "Real Property Lenders" means Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, and Banc of California.

the near future leading into the Debtors' busy summer season. Thus, the relief requested in the Motion is also necessary to reassure the City of Laguna that the art shows, festivals, and other summer events, which are longstanding traditions and important to the city's economy, can proceed in the ordinary course of business.

9.      Without approval of the Motion and access to the additional liquidity, I would have no choice but to seek to convert the Chapter 11 Cases to ones under Chapter 7. Assets would need to be liquidated on an expedited basis because there would not be any funds to pay payroll, costs to maintain and replace insurance as needed, post-petition property taxes, professional fees, and the like. Even with the sale of the Tesoro property proceeding, the funds generated from such sale would be insufficient to extend the Debtors' runway enough to allow the Debtors to fulfill their fiduciary duties and consummate a value maximizing sale process and/or may not be received in a timely manner to do so. Moreover, my concern, is that conversion to Chapter 7 would likely decrease the value available for all constituents and harm the community at large.

10.     Accordingly, the Debtors need access to additional liquidity as contemplated by the Motion, and I believe that the intended use of such funds is appropriate and necessary under the circumstances. Failure to obtain additional financing would weaken the Debtors' liquidity and cause irreparable harm to the Debtors' estates.

**MARKETING AND SOLICITATION OF ALTERNATIVE DIP PROPOSALS**

11.     As described in the Initial DIP Declaration, the Debtors have now entered Phase 2 of these Chapter 11 Cases. Initial DIP Decl. ¶¶ 11-14. Having stabilized operations, including maintaining and renewing insurance and replacing the force-placed policies, and having obtained access to the Debtors' books and records from the Continuum Parties and the Honarkar Parties, the Debtors have been able to create reliable budgets and forecasts to formulate the Debtors' go

forward strategy in these Chapter 11 Cases.  As previewed in the *Motion of Debtors for Entry of an Order (A)(I) Approving Bidding Procedures for Tesoro Property, (II) Scheduling the Bid Deadlines,(III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of the Tesoro Property, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of the Tesoro Property Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 280] (the "Tesoro Sale Motion") and the *Debtors' Motion for Order (I) Establishing Procedures for the (A) Sale of Real Estate Free and Clear of all Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts and Unexpired Leases of Non-Residential Real Property; and (II) Granting Related Relief* [Docket No. 394] (the "Sale Procedures Motion"), that strategy contemplates the sale of the Debtors' assets to maximize the return for all stakeholders.  To get there, however, the Debtors require an immediate influx of cash to extend the runway.

12.     To that end, the Debtors have marketed, solicited, and explored alternative long term DIP financing options since the initial DIP Loan was approved on May 1, 2025.  This process has been challenging because, among other things, the Debtors faced an informational gap due to the true free fall nature of these Chapter 11 Cases and a lack of reliable books and records resulting from the ownership dispute that necessitated the commencement of same.  The solicitation of alternative DIP proposals has been further complicated by the fact that, consistent with the initial DIP Loan, any proposed financing options would have to be subordinate to existing secured first lien debt, could not be secured by any of the estates' causes of actions, and could not be secured by liens on the equity held by the Debtors in their subsidiaries.

13.    Since gaining access to the Debtors' books and records, FTI has compiled a virtual data room (the "VDR") and has provided all interested parties, including potential post-petition lenders, with extensive diligence related to the Debtors' operations and properties. Such information includes, but is not limited to, insurance policies, title reports, rent rolls, cash flow statements, and other relevant and necessary financial data of the Debtors' operations and properties.

14.    In total, the Debtors under my direction contacted 71 parties with respect to providing junior financing, 39 parties executed non-disclosure agreements and were provided access to the VDR, 1 potential lender conducted site visits of the Debtors' properties, and 4 parties submitted term sheets. The Debtors also communicated with the Honarkar Parties on several occasions requesting that they provide DIP financing or introduce the Debtors to financiers that would be willing to do so. The Honarkar Parties did not come forth with any financing proposals but instead provided a draft term sheet for a plan structure that the Debtors believe is patently unconfirmable and lacks committed funding.

15.    The Debtors negotiated with the four parties that provided term sheets simultaneously to reach an agreement as expeditiously as possible. Although these efforts resulted in interest from several parties seeking to provide the Debtors with a loan to fund these Chapter 11 Cases none were on terms nearly as favorable to the Debtors' estates as those contained in the DIP Amendment. More specifically, the alternative proposals, which are confidential, fell short because, among other things, (i) the aggregate principal amount of financing was well below the amount needed to fund these Chapter 11 Cases and offered in the DIP Amendment, (ii) the offers were tied to the lender having the right to serve as a stalking horse bidder in connection with the Debtors' sale process and the proposed purchase price was well below what the Debtors believe

the properties are worth, (iii) the proposal was tied to the ability of the lender to match any sale price, which would chill bidding, and/or (iv) the interest rates and fees resulted in a staggering annualized return on the loan, to which the Debtors could not agree.

16.     Ultimately, the alternative proposals contained too much risk and not enough reward and the terms of the DIP Amendment are much more favorable to the Debtors' estates. Moreover, as was done with the initial DIP Loan, the Debtors have not given up any control over these Chapter 11 Cases by agreeing to the DIP Amendment.  Rather, the DIP Amendment and increased loan amount provide funding to provide the runway my advisors and I seek and permit the Debtors to implement the value maximizing sale process that was developed by the Debtors in consultation with their advisors and discussions with key third parties such as the Real Property Lenders.  Finally, the DIP Amendment does not grant liens on estate causes of action, and does not include other bells and whistles often seen in DIP financing.

### THE DEBTORS' EXERCISE OF BUSINESS JUDGMENT

17.     In light of the Debtors' current liquidity needs, I believe that entry into the DIP Amendment is appropriate in these Chapter 11 Cases and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

18.     As set forth above, and in the First Day Declaration, Initial DIP Declaration, and Supplemental DIP Declaration, the Debtors have little to no liquidity left and a limited runway in bankruptcy before being forced into chapter 7.  Therefore, in parallel with the Debtors' efforts to solicit alternative financing proposals on better terms, the Debtors approached the DIP Lender to request that it increase the DIP Loan amount to meet the Debtors' liquidity needs.  The Debtors negotiated the provisions of the DIP Amendment at arms' length (and were able to obtain various concessions with respect thereto).  I understand that the provisions contained in the DIP Amendment

are necessary to induce the DIP Lender to enter into the DIP Amendment and increase the DIP Loan amount.  The Debtors will materially benefit from entry into the DIP Amendment and access to financing of $14,500,000.00 under the DIP Loan, which will be used to preserve and maximize the value of the Debtors' assets for the benefit of all parties in interest.

19.    In my opinion as CRO, the relief requested in the Motion is necessary and appropriate to preserve the value of the Debtors' estates and is in the best interest of all parties in interest.  Accordingly, entry into the DIP Amendment is appropriate given the circumstances of these Chapter 11 Cases, is justified and a reasonable exercise of the Debtors' business judgment and should be approved by the Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: June 3, 2025

By:     */s/ Mark Shinderman*
Name:  Mark Shinderman
Title:   Chief Restructuring Officer

12244428v.1