## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Requested Hearing Date: June 30, 2025 at 9:30 a.m. (ET)** |
| | **Requested Objection Deadline: At or Before the Hearing** |

## EMERGENCY MOTION OF MOHAMMAD HONARKAR AND 4G WIRELESS, INC. FOR ENTRY OF AN ORDER DISMISSING OR CONVERTING THE CHAPTER 11 CASES PURSUANT TO 11 U.S.C. § 1112(b)

Mohammad Honarkar and 4G Wireless, Inc. ("**4G**" and together with Mr. Honarkar, the "**Honarkar Parties**"), by and through their undersigned counsel, hereby move (this "**Motion**")[2] for entry of an order either dismissing the above-captioned bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") or converting the Chapter 11 Cases to cases under chapter 7 pursuant to 11 U.S.C. § 1112(b). In support of this Motion, the Honarkar Parties respectfully state as follows:

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2] Capitalized terms used but not defined in this Motion shall have the meaning ascribed to such terms in the Complaint (as defined herein).

## INTRODUCTION

1.      Now four months in, these Chapter 11 Cases have reached a breaking point. The Debtors have rejected the Honarkar Parties' proposed plan term sheet, which the Honarkar Parties believe presented the best path forward in these Chapter 11 Cases. Rather than work with the Honarkar Parties, as Debtors repeatedly represented to the Court that they would do, the Debtors have attacked and retaliated against them for their efforts to protect and preserve their interests in the Properties and their rights under the Partial Final Award. Notwithstanding assertions to the contrary, the conduct of the Debtors demonstrates that they have squarely aligned themselves with the Continuum Parties. They have opposed the Honarkar Parties' limited stay relief motion, served the Honarkar Parties with multiple discovery requests and demand letters, moved to reject their agreements with the Honarkar Parties, and, most recently, interfered with the Honarkar Parties' rights in an entirely separate litigation and sought to enforce, without any factual or legal basis, the agreements of the Joint Venture that were procured by fraud and under which the Honarkar Parties have no further duty to perform.

2.      The Debtors' singular objective in these Chapter 11 Cases has been to sell and liquidate all of the Properties, beginning with the Tesoro Property. The Continuum Parties, for their part, have been very supportive of this strategy, which is unsurprising given that they have everything to gain if the Properties are sold before the Honarkar Parties can exercise rescission. However, the Honarkar Parties have objected to the sales and intend to oppose the closing of any sales, particularly if the Debtors continue to try to sell any of the Properties to individuals or entities associated with the Continuum Parties. The Honarkar Parties already had the Properties stolen from them once. They are not going to sit back while the Debtors try to sell the Properties out from

under them before they have an opportunity to exercise rescission. Thus, the Debtors do not have any viable strategy in these Chapter 11 Cases.

3.        Meanwhile, the Debtors have incurred, and are continuing to incur, substantial administrative expenses and costs, and the Properties have suffered. The Debtors have incurred millions of dollars in fees and expenses, the vast majority of which seems to have gone towards attacks on the Honarkar Parties and their ill-fated sale process, while the Continuum Parties and their associates remain in control of the management and operations of most of the Properties. While in chapter 11, the Debtors have been operating at a net loss, and the condition of the Properties has continued to worsen. As just a few examples, the Hotel Laguna has been accused by the California Coastal Commission of operating in violation of California law, the occupancy rate at the Tesoro Property continues to be at an all-time low, and the Honarkar Parties have received numerous complaints from tenants at many of the Properties about management issues.

4.        Critically, the Debtors have also been unable to secure any financing except from Specialty DIP, an entity formed and controlled by Mahender Makhijani. Although the Debtors are currently seeking to increase their loan with Specialty DIP, in exchange for multiple material modifications to the loan and increased power granted to Specialty DIP, this additional DIP financing is merely illusory. As proposed, the closing of the loan amendment, and thus Specialty DIP's obligation to provide any additional financing to the Debtors, is expressly contingent upon the approval of the sale of the Tesoro Property. But, as noted above, the Honarkar Parties have objected to, and continue to object to, the sale of the Tesoro Property. Thus, without this financing from Specialty DIP or any other lender, and per the Debtors' representations at the June 10, 2025 hearing that they would run out of liquidity within the next ten (10) days, the Debtors are now administratively insolvent, and this insolvency will only worsen if they remain in chapter 11.

5.    Given the ongoing losses to the Debtors' estates, the lack of any viable plan of rehabilitation or reorganization, and the Debtors' administrative insolvency, there is more than sufficient cause to convert or dismiss these Chapter 11 Cases. Conversion would enable a chapter 7 trustee to administer the Debtors' estates while the Honarkar Parties proceed with the Arbitration, or, alternatively, dismissal would allow the Honarkar Parties to immediately appoint a receiver for all of the Debtors and the Properties. Either way, a truly independent, impartial third party would be able to protect and preserve the Properties and conduct the accounting that the Debtors require and that the Debtors have failed to even begin. Given all of the highly unusual circumstances surrounding these Chapter 11 Cases, and the apparent commitment of the Debtors to further the interests of the Continuum Parties, dismissal or conversion is the only option left in these Chapter 11 Cases to serve the best interests of the Debtors' estates and all of their creditors.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

7.    In accordance with Rule 9013-1(f) of the Local Rules of Bankruptcy Procedure for the District of Delaware, the Honarkar Parties hereby consent to entry of a final order if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

8.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The statutory bases for this Motion are 11 U.S.C. §§ 105(a) and 1112(b).

## BACKGROUND

**A.      The Chapter 11 Cases**

11.      On February 28, 2025, MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC (collectively, the "**MOM Investcos**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

12.      On March 10, 2025, nineteen of the MOM Investcos' subsidiaries (collectively, the "**SPEs**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Chapter 11 Cases of each of the MOM Investcos and the SPEs are being jointly administered under Case No. 25-10321-BLS. *See* Docket No. 56.

13.      On March 31, 2025, Terra Laguna Beach, Inc. ("**Terra**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. Terra's Chapter 11 Case is being jointly administered with the Chapter 11 Cases of the other Debtors under Case No. 25-10321-BLS on an interim basis.[3] *See* Docket No. 220.

14.      The Debtors are currently operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.

---

[3] On April 10, 2025, the Honarkar Parties filed in Terra's Chapter 11 Case the *Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Dismissing Debtor's Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)* (the "**Terra Dismissal Motion**"), seeking to dismiss case for lack of authority for the bankruptcy filing. *See* Case No. 25-10641 (BLS), Docket No. 3. Pursuant to the Settlement Stipulation (as defined herein), the Terra Dismissal Motion has been adjourned indefinitely. The Honarkar Parties expressly reserve and preserve, and do not waive, the arguments raised in the Terra Dismissal Motion, and this Motion is filed without any prejudice to the Terra Dismissal Motion.

104310678.5

B.       **The Chapter 11 Trustee Motion**

15.       Shortly after the commencement of the Chapter 11 Cases, on March 13, 2025 the Honarkar Parties filed the *Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* [Docket No. 29] (the "**Chapter 11 Trustee Motion**"), seeking the appointment of a chapter 11 trustee for all of the Debtors (other than Terra, whose Chapter 11 Case had not yet been filed at the time).

16.       As set forth in the Chapter 11 Trustee Motion, the Honarkar Parties were not given any advance notice of, and did not consent to, the filing of the MOM Investcos' Chapter 11 Cases, which were filed just one week after the issuance of the Partial Interim Award in the Arbitration.

17.       The Honarkar Parties also were not given any advance notice of the appointment of Mark Shinderman as the CRO and/or of Robbin Itkin as the Independent Manager for the Debtors, each of whom were unilaterally appointed by the Continuum Parties shortly after the issuance of the Partial Interim Award and, in the case of the Independent Manager, after the MOM Investcos' Chapter 11 Cases were filed.

18.       Given the circumstances surrounding these Chapter 11 Cases, including the Arbitrator's definitive and well-supported findings in the Partial Interim Award, and the appointment of the Debtors' current management, the Honarkar Parties filed the Chapter 11 Trustee Motion out of a grave and justified concern as to how these Chapter 11 Cases would be run and that they would be used as an attempt to undermine and interfere with the Arbitration and the Arbitrator's findings in the Partial Interim Award.

