# WHISTLEBLOWER NOTIFICATION

Enterprise Bank and Trust has been misrepresenting the facts since 2023 on these investor calls.

INFORMATION MANIPULATION = STOCK MANIPULATION

HUGE BANKRUPTCY CASE WITH ENTERPRISE BANK LYING ABOUT ITS COLLATERAL PROPERTY

Hold these executives accountable!!! They are lying to the public! It is against the law.

*2025 JUL 23 A 9:45*
*CLERK*
*US BANKRUPTCY COURT*
*DISTRICT OF DELAWARE*

## STOCK MANIPULATION WITH IMPROPER DISCLOSURE??????

### Investor Call April 29, 2025

Jim Lally, Doug Bauche, Keene Turner, and Scott Goodman misrepresenting the facts on a public investor call since 2023. Q1 2025 Doug Bauche stated ...properties in Bankruptcy were "well performing" and that the dispute was "unforeseen."

A Brief filed BANKRUPTCY COURT - June 9, 2025 by Enterprise Bank

"Some of these properties generating little to no revenue" Page 5 of the brief. Eric Sutty of Enterprise Bank CERTIFIED that the properties were LOSING MONEY. EBT executive management stated the COMPLETE OPPOSITE on the Q1 2025 earnings call!

How can the Attorney's for Enterprise Bank claim one thing in Bankruptcy Court and the Management Team for the bank claim the complete opposite in PUBLIC on the quarterly earnings call just one month earlier to the INVESTING public of the bank? Maybe Jim Lally can introduce Eric Sutty to Doug Bauche so they can all get their story straight.

Lying on the Investor Call to Public Investors is a crime! These Executives are willing to lie on the Investor Call, then it is NO SURPRISE they are also guilty of working with Nano Bank to commit fraud against Mo Honarkar. This needs to be investigated by the Securities and Exchange Commission. Lying on a public investor call is against the law.

Where the HELL are the State and Federal Bank examiners????? FDIC needs tolook into this complete disaster!

Is Enterprise Bank cooking the company books? I wonder what else they are hiding on the Balance Sheet? Keene Turner is misrepresenting the facts on the investor call stating this matter is "short term." How does the bank not have a reserve for this?

Is the bank purposely delaying loan downgrades in the loan portfolio so the financials will appear to the investing public like everything is ok? Where are the bank examiners? FDIC, SEC, State Regulators, Institutional Investors, do YOUR job and hold these executives responsible for the statements that they make in PUBLIC!!!

Did Enterprise Bank monitor and collect all financial information according to the Business Loan agreements for all these loans held in Bankruptcy? How liable is the bank in this mess?

How credible is this management team going forward? Will they continue to lie going forward on the Quarterly earnings calls? Next earnings call in last week in July 2025!

These trends aided a continued reduction in the overall cost of deposits to 1.83%, a 17 basis point drop in the quarter.

Another strength of our company is our well-positioned balance sheet, which provides for great flexibility with respect to capital planning. Capital levels at quarter end remained stable and strong, with our tangible common equity to tangible assets ratio at 9.30%. Despite TCE well above 9%, we still delivered 14% return on tangible common equity for the first quarter.

Our strong return profile aided continued expansion in tangible book value per common share to $38.54, an annualized quarterly increase of 14%. Given the strength of our earnings and our confidence in our continued execution, we increased the dividend by $0.01 per share for the second quarter of 2025 to $0.30 per share and returned another $11 million to common shareholders in the quarter through share repurchases.

Additionally, we were able to utilize our demonstrated experience in M&A by further leveraging our excess capital through the strategic branch acquisition we announced. To complement our organic growth, yesterday, we announced our agreement with First Interstate Bank to acquire 10 branches in Arizona and 2 in Kansas City. With this purchase comes approximately $740 million of favorably priced commercially oriented relationship-based deposits and approximately $200 million of related commercial loans. This purchase is highly strategic and supports our growth strategy of expanding our strong positions in attractive markets.