19.       However, cautiously optimistic that the Honarkar Parties could work with the Debtors to formulate a proposed chapter 11 plan of reorganization that would honor the findings and remedies granted in the Partial Interim Award, the Honarkar Parties withdrew the Chapter 11

104310678.5

Trustee Motion in accordance with the *Stipulation By and Among the Debtors and the Honarkar Parties Regarding Resolution of Several Contested Matters* approved by this Court on May 9, 2025. *See* Docket No. 379, 395.

20.    Unfortunately, as set forth herein, it is now abundantly clear that the Debtors have no intent to honor the Arbitrator's findings in the Arbitration and have instead aligned themselves completely with the Continuum Parties, who are the entities and individuals conclusively found by the Arbitrator to have grossly mismanaged and stolen from the Debtors (as well as the Honarkar Parties) and who necessitated these Chapter 11 Cases.

### C.    The Adversary Proceeding

21.    On May 27, 2025, the Honarkar Parties filed the *Complaint for Declaratory Judgment, Imposition of Constructive Trust, and Turnover of Property* [Docket No. 454] (the "**Complaint**") against the MOM Investcos and the SPEs commencing an adversary proceeding that is currently pending before the Court and captioned as *Honarkar v. MOM CA Investco, LLC, et al.,* Adv. No. 25-50959 (the "**Adversary Proceeding**").

22.    By the Complaint, the Honarkar Parties are seeking a declaratory judgment under section 541(d) of the Bankruptcy Code against the MOM Investcos (Count I), a declaratory judgment under section 541(d) of the Bankruptcy Code against the SPEs (Count II), imposition of a constructive trust upon the membership interests in the SPEs, the Properties and turnover of the proceeds of any and all sales of the Properties (Count III), and turnover by the Debtors of any legal title they possess in the membership interests and/or the Properties to the Honarkar Parties and the proceeds of any and all sales of the Properties (Count IV).

23.    The Honarkar Parties hereby incorporate all of the factual background set forth in the Complaint as if set forth herein in full.

104310678.5

D.     **The Arbitration Awards**

24.     On February 21, 2025, just one week before the filing of the MOM Investcos'

Chapter 11 Cases, the Honorable David A. Thompson (the "**Arbitrator**") issued the *Partial*

*Interim Award* (the "**Partial Interim Award**") in the pending arbitration proceeding captioned as

*Honarkar v. Makhijani*, JAMS No. 5220003126, as consolidated with *MOM AS Investco LLC v.*

*Honarkar*, JAMS No. 5200001122 (the "**Arbitration**"). A true and correct copy of the Partial

Interim Award was filed in these Chapter 11 Cases at Docket No. 27-1. As set forth in the Partial

Interim Award, and as discussed in the Chapter 11 Trustee Motion and the Complaint, the

Arbitrator found in the Honarkar Parties' favor on nearly all of their claims asserted.

25.     The Arbitrator also denied all of the Continuum Parties' claims asserted against the

Honarkar Parties. Specifically, the Arbitrator determined that:

> All of these claims depend on the existence and enforceability of the
> Operating Agreements and the Other JV related Agreements. But
> the Arbitrator has found Claimants may rescind these agreements
> for fraud in the inducement and failure of consideration. In any
> event, the MOM Respondents' prior material breach of the
> Operating Agreements discharged Honarkar from any further duty
> to perform thereunder.

Partial Interim Award, p. 44.

26.     On April 2, 2025, after it became clear to the Honarkar Parties that the Debtors

would not consent to stay relief to allow the Honarkar Parties to proceed with the Arbitration

against the Respondents, the Honarkar Parties filed the *Motion of Mohammad Honarkar and 4G*

*Wireless, Inc. for Entry of an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C.*

*§ 362(d)* [Docket No. 175] (the "**Stay Relief Motion**"), seeking limited relief from stay, if and to

the extent applicable, to take the Arbitration to finality but not to exercise the Honarkar Parties'

rights to rescission.

27.     The Debtors along with Nano, the MOM Members, and Continuum Parties Bhajneet Singh Malik, Deba Shyam, and Andrew Stupin objected to the Stay Relief Motion. *See* Docket Nos. 223, 236, 237, 238.

28.     Following a hearing held on April 22, 2025, the Court entered on April 28, 2025 the *Order Granting in Part and Adjourning in Part Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 303], lifting the stay, to the extent applicable, to allow the Honarkar Parties to obtain an award of their attorneys' fees and costs in the Arbitration and to proceed with the awarded accounting in the Chapter 11 Cases.

29.     On May 23, 2025, the Arbitrator issued the *Partial Final Award* (the "**Partial Final Award**"). The Partial Final Award incorporates the Partial Interim Award, other than the Arbitrator's findings with respect to the derivative claims given the pendency of these Chapter 11 Cases, and includes the Arbitrator's since-clarified finding that Terra and various other entities "are not now and never have been owned by the MOM [Investcos]." *See* Partial Final Award, p. 40. As referenced in the Partial Final Award, the Arbitrator's *Ruling on Motion for Attorney Fees and Costs* was filed contemporaneously with the Partial Final Award and entitles the Honarkar Parties to recover their attorneys' fees in the amount of $8,303,510.25 plus $893,916.06 in costs, for a total of $9,197,426.31.

30.     On May 30, 2025, Mahender Makhijani, Continuum, the MOM Members, and the MOM Managers (*i.e.*, the MOM Respondents) filed the *MOM Respondents' Request to Correct the May 23, 2025 Partial Final Award* (the "**Correction Request**"), purportedly seeking to "correct" the Partial Final Award but, in truth, improperly attacking and seeking to relitigate the findings in the Partial Final Award and other issues previously decided in the Arbitration.

9

31.     On June 6, 2025, the Arbitrator issued the *Ruling on Request for Correction* (the "**Correction Request Ruling**"), denying the Correction Request in its entirety. The Correction Request Ruling provides, among other things, that the "Partial Final Award is now final for all purposes." *See* Correction Request Ruling ¶ 5.

32.     On June 11, 2025, the Court entered the *Order Granting Motion of Mohammad Honarkar and 4G Wireless, Inc. for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* [Docket No. 525], lifting the automatic stay, if and to the extent applicable, to permit the Honarkar Parties to, among other things, seek and obtain confirmation of the Partial Final Award.

33.     On June 18, 2025, the Honarkar Parties filed a petition with the Superior Court of California, County of Orange (the "**California Court**") seeking confirmation of the Partial Final Award (the "**Petition to Confirm**"), to which the MOM Respondents filed a petition with the California Court seeking to vacate the Partial Final Award (The "**Petition to Vacate**"). True and correct copies of the Petition to Confirm and the Petition to Vacate are attached hereto as Exhibit A and Exhibit B, respectively.

34.     The Petition to Vacate regurgitates many of the same arguments already made and rejected in the Correction Request, including the MOM Respondents' baseless accusations of bias on the part of the Arbitrator and repeated attempts to circumvent the Arbitrator's authority. The Honarkar Parties intend to timely oppose the Petition to Vacate.

35.     The hearing on the Petition to Confirm and the Petition to Vacate is scheduled for December 22, 2025, but the Honarkar Parties also intend to obtain an earlier hearing date.

**E.     The Sale Motions and the Honarkar Parties' Sale Objections**

36.     On April 22, 2025, the Debtors filed the *Motion of Debtors for Entry of Orders (A)(I) Approving Bidding Procedures for Tesoro Property, (II) Scheduling the Bid Deadlines, (III)*

*Scheduling Hearings and Objection Deadlines with Respect to the Sale of Tesoro Property, (IV)*
*Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and*
*Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of Tesoro*
*Property Free and Clear of All Interests, (II) Approving Assumption and Assignment of Executory*
*Contracts and Unexpired Leases, (III) Request to Adjourn Hearing, and (IV) Granting Related*
*Relief* [Docket No. 280] (the "**Tesoro Sale Motion**") seeking, *inter alia*, authority to market and
sell the Tesoro Property and certain related assets to a Successful Bidder, if any, free and clear.