The large majority of these loans and deposits are in Arizona, a market we know well and have had tremendous growth and success in recent years, and it provides us physical presence in the Southeast Valley of Phoenix, Pinal County as well as in Tucson. These locations and markets fit extremely well with the position we have built over the last 15 years in Arizona, and we're very excited to further our commitment to this market and to capitalize on a rare opportunity given the complexion of the banking landscape in Arizona.

This acquisition is a low-risk, shareholder-friendly way to leverage our proven strength in acquiring and integrating organizations. For us, this is a highly strategic fit for both the types of businesses and relationships that we bank and the types of employees who serve them well. This acquisition supports our objectives of growing our balance sheet to deliver top-quartile returns and consistently deliver compounding tangible book value. When completed, this opportunity will immediately leverage a modest amount of TCE in capital and will also produce attractive EPS accretion in 2026 and beyond. We anticipate closing and converting by the early fourth quarter of this year.

Before we discuss the performance of our markets and businesses, I would like to address the increase in NPAs in the quarter. This is related to several loans that are linked through a common ownership and located in our Southern California market. You need to know that we are well prepared for situations like this one, and I'm confident that this matter will be resolved favorably. Doug and our experienced resolution management team are personally involved in resolving this matter, and I anticipate that we'll receive full repayment of these loans. I remain highly confident in Enterprise's risk management process and in the strength of our loans and assets.

Now I'd like to turn the call over to Scott Goodman, who will provide an update on our performance in our markets and national businesses. Scott?

**Scott R. Goodman**
*President*

Thank you, Jim, and good morning, everyone.

Expanding a bit more on Jim's comments regarding loan production. Loan activity was generally healthy with originations for the quarter up nearly 40% from Q1 of the previous year. Loan balances by category are broken out on Slide 6, showing the net growth for the quarter and for the trailing 12 months.

Lastly, Slide 11 profiles the mix of our core deposit base, which continues to be well diversified and highly relationship-oriented with roughly 1/3 of these accounts being noninterest-bearing and 90% of them using some form of treasury management or online banking. They provide strong continuity and a solid base from which to expand other fee-generating revenue streams.

Now I would like to hand the call over to Keene Turner for his comments. Keene?

**Keene S. Turner**
*Senior EVP & CFO*

Thanks, Scott, and good morning, everyone.

Turning to Slide 12. We reported earnings per share of $1.31 in the first quarter on net income of $50 million. That's a $0.03 increase over the linked quarter for which earnings per share was $1.28. On an adjusted basis, earnings per share was relatively stable at $1.31 in the current quarter. Adjusted EPS excludes the impact of core conversion-related expenses and gains and losses on the sale of OREO and securities.

One of the highlights of the quarter was the increase in net interest income. Our disciplined pricing of loans and deposits benefited net interest income, along with growth in average loans and securities. These actions more than offset the impact of fewer days in the quarter and the repricing of variable-rate loans. Noninterest income was also strong to start the year, although it did decline from the fourth quarter, which is typically the highest quarter of the year.

The provision for credit losses decreased from the linked quarter due to lower growth in a net recovery on loans. As Jim noted, while nonperforming loans have increased due to the relationships in bankruptcy, we did not reserve for those loans as we fully expect to collect related balances. Noninterest expense was slightly higher in the quarter as a seasonal increase in compensation and benefits was mostly offset with the decrease in conversion costs related to the core system migration in the fourth quarter.

Turning to Slide 13 with more details to follow on 14. To me, the highlight of the first quarter is how well we were able to manage net interest income. First and foremost, we were able to mitigate 2 fewer days in the quarter. There isn't one single factor that led to this performance. However, we were able to largely replace seasonal deposit outflows to maintain the size of the balance sheet. For the last several quarters, the investment rate for securities has been favorable, and we've been adding to those balances in order to strengthen our earnings profile.

Also, from a business perspective, we have had success in repricing loans better than we had anticipated, while also improving the pricing on our deposit balances. The origination rate for new loans was 7.12% in the quarter, and we were able to drive deposit rates down another 10 basis points to 1.82% at the end of the first quarter. The combination of those factors has led to better than planned net interest margin in this first quarter. Starting off the year with a 4.15% net interest margin has set the stage for slightly stronger net interest income performance for 2025.