37.     On May 13, 2025, the Debtors filed the *Debtors' Motion for Order (I) Establishing*
*Procedures for the (A) Sale of Real Estate Free and Clear of all Liens, Claims, Encumbrances,*
*and Other Interests; (B) Assumption and Assignment of Executory Contracts and Unexpired*
*Leases of Non-Residential Real Property; and (II) Granting Related Relief* [Docket No. 394] (the
"**Global Sale Procedures Motion**") seeking, *inter alia*, approval of procedures pursuant to which
the Debtors may sell some or all of the Properties, other than the Tesoro Property.

38.     On May 27, 2025, the Honarkar Parties filed the *Objection of Mohammad*
*Honarkar and 4G Wireless, Inc. to Debtors' Motion for Order (I) Establishing Procedures for the*
*(A) Sale of Real Estate Free and Clear of all Liens, Claims, Encumbrances, and Other Interests;*
*(B) Assumption and Assignment of Executory Contracts and Unexpired Leases of Non-Residential*
*Real Property; and (II) Granting Related Relief* [Docket No. 455] (the "**Global Sale Procedures**
**Objection**"), objecting to the Sale Procedures Motion on various grounds, including that the
Debtors cannot sell any of the Properties.

39.     On May 30, 2025, the Honarkar Parties filed the *363 Objection of Mohammad*
*Honarkar and 4G Wireless, Inc. to Tesoro Sale Motion and Request to Adjourn Sale Hearing*
[Docket No. 460] (the "**Tesoro 363 Objection**"), objecting to the Debtors' right to sell the Tesoro

Property, whether pursuant to section 363 of the Bankruptcy Code, including section 363(f), or otherwise.

40.     On June 2, 2025, the Debtors filed a notice identifying Patrick Theodora as the Successful Bidder for the Tesoro Property. *See* Docket No. 468.

41.     On June 4, 2025, the Honarkar Parties filed the *Objection of Mohammad Honarkar and 4G Wireless, Inc. to Tesoro Sale* [Docket No. 483] (the "**Tesoro Sale Objection**," and together with the Global Sale Procedures Objection and the Tesoro 363 Objection, the "**Sale Objections**"), objecting to the Debtors' proposed sale of the Tesoro Property to Mr. Theodora on the additional grounds that the sale is an improper insider transaction and that Mr. Theodora is not entitled to the protection and benefits of section 363(m).

42.     On June 18, 2025, the Honarkar Parties filed the *Declaration of Mohammad Honarkar in Support of Sale Objections* [Docket No. 548] (the "**Honarkar Declaration**").

43.     As set forth in the Tesoro Sale Objection, through Mr. Theodora's close relationship with Gerald Marcil—one of Continuum's largest investors and a shareholder in Nano—and Mr. Theodora's documented history of doing business with entities related to Continuum and with Nano, Mr. Theodora has deep, longstanding ties to the Continuum Parties.

44.     In fact, in the *Declaration of Patrick Theodora in Support of the Sale of Tesoro Property* [Docket No. 509] (the "**Theodora Declaration**"), Mr. Theodora admits that it was Mr. Marcil who told him about the potential sale of the Tesoro Property. Theodora Decl. ¶ 6 ("I first heard about the sale of the Tesoro Property through Gerald Marcil. He is my neighbor, friend, and someone who I have invested with in syndicated real estate investments in the past.").

104310678.5

45.     Accordingly, the Honarkar Parties believe, and the evidence shows, that the proposed sale of the Tesoro Property to Mr. Theodora was orchestrated by, and is intended to benefit, the Continuum Parties.

46.     Further evidencing this fact, on June 25, 2025, the MOM Members filed the *MOM Members' Statement in Support of Debtors' (I) Tesoro Sale Motion and (II) Sale Procedures Motion* [Docket No. 582] (the "**MOM Members Sale Statement**"), urging this Court to ignore and disregard the Partial Final Award (which the MOM Members are continuing to try to collaterally attack in these Chapter 11 Cases)[4] and to grant the Tesoro Sale Motion and the Global Procedures Sale Motion. The complete erasure of the Arbitration has undoubtedly been the goal of the MOM Members and the rest of the Continuum Parties throughout these Chapter 11 Cases. They knew that they could never achieve the sale of any of the Properties outside of bankruptcy. This is why they caused the MOM Investcos to file for bankruptcy, why they have been pushing the CRO and Independent Manager to sell the Tesoro Property since Day 1, and why they are still pushing for the sale of the Tesoro Property and all of the other Properties now.

---

[4] Included in the MOM Members' ongoing attacks on the Partial Final Award is their claim that, to effectuate rescission, "Mr. Honarkar also must return the MOM Members' investments into the properties to restore the parties to their original positions as if the joint venture never existed." MOM Members Sale Statement ¶ 7. The Debtors have apparently adopted this position as well, as demonstrated by their Ex Parte Reply (as defined and discussed further herein). However, this is refuted by the Partial Final Award itself. As the Arbitrator explained, while rescission generally requires that "each party must return the consideration they received, if defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiffs"—as the MOM Members did here—"courts are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff." Partial Final Award, p. 42 (internal quotations and citations omitted).) Further, "the defrauding party has the burden to prove any offsets to which they claim they are entitled." *Id.* Thus, the Arbitrator found that, if the Honarkar Parties elect rescission, "they will be entitled to restitution and consequential damages in amounts to be determined following the accounting, and Respondents will have the burden of proving their rights to any offsets." *Id.* The Partial Final Award is therefore clear that the burden is on the Respondents to prove that they are entitled to any offsets that would reduce the damages they owe to the Honarkar Parties. Any claim that it is somehow the Honarkar Parties, the victims of the Respondents' fraud, who have to pay any amounts in order to effectuate rescission is false.

104310678.5

47. However, for all of the reasons set forth in the Honarkar Parties' Sale Objections, the Adversary Proceeding, and the Honarkar Declaration, none of these sales can be approved.

48. The hearing on the Tesoro Sale Motion, the Global Sale Procedures Motion, and the Sale Objections is currently scheduled for June 30, 2025 at 9:30 a.m. (ET).

**F.      The Original Specialty DIP Loan and Amendment Motion**

49. On March 19, 2025, the Debtors filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89] (the "**Specialty DIP Motion**"), seeking authority to enter into and obtain a DIP loan ("**Specialty DIP Loan**") from Specialty DIP LLC ("**Specialty DIP**")—an entity formed and controlled by Mahender Makhijani—in the principal amount of up to $5 million.

50. The Honarkar Parties objected to the Specialty DIP Motion on multiple grounds, including that the Specialty DIP Loan was an insider loan that sought to grant the Continuum Parties an improper advantage and control over these Chapter 11 Cases. *See* Docket No. 96. The Debtors' intent to enter into and obtain financing from an entity controlled by Mr. Makhijani was particularly troubling given the fraud, conversion, unjust enrichment, and other findings made against Mr. Makhijani in the Partial Interim Award (and now the Partial Final Award).

51. The hearing on interim approval of the Specialty DIP Motion initially went forward on March 24, 2025 and, as a direct result of Honarkar Parties' objection, was adjourned to March 31, 2025. During the March 31 hearing, the Honarkar Parties and the Debtors announced a partial resolution pursuant to which the Honarkar Parties did not oppose the approval of the Specialty DIP Motion on an interim basis, subject to certain conditions, including the Debtors' announcement on the record that they would work with the Honarkar Parties in good faith on a term sheet for a chapter 11 plan of reorganization.

52.     Unfortunately, despite extensive negotiations between the Honarkar Parties, the Debtors, and Specialty DIP (through Mr. Makhijani), the parties could not reach a final agreement the terms of the Specialty DIP Loan, and, over the Honarkar Parties' objections, the Court entered the interim order granting the Specialty DIP Motion on April 4, 2025. *See* Docket No. 187

53.     On May 1, 2025, the Court entered the final order granting the Specialty DIP Motion. *See* Docket No. 316.

54.     On June 3, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 475] (the "**Original DIP Amendment Motion**"), seeking authority to refinance and increase the principal amount of the Specialty DIP Loan by $9.5 million to $14.5 million and to materially modify certain of the other terms of the Specialty DIP Loan.