With that said, we do expect to see modest erosion of margin during this year. With recent variability in interest rates in recent weeks, it's difficult to assume that we would face the same strength in reinvestment rates throughout 2025. However, we will continue our efforts to mitigate expected pressure on net interest margin with continued discipline on pricing performance on both sides of the balance sheet. As for net interest income dollars, day count is now in our favor for the remainder of 2025.

Slide 15 reflects our credit trends. We had a net recovery of $1.1 million compared to net charge-offs of $7.1 million in the linked quarter. The provision for credit losses declined to $5.2 million in the period compared to $6.8 million in the linked quarter due to changes in loan growth and the net recovery.

Nonperforming assets were 72 basis points of total assets compared to 30 basis points at the end of the year. The temporary increase in the nonperforming asset ratio was primarily related to 2 relationships with common general partners that went into bankruptcy due to a business dispute. We are well secured with collateral and individual guarantees and fully expect to collect each of the underlying loans, and we expect NPAs to return to normalized level in the next couple of quarters.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the maximum data that we have when rates were rising. So those things help to stabilize margin as do the proactive steps we took on boosting the size of the investment portfolio and getting some durable earnings there. So we feel pretty good about stable margin. And I would say the margin declination that I referred to is self-inflicted, but an opportunity to manage the share count and equity part of the capital stack here in the coming couple of quarters.

**David Joseph Long**
*Raymond James & Associates, Inc., Research Division*

Got it. Great. No, I appreciate that color. And then on the credit side of things, Keene, I think you called these new nonperforming loans temporary. What is the timing of the process to exit these credits? Or what's your best guess on how that plays out to exit those without any losses?

**Douglas N. Bauche**
*Senior EVP & Chief Credit Officer*

Yes. David, it's Doug Bauche. I'll comment on that. And listen, due to the bankruptcy, I think it's difficult for us to predict the specific timing of the resolution of these particular loans. I think what we can just do is kind of reiterate, right, our position that we're in today relative to loan to values and recourse to these sponsors and our confidence to be able to collect. I can tell you, David, I went out, personally visited each and every one of these properties. And then we've, of course, engaged independent third-party appraisals that we just got here in March.

So listen, absent a dispute, these properties, these loans would be well performing. They're occupied. They're well positioned. They're in a very attractive Laguna Beach market. So this dispute was unforeseen. It's unfortunate. But we'll have to let things play out here in the bankruptcy proceedings and in due process, due time, I think we're going to have a very favorable outcome.

**Operator**

[Operator Instructions] And our next question comes from Brian Martin with Janney.

**Brian Joseph Martin**
*Janney Montgomery Scott LLC, Research Division*

Keene, it sounds like just fair to say, given your -- the outlook on margins, just even into next year, if we're kind of thinking about things where rates are and maybe a couple of cuts here and the margin is still well above 4% in terms of even longer term than kind of the near-term comments you've made. Does that seem fair based on kind of the positioning of the balance sheet and kind of your rate outlook today?

**Keene S. Turner**
*Senior EVP & CFO*

That is accurate.

**Brian Joseph Martin**
*Janney Montgomery Scott LLC, Research Division*

Got you. Okay. Perfect. And then just in terms of the pro forma cap, I think you said with the transaction, where is your expectation in terms of where the TCE lands in the fourth quarter? I think -- I don't remember if you said what that was.

**Keene S. Turner**
*Senior EVP & CFO*

Yes. Brian, it's going to be dependent on how much we're after the common stock, but sort of 8.5% is where we think it is. It leverages TCE roughly 100 basis points and the other capital ratio is sort of around the same amount, just slightly under. So we think it's a really nice way to rightsize capital and also strategically expand the business and add to EPS, all that stuff. So -- and that's, in my opinion, with where we're seeing pricing and opportunities gives us a chance to still manage some share count.

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, hereby certify that on June 9, 2025 I caused a true and correct copy of the foregoing *Objection of Enterprise Bank & Trust to Debtor's Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* to be served upon the attached 2002 service list by U.S. Mail.