55.     In support of the Original DIP Amendment Motion, the CRO stated in a declaration that:

> Without approval of the Motion and access to the additional liquidity, I would have no choice but to seek to convert the Chapter 11 Cases to ones under Chapter 7. Assets would need to be liquidated on an expedited basis because there would not be any funds to pay payroll, costs to maintain and replace insurance as needed, post-petition property taxes, professional fees, and the like. Even with the sale of the Tesoro property proceeding, the funds generated from such sale would be insufficient to extend the Debtors' runway enough to allow the Debtors to fulfill their fiduciary duties and consummate a value maximizing sale process and/or may not be received in a timely manner to do so.

Original DIP Amendment Motion, Exh. B, ¶ 9.

56.     On June 9, 2025, the Honarkar Parties filed the *Objection of Mohammad Honarkar and 4G Wireless, Inc. to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 508] (the "**DIP**

**Amendment Objection**"), objecting to the Original DIP Amendment Motion on various grounds, including that the Debtors were improperly seeking to materially modify the terms of the Specialty DIP Loan and, in so doing, to confer upon Specialty DIP and, thus, Mahender Makhijani even more control over these Chapter 11 Cases.

57.     Various of the Debtors' prepetition secured lenders filed objections to the Original DIP Amendment Motion, as well. *See* Docket Nos. 503, 504, 506, 507.

58.     Later that same day, the Debtors filed a notice withdrawing the DIP Original Amendment Motion without prejudice. *See* Docket No. 515.

       **G.**      **The Golden East DIP Term Sheet**

59.     On June 13, 2025, the Debtors informed the Honarkar Parties that they were considering entering into a term sheet for new postpetition financing with Golden East Investors, LLC ("**Golden East**").

60.     The following Monday, on June 16, 2025, the Debtors filed the *Notice of Filing of Summary of Proposed Terms and Conditions for Debtor-in-Possession Financing* [Docket No. 538], which included as an exhibit the executed term sheet between the Debtors and Golden East (the "**Golden East Term Sheet**").

61.     When the Honarkar Parties first learned of the potential Golden East DIP loan, they were hopeful that it would be a viable financing alternative that would enable the Debtors to remain in chapter 11 and to finally commence the accounting process.

62.     However, among various other issues with the as-filed Golden East Term Sheet, it provided that one of the conditions precedent to Golden East providing any financing to the Debtors would be the Court's approval of the sale of the Tesoro Property in the amount of $55

104310678.5

million, which is the purchase price offered by, and only offered by, Patrick Theodora. As the Debtors were and still are aware, the Honarkar Parties are objecting to this sale.

63.     At a status conference held on June 17, 2025, the Debtors represented to the Court and all parties that they would soon be filing a motion seeking approval of and authority to enter into the DIP loan with Golden East, and, therefore, requested and obtained from the Court June 23, 2025 at 11:00 a.m. (ET) as the hearing on interim approval of this forthcoming motion and June 22, 2025 at 5:00 p.m. (ET) as the objection deadline.

64.     However, the Debtors did not file, and have not filed, a motion seeking approval of any loan from Golden East.

65.     On June 20, 2025, counsel to the Debtors and to the Honarkar Parties met and conferred with respect to the June 23 hearing. During this meet and confer, Debtors' counsel informed the Honarkar Parties' counsel that the Golden East Term Sheet would not be going forward on June 23.

66.     The Debtors subsequently filed an amended agenda for the June 23 hearing stating that all matters scheduled therefor, including the forthcoming Golden East DIP motion, had been continued to June 30, 2025 at 9:30 a.m. (ET), and that the objection deadline for the Golden East DIP motion was extended to June 29, 2025 at 5:00 p.m. (ET). *See* Docket No. 550.

67.     On June 25, 2025, at approximately 10:00 p.m. (ET), the Debtors then filed a new motion again seeking to amend the terms of the Specialty DIP Loan, as discussed further below, which motion states that Golden East had decided not to proceed with Term Sheet.

**H.**     **The Honarkar Parties' Efforts To Secure Exit/DIP Financing**

68.     Although the Honarkar Parties did not authorize or consent to the filing of these Chapter 11 Cases (nor did the Honarkar Parties have any prior knowledge or advance notice of the

104310678.5

filing of the MOM Investcos' cases), the Honarkar Parties believed that a refinancing pursuant to a chapter 11 plan that would honor the Partial Interim Award and now the Partial Final Award was the best path forward in these Chapter 11 Cases.

69.     Accordingly, from the beginning of these Chapter 11 Cases, the Honarkar Parties have had several discussions with potential sources of exit financing, which culminated in a plan term sheet (the "**Plan Term Sheet**") that the Honarkar Parties provided to the Debtors.

70.     The Plan Term Sheet contemplated, among other things, $200 million in financing, subject to due diligence and other standard contingencies, from Genesis Credit LLC, a well-established lender that specializes in commercial real estate loans.

71.     However, the Debtors rejected each version of the Plan Term Sheet and proceeded to market and seek approval of the sale of the Tesoro Property and all of the other properties over the Honarkar Parties' multiple objections.

72.     Following the hearing held on June 10, 2025, which was initially set as the hearing on approval of the sale of the Tesoro Property before the sale hearing was adjourned, the Debtors offered to make the Honarkar Parties the property managers for all of the Properties if the Honarkar Parties were able to secure replacement DIP financing in just seven (7) to (10) days thereafter.

73.     Given this extremely narrow timeframe, the Honarkar Parties have not been able to secure alternative DIP financing. One of the major obstacles that the Honarkar Parties have faced in their numerous discussion with potential financing sources has been the exorbitant costs of these Chapter 11 Cases. Among other issues, the Debtors requested that any financing proposal presented by the Honarkar Parties include $6 million to fund the Debtors' professionals' fees—which is six times the Debtors' financing needs for their actual operations and twice the amount estimated for a forensic accounting. The excessive administrative burn and the complex and

extraordinary facts and circumstances surrounding these Chapter 11 Cases, and set forth in the Partial Final Award, has made it exceedingly difficult for the Honarkar Parties to explain and justify the Debtors' financing requests to potential lenders.

## I.     Ongoing Property Management Issues

74.     Also impairing the Honarkar Parties' ability to secure financing is the fact that, throughout the pendency of these Chapter 11 Cases, and despite the concerns repeatedly raised by the Honarkar Parties, the Debtors have continued to allow entities related to or historically used by the Continuum Parties to operate and manage many, if not most, of the Debtors' properties. This has already had potentially disastrous consequences.

75.     As set forth in the Global Sale Objection, as a result of the Continuum Parties' ongoing mismanagement, a dispute arose just last month between the Hotel Laguna and the California Coastal Commission that could result in an enforcement action and daily fines against the Hotel Laguna based on allegations that it is obstructing public beach access in violation of California law. *See* Global Sale Objection ¶ 20; *see also Objection of Banc of California to Debtors' Motion Authorizing Debtors to Amend the DIP Credit Agreement* [Docket No. 503].

76.     Further, the Tesoro Property, which was at 90% to 99% occupancy prior the formation of the joint venture, has dropped to nearly just 80% occupancy. Rather than retain a competent property manager to come in and improve the conditions and increase the occupancy of the Tesoro Property, the Debtors have instead decided to sell the Tesoro Property at a significantly discounted price to a person closely tied to the Continuum Parties.

77.     Additionally, over the past two years, and during the pendency of these Chapter 11 Cases, many tenants of the Properties have raised concerns about the entities and individuals employed by the Continuum Parties for the Properties.

78.     These and other ongoing issues with the Properties and the apparent control that the Continuum Parties and their associates continue to have over the Properties is particularly troubling as, on May 30, 2025, just three (3) days after the Honarkar Parties filed the Complaint commencing the Adversary Proceeding, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject the Alleged Honarkar Agreements, Effective as of Rejection Date, (II) Requiring Turnover of Books and Records, and (III) Granting Certain Related Relief* [Docket No. 462] (the "**Rejection Motion**"), seeking, among other things, to "reject" pursuant to section 365 of the Bankruptcy Code all of the "Alleged Honarkar Agreements," which the Debtors define to include all "alleged oral agreements and historical course of dealing" and "any other agreements that the Honarkar Parties, or any of their affiliates, relatives, employees, or agents allege were established via oral contract or in the ordinary course of past dealing between the Debtors." Rejection Motion ¶ 11.