/s/ Eric M. Sutty
Eric M. Sutty (No. 4007)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MOM CA Investco LLC, et al.,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 25-10321 (BLS)<br>)<br>) (Joint Administration Requested)<br>)<br>) Re: Docket No. 475 |

## OBJECTION OF ENTERPRISE BANK & TRUST
## TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO AMEND THE DIP CREDIT AGREEMENT AND (II) GRANTING RELATED RELIEF

Enterprise Bank & Trust (the "Enterprise Bank"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the motion of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for the entry of an order (i) authorizing the Debtors to Amend the DIP Credit Agreement and (ii) granting related relief [Docket No. 475] (the "Motion"). In support of the Objection, Enterprise Bank respectfully states as follows:

### INTRODUCTION

1.    These cases have reached a crossroad. Over the past three months, the Debtors and their professionals have spent over $5 million dollars in considering, analyzing and negotiating

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], and 837 Park Avenue, LLC [3229]. The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660. For purposes of this representation, Hotel Laguna, LLC is represented solely by Potter Anderson & Corroon LLP and is not represented by Buchalter, A Professional Corporation.

SPE real properties will be sold, whether in this Court or otherwise, all while the costs and loss in value resulting from the same will be borne by the respective Debtor.

5.  On the other hand, approval and closing of the Tesoro sale will generate over $15 million in unencumbered sale proceeds from which the expenses and fees in the proposed budget for the amended DIP Loan can be paid. It will further generate proceeds which will support Debtors' future efforts to sell more property and recognize additional value from the real estate holdings.

6.  The problem for Debtors' DIP motion is that in either scenario, the request for authorization to borrow is premature and may be unnecessary.

7.  The Motion seeks authority to borrow $14.5 million in additional funds to pay for expenses that have not and/or need not be incurred until the success of the sale process is known. Currently, the Debtors' focus of time and money should be on the sale of the real estate properties and the generation of unencumbered sale proceeds, which may eliminate the need for borrowing. Likewise, the need to borrow to repay the DIP Loan or to fund a Professional Fee Escrow Account should be deferred until the Debtors' sale efforts, developed and conducted by those professionals, are concluded.

8.  Moreover, under these extremely unusual circumstances, the DIP Lender is not an ordinary DIP lender, but instead an aggregation of insiders and guarantors using a loan under Section 364 as a vehicle to mitigate their personal exposures on loans or any damage claim under the arbitration award. Not surprisingly, that the terms of the amended DIP Loan provide the DIP Lender with inappropriate influence confirm this is not an ordinary or appropriate DIP Loan.

9.  Enterprise Bank does not want its objection to be interpreted as a hard and fast position that it opposes any funds to the Debtor or its professionals. Rather, it urges the Debtors

3

 (f) Heisler Laguna, LLC owns seven separate adjacent retail and residential parcels located in Laguna Beach originally purchased by the owner for redevelopment of a boutique hotel; and

 (g) 777 at Laguna, LLC, 891 Laguna Canyon Road, LLC, and Laguna Art District Complex, LLC are owners of separate adjacent parcels of real estate located on Laguna Canyon Road comprising a 63,967 square foot, mixed-use, commercial, residential, school and event center located in Laguna Beach (the "Laguna Arts District").

12. Each of the Enterprise Bank Debtors is a single asset debtor. Except as to the four properties within the Laguna Arts District and the Heisler Laguna parcels, each property operates on a stand-alone basis. The properties are not inter-dependent. They can and should be managed separately. Some of the properties generate little to no revenue. Each is individually financed and, except as to the Laguna Arts District properties, there is no cross-collateralization. Simply stated, there is no synergy resulting from common ownership of these properties within a single "portfolio."

13. On May 1, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (II) Granting Related Relief* [D.I. 316] (the "Final DIP Order"). The Final DIP Order authorized the Debtors to borrow up to an aggregate principal amount of $5 million. The Final DIP Order obligates the Enterprise Bank Debtors, among others, for borrowed funds that did not benefit those entities or their properties. The Debtors now move to amend the DIP Credit Agreement to borrow up to an aggregate principal amount of $14.5 million and to add provisions that are unnecessary and prejudicial to creditors of each of the Enterprise Bank Debtors.