79.     The Rejection Motion fails to demonstrate any business justification for the relief sought nor does it identify any replacement property manager or any other companies to oversee the Properties more cost effectively or otherwise, so, presumably, the Debtors would turn to the Continuum Parties as the Honarkar Parties' "replacement." This is untenable.

## J.      Debtors' Administrative Expenses and Net Operating Loss

80.     Since commencing these Chapter 11 Cases four months ago, the Debtors have incurred millions in administrative expenses. Indeed, according to the Debtors, they have exhausted nearly all of the $5 million advanced by Specialty DIP, and they estimate that they require at least an additional $9.25 in financing to remain in chapter 11.

81.     Meanwhile, according to the Debtors' monthly operating reports (the "**MORs**"), most of the Debtors have been operating in chapter 11 at a net loss:

104310678.5

| MOR INCOME STATEMENT – PROFIT/LOSS | | | | |
|---|---|---|---|---|
| **Debtor** | **Month Ending 2/28/25** | **Month Ending 3/31/2025** | **Month Ending 4/30/25** | **Month Ending 5/31/25** | **Cumulative** |
| MOM CA Investco LLC | ($30) | ($30) | ($73,243) | ($543,217) | ($616,520) |
| MOM AS Investco LLC | $0 | $0 | ($50) | ($310) | ($360) |
| MOM BS Investco LLC | $0 | $0 | ($50) | ($310) | ($360) |
| Retreat at Laguna Villas, LLC | N/A | $37,043 | $22,470 | $58,243 | $117,756 |
| Sunset Cove Villas, LLC | N/A | $64,520 | $47,237 | $116,730 | $228,487 |
| Duplex at Sleepy Hollow, LLC | N/A | $1,805 | ($5,448) | $17,960 | $14,316 |
| Cliff Drive Properties DE, LLC | N/A | $0 | ($24,595) | ($1,831) | ($26,425) |
| 694 NCH Apartments, LLC | N/A | $0 | ($16,246) | ($6,942) | ($23,188) |
| Heisler Laguna, LLC | N/A | $0 | ($63,851) | $29,533 | ($34,318) |
| Laguna Festival Center, LLC | N/A | $28,785 | ($14,459) | $57,255 | $42,796 |
| 891 Laguna Canyon Road, LLC | N/A | $50 | ($21,246) | ($160) | ($21,407) |
| 777 AT Laguna, LLC | N/A | $22,396 | $49,134 | $21,855 | $93,385 |
| Laguna Art District Complex, LLC | N/A | $53,096 | ($15,432) | $103,605 | $141,268 |
| Tesoro Redlands DE, LLC | N/A | $109,398 | $146,605 | $259,584 | $515,588 |
| Aryabhata Group LLC | N/A | $0 | ($163,705) | ($2,649) | ($166,354) |
| Hotel Laguna, LLC | N/A | $383,999 | ($602,110) | ($216,810) | ($434,921) |
| 4110 West 3rd Street DE, LLC | N/A | $0 | ($23,938) | ($275) | ($24,213) |

| | | | | | |
|---|---|---|---|---|---|
| 314 S. Harvard DE, LLC | N/A | $0 | ($10,835) | ($275) | ($11,111) |
| Laguna HI, LLC | N/A | $24,371 | ($12,015) | $55,895 | $68,251 |
| Laguna HW, LLC | N/A | $48,570 | $10,966 | $52,940 | $112,476 |
| The Masters Building, LLC | N/A | $30 | ($33,468) | ($345) | ($33,783) |
| 837 Park Avenue, LLC | N/A | $0 | ($2,034) | ($1,004) | ($3,038) |
| Terra Laguna Beach, Inc. | N/A | $0 | ($14,874) | ($8,628) | ($23,502) |
| | | | | | |
| | | | | **Total:** | **($85,177)** |

82.    As set forth above, only nine (9) of the twenty-three (23) Debtors have managed to maintain a cumulative profit as of the month ending May 31, 2025, and, taken together, the Debtors are operating at an overall net loss.[5]

### K.    The Debtors' Interference With The Cantor Litigation and PDCR Demands

83.    Since 2023, the Honarkar Parties, one of their "Held-Back LLCs" and non-debtor Palm Desert Collective Resorts, LLC ("**PDCR**"), Debtor MOM CA Investco LLC ("**MOM CA**"), and Cantor Group IV, LLC ("**Cantor**") have been parties to a lawsuit pending in the California Court under Case No. 30-2023-01325570-CU-BC-WJC (the "**Cantor Litigation**").

84.    As set forth in the Partial Interim Award and now the Partial Final Award, Cantor is an entity owned and controlled by Continuum Party Deba Shyam, who also owns and controls Continuum. Thus, the Cantor Litigation is one part of the larger litigation between the Honarkar Parties and the Continuum Parties.

85.    The claims and cross-claims asserted in the Cantor Litigation have been administratively stayed pending the outcome of the Arbitration, but, in January 2025, the

---

[5] Notably, the Debtors' revenues as reported in the MORs are substantially lower than the revenues that the Debtors generated when Mr. Honarkar was the Administrative Manager for all of the Debtors three years ago.

California Court lifted this stay to allow one of the Honarkar Parties' and PDCR's causes of action against Cantor to go forward, as it is unrelated to the issues raised in the Arbitration.

86.     This cause of action against Cantor relates to a certain deed of trust and assignment of rents (the "**Cantor Deed of Trust**") recorded against PDCR's properties, which has placed a $5.5 million cloud on title with respect to such properties, that the Honarkar Parties are seeking to cancel on the basis that the Cantor Deed of Trust was forged and fraudulently recorded.[6]

87.     The California Court scheduled the trial on the cancellation of the Cantor Deed of Trust for June 30, 2025 (the "**Trial**"), and this was the only matter set to go forward at the Trial.

88.     On June 25, 2025, just before 9:00 a.m. (PT), the Honarkar Parties' litigation counsel received an email from the Debtors' special counsel, Bienert Katzman Littrell Williams LLP ("**BKLW**"), notifying the Honarkar Parties that MOM CA would be moving *ex parte* to request a 60-day continuance of the Trial. A true and correct copy of this email correspondence is attached hereto as Exhibit C.

89.     Shortly thereafter, BKLW submitted the *ex parte* application (the "**Ex Parte**") with the California Court, a true and correct copy of which is attached hereto as Exhibit D.

90.     On June 26, 2025, the Honarkar Parties filed their opposition to the Ex Parte (the "**Ex Parte Opposition**"), and MOM CA filed its reply in support of the Ex Parte (the "**Ex Parte Reply**"). True and correct copies of the Ex Parte Opposition and the Ex Parte Reply are attached hereto as Exhibit E and Exhibit F, respectively.

---

[6] The Cantor Deed of Trust was recorded just one day after the Honarkar Parties served their demand for books and records on the Continuum Parties. Its timing and purpose were deliberate—it was recorded solely to disrupt the operations of the properties and to prevent Mr. Honarkar from securing the funds necessary to pursue the litigation that was anticipated to follow.

91.     The Honarkar Parties were surprised by the Ex Parte, as the Trial had been scheduled for months, and none of the Debtors are parties to the only matter going forward at the Trial: the cancellation of the Cantor Deed of Trust.

92.     The Debtors' asserted justification for their request to continue the Trial just three (3) business days before it was scheduled to begin is that over a month ago, sometime around May 20, 2025, the Debtors learned through a news article that there may have been a "refinancing" of the first-priority loan secured by PDCR's properties, and that, under the terms of the Asset Contribution Agreement (the "**ACA**") executed in connection with the Joint Venture, this "refinancing," if it in fact occurred, automatically caused PDCR to be contributed to the Joint Venture and to become a wholly-owned subsidiary of MOM CA.

93.     However, the Debtors concede in their Ex Parte that the Honarkar Parties provided to the Debtors on May 30, 2025, at their request, documents demonstrating that the transaction at issue was an assignment, not a refinancing.[7]

94.     More importantly, the Debtors' Ex Parte does not even mention or acknowledge the Partial Final Award at all, including the Arbitrator's findings that PDCR is a Held-Back LLC retained by the Honarkar Parties, that the ACA on which the Debtors are attempting to rely was procured by fraud and without consideration, and that, as a result of the Continuum Parties' prior material breaches of the MOM Investcos' operating agreements, Mr. Honarkar is excused of any further duty to perform thereunder. *See* Partial Final Award, p. 41.