## OBJECTION

**A. The Budgeted Costs Are Unnecessary; Borrowing is Unnecessary or Premature**

14. These cases are the consequence of an "equity" dispute between two warring groups claiming ownership of the SPE debtors. The Debtors have already incurred substantial

5

this stage of the cases that the best chance for maximization of value of the Debtors' assets is through the Debtors' sale process.

17. However, of the requested $14.5 million in borrowed funds, the Debtors intend to spend only $2.5 million for the operating expenses of the Borrowers. Instead, the majority of the borrowed funds are to be spent on items that have no impact on the sale of the real estate assets. For example, $3,000,000 is to be allocated to the costs incurred in the conduct of forensic accounting. Such an accounting exercise, while important to the equity dispute and to the Debtors' efforts to identify and pursue claims for the diversion of assets or to disallow illegitimate claims, is of no asserted benefit to the sale process and the recovery by the real property lenders on their secured claims (which continue to accrue interest and fees)[2].

18. In addition, the Debtors seek to borrow $3.0 million to park in the Professional Fee Escrow Account. This amount is in addition to the $3.5 million in previously borrowed funds that have already been deposited into that same escrow account. Understanding that professionals do not work for free, Enterprise Bank did not oppose the earlier funding of the escrow while awaiting the Debtors' review and negotiations of their options and the implementation of their exit strategy. To this point, Enterprise Bank, despite the dissipation of its cash collateral through use or theft and the impairment of its loans, has received no payment. It has patiently awaited payment dependent upon the Debtors' successful sale of its properties. The Debtors' professionals, having determined how and where to spend their time and effort, including the development and implementation of the recently noticed sale process, and having already received funds and/or payment, should be

---

[2] Enterprise Bank opposes the bankruptcy estates' borrowing or expenditure of any funds now or in the future which benefit either the Honarkar Parties or the parties behind the DIP Loan. If, for example, the work product of the forensic accountant will be available or used by either the Honarkar Parties or the arbitration defendants for the purpose of calculating the arbitration damage award, they should pay for it.

7

Debtors. See e.g., *Objection of Mohammad Honarkar and 4G Wireless, Inc. to Debtors' Motion for Order (I) Establishing Procedures for the (A) Sale of Real Estate Free and Clear of All Liens, Claims, Encumbrances, and other Interests; (B) Assumption and Assignment of Executory Contracts and Unexpired Leases of Non-Residential Real Property; and (II) Granting Related Relief*, (Dkt. No. 455), ¶¶ 3, 4 and 28; *Complaint for Declaratory Judgment, Imposition of Constructive Trust, and Turnover of Property*, (Dkt. No. 454), ¶ 66. This presents a gating issue. If the Court lacks jurisdiction to approve a sale of the real property assets, neither does it have jurisdiction to approve borrowings or grant liens against those same properties.

23. Furthermore, if the real estate assets are not property of the relevant bankruptcy estates, as asserted by the Honarkar Parties, those assets are not protected by the automatic stay and Enterprise Bank, and the other real property lenders, are free to pursue foreclosure, receivership appointments and other remedies under their loan documents.

C. **The DIP Lender is not Extending the Loan in Good Faith; the Proposed DIP Loan Levers the Cases and Restricts the Debtors' Business Judgment**

24. The DIP Lender is not extending financing in good faith. First, the DIP Lender is comprised of and controlled by individuals who have personal exposure under guarantees to the real estate lenders and/or potential exposure to the Honarkar Parties for damages under the arbitration award. While their interests appear to be aligned with those of the real estate lenders in supporting the sale of the real estate assets, they are using the DIP Loan as a vehicle to disguise real equity contributions which are of singular or primary benefit to the individuals behind the DIP Lender. The use of such a vehicle to infuse equity may not be objectionable by itself, but the insertion of overreaching and wholly inappropriate provisions requires heightened scrutiny of their good faith.

9

(g)     baseless reason to threaten to withhold funding or terminate the DIP Loan if its backers disagree with the Debtors' decisions.

(g) Section 7.15(c) requires the Debtor to consult with the DIP Lender regarding the sequencing of the sales and closing, the allocations of the sale prices and the target sales prices. Providing the DIP Lender, an insider, with such access and opportunity, under threat of default, to influence is unnecessary and inappropriate in light of the Debtors' fiduciary obligations to their creditors (and as to which the DIP Lender has none).