---

[7] The Honarkar Parties expressly reserve and preserve all of their rights with respect to PDCR and the Debtors' allegations regarding this purported "refinancing," including the rights to oppose or challenge or to seek a protective order in response to any discovery requests and to contest the applicability and/or enforceability of any agreements or other documents that purport to deem PDCR a contributed entity on any grounds. The Honarkar Parties further expressly reserve and preserve all potential claims against Debtors for the ongoing interference with PDCR's operations.

104310678.5

95.     To make matters worse, after the Ex Parte was filed, Mr. Honarkar received a letter on June 25, 2025 (the "**June 25 Demand Letter**") from the Debtors' Independent Manager demanding that Mr. Honarkar produce various documents and information related to PDCR by close of business on June 27, 2025 based solely on the assumption that MOM CA is now the owner of PDCR. A true and correct copy of the June 25 Demand Letter is attached hereto as <u>Exhibit G</u>.

96.     As set forth more fully in the Ex Parte Opposition, the Debtors' entire position hinges on the unsupported claim that PDCR is now a contributed entity pursuant to the terms of an agreement that the Arbitrator has conclusively and preclusively found was induced by fraud and is unenforceable. In their Ex Parte Reply, the Debtors focus solely on the fact that the Honarkar Parties have not yet exercised rescission, and ignore the Arbitrator's findings that the Honarkar Parties have no further duty to perform due to the Continuum Parties' prior material breach.

97.     Thus, while the Debtors claim to "respect" the Arbitrator's findings, they simultaneously attempt to enforce the very agreements that have been indisputably found to be the product of fraud. At the same time, they purport to "acknowledge" rescission, but argue that Mr. Honarkar cannot yet exercise it because the accounting has not been completed. This asserted barrier to rescission is particularly disingenuous given that the accounting depends, at least in part, on the Debtors' own cooperation and participation.

98.     Unfortunately, despite the flaws in the Debtors' arguments, the California Court granted the Ex Parte and rescheduled the trial in the Cantor Litigation for September 8, 2025. A true and correct copy of the minute order granting the Ex Parte is attached as <u>Exhibit H</u>.

99.     The only parties who benefit from this continuance are Cantor and, by extension, the Continuum Parties. The Honarkar Parties' cause of action to cancel the Cantor Deed of Trust is not asserted by or against any of the Debtors, and the cancellation would finally relieve PDCR

104310678.5

of an unlawful and fraudulent encumbrance that the Honarkar Parties have been fighting against for years. Only the Continuum Parties' interests, and not the interests of PDCR, are served by continuing the Trial and delaying justice to the PDCR and the Honarkar Parties.

100.    Moreover, if PDCR has been contributed to the Joint Venture (which it has not), then that would make the MOM Members indirect partial members of PDCR (which they are not). Thus, by asserting that PDCR may have been contributed to the Joint Venture, the Debtors are putting forth an argument that, while ultimately unsuccessful, would give the MOM Members and the rest of the Continuum Parties access to and partial ownership of PDCR, furthering the Continuum Parties' theft and fraud to the exclusive detriment of the Honarkar Parties.

101.    This is not the first time that the Debtors have acted in disregard of the Arbitrator's findings and harmed the Honarkar Parties as a result. Indeed, the Ex Parte is reminiscent of the filing of Terra's Chapter 11 Case, which was filed without the Honarkar Parties' prior knowledge or consent notwithstanding the Arbitrator's clear and unambiguous award in the Honarkar Parties' favor on their declaratory relief claim that Terra (along with the other declaratory relief entities, including PDCR) was never contributed to the Joint Venture and instead wholly retained by the Honarkar Parties. *See generally*, Terra Dismissal Motion.

102.    Furthermore, and notably, while the Ex Parte was submitted by BKLW as MOM CA's special counsel, this Court approved BKLW's retention as the Debtors' section 327(e) counsel only in connection with the Arbitration, *not* the Cantor Litigation. That is, the Debtors sought to retain, and the Court approved the retention of, BKLW to provide the following services:

     a.   Advise the Debtors with respect to matters related to the Arbitration;

     b.   Represent the Debtors in any proceeding or hearing in the Arbitration or, to the extent necessary and appropriate, before this Court as it relates to the Arbitration;

    c.  To assist Debtors' general bankruptcy counsel, if and when requested, with respect to any matter impacting the Debtors' reorganization and/or estates as it relates to the Arbitration;

    d.  File any motions, applications, or other pleadings as may be necessary or appropriate to protect the interests of the Debtors with respect to the Arbitration; and

    e.  Perform any and all other legal services necessary to represent the Debtors with respect to the Arbitration.

*See Application of Debtors Pursuant to 11 U.S.C. § 327 and Fed. R. Bankr. P. 2014 and 2016 for Authorization to Employ and Retain Bienert Katzman Littrell Williams LLP as Special Counsel Effective as of April 11, 2025* [Docket No. 315], ¶ 19; *Order Authorizing Debtors Pursuant to 11 U.S.C. § 327 and Fed. R. Bankr. P. 2014 and 2016 for Authorization to Employ and Retain Bienert Katzman Littrell Williams LLP as Special Counsel Effective as of April 11, 2025* [Docket No. 499] ¶ 2 ("Pursuant to section 327(e) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to employ BKLW as counsel in these cases on the terms set forth in the Application, the Bisconti Declaration, and the Shinderman Declaration, effective as of April 11, 2025.").

103.    The Honarkar Parties' cause of action to cancel the Cantor Deed of Trust is not related to the Arbitration, which is why the California Court lifted the administrative stay to allow the claim to go forward, and, as such, the Debtors' Ex Parte does not fall within the scope of BKLW's approved retention. To the contrary, the Ex Parte goes directly against the Arbitration and the Arbitrator's findings therein. Thus, the Ex Parte was not only an attack on the Partial Final Award, but disregarded the limited scope of BKLW's representation authorized by this Court.

### L.    <u>The New Specialty DIP Amendment Motion</u>

104.    Late on June 25, 2025, just hours after the Debtors filed the Ex Parte in the Cantor Litigation and after the Independent Manager sent the June 25 Demand Letter, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Amend the*

104310678.5

*DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 583] (the "**New DIP Amendment Motion**"), renewing their request to amend and expand the Specialty DIP Loan.

105.    As of the filing of this Motion, the Debtors have not filed any motion to shorten the notice period for the New DIP Amendment Motion. Yet, the Debtors noticed the New DIP Amendment Motion for the June 30 hearing, with a purported objection deadline of Sunday, June 29 at 5:00 p.m. (ET).[8]

106.    Because the New DIP Amendment Motion was just filed, the Honarkar Parties have not yet had an opportunity to complete their review of the new proposed terms for the Specialty DIP Loan, and the Honarkar Parties reserve all rights with respect to.

107.    However, it does not appear that the Debtors have cured the fatal flaws raised in the Honarkar Parties' Original DIP Amendment Objection. To the contrary, the Debtors' renewed request to amend the Specialty DIP Loan pursuant to the New DIP Amendment Motion is, incredibly, even worse.

108.    Among other issues, if the proposed amendment is approved, it would now be a condition precedent for Specialty DIP to advance any of the contemplated additional funding, including the funding for the forensic accounting, that the Court enter an order approving the Tesoro Sale Motion by June 30, 2025, "which order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended (in whole or in part)." *See* DIP Amendment § 2(j).

---

[8] On June 26, 2025, the Debtors filed the agenda for the June 30 hearing, on which the Debtors apparently intended to include the New DIP Amendment Motion. *See* Docket No. 584. However, the agenda lists the same name used as a placeholder for the never-filed Golden East DIP motion on the agenda for the now-adjourned June 23 hearing, not the actual name of the New DIP Amendment Motion. The only difference is the inclusion of the docket number for the New DIP Amendment Motion. The Honarkar Parties reserve all rights to oppose the New DIP Amendment Motion going forward at the June 30 hearing.

104310678.5

109.    However, as noted above, the Honarkar Parties intend to contest the approval and closing of any sale of the Tesoro Property.