(h) Section 7.15(d), through the use of undefined "distributees," is an unnecessary provision intended to by the DIP Lender to influence, impede or affect the timing of distributions of sale proceeds.

(i) As a condition precedent to the loan, the Debtors must reach an agreement subordinating the claims of Cantor Group IV, LLC, Cantor Group V, LLC Coastline Santa Monica Investments, LLC and Coastline Loans, LLC to all the administrative expenses claims. Amendment, Section 5.01(g). The relationships between these parties and the DIP Lender backers are undisclosed. Neither the status nor the terms of such an agreement has been provided. Nor does it appear that the settlement requires notice to creditors and court approval.

(j) The release in Section 11.10 should be stricken. Because of the insider participation in the DIP Lender and the history of self-dealing as found in the arbitration award, it is inappropriate. Short of deletion of the entire release, any officer, director or employee of the DIP Lender who is a guarantor of any loan or the subject of any finding by the arbitrator, should be removed as a released party.

26. Even if these provisions were found in other cases, they are improper and inequitable here for at least two reasons: (a) they erode and prejudice the rights and interests of senior real estate lenders in their collateral; and (b) they grant to the disguised equity holders, guarantors and arbitration defendants leverage and the ability to block the Debtors from exercising their business judgment and pursuing strategies that are in the best interests of the creditors of the individual and separate Debtor estates.

### D.    Joint and Several Liability Is Unfair and Inappropriate

27. Regardless of whether or how much consideration in the form of loan proceeds is received, each Debtor, other than Terra Laguna, will be jointly and severally liable for the full

11

What constitutes lying:

- False Statements: Providing inaccurate figures or information about the company's financial performance or prospects.
- Material Omissions: Failing to disclose information that could significantly influence an investor's decision.
- Misleading Guidance: Providing inaccurate or overly optimistic financial forecasts. 🔗

In essence, lying on an earnings call constitutes a form of securities fraud, a serious offense with potentially devastating consequences for both the individuals involved and the company as a whole. Transparency and accuracy in communications with investors are essential for maintaining market integrity and avoiding legal trouble. 🔗

When an executive lies in an earnings call, it can lead to severe consequences, including financial penalties, legal ramifications, and damage to the company's reputation. Investors can quickly punish the company, and the stock price may plummet.

Here's a more detailed look at the potential outcomes:

### Financial and Legal Consequences:

#### Stock Price Decline:
Investors can react negatively to perceived deception, leading to a sharp drop in the company's stock price.

#### Fines and Penalties:
The Securities and Exchange Commission (SEC) can impose fines and other penalties for misrepresenting facts on financial statements.

#### Criminal Charges:
In some cases, lying on earnings calls can lead to criminal charges, including perjury and securities fraud.

#### Whistleblower Awards:
Whistleblowers who report such misconduct can receive significant financial awards from the IRS.

EBT has been misrepresenting the facts since 2023 on these investor calls.

 Sign in

Search for news or symbols

**David Long**

Got it. Great. No, I appreciate that color. Thank you. And then on the credit side of things, Keene, I think you called these new non-performing loans temporary. What is the timing of the process to exit these credits? Or what's your best guess on how that plays out to exit those without any losses?

**Douglas Bauche**



## yahoo/finance   Sign in

**Douglas Bauche**

Yeah. David, it's Doug Bauche. I'll comment on that. And listen, due to the bankruptcy, I think it's difficult for us to predict the specific timing of the resolution of these particular loans. I think what we can just do is kind of reiterate, right, our position that we're in today relative to loan to values and recourse to these sponsors and our confidence to be able to collect.

I can tell you, David, I went out, personally visited each and every one of these properties. And then we've, of course, engaged independent third-party appraisals that we just got here in March. So listen, absent a dispute, these properties, these loans would be well performing. They're occupied. They're well positioned. They're in a very attractive Laguna Beach market. So this dispute was unforeseen.

It's unfortunate. But we'll have to let things play out here in the bankruptcy proceedings and in due process, due time, I think we're going to have a very favorable outcome.



finance.yahoo.com