110.    Thus, the additional financing proposed to be provided by Specialty DIP is nothing short of illusory, and is yet another improper attempt to finance and force through the approval of the Tesoro sale while holding the accounting process hostage.

111.    With no one other than the Continuum Parties and their associates willing to finance these Chapter 11 Cases, and given that the only financing options proposed by the Debtors have all been subject to and conditioned upon the improper sale of the Tesoro Property, it is clear that the time has come for these Chapter 11 Cases to either be dismissed or converted to chapter 7.

## RELIEF REQUESTED

112.    The Honarkar Parties seek entry of an order either dismissing these Chapter 11 Cases or converting them to cases under chapter 7 for cause pursuant to section 1112(b) of the Bankruptcy Code because: (i) the Debtors' estates are suffering a substantial and/or continuing loss without any reasonable likelihood of rehabilitation, (ii) the Debtors are administratively insolvent and have not presented any viable proposal for postpetition financing, and (iii) all of the highly unusual circumstances surrounding these Chapter 11 Cases overwhelmingly support and demonstrate that dismissal or conversion is the only path forward.

## BASIS FOR REQUESTED RELIEF

**A.    The Court Should Dismiss Or Convert The Chapter 11 Cases Pursuant To Section 1112(b)(4).**

113.    Section 1112(b) of the Bankruptcy Code provides that a bankruptcy court "shall" either convert a chapter 11 case to a case under chapter 7 or dismiss the case, "whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment

… of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added).

114.    Section 1112(b)(4) lists sixteen examples of what constitutes cause for dismissal or conversion, but this list is non-exhaustive. *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012). As such, this Court has wide discretion in determining whether cause exists to dismiss or convert a chapter 11 case. *In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999).

115.    One of the enumerated examples of cause under section 1112(b)(4) is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

116.    Here, the Debtors' estates are suffering substantial losses that are very likely to continue if the Debtors remain in bankruptcy, and the Debtors do not have any reasonable likelihood of rehabilitation in bankruptcy.

### 1.    The Debtors' Estates Are Suffering Continuing Losses.

117.    Since the Continuum Parties fraudulently induced the Honarkar Parties to enter into the Joint Venture, and stole the SPEs and the Properties from the Honarkar Parties in the process, the Continuum Parties grossly mismanaged the MOM Investcos and the SPEs. As set forth in the Partial Final Award, the Continuum Parties repeatedly converted the Debtors' assets, encumbered them with unlawful and invalid debts, and failed to pay nearly all of the SPEs' mortgages. Then, just one week after the entry of the Partial Interim Award, the Continuum Parties unilaterally appointed the CRO and Independent Manager and caused the MOM Investcos to file for bankruptcy, all without the Honarkar Parties' prior knowledge or consent.

118.    Despite all of this, and despite the Honarkar Parties' multiple requests to the contrary, from the commencement of the Chapter 11 Cases, the CRO and Independent Manager

have allowed the Continuum Parties and their affiliates and associates to remain in control of most of the Debtors and the Properties. As a result of the Continuum Parties' ongoing mismanagement, the Hotel Laguna has been embroiled during the pendency of these Chapter 11 Cases in multiple allegations that it is operating in violation of California law, the Tesoro Property has continued to maintain a historically low occupancy rate, and the Honarkar Parties are continuing to field numerous complaints from the tenants at the Properties.

119.     Rather than adequately address any of these issues, the Debtors have been preoccupied with attacking and engaging in vexatious litigation tactics against the Honarkar Parties. They have incurred millions of dollars in fees and expenses in opposing the Honarkar Parties' request for limited stay relief to proceed with the Arbitration, serving the Honarkar Parties with multiple discovery requests, moving to reject the Honarkar Parties' agreements with the Debtors, pursuing sales of all of the Properties over the Honarkar Parties' objections, and repeatedly attempting to enforce the terms of the Joint Venture agreements that have been adjudicated as procured by fraud. What the Debtors have <u>not</u> done is serve the Continuum Parties with any discovery requests, commence any adversary proceeding or litigation against the Continuum Parties, seek to move forward with the derivative claims in the Arbitration, or even begin the accounting process. All of the Debtors' actions, and inaction, in these Chapter 11 Cases have one thing in common: they serve the interests of the Continuum Parties.

120.     Thus, it is no surprise to the Honarkar Parties that the vast majority of the Debtors have been operating at a net loss, and that all of the Debtors, collectively, have been losing more money than they have been making, as set forth in the MORs. However, while not surprising, this is nevertheless deeply troubling and disappointing to the Honarkar Parties, who know the true value and the potential profit that can be realized by all of the Properties if managed properly.

121.    If the Debtors were to remain in chapter 11, they will only continue to incur more losses and administrative expenses that they cannot afford.

### 2.    The Debtors Lack Any Likelihood of Rehabilitation in Chapter 11.

122.    As the Debtors have stated since the commencement of these Chapter 11 Cases, they require financing in order to achieve any successful reorganization or rehabilitation. However, the only financing that the Debtors have been able to receive to date has been from Specialty DIP.

123.    Although the Debtors are now seeking to increase this financing from Specialty DIP, this additional financing is just an illusion, as it is expressly conditioned upon this Court's approval of the Tesoro sale, which the Court cannot and should not approve.

124.    The Debtors' financial proposals reveal their intent to use any financing as leverage to push through approval of the Tesoro sale. This is because the Debtors' sole strategy in these Chapter 11 Cases is, and has always been, to sell all of the Properties before the Honarkar Parties can effectuate rescission. This is despite the fact that the Honarkar Parties delivered to the Debtors the Plan Term Sheet, and have endeavored multiple times to reach an agreement with the Debtors on a path forward in these Chapter 11 Cases. Rather than meaningfully engage with the Honarkar Parties, the Debtors have insisted on pursuing their sale process.

125.    However, the Honarkar Parties have objected to the sales of the Properties, and for all of the reasons set forth in the Honarkar Parties' Sale Objections, the Honarkar Declaration, and the Adversary Proceeding, none of the Properties can be sold without the Honarkar Parties' consent. The Honarkar Parties intend to proceed with their objections and to contest the approval and/or closing of any sales of the Properties.

126.    Because the Debtors should not and cannot be able to sell any of the Properties, which has been and continues to be their exclusive focus in these Chapter 11 Cases, they have no

plan of rehabilitation that has any reasonable likelihood of being successful. As such, and given the continuing losses to the Debtors' estates, the Debtors' time in chapter 11 must end.

**B.**    **The Court Should Dismiss Or Convert The Chapter 11 Cases Because The Debtors Are Administratively Insolvent.**

127.    Courts have also held that a debtor's administrative insolvency constitutes cause for purposes of section 1112(b). *See, e.g.*, *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) ("Although section 1112(b)(4) does not list administrative insolvency as cause to convert or dismiss a chapter 11 case, a court may still consider this factor. Courts have converted cases, in part, on the basis of administrative insolvency.") (internal citations omitted); *See also In re Grasso*, 497 B.R. 448, 456 (Bankr. E.D. Pa. 2013), *aff'd sub nom. Grasso v. Madison Cap. Co.*, No. CIV.A. 13-4308, 2014 WL 1281123 (E.D. Pa. Mar. 31, 2014) ("Madison successfully established that the Debtor's estate is suffering a continuing loss as evidenced by the fact that it is presently administratively insolvent. The administrative insolvency of the Debtor's estate also established the absence of a reasonable likelihood of rehabilitation.").

128.    By the Debtors' own admission, without immediate additional financing, the Debtors lack the funds to cover payroll or their professionals' fees, maintain their insurance, and pay property taxes. Indeed, the Debtors represented to the Court at the June 10 hearing that they would likely run out of liquidity within the next ten (10) days. Thus, the Debtors are administratively insolvent, and will continue to be insolvent without an immediate influx of cash.

129.    However, the Debtors have not been able to secure any additional financing other than from their insider Specialty DIP, and the only offer that the Debtors have from Specialty DIP is contingent upon the approval of the Tesoro sale, which should not and cannot be granted. And to the extent the Debtors propose any alternative financing that will simply be used to finance the improper sales of the Properties, the Honarkar Parties intend to oppose any such financing.

104310678.5

130.    Thus, the Debtors are administratively insolvent, and remaining in chapter 11 will only further deepen their administrative insolvency. This constitutes a separate, independent cause to dismiss or convert these Chapter 11 Cases.

C.    **The Unusual Circumstances Of These Chapter 11 Cases Overwhelmingly Support Dismissal Or Conversion.**

131.    Once a court determines that cause exists under section 1112(b), the court "shall" convert or dismiss the case, whichever is in the best interests of creditors and the estate, unless "the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." *See* 11 U.S.C. § 1112(b)(2). To be sure, there are highly unusual circumstances present in these Chapter 11 Cases, but these circumstances weigh heavily in favor of, not against, dismissal or conversion.

132.    As set forth in the Chapter 11 Trustee Motion and in the Stay Relief Motion, these Chapter 11 Cases are unusual in the sense that the Honarkar Parties did not come into the cases with mere allegations against the Continuum Parties. Instead, the Chapter 11 Cases were filed fresh off the heels of the Partial Interim Award, in which the Arbitrator found definitively in the Honarkar Parties' favor on nearly all of their asserted direct and derivative claims following nearly two years of litigation, a three-week long evidentiary hearing, and pre- and post-hearing briefing.

133.    The Arbitrator's findings on the Honarkar Parties' direct claims are now set forth in the Partial Final Award, which is final as to liability and constitutes *res judicata* as to all parties to the Arbitration. *See, e.g.*, *Cal Sierra Dev., Inc. v. George Reed, Inc.*, 14 Cal. App. 5th 663, 678 (2017) ("For purposes of res judicata, even an unconfirmed arbitral award is the equivalent to a final judgment."); *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 579 (2005) ("[W]e perceive no reason why the … claim preclusion rule should not be made available to a defendant … sued on a conspiracy and aiding and abetting theory where plaintiff has already arbitrated or

34

litigated against the direct tortfeasor and lost."); *Thibodeau v. Crum*, 4 Cal. App. 4th 749, 759 (1992) ("[I]n several cases, the courts have viewed an unconfirmed arbitration award as the equivalent of a final judgment."); *In re Khaligh*, 338 B.R. 817, 828 (B.A.P. 9th Cir. 2006), *aff'd*, 506 F.3d 956 (9th Cir. 2007) ("The consensus within the California appellate courts is that an unconfirmed arbitration award may be 'sufficiently firm' as to warrant issue preclusion …[.]").

134.    Nevertheless, the Debtors repeatedly undermine the Partial Interim Award and now the Partial Final Award to enforce agreements that the Arbitrator found were the result of fraud and lacked any consideration. Despite the Arbitrator's finding that the Continuum Parties materially breached the terms of the Joint Venture, thereby excusing the Honarkar Parties from any further performance, the Debtors accuse the Honarkar Parties of somehow being the ones in breach without any factual or legal basis. This conduct should not be countenanced by the Court.

135.    To make matters worse, the Debtors have completely aligned themselves with the Continuum Parties and have used the increasingly limited resources of the Debtors' estates to take actions against the Honarkar Parties and in furtherance of the Continuum Parties' interests. This is what the Debtors did when they spent months opposing the Honarkar Parties' Stay Relief Motion, where the only other objectors were the Continuum Parties and Nano (*i.e.*, the Respondents in the Arbitration). This is also what the Debtors did by seeking a continuance of the Trial in the Cantor Litigation and by baselessly asserting control over PDCR, from which acts only the Continuum Parties stand to gain. As noted above, if PDCR was contributed to the MOM Investcos (which it was not), then that would mean that the MOM Members are indirect members of PDCR (which they are not). Thus, the Debtors are only trying to further damage the Honarkar Parties and take what are rightfully their assets and effectively give them to the Continuum Parties.

104310678.5

136.    The conspicuous timing of the Debtors' interference with the Cantor Litigation and their demands with respect to PDCR is not lost on the Honarkar Parties. The Ex Parte was filed and the June 25 Demand Letter was sent just hours before the Debtors filed the New DIP Amendment Motion. So, the day that the Debtors suddenly acted to give the Continuum Parties a "win" in the Cantor Litigation is the same day that Mahender Makhijani and Specialty DIP came back to the table after previously withdrawing their prior financing offer on June 9. This was also the same day that the MOM Members suddenly filed their statement in support of the Property sales after being silent in these Chapter 11 Cases since their separate bad-faith chapter 11 cases were dismissed nearly two months ago. This all begs the question of whether the Debtors took these recent actions solely to appease Specialty DIP and, by extension, Mahender Makhijani, and whether the MOM Members knew that all of this was coming and were poised to join forces yet again with the Debtors at the same time.

137.    All of these unusual circumstances demonstrate that allowing the Debtors to remain in chapter 11 is against the best interests of their estates and their creditors. Rather than allow the Debtors to remain on this destructive path, conversion to chapter 7 will allow a truly independent and impartial chapter 7 trustee to come in and take the reigns and to finally perform the accounting that is so desperately needed and already awarded to the Honarkar Parties. Alternatively, if the Chapter 11 Cases are dismissed, then the Honarkar Parties can immediately move for the appointment of a receiver, as contemplated in the Partial Interim Award, which receiver could efficiently and effectively manage the Properties and perform the accounting.

138.    Accordingly, only the dismissal or conversion to chapter 7 of these Chapter 11 Cases is in the best interests of the Debtors' estates and their creditors.

## CONCLUSION

139.    In sum, given the continuing losses suffered by the Debtors' estates, and the absence of any viable plan of rehabilitation, as well as the Debtors' administrative insolvency, dismissal or conversion is the only remaining option in these Chapter 11 Cases. Whether in the form of a chapter 7 trustee or a court-appointed receiver, what the Debtors require now is an independent, impartial third-party to come in and oversee the Debtors and the Properties and to perform the accounting while the Arbitration and the confirmation proceedings before the California Court go forward. This is the only way to reveal the full extent of the Continuum Parties' fraud and misconduct, and to allow the Honarkar Parties to realize their rights and remedies afforded to them under the Partial Final Award. Rather than allow the Debtors to remain in control and to continue to run these Chapter 11 Cases for the benefit of the Continuum Parties, dismissal or conversion will benefit all of the Debtors' legitimate creditors. Thus, the Court should immediately dismiss or convert these Chapter 11 Cases.

## RESERVATION OF RIGHTS

140.    The Honarkar Parties expressly reserve and preserve all rights with respect to these Chapter 11 Cases and to seek or pursue any additional or other forms of relief in these Chapter 11 Cases. The Honarkar Parties further expressly reserve and preserve all rights and remedies with respect to the Arbitration and the claims asserted therein, including, without limitation, all rights to exercise their remedies with respect to their claims or to otherwise pursue such remedies.

141.    Finally, to the extent any assets are sold out of the Debtors' estates, the Honarkar Parties fully reserve all rights to include the amounts of such sales in their calculation of damages that will come out of the Arbitration. Nothing in these Chapter 11 Cases can or should be deemed to mean or imply that the Honarkar Parties have consented to the sale of any assets and/or waived

104310678.5

any of their rights in the Arbitration, including, without limitation, with respect to the amount or calculation of damages. The accounting and ultimate damages award to be issued by the Arbitrator will dictate the amount of damages due to the Honarkar Parties and no actions taken in these Chapter 11 Cases constitute a waiver of such rights and remedies in the Arbitration.

**NOTICE**

142.    Notice of this Motion has been given to (i) counsel to the Debtors; (ii) the Office of the United States Trustee for the District of Delaware; (iii) the Debtor's 30 largest creditors, and (iv) all parties entitled to receive notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Honarkar Parties submit that no other or further notice is necessary.

104310678.5

**WHEREFORE**, the Honarkar Parties respectfully request entry of an order: (i) either dismissing or converting the Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code; and (ii) granting the Honarkar Parties such other and further relief that the Court deems necessary or appropriate.

Dated: June 27, 2025
       Wilmington, Delaware

**POLSINELLI PC**

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

Elisa Hyder (admitted *pro hac vice*)
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 267-3001
Facsimile: (215) 267-3002
ehyder@polsinelli.com

*Counsel to Mohammad Honarkar and*
*4G Wireless, Inc.*

104310678.